# Volume I.    Exhibits 1-10
# (Deposition Transcripts)

Exhibit 1:      Brian Edwards Deposition Transcript
Exhibit 2:      Brian Edwards 30(b)(6) Deposition Transcript
Exhibit 3:      Delray "Paco" Jones Deposition Transcript
Exhibit 4:      Kristopher Cooper Deposition Transcript
Exhibit 5:      Kenny Marchant Deposition Transcript
Exhibit 6:      Arthur Briggs Deposition Transcript
Exhibit 7:      Cindy Stewart Deposition Transcript
Exhibit 8:      Starkie Cornett Deposition Transcript
Exhibit 9:      Ron Nieters Deposition Transcript
Exhibit 10:     Kelly Triplett Deposition Transcript

# Exhibit 1:
# Brian Edwards Deposition Transcript

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF WYOMING

3

4    STARKIE CORNETT,                      )
                                           )
5         Plaintiff,                       )
                                           )
6    V.                                    )  22-CV-00034
                                           )
7    PARK COUNTY BOARD OF COUNTY           )
     COMMISSIONERS and PARK COUNTY )
8    ROAD AND BRIDGE DIVISION OF           )
     THE PUBLIC WORKS DEPARTMENT,    )
9                                          )
          Defendants.                      )
10   _____)

11
     March 13, 2024
12

13   Remote oral deposition of Brian Edwards
     conducted via Zoom in the State of Wyoming,
14   commencing at 1:10 p.m. on the above date,
     before Barbara Morgenweck, Registered
15   Professional Reporter, Realtime Reporter and
     Notary Public.

16

17               MORGENWECK COURT REPORTING

18                    307.250.0220 ph

19               Barbcourtreporter@gmail.com

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

 3   On behalf of the Plaintiff:

 4
     Marshall E. Keller
 5   KELLER LAW FIRM, PC
     116 N 5th St
 6   Thermopolis, WY 82443
     (307)864-2318
 7   Marshall@kellerlawpc.com

 8
     On behalf of Defendant:
 9

10   Thomas A. Thompson
     MaryBeth Oatsvall
11   WYOMING LOCAL GOVERNMENT LIABILITY POOL
     6844 Yellowtail Road
12   Cheyenne, Wyoming 82009
     (307) 638-1911
13   (307) 638-6211 Facsimile
     Tthompson@lglp.net
14

15

16

17

18

19

20

21

22

23

24

25
```

1                        <u>EXAMINATION INDEX</u>

2

3                                              PAGE:

4    Brian Edwards:

5          Examination by Mr. Keller          4

6          Examination by Mr. Thompson       71

7

8                        <u>INDEX TO EXHIBITS</u>

9

10   EXHIBIT:        DESCRIPTION              PAGE:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BRIAN EDWARDS,

2   Having first been duly sworn, testified as

3   follows:

4                          EXAMINATION

5   BY MR. KELLER:

6     Q.    Mr. Edwards, were you listening in on

7   the depositions yesterday?

8     A.    Yes, I was.

9     Q.    And so you heard that in regards to the

10  oath that you're now sworn under oath and

11  there's -- that has a certain meaning to it?

12    A.    Yes, I understand that.

13    Q.    What does it mean to you that you are

14  now under oath?

15    A.    That I need to tell the truth, nothing

16  but the truth, and that I would be subject to

17  perjury if -- could potentially be subject to

18  perjury if I did not tell the truth.

19    Q.    I just want to reiterate a couple rules

20  here, make it easier for the court reporter as

21  well as helps prevent a little bit on the

22  argumentative side of things.  So let's try not

23  to talk over each other and give a pause

24  after -- wait for a pause when someone is

25  speaking and then try to answer.  Would you

Page 5

1    agree to do that?

2    A.    Yes, I agree to that.

3    Q.    You'll have to forgive me.  I am not as

4    smooth on a lot of my questions as Mr. Thompson

5    is, so -- but we will go ahead get started,

6    okay?

7    A.    Sounds good.

8    Q.    What is your -- where do you work?

9    A.    I work for Park County Government.

10   Q.    That's in Wyoming?

11   A.    Yes.

12   Q.    What is your position?

13   A.    My position is county engineer.

14   Q.    What -- as county engineer, what does

15   that job entail?

16   A.    It entails several things.  Probably

17   difficult to say everything, but I view it as I

18   am the engineer for the county, and that means

19   not just for road and bridge or landfill or

20   anything else.  I do a lot of different things

21   for other departments as well.  Get called in

22   for different situations, but on a daily basis,

23   I am responsible for managing the Public Works

24   Department, which consists of the Engineering

25   Division, the Solid Waste Division, and then the

Page 6

1  Road & Bridge Division.

2     Q.    As management, does that include

3  supervisory role?

4     A.    Yes, sir, it does.

5     Q.    Who reports to you directly in the Road

6  & Bridge Department?

7     A.    Currently, in my office that would be

8  the operations coordinator, which is John

9  Trapper Marsh, Whitney Weidenborner.  Don't ask

10  me to spell her last name, please.  Ben

11  McDonald, who is our project manager, and Mike

12  Thompson, who is our sign technician.  They all

13  report to me directly, and then within the road

14  and bridge crew, the road and bridge foreman for

15  Cody, which is Louis "Chip" Ash, reports to me.

16  In the Powell road and bridge crew, Delray Paco

17  Jones reports to me, and then our mechanic,

18  Jason Showalter, he reports to me as well.  Then

19  within the solid waste division, the solid waste

20  division manager, Travis Ball, he reports to me

21  as well.

22     Q.    How long have you been with Park County?

23     A.    It will be ten years this September.

24     Q.    What is your education?

25     A.    I have a bachelor of science degree in

1    civil engineering from University of Wyoming.

2    Then I lack a class or two from having my

3    master's degree in engineering from the

4    University of Arkansas.  Graduated from Kelly

5    Walsh High School in Casper.

6       Q.    And besides working for Park County, did

7    you work anywhere else prior?

8       A.    Yes, I did.

9       Q.    Who was that with and how long?

10      A.    How far back would you like me to go,

11   sir?

12      Q.    You can just give a quick rundown --

13   well, let me ask you this -- let me back up.

14   When did you graduate from University of

15   Wyoming?

16      A.    December 1991.

17      Q.    Who did you work -- did you go right to

18   grad school after graduating from UW?

19      A.    No, I went to grad school part-time

20   while I was full-time employed.

21      Q.    Who were you full-time employed with?

22      A.    Soon as I got my degree, I hired on with

23   James L. Grant and Associates in Hot Springs,

24   Arkansas, and their main office was in Denver,

25   Colorado.

Page 8

1    Q.    How long did you work there?

2    A.    Roughly six months, and then I can

3    explain why, but, yeah, it was a pretty short

4    situation.

5    Q.    Who did you work for after -- who did

6    you go to next?

7    A.    I went to Genesis Environmental

8    Consulting based in Little Rock, Arkansas.

9    Q.    What was your length of time with them?

10    A.    So that would have been the summer of

11    1992 until spring 2023, so however long that is;

12    about 11 years, I think.

13    Q.    After Genesis Environmental, who was

14    your next employer?

15    A.    At that point, I broke off and started

16    my own engineering and consulting company,

17    called Edwards Engineering.  It was based in

18    North Little Rock, Arkansas.  And I also had an

19    office in Jonesboro, Arkansas.

20    Q.    Now at what point did you come back to

21    Wyoming?

22    A.    That would have been December 2008.

23    Q.    Was that work for another employer?

24    A.    Yes, it was.

25    Q.    Who was that?

1    A.     Holm, Blough and Company.  H-O-L-M,

2    Blough is B-L-O-U-G-H, and Company.  They're

3    based in Cody -- they were based in Cody at the

4    time.

5    Q.     Then from there, Road & Bridge?

6    A.     Yes, sir.

7    Q.     So you mentioned that foremen for Road &

8    Bridge work for you.  What is their job

9    description?

10   A.     Each of them have a geographical area

11   that they're responsible for within the county,

12   and the county -- the Cody district is a little

13   bigger.  It involves Clark, Meeteetse, Crandall

14   area, and then the Powell area is Eastern Park

15   County, probably about halfway between Cody and

16   Powell.  There is territorial areas within that

17   they're responsible for managing their

18   individual crews on a daily basis.  Everything

19   from daily maintenance, which is mostly what

20   they do, but we also do some projects as well,

21   but they're responsible for executing those and

22   usually on routine maintenance, they actually

23   direct those activities.

24   Q.     Are they also in charge of training?

25   A.     Yes, they are.  Well, if I could qualify

Page 10

1    that, as it relates to equipment, that is

2    correct.  We do some coordination on the safety

3    side of things with MSHA training, CPR, we go to

4    an annual Safety Congress.  Our office does

5    coordinate that type of training.

6    Q.    Why is it that you need MSHA training?

7    A.    Because we have gravel pits that the

8    county does own, and then we also have private

9    gravel pits or gravel pits owned by or managed

10   by BLM or Bureau of Rec, and we often work to

11   get those pits as far as acquiring gravel or

12   road materials, and my understanding is that

13   it's gray as far as whether or not it is

14   required.  We do it just because it is a very

15   good safety program and it's just another way to

16   make sure our employees are trained in the areas

17   of safety.

18   Q.    MSHA ever inspect your pits?

19   A.    They have not since I have been here.

20   Not the county pits, I will say that.

21   Q.    You don't know about the private pits

22   that you work with?

23   A.    I don't.  I believe I have heard that

24   one of them had been inspected by -- when I say

25   MSHA, it is through the State, Department of

Page 11

1   Workforce Services or state equivalent of MSHA.

2   I was told that one of them got inspected at one

3   point.

4      Q.    Who evaluates the skill levels of the

5   Road & Bridge employees?

6      A.    That would be the Road & Bridge foreman,

7   sometimes the assistant foreman.  Yes, that is

8   who does it.  The case of the landfill, the

9   solid waste manager, I will say that.

10     Q.    Is there a set standard for each piece

11  of equipment for evaluation?

12     A.    Not that I'm aware of.  Probably varies

13  by Road & Bridge foreman.

14     Q.    Is there any documented best practices

15  for operating the equipment?

16     A.    Nothing that I'm aware of that Park

17  County has generated.

18     Q.    Is it the foreman that also recommended

19  advancements?

20     A.    That is correct.  I will say they

21  recommend to me, and then I make the

22  recommendation to the commissioners.

23     Q.    Is there a -- is it a set standard for

24  the recommendations when employees can be

25  recommended for advancement?

1          MR. THOMPSON:  Objection to form.

2     BY MR. KELLER:

3      Q.    Is there a -- so let me -- I am going to

4     ask that again, because it was a confusing

5     question.

6          MR. KELLER:  Thanks, Tom.

7     BY MR. KELLER:

8      Q.    So when -- for recommendation -- for

9     advancement to -- let me back up.

10         Is -- actually, I'll save it for a

11    little bit later.  Save that question for later.

12         So Ralph -- was Ralph [sic] Nieters a

13    foreman?  I mean, Ron?

14     A.    Yes.  Ron Nieters, yes, he was.

15     Q.    He worked for you?

16     A.    Yes, he did.

17     Q.    How long did he work for Road & Bridge?

18     A.    I don't have the exact date, but it was

19    over 35 years.  I was told it was kind of the

20    only job he had ever had.

21     Q.    Do you believe Ralph -- or I mean, Ron,

22    was a -- Ron Nieters was a qualified

23    knowledgeable foreman?

24     A.    As a foreman, yes, good operator too.  I

25    had to think on the foreman because we had

```
 1  difference of opinion on a few things, but yes,
 2  he was good at what he did.
 3      Q.    Did you value his opinion?
 4      A.    I certainly did, yes.
 5      Q.    Mr. Nieters, he had also trained
 6  employees?
 7      A.    Yes, he did.  To my knowledge, he did,
 8  yes.
 9      Q.    When he made recommendations for
10  advancement and the qualifications of employees,
11  did you believe that -- did you believe in his
12  opinion?
13          MR. THOMPSON:  Objection to form, vague.
14          THE WITNESS:  Yes, I did, and do value
15  Ron Nieters' opinion as it relates to
16  advancement.
17  BY MR. KELLER:
18      Q.    Did you have any reason to doubt Ron
19  Nieters' opinions in regards to advancement?
20          MR. THOMPSON:  Same objection.
21          THE WITNESS:  No, I had no reason to
22  doubt his recommendation.
23  BY MR. KELLER:
24      Q.    Did Ron Nieters make a recommendation
25  for advancing Ms. Cornett?
```

Page 14

1    A.    Yes, he did.

2    Q.    Did you have any reason to doubt that

3    recommendation?

4    A.    No, I did not.

5    Q.    So I want to ask you a little bit about

6    Mr. Delray Jones.  How long has Mr. Jones worked

7    for the Park County Road & Bridge?

8    A.    If I could refer to the summary table

9    real quick.  This is one of your exhibits.

10    Q.    Are you talking about Exhibit 13?

11    A.    Yeah, it is the matrix that has

12    everybody's name on it, hire dates and wages.

13    Q.    Well, we will go ahead and pull up

14    Exhibit 13 then.

15    A.    Could you please repeat the question?

16    Q.    How long had Delray Jones been with the

17    Park County?

18    A.    As of today?

19    Q.    Well, let's -- I guess we will pick as

20    of fiscal year 2018?

21    A.    Boy, I would have to do a little math

22    there.  He hired on November 4, 2002, so not

23    very quick with math.

24    Q.    So would you -- is it safe to say that

25    by fiscal year 2018, he had been with Park

Page 15

1    County for approximately 16 years?

2    A.    That looks about right, yes.

3    Q.    Do you know what his experience was

4    prior to coming to Park County?

5    A.    My understanding is that he worked at

6    various construction occupations and for various

7    companies.  I do know that he spent a little

8    time working for Harris Construction, and that I

9    know he did a lot of concrete work.  You know,

10   the way of framing and finishing concrete.

11   That's -- I generally know of his qualifications

12   before that time.  He was there when I got

13   there.

14   Q.    And so would it be safe to say, then,

15   that Mr. Nieters had more experience than Delray

16   Jones by 2018?

17   A.    Yes, he did.

18   Q.    So when it comes to seeking advancement,

19   you stated that there was no set standard,

20   correct?

21   A.    There is -- it does vary by department.

22   No set standard, that is correct.

23   Q.    That -- but you relied on the opinion of

24   whoever the foreman is that is making the

25   recommendation?

1    A.    I do, and when I say there is no, I

2    guess, plan, we do have a grade/step scale plan

3    that we all are aware of, and we all have to

4    work within, but that is about the extent of it.

5    Q.    That grade/step scale, that is what

6    we're seeing here on this Exhibit 13?

7    A.    Not entirely, but it is referenced

8    there, that's correct, grade/steps.

9    Q.    Can you explain the grade/step?

10   A.    I can.  So the grade defines a person's

11   position and their duties, and for example, in

12   the Road & Bridge Department, and in the Solid

13   Waste Division, Grade 12 is Operator I, and

14   Grade 15 is Operator II, and a Grade 17 is

15   Operator III.  You can see the Road & Bridge

16   foremen are Grade 24.  The steps, I think you

17   asked me that too, on the steps, so within each

18   grade there are a number of steps, and that

19   number of steps has changed at least twice since

20   I have been with the county in the way of like

21   splitting the number of steps.  So sometimes it

22   is a bit hard to keep up with that, but that is

23   a commissioner decision.  Steps is how you move

24   up within your specific grade, okay?

25   Q.    So since we're on this Exhibit 13, I

1  want to stick with it here, I guess.  So the --

2  we're talking about there is a Bates stamp

3  number down at the corner, 01908, and is this a

4  report that you generated?

5  A.    Yes.

6  Q.    Is this something you use in your normal

7  daily business?

8  A.    Yes, it is.

9  Q.    So can you explain what the purpose of

10  what this report is?

11  A.    Yes, I can.  The reason I put this

12  together is, you know, I always get questions

13  and things from various staff or employees and,

14  you know, it just naturally seems to work out.

15  I have never been one to talk about my wages,

16  but everybody generally knows when you work for

17  the government, everybody knows each other's

18  wages.  And so what I do here, and I feel like

19  part of my role when I am meeting with the Road

20  & Bridge foremen, or the Solid Waste Division

21  manager is to make sure that if we are advancing

22  someone, say in the Powell crew, that, say the

23  Powell foreman wants to move up, I have to make

24  sure that by moving him up, we're not -- him or

25  her -- moving that person up, that we're not

1    incorrectly stepping them over somebody say in

2    the Cody crew that has more experience and

3    skills.  So I do that every year at budget time,

4    usually the spring.  This is usually something

5    that only myself.  I have a similar one for

6    solid waste, the landfills, but myself and the

7    Road & Bridge foremen, we sit down and go over

8    this every spring.

9    Q.    So you're saying you use this to

10   reference to make sure you're not stepping over

11   other people's skills.  So where do you get the

12   information about what their skill level is?

13   A.    From the Road & Bridge foremen, from the

14   Cody district foremen and the Powell district

15   foremen.

16   Q.    Again, there is no testing done or

17   recording of whether that for that step and

18   grade, is there?

19   A.    Not by me, no.

20   Q.    So would you say it is fairly subjective

21   as to whether or not someone actually qualifies

22   for that step and grade?

23        MR. THOMPSON:  Objection to form.

24        THE WITNESS:  I would disagree with

25   that, and mainly because the road, these foremen

1  worked with these individuals every day, and so

2  they know what their skill level is.  Them being

3  experienced operators having worked within the

4  Road & Bridge Division for many years, they have

5  a good idea where everybody is at and what their

6  abilities are.

7  BY MR. KELLER:

8      Q.    So you've never had, say, a

9  recommendation from one foreman, specific from

10  Ralph, or I mean Ron Nieters, about Star

11  Cornett's skill level and that she is ready for

12  Operator II, and did Delray versus Delray's

13  opinion as to whether she is ready or not for

14  Operator II?

15          MR. THOMPSON:  Object to form.

16  Compound, go ahead.

17          THE WITNESS:  I did get a recommendation

18  from Ron Nieters, but contrary to the testimony

19  this morning, I did not get that recommendation

20  from Ron Nieters until around 2019, 2020.

21  BY MR. KELLER:

22      Q.    By 2019, was -- Star was at that time in

23  the Powell shop, wasn't she?

24      A.    I believe so, yes.

25      Q.    I want to get back to this before I get

1  lost here.  So I'm on 13.  We're going back over

2  this now.  When we look at the column that says

3  "Position," you have "Operator III, Mechanic,

4  Operator II, I"; can you explain those

5  designations?

6     A.     Sure.  Within the Road & Bridge Division

7  and the Solid Waste Division, we have basically

8  three levels of operators that have different

9  levels of experience, so an operator skill and

10  ability.  So Operator I is someone that has

11  anywhere from minimal or none experience all the

12  way up to maybe an introductory level of

13  experience operating equipment.  I consider

14  almost maybe a beginner, and then the

15  intermediate level, I consider as an Operator

16  II, and of course, there is job descriptions for

17  these, and then the Operator III, they're pretty

18  skilled and they're able to operate any

19  equipment that we have, generally speaking.  The

20  mechanic Operator III was a position that we

21  actually created.  I can't remember when, but

22  maybe two or three years ago.  That was because

23  we had lost our mechanic, and we -- our mechanic

24  that was hired was having a hard time keeping

25  up, so we hired a, or we moved a person into

Page 21

1    that role in the Powell shop to help our

2    mechanic, our full-time mechanic.  That is all

3    he does.  We also have a mechanic Operator III

4    in the Solid Waste Division as well that

5    basically their job is to do what they can do.

6    If it gets more complicated, we bring in Jason

7    Showalter, who is our main mechanic, lead

8    mechanic.  I guess the other op was the

9    supervisor that I see listed any way.  I think

10   that is self-explanatory.

11      Q.    When I am looking -- so the designation

12   in there, is that -- what point in time

13   because -- well, let me back up.  So when I am

14   looking across this document, we have different

15   fiscal years, correct?

16      A.    Correct.

17      Q.    We have different times and when people

18   started and left the Park County?

19      A.    Correct.

20      Q.    Okay.

21      A.    I will add, these are all people that

22   worked at Park County during my time of

23   employment, so I don't have anybody on here that

24   was -- left prior to my employment with Park

25   County.

1    Q.    Okay.  And that -- so the position

2    designation, what point in time in the

3    employee's career does that designate?

4          If that is confusing, I can try to

5    rephrase it.

6    A.    Yes, could you, please.

7    Q.    Yeah, so we see -- I will give you an

8    example.  So we see Paul Luthy, and he is an

9    Operator III.  So as an Operator III, is that

10   for fiscal year 2024, or would that be for

11   fiscal year 2018?  See if I can look a little

12   bit here.

13   A.    I am not sure when Paul Luthy moved to

14   an Operator III, to be honest.  Based on the

15   wages, it appears likely fiscal year 2022 maybe.

16   I really don't know, but to answer your

17   question, what constitutes somebody, say, moving

18   between levels of, say, an Operator I to a two

19   or a three.  There are a few things where they

20   say, like for an Operator II, minimum of four

21   years of experience and a few other things,

22   which, you know, we do try to consider that, but

23   really, it's when the Road & Bridge foreman

24   feels that that person can get to a level that

25   or can excel within the level that they want to

Page 23

1   be moved up to.

2   Q.    Okay.  I appreciate that, but I want to

3   thank you for that explanation.  I am going to

4   try to clarify my question again a little bit

5   better.  I will get back to that.  I think my

6   question is a little confusing.  So as I am

7   looking at, let's say again, Paul Luthy, we're

8   looking at fiscal year 2018, and I see a 13.71.

9   Is that -- would he have been an Operator III in

10  fiscal year 2018?

11  A.    No, he would not.

12  Q.    And so when I am looking at this,

13  though, that we look at fiscal year 2024, that's

14  highlighted in blue?

15  A.    Yes.

16  Q.    So when it says, "Paul Luthy, Cody

17  Operator III," does that designate where he is

18  currently at in position to where he works for

19  fiscal year 2024?

20  A.    Yes, it does.

21  Q.    Okay.  So if I go down to John Klein and

22  these are slashed out.  Why are they slashed,

23  the lower half, why are they slashed out?

24  A.    These are employees that worked at Park

25  County at some time during my time with Park

Page 24

```
 1  County, but are no longer with the county due to

 2  attrition or whatever reason.

 3     Q.    So it says under John Klein that he is

 4  an Operator II?

 5     A.    Correct.

 6     Q.    Would that have been when his last

 7  fiscal year of employment with Park County?

 8     A.    That is correct.  I believe he moved up

 9  to an Operator II about the same time

10  Ms. Cornett did.

11     Q.    He didn't start out in fiscal year 2017

12  as an Operator II, did he?

13     A.    No, he did not.

14     Q.    So looking at this, he would have made

15  Operator II, say, in fiscal year of 2022?

16     A.    I believe that is correct.  I think it

17  would have been spring/summer of 2021, which

18  would go into effect fiscal year 2022.

19     Q.    Okay.  In fiscal year 2022, is it

20  showing that his rate of pay was $18.17?

21     A.    Yes, it does.

22     Q.    If we go up to Star Cornett's fiscal

23  year of 2022, what was her rate of pay that

24  year?

25     A.    17.90.
```

Page 25

1    Q.    Thank you.

2          He was in the Cody shop?

3    A.    Correct.

4    Q.    What about Phillip Heag?

5    A.    He was also in the Cody shop.

6    Q.    So I want to get back to what you were

7    stating about the descriptions.  You were

8    stating that the -- we were talking about -- let

9    me back up.  You were talking about the

10   descriptions for the operators?

11   A.    Yes.

12   Q.    Okay.

13   A.    Sorry.  Was there an open question

14   there?

15   Q.    No, you answered it.

16   A.    Thank you.

17   Q.    Just for the record, so we can get on

18   before I forget, can we pull up Exhibit 8?

19   Thank you.  And Exhibit 8 here has the

20   descriptions.  Is this the -- what you were --

21   believed the question you were answering -- the

22   form?

23   A.    Correct.  This was the job description

24   for an equipment Operator I.

25   Q.    Then we have a similar job description

Page 26

1    for Operator II?

2    A.    Correct.

3    Q.    And Operator III?

4    A.    Yes.

5    Q.    It's your testimony that that's not a

6    set-in-stone policy.  It's a guideline for

7    recommendations?

8         MR. THOMPSON:  Object to form, misstates

9    his testimony.

10        THE WITNESS:  Could you define the

11   guideline?  I may not quite understand what

12   you're asking there.

13   BY MR. KELLER:

14   Q.    Yeah, let me re-ask that.  So I was

15   trying to break down your explanation so I -- I

16   will let you explain in your own words, again,

17   what you were trying to state about Exhibit 8

18   previously.

19        MR. THOMPSON:  Object to form.  Not a

20   question.

21        MR. KELLER:  Okay.

22   BY MR. KELLER:

23   Q.    What's the purpose of these Exhibit 8

24   job descriptions?

25   A.    So these are county wide.  Every

1  department and division for every position that

2  is a Park County position has job descriptions,

3  and the job descriptions fall within that

4  Grade/Step 6 scale that we were talking about.

5  That basically sets where you are on that grade

6  and step scale, but, you know, whether or not it

7  is a guideline, it is what we hire people into

8  when we're reviewing their qualifications and

9  skills.

10    Q.    Okay.  If a foreman decides that someone

11  is ready based on skill to move up prior to the

12  experience that is listed, you follow the

13  recommendation of the foreman over the job

14  description?

15    A.    I do, yes.

16    Q.    Because that is the only questions I had

17  on that.  I was just trying to clarify that.

18  Sorry for the confusing question.

19    A.    No problem.

20        MR. KELLER:  One second, Tom.  I am

21  going to try to get back to where I was.

22        MR. THOMPSON:  Not a problem, sir.

23  BY MR. KELLER:

24    Q.    So I want to talk a little bit about the

25  hiring/training of Star.  Do you recall when she

1    was hired on as a flagger?

2    A.    Yes, I do.

3    Q.    When was that?

4    A.    I believe it was April 2016.  It was

5    definitely in the spring of 2016.

6    Q.    Mr. Nieters was her foreman at the time?

7    A.    Correct.

8    Q.    He was the one responsible for training

9    Star?

10   A.    He was, him, and I am going to say Mike

11   Thompson, Tommy Thompson, because in a flagger

12   position, Tommy because of his experience, he

13   usually takes on a lot of the coordination and

14   training of the seasonal help as far as

15   flaggers.

16   Q.    Then she became a full-time employee,

17   correct?

18   A.    She did, correct.

19   Q.    Do you recall when that happened?

20   A.    I believe it was November, 2016.

21   Q.    I think it had been brought up before,

22   but I am just going to ask again, so was -- did

23   anybody recommend Star for a step up to an

24   Operator II?

25   A.    Yes, they did eventually, yes.  Not in

Page 29

1   2016.

2      Q.     Okay.  When was the first time she was

3   recommended for Operator II?

4      A.     I am going to say 2019.  That would have

5   been spring 2019.

6      Q.     I want to go back to this Exhibit 13.

7   So Exhibit 13 in fiscal years -- can you explain

8   what the -- when the -- what the fiscal year is?

9      A.     Yes, I can.  Our fiscal years start

10  July 1st and end June 30th.

11     Q.     So would fiscal year of '19, would that

12  have started in July 1 of 2019 or July 1 of

13  2018?

14     A.     It would be July 1 of 2018.  Mr. Keller,

15  if I could, I told you incorrectly.  It was

16  actually 2020 when Ron Nieters recommended Star

17  to be an Operator II.

18     Q.     Was that in that recommendation in

19  writing?

20     A.     No, it was not.

21     Q.     Was that based off of a conversation

22  with Mr. Nieters?

23     A.     Yes, it was.

24     Q.     So would that -- do you recall what

25  month that happened?

Page 30

1    A.    I don't recall which month, but it would

2    have to be April, May timeframe, because that is

3    when we're working on budgets.

4    Q.    So had all the budgeted positions been

5    filled at that point in time?

6          MR. THOMPSON:  Referring to April/May of

7    2020?

8    BY MR. KELLER:

9    Q.    Yeah, let me clarify, so when Ron

10   Nieters, to your memory, made that

11   recommendation of -- in April/May of 2020, were

12   all the budgeted positions filled?

13   A.    I can't answer that.  I would have to do

14   a little figuring.  I believe so, yes, but I am

15   not for sure.

16   Q.    So, I mean, as I am looking at

17   Exhibit 13, you had in fiscal year 2018, am I

18   correct in saying that you had Jason Fields and

19   Bill Sanvold that had left the Road and Parks

20   [sic] at that time?

21         MR. THOMPSON:  Road & Bridge?

22         MR. KELLER:  I mean, Road & Bridge.

23         THE WITNESS:  I apologize.  My sight is

24   not very good, so Jason Fields, he left in

25   fiscal year 2018/2019, or at least his last pay

1   was fiscal year 2018.  Who was the other one you

2   mentioned?

3   BY MR. KELLER:

4       Q.    Bill Sanvold?

5       A.    Yes, his would have been -- fiscal year

6   2018 would have been his last year of

7   employment, so somewhere between '18 and '19,

8   yes.

9       Q.    Okay.  And who filled those budgeted

10  positions?

11      A.    So let me think about that for a second.

12  When Jason Fields left, I am going to say Tim

13  Morrison.

14      Q.    And so then we will go to -- oh, you

15  said one name was -- did he fill both positions

16  budgeted?

17      A.    No, I'm sorry, he did not.  One was in

18  the Powell crew, and one was in the Cody crew.

19  And I believe there was a little bit of a lag

20  there when we lost -- you know, when the

21  position opened up in the Cody crew, but looking

22  here.

23            I believe Paul Luthy was the one that

24  was hired on to fill that spot.

25      Q.    I am going to go to Cindy Stewart.  Am I

1  correct in stating that she left at some time in

2  fiscal year 2019?

3    A.    Yes, I would say that is correct.

4    Q.    We're just looking at the Powell crew,

5  so that would be also the same fiscal year that

6  Dale Hobby left?

7    A.    That is correct.

8    Q.    At that time, that -- is that when

9  Delray Paco moved out of his position and moved

10  into -- I mean, Delray Jones moved into Dale

11  Hobby's position?

12    A.    I believe it was about that time,

13  correct.

14    Q.    The -- so were those budgeted positions

15  filled by someone else?

16    A.    So we had a little bit of shuffling, so

17  Chris Carter moved up to aqua foreman position,

18  which would have been assistant foreman when

19  Delray took over as foreman.  That was Delray's

20  choice, and then we similarly, I am going to say

21  shortly after, Cindy and Dave Williams retired

22  -- Dave Williams from the Cody crew, they

23  retired at the same day.  We had their

24  retirement party at the same time.  But I will

25  say that after that, we hired Greg Torczon and

Page 33

1  Kenny Marchant at the same time.  Kenny Marchant

2  was hired onto the Powell crew.  Greg Torczon

3  hired onto the Cody crew.

4    Q.    Why wasn't Star put in -- moved up into

5  Equipment Operator II position to fill that

6  role?

7          MR. THOMPSON:  What time period are you

8  discussing?

9          MR. KELLER:  We're talking fiscal year

10  of 2020.

11          THE WITNESS:  That was not the

12  recommendation that was provided to me by the

13  Road & Bridge foreman.

14  BY MR. KELLER:

15    Q.    Okay.  You said that Ralph [sic] Nieters

16  had recommended her for advancement to Equipment

17  Operator II, correct?

18    A.    Yes, in 2020, correct.

19    Q.    Now you're saying that she wasn't

20  recommended for advancement to fill that -- to

21  Equipment Operator II.  Who recommended that --

22  who made that recommendation?

23    A.    I am not sure I completely follow your

24  question.

25    Q.    I just -- you said that was not the

Page 34

1  recommendation to bring her up to Equipment

2  Operator II, but you just said Ralph, or Ron

3  Nieters, had made that recommendation.  So where

4  did the recommendation not to advance her to

5  Equipment Operator II come from?

6     A.    There was not a recommendation for her

7  not to move up.  The Road & Bridge foreman at

8  the time did not recommend her to move up, so to

9  my knowledge, I don't even recall discussing

10  that, but that was not presented to me as a

11  viable option at the time.

12     Q.    Okay.  And by that foreman, would that

13  have been Delray Paco Jones?

14     A.    I believe so, yes.

15     Q.    So are you saying that Ron Nieters

16  wasn't qualified to make that observation or

17  recommendation?

18     A.    He was, but he -- at that time he was

19  working in the Cody crew, or he was overseeing

20  the Cody crew, and he did not.  He was mainly

21  worried about his crew and advancing his crew,

22  so he did not make the recommendation to advance

23  her at that time.

24     Q.    So I am a little confused.  When did he

25  make the recommendation?

Page 35

1          MR. THOMPSON:  I think there is

2     confusion about "he."

3     BY MR. KELLER:

4     Q.      When did Ron Nieters make -- I am

5     confused to -- well, when did Ron Nieters make

6     the recommendation?

7     A.      I apologize, I have a hard time with

8     dates.  Sometimes I mess it up.  So Star

9     requested we consider for an Operator II on

10    May 23, 2019.  At that time, I asked Ron Nieters

11    the very next day, May 24th, did he feel that

12    she was ready to become Operator II, and he said

13    she had all the potential.  This is all in my

14    notes that have been provided.  She had the

15    potential, but she just needed time in the seat.

16    So that was as of 2019.  When she was actually

17    recommended to move up was in 2020 for a fiscal

18    year 2021.

19    Q.      Was there a reduction in budgeted

20    positions in Park County?

21          MR. THOMPSON:  What dates?

22    BY MR. KELLER:

23    Q.      Was there -- in fiscal year of 2020, was

24    there a reduction in positions?

25    A.      Not that I remember.  I am cautious of

1    that because I know at one point, Ron Nieters --

2    we had lost our Meeteetse Road & Bridge foreman,

3    and we tried for awhile to not fill that

4    position, but to handle it out of Cody, because

5    budgets were lean at that time, and then also, I

6    can't remember who it was that left.  Delray

7    tried to run one short for awhile in the Powell

8    crew, but again, ultimately we ended up getting

9    those positions back and filling them.

10    Q.    Do you recall if there was in fiscal

11    year of 2020 or fiscal year of 2021, was there a

12    vote by county commissioners to reduce your

13    budget?

14    A.    I'd have to go back and double check.  I

15    believe there was up until from -- I am going to

16    say, up until the point where Star filed her

17    complaint, we had some very lean budget years.

18    One year we cut our budget by 20 percent, so I

19    can't tell you which years, but I could research

20    that and tell you, but it was multiple years

21    that we were asked to cut our operating budget.

22    Q.    Did that include taking away equipment

23    operator positions?

24    A.    No, it did not.

25    Q.    Go to Exhibit 4, and that would be Park

Page 37

1    County Policy Manual.  And I am looking at Bates

2    Park County 01442.  Mr. Edwards, go ahead if you

3    can, just go ahead and review this hiring policy

4    if you can.  Let me know when you're finished.

5        A.    Okay.

6        Q.    So I am looking at the second sentence,

7    and I am going to go ahead and read this to you.

8    "Once a position has been filled and becomes

9    vacant, positions that have been approved in the

10   current fiscal year budget can be filled by the

11   appropriate Elected Official without review or

12   approval of the Board of County Commissioners

13   unless specific action has been taken to freeze

14   hiring within the Park County organization."

15           Did I read that correctly?

16       A.    I believe you did, yes.

17       Q.    Okay.  As far as -- can you explain to

18   me what that first part, where it talks about

19   once a position has been filled becomes vacant,

20   what does that mean to you?

21       A.    What has been explained to me is that

22   when -- is if a position has already been

23   approved and filled, say somebody is occupying a

24   position, if they -- if their employment is

25   terminated, whether they quit or the county

1    terminates their employment, that the elected

2    official or the department head that is running

3    a specific department could fill that position

4    without having to go to the County Commissioners

5    for approval, and that is generally explained to

6    me most of the time that as long as the person

7    that we're bringing in is making the same wage

8    or less than the position that's vacated.  If we

9    are going to pay more, we usually at least

10    bounce it off the commissioners.

11    Q.    Okay.  So you said that the elected

12    official or department head -- did I hear you

13    correctly on that?

14    A.    Correct.

15    Q.    Okay.  You're the department head?

16    A.    Yes, I am.

17    Q.    So if the budgeted position had been

18    left by, say, an equipment Operator III, you

19    could bring in someone for equal or less pay

20    into that position so long as there hasn't been

21    a hiring freeze?

22    A.    Correct.

23    Q.    Okay.

24          That would include bringing someone in

25    as an equipment Operator II into that position?

Page 39

1    A.    Correct.

2    Q.    Was there a hiring freeze in fiscal year

3    of 2020?

4    A.    I would have to go back and double check

5    with the clerk's office.  There was a hiring

6    freeze sometime for 2021, and it lasted at least

7    a year, maybe two years.  We did have some very

8    lean budget times.

9    Q.    So do you have -- let me back up.  So

10   you stated you had had notes regarding Ron

11   Nieters' recommendations for Star to be

12   advanced?

13   A.    I have a note that where I -- where Star

14   came into my office and actually to myself and

15   mentioned it to Ben McDonald, but she

16   specifically asked, she said, "I want to be

17   considered for an Operator II position," and

18   then in my notes, I say it was either that same

19   day or the next day, but I don't have my notes

20   in front of me, but I specifically asked Ron

21   Nieters, is Star ready for an Operator II

22   position?  And his statement to me was, "She has

23   all the potential to do that, but she just

24   needs," his exact words were, "She needs time in

25   the seat," was his response.

Page 40

1    Q.    You made those notes immediately after

2  speaking with Star and Mr. Nieters?

3    A.    Yes, I did.

4    Q.    Was there -- in talking about the hiring

5  freeze, was there an actual memorandum of the

6  hiring freeze?

7    A.    I believe there was an action -- there

8  was a commissioner action and I believe -- I

9  don't know if it was a resolution, but the

10  commissioners took action to initiate a hiring

11  freeze, and then I believe there was a similar

12  action when they decided to cease the hiring

13  freeze.

14         During that hiring freeze, all of the

15  department heads or elected officials had to

16  come in front of the commissioners in public

17  session and explain, you know, justify why the

18  position was needed, and that if possible we

19  would try to go for awhile without them and make

20  sure the position was truly needed.  So we had

21  to sell ourselves that we needed that position

22  during the hiring freeze, and I can't tell you

23  when the hiring freeze was, but it was before

24  2021.

25    Q.    Would that have been in, say, meeting

1  notes, or where would we find that information?

2  Do you know?

3      A.    I could get that from the clerk's

4  office.    That would be in the commissioner's

5  meeting minutes because that was done in open

6  session in front of the Board of County

7  Commissioners.

8      Q.    When was Arthur Briggs hired?

9      A.    He was hired February 11, 2017.

10     Q.    So you stated Star had started as a

11  flagger prior to February 11, 2017?

12     A.    Yes, she did.

13     Q.    So technically, was she with Road &

14  Bridge longer than Arthur Briggs?

15     A.    Yes, she was.

16     Q.    What position did Arthur Briggs start?

17     A.    He started as an Equipment Operator I at

18  the rate of 13.71 an hour.

19     Q.    Who made the recommendation for him to

20  move up to Equipment Operator II?

21     A.    That would have been -- I don't believe

22  Dale Hobby at that point -- that would have been

23  Delray Paco -- Paco Jones.

24     Q.    Was he moved up a grade/step to an

25  equipment Operator II before Star?

Page 42

1    A.    Yes, he was.

2    Q.    Again, was he tested on any equipment

3    prior -- well, actually, let me back up.  What

4    was his experience upon hiring?

5    A.    Rowdi, I think anybody that knows him

6    would tell you he grew up on a farm in an ag

7    environment, and so he was operating large farm

8    equipment in the terms of like combines.  He had

9    a CDL at the time we hired him.  He operated all

10   kinds of equipment related to a farming

11   operation and including large beet trucks, so he

12   was doing that.  And he still does that in his

13   spare time.  But, yeah, mainly farm related,

14   that is why we hired him when we did.

15   Q.    Did you test him on any equipment upon

16   hiring?

17   A.    I did not, no, and I normally don't.

18   Q.    You just go off of the word of the

19   applicant?

20   A.    No, I also go off references when I can.

21        MR. THOMPSON:  Counsel, is this a good

22   time for a break?  We have been going about an

23   hour and 15 minutes.

24        MR. KELLER:  Yes, sounds good.

25        (A recess was taken from 2:27 p.m. until

Page 43

1    2:33 p.m.)

2    BY MR. KELLER:

3        Q.    Mr. Edwards, we are back on the record.

4    So as we were talking a bit about Arthur Briggs

5    and hiring, so I am just going to go down the

6    list because we don't have access to anybody's

7    applications, so Mark Norton, when was he hired?

8        A.    February 14, 2019.

9        Q.    What was in his application -- what was

10   his experience?

11       A.    So he worked for a -- he had some

12   hauling experience in terms of having a CDL, and

13   driving heavy trucks.  He also worked for

14   Northwest Rural Water District where he was

15   responsible for maintaining, you know, water

16   systems, you know, where he would operate

17   backhoe, track hoe, that kind of thing and

18   fixing waterlines or working with waterlines,

19   and then he also worked for the -- I am trying

20   to recall.  He worked for a ranch.  The name of

21   it is slipping me, but he worked for a ranch

22   doing ranch management type activities.

23       Q.    What grade and step was he upon hiring?

24       A.    He was hired on as a Grade 17, Step 3.

25   I'm sorry, that's what he is now.  He was hired

1   on, I would have to double check, it might have

2   been at Operator II, but I can't tell from this.

3       Q.    Do you recall -- well, never mind.  I

4   think we have already asked that.

5             Denny Orrin, when was he hired?

6       A.    He was hired February 6, 2023.

7       Q.    What was his experience upon hire?

8       A.    Been on equipment all of his life on

9   farming type activities, so large trucks, had

10  his CDL, over-the-road type things, large farm

11  equipment, some mechanic capabilities too, but

12  basically born and raised on equipment.

13      Q.    When was Mark Norton hired?

14      A.    February 14, 2019.

15      Q.    What was his experience upon hire?

16      A.    I gave that a minute ago.

17      Q.    Nope, never mind.  It's a double in

18  there.  Sorry.

19            Kenny Marchant.  I keep mispronouncing

20  it.

21      A.    So Kenny hired on at the same time as

22  Greg Torczon, January 28, 2019.

23      Q.    What experience did Kenny have prior to

24  being hired?

25      A.    At the time we hired him, he owned his

1   own reclamation company, Marchant Reclamation,

2   and I knew of Kenny beforehand on some landfill

3   closure projects where he did -- his company did

4   some reclamation work for the county, and so

5   that I kind of knew of Kenny.  Contrary to what

6   was said yesterday, I was not personal friends

7   with Kenny prior to hiring him.  I just knew him

8   professionally, but, yeah, he had operated all

9   kinds of equipment.  I don't believe he had

10  operated a motor grader.  That is why we hired

11  him in as an Operator II.  But he had operated,

12  you know, small dozers.  He had operated, you

13  know, loaders, forklifts, skid steers, trucks,

14  you know, had his CDL and, you know, moving

15  things around, and if you're familiar with the

16  reclamation activities, a little bit of

17  everything:  Little smoothing, leveling,

18  installing, erosion matting, that kind of thing

19  and seeding.  Seeding was the big part of it,

20  seeding equipment.

21    Q.    On his application, did he actually put

22  down that he ran a dozer?

23    A.    I don't believe so.  I think that came

24  out in his interview.

25    Q.    Did he put down that he had run -- he

Page 46

1   was running backhoes on his application?

2      A.    I don't recall.

3      Q.    Greg Torczon?

4      A.    Greg Torczon hired on same time as

5   Kenney, January 28, 2019, and he was also hired

6   on as an Operator II at that time, I believe,

7   and still is.  He had some prior experience and

8   I'd have to go back and check notes on what he

9   did prior to.  He worked in construction, but I

10  can't recall what specifically his background

11  was before this.

12     Q.    I'm sorry.  I didn't mean to step in.

13  What kind of construction?

14     A.    I'd have to go back and re-look at his

15  application/resume.  At that particular time, we

16  interviewed several people.  At the time, I

17  can't recall.  I knew Kenny, but Greg, I can't

18  recall what his specific experience was.  I can

19  look at his application and tell you, but I

20  don't recall.

21     Q.    Tim Morrison?

22     A.    So Tim Morrison, he hired on

23  September 10, 2018, as an Operator III in the

24  Powell crew.  Tim previously, he worked at

25  Vincent Road and Bridge Work, where -- I worked

Page 47

1    --  he was in the military, was one thing, I

2    know that.  Then he -- in Colorado, he did some

3    work with the fire department, heavy trucks,

4    whatnot in the fire department, and then he --

5    his dad was Road & Bridge foreman, so I know he

6    operated equipment with him at that time, and

7    then he hired on with City of Cody and their

8    street department and operated all kinds of

9    different equipment.  He did have some

10   experience on the motor grader, but his

11   experience was not laying out gravel.  I think

12   that is some of the things that Star was

13   referring to.

14      Q.    Michael Lohr.

15      A.    Michael Lohr.  So we hired him on in

16   January 18, 2021, and he was actually hired on

17   as an Operator II, same thing, grew up ranching,

18   farming, and he had a lot of -- I am trying to

19   remember who the company was -- he worked -- a

20   lot of mechanic experience.  I can't remember if

21   he was certified but a lot of mechanic

22   experience, and that was part of why we hired

23   him.

24            And then on the equipment side of

25   things, he had operated, you know, several

Page 48

1    different types of equipment.  Reed, I think,

2    was who he had worked for at the time, but I

3    can't remember specifics.  But he did have some

4    prior experience.

5        Q.    You were mentioning certifications.  You

6    can't recall if he was certified mechanic?

7        A.    I can't recall, no.

8        Q.    Do you recall from on his application,

9    he had any education, say, at a two-year trade

10   school, learning how to be a mechanic?

11       A.    He didn't have that on his application,

12   no.  I believe he did have some training in it

13   though, came out in our interview.

14       Q.    Does he have welding certifications?

15       A.    That, I am not sure of.

16       Q.    Has he -- Michael Lohr, as part of being

17   a mechanic, does he do welding?

18       A.    Not very often, but he does.

19       Q.    Scott Beechler?

20       A.    Scott Beechler.  So he was hired on

21   October 17, 2022, as an Operator III.  And he

22   actually came to us from Iowa, where he was

23   doing very similar work for most of his career

24   as a road and bridge operator.  So he operated

25   everything, lots of experience with motor

Page 49

1    graders to everything.  He came highly

2    qualified.

3     Q.    In regards to all these, I am going to

4    ask again, was there any testing to verify their

5    experience?

6     A.    Not by me, no.

7     Q.    Was there testing so -- let me back that

8    up.  Upon hire, if they are found to not be as

9    competent as they have claimed, what is the --

10   are there any repercussions?

11    A.    That's never happened since I have been

12   here.  Sometimes the pay scale has a way of we

13   can adjust that as far as maybe this person is

14   about right where they're supposed to be and

15   that gap will close between some of the people

16   under him, so we do try to adjust where people

17   are in this every year to evaluate where they're

18   at.  When I say "we," not myself, the two road

19   and bridge foremen, but as far as putting

20   somebody back and demoting them to a lower

21   level, that has not come up since my time at the

22   county.  I have not been informed by either Road

23   & Bridge foremen of any individual that needed

24   to be -- that wasn't as billed, I will say that.

25    Q.    Have you heard of complaints from any

Page 50

1    other operators about new hires not being

2    competent at their job?

3      A.    Just from Star Cornett.

4      Q.    Only Star Cornett?

5      A.    That I recall, yes.  Star Cornett, that

6    I recall.

7      Q.    So as the chief engineer, do you track

8    operational performance of each employee?

9      A.    I don't track it, no.  I don't, but I'd

10   say it is evaluated once a year, at least, for

11   me anyway.

12     Q.    By evaluate, can you explain that?

13     A.    Yes, it is a meeting with Road & Bridge

14   foremen where we talk about how each individual

15   is doing.  Somebody is excelling, really moving

16   ahead, they will point that out, and I would say

17   they will almost beat the table that this person

18   is really a keeper.  It could be work ethic to,

19   you know, just for whatever reason.  Some

20   people, Rowdi is a good example of that, just

21   move up any piece of equipment he gets on, he's

22   just a natural at it.  And so, yeah, those are

23   the kind of conversations we have as how each

24   individual is doing.

25     Q.    When it comes to, say, for example, the

1  operating of the equipment, let's say, a truck.

2  Do you have any way of oper -- you don't monitor

3  or track at all how they're doing in the truck,

4  like, hard stops or, you know, how many cycles

5  of material they are able to run?

6    A.    I don't do that, no.  I will say, we

7  track -- I have that capability because we have,

8  we track what I call almost job cost accounting,

9  where everybody submits their daily work

10 activities, and we know what equipment they are

11 operating, where they are operating, and what

12 project they are using it on, how many hours,

13 that kind of thing.

14         But we do -- so, you know, a lot of

15 times I get called by a commissioner or somebody

16 in the public, how much time or money did we

17 spend on a certain project?  We haven't always

18 had that capability, but the last, say, four or

19 five years, we have been able to do that.

20   Q.    So does that also track hours for each

21 employee on each piece of equipment?

22   A.    It does.

23   Q.    Have you ever done that for Star

24 Cornett?

25   A.    I have not done that, but people in my

1  office entered that information or they used to

2  enter it via paper.  Now all the employees enter

3  their time on iPads on surfaces so their time

4  comes automatically into the program we use,

5  which is called "iWork."

6      And then we have somebody in here in the

7  office that double checks to make sure

8  everything is -- correctly, you know, whether --

9  which the proper borrow pit, the proper type of

10  material.  Sometimes that takes conversations

11  with the person that is operating the equipment,

12  and sometimes it takes conversations with the

13  Road & Bridge foremen, but, yeah, all the

14  employees track their activities.

15     Q.    So going -- I guess, kind of going back

16  to this, I mean, you have all this information,

17  how do you compare, or did you compare, Star's

18  performance to other equipment operators?

19     A.    Based on the Road & Bridge foreman's

20  recommendation.

21     Q.    Again, that would be from Delray Jones?

22     A.    Delray Jones and Ron Nieters.

23  Sometimes, one or two of the times we sat in, an

24  assistant foreman might be there, like, I know

25  Chris Carter, when he was the assistant foreman,

1  he would sometimes weigh in and provide his

2  opinion as well, but I relied heavily on the

3  Road & Bridge foreman's opinion.

4    Q.    I am going to go back a little bit on

5  these mechanic stuff and repairs.  So in your

6  shop, is there a quality control procedure for

7  repairs?

8        MR. THOMPSON:  Are you referring to the

9  Powell shop, the Cody shop, or some other shop?

10  BY MR. KELLER:

11    Q.    I will back up.  In the shop, in Road &

12  Bridge in Park, is there a quality control

13  procedure for repairs?

14    A.    Not a written procedure, no.

15    Q.    Is there a verbal procedure?

16    A.    That is going to vary by shop, but

17  the -- generally the -- if there is a service or

18  repair done, a mechanic, depending on the

19  difficulty, will do the repairs, and my

20  understanding that the Road & Bridge foreman is

21  aware of that, and they are at least aware that

22  work and that they're following up.  And I

23  suspect the operators probably do that as well.

24  Involved with it, but yeah, that is going to

25  vary between shops.

Page 54

1    Q.    Do you have a head maintenance

2    individual?

3    A.    I do, yes.

4    Q.    Who is that?

5    A.    Jason Showalter.

6    Q.    How do you spell his name?

7    A.    S-H-O-W-A-L-T-E-R.

8    Q.    What are his qualifications as head

9    maintenance?

10    A.    His qualifications, he's a mechanic.

11    That's about all he has done his whole career

12    life.  We hired him from a local equipment

13    supply company where he was doing all of their

14    repairs and maintenance.  So we knew of Jason

15    beforehand, but mostly his experience is

16    mechanic related work, various companies.

17    Q.    Do you know if he's a certified

18    welding -- welder -- welding inspector?

19    A.    I am not sure about that, no.

20    Q.    Jason Showalter, he reports directly to

21    you?

22    A.    He does, yes.

23    Q.    I want to talk to you a little bit about

24    the Employee Handbook.  I believe that is

25    Exhibit 5, I think?  Is that the one we were

1    looking at?  No, Exhibit 4.  Mr. Edwards, have

2    you seen this Park County Policy Manual before?

3        A.    Yes, I have.

4        Q.    What is the date on it?

5        A.    Says July 1, 2017.

6        Q.    You have had a chance to review and

7    familiarize yourself with the manual?

8        A.    Yes, I have.

9        Q.    In your own words, what does unlawful

10   harassment mean to you?

11           MR. THOMPSON:  Objection to form.

12           THE WITNESS:  To me, unlawful harassment

13   is anything that could rise to the level of

14   discrimination based on age, sex, sexual

15   orientation, age, things like that, as well as

16   from a sexual side, somebody that refers to

17   something sexually or some inappropriate remark

18   that is of a derogatory nature that would make a

19   person of the opposite sex uncomfortable in the

20   workplace.  Where they can't do their job as

21   they need to.  That is my non-legal opinion.

22   BY MR. KELLER:

23       Q.    Okay.  And someone has a complaint of

24   discrimination, who are they supposed to

25   complain to?

Page 56

1    A.    Per the manual, it would be the county

2    attorney.

3    Q.    And when Star made complaints, who did

4    she make the complaints to?

5         MR. THOMPSON:  Objection to form,

6    foundation.

7    BY MR. KELLER:

8    Q.    Did Star make complaints of

9    discrimination?

10   A.    She did.

11   Q.    When was the first time she made a

12   complaint?

13   A.    A complaint regarding discrimination was

14   February 2020.  February 14th, to be exact.

15   Q.    And at that time, did you direct her to

16   go to the county attorney?

17   A.    I immediately called the county attorney

18   after our conversation, and because that was

19   something that hadn't happened for me since I

20   have been here, so I wanted to make sure that we

21   were following appropriate protocols, so I

22   called him, if not that day, it seemed like that

23   was on a Friday.  I probably called him on a

24   Monday, but I notified him immediately.

25   Q.    Did you inform Star that the county

Page 57

1    attorney was involved?

2      A.    I did.

3      Q.    When did you inform Star?

4      A.    I'm not sure if I told her when she came

5    into my office on February 14, 2020.  I think at

6    that point, I probably said something to the

7    effect, well, this is a serious allegation, and

8    I will definitely look into it.  And then I

9    believe I followed up with her after I talked to

10   Bryan Skoric, and told her that the county

11   attorney's office was going to be investigating

12   the matter.

13     Q.    In regards to claims of harassment, when

14   was the first time Star made a claim?

15         MR. THOMPSON:  Objection to form.  Asked

16   and answered.

17   BY MR. KELLER:

18     Q.    Let me back up.  Did Star make -- call

19   you to make complaints about harassment?

20     A.    No, none of our prior meetings had never

21   rose to my opinion what would be considered

22   harassment.

23     Q.    Okay.  So she had called or spoke to you

24   that you said in a previous meeting -- that you

25   said they didn't rise to what you considered a

1   level of harassment.  What were the complaints

2   for?

3    A.    So there were multiple meetings with

4   Ms. Cornett.  The first one I had a record of

5   was actually December 14, 2018, when she was in

6   the Powell Road & Bridge shop.

7         Prior to that, I know she says we had a

8   conversation on August 4, 2017, and I have no

9   reason to dispute that.

10        While she was in the Cody crew, I talked

11  to her at least three or four times, no more

12  than five, but three or four times, and the

13  nature of those varied.

14        As you'd probably figured out, Star

15  likes to talk, like a very friendly outgoing,

16  and so she has always got a lot to say.  So it

17  would vary anything from somebody speeding or

18  not doing something safely to oftentimes it was

19  about Ron, that Ron Nieters, that he -- there

20  would be times when Ron would -- where they have

21  their morning meetings before they get ready to

22  go out to work.

23        Ron would go around the table, say, so

24  and so, I need you to go here and do this, so

25  and so, I need you to load trucks here.  And

1  they would get to the end, and there would be

2  Star.  And Star -- Ron would say, Star, why

3  don't you come with me, and we will go check

4  roads.

5          And so Star, in her opinion, she felt

6  like the rest of the crew was looking like that

7  she was not capable, or that she didn't have a

8  role or a job or something, and so I am going to

9  say most of those meetings during the Cody time

10  were regarding Ron Nieters, and she wanted to

11  move up and be able to operate on other pieces

12  of equipment, and she was unhappy that Ron

13  didn't seem to be cross training everybody

14  enough on equipment.

15          She did on at least one occasion,

16  probably a couple, she was having a hard time

17  with both Tom Hilts, Gator, and Louis "Chip"

18  Ash, as well.  And mainly that the way that they

19  spoke to her and that they were -- I can't

20  remember exact words, but something to the

21  effect of, mean, you know, that they were short.

22          And I can't think of the right word,

23  just real firm with her and abrupt, thinking at

24  the time that -- I did follow up every time she

25  come to my office about something in the Cody

Page 60

1    crew, every single time, I talked to Ron Nieters

2    about it.

3          You know, and Ron's response to me would

4    be, he would say, Chip and/or Gator, that is how

5    they are with everybody.  That's just their

6    personality is short gruff.  Gator sometimes is

7    considered he gets in a hurry, so he can be kind

8    of abrupt or short with people, but I never took

9    it that either of those two were treating her

10   any different than anybody else.

11   Q.    Okay.  So I am going to back up.  So

12   when you were saying that, it was Ron Nieters

13   that she complained about and not Tom or about

14   Gator, I believe it's Tom Hiltz?

15   A.    She did complain about Tom Hiltz at

16   least once, but most of our conversations were

17   in regard to Ron Nieters, and not in a

18   derogatory way.

19         She, I think, liked and respected Ron,

20   but she felt the fact that Ron would not maybe

21   send her out and have assignments for her,

22   things like that, or that she would -- maybe she

23   stood out of the crew because other people were

24   out working on a job or doing something, and in

25   fairness to Ron, I felt like maybe Ron was

1    having a difficult time figuring out what to do

2    with her because of her lack of experience.  You

3    would have to ask Ron.

4      Q.    You're speculating as to that.  You

5    don't know --

6      A.    I am, but Ron and I did have those

7    conversations.  He would say often that -- and

8    he will tell you to this day, in his position he

9    probably didn't do a lot of cross training.  He

10   lost a lot of experienced operators to attrition

11   during my time, and he would often say, because

12   I'd have other people coming in wanting --

13   complaining that they -- all I get to do is

14   drive a truck.  So she is not the only one that

15   did that.  So there were multiple others did

16   that quite regularly.

17     Q.    I am going to cut you off there for a

18   second.  When you were talking about her

19   complaint, she never complained to you about the

20   specific words that Gator used calling her

21   something to the effect of like the token bitch

22   or anything like that?

23     A.    -- I don't recall that, no.

24     Q.    Anything similar to that?

25     A.    I do recall her making a statement that

1    when the crew came back one day, somebody, and I

2    can't recall who it was, that because she didn't

3    tell me this.  She left early or something, and

4    that someone would say something like, "So

5    you're not going to put in a full day's work

6    today?"  Or that kind of thing.

7            And then I know that somebody said, or

8    she said that somebody said, "What have you been

9    doing, snuggling up to Ron all day?"  So that

10   was -- she did tell me that.

11           As far as the name calling, I am sorry,

12   it has been such a long time, I don't recall

13   that.  I can tell you the C word when the first

14   time I recall hearing that was when Jack

15   Hatfield, the deputy county attorney,

16   interviewed me, and I was a bit surprised when

17   he said it, because that is not something that I

18   hear every day, it is not in my vocabulary.  I

19   think I would have recalled that, but maybe it

20   did happen, but I certainly don't recall that.

21   Q.    Do you recall talking or advising Star

22   to speak with a Cindy Stewart?

23   A.    I do.

24   Q.    Did you advise her to speak with Cindy

25   Stewart to learn what -- to learn how to work in

1   a man's job or something similar to that effect?

2     A.    I did not use the words that Star said I

3   used.  I knew that Cindy had worked in the Road

4   & Bridge system for many, many years, and

5   knowing Cindy, based on her personality, she had

6   a way about if somebody was maybe giving her a

7   hard time about something, she would give it

8   right back times ten.  She's just as tough as

9   nails, and, you know, she had success getting

10  along within the crew because of that.

11          And I guess the reason I single her out

12  is, yes, because I put myself in Star's

13  position, you know, whether this is appropriate

14  or not, if you put me in a -- if I am the only

15  one in a group of a bunch of males, I would have

16  a hard time fitting in as well.  And I knew that

17  she was struggling fitting in with some of the

18  senior level operators.

19          I think some thought that she came in

20  and was given opportunities above them, and so,

21  yeah, I know that she was ruffling some feathers

22  within the Cody crew, and so she was having

23  trouble fitting in and that's -- I don't

24  remember if it was when she was in Cody or

25  Powell, but at one point I did suggest that she

Page 64

1    talk to Cindy Stewart.

2    Q.    Before Cindy Stewart retired, did she

3    talk to you at all why she was leaving?

4    A.    She did not.

5    Q.    She didn't tell you at all why she was

6    leaving?

7    A.    She might have.  I don't recall.  I

8    don't recall.  She left about the same time --

9    the exact same time as Dave Williams, and I

10   thought she had been doing a long time.  She was

11   of the age to retire, so I didn't question it

12   though.

13   Q.    You don't recall her telling you that

14   the reason why she was leaving was because she

15   refused to work for Delray Paco Jones?

16   A.    I don't recall that, no.

17   Q.    Who handles the employee files?

18   A.    The county clerk's office.

19   Q.    Who would oversee entering accident

20   reports into employee files?

21   A.    That is usually me.  I would think that

22   sometimes -- I believe when because we go

23   through the clerk's office when there is an

24   accident that rises to the level of reporting an

25   insurance type issue, especially involving

1    something outside of the county, like hitting

2    somebody else.  That, I believe the clerk put

3    something in their file with that, maybe the

4    accident report or something like that, but I am

5    not a hundred percent sure what their policy is

6    on that.  That would be the clerk.

7       Q.    Okay.  So do blown tires normally end up

8    in employee files for the majority of your Road

9    & Bridge employees?

10      A.    No, they do not.

11      Q.    I'm going to blow up Exhibit 15.

12   Mr. Edwards, have you seen this Exhibit 15?

13      A.    Yes, I have.

14      Q.    Where did you see this?

15      A.    I first saw it from -- I can't remember

16   if it was Delray or Ben McDonald provided me

17   photos, and I believe at the time there were

18   other photos.  But, yeah, at the time the

19   incident happened, I saw this photo, or

20   something like this photo, maybe from a

21   different angle.

22      Q.    So you -- when did you see this photo or

23   some photo the same type of photo of this

24   incident?

25      A.    The date on there says 2017.  I really

1    don't recall when this took place.  It says on

2    the top September 9, 2019, so I would say some

3    time, if not that same day, shortly thereafter.

4        Q.    Do you know if these made it into the

5    employee file of the operator of this equipment?

6        A.    I don't believe so, no, because no

7    equipment was damaged.

8        Q.    I want to look at Exhibit 16.  Have you

9    seen Exhibit 16 before.

10       A.    Yes, I have.

11       Q.    Can you tell me what Exhibit 16 is?

12       A.    So this was a situation that occurred

13   down on County Road 7 RP, which is a project

14   we're working on now.  You can tell from the

15   time of year too, the conditions were a little

16   bit slick and whatnot, and this was Tim Morrison

17   was operating this truck, and my understanding

18   is that the shoulders, because part of what they

19   were doing was building out the shoulders and

20   filling it, widening it, extending the road, but

21   you know, admittedly he probably got a little

22   too close to the shoulder of the road and slid

23   off.

24       Q.    Do you know if this made it into Tim

25   Morrison's employee file?

Page 67

1    A.    It did not because my understanding was

2   any of the damage was not his fault.  There was

3   some damage to the truck, but that was at the

4   advice of other operators.

5    Q.    I am going to look at Exhibit 17.  Have

6   you seen Exhibit 17 before?

7    A.    I don't believe I have seen that until

8   it was provided to me by our attorney.  And I am

9   going to say the last couple days.  I don't

10  recall seeing that.

11   Q.    In Exhibit 17, in your own words, what

12  are you looking at?

13   A.    I understand it's the water truck and

14  some damage to one of the guard rails on the

15  side rails on the water truck.

16   Q.    Was that damage ever reported to you?

17   A.    Not to my recollection, no.

18   Q.    So you don't know if that ever made it

19  into whoever the equipment operator is that

20  caused the damage, if it ended up in their

21  employee file?

22        MR. THOMPSON:  Objection to form,

23  foundation.  Assumes facts not in evidence.

24        MR. KELLER:  Okay.  I will back up.

25  BY MR. KELLER:

Page 68

1    Q.    Do you know who caused the damage?

2    A.    My understanding, because I had to ask

3    Delray what this was.  This has been in the last

4    few days.  Was that Tim Morrison, if my

5    understanding is correct, he was operating a

6    motor grader, and I think he got too close to it

7    and either backed into it or hit it somehow.

8    Q.    Do you know if this equipment made it

9    into Tim Morrison's employee file?

10   A.    I am not sure, sir.

11         MR. KELLER:  I am going to take a break

12   here, Tom.  I think I am done.  I just want to

13   go through my questions here and see if there is

14   anything I haven't gone over.

15         (A recess was taken from 3:17 p.m. until

16   3:23 p.m.)

17         MR. KELLER:  Mr. Edwards, I don't have a

18   whole lot of questions here, just a couple of

19   clean up questions.

20   BY MR. KELLER:

21   Q.    We had previously talked about the grade

22   and step system.  You mentioned your time while

23   you were at Road & Bridge, it had changed a few

24   times.  When was the last change?

25   A.    I am not a hundred percent certain, but

Page 69

1    I know it did change in 2021.  When I say

2    "changed," the steps were split so that there

3    were instead of, say there was 15 steps, then it

4    became 30 steps.  And the reason was at the

5    time, because at least one of the times is the

6    steps were about a three percent difference, and

7    with the amount of raises, we were allowed to

8    provide in a given year, it kind of restricted

9    our hands if we wanted to -- if they were given

10   a COLA, and we wanted to give a half a step or

11   something like that, we weren't able to do it.

12   So that was the recommendation of the department

13   heads and the elected officials, they made that

14   recommendation to the commissioners who approved

15   that.

16   Q.    Getting to Kris Cooper, when did he

17   leave Road & Bridge?

18   A.    I don't have the exact date, but I know

19   it was after February 14, 2020, and before she

20   filed her documentation with EEOC.  I am trying

21   to think of about when that was, so that would

22   have been some time in 2020, I suspect.

23   Q.    What were the terms on the Mr. Cooper

24   leaving?

25         MR. THOMPSON:  Counsel, I am going to

Page 70

1    object to the extent this involves personnel

2    matters that otherwise would be confidential

3    pursuant to Wyoming law.  I think he can talk

4    about whether he voluntarily resigned or was

5    discharged, but I am hesitant to allow him to

6    testify in regards to matters which could be

7    future litigation.

8    BY MR. KELLER:

9      Q.    I want to back up that question there,

10   Mr. Edwards.  You sat in on Star's deposition,

11   did you not?

12     A.    I did, yes.

13     Q.    Okay.  And you heard accusations that,

14   or not accusations, but essentially questions of

15   Star trying to cooperate with Mr. Cooper to fire

16   Delray Jones, correct?

17     A.    I did hear that in the testimony, yes.

18     Q.    Okay.  And so was Mr. Cooper having

19   issues with Delray Jones when he worked there?

20     A.    He was, yes.

21     Q.    Was that the reason why Mr. Cooper left?

22     A.    Not the only reason, no.

23     Q.    Did that have a factor in Mr. Cooper

24   leaving?

25     A.    It did play into that decision, yes.

Page 71

1    Q.    Okay.

2    A.    Not the sole reason though.

3    Q.    Was he discharged by the county?

4    A.    Yes, he was.

5          MR. KELLER:  That is all the questions I

6    have.

7          MR. THOMPSON:  I actually have a couple

8    questions, but it is going to be very brief.

9    BY MR. THOMPSON:

10   Q.    We go to the Personnel and Policy Manual

11   dated January 1, 2008, go to page 16.

12         MS. OATSVALL:  I'm sorry, Tom, I didn't

13   catch the page.

14         MR. THOMPSON:  I believe it is under 16,

15   right there.  Thank you.

16   BY MR. THOMPSON:

17   Q.    Mr. Edwards, can you read to yourself

18   that first paragraph under Chapter 4, Equal

19   Employment Opportunities?  Just let me know when

20   you have read that.

21   A.    Okay.

22   Q.    Based upon your experience as the county

23   engineer for Park County, do you believe that

24   you have followed the mandate set forth under

25   Equal Employment Opportunity of this policy

1  manual?

2     A.    Yes, I do, absolutely.

3     Q.    And when you consider an employee for a

4  pay raise or a promotion, do you consider their

5  race, color, religion, gender or national

6  origin?

7     A.    Absolutely not.

8     Q.    Do you believe that you pay both men and

9  women based upon their performance experience

10  and longevity?

11    A.    Yes, I do.  That is how I do it.

12    Q.    Can we go now to the exhibit, I believe

13  it is 12, with the wage -- Summary of Wages,

14  Exhibit 13.  I'm sorry.  This is Exhibit 13,

15  Summary of Road & Bridge Department Wage

16  Adjustments.  It appears to me in reading this

17  that there were approximately three years where

18  nobody received any wage increase.  Is that

19  accurate?

20    A.    That's accurate, yes.

21    Q.    Those would be years -- fiscal year

22  2019, so that would be from July 1, 2019, to

23  June 30th of 2020?

24    A.    That is correct.

25    Q.    And fiscal year, 2020, which again is

1    July 1st of 2020 to June 30th of 2022, or 2021.

2    A.    Yes.  No raises were authorized by the

3    Board of County Commissioners.

4    Q.    Same for fiscal year 2021?

5    A.    2021, I could tell you what happened

6    there.  Rowdi and Chip were the only individuals

7    in the Road & Bridge Division that received pay

8    increases.  Explain if you'd like.

9    Q.    Yes, please.

10    A.    So at that time, we might have been

11    still in the hiring freeze, but still, you know,

12    budgets were a little bit tight, you know,

13    coming out of COVID, whatnot, and the chairman

14    at the time, Jake Fulkerson, asked each

15    department, they said, give me one name, give me

16    an individual that's -- who is your rock star.

17    We were worried because we weren't given raises,

18    us as department heads, that we were going to

19    lose people.  And, you know, because some of the

20    others in other disciplines in our competitors

21    were paying more, and so we were concerned about

22    that, myself and the Road & Bridge Board, so

23    Commissioner Fulkerson asked, who is your rock

24    star, who is the person that in Powell crew and

25    Cody crew that is -- he used the word "rock

Page 74

1    star," that you don't want to lose -- absolutely

2    don't want to lose, you can't live without.  And

3    Delray at that time said Rowdi, and I think he

4    tried to get Chris Carter too, but Rowdi, and

5    then Ron Nieters recommended Chip, so those were

6    the two -- only two that got raises in the Road

7    & Bridge Division.

8        Q.    Last question.  Are you familiar with --

9    last area -- with Delray Jones' work history

10   with Park County?

11       A.    I am for the time that I have been here,

12   yes.

13       Q.    Do you know if Delray Jones started off

14   as an Operator I?

15       A.    My understanding is he did, yes.

16       Q.    Do you know how long it took him to be

17   promoted to an Operator II?

18       A.    If my memory is correct, it was seven or

19   eight years.  He can tell you that for sure, but

20   it was quite a lengthy time.

21           MR. THOMPSON:  Thank you.  I have no

22   further questions.

23           MR. KELLER:  I just have a real quick

24   rebuttal.

25   BY MR. KELLER:

Page 75

1    Q.    Going back to the question about
2    considering -- well, let me -- let me gather my
3    thoughts here.
4         So we were looking at the Park County
5    Personnel Policy Manual 2008, and when you
6    stated that you don't consider gender for
7    advancement?
8    A.    Was that a question, sir?
9    Q.    Am I paraphrasing right, or stating
10   correctly that when it comes to advancement, you
11   don't consider an employees gender?
12   A.    Absolutely not.
13   Q.    Okay.  You take your recommendation from
14   your foreman, do you not?
15   A.    In terms of hiring people, is that what
16   you're asking?
17   Q.    And advancement?
18   A.    Yes, I definitely strongly consider
19   their recommendation, yes.
20   Q.    So if your foreman is -- discriminates,
21   how would you know that he -- I mean, you're
22   taking his recommendation, correct?
23        MR. THOMPSON:  Objection to form.
24        MR. KELLER:  That is a bad question.
25   BY MR. KELLER:

1   Q.    So if your foreman has an issue with
2   advancing women, how do you know?

3          MR. THOMPSON:  Objection to form.

4          THE WITNESS:  I wouldn't know unless
5   that person brought it to my attention.

6   BY MR. KELLER:

7   Q.    The person that made the complaint?

8   A.    Yes.

9   Q.    And, i.e., the employee that feels that
10  they have been discriminated against?

11  A.    Yes, I will say the employee or if
12  another fellow employee, if they feel like there
13  is some unfair treatment or discriminatory
14  management as it relates to advancement or
15  hiring, I would expect that they would bring
16  that up to either myself or the county attorney,
17  but I didn't get any of that until February 14,
18  2020.

19         MR. KELLER:  Yeah, I am going to leave
20  it there.  Thanks.  That is all I have.

21         MR. THOMPSON:  We will go ahead and read
22  and sign.

23         (At 3:36 p.m. the matter was completed)

24

25

Page 77

```
 1

 2              WITNESS' SIGNATURE/CORRECTION PAGE

 3

 4    If there are any typographical errors to your

 5    Deposition, please indicate them below.

 6

 7    PAGE/LINE

 8    _____Change to_____

 9    _____Change to_____

10    _____Change to_____

11    _____Change to_____

12    Any other changes to your Deposition are to be
      listed below with a statement as to the reason
13    for such change.

14    PAGE/LINE          CORRECTION   REASON FOR CHANGE

15    _____

16    _____

17    _____

18    _____

19    _____

20         I, BRIAN EDWARDS, do hereby certify that I
      have read the foregoing pages of my testimony as
21    transcribed, and that the same is a true and
      correct record of the testimony given by me in
22    this Deposition on March 13, 2024, except for
      the changes made.

23

24    _____      _____
      Date Signed                  BRIAN EDWARDS
25
```

Page 78

```
 1

 2

 3                       CERTIFICATE

 4

 5        I, Barbara Morgenweck, Registered
    Professional Reporter, and Certified Court
 6  Reporter, do hereby certify that prior to the
    commencement of the examination the Deponent was
 7  duly sworn by me to testify to the truth, the
    whole truth and nothing but the truth.
 8        I DO FURTHER CERTIFY that the foregoing is
    a verbatim transcript of the testimony as taken
 9  stenographically by me at the time, place and on
    the date hereinbefore set forth, to the best of
10  my ability.
          I DO FURTHER CERTIFY that I am neither a
11  relative nor employee nor attorney nor counsel
    of any of the parties to this action, and that I
12  am neither a relative nor employee of such
    attorney or counsel, and that I am not
13  financially interested in the action.
          Dated April 4, 2024.

14

15

16           Barbara Morgenweck

17        _____

18  Barbara Morgenweck
    COURT REPORTER
19  Registered Professional Reporter
    Certified Court Reporter NM # 526
20  Notary Public

21

22

23

24

25
```

Exhibit 2:
Brian Edwards 30(b)(6) Deposition Transcript

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF WYOMING

3

    STARKIE CORNETT,                    )
4                                       )
          Plaintiff,                    )
5                                       )
    V.                                  )  22-CV-00034
6                                       )
    PARK COUNTY BOARD OF COUNTY         )
7   COMMISSIONERS and PARK COUNTY       )
    ROAD AND BRIDGE DIVISION OF         )
8   THE PUBLIC WORKS DEPARTMENT,        )
                                        )
9         Defendants.                   )
    _____)

10

11  August 21, 2024

12

    Oral deposition of BRIAN EDWARDS AND BOBBIE
13  HINZE conducted at the Park County Courthouse in
    Cody, Wyoming, commencing at 9:00 a.m. on the
14  above date, before Barbara Morgenweck,
    Registered Professional Reporter, Realtime
15  Reporter and Notary Public.

16

17              MORGENWECK COURT REPORTING

18                 307.250.0220 ph

19              Barbcourtreporter@gmail.com

20

21

22

23

24

25

```
                                                      Page 2
 1   APPEARANCES:

 2

 3   On behalf of the Plaintiff:

 4
     Phil Nicholas
 5   NICHOLAS & TANGEMAN, LLC
     170 N. 5th Street
 6   Laramie, Wyoming 82072
     307-742-7140
 7   Nicholas@wyolegal.com

 8   Marshall E. Keller
     KELLER LAW FIRM, PC
 9   116 N 5th St
     Thermopolis, WY 82443
10   (307) 864-2318
     Marshall@kellerlawpc.com
11

12   On behalf of Defendant:

13
     Thomas A. Thompson
14   MaryBeth Oatsvall
     WYOMING LOCAL GOVERNMENT LIABILITY POOL
15   6844 Yellowtail Road
     Cheyenne, Wyoming 82009
16   (307) 638-1911
     (307) 638-6211 Facsimile
17   Tthompson@lglp.net

18

19

20

21

22

23

24

25
```

Page 3

1                          EXAMINATION INDEX

2

3                                                    PAGE:

4    BRIAN EDWARDS AND BOBBIE HINZE:

5          Examination by Mr. Nicholas              4

6

7                          INDEX TO EXHIBITS

8

9    EXHIBIT:       DESCRIPTION                      PAGE:

10   19 Subpoena Duces Tecum                          6
     20 summary of R&B wage adjustments 8/12/24
11   PARKCO 2047                                      9
     21 Park County gross annual salaries           10
12   22 annual wage info 2024-25 PARKCO 2036         11
     23 annual wage info 2024-25 PARKCO 2045         12
13   24 3100 Park County R&B PARKCO 2056             15
     25 position advertisement                       44
14   26 Park County pay plan PARKCO 2010             49
     27 wage increase study PARKCO 01830             76
15   28 wage increase study PARKCO 2049              76
     29 PARKCO 2048                                  84

16

17

18

19

20

21

22

23

24

25

Page 4

1    BRIAN EDWARDS and BOBBIE HINZE,

2    Having first been duly sworn, testified as

3    follows:

4                        EXAMINATION

5    BY MR. NICHOLAS:

6      Q.    Thank you, and good morning.  Brian, if

7    you would just introduce yourself and your name

8    again, please.

9      A.    My name is Brian Edwards.  I am the

10   county engineer, Park County.

11     Q.    Brian, you know that we're here to

12   depose you on what is called a 30(b)(6)

13   deposition?

14     A.    Yes, I am aware of that.

15     Q.    And you understand that in this capacity

16   you are asking -- we're asking questions and you

17   are the representative of the County to make

18   answers.

19     A.    I understand that.

20     Q.    Bobbie Hinze is here this morning.  She

21   has also been designated in areas that you can't

22   answer, you will tell us, if you would, please.

23     A.    I will.

24     Q.    You have already given the deposition in

25   this matter?

Page 5

1   A.    I have.

2   Q.    It is not my intention to go over or try

3   to go back on that testimony.  The testimony is

4   what it is.  I don't want you to feel like

5   you're, at any given time -- I'm asking you to

6   challenge what you said before, and so you let

7   me know if you're uncomfortable.  I think I have

8   testified to that, but I don't think we're going

9   to have that problem.  But would you let me know

10  that, please?

11  A.    I will.

12  Q.    And I know that you have given a

13  deposition, but the general rule that I just

14  want witnesses to understand is that it's being

15  recorded, and you know that, and you have got

16  Helen over here.  All right?

17         THE COURT REPORTER:  Barbara.

18         MR. NICHOLAS:  Barbara.  Thank you.  I

19  don't know where I got that.  Thank you,

20  Barbara.

21  BY MR. NICHOLAS:

22  Q.    We have Barbara here, and Barbara is the

23  king.  She has a job to do, and she has to

24  report everything on this stenograph.  She can

25  only get one person at a time.  The -- I have a

1   hard time speaking over -- I start -- I will

2   make false starts, as you just saw one.

3   Sometimes I will cut you off inadvertently

4   because you're thinking, and so let's try for me

5   to complete my question and you complete your

6   answer and make it easy for her.  And, of

7   course, you know, you're under oath?

8       A.    Yes, I do.

9       Q.    You know that what you say today is

10  binding on the County?

11      A.    I understand that.

12      Q.    Thank you.  Let me give to you what I

13  have marked -- I am marking right now as Exhibit

14  Number 19.

15          (Exhibit 19 was marked for

16  identification.)

17  BY MR. NICHOLAS:

18      Q.    Exhibit Number 19 is the copy of the

19  subpoena duces tecum.  It's the second amended

20  notice.  I will give you a copy, and I think I

21  have enough copies for you.  There you go.  I

22  have got copy -- I am going to give you one,

23  Bobbie, so you can have it to keep track.  I got

24  one left.  You have yours?

25          MR. KELLER:  Yep, sure do.

Page 7

1          MR. NICHOLAS:  Do you need one?

2          MR. THOMPSON:  I have got mine.

3          MR. NICHOLAS:  I'll just put that out

4   there.  Actually, what I might do, if everybody

5   is okay.  I will use this one to write on.

6   BY MR. NICHOLAS:

7     Q.    So I think, Brian, we have gotten some

8   documents from you, and I think I see that you

9   have got some of the things that I want to go

10  over.  And I think what I am going to do is

11  start right into those documents and have you

12  explain them.  Then I'll go back and ask

13  questions.  Is that okay with you?

14    A.    That's okay with me.

15    Q.    Great.  Thanks.

16          Let's begin with some exhibits.

17          MR. NICHOLAS:  And so, Barbara, I told

18  you I was going to mark -- my first Exhibit was

19  19, and it's a subpoena duces tecum.

20          THE COURT REPORTER:  Thank you.

21  BY MR. NICHOLAS:

22    Q.    The next exhibit -- I am going to hand

23  you one exhibit that's already been marked.  I

24  do want to talk to you a little bit about that

25  today.  Exhibit 13 was already marked.  I don't

Page 8

1    know, is that one -- is that the exhibit you

2    have there, the 13?

3    A.    It is.

4    Q.    So you don't need another copy.  Is

5    yours numbered?

6    A.    It's the ones that MaryBeth sent, so,

7    yeah, they have got --

8    Q.    Okay.  Let me give you this one, because

9    it's actually marked.

10         MR. THOMPSON:  Counsel, just for

11   clarification, I believe that what Brian has

12   with him today is an updated version of the

13   exhibit that was produced at the deposition that

14   is marked 13.

15         MR. NICHOLAS:  Thank you.

16         MR. THOMPSON:  They are different

17   documents.

18         MR. NICHOLAS:  I appreciate, and thank

19   you for that, because the reason I gave you 13

20   is to make sure we're on the same page, and I

21   have the new updated one.  Okay?

22         THE WITNESS:  Got you.

23   BY MR. NICHOLAS:

24   Q.    So you're correct.  13 is the updated --

25   as of July 3rd, '23, right?

Page 9

1    A.    So the two copies, the one that you just
2    handed me was July 3rd, 2023.

3    Q.    And you have a more recent --

4    A.    I have a more recent one that includes
5    the raises and wage adjustments that were put in
6    effect for fiscal year '25.

7    Q.    Thank you.  Let's -- while we're there,
8    then, is the other one the one dated
9    August 12th, 2024?

10    A.    Yes.

11         MR. NICHOLAS:  I am going to mark that
12    one Exhibit Number 20.

13         (Exhibit 20 was marked for
14    identification.)

15         MR. NICHOLAS:  For the record, Exhibit
16    Number 20, Barbara, is August 12, 2024, Summary
17    of Road & Bridge Department Wage Adjustments,
18    and it has got a Bates number called PARKCO
19    2047.

20         And let me hand that to you, Brian, is
21    that the other document -- that is the document
22    that you brought today.

23         THE WITNESS:  Yes.

24         MR. NICHOLAS:  So that would be Exhibit
25    Number 20.

1          Bobbie, would you like to have a larger

2     one, or is that the same size?  Are you able to

3     read that well?

4          MS. HINZE:  Well, notice I am reading

5     from a distance.  Thank you.

6          MR. NICHOLAS:  I am at that stage.  Did

7     you want one?

8          MR. THOMPSON:  Sure.

9          MR. NICHOLAS:  So I am going to

10    introduce a couple more exhibits and then I am

11    going to come back.  I think sometimes it is

12    easier for you to go back and forth between

13    exhibits is my belief, and so...  I am going to

14    hand you what I am marking as Exhibit No. 21.

15         (Exhibit 21 was marked for

16    identification.)

17    BY MR. NICHOLAS:

18     Q.    Exhibit No. 21, I don't think you

19    produced it, but it came off your website.  Take

20    a look at that.  I think that's just a print

21    off, and I think it's essentially the same,

22    generally the same thing we're going to see in

23    Exhibit Number 20, which is the implementation

24    of that.  Take a look at that and see if you

25    recognize it.

Page 11

1    A.    I don't recognize it, but not to say --

2    oh, I'm sorry -- is it just the latest?  This is

3    current wages?

4    Q.    It is.  If we just printed off -- I

5    think following the beginning of the fiscal

6    year, but we'll -- you generally understand the

7    format --

8    A.    I do.

9    Q.    -- and how it's produced?

10    A.    I do.

11          MR. NICHOLAS:  So that's No. 21.  I did

12    want to introduce Exhibit No. 22 is -- I want to

13    go to another one first.  Exhibit No. 22 is

14    marked PARKCO 2036.

15          (Exhibit 22 was marked for

16    identification.)

17          MR. NICHOLAS:  It is an Annual Wage

18    Information for Budgets '24, '25.

19    BY MR. NICHOLAS:

20    Q.    Is that a document you will recognize?

21    A.    Yes, it is. I have a copy if needed.

22    Q.    What I might do is swap you, then, if

23    you have a copy.  I think I will find one here

24    but --

25          MR. THOMPSON:  What is the Bates

Page 12

1    number on that?

2         MR. NICHOLAS:  That one starts at 2036

3    and goes to 2043.  I'll swap you.

4         That's if you don't mind, I'll --

5         That's exhibit 23?

6    MR. EDWARDS:  22.

7         MR. NICHOLAS:  22.  Thank you very much.

8    Then the next one that I am marking is Exhibit

9    No. 23.

10        (Exhibit 23 was marked for

11   identification.)

12        MR. NICHOLAS:  That is an Annual Wage

13   Information for Budgets '24 through '25,

14   beginning at PARKCO 2045, and I am going to let

15   you know I made highlights that were not to the

16   original to make it easier for us.

17        Tom, I will give you one of these

18   because it does have the highlights in it.

19        MR. THOMPSON:  Thank you.

20        MR. NICHOLAS:  Bobbie, I will give you

21   the same thing here.

22        MS. HINZE:  Thank you.

23        MR. NICHOLAS:  All right.  And then I

24   wanted to ask you about PARKCO 2056, which I am

25   marking as Exhibit No. 24.  Hand you that.

1          MR. THOMPSON:  Is there a title to that

2     document?

3          MR. NICHOLAS:  Yes, there is.  It's

4     called -- it's a Budget Code 3100, County Road &

5     Bridge, PARKCO 2056.

6     BY MR. NICHOLAS:

7      Q.     Mr. Edwards, what is the budget fiscal

8     year?  When does it begin and when does it end?

9      A.     Our fiscal years start July 1st and end

10    June 30th.

11     Q.     You, the County would do their

12    accounting based upon governmental accounting

13    standards; would that be true, as best you know?

14     A.     As best I know.  I am probably not the

15    best person to answer that, but as best I know,

16    yes.

17     Q.     The State of Wyoming, the counties,

18    cities, generally go by the same fiscal year; is

19    that right?

20          MR. THOMPSON:  Objection to form.

21    BY MR. NICHOLAS:

22     Q.     If you know?

23     A.     I believe so, yes.

24     Q.     Now with respect to county budgets, when

25    do you begin preparing your budget to provide to

Page 14

1    the county commissioners?

2       A.    It varies, but it seems like March,

3    April is when we start talking about budgets and

4    thinking about it and so, yes, spring,

5    springtime.

6       Q.    Then you generally have budget meetings

7    with the county commissioners?

8       A.    We do.

9       Q.    Is there a budget supervisor or somebody

10   on behalf of the county commissioners that

11   coordinates everything, or do the county

12   commissioners do it themselves?

13      A.    The county commissioners organize, run

14   the meetings, but our -- someone from the

15   clerk's office, Steve Pomajzl, he is usually the

16   person that is in every one of the budget

17   meetings with the various departments.  And the

18   clerk is in there usually, too.

19      Q.    Who does the actual fiscal accounting to

20   keep the track of the accounting itself; is that

21   Steve?

22      A.    For the county, that would be Steve, and

23   then each department does some of their own

24   level of budget tracking to make sure of things

25   are where they are supposed to be.

Page 15

1    Q.    Who teaches you, then, how to keep track
2    of your budget so they can be integrated into
3    the county budget?
4    A.    I don't believe anybody taught me that.
5    It's pretty straightforward.  We have developed
6    a budget over a number of years, our budget for
7    our department, and, yeah, I work with the
8    commissioners and Steve to set budget
9    categories, and then what those budget items
10    need to be based on need.  You know, that is
11    mainly how that is set.
12         (Exhibit 24 was marked for
13    identification.)
14    BY MR. NICHOLAS:
15    Q.    So, for example, your budget category
16    for Road & Bridge is 3100?  I need to get yeses
17    and nos from you just because our reporter can't
18    get the head nods very well.
19    A.    Understood.  But you didn't ask a
20    question.
21    Q.    Oh, I didn't.  Okay.  Is 3100 your
22    budget code for your division?
23    A.    It is the budget code for the Road &
24    Bridge Division.
25    Q.    You're responsible for more than that?

Page 16

1    A.    Correct.

2    Q.    So for today, we don't need to go to the

3    other ones, but 3100 is assigned to Road &

4    Bridge?

5    A.    Correct.

6    Q.    And then, within 3100, do you have sub

7    codes for Wages, Benefits, and Capital

8    Improvements, all of those sub codes?

9    A.    We do, yes.

10    Q.    I do see the -- well, are those the sub

11    codes that we see here?  Which sheet that I gave

12    you would best tell us -- explain the sub codes?

13    A.    The best is if you look at Exhibit 24.

14    Q.    Okay.  I have got it almost in front of

15    me.  I have got it there.  Thank you.  So here,

16    what we have is 3100 Road & Bridge, and your

17    Salary and Wages are in the 0103100 4112; is

18    that right?

19    A.    That is correct.

20    Q.    So you are accounting generally in

21    Salaries and Wages at the top benefits and then

22    your -- then below that -- and those -- so let

23    me just stop there for a moment.  When I see

24    this budget, I see your total salaries.  What I

25    don't see is number of positions authorized.

Page 17

1   How do you know how many positions you are

2   authorized?

3      A.    That is a good question.  That is

4   usually not something that comes up at budget

5   time.  That -- essentially, we have generally

6   the same number of employees the time that I

7   have been here such that if something -- a

8   person leaves, we may try to go without that

9   person for awhile, but generally we have had

10  about the same number of people since I have

11  been here.  So no one has ever told me, You need

12  to have this set number of people --

13     Q.    Okay.

14     A.    -- so I don't know if I have a good

15  answer to that question.

16     Q.    Okay.  The -- what we know is that when

17  you build your budget, you build it on a

18  premises where you would have estimate number of

19  your full-time employees, an estimate of your

20  part-time employees; you would have FTEs and

21  PTEs, right?

22     A.    Yes, that's correct.

23     Q.    And as a general rule, you provide -- is

24  this the budget, the form that you provided to

25  the commissioners?

Page 18

1    A.    It's something like this, yes.

2    Q.    In the budget that you provide the

3    commissioners, do you have a more detail

4    including the FTEs and PTEs and show how you

5    build the budget?

6    A.    I can explain a little bit if I could.

7    There is a version how this usually works with

8    the wage related items of the budget is the

9    clerk's office, usually Bobbie or Steve, they

10   will provide us what our current employees list,

11   so they provide, here is our wages, and then if

12   there's wage adjustments, that's done on

13   basically a breakout that's got every person's

14   listed and their wages.  That's what we look at

15   to verify, for example, mainly relates to, like,

16   temporary, seasonal type employees.  Do we have

17   enough hours in there?  Do we have enough summer

18   seasonal help?  So we're looking at that kind of

19   thing.  The things like benefits, that all comes

20   from Bobbie.  She tracks all of that.  And, but,

21   yeah, I try to basically take a look at that and

22   make sure that everything is consistent there.

23   Q.    Now, for your full-time equivalence for

24   the position of heavy equipment operators, how

25   many positions do you generally historically

Page 19

1    have you had authorized?

2    A.    I would have to think about that.  I

3    don't have an exact number off the top of my

4    head.  I can look at my exhibit.

5    Q.    Sure, go ahead and do that.

6          MR. THOMPSON:  I don't want you

7    guessing.

8          MR. NICHOLAS:  If you don't have it

9    memorized, that's fine.  Thank you, Tom.  This

10   isn't a guessing game.  So it's -- which sheet

11   are you looking at?

12         THE WITNESS:  I am looking at the

13   Exhibit 13, and I'm -- it looks like anywhere

14   from 20 to 23 people at a time.

15   BY MR. NICHOLAS:

16   Q.    In the category of heavy equipment

17   operator, when you're authorized a position, I

18   assume that what the county commissioner does is

19   authorize you the position of heavy equipment

20   operator, that the grades in pay come later; is

21   that true?

22   A.    I am not sure I understand the question.

23   Q.    As I read the -- your manual, Park

24   County Employee Manual, what I understand and

25   based upon a little experience I've had with

1    your budgeting, you would ask for -- you would

2    go to the county commissioners and say, Look, I

3    need to have 23 equipment operators to get the

4    work done for the county, and as I hire them, I

5    may hire them as a Grade I, a Grade II, a Grade

6    III, but when once you're authorized a position,

7    you have freedom whether to assign them as a

8    Grade I, II or III; true or false?

9            MR. THOMPSON:  Objection to form.

10           THE WITNESS:  That's -- I am going to

11    say, partially false.  I can explain.

12    BY MR. NICHOLAS:

13      Q.    Why don't you tell me the way you think

14    it works?

15      A.    Well, the way it's been explained to me,

16    and I believe, this is outlined in the policy

17    manual, is that, say, we have an open position

18    because I, basically, when I hired on pushing

19    ten years ago now, the -- I inherited a staff,

20    you know, a crew, various equipment operators.

21    Then over that time through attrition,

22    retirement, firing or somebody leaving, a

23    position might open up, and we are allowed

24    within the department to replace that person,

25    that position, at the same wage or less.  So if

1    it's an Operator III, at a higher wage, we can

2    hire an Operator III at the same wage or less,

3    or an Operator I that we want to maybe grow

4    through the ranks and move up.  But, yeah, but

5    if there is a, for example, say we lost an

6    Operator II, and we need to bring somebody in

7    and need to pay more, somebody with more

8    experience, then we would have to go to the

9    commissioners to get their approval to hire

10   somebody above what is a budgeted wage.

11   Q.    Let me -- I think what you have

12   explained to me is that every biennium you're

13   budgeting on the biannual basis or are you doing

14   this on an annual fiscal year?

15   A.    It's on a fiscal year.

16   Q.    So every fiscal year, you provide a

17   budget, and in that budget you might say, I

18   want -- I have five Operator IIIs, I have five

19   Operator IIs; I have five Operator Is, and once

20   that is approved, you're authorized to have 5, 5

21   and 5?

22   A.    That's correct.

23   Q.    And you are also appropriated the money

24   for the 5, 5 and 5?

25   A.    That's correct.

1    Q.    If during the fiscal year, an Operator I

2    leaves, you can replace it without asking

3    permission?

4    A.    If I hire an Operator I at the same or

5    lower wage.

6    Q.    If an Operator II leaves, you have

7    choices.  You can hire another operator, but you

8    could take an Operator I and move them up to the

9    Operator II authorized budget level, or you

10    could hire an Operator II, but your -- I think

11    -- is that true?

12    A.    That is true.

13    Q.    So what I think you're telling me, and I

14    think, you know, as I understand budget and

15    principles, is that you have two constraints.

16    One constraint is you have -- I know my

17    scenario, you have 15 operators that you can

18    hire.  The second constraint is the amount you

19    can pay the entire group is what you're approved

20    budget was.

21    A.    That is true.  That is correct.

22    Q.    You can move people around

23    hypothetically as long as you stay within your

24    approved total budget?

25    A.    Generally, that's correct.  I still --

Page 23

1    if there is some sort of a change, say somebody

2    is being bumped up or promoted or something like

3    that, and we're still within our budget, I

4    still, even if it is not formal, I will usually

5    bounce it off the commissioners just so they

6    know what we're doing.

7        Q.    Let's talk about that, and I

8    understand -- I think I understand what you're

9    saying.  The commissioners are the elected

10   officials responsible for the final budget?

11       A.    That's correct.

12       Q.    For what you do, and it's easy enough

13   because they're accessible, you can keep them

14   informed of how your staff is moving, how you're

15   making adjustments within the authorizations

16   that they have given you?

17       A.    That is true.

18       Q.    So I think -- are we using the correct

19   term?  And that is you have positions that are

20   authorized, that is correct?  Authorization is

21   the correct term of word?

22       A.    That's correct.

23       Q.    You have a total budget that you

24   authorized?

25       A.    Correct.

Page 24

1    Q.    And generally speaking, you can make

2    movements without -- you have the authority to

3    make movements within your authorized total

4    expenditure without talking to the commissioners

5    as long as you don't exceed your total

6    authorized positions and you keep your number of

7    authorized personnel?

8            MR. THOMPSON:  Objection to form.

9            MR. NICHOLAS:  Is that too complicated?

10           THE WITNESS:  No, I think I understand

11   it.  That is generally correct.  I will say

12   that, for example, especially seasonal part-time

13   employees, because that could change based on

14   what we have going as long as we're within a

15   budget.  For example, if I have the room, I

16   might add a position based on our need or

17   seasonal need or something like that, but so I

18   would say the most critical thing is staying

19   within the budget.

20   BY MR. NICHOLAS:

21   Q.    I appreciate that, and I understand that

22   the part-time employees, seasonal employees, are

23   always going to be a little bit different, so as

24   we talk today, let's assume we're talking FTEs

25   unless we call it out.  Is that an easy way to

Page 25

1    go about this?

2    A.    That works for me.

3    Q.    Thanks.  I am going to get to your

4    actual papers in a moment, but generally

5    speaking, when you advertise for a heavy

6    equipment operator, I see that sometimes you

7    actually advertise for an Operator I.  So all

8    the funding we have, that's the position.  If

9    you don't like that position, don't apply.

10         Is that true?

11   A.    That is true.

12   Q.    It looks to me like in most instances,

13   though, you advertise for a heavy equipment

14   operator, and you say that, When you come, we

15   will evaluate whether you're I, II or III, but

16   we're looking for the best candidates?

17   A.    That's generally true.  I can add to

18   that.

19   Q.    Yes, go ahead?

20   A.    What we -- a lot of times, what is the

21   case is equipment operators are just

22   specialized, hard to come by, and sometimes

23   we've got equipment operators knocking on our

24   door that want jobs, that are plentiful, and

25   when -- if we're looking for a I, II or a III

1   specifically, like say, we're looking for a II,

2   if they're plentiful, we would advertise for a

3   II, but we have had cases where we have had a

4   bunch of resumes in response, and we have had

5   none.

6          So based on that, what I started to do

7   and what I try to do most often is just

8   advertise a I, II and III, cast a big net, and

9   then you're right, evaluate what we've got and

10  see whether or not they can fit into whatever

11  position we're trying to fill.

12  Q.    What that tells me, and I'll ask you if

13  that is correct, what that tells me is that you

14  have the authorization to fill a vacancy, which

15  is an equipment operator, and you have the

16  funding available that's already been authorized

17  to pay an Operator I, II, or III.  So you have

18  funding authority and you have a position

19  authority, and then you're going to wait and see

20  what your candidate pool looks like to decide

21  which to do?

22          MR. THOMPSON:  Objection to form.

23          THE WITNESS:  That's generally true.  A

24  lot of times, what we're doing is based on input

25  from the Road & Bridge foreman where we're at as

Page 27

1  accrue.  You know, if we've had quite a bit of

2  turnover, if retirees or whatnot, we may be

3  looking for a more skilled person, experienced

4  person.  If we're -- if we've got a good balance

5  of experienced journeymen to start, we would

6  like to hire at the bottom end and grow them

7  through the ranks.  But that's not always

8  possible with the type of work we've got.

9  BY MR. NICHOLAS:

10   Q.    Why do you generally like to start them

11  as 1s and grow them through the ranks?

12   A.    I think that's how it was done when I

13  got to the county.  I think it just helps bring

14  the team together.  They learn and grow.  You

15  can train them, or at least our Road & Bridge

16  foreman can train them to the way we do things

17  and basically mold them into the kind of

18  operators that are most skilled and efficient to

19  do the type of work we do there.  So there's

20  advantages and disadvantages.  We have hired

21  everything from somebody that has zero

22  experience to, you know, very, very seasoned

23  experienced operators.

24   Q.    Is it your expectations or the county's

25  expectation that you're going to need to hire

Page 28

1  people and train them?

2          MR. THOMPSON:  Objection to form.

3          THE WITNESS:  Yes, that's true.  The

4  level of training does vary.

5  BY MR. NICHOLAS:

6    Q.    And you expect that's going to be the

7  case, correct?

8          MR. THOMPSON:  Same objection.

9          THE WITNESS:  Correct.

10 BY MR. NICHOLAS:

11   Q.    No two employees are going to be

12 identical; is that true?

13   A.    That is absolutely true.

14   Q.    And each employee is going to come to --

15 as a heavy equipment operator with more skills,

16 less skills than the other; that true?

17   A.    That is true.

18   Q.    And it's someone's responsibility to

19 evaluate those skills and then begin to train

20 them, and build their skills to match your

21 needs; is that true?

22   A.    That is true.

23   Q.    Whose general responsibility in your

24 crew in the Road & Bridge crew is it to make the

25 assessment of what the skills are necessary for

1  each employee and then develop those skills into

2  what the Road & Bridge Commission or Division

3  needs?

4      A.    It is a bit of a team effort, so when we

5  hire somebody new, on the evaluation process,

6  that would be myself and usually both of the two

7  Road & Bridge foremen are involved in the

8  interview process.  Checking references, you

9  know, talking to people that have worked with

10  them, so that's really a group of us that do

11  that.  And then as far as evaluating their

12  skills after we have hired them, that is

13  generally the two Road & Bridge foremen or the

14  assistant foreman.

15      Q.    Now the two foremen, when you talk, you

16  say you used the foremen to help you.  Do they

17  both interview both Cody and Powell, or do

18  you -- does the Powell foreman work with you on

19  the Powell employees and you work separately and

20  independently with the Cody foreman for his

21  area?

22      A.    Most of the time, both foremen are in

23  there, just gives us more eyes to look at things

24  and different experiences.  The two crews work a

25  lot together, so there has been times when maybe

Page 30

1    a foreman couldn't make it, and maybe their

2    assistant foreman sits in.  But generally, it's

3    both Road & Bridge foremen in the interview with

4    myself.

5        Q.    Who do you -- who does the county

6    designate to be the instructors, the teachers,

7    if you will, to teach new hires skills they

8    don't know and even the skills that they do know

9    to do it your way?

10       A.    Generally, that's either the Road &

11   Bridge foreman, the assistant foreman, or

12   sometimes Operator IIIs that might be lead

13   operators that are running projects, leading a

14   maintenance effort, or something like that.

15   They are generally the ones that people go to

16   for answers of questions, kind of watching over

17   everything.

18       Q.    Is there any cap on the number of

19   Operator IIIs that you could develop or

20   ultimately hire other than your salary cap?

21       A.    There is no cap other than salary cap.

22       Q.    Same question with Operator IIs.  Is

23   there any cap on the number of IIs you could

24   have other than your authorized expenditure cap?

25       A.    No limit on the number of IIs other than

1    the salary cap.

2    Q.    I assume the same answer for Is?

3    A.    Correct.

4    Q.    In fact, I see you're in a situation now

5    where you only have IIs and IIIs, as you sit

6    here today?

7    A.    Yes, that's correct.

8    Q.    If you had all of your crew as IIIs, as

9    the head of the division, would that be a good

10   thing?

11   A.    I think that would -- generally, I think

12   that would be a good thing because that usually

13   would mean we have retained employees, most

14   likely, and kept them for awhile, and they have

15   grown through the ranks.  We haven't had as much

16   attrition, so yeah, I think that would be a good

17   thing.

18   Q.    Would it be fair to say that what your

19   crews do in the Road & Bridge is part of the

20   essential safety functions for the residents in

21   Park County?

22        MR. THOMPSON:  Object as to form.

23   Counsel, we're sort of getting off the subject

24   areas that you've designated for examination.

25        MR. NICHOLAS:  Well, I hear your

Page 32

1    objection.  I disagree with you, and I would

2    like an answer.

3        MR. THOMPSON:  I am going to direct the

4    witness not to answer if it has not been

5    designated as an area that he is testifying on

6    behalf of the county for.

7        MR. NICHOLAS:  Well, I think the -- when

8    it comes to freezes, does the county assess and

9    make a distinction between essential jobs and

10   non-essential jobs, in your experience?

11       MR. THOMPSON:  You speaking of wage

12   freezes?

13       MR. NICHOLAS:  Wage freezes, salaries,

14   filling vacancies.

15       THE WITNESS:  It's generally across the

16   board.  Full-time employees and seasonal and

17   part-time too, if there is a freeze, it is

18   usually across the board.

19   BY MR. NICHOLAS:

20    Q.    Was it across the board for all the

21   county or just across the board in your

22   division?

23    A.    Generally, across the county, and I

24   can't speak for law enforcement.  Because I know

25   sometimes they are a bit different, when you

1  start talking to essential and non-essential,

2  but my understanding is when we've had freezes

3  since I've been here, that it applies to all

4  departments.

5      Q.    Well, let's talk about freezes for a

6  moment.  In my experience, I want to make sure

7  we're talking about it.  I think there are --

8  the word "freezes" has different meanings,

9  different times.  One meaning would be that

10  you're frozen at your authorized position level

11  and your salary level.  You're free to make

12  decisions, but you can't -- don't come ask us

13  for a new position and don't ask us for any more

14  money.  Would you agree with that is one

15  definition of freeze?

16      A.    That is a definition of a freeze, yes.

17      Q.    Another definition of a freeze is that

18  if you have a vacancy, we do not want you to

19  fill that vacancy unless you come ask us for

20  approval.  That might be another form of freeze?

21      A.    That's another form, yes.

22      Q.    Another form of freeze is that freezes

23  can come in all kinds and forms of directives;

24  is that true?

25      A.    That's true.

1    Q.    In your experience, let's just...this is

2    harder to talk about, but when -- so when I hear

3    the word "freeze," I don't know which we're

4    talking about.  So when we're moving forward in

5    the last five years, have you ever had a freeze

6    where you have been told that you cannot fill an

7    authorized vacancy?

8    A.    I have to think about my years here.  I

9    think 2021, somewhere in there -- in my time

10   with the county, there has been at least one,

11   and I am thinking maybe two times, and the type

12   of freeze that -- the only type I have seen is

13   that you don't hire anybody, even if you lose

14   somebody, unless you come to the commissioners.

15        They want to see you try to go for

16   awhile without that person, or justify that you

17   need that -- to fill that position.  So that's

18   generally how it has been since I have been with

19   the county.

20   Q.    I have been through the minutes, and we

21   can go through them, but it looks to me like

22   each and every time a department head kind of

23   came to the commission and said, I need that

24   position, they were given that position.  That's

25   what I look -- I am going to ask you now.  Each

1  and every time -- every time that you have had a

2  vacancy or a freeze, have you asked to have the

3  vacancy filled for safety reasons or whatever

4  reasons?

5     A.    I don't recall going and asking them for

6  a -- to fill a vacancy for safety purposes.  I

7  do know that we, for example, when we lost our

8  Meeteetse Road & Bridge foreman, we tried to run

9  for awhile without that person and tried to run

10  it out of Cody with the staff that we have and

11  found that we weren't able to do that very

12  efficiently.  Same thing with the Powell crew.

13  They lost somebody, they tried to go for awhile

14  without that person and eventually ended up

15  filling that position.  Lean times, we will try

16  to do more with less obviously.  I don't recall

17  specifically going to the commissioners and

18  saying we need to fill this position for safety

19  purposes.

20     Q.    In your tenure with -- as the head of

21  the Road & Bridge, has your crew generally

22  stayed the same size in the Road & Bridge area?

23     A.    Generally the same size, in the Road &

24  Bridge area.

25     Q.    In those instances where you did not

1   fill a vacancy, did you generally fill the

2   vacancy within six -- six months to a year?

3      A.    Generally, that's the case, yes.

4      Q.    Then I would think that if there can be

5   obviously a hiring freeze, but there could also

6   be a salary freeze, which would be different; is

7   that true?

8      A.    I have to maybe just say yes or no on

9   that.  It is a little difficult.  The

10  commissioners can, if the budgets are tight,

11  they can say, No raises.  No company raises, no

12  raises, no bonuses.  They will say that at the

13  time of the new budget directed to all the

14  departments, and we explain to our employees and

15  say, sorry, no raises this year.  But I don't

16  know if you call that a freeze.  It just has to

17  do with dollars in versus dollars out.  Is there

18  enough money in the budget to allow for raises?

19     Q.    Generally speaking, in your Road &

20  Bridge, what percentage are the wages and

21  salaries to your total budget?

22     A.    I got to look at my chart or an exhibit.

23          MR. NICHOLAS:  Sure.  Why don't you tell

24  us what exhibit you're looking at?

25          THE WITNESS:  Looking at Exhibit 24.

1   For example, in fiscal year '25, our salary

2   related items, which include the benefits that

3   go along with them, about 1.9, if I am reading

4   that right.

5          And then as a percentage of our total

6   budget, which is, I think, 5.4, I believe that

7   is at the bottom.  So what's that, maybe a third

8   roughly of the dollars.  That's going to vary

9   based on what we have in a year in the way of

10  equipment needs, materials, that kind of thing,

11  which we have the second largest budget in the

12  county, and ours is kind of flexible, not

13  flexible, but varies from year to year.

14  BY MR. NICHOLAS:

15  Q.    So when you break out the budget, as

16  you're looking at Exhibit 24, would it be fair

17  to say that the first row, which is the Wages,

18  Benefits, et cetera, that those are what you

19  would call your fixed costs?

20          MR. THOMPSON:  Objection to form.

21          THE WITNESS:  I would say, you said the

22  first row, I would say that first group of

23  boxes, which is 1, 2, 3, 4, 5, 6, 7, 8, the top

24  eight items that are all salary related items.

25  Are what you consider --

Page 38

```
 1   BY MR. NICHOLAS:
 2     Q.    Well, let me -- your counsel made a form
 3   objection, so I want to correct it.  Do you
 4   understand what a fixed cost is?
 5     A.    I do.
 6     Q.    You understand what a variable cost is?
 7     A.    I do.
 8     Q.    And when you assign fixed and variable
 9   costs, you are using what is normally used as
10   governmental accounting principles; is that
11   true?
12           MR. THOMPSON:  Objection to form.
13           THE WITNESS:  That is true.
14   BY MR. NICHOLAS:
15     Q.    I should say, is that your
16   understanding, to get around the counsel's
17   objection.  Is that your understanding?  Is it
18   you're following generally accepted governmental
19   accounting principles?
20           MR. THOMPSON:  Objection to form.  Asked
21   and answered.
22           THE WITNESS:  As far as I know,
23   following general accounting practices.
24   BY MR. NICHOLAS:
25     Q.    Thank you.  So your fixed cost would
```

1  be -- and I think what we're talking about is,

2  when I said "row," I was looking at these lines

3  here, but this top item, which -- this entire

4  box, those would be your fixed costs, correct?

5          MR. THOMPSON:  Counsel, for the record,

6  I am not sure if that would accurately reflect

7  what you're referring to.

8          MR. NICHOLAS:  Well, let me.

9  BY MR. NICHOLAS:

10   Q.    In the budget codes, the 4100 numbers

11  beginning 41, it starts 4112 through 4196, those

12  account -- those are account numbers, correct?

13   A.    Those are budget categories, and when we

14  say account, we have a general fund, or it might

15  come out of our county road funds, so those are

16  accounts, but these are --

17   Q.    These are categories?

18   A.    Budget categories is the best way I can

19  describe it.

20   Q.    So the budget categories for the top

21  item are all fixed costs, correct?

22   A.    Yes.  The more I think about it, I would

23  say all of these are fixed costs because this is

24  our budget, these are the items that we have

25  been approved to.

1    Q.    Well, let's just distinguish from the

2    county between authorized expenditures and what

3    is your understanding of an authorized

4    expenditure?

5    A.    Essentially, when the county authorizes

6    and approved a budget, which goes through a

7    public process, then we are authorized, and me

8    as a department manager, I am authorized to

9    administer and work within this budget.  Now

10    when I get expenses in the way of, you know, a

11    voucher for a piece of equipment, some

12    materials, whatever that may be, we do that

13    twice a month.  We do vouchers, I review and

14    approve all those.  Those go to the

15    commissioners, they approve those also.  So

16    basically everything we expend is approved by

17    the commissioners starting with the budget and

18    then the expenditures each month.  I don't know

19    if that answers your question.

20    Q.    It does.  So what I want to do is make

21    sure that we're distinguishing between -- once

22    the budget is approved, it is fixed in time for

23    you, true?  I don't know if that's the word

24    you're wanting.  Let me back up and restart

25    that.

1          I want to make sure we're talking about

2     the right term, so an approved budget is the

3     confines of your authorization to expend,

4     correct?

5     A.     That is correct.

6     Q.     Within an approved budget from the

7     county's point of view and from accounting point

8     of view, there is -- when you look at from year

9     to year, you have fixed costs, and your fixed

10    costs are generally your employees; that's true?

11    A.     I see what you're asking now.  With the

12    employees, those items are generally -- I am

13    trying to think of something that wouldn't --

14    retirement -- those are generally fixed and will

15    not change through the year.  I think that's

16    what you're trying to ask or asking me.

17    Q.     Maintenance things you have more --

18    they're variable and you can choose not to

19    expend.  You could save money?

20    A.     But we still have to hit that overall

21    total budget, so we need to be within that

22    budget total, but yeah, if the chips end up

23    costing a dollar a ton less or more, we do that,

24    we may have to cut something else to stay within

25    that, but that's usually my level.  We're able

Page 42

1   to do that as long as we stay, so I think I

2   understand your question.

3       Q.    Do you have flex authority between -- so

4   the big boxes are -- I assume you have flex

5   authority within those boxes, as you decide,

6   chips came in cheaper, but fuel is more

7   expensive.  Those things, I assume you have flex

8   authority within your variable budgets?

9       A.    I do.  We also deal within the salary

10  too, as long as we stay under that total salary

11  item.  It goes back to the discussion we had

12  earlier.  Really, all of these, as long as we

13  stay within that total budget, total budget for

14  salaries, or total budget for our overall

15  budget, we're -- we can work within that.

16      Q.    Let's explore that a little bit.  I just

17  want to make sure.  If you, for example, you

18  have something here, road materials, mailboxes,

19  and suppose you save that money, could you move

20  that into salaries?

21      A.    I could not.

22      Q.    I am assuming that your flex authority

23  is in what I call the variables from below

24  salaries down, you can flex within those

25  categories, but you can't flex from here to

Page 43

1    salaries?

2       A.    That is correct.

3       Q.    You can't flex from salaries to here?

4       A.    We cannot.

5       Q.    Because those are fixed, you leave those

6    alone.  Within these categories, you have flex

7    authority, you probably -- or do you need

8    approval to move from road materials to safety

9    equipment?

10      A.    I don't need approval to move from road

11   materials to safety equipment.  The thing that I

12   am struggling with your line of questioning is

13   this, we operate the same in these categories as

14   we do here.  You are correct that we don't move

15   salary dollars or save salary dollars and use

16   them in something here, or use road material

17   dollars to cover salaries, but within the

18   salaries, all you got to do is look at each

19   year.  The budget amount, the actual amount is

20   going to vary every year.  So within that, which

21   goes back to as long as we don't blow that total

22   salary number, salary and benefit number, we can

23   work within that as long as we're hiring people

24   in at the same wage or less that they were

25   making when they left.

Page 44

1    Q.    I think I understand, and I would --

2    I'll just make sure.  I think what your

3    constraints are, is that you have to stay --

4    total payroll has to stay within your total

5    authorization?

6    A.    That is correct.

7    Q.    But you can't add an FTE without

8    approval of the...

9    A.    That is correct.

10   Q.    So as long as you stay at the same or

11   fewer FTEs, you just have to come in on your

12   budget number?

13   A.    That is correct.

14   Q.    So the -- I am going to have to take a

15   break -- a coffee break.  I apologize.  But

16   let's -- I think now I understand Exhibit

17   No. 24.  The -- I want to talk about -- I tell

18   you what the next category I want to go is in

19   the wage categories, how you do that.  Let's

20   take a -- can we take a short ten-minute break?

21         (A recess was taken from 9:50 a.m. until

22   10:03 a.m.)

23         MR. NICHOLAS:  The next exhibit is?

24         (Exhibit 25 was marked for

25   identification.)

Page 45

1          (Discussion off the record.)

2    BY MR. NICHOLAS:

3      Q.    I am going to hand you Exhibit No. 25,

4    Park County Bates 2283 through 2308?

5          MR. THOMPSON:  Sorry, Counsel, what were

6    those numbers again?

7          MR. EDWARDS:  2283 to 2308.

8          THE COURT REPORTER: (Requesting

9    clarification.)

10   BY MR. NICHOLAS:

11     Q.    I think we have already talked about

12   these.  We don't really need to go over, but

13   just to make sure I am understanding, when you

14   look at the first page, behind that, you have

15   heavy equipment Operator I, position available.

16   I am assuming that's one where you have an

17   authorized position, but you have only limited

18   funding?

19     A.    I can't recall specifically, but I

20   would -- you are probably correct with that.

21     Q.    If you jump over to the next one, there

22   you have got heavy equipment operator positions

23   available.  Here you have two operator positions

24   open, and you have the funding that you could

25   pay the applicant.  You could hire them as an

1    Operator I, II, or III, because you have the

2    available funding, and you would determine which

3    position to give him depending on his -- whether

4    you liked the employee or his qualifications?

5            MR. THOMPSON:  Objection to form,

6    foundation.

7    BY MR. NICHOLAS:

8    Q.    I think it is a poorly asked question.

9    Let me ask it again.

10           In this one, you have two authorized

11   positions you can fill, correct?

12   A.    That is correct.

13   Q.    For each of the two positions, it

14   appears that you have enough funding available

15   that's authorized that you could hire that

16   person as a Grade I, II, or III?

17   A.    Not entirely.  I am trying to -- have a

18   hard time just making an answer there, but it

19   depends on how we have some overlap, like a high

20   grade of an Operator II wage in the steps might

21   overlap with an Operator III, so we do have the

22   flexibility to hire a I, II, or III.  It is just

23   we may be limited based on where that person is,

24   you know, in the wage that maybe we can only do

25   a II because of where they fit in.  I don't know

Page 47

1   if I explained that well.

2    Q.    I think you have.  We're going to go to

3   another exhibit to help explain that better, but

4   by and large, it looks to me like, for at least

5   one of the positions, you have funding to go

6   from anywhere from $15.60 an hour up to 27.96 an

7   hour.  You published that because you thought

8   that you had that available funding, for at

9   least one of the positions?

10   A.    That's generally correct.

11    Q.    It may be you had a funding for two

12   positions to go to 27.96.  Maybe you didn't.

13   Can't know from this document, correct?

14   A.    That's correct.

15    Q.    I think I understand these now.  But

16   these are true and correct copies of

17   notifications that went out to the public

18   soliciting for employment, correct?

19   A.    That is correct.

20    Q.    When we go to Park County 2293, that's

21   the Bates number on the right on the bottom?

22   A.    Okay.

23    Q.    I just want to make sure that I

24   understand.  When I look at this, this again

25   looks like a publication that you're looking for

Page 48

1    new employees, correct?

2      A.    Correct.

3      Q.    It is dated underneath the County of

4    Park at the top, it is dated January 5, 2023.

5    Can we assume that the publication went out

6    shortly after that date?

7      A.    I think my date says mine says

8    February 8, 2022.

9      Q.    What Bates number are you on?

10     A.    Maybe I am on the wrong -- 2293.

11     Q.    I will flip over with you.  Now I am

12   with you.  So on the 2293, the date says

13   February 8, 2022?

14     A.    Yes.

15     Q.    Can we assume that the publication went

16   shortly after that?

17     A.    Yes, you can.

18     Q.    We can assume is that you authorized on

19   February 8, 2022, to go out to publication for

20   these positions?

21     A.    That's correct.

22     Q.    Thank you.  I think that's all the

23   questions I need to ask you on that.

24           Let me hand you what I am marking now as

25   Exhibit No. 26.

Page 49

```
 1            (Exhibit 26 was marked for

 2    identification.)

 3            MR. NICHOLAS:  The title of the document

 4    is "Park County Pay Plan" -- Exhibit No. 26,

 5    "Park County Pay Plan" beginning Park No. 2010

 6    going to 2035.

 7            Are you familiar with that document?

 8            THE WITNESS:  Yes, I am.

 9            MR. NICHOLAS:  If you don't have that

10    one --

11            MR. THOMPSON:  Thank you.

12    BY MR. NICHOLAS:

13    Q.    Can you explain to me generally what

14    this document is?

15    A.    I will try.  This is a summary of all

16    the positions within Park County government

17    which includes all the departments, and it also

18    has -- so it has the position, shows the

19    department, and then the grade, and the pay

20    range is based on what's established as we call

21    it a pay plan, but it is a grade step scale.

22    For each grade, there is a number of steps.  So

23    this shows for a specific position what is the

24    assigned grade, so that you can apply that to a

25    wage plan steps within that grade.
```

1    Q.    Well, I see that this one was revised in

2    July of July 16th of 2024.  Maybe I said that

3    wrong.  It was revised in July 16, 2023, but

4    adopted in July 16th of 2024, is what it says.

5           Do you see that?

6    A.    I see that.

7    Q.    Have you participated in the review of

8    these pay grades in your term?

9    A.    I can't recall specifically if I have

10   reviewed.  I believe I have.  I can't recall

11   specifically.

12   Q.    Do you have an understanding as to how

13   the pay grades were established?

14   A.    I don't have that understanding.  They

15   were in place when I hired on.

16   Q.    Do you know whether, for example, the

17   county hired an outside consultant to come in

18   and do salary evaluations, or whether this is

19   just developed by the county over time?

20   A.    I can't answer that.  I really don't

21   know.

22   Q.    The -- if I may ask --

23          MR. NICHOLAS:  Bobbie, do you know the

24   answer to that question?

25          MS. HINZE:  From what I was told by my

1    supervisor, that they did have some company come

2    in and do the pay plan and the job descriptions

3    to go with them and the pay scale.

4          MR. NICHOLAS:  Thank you very much.

5    That answers my question.

6          MR. THOMPSON:  Counsel, for the record,

7    it looks like this pay plan was adopted back in

8    April 20th of 2010.

9          MR. NICHOLAS:  Originally.

10          MR. THOMPSON:  Yes.

11          MR. NICHOLAS:  Bobbie, does it sound

12    correct that they originally brought consultants

13    in to set the salary ranges, and then over time

14    maybe the county made some adjustments to

15    themselves based on requests from department

16    heads?

17          MS. HINZE:  There could be some changes

18    like that.  I am not for certain.  I know a lot

19    of these have to go before the commissioners if

20    they're moving them.  I do know that the

21    starting/ending is, of course, adjusted by the

22    commissioners with the COLAS.

23    BY MR. NICHOLAS:

24    Q.    Yes.  Let's just talk about that.

25          When a -- I am going to jump back to

Page 52

1    you, Brian.  When a cost of living is assigned

2    with COLA, are the COLAS applied to across the

3    board to all categories?

4      A.    That's my understanding, yes.

5      Q.    If there has been -- let's, for example,

6    a COLA is introduced this year of 3 percent

7    across the board, then the next revision will

8    have the 3 percent built into this?

9      A.    That is correct.  That is my

10   understanding, correct.

11          MR. NICHOLAS:  Bobbie, is that your

12   understanding as well?

13          MS. HINZE:  Yes.

14          MR. NICHOLAS:  I think I am going to do

15   this a little bit, because I think it will make

16   everything go quicker today. I changed my mind a

17   little bit, Barbara.  Okay.  Perfect.

18   BY MR. NICHOLAS:

19     Q.    Now, when you turn over to -- so let's

20   go back.  Each of the positions that are in your

21   department for Road & Bridge, each of the

22   categories, equipment Operator I, equipment II,

23   each of those has a job description?

24     A.    Yes, that is true.

25     Q.    And so when we're dealing with the pay

Page 53

1    plan on the front page, a job description, it

2    matches each one of the categories?

3    A.    Yes, it does -- should, yes.

4    Q.    Now when you go to the -- going to

5    beginning with Park County 2012, this is the

6    Park County pay plan, and it shows steps,

7    correct?

8    A.    Correct.

9    Q.    As I understand, the way I would read

10   this is that if, for example, my client was --

11   Star Cornett was a Grade 14, Step 10, then her

12   salary should be -- actually, say Grade 15,

13   because she is actually a 15.  If you're a Grade

14   15, Step 10, her salary would be $23.04 an hour?

15   A.    That is correct.

16   Q.    I will represent to you, in fact, when

17   you go look at hers, that's what it is.  You can

18   double check.  If you look at your spreadsheet,

19   that one there, I think if you look at her,

20   you're going to see she is a 23.04; is that

21   right?

22   A.    I am looking at the old one, sorry.

23   Q.    Yeah, I had to do the same thing.

24   A.    That is correct.

25   Q.    Okay.  So that makes sense to me.  Now

Page 54

1    the steps go all the way to a Step 30, correct?

2    Looking over Park County 2013?

3     A.    That is correct.

4     Q.    What I would like to understand is that

5    if your pay grade range caps out at, let's say,

6    for Road & Bridge equipment Operator I, Grade

7    11, and it says the range is 24.29, and if at a

8    Grade 11, which is 1, 2, 3, 4, 5 -- 1, 2, 3, 4,

9    5, actually total in theory, all of the steps

10   should be within that range?

11    A.    In theory, yes.

12    Q.    All the available steps should be within

13   the range?

14    A.    Yes.

15    Q.    Now is there a guide, a written guide,

16   that explains how you assign steps within a

17   grade?

18    A.    There is no written guide that I'm aware

19   of.

20    Q.    How do you know what step to assign to

21   an employee at any given time?

22    A.    So this has evolved in my nine or ten

23   years since being with the county.  My first

24   four or five years with the county, budgets were

25   lean.  It would be -- generally it might be a

1   2 percent or a 3 percent adjustment, whatever

2   that nearest step may be for a few select

3   employees or whatever.

4          (Phone ringing.)

5          MR. NICHOLAS:  Excuse me.

6          THE WITNESS:  So again, raises and wage

7   adjustments were few and far between the first

8   half of my career up until when the lawsuit was

9   filed, and then since that time, they have been

10  a little more plentiful.  Budgets have been a

11  little better.

12         I would say post COVID, after COVID, and

13  since that time, generally speaking, the

14  commissioners might say across the board COLA,

15  but as far as a merit raise, they will say each

16  department is allocated 3 percent or 5 percent,

17  so they take your -- what our salaries were from

18  the previous year, they take that with an

19  increase of, say, 5 percent, we get a number

20  that I would have for each of my divisions, Road

21  & Bridge, Solid Waste and Engineering.

22         Then I would take that number and I have

23  a -- they give us a spreadsheet.  I don't know

24  if Bobbie made it or Steve, but they have a

25  spreadsheet where we can put somebody for no

Page 56

1    steps, we can put somebody for three steps, five

2    steps, as long as that total at the bottom of

3    the spreadsheet doesn't exceed 5 percent of our

4    overall salaries.  I don't know if that makes

5    sense.

6    BY MR. NICHOLAS:

7      Q.    It does make sense, and this is an area

8    where we're going to -- I want -- I don't want

9    to go rehash your whole examination.  I am not

10   entitled to, okay?  But I recall that the

11   examination is that generally your division,

12   your foreman made recommendations to you for the

13   allocation of increases among their employees

14   and generally you approve that.  Is that true?

15   Have I stated that correctly?

16     A.    That is generally true.

17     Q.    Now, when assessing the steps, can a

18   foreman choose to allocate more steps based upon

19   merit?

20     A.    Yes, they can.

21     Q.    Can the --

22          MR. THOMPSON:  I don't think he is done

23   with his answer.

24          THE WITNESS:  Sorry about that.  I feel

25   like I have to explain a little bit on that.

1    Tom hates when I explain.  But, so it is more of

2    a process, so when we have our meeting where it

3    would be myself, the two Road & Bridge foremen,

4    say, and it's a bit of a -- we're looking at --

5    basically, Exhibit 20 would be up on the screen

6    that we're looking at.  And we're looking at

7    every employee, and we're saying, you know,

8    they're giving input of, hey, this person really

9    needs to be moved up; they're really doing

10   great, come a long way in their skill level,

11   good work ethic, whatever the case may be.  And

12   then part of my role is, I have got Powell crew,

13   I have got a Cody crew, so I am trying to

14   balance -- well, is this person at the same

15   level -- we're going to move this person two

16   steps.  Is this person really that much better

17   than operator or this person in the Powell crew?

18          So there is a bit of a give and take

19   between the two Road & Bridge foremen and

20   myself.  Ultimately, making sure that we don't

21   exceed that bottom level, but that is how we go

22   through the steps.

23   BY MR. NICHOLAS:

24     Q.    Do you do an independent evaluation of

25   the skills of an individual employee personally?

Page 58

1    A.    I do not, personally, no.

2    Q.    So merit is one of the criteria that can

3  be used to assign a step?

4    A.    That is correct.

5    Q.    Can longevity be considered to assign a

6  step?

7    A.    It can be, yes.

8    Q.    Can attitude be considered to assign

9  steps?

10    A.    It does with me, yes.

11    Q.    What other qualities can be considered

12  for assigning steps?

13    A.    Work ethic, dependability, versatility,

14  that's probably the main thing.

15    Q.    Is it fair to say that the assignment of

16  steps and the allocation of raises for step

17  increases that you're awarded is a subjective

18  decision?

19    A.    I am not sure if that is the word I

20  would use.  Subjective.  It's an evaluation.

21  Probably within each department, there is

22  probably going to be a different way that that

23  department person evaluates that same person,

24  that they have got people that all do, basically

25  do the same thing.

Page 59

```
 1              They are probably going to adjust their
 2    wages or steps across the board, whereas in my
 3    department, I have got various skill levels,
 4    various things that people do, and so it is a, I
 5    guess, kind of a basically an evaluation or an
 6    assessment based on largely the input from the
 7    Road & Bridge foremen as to what that person is
 8    deserving of in the way of whether it be merit,
 9    longevity, dependability, all those things that
10    I mentioned.
11    Q.    Have you been provided personally
12    training on employee discrimination?
13    A.    I don't recall anything specific from
14    the county, no.
15    Q.    Have you been -- has the county sent you
16    somewhere or brought people in to train you on
17    principles of discrimination?
18    A.    No.
19    Q.    Do you know whether your two foremen,
20    you got "Paco" Delray.  I think I have got
21    his -- so yeah, Paco, and who is your other
22    foreman?
23    A.    Lewis Ash.  He goes by "Chip."
24    Q.    So Chip and Paco; is that correct?
25    A.    That's correct.
```

Page 60

```
 1    Q.    Do Chip -- has the county provided any

 2   training for them on discrimination?

 3    A.    I am not sure.

 4    Q.    Are you aware of any?

 5    A.    I am not aware of any, no.

 6    Q.    Do you believe you would be aware of it

 7   if they were provided training?

 8          MR. THOMPSON:  Objection to form,

 9   speculation.

10          THE WITNESS:  I would be aware of that.

11   I would say, reason why I say I am not sure is

12   both of these individuals were here for a long

13   time before I hired on, so I don't know what

14   training they had before I got there.

15   BY MR. NICHOLAS:

16    Q.    Would it be fair to say you're not aware

17   of any training they have received since you

18   took over the division?

19    A.    That is correct, not to my knowledge.

20    Q.    Do you know what the term "explicit

21   discrimination" is?  Have you ever heard that

22   term?

23    A.    I have heard it, yes.

24    Q.    Where did you hear it from?

25    A.    I can't recall.
```

Page 61

1    Q.    Do you generally have an understanding

2    of what explicit discrimination means?

3          MR. THOMPSON:  Objection to form.

4    BY MR. NICHOLAS:

5    Q.    Let me re-ask the question.  What is

6    your understanding that you have developed with

7    respect to what explicit discrimination means?

8          MR. THOMPSON:  Objection to form.  Calls

9    for a legal conclusion.

10   BY MR. NICHOLAS:

11   Q.    Go ahead.

12   A.    My understanding may not be completely

13   accurate, but it's -- the way I view it is any

14   discrimination that puts some form of bias for

15   treatment to a person because of the group that

16   they're identified with, whether it be male,

17   female, race, sexual orientation, whatever that

18   may be, if because of their classification for

19   better word, if they are treated differently

20   because of that, that's my understanding of what

21   explicit discrimination is.

22   Q.    But the word I used was "explicit."  Now

23   I am going to ask you about the word "implicit,"

24   "implicit bias," or implicit bias

25   discrimination.  Have you heard that word?

Page 62

1    A.    I have heard it.

2    Q.    Did you develop an understanding of what

3    implicit bias is?

4         MR. THOMPSON:  Objection to form.  Legal

5    conclusion.

6         THE WITNESS:  My understanding there is

7    that if a person is singled out and treated

8    differently, not necessarily based on one of

9    the, you know, classifications, again, whether

10   it be male, female, race, or whatever, but the

11   person is singled out and treated differently

12   for some other reason.  They just don't like the

13   person or whatever.  Again, I may be incorrect,

14   but that is the way, I guess, I understood it.

15   BY MR. NICHOLAS:

16   Q.    Have you ever heard the words

17   "unconscious bias"?

18        MR. THOMPSON:  Objection to form.

19   Counsel, is this within your areas of -- what

20   number?

21        MR. NICHOLAS:  It is within the areas of

22   number 13.

23        MR. THOMPSON:  That's equal opportunity

24   and equal pay policies.

25        MR. NICHOLAS:  That is exactly.

1      MR. THOMPSON:  You're asking him of his

2    knowledge of legal terminology, so I am going to

3    object to any questions concerning his knowledge

4    of legal terminology, and direct him not to

5    answer, because he is not prepared for that

6    based upon your 15 areas of examination.

7      MR. NICHOLAS:  You can direct him.  I am

8    going to ask you -- I want to find out what your

9    knowledge is as a director of equal employment

10   opportunity concepts, okay?

11     MR. THOMPSON:  Counsel.

12     MR. NICHOLAS:  Let me ask my foundation.

13     MR. THOMPSON:  It's the county's

14   adoption.  It's not his personal knowledge.

15     MR. NICHOLAS:  Let's talk about --

16   BY MR. NICHOLAS:

17   Q.   Has the county provided you training on

18   how to identify explicit bias among your staff?

19     MR. THOMPSON:  Objection to form.  Calls

20   for a legal conclusion.  Not within the areas of

21   examination.

22     THE WITNESS:  Okay to answer, Tom?

23     MR. THOMPSON:  If you understand the

24   question.

25     THE WITNESS:  The county has not

```
 1  provided specific training in these areas,

 2  however, we are all provided employee policy

 3  manuals.  We do review those and discuss those,

 4  but no specific training, no.

 5  BY MR. NICHOLAS:

 6    Q.    Has the county provided you training on

 7  identifying implicit bias?

 8          MR. THOMPSON:  Same objection.

 9          THE WITNESS:  Not that I recall, no.

10  BY MR. NICHOLAS:

11    Q.    Has the county provided you training on

12  identifying unconscious bias?

13          MR. THOMPSON:  Same objection.

14          THE WITNESS:  They have not, that I

15  recall, no.

16  BY MR. NICHOLAS:

17    Q.    Have you reviewed -- at any given time,

18  did you review your actual wage scales that

19  comes out in exhibit number -- what is this

20  number here?

21    A.    13.

22    Q.    13?

23    A.    13 -- Oh, I'm sorry.  That was the old

24  one.

25    Q.    Yeah?
```

Page 65

1     A.     Exhibit 20.

2     Q.     20.  Exhibit 20, did you ever do an

3     independent analysis of whether or not the final

4     assignments were being affected by unconscious

5     bias?

6           MR. THOMPSON:  Same objection.

7           THE WITNESS:  Generally speaking, I try

8     to make sure that when a Road & Bridge foreman

9     is making a recommendation or they're evaluating

10    one of their workers, that they are doing it

11    fairly in terms of, you know, they're treating

12    each person with respect as far as how they're

13    talking about them, how they're presenting them

14    to me, and then -- but, yeah, I guess generally

15    speaking, I try to make sure that everything is

16    fair.

17           That's part of what I do in evaluating

18    what they provide to me.  As far as specifically

19    as an unconscious bias, I can't recall that

20    coming into the picture.  I can't recall that it

21    has ever been an issue, I will say that.

22    BY MR. NICHOLAS:

23    Q.     The -- all of the Operator I's perform

24    generally the same -- required to perform the

25    same work; is that true?

Page 66

1    A.    Not necessarily.

2    Q.    Explain.

3    A.    Depends on what we're doing, in that we,

4    as a division, we will do maintenance work.  We

5    will do projects, special projects.  I'd say as

6    far as routine maintenance goes, like the

7    snowplowing or even -- well, mainly,

8    snowplowing, they generally do the same thing

9    there, but as far as what they're doing on a

10   day-to-day basis, that could vary.  Could vary

11   between crews, vary based on what job they do.

12   So, yeah, project specific, there can be

13   changes.

14   Q.    Is it your goal that every Operator I

15   can perform all the functions that are

16   designated in the job description?

17   A.    That is a goal, yes.

18   Q.    Same question for Operator II?

19   A.    That is a goal, yes.

20   Q.    Same question for Operator III?

21   A.    Yes.

22   Q.    In general, the job descriptions for an

23   operator -- heavy equipment operator for the --

24   heavy equipment operator is the same for

25   Operator I's, II and III, correct?

Page 67

1          MR. THOMPSON:  Objection to form.

2          THE WITNESS:  For an Operator I,

3    generally it is the same.  But again, it just

4    depends on what that person's skill level

5    capability, whether, you know, depends on what

6    piece of equipment they're, you know,

7    comfortable in using, how far along they are in

8    their training.  But generally, that's true on

9    an -- you said Operators I, II and III, that

10   gets more diverse as you get to II and III.

11          For example, in the IIIs, we -- not

12   everybody on the crew runs the chipper, you

13   know, or runs the oil distributor.  We try to do

14   some cross-training within that, but there are

15   some things that not everybody knows how to do.

16   BY MR. NICHOLAS:

17     Q.    Is it your goal to have everybody

18   cross-trained that wants to be cross-trained?

19     A.    It is my goal, yes.  I don't know if

20   that has always been the case with the Road &

21   Bridge foremen.  There is always that balance of

22   trying to -- we have got a lot of projects

23   going.  We have got a lot of work we've got to

24   get done.  We got a short season, and we need

25   the people in the right piece of equipment to

1   get things done.  So we're balancing that with

2   trying to train, cross-train, whenever we have

3   time to do so.

4      Q.     Is it the county's goal to have

5   everybody cross-trained that wants to be

6   cross-trained?

7      A.     I believe it is, yes.

8      Q.     Is there a written set of standards for

9   the foreman to evaluate the skill sets?

10     A.     There is no written standard that I am

11  aware of.

12     Q.     If you hire equipment operator, for

13  example, that came from the mines up in

14  Gillette, let's suppose he can run a large haul

15  truck, and let's suppose he can also run an

16  electric shovel.  Do you know what an electric

17  shovel is?

18     A.     Yep.

19     Q.     Does that affect -- if you were to hire

20  him in, would that affect his pay rate?

21         MR. THOMPSON:  Objection to form.

22  Hypothetical.

23         THE WITNESS:  I am going to say it

24  depends.  It depends on if there were other, how

25  long, was it just those pieces of equipment or

Page 69

1    anything else, do they come with a CDL or not,

2    so there is a lot of factors, a case-by-case

3    basis.

4    BY MR. NICHOLAS:

5      Q.    Would you agree with me that -- well,

6    you've testified that part of the goal of the

7    county is to provide training for its employees

8    to improve their skills, correct?

9      A.    Correct.

10     Q.    And would you agree with me that it is

11   the foreman's job to provide that opportunity to

12   all employees fairly?

13           MR. THOMPSON:  Objection to form.

14           THE WITNESS:  That's my understanding.

15   That's correct.

16   BY MR. NICHOLAS:

17     Q.    Would you agree that that opportunity to

18   be trained should be given to men and women

19   equally?

20     A.    Absolutely agree with that.

21     Q.    Would you agree with me that a foreman

22   could help one employee over the other by giving

23   that employee more training opportunity than a

24   second employee?

25           MR. THOMPSON:  Objection to form.

1    Incomplete hypothetical.

2         THE WITNESS:  Generally, that could

3    happen.  It's going to depend on a lot of

4    factors though.  One employee may have better

5    work ethic, more try, more eagerness to learn,

6    so there is -- each case is different.

7    BY MR. NICHOLAS:

8    Q.    Foremen, though, are in an opportunity

9    to pick winners and losers by offering if they

10   like someone better, they can unconsciously give

11   them more training.  Would you agree that that

12   can happen?

13        MR. THOMPSON:  Objection to form.

14   Speculation, incomplete hypothetical,

15   foundation.

16        THE WITNESS:  I guess that could happen.

17   BY MR. NICHOLAS:

18   Q.    If the foreman gives a person more

19   opportunity for training after he has obtained

20   those skills, he will move -- that person will

21   move up in steps, correct?

22        MR. THOMPSON:  Same objection.

23   BY MR. NICHOLAS:

24   Q.    If the foreman recommends it?

25        MR. THOMPSON:  Same objection.

```
 1            THE WITNESS:  If the foreman recommends
 2    it, but again, that's based on several factors,
 3    not just that I like them.  They might like them
 4    because of their work ethic, because of their
 5    attitude, a lot of different factors.  So like
 6    them just because personally they are a good
 7    guy, that, I have never seen happen.  But
 8    happening based on those criteria we have all
 9    discussed, just like any boss of any employee,
10    you have got your employees that go the extra
11    mile, and you have got people that come and do
12    the bare minimum, do basically what they have
13    got to do.  They go home and punch the clock.
14    That varies.
15    BY MR. NICHOLAS:
16      Q.    So does the county evaluate foremen on
17    whether they are providing equal training
18    opportunities to all employees?
19      A.    Not that I'm aware of, no.
20      Q.    Another way of certainly experience,
21    would you agree that more experience generally
22    leads to better skills?
23            MR. THOMPSON:  Objection to form.
24            THE WITNESS:  Not always.  Generally
25    speaking, yes, but not always.
```

1  BY MR. NICHOLAS:

2    Q.    What would be the exceptions that you

3  can think of where more experience does not

4  provide better skills?

5    A.    Well, in my 30-year career plus I have

6  worked with a lot of different operators.  Some,

7  like, you could put them on a piece of

8  equipment, they can maybe go down the road.

9  Some of these things like a motor grader, a

10  blade, or even a dozer, a finished dozer, some

11  people can run it for years and years and never

12  get it.  And there are others that they get on

13  it day one, after a month or so, and they can

14  put icing on a cake.  You know, they are just

15  very skilled with it, and it is an art,

16  honestly.  Some people have it, some people

17  don't.  Not everybody can be a skilled equipment

18  operator in my opinion.

19    Q.    But everybody that becomes qualified as

20  an Operator I has demonstrated they at least

21  have the skills to develop an expertise in the

22  equipment that they are assigned; is that true?

23        MR. THOMPSON:  Objection to form.

24        THE WITNESS:  I am going to say

25  incorrect, because we have had individuals that

1    they have been content on driving a truck, CDL,

2    that's all they wanted to do, and their capacity

3    was about at that level.  If we started talking

4    running a chipper, an oil distributor, running a

5    motor grader, overseeing a job, they just don't

6    have that capacity to do that.

7    BY MR. NICHOLAS:

8       Q.    Do you have anybody on your crew today

9    that you would identify like that?

10      A.    I don't have anybody like that on my

11   crew today, no.

12      Q.    Then, would you agree that one of the

13   obligations of your -- of the county's foremen

14   is to help develop the skills of all of your

15   heavy equipment operators as much as they can?

16           MR. THOMPSON:  Objection to form.

17           THE WITNESS:  I agree that is true, but

18   it also balances with that individual's

19   eagerness to learn and grow and expand their

20   capabilities.

21   BY MR. NICHOLAS:

22      Q.    So would you agree, then, that for every

23   employee that wants to improve their skills and

24   become better, it is part of the obligation of

25   the foreman to help that person, help teach that

Page 74

1    person and help give them the skills that they

2    want to obtain?

3         MR. THOMPSON:  Objection as to form.

4         THE WITNESS:  I would agree with that,

5    yes.

6    BY MR. NICHOLAS:

7    Q.    Would you agree that men and women

8    should be paid the same wage for performing the

9    same work?

10   A.    Absolutely.

11        MR. THOMPSON:  Objection.  Counsel,

12   we're not doing a 30(b)(6) deposition anymore.

13   We're off onto a fact.

14        MR. NICHOLAS:  I disagree with you.  We

15   are wrapping it up.  Tom, if you want to keep

16   this going, I can ask these questions.  I am

17   going to get this information out.  These are

18   within the 30(b)(6).

19        MR. THOMPSON:  We will call the

20   magistrate.

21        MR. NICHOLAS:  I don't need to do that.

22        MR. THOMPSON:  Will you let me --

23        MR. NICHOLAS:  I would like you not to

24   interrupt my deposition.

25        MR. THOMPSON:  Tell me where that

1  question comes from, because I am all game for

2  you asking what you have designated in your 15

3  areas, but you're asking him --

4       MR. NICHOLAS:  This is part of the

5  County's option and the enforcement that are

6  equal employment in equal pay policy for the

7  past five or seven years.  That is within that

8  category.

9       MR. THOMPSON:  I would disagree with

10  you.  And I have been letting it go on and go on

11  and go on, so if you're going to stick to the

12  areas that you have designated, I am fine.  If

13  not, we're going to need to get the magistrate

14  on the phone.

15       MR. NICHOLAS:  I don't care about

16  getting -- I am happy to get the magistrates on,

17  but he has answered the question, and we're

18  moving on.

19       MR. NICHOLAS:  Let's do this.  Let's

20  take about a ten-minute break because I want to

21  get organized and, honestly, I am going to get

22  close to wrapping this up.

23       (A recess was taken from 10:51 a.m.

24  until 11:00 a.m.)

25  BY MR. NICHOLAS:

Page 76

1    Q.    I am going to provide to you two

2    exhibits.  Exhibit No. 27 is a wage increase

3    study, and it is Park County 1830; and the

4    second one is Wage Increase Study, Park County

5    2049.

6              (Exhibit 27 was marked for

7    identification.)

8              (Exhibit 28 was marked for

9    identification.)

10             MR. NICHOLAS:  Thank you.

11             MR. THOMPSON:  Counsel, could we -- I am

12   missing 27, or maybe I just.

13             MR. NICHOLAS:  27 was the -- did I not

14   give you 27?

15             MR. THOMPSON:  This one is marked 28,

16   both of these.

17             MR. NICHOLAS:  I apologize.  I think I

18   wrote the wrong number on -- 27 is the one

19   that's 1830.

20             MR. THOMPSON:  Okay.  Thank you.

21             MR. NICHOLAS:  I apologize.  I see what

22   I did.

23             MR. THOMPSON:  Okay.

24             MR. NICHOLAS:  I think you have it

25   correct. I apologize. Thank you for helping me.

Page 77

1  BY MR. NICHOLAS:

2    Q.    Do you know what these are?

3    A.    I do.

4    Q.    These are -- well, tell us what they

5  are.

6    A.    So these are prepared by the clerk's

7  office, probably Bobbie, I am guessing, which

8  basically tracks what sort of wage adjustments

9  in a given year were approved or authorized by

10 the commissioners, whether that be COLA, merit,

11 or a bonus.

12   Q.    Can we generally assume that 1830, which

13 is Exhibit 27, is the same as Exhibit 28, except

14 for 28 is just -- brings it current to 2024?

15   A.    I would say that is generally correct,

16 yes.

17   Q.    So let's focus, then, on Exhibit No. 28,

18 which is Park County, Bates number 2049.  So in

19 1997, it says, revised grade and step realigns

20 to grade -- I am assuming that that is a

21 revision of the Exhibit No. 26 that we have

22 already talked about.  Is that what you would

23 assume?

24   A.    That's what I would assume, yes.

25   Q.    Then on July 1, 1998, it says

Page 78

1    2.3 percent COLA.  That would be a permanent

2    COLA that would be applied across the board to

3    all employees and would increase the numbers in

4    Exhibit No. 26, correct?

5    A.    That's my understanding, yes.

6    Q.    Let's jump down to a 7/1/2001.  .25 per

7    hour, plus 1.95 percent COLA.  The COLA, I

8    understand.  What does the .25 per hour

9    represent?

10   A.    That would be a change to a person's

11   hourly rate, but I will say this is well before

12   I came to the county, so I can't say what the

13   basis of -- those are kind of some odd numbers.

14   The percentage is well before my time, so I

15   really can't say.

16   Q.    I assume, then, that that probably .25

17   -- well, if you don't know, but do you believe

18   that actually then was added across the board to

19   the steps?

20   A.    That is my understanding, correct.

21   That's how I would think it would have gone

22   down.

23   Q.    Then on January -- on July 1, 2003,

24   there was a raise based on longevity and scaled

25   adjustment so that people got raises for

Page 79

1   longevity.

2           Do you see that?

3   A.      I do, yes.

4   Q.      Do you know how that was calculated?

5   A.      I do not, no.

6   Q.      Then below that, there is -- or 2005,

7   there is wage increase on $0.47 an hour, there

8   was wage given for longevity and $0.50 an hour

9   increase plus a COLA.  Do you know whether all

10  those were applied across the board to all

11  employees?

12  A.      I don't know.  I have no knowledge of

13  that.  I suspect that is the case, but I don't

14  know.

15          MR. NICHOLAS:  Bobbie, do you go that

16  far back?

17          MS. HINZE:  I do not.

18          MR. NICHOLAS:  Do you have an

19  understanding of whether that was applied across

20  the board?

21          MS. HINZE:  You know, in doing this

22  study, it was based off of an employee that had

23  been there for such a long period of time is how

24  they got these percentages in hourly rates, but

25  I do not know if they were applied across the

Page 80

1    board.

2            MR. NICHOLAS:   That's fine.

3    BY MR. NICHOLAS:

4      Q.    Let's go to more current -- what year

5    did you come in?

6      A.    I came in fall 2014.

7      Q.    Let's start from there, then.  At '14,

8    there is a 2 percent COLA.  That would be across

9    the board?

10     A.    Yes, that's correct.

11     Q.    At '15, there were a few individuals

12   that received a raise this year.  It was

13   submitted individually by the supervisor.  And

14   do you have any recollection of whether you

15   remade or made requests for individual employees

16   within your division at that time?

17     A.    I don't recall.  On my exhibit that is

18   Exhibit 20.  You can see where I, in later

19   years, I tried to note that, if only a couple

20   people got raises, so I can tell you for later

21   years, but I don't have that for that specific

22   year of who.

23     Q.    But it's something that can happen.

24   You're always free to go in and make adjustments

25   if you think equity requires it?

Page 81

1    A.    We're able to recommend that to the

2    commissioners pending their approval, correct.

3    Q.    Can you recall the commissioners ever

4    denying you a request?

5    A.    I have been -- I can't recall specific

6    times, but, say, the amount of the adjustment

7    has been discussed, and I can say back for the

8    first half of my career up until about 2020, a

9    lot of times there would be -- I am not sure if

10   I can say this -- be an executive session type

11   deal where each department manager would come in

12   from the commissioners, and we would talk about

13   those kind of things.  But, you know, usually

14   Road & Bridge foreman is in there too, but what,

15   you know, what amounts we are able to do.

16         Does that make sense?

17   Q.    Yeah.

18   A.    So sometimes it is a bit of a

19   negotiation.  A lot of times the commissioners

20   will want us to come in prepared to defend why

21   we need this adjustment.

22   Q.    2016, there were no increases.  2017,

23   there were a few individual raises submitted by

24   supervisors.  Now are you the supervisor; is

25   that what they're referring to, or is it

Page 82

1    referring to --

2    A.    I believe I would classify that as, yes,

3    I am a department head, yes.

4    Q.    There was bonuses of 500 per employee

5    that worked 0 to 20, 750 for employees that

6    worked 21 to 30 hours, there were bonuses of a

7    thousand dollars that worked 31 to 40 hours.  Do

8    you recall generally that being implemented?

9    A.    I do recall that being implemented, yes.

10    Q.    Are all of the heavy equipment operators

11    provided the same opportunity to provide

12    overtime or to work additional hours?

13    A.    That's generally up to the Road & Bridge

14    foreman, but generally, that's true.  But it

15    depends on what's needed.  If it's a mowing

16    where just one or two people need to go out or

17    we're sweeping in preparation for a chip seal,

18    then we may not need the whole crew.  So it's

19    generally the foreman's call, and generally if

20    there is going to be overtime, they usually

21    discuss that with me as far as -- generally, the

22    commissioners don't like to see overtime, so we

23    do talk about it if there is going to be

24    overtime.

25    Q.    Generally, the heavy equipment

Page 83

1   operators, I assume, all work 40 hours?

2   A.    Generally speaking, that's correct.

3   Q.    Then in 2018, 5 percent COLA, and a few

4   individual raises, so would I be correct in

5   assuming that the -- in that year, each

6   supervisor had to come and ask specifically for

7   the employees that they wanted to advocate to

8   get more raises?

9   A.    That's correct.

10  Q.    2020, 2 percent bonuses for department

11  heads to distribute and few individual raises,

12  so this is one of those things you were talking

13  about earlier where you would get an allocation

14  and then you would put it up on a chart?

15  A.    That is correct.

16  Q.    For those years, where you actually had

17  an allocation and you did a distribution, do you

18  still have the charts that show how you

19  distributed for those specific years, 2020, it

20  looks like?  From 2020 to '24, it looks like you

21  each year were provided funds to be distributed

22  at your discretion?

23  A.    I have those, and I know Bobbie has

24  those exhibits.

25        MS. HINZE:  One of the exhibits.

Page 84

1          MR. NICHOLAS:  Have I already identified

2    it?

3          MS. HINZE:  No.

4          MR. NICHOLAS:  Is that this one?

5          MR. THOMPSON:  What is -- the date's in

6    the lower right-hand corner.

7          MS. HINZE:  2048.

8          MR. NICHOLAS:  Let's mark that as

9    Exhibit 29.

10          (Exhibit 29 was marked for

11    identification.)

12    BY MR. NICHOLAS:

13    Q.    Let me hand you Exhibit No. 29, and can

14    you help me how I read this correctly?

15    A.    Yes.  I can help you with that.

16    Q.    Thank you.

17    A.    So in this case, that red at the top,

18    that's the allocation which is -- I forget what

19    they said -- was it a 5 percent bonus for that

20    year?  Whatever the commissioners say, so that

21    5 percent -- or was it 2?

22          MS. HINZE:  I think maybe 2.

23    A.    So say 2 percent.  That goes across the

24    board or across the board that 2 percent of our

25    salaried budget for, say, 3100, which is Road &

1   Bridge, that's that number in red, 2 percent

2   increase.  And then what Bobbie or somebody -- I

3   think Bobbie does this.  It's pretty handy -- is

4   we will then go along and say whether it's two

5   steps, one step, zero steps, four steps.  We'll

6   put that for each individual, and in this case,

7   it was just a bonus, and you can see that on

8   that far column, everybody got the same amount.

9   It was distributed evenly.  I think right then

10  we were coming out of COVID.  Everybody was

11  hurting, deserving, and we were hoping to get

12  merit raises.  We were allowed to give bonuses.

13  We just across the board gave everybody the same

14  amount.

15     Q.    So that was a one-time bonus?

16     A.    That was a one-time bonus.  But also I

17  noticed that the Road & Bridge foremen did not

18  take a bonus.  Them and myself.  We took our

19  bonus and distributed it amongst the employees.

20          MR. NICHOLAS:  Bobbie, do we have any

21  more of these?

22          MS. HINZE:  We do, but I guess I thought

23  they were in here, but I don't know if they are.

24          MR. NICHOLAS:  Would you do me a favor?

25  If we don't have them, that's fine.  Would you

Page 86

1    just provide them to Tom, and then, Tom, if you

2    would mail them for me for the other years.

3          MR. THOMPSON:  I think they have already

4    been provided.

5          MS. HINZE:  I didn't know what had been

6    sent before.

7          MR. THOMPSON:  Let me take a quick look

8    at...

9          MR. NICHOLAS:  What page number are you

10   looking at, Tom?

11         MR. THOMPSON:  If we haven't provided

12   it, we will send it to you.

13         MR. NICHOLAS:  Would you, please?

14         MR. THOMPSON:  Yep.

15         MR. NICHOLAS:  And we'll go back and

16   look, too.

17         MR. THOMPSON:  It could be in the

18   previous.

19         MR. NICHOLAS:  Could be.  That's fine.

20   I just want to make sure we have got it.  I

21   think you have explained it, so we'll understand

22   it when we see it.

23         Let me draw your attention on Exhibit

24   Number 13.

25   BY MR. NICHOLAS:

Page 87

1    Q.    So on 13, I want to draw your attention

2    to Kip Matteson.  Did I say that right, Matteson

3    or Matheson?

4    A.    Matteson.

5    Q.    Kip was hired in 2022 as an Operator III

6    with only a hit 1.5 years of service, so he is

7    in a Grade 15, Step 6.

8          Do you see that?

9    A.    I think that Operator III is an error,

10   because Grade 15 would be an Operator II level,

11   so I think that is an error.  Probably hired in

12   an Operator II.

13   Q.    Well, I can see that in the following

14   year, he is shown as an Operator II, if you look

15   over to Exhibit 20.

16   A.    I caught that at some point.

17   Q.    So you think that the Exhibit 13 is just

18   a mistake?

19   A.    Yes.  Correct.

20   Q.    All right.

21         MR. NICHOLAS:  Bobbie, we went through

22   the questions I had.  Is there anything that you

23   would add or change from what you heard

24   Mr. Edwards to speak this morning that you can

25   think of?

Page 88

 1          MR. THOMPSON:  Objection to form.

 2          MS. HINZE:  No, I think he pretty well

 3     covered it.

 4          MR. NICHOLAS:  I think -- let me just go

 5     through my questions here.

 6     BY MR. NICHOLAS:

 7     Q.     On the -- you talked about the county

 8     commissioners meeting in March and giving a

 9     directive as to what forward year was going to

10     look like.  Were those instructions ever given

11     in writing?

12     A.     Usually an email that would come from

13     the clerk so that the commissioners would

14     communicate through the clerk's office what we

15     were supposed to do, whether or not it would be

16     a COLA, or 2 percent, a discretionary merit, but

17     where was I going with that.  Usually, that is

18     done late in the budget process.  I don't really

19     like that it is, but they will try to balance

20     the budget with everything else, so it will be

21     our expense items.  And not just us, but across

22     the county, they will be looking at that budget

23     and see -- okay, can we do raises?  Can we do a

24     COLA?

25     Q.     Were we able to find those emails with

Page 89

1    the actual budget directives as to what the

2    budget should be submitted on?

3        MS. HINZE:  I am not for certain if they

4    would come from the accounts payable budget

5    side, or are you just --

6        MR. NICHOLAS:  Well, what I am looking

7    for is -- I was in budget for a long time with

8    the State, and the governor every year said, I

9    am going to have to put a budget -- here is what

10   my directors, I want them to do.  I am going to

11   allow you to do a COLA.  You can do 1 percent,

12   and that was what the directors would submit

13   their budgets on.

14       And I think, Brian, what you described

15   to me is what I expect to see and that is your

16   bosses, the commissioners, would say, we expect

17   you to bring forward a budget with these

18   parameters.  So I was looking for those budget

19   directives, for the parameters if they exist.

20       THE WITNESS:  Kind of a step before

21   that, we have -- and it has just been the last

22   four years or so, really since we started doing

23   the department discretionary distributions, but

24   we have budget committee meetings or even

25   benefits.  They are called benefits, where we

1  might discuss healthcare, going to a PPO -- PTO

2  versus, you know, so just big picture

3  discussions.

4        That's all the department heads and it's

5  usually at least one or two commissioners.  But

6  usually the chair has been, and in those

7  meetings, we -- that particular commissioner,

8  again, usually the chair, they are getting a

9  read on what the employees' situation is like.

10       For instance, the sheriff may be saying,

11  We're losing our quality officers and they're

12  all going to Cody because our pay scale's not in

13  line with, you know, everybody else.

14       So those kind of discussions happen, and

15  then that goes back to the commissioners, and

16  they weigh that with all the expenses and

17  everything else, looking to see if they've got

18  revenue and expenses, trying to keep that budget

19  balanced, but then what can they do within that.

20       The benefits committee may say, Hey, we

21  recommend a 3 percent COLA, and we do all kind

22  of agree to that, and 3 percent merit,

23  discretionary to be spent, and that is kind of

24  discussed in that meeting, and then that is

25  taken to the commissioners.

1          And the commissioners usually will cut

2     that back.  Instead of 5, they will say 3 or 2,

3     or whatever.  But then what happens is they take

4     an action on that, which would be in the meeting

5     minutes that you should have, and then from

6     that, the clerk or usually Bobbie or somebody,

7     the clerk's office, we get an email that will

8     have that spreadsheet that we were looking at

9     that has the, how do we distribute it.

10    BY MR. NICHOLAS:

11       Q.    The wage?

12       A.    Yes.  And that will be the instruction

13    on what you need to do.

14       Q.    Would there be more discussion on how

15    you are to allocate the discretionary money?

16       A.    No.  When it's discretionary by the

17    department, that's the department heads decision

18    on how they want to go about distributing it.

19    Some will do it across the board depending on

20    their type of operation.  Some will do it

21    differently.

22       Q.    I am satisfied we have a good

23    explanation of that.  The -- was there a final

24    report from the consultants that created the

25    compensation plan?

Page 92

1           MS. HINZE:  I am not aware of any.

2           MR. NICHOLAS:  This may be the report?

3           MS. HINZE:  Well, yeah, it very well

4    could be.  I know.  Yeah, I don't know.

5           MR. NICHOLAS:  I assume it goes so far

6    back before your time, whatever it was.

7           MS. HINZE:  Nothing stored on the

8    computer that I am aware of for that.

9           MR. EDWARDS:  I have never seen anything

10   in my files either on that.

11          MR. NICHOLAS:  That is all the questions

12   we have.  Thank you for your time.

13          MR. EDWARDS:  Could I -- off the

14   record -- I want to clarify an error.

15          MR. NICHOLAS:  Do it on the record.

16          MR. EDWARDS:  I think it affects all of

17   us, not just one.  I noticed it this morning.

18   When you were looking at exhibit -- this pay

19   plan, whatever exhibit that is?

20          MR. NICHOLAS:  Yeah, I will help you

21   there.  It is --

22          MR. THOMPSON:  26.

23          MR. NICHOLAS:  That sounds right.

24          MR. EDWARDS:  Yeah, 26.  I was looking

25   this morning at this, and I was just comparing

Page 93

1    my summary chart, and a bit of an oversight, but

2    looking at it, noticed that on the Exhibit 26

3    like an Operator I is still shown as a Grade 11.

4    They are actually a 12 now.

5    BY MR. NICHOLAS:

6      Q.    I saw it.  Operator II is now a 15.  I

7    meant to ask you about that.

8           MR. EDWARDS:  I just wanted to clarify

9    it because if some of the documents don't line

10   up with that.  A couple years ago, it was an

11   adjustment that we asked for and the

12   commissioners agreed to, to bump those grades up

13   for those two levels just because of the ranges

14   were not competitive with our competitors.

15          MR. NICHOLAS:  Here is what I assume.

16   If you look at Exhibit Number 20, and we could

17   see that your Operator I's are Grade 15; 17s are

18   IIs -- no, IIIs are 17s; IIs are 15s, and so I

19   knew that.  So I had in my mind -- when I go to

20   pay scale, I put -- I followed the grades and

21   steps that are on Exhibit 20, and it sounds like

22   that's where we should go.

23          THE WITNESS:  That's correct.  Those are

24   everybody's current grade and steps.  And I

25   notice on one of Bobbie's, on the summary, she

Page 94

1   is listing what they were before, the grade and

2   step.

3           MR. NICHOLAS:  So I assume that when it

4   comes out in 2025, you will have that corrected?

5           THE WITNESS:  Correct.

6           MS. HINZE:  I think it is in the

7   minutes, too, when we did that.

8           THE WITNESS:  Yeah, it is.

9           MR. NICHOLAS:  Well, I -- and honestly,

10  I did see that.  I meant to ask you about it,

11  but I could tell what happened.  I suspect could

12  have happened to other positions, but at least

13  with the heavy equipment operators, they're

14  reflected on Exhibit 22.  6 that would be

15  incorrect grade, but if you take the grades and

16  the steps and apply them to the pay plan, which

17  it starts on the 2012, it makes sense.

18          MR. EDWARDS:  It does.

19          MR. NICHOLAS:  It matches those.  Got

20  it.  Thank you.

21          MR. EDWARDS:  You're welcome.

22          (At 11:28 a.m. the matter was completed)

23

24

25

Page 95

1

2              WITNESS' SIGNATURE/CORRECTION PAGE

3

4     If there are any typographical errors to your

5     Deposition, please indicate them below.

6

7     PAGE/LINE

8     _____Change to_____

9     _____Change to_____

10    _____Change to_____

11    _____Change to_____

12    Any other changes to your Deposition are to be
      listed below with a statement as to the reason
13    for such change.

14    PAGE/LINE          CORRECTION    REASON FOR CHANGE

15    _____

16    _____

17    _____

18    _____

19    _____

20         I, BRIAN EDWARDS, do hereby certify that I
      have read the foregoing pages of my testimony as
21    transcribed, and that the same is a true and
      correct record of the testimony given by me in
22    this Deposition on August 21, 2024, except for
      the changes made.

23

24    _____        _____
      Date Signed                BRIAN EDWARDS
25

Page 96

```
 1

 2

 3              WITNESS' SIGNATURE/CORRECTION PAGE

 4

 5     If there are any typographical errors to your

 6     Deposition, please indicate them below.

 7

 8     PAGE/LINE

 9     _____Change to_____

10     _____Change to_____

11     _____Change to_____

12     _____Change to_____

13     Any other changes to your Deposition are to be
       listed below with a statement as to the reason
14     for such change.

15     PAGE/LINE          CORRECTION    REASON FOR CHANGE

16     _____

17     _____

18     _____

19     _____

20     _____

21          I, BOBBIE HINZE, do hereby certify that I
       have read the foregoing pages of my testimony as
22     transcribed, and that the same is a true and
       correct record of the testimony given by me in
23     this Deposition on August 21, 2024, except for
       the changes made.

24

25     _____          _____
       Date Signed                 BOBBIE HINZE
```

Page 97

CERTIFICATE

     I, Barbara Morgenweck, Registered
Professional Reporter, and Certified Court
Reporter, do hereby certify that prior to the
commencement of the examination the Deponent was
duly sworn by me to testify to the truth, the
whole truth and nothing but the truth.
     I DO FURTHER CERTIFY that the foregoing is
a verbatim transcript of the testimony as taken
stenographically by me at the time, place and on
the date hereinbefore set forth, to the best of
my ability.
     I DO FURTHER CERTIFY that I am neither a
relative nor employee nor attorney nor counsel
of any of the parties to this action, and that I
am neither a relative nor employee of such
attorney or counsel, and that I am not
financially interested in the action.
     Dated this 2nd Day of September, 2024.

_____

Barbara Morgenweck
COURT REPORTER
Registered Professional Reporter
Certified Court Reporter NM # 526
Notary Public

BARBARA MORGENWECK
Notary Public - State of Wyoming
Commission ID 84396
My Commission Expires JAN. 23, 2030

Exhibit 3:

Delray "Paco" Jones Deposition Transcript

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3

4    STARKIE CORNETT,                    )
                                         )
5         Plaintiff,                     )
                                         )
6    V.                                  )  22-CV-00034
                                         )
7    PARK COUNTY BOARD OF COUNTY         )
     COMMISSIONERS and PARK COUNTY       )
8    ROAD AND BRIDGE DIVISION OF         )
     THE PUBLIC WORKS DEPARTMENT,        )
9                                        )
          Defendants.                    )
10   _____)

11
     March 14, 2024
12

13   Remote oral deposition of Delray Jones (Paco)
     conducted via Zoom in the State of Wyoming,
14   commencing at 9:00 a.m. on the above date,
     before Barbara Morgenweck, Registered
15   Professional Reporter, Realtime Reporter and
     Notary Public.

16

17              MORGENWECK COURT REPORTING

18                  307.250.0220 ph

19              Barbcourtreporter@gmail.com

20

21

22

23

24

25

```
                                                         Page 2
 1   APPEARANCES:

 2

 3   On behalf of the Plaintiff:

 4
     Marshall E. Keller
 5   KELLER LAW FIRM, PC
     116 N 5th St
 6   Thermopolis, WY 82443
     (307)864-2318
 7   Marshall@kellerlawpc.com

 8
     On behalf of Defendant:
 9

10   Thomas A. Thompson
     MaryBeth Oatsvall
11   WYOMING LOCAL GOVERNMENT LIABILITY POOL
     6844 Yellowtail Road
12   Cheyenne, Wyoming 82009
     (307) 638-1911
13   (307) 638-6211 Facsimile
     Tthompson@lglp.net
14

15   Also Present:

16
     Brian Edwards
17

18

19

20

21

22

23

24

25
```

Page 3

1                    <u>EXAMINATION INDEX</u>

2

3                                              PAGE:

4   Delray Jones (Paco):

5          Examination by Mr. Keller        4

6          Examination by Mr. Thompson      50

7

8                    <u>INDEX TO EXHIBITS</u>

9

10  EXHIBIT:        DESCRIPTION              PAGE:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1    DELRAY JONES,

2        Having first been duly sworn, testified

3    as follows:

4                    EXAMINATION.

5    BY MR. KELLER:

6    Q.    Mr. Jones, what name do you prefer being

7    called by?

8    A.    Everybody calls me Paco, so if you're

9    comfortable with that, I am.

10    Q.    Yep, I sure am.

11    A.    That is my nickname.

12    Q.    Okay.  So there is going to be a couple

13    rules here, and we just broke one of them,

14    believe it or not.  The rule is for the court

15    reporter and for the record, I am going to do my

16    best to try to pause and let you finish what

17    you're saying so we're not -- and I am going to

18    ask that you do the same thing when I am talking

19    on questions and not try to anticipate the

20    question.  Reason being is we end up talking on

21    each other, and it is really hard for the court

22    reporter.  So is that something you could agree

23    on?

24    A.    Yes, sir.

25    Q.    Okay.  The other is I am going to -- I'm

Page 5

1    just going to ask you what -- you know, you just

2    swore under oath and you're under perjury, in

3    your own words, what do you believe that means?

4       A.    That I need to tell the whole truth and

5    nothing but the truth.

6       Q.    You understand, and what is the term

7    "under the penalty of perjury" mean to you?

8       A.    I don't understand that.

9       Q.    Okay.  So just to let you know, under

10   the penalty of perjury, that actually can be

11   something that can be criminally charged if it

12   is found that you have been -- perjured yourself

13   in testimony, okay?  So just to start off with,

14   what is your full name?

15      A.    Delray Jones.

16      Q.    When did you first start working for

17   Park County?

18      A.    November 2nd, 2002.

19      Q.    Was that with Parks & Bridge, I mean,

20   not Parks & Bridge, Road & Bridge?

21      A.    Yes, sir.

22      Q.    And do you recall what level you were

23   hired on at?

24      A.    Yes, I was hired on as an Operator I.

25      Q.    Were you immediately hired on full-time?

Page 6

1    A.    Yes, sir.

2    Q.    Prior to working for Road & Bridge, what

3    was your experience?

4    A.    In the construction field?

5    Q.    Yes.  Yep.

6    A.    Well, I run some equipment tractors and

7    whatnot on ranches, and then I run some smaller

8    equipment when I worked -- I worked 11 years

9    pouring concrete on a concrete crew.  I run, you

10   know, the bobcat, skid steers, little excavators

11   and stuff like that, and smaller equipment.

12   Worked for Whitlock Construction in Powell, and

13   that's where I got into the bigger loaders,

14   excavators.  I run dozers for them, and drove

15   trucks, truck/trailer combinations.

16   Q.    Who was your foreman when you hired on

17   with Road & Bridge?

18   A.    Larry Nielson.

19   Q.    How long was he your foreman for?

20   A.    Excuse me?

21   Q.    How long was he your foreman?

22   A.    I don't have the dates, but he was a

23   long time.  Dale Hobby was that took his

24   position.  I don't have the dates.  It was a

25   long time.

Page 7

1     Q.     How long was Dale Hobby your foreman?

2     A.     I think it was like seven years.

3     Q.     In regards to Dale Hobby, was he, in

4     your opinion, do you believe he was a

5     knowledgeable equipment operator.

6     A.     No.

7     Q.     Was he a -- did he know his -- as a

8     foreman, was he a -- well, I am just going to

9     ask you, do you believe he did a good job as a

10    foreman?

11    A.     Yes.

12    Q.     So why do you believe he wasn't a

13    knowledgeable equipment operator?

14    A.     I don't think he had a lot of experience

15    with, but he was very well organized and to be a

16    supervisor.  He did real good, you know,

17    managing it.  He was real good at that.

18    Q.     And do you know what Dale Hobby's

19    experience was prior to becoming a foreman?

20    A.     I don't.

21    Q.     Do you know if he's a certified crane

22    operator?

23    A.     I don't.

24    Q.     CDL truck driver?

25    A.     Still talking Dale?

Page 8

```
 1    Q.    Yes.

 2    A.    Yes.

 3    Q.    You don't know how many years he

 4  operated that equipment before he became

 5  foreman?

 6    A.    No.

 7          MR. THOMPSON:  Objection to form, vague.

 8  BY MR. KELLER:

 9    Q.    Let me re-ask that question.  Do you

10  know what Dale Hobby's experience was prior to

11  him becoming a foreman?

12    A.    No.

13    Q.    When did you become -- so were you the

14  one replaced Dale Hobby?

15    A.    Yes.

16    Q.    And when did that occur?

17    A.    In 2019.

18    Q.    When you became foreman, was Starkie

19  Cornett already on the crew?

20    A.    No.

21    Q.    She was not already on the crew when you

22  became a foreman in Powell?

23    A.    No.

24    Q.    Whose decision was it to bring Starkie

25  Cornett from the Cody shop to Powell?
```

Page 9

1    A.    I don't know.

2    Q.    Do you recall when Starkie Cornett

3    started in Powell shop?

4    A.    No.

5    Q.    Did Dale Hobby supervise Starkie Cornett

6    at all?

7    A.    Yes.

8    Q.    So were you Dale Hobby's supervisor?

9    A.    Was I?

10    Q.    Yes.

11    A.    No.

12    Q.    So how -- explain to me how Starkie

13    Cornett was not on the Powell crew, but Dale

14    Hobby was supervising Starkie Cornett?

15    A.    So she worked on the Cody crew and then

16    she transferred over to the Powell crew, and

17    there was a short time that Dale was her

18    supervisor.  I don't know the time, date, how

19    long that was, but -- and then he moved on.

20    Q.    So then Starkie was, in fact, on the

21    Powell crew by the time when you became foreman?

22    A.    Yes.

23    Q.    And do you know if Dale Hobby had tried

24    to get Starkie Cornett moved up to an Equipment

25    Operator II?

Page 10

1    A.    No.

2    Q.    Do you know if he tried to get Arthur

3    Briggs moved up to an Equipment Operator II?

4    A.    No.

5    Q.    Do you know if Ron Nieters had tried to

6    get Star Cornett moved up to an Operator II?

7    A.    No.

8    Q.    Do you know if Dale Hobby had gone out

9    to evaluate Star Cornett's performance on

10   equipment?

11   A.    No.

12   Q.    Did -- before Star Cornett came over to

13   Powell, did he give everybody an opportunity to

14   give their opinion on who to bring into the

15   Powell shop?

16        MR. THOMPSON:  Objection to form, vague

17   as to "he."

18        MR. KELLER:  Yeah, Dale Hobby.

19   BY MR. KELLER:

20   Q.    Did Dale Hobby give you the opportunity

21   to review new hires or people that were going to

22   be potentially brought over to the Powell crew?

23   A.    Yes.

24   Q.    Did you tell him that you did not want

25   Star Cornett to come over to the Powell crew?

Page 11

1     A.     No.

2     Q.     Did you ever tell Dale Hobby that was a

3  mistake that he hired Starkie Cornett?

4     A.     No.

5     Q.     So when I bring Dale Hobby in to

6  testify, that is what he's going to testify to?

7     A.     Yes.

8            MR. THOMPSON:  Objection to form.  Calls

9  for speculation.  Foundation also.

10 BY MR. KELLER:

11    Q.     So when Starkie Cornett came to the

12 Powell crew, was there someone that had quit and

13 left Powell before her transfer?

14    A.     I can't remember.

15    Q.     Do you recall if there was an open

16 position on the Powell crew?

17    A.     I can't.  I don't know.

18    Q.     And you also supervise Tim Morrison?

19    A.     Yes.

20    Q.     Arthur Rowdi Briggs?

21    A.     Yes.

22    Q.     You supervise Kristopher Cooper?

23    A.     Yes.

24    Q.     Kristopher Cooper no longer works for

25 you; is that correct?

Page 12

1    A.    Yes.

2    Q.    Was it ever mentioned around the shop

3    that Star Cornett was sleeping with Kristopher

4    Cooper?

5    A.    No.

6    Q.    You never heard that rumor?

7    A.    No.

8    Q.    Did Kristopher Cooper's wife ever show

9    up at the shop accusing Star of sleeping with

10    Kristopher Cooper?

11    A.    No.

12          Can I add to that, or no?

13    Q.    Please do.

14    A.    She -- Kris Cooper's ex-wife showed up

15    at the shop wondering where those two were.

16    Q.    Do you know why she would wonder where

17    those two were?

18    A.    No.

19          MR. THOMPSON:  Objection to form,

20    speculation.

21    BY MR. KELLER:

22    Q.    So going back to your experience, how

23    much -- if you were going to compare your

24    experience to Dale Hobby's, do you believe you

25    had more equipment operating experience than

Page 13

1    Dale Hobby?

2      A.    Yes.

3      Q.    What makes you believe that you had more

4    equipment operating experience than Dale Hobby?

5      A.    Just work history that I got.

6      Q.    You don't know what Dale Hobby's work

7    history is, do you?

8      A.    No.

9      Q.    Do you believe you have more experience

10   than Ron Nieters?

11     A.    No.

12     Q.    Do you believe Ron Nieters was a

13   competent knowledgeable foreman?

14     A.    Yes.

15     Q.    Do you believe he knew how to operate

16   equipment?

17     A.    Yes.

18     Q.    Do you believe he was a good evaluator

19   of equipment operator skills?

20          MR. THOMPSON:  Objection to form,

21   foundation.  Go ahead and answer, if you can.

22          THE WITNESS:  Yes.

23   BY MR. KELLER:

24     Q.    Why do you believe that he was a good

25   evaluator of skills?

Page 14

1    A.    Just because of his experience of being

2   around it.

3    Q.    Did you work with Cindy Stewart?

4    A.    Yes.

5    Q.    How long did you work with Cindy

6   Stewart?

7    A.    I think 15 years.

8    Q.    That was at the Powell shop?

9    A.    Yes.

10    Q.    Did you work with her anywhere prior to

11   Road & Bridge?

12    A.    No.

13    Q.    What was your opinion of Cindy Stewart's

14   qualifications as an equipment operator?

15    A.    Not real great.

16    Q.    Why?

17    A.    She -- because she was -- pretty much

18   wanted to just drive trucks and run a loader and

19   she was very proficient at both of those.  But

20   the years that she put in with the county, she

21   never really showed me that she wanted to exceed

22   further than that.

23    Q.    Did you ever call Cindy Stewart

24   derogatory names?

25    A.    No.

Page 15

1    Q.    You never called her "cuntswaylow"(ph)?

2    A.    No.

3    Q.    When you became foreman, did you

4    separate her from the rest of the crew and put

5    her on equipment all by herself?

6    A.    No.

7    Q.    Did you ever mention to her that women

8    shouldn't be on equipment?

9    A.    No.

10   Q.    Was she already working on the Powell

11   crew when you started?

12   A.    Cindy?

13   Q.    Yes.

14   A.    Yes.

15   Q.    Do you recall how many years she'd

16   already been operating equipment when you were

17   hired?

18   A.    No.

19   Q.    Do you recall Larry Nielson putting her

20   in to be promoted -- not her, but let me back

21   up.

22         Do you recall if you made Equipment

23   Operator II prior to Cindy Stewart?

24   A.    No.

25   Q.    You don't recall Cindy Stewart going to

Page 16

1    the county commissioners and making a complaint

2    regarding you being promoted to Equipment

3    Operator II before she made Equipment Operator

4    II?

5      A.    No.

6      Q.    Do you recall an equipment damage to a

7    truck that was blamed on Cindy Stewart about

8    eight years ago?

9      A.    No.

10     Q.    Do you recall trying to blame the

11   equipment damage on Cindy Stewart?

12           MR. THOMPSON:  Objection to form.

13   Answer, he doesn't recall.

14   BY MR. KELLER:

15     Q.    Go ahead and answer.

16     A.    No.

17     Q.    Do you ever recall any equipment damage

18   being blamed on Cindy Stewart?

19     A.    No.

20     Q.    So in your opinion, was Cindy Stewart as

21   good of an equipment operator as, say, Tim

22   Morrison?

23     A.    No.

24     Q.    Why?

25     A.    Because I have seen what Tim can do and

Page 17

1  different equipment, I have watched her doing.

2     Q.    Do you believe she was as good of an

3  equipment operator as Arthur Briggs?

4     A.    No.

5     Q.    Why?

6     A.    Again, just because of the advancements

7  that they did to run equipment.

8     Q.    Do you know how many years Cindy Stewart

9  worked for Road & Bridge before -- by the time

10 she retired?

11    A.    I think she had 23 years in.

12    Q.    So that would be 23 years of equipment

13 operating experience?

14    A.    No.  No, that ain't.

15    Q.    No, she didn't operate equipment for

16 23 years?

17    A.    No.

18    Q.    What did she do for those 23 years?

19    A.    Equipment is for Park County.  She drove

20 trucks.  She rode a loader, a mower.

21    Q.    Is that the only equipment you would

22 allow her to run when you became foreman?

23    A.    No.

24    Q.    What other equipment would you have

25 allowed her to run?

Page 18

1    A.    She could have run the motor graders,
2    the chipper, distributor, but I was never asked
3    if she could or wanted to.
4    Q.    As far as her skill level within the
5    Road & Bridge department, do you know if she had
6    a reputation for being a skilled equipment
7    operator?
8    A.    No.
9    Q.    No, you don't know, or no, she did not?
10    A.    No, I don't know.
11    Q.    When you became foreman, was that the
12    same time you became Starkie Cornett's
13    supervisor?
14    A.    Yes.
15    Q.    When you became foreman, did she have
16    the skills to be an Equipment Operator II?
17    A.    No.
18    Q.    Why do you say that?
19    A.    Because she told me what her experience
20    was then.
21    Q.    Did she tell you she -- Ron Nieters had
22    already been training her on the motor grader?
23    A.    No.
24    Q.    Did Dale Hobby ever -- well, we already
25    asked that question.

Page 19

1          Did Dale Hobby ever mention to you that

2   he believed she had the skills of Equipment

3   Operator II?

4     A.    No.

5     Q.    Would you have disagreed with him?

6     A.    Yes.

7     Q.    Based on what?

8     A.    She --

9          MR. THOMPSON:  Objection, asked and

10  answered.

11  BY MR. KELLER:

12    Q.    Go ahead and answer.

13    A.    She had no experience.

14    Q.    So if Ron Nieters had told you that he

15  believed that she had the skills to be an

16  Equipment Operator II, would you have disagreed

17  with him?

18          MR. THOMPSON:  Objection to form, calls

19  for speculation.  Incomplete hypothetical,

20  foundation.  Go ahead and answer, if you can.

21          THE WITNESS:  Yes.

22  BY MR. KELLER:

23    Q.    Yes, you would have disagreed with him?

24    A.    For Operator II, yes.

25    Q.    Do you know how long Ron Nieters had

Page 20

1    supervised Star Cornett?

2    A.    No.

3    Q.    Do you know when she was first started

4    working for Ron Nieters?

5    A.    I know she was a part-time, no.

6    Q.    So if you don't know those, how do

7    you -- when she started, and how do you know she

8    didn't have experience?

9         MR. THOMPSON:  Objection to form, asked

10   and answered.  Go ahead and answer, if you can.

11        THE WITNESS:  I don't know.

12   BY MR. KELLER:

13   Q.    Do you have standard tests for equipment

14   operators on equipment to prove their

15   proficiency?

16   A.    No.

17   Q.    Did you ever test Star on any equipment?

18   A.    Can you explain that to me?  What test?

19   Q.    Did you ever put Star in equipment to

20   see if she could actually operate the equipment

21   or not?

22   A.    Yes.

23   Q.    What piece of equipment?

24   A.    The broom, the road broom, the Boeing

25   tractor, she run the motor grader for like two

Page 21

1    weeks.  A roller.

2    Q.    Was someone else training Star Cornett

3    on the motor grader as well?

4    A.    Rowdi.  She went with Rowdi Briggs.  She

5    was in a grader and he was in another grader.

6    Q.    Did Rowdi Briggs tell you what his

7    opinion of her operating skill level was?

8    A.    Yes.

9    Q.    And what was his opinion as to her skill

10    level?

11    A.    If she could stay focused on her job,

12    she would probably do all right, but if she

13    continued grading the way she was grading with

14    him, probably wouldn't work out for her.

15    Q.    You believe that is what Rowdi is going

16    to testify to?

17    A.    Yes.

18        MR. THOMPSON:  Objection to form,

19    speculation.

20    BY MR. KELLER:

21    Q.    I am going to ask you, so before

22    depositions today, what did you do to prepare

23    for depositions?

24    A.    Looked over some notes that I had.

25    Q.    Did you get together with any of the

Page 22

1    crew members before depositions?

2     A.     To talk about this?

3     Q.     Yes.

4     A.     Yes.

5     Q.     In those conversations, did you mention

6    at all that you all needed to get your stories

7    straight?

8     A.     No.

9     Q.     What did you talk about?

10    A.     This process that we're going through

11    because none of us have ever done this before.

12    Q.     So if you're competent Rowdi Briggs is

13    going to have the same story as you, as far as

14    Star's skill level, what she had told you, how

15    do you know that is what he is going to testify

16    to?

17         MR. THOMPSON:  Objection to form.

18         THE WITNESS:  I am not sure.

19    BY MR. KELLER:

20    Q.     Not sure as in you didn't understand the

21    question, or not sure as in?

22    A.     I am not sure that is what he is going

23    to say.

24    Q.     Okay.

25    A.     I don't know what his answer will be.

Page 23

```
 1     Q.    So getting back to Star's experience
 2   levels, when you were -- first became foreman,
 3   it's correct to say she was an equipment
 4   Operator I?
 5     A.    Yep, very new at it.
 6     Q.    When did she advance to Equipment
 7   Operator II?
 8     A.    Not sure.
 9     Q.    Was it after she complained?
10         MR. THOMPSON:  Objection to form, vague.
11         THE WITNESS:  Not sure.
12   BY MR. KELLER:
13     Q.    I am going to rephrase that, for the
14   record.
15         Was Star Cornett's advancement to
16   Equipment Operator II after she made her
17   complaint?
18         MR. THOMPSON:  Objection to form.
19   BY MR. KELLER:
20     Q.    Go ahead and answer.
21     A.    I am not sure.
22     Q.    Do you know how long Starkie Cornett had
23   been working for Park County Road & Bridge
24   before she was advanced to Equipment Operator
25   II?
```

Page 24

```
 1    A.    I am not sure.

 2    Q.    When, before you became foreman, was

 3  there a pass over between you and Dale Hobby as

 4  to how the shop operated and ran?

 5          MR. THOMPSON:  I got to object as to

 6  form of the question.  Go ahead and answer, if

 7  you understand it.

 8          THE WITNESS:  I don't understand it.

 9  BY MR. KELLER:

10    Q.    Okay.  So when you knew Dale Hobby was

11  retiring, did you know you were going to become

12  foreman before he actually retired?

13    A.    No.

14    Q.    So you didn't know that he -- you didn't

15  know that you were going to be foreman until

16  after he was gone?

17    A.    I didn't know until I was interviewed

18  for the position.

19    Q.    Was that after Dale Hobby had left?

20    A.    Yes.

21    Q.    Okay.

22          Were you the assistant foreman before

23  Dale Hobby left?

24    A.    Yes.

25    Q.    As the assistant foreman, did he discuss
```

Page 25

1    with you employee evaluations?

2    A.    No.

3    Q.    Did he discuss with you different skill

4    levels of employees and what jobs they could do?

5    A.    No.

6    Q.    Did he discuss with you equipment

7    that -- the different equipment that he put each

8    operator on for work?

9    A.    No.

10   Q.    Was it your job as the assistant foreman

11   to know what equipment each operator was put on?

12   A.    Yes.

13   Q.    If Dale Hobby was not telling you what

14   equipment each operator was on while you were

15   assistant foreman, how did you know?

16   A.    How did I know?

17   Q.    Yes?

18   A.    Because we got a very small crew and

19   there is not a big change in who's running what.

20   It is pretty much a daily thing of you got your

21   grader operators.  You got your truck drivers.

22   I am trying to explain that to you that it isn't

23   where one day I am running a grader.  The next

24   day I am driving a truck, you know.  We've each

25   got our first A positions and you stick with it.

1    Q.    So if Dale Hobby had been putting Star

2    Cornett on different pieces of equipment to

3    evaluate her, would you have known?

4    A.    Yes.

5    Q.    Do you know if Dale Hobby evaluated her

6    on different equipment?

7            MR. THOMPSON:  Objection to form, asked

8    and answered.

9            THE WITNESS:  I did not.  I never seen

10    it do it.

11    BY MR. KELLER:

12    Q.    We have no documentation of that?

13    A.    None of us -- I never seen it.

14    Q.    You document training of your -- all the

15    other equipment operators?

16    A.    No.

17    Q.    So why would there be documentation of

18    Star's training if the other equipment operators

19    aren't documented?

20    A.    With Dale, there was no documentation.

21    If you're asking me if he trained her, I have no

22    record of it.  I didn't physically see it.  I

23    didn't see it on documentation or anything.

24    Q.    Is their documentation of observation of

25    any other equipment operators and their skill

Page 27

1    levels?

2      A.    No, not that I know of.

3      Q.    Did you personally train Starkie Cornett

4    on any equipment?

5      A.    I spent some time with her on the mower

6    to get her started on the mower, just to give

7    her some quick tips on that.

8      Q.    Does the Cody shop have a mower?

9      A.    Yes.

10     Q.    Is that mower different than the one

11   from Powell County?

12           MR. THOMPSON:  In the City of Powell?

13           MR. KELLER:  Sorry.

14   BY MR. KELLER:

15     Q.    City of Powell, correct.

16     A.    Is it different from the one at the City

17   of Powell?  I don't know if the City of Powell

18   has a mower.

19     Q.    Well, let me rephrase it.

20           Powell shop, is it different?

21     A.    They're both John Deere.  They're both

22   Tiger Mowers.  The only thing that might be a

23   little bit different, and I'm not sure about

24   this, is just the way the controls are, but the

25   functions of them, they're the same.

1    Q.    Do you know if Starkie Cornett had been

2    running the mower in the Cody shop?

3    A.    Yes.

4    Q.    Yes, you know, or yes, she has been?

5    A.    Yes, she has.

6    Q.    Did you have other more experienced

7    hands train Starkie Cornett on other equipment?

8    A.    Did I?

9    Q.    Yeah, did you instruct anybody to train

10   Starkie Cornett on other equipment?

11   A.    Yes.

12   Q.    Who was that?

13   A.    Kris Cooper with the dozer.

14   Q.    When did you have Kris Cooper train

15   Starkie Cornett on the dozer?

16   A.    Well, she was -- it was on a Friday, I

17   know.  They both asked to come in to train on

18   that.  It wasn't much.

19   Q.    Where did this training occur?

20   A.    At the Powell Road & Bridge shop.

21   Q.    In the yard?

22   A.    Yes.

23   Q.    Was there any other training?

24   A.    Nope.

25   Q.    So I want to talk a little bit about

Page 29

1    some of your other people here.

2            So Tim Morrison, who recommended Tim

3    Morrison for hire?

4      A.    Brian Edwards.

5      Q.    How do you know Brian Edwards

6    recommended him for hire?

7      A.    He recommended him to me.

8      Q.    Did you get to see his application?

9      A.    Yes.

10     Q.    And on his application, do you recall

11   what he had put on there for experience?

12     A.    Yeah, several years of construction

13   experience.

14     Q.    What type of construction?

15     A.    Paving was one, and then he worked for a

16   couple different cities, one in Colorado and the

17   City of Cody.

18     Q.    Do you recall what pay grade he was

19   hired at?

20     A.    No.

21     Q.    Who makes that decision?

22     A.    That's between the two supervisors.  We

23   talk about that with Mr. Edwards, Brian Edwards,

24   but it all boils down to commissioners make the

25   decision.

Page 30

1    Q.    Do you know if there was an open
2    budgeted position at the time he was hired?
3    A.    I don't.  I don't know.
4    Q.    Does every hire in advancement go before
5    the commissioners?
6    A.    Yes.
7    Q.    Do you know if that is policy?
8    A.    I don't know.
9    Q.    Do you know if that is in your Employee
10   Policy Manual?
11   A.    I think it is.
12   Q.    Are you familiar with your Employee
13   Policy Manual?
14   A.    Some of it.
15   Q.    Are you -- what do you mean by "some of
16   it"?
17   A.    Not all of it.  Some of it.  If I'm
18   having a --
19   Q.    If you have questions about the Employee
20   Policy Manual, who do you call?
21   A.    Usually Brian Edwards.
22   Q.    I am going to get back to Tim Morrison.
23   We kind of went down a rabbit hole there, so
24   anyways, when you brought him on, did you test
25   him on any equipment?

Page 31

1   A.    No.  We don't test.

2   Q.    Did he require any equipment training

3   after being hired?

4   A.    No.

5   Q.    Was he given any training after he was

6   hired?

7   A.    Yes.

8   Q.    What was he trained on?

9   A.    He was given tips by Chris Carter, that

10  was assistant supervisor, just different tips on

11  grading a road.

12  Q.    Was he the only one?

13        MR. THOMPSON:  Objection to form, vague.

14  BY MR. KELLER:

15  Q.    Was Chris Carter the only person that

16  was out giving tips to Tim Morrison?

17        MR. THOMPSON:  Objection to form,

18  speculation, foundation.  Go ahead and answer,

19  if you can.

20        THE WITNESS:  Can you repeat that

21  question for me?

22  BY MR. KELLER:

23  Q.    Yes.  You said that Chris Carter had

24  been out giving tips on how to run the grader to

25  Tim Morrison.  Were there other employees that

Page 32

1    you had go out to give tips to Tim Morrison on

2    how to run the grader?

3    A.    No.

4    Q.    Was Kristopher Cooper ever sent out to

5    help train Tim Morrison?

6    A.    No.

7    Q.    As the foreman, do you keep track of the

8    accidents your employees have in equipment?

9    A.    Yes.

10   Q.    How many accidents has Tim Morrison had?

11   A.    One that I know of.

12   Q.    Can you give the details of the

13   accident, and by "details," I mean, what

14   happened, when and where?

15   A.    It happened in the Powell Road & Bridge

16   yard.  He was plowing snow with his motor grader

17   and has a front end blade on it, and he

18   accidently bumped into the fender of a watering

19   truck, and let me know about it immediately.

20   Q.    Did that make it into his employee file?

21   A.    No.

22   Q.    Well, what I have here is we have

23   labeled these exhibits previously.

24        MS. OATSVALL:  Do you want me to screen

25   share those for you?

Page 33

1          MR. KELLER:  Yes, if you could please.

2     We are looking at Exhibit 15, Bate stamped 2017

3     and 2018.

4     BY MR. KELLER:

5      Q.    Delray, have you seen these photographs

6     before?

7      A.    Yes.

8      Q.    Do you know what's in these photographs?

9          MR. THOMPSON:  For the record, we're

10     looking at currently at 2017 and 2018.

11     BY MR. KELLER:

12     Q.    Let me know when you're done looking at

13     them.

14     A.    I'm done.

15     Q.    Can you tell me -- do you know what is

16     in the photographs?

17     A.    Yes.

18     Q.    Can you tell me or describe what you're

19     seeing?

20     A.    I know exactly what happened there.  I

21     can describe it to you.  Tim Morrison was

22     running this grader and the bank gave way on him

23     on the water's edge there.

24     Q.    Okay.  And when did this occur?

25     A.    19, it looks like the date on it that I

Page 34

1    am reading.

2      Q.    Do you recall if there is any equipment

3    damage?

4      A.    None.

5      Q.    What is the grader number?

6      A.    I don't know.

7      Q.    Do you know if there would be

8    maintenance records or repair records regarding

9    this grader?

10      A.    Yes.

11      Q.    They would be kept all the way back to

12    2019?

13      A.    Yes.

14      Q.    I am going to have you look at

15    Exhibit 16, and it's Bates number 4001.  Can you

16    describe for the record what you're looking at,

17    Paco?

18      A.    Yep.  Tim was driving this truck.  They

19    were working over in Clark on the Road 7RP and

20    the shoulder was real soft on that leaning side

21    of the truck.  He got over on the soft shoulder

22    and it pulled him off into it.

23      Q.    Was there any equipment damage to this

24    truck?

25      A.    Yes.

Page 35

1    Q.    Did this make it into Tim Morrison's

2    record at all?

3    A.    No, because the damage wasn't caused by

4    Tim.

5    Q.    Would it have been caused had he not

6    gotten too close to the shoulder of the road?

7         MR. THOMPSON:  Objection to form,

8    speculation, foundation.

9    BY MR. KELLER:

10    Q.    Would the accident have occurred --

11    well, let me back up.

12         You said that the shoulder gave way on

13    the road?

14    A.    Yes.  It was soft shoulder.

15    Q.    Is that because he got too close to the

16    shoulder of the road?

17         MR. THOMPSON:  Objection to form,

18    speculation.

19    BY MR. KELLER:

20    Q.    Go ahead and answer.

21    A.    Yes, he went off the road because of the

22    soft shoulder.

23    Q.    So I have here exhibit, it's Bates

24    number 4008, and it was in my exhibits I sent

25    over out of seven.  It's Bates number 4008.

Page 36

1   What I have here, Delray, then you look at the

2   bottom-right corner, there is a number that's

3   what I call Bates 4008, and I believe this would

4   be Exhibit 18.

5          Paco, can you describe what you're

6   looking at in this exhibit?

7   A.     Yes, front bumper off of a truck.

8   Q.     And it's laying on the ground?

9   A.     It's in our shop, sitting on the floor

10  in our shop.  It was taken off of the truck.

11  Q.     Does it appear as if it's damaged?

12  A.     Yes.

13  Q.     Can you describe the damage?

14  A.     It's bent.

15  Q.     How did this damage occur?

16  A.     Kenny Marchant was backing in to a hot

17  mix plant here in Cody, and he hooked the bumper

18  on a concrete barricade.

19  Q.     Did this damage end up in his personnel

20  record?

21  A.     Nope.

22  Q.     I am going to ask you some questions

23  here about Mr. Briggs.  Do you know who

24  recommended Arthur Briggs?

25  A.     To hire?

Page 37

1    Q.    Yep, for hire.

2    A.    I did.

3    Q.    Did you know Arthur Briggs prior to him

4    being hired?

5    A.    Yes.

6    Q.    What was his experience before being

7    hired?

8    A.    Mostly farming, running tractors, big

9    tractors, driving trucks, hired on with a CDL to

10    drive trucks.

11    Q.    Do you recall what experience level he

12    was hired at?

13    A.    Operator I.

14    Q.    Was he given training while he was at

15    the -- when he started working for Road &

16    Bridge?

17    A.    If any, it was just tips on how to do

18    stuff, you know what, I wish I could explain

19    that better.  You know, um -- just tips on how

20    to we do stuff.

21    Q.    You're saying he knew how to run all the

22    equipment when he hired on?

23    A.    Not all of it.

24    Q.    So what equipment did he need to get

25    tips on for operation?

Page 38

1    A.    The grader.

2    Q.    Who showed him the tips on how to run

3    the grader?

4    A.    I'd given him some, and Chris Carter had

5    given him some, and Kris Cooper gave him some.

6    Q.    So those tips for running the grader,

7    would that equate to training?

8    A.    Yes.

9    Q.    Was there other equipment that -- well,

10   let me back up.

11         When did this training occur?

12   A.    I don't know.

13   Q.    Was it still while he was an equipment

14   Operator I?

15   A.    I don't think so, no.

16   Q.    Was there other equipment where Arthur

17   Briggs needed tips or training on that are used

18   in the Powell Road & Bridge shop?

19   A.    No.

20   Q.    So your testimony, is it that Arthur

21   Briggs knew how to run all the equipment in the

22   Powell Road & Bridge shop other than the grader

23   when he was hired on?

24         MR. THOMPSON:  Objection to form,

25   misstates his testimony.

```
 1            THE WITNESS:  No, he did not know how to
 2    run all of the equipment.
 3    BY MR. KELLER:
 4      Q.     What equipment did he need to be trained
 5    on?
 6      A.     The grader.
 7      Q.     Other than the grader, was there any
 8    equipment in the shop that he needed training
 9    on?
10      A.     Yes.
11      Q.     What equipment was that?
12      A.     That would be the -- our oil distributor
13    and our chipper that he doesn't run.
14      Q.     So prior to Arthur Briggs being hired,
15    do you know if he had ran a dozer?
16      A.     No.
17      Q.     You don't know, or he hadn't?
18      A.     I don't know if he had or not.
19      Q.     What about an excavator?
20      A.     I don't know.
21      Q.     Water truck?
22      A.     He had lots of experience in that.
23      Q.     Water trucks or just driving trucks?
24      A.     Driving trucks.
25      Q.     What about the water truck?
```

1    A.    He didn't -- you still asking me what he

2    needed -- if he was trained?

3    Q.    No, I am asking if you knew if he had

4    experience running a water truck prior to being

5    hired?

6    A.    Yes.

7    Q.    So yes, he had ran a water truck prior

8    to being hired?

9    A.    A truck similar to it, a vac truck,

10   water truck, tanker truck.

11   Q.    What about a -- I keep hearing this word

12   "broom," that he ran a -- well, let's -- I keep

13   hearing the word, can you describe what a broom

14   is for us?

15   A.    Yep.  So it's a road broom, and it's

16   made for sweeping, like road surfaces.

17   Q.    Had he operated a road broom before

18   being hired on?

19   A.    I don't know.

20   Q.    In regards to his -- Arthur Briggs, his

21   time with Road & Bridge, did he have any

22   accidents?

23   A.    No.

24   Q.    Has Arthur Briggs been disciplined at

25   all?

Page 41

1    A.    No.

2         MR. KELLER:  Tom, I think this is a good

3    spot for us to take a break.

4         MR. THOMPSON:  Yeah, we have been going

5    about an hour and 15.

6         (A recess was taken from 10:13 a.m.

7    until 10:22 a.m.)

8    BY MR. KELLER:

9    Q.    Back on the record.  Paco, I just want

10   to remind you that you are still under oath.  I

11   am going to bring up one thing here, and it's

12   not on you, some of it's on me.  Just to let you

13   know, if there is a question that you don't

14   understand because I do ask dumb questions, just

15   please say, I have no idea what you're talking

16   about.  However you want to phrase it, just tell

17   me to rephrase the question, okay?

18   A.    Okay.

19   Q.    There is absolutely nothing wrong with

20   doing that.  So I am going to talk to you a

21   little bit here -- a little bit about

22   advancement decisions.  Who makes the

23   recommendations for advancement?

24   A.    That's a number of people.

25   Q.    In your experience, who typically makes

Page 42

```
 1   the recommendations for advancement?
 2      A.    The supervisor and assistant supervisor.
 3      Q.    If the assistant supervisor makes a
 4   recommendation, does that go to you first?
 5      A.    Should.
 6      Q.    Who's your assistant supervisor?
 7      A.    Rowdi Briggs.
 8      Q.    And where does the -- where does the
 9   recommendation go to or who?
10      A.    We bring that to Brian Edwards.
11      Q.    Do you know if Rowdi Briggs has made a
12   recommendation without your input to Brian
13   Edwards?
14      A.    No.
15      Q.    No, you don't know, or do you know --
16      A.    I don't know.
17      Q.    Is there a standard for -- a standard
18   requirement for employee as far as experience
19   and skill level to make advancement?
20      A.    A written standard, no.
21      Q.    Did you make the recommendations for
22   advancement to Tim Morrison?
23      A.    Excuse me, I didn't catch that.
24      Q.    Are you the one who made the
25   recommendations for advancing Tim Morrison?
```

Page 43

```
1     A.     I don't think he has made an
2   advancement.
3     Q.     Did he automatically start out as an
4   Operator III or II?
5     A.     Operator III.
6     Q.     Whose recommendation was it that he be
7   hired as an Operator III?
8     A.     I don't know.
9     Q.     Did you make that recommendation?
10    A.     No.
11    Q.     Okay.  Arthur Briggs, did you make a
12  recommendation for his advancement?
13    A.     Yes.
14    Q.     Based on what?
15    A.     His improvements of what he is doing,
16  the jobs that he was doing.  He was improving.
17    Q.     Can you -- now you're saying by
18  improvements on the job, can you elaborate what
19  you mean by improvements?
20    A.     Yes.
21    Q.     Go ahead.
22    A.     Okay.  Just in time of doing a better
23  job of grading roads, in time of doing -- just
24  running his equipment, Rowdi is a likable guy on
25  the crew.
```

```
1            I think there's probably some people on

2    the crew that don't have a lot of respect for

3    him and some of the decisions that he has made

4    and whatnot, but overall Rowdi is a likable guy

5    on the crew.  I have never had any troubles with

6    him.  I can call Rowdi at midnight and need him

7    to go out, you know, if we have an emergency.

8    He just has improved a bunch.

9    Q.    I think I may have asked this.  I just

10   can't remember, but is he your second in charge?

11   A.    Yes.  He is assistant supervisor.

12   Q.    When did he become the assistant

13   supervisor?

14   A.    After Chris Carter left, retired.

15   Q.    Do you recall when?

16   A.    Chris Carter was my assistant

17   supervisor.  He retired and then Rowdi took his

18   position.

19   Q.    Do you recall about when that happened?

20   A.    No.

21   Q.    Had Rowdi Briggs ever stated to you that

22   Starkie Cornett should be advanced to Equipment

23   Operator II?

24   A.    No.

25   Q.    Had any of the other operators within
```

Page 45

1    the Powell shop made that recommendation to you?

2    A.    No.

3    Q.    Does Kelly Triplett work for you?

4    A.    Excuse me?

5    Q.    Kelly Triplett, does he work for you?

6    A.    Yes.

7    Q.    Has Kelly Triplett ever told you that

8    she had the skills to be an Equipment Operator

9    II before she was advanced?

10    A.    No.

11    Q.    Did Star ever ask you to run the

12    distributor?

13    A.    I think, yes.

14    Q.    And was she ever trained on the

15    distributor?

16    A.    No.

17    Q.    Did she ever ask to be trained on, or to

18    run any other equipment besides the distributor?

19    A.    The motor grader.

20    Q.    Only the motor grader?

21    A.    Yes.

22    Q.    Did Star ever ask what she needed to do

23    to become an Operator II before she was finally

24    advanced?

25    A.    No.

Page 46

1    Q.    Did you ever tell Star that she wouldn't

2    like running any piece of equipment because it

3    was too dirty and too hot, she wouldn't like it?

4    A.    No.

5    Q.    Can you explain to me what comp time is?

6    A.    Comp time, so if the members on my crew

7    work over the 40 hours given week, they have a

8    choice to either use comp time or get paid

9    overtime for that, and they can bank up to

10   40 hours of comp time.  And with comp time, they

11   can use that then for vacation or -- I think

12   just vacation.

13   Q.    Typically, how do employees get

14   additional hours, more than 40 hours a week?

15   A.    Typically, it's just in snow removal.

16   Q.    Are there other instances where people

17   are needed to come in for overtime?

18   A.    Yes, if we -- you know, if there is an

19   emergency, a tree falls down across the roadway,

20   just an emergency situation.

21   Q.    As part of Road & Bridge, you're tasked

22   with doing special projects?

23         MR. THOMPSON:  Objection to form, vague.

24   BY MR. KELLER:

25   Q.    Besides regular maintenance, sir, is

Page 47

1    Road & Bridge tasked with doing special

2    projects?  I am going to give you an example,

3    like putting in a road, new culverts or bridges

4    or anything like that as such?

5    A.    Yes.

6    Q.    Due to scheduling, are people required

7    to come in on for overtime for the special

8    projects?

9    A.    They're not required.  There's times

10   that I have asked.

11   Q.    Had Star asked for -- to be one of those

12   people that work overtime?

13   A.    Early on, yes.

14   Q.    Was she allowed to work overtime?

15   A.    No.

16   Q.    Why not?

17   A.    Because at the time, she had a lot of

18   things going on.  Her son was just in an

19   accident.  She had gone through a major surgery.

20   I didn't feel that she had a lot of experience

21   to let her go on herself on a Friday, Saturday.

22   Just being her supervisor, I didn't feel good

23   about it, so I didn't let it happen.

24   Q.    Were there other employees that told you

25   they believed that Star had the experience to

Page 48

1    work on Fridays alone?

2     A.    No.

3     Q.    No other -- so no other -- I want to

4    rephrase that because I am a little confused.

5          Were there other employees that stated

6    to you that she could work alone?

7     A.    No.

8          MR. KELLER:  One second, Tom.  I think I

9    am about done here.

10          MR. THOMPSON:  Want to take a quick

11    break?

12          MR. KELLER:  Yeah, I just want to go

13    back through my notes and double check.  I think

14    I'm about done.

15          MR. THOMPSON:  Okay.

16          (A recess was taken from 10:39 a.m.

17    until 10:41 a.m.)

18    BY MR. KELLER:

19     Q.    Getting back to the overtime on

20    weekends, do you know if Star had been working

21    by herself on the weekends in Cody?

22     A.    No, I don't know.

23     Q.    During the regular week, was Star put

24    off by herself to run tasks by herself?

25     A.    Yes, because like mowing, sweeping, that

1   doesn't take two people to operate that piece of

2   equipment.  She would be by herself.

3     Q.    Have there been other crew members that

4   have complained about Star's lack of ability to

5   do work?

6     A.    No.

7     Q.    I am going to ask you a little bit about

8   nicknames.  It seems like I keep hearing all

9   these different names.  It takes me awhile to

10  figure out who anybody is talking about.  So how

11  do crew members get their nicknames?

12    A.    How do --

13    Q.    Yeah, everybody has a nickname.  Is that

14  something that you -- that is given to you while

15  you're working at the shop?

16    A.    I don't know of any nicknames that

17  people have.

18    Q.    Well, I mean, you're called by Paco,

19  right?

20    A.    Yes.

21    Q.    Arthur Briggs, his name is -- everybody

22  calls him Rowdi?

23    A.    Yes.

24    Q.    And I've heard Kelly Triplett, he is

25  called Snuff?

Page 50

1    A.    Yeah.   That's nicknames that we have all

2    had for a long, long time.

3    Q.    Okay.   With Star, I mean, do you call

4    her Sweetie?

5    A.    No.

6    Q.    Okay.   You never used that term when

7    talking with Star?

8    A.    No.

9         MR. KELLER:   That is all the questions I

10   have, Tom.

11        MR. THOMPSON:   I just have a couple

12   follow-ups.

13   BY MR. THOMPSON:

14   Q.    Paco, were you an Operator II and then

15   an Operator III?

16   A.    Yes.

17   Q.    How long did it take you to move from

18   Operator I to Operator II?

19   A.    About seven years.

20   Q.    How long from Operator II to Operator

21   III?

22   A.    I'm not sure about the years.   I'm not

23   sure.

24   Q.    You had, I think tried to explain to us

25   how the day-to-day operations of the Powell shop

Page 51

```
1    work, and as I understand it, people are
2    basically assigned to different equipment for
3    different seasons and they really don't rotate.
4    Is that accurate?
5        A.    Yes.
6        Q.    And so your crew for the winter plowing
7    season, everybody is assigned to a different
8    piece of equipment?
9        A.    Yes.
10       Q.    And same thing for the summertime, could
11   you describe how that works?
12       A.    So in the summertime on our road
13   projects, we have got three belly dump trucks
14   and we have got four end dump trucks.
15           The belly dump trucks are used for
16   hauling material, pit run or gravel, when we're
17   rebuilding or putting maintenance to a roadway.
18           Then they will have a grader operator
19   there and a roller, and the crew, either the
20   grader operator at the end of the day does a
21   rolling, but most of the time somebody will kick
22   off of a truck and do the rolling operation.
23           We have two water trucks.  I try to
24   assign a water truck in that.  We have a
25   summertime or spring and a fall maintenance
```

1    grading program, and where all three of the

2    graders that go to different areas with

3    operators and they grade the roads for the

4    summertime.

5           We go, like, right now, we will be going

6    into the season of catching up with our

7    culverts, projects, stuff like that.  We go into

8    the summer.  We go into hot mix patching, which

9    involves truck drivers.

10           We haul our hot mix patch for a private

11   company that has a lay-down machine does that.

12   We have our own chip operation where we chip

13   seal the roadways.  We use our own trucks, and

14   we have two distributors and one chip machine.

15   Q.    You talked a little bit about whether or

16   not there were certain qualifications that

17   needed to be met from Operator I to Operator II

18   to Operator III.  You use job descriptions for

19   those positions?

20   A.    Yes.

21   Q.    There is minimum qualifications in those

22   job positions, correct?

23   A.    Correct.

24   Q.    Is it fair to say that the real -- one

25   of the important or most important criteria to

Page 53

```
 1   move from Operator I to Operator II and Operator
 2   II to Operator III is not just how many hours
 3   you spend in a piece of equipment, but how
 4   proficient you are in the operation of that
 5   equipment?
 6     A.    True.
 7           MR. THOMPSON:  Thank you.  I don't have
 8   any further questions.
 9           MR. KELLER:  I have a real short
10   rebuttal here, Paco.
11   BY MR. KELLER:
12     Q.    So you kind of understand what is going
13   on now.  I get to ask just a little bit of --
14   elaborate on what the same questions
15   Mr. Thompson asked, so this won't take too long.
16           Just to understand a little bit on the
17   operation, you're saying equipment operators are
18   not moved around into different pieces of
19   equipment, if I am understanding you correctly?
20     A.    Not on a fast pace.  Every piece of
21   equipment that's run is during a daily basis is
22   important.  It's just as important to be a truck
23   driver as it is to be a grader operator.  It's
24   important to be able to proficiently load a load
25   of material onto a truck with a loader, you
```

Page 54

1    know.

2      Q.    But so getting back into that, how does

3    one gain the experience to run the different

4    equipment if you're not training them or moving

5    them on to a new piece of equipment?

6      A.    I will use myself for an example there,

7    if you mind.

8      Q.    Yes, please do.

9      A.    Okay.  I drove truck for Park County for

10    seven years before I advanced.  And then by just

11    showing up every day to work and showing that I

12    had interest in it, and moved -- got myself

13    moved up to where I am at now.

14      Q.    And -- but you say at the same time,

15    Mr. -- I am going to slaughter his name, Kenny

16    Marchant moved up pretty fast, didn't he?

17      A.    Kenny Marchant, yes.

18      Q.    And Arthur Briggs?

19      A.    Yes.

20      Q.    And, boy, I am drawing a blank there,

21    going back to your experience there.  Would it

22    be that same opinion of other people that when

23    you were hired on that you were actually a

24    qualified truck driver?

25      A.    Yes.  I had a CDL, Class A license, when

Page 55

1    I hired on.  Still do to this day.

2     Q.    Is there any truth to the fact that when

3    you hired on, you couldn't even drive the truck

4    out of the parking lot?

5     A.    That's not true.

6         MR. KELLER:  I don't have any further

7    questions, Tom.

8         MR. THOMPSON:  We will go ahead and read

9    and sign.

10        (At 10:52 a.m. the matter was completed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 56

WITNESS' SIGNATURE/CORRECTION PAGE

If there are any typographical errors to your

Deposition, please indicate them below.


PAGE/LINE

_____Change to_____

_____Change to_____

_____Change to_____

_____Change to_____

Any other changes to your Deposition are to be
listed below with a statement as to the reason
for such change.

PAGE/LINE          CORRECTION    REASON FOR CHANGE

_____

_____

_____

_____

_____

     I, DELRAY JONES, do hereby certify that I
have read the foregoing pages of my testimony as
transcribed, and that the same is a true and
correct record of the testimony given by me in
this Deposition on March 14, 2024, except for
the changes made.


_____        _____
Date Signed               DELRAY JONES

Page 57

```
 1

 2

 3                    CERTIFICATE

 4

 5        I, Barbara Morgenweck, Registered
      Professional Reporter, and Certified Court
 6    Reporter, do hereby certify that prior to the
      commencement of the examination the Deponent was
 7    duly sworn by me to testify to the truth, the
      whole truth and nothing but the truth.
 8        I DO FURTHER CERTIFY that the foregoing is
      a verbatim transcript of the testimony as taken
 9    stenographically by me at the time, place and on
      the date hereinbefore set forth, to the best of
10    my ability.
          I DO FURTHER CERTIFY that I am neither a
11    relative nor employee nor attorney nor counsel
      of any of the parties to this action, and that I
12    am neither a relative nor employee of such
      attorney or counsel, and that I am not
13    financially interested in the action.
          Dated this 4th Day of April, 2024.

14

15         Barbara Morgenweck

16        _____

17        Barbara Morgenweck
          COURT REPORTER
18        Registered Professional Reporter
          Certified Court Reporter NM # 526
19        Notary Public

20

21

22

23

24

25
```

Exhibit 4:

Kristopher Cooper Deposition Transcript

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF WYOMING
 2

 3     STARKIE J. CORNETT,        ) Case No.:  22-CV-00034
                                  )
 4                  Plaintiff,    )
                                  )
 5     vs.                        )
                                  )
 6     PARK COUNTY BOARD OF       )
       COUNTY COMMISSIONERS and   )
 7     its PARK COUNTY ROAD AND   )
       BRIDGE DIVISION OF THE     )
 8     PUBLIC WORKS DEPARTMENT,   )
                                  )
 9                  Defendants.   )
       _____)
10

11

12

13

14            DEPOSITION OF KRISTOFER P. COOPER

15            TAKEN ON BEHALF OF THE PLAINTIFF

16                  AT CODY, WYOMING

17            APRIL 23, 2024 AT 3:55 P.M.

18

19

20

21

22     REPORTED BY:

23     JOAN F. MARSHALL, C.S.R.
24     Notary Public

25
```

**Two Sisters Reporting Service**
**(307) 438-1629**

2

A P P E A R A N C E S

MR. MARSHALL E. KELLER, Attorney at Law, of the Keller Law Firm, P.C., P.O. Box 111, Thermopolis, Wyoming 82443, appearing for and on behalf of the Plaintiff.

MR. THOMAS A. THOMPSON, Attorney at Law, of the Wyoming Local Government Liability Pool, 6844 Yellowtail Road, Cheyenne, Wyoming 82009, appearing for and on behalf of the Defendants.

Also present:  Starkie J. Cornett and Brian Edwards.

---

3

I N D E X

TESTIMONY OF KRISTOFER P. COOPER:          PAGE

Examination by Mr. Keller          4
Examination by Mr. Thompson          29
Further Examination by Mr. Keller          49

DEPOSITION EXHIBITS:  (Previously marked)   REFERRED

12 - 7/15/20 Park County Position Statement 18

---

4

THE DEPOSITION OF KRISTOFER P. COOPER was taken on behalf of the Plaintiff on this, the 23rd day of April 2024, at the Park County Public Works Conference Room, 2820 Highway 120 South, Cody, Wyoming, before Two Sisters Reporting Service, by Joan F. Marshall, Court Reporter and Notary Public within and for the State of Wyoming, to be used in an action pending in the United States District Court for the District of Wyoming, said cause being Cause No. 22-CV-00034 in said Court.

AND THEREUPON, the following testimony was adduced, to wit:

KRISTOFER P. COOPER,
having been first duly sworn to tell the truth, the whole truth and nothing but the truth relating to said cause, deposes and says:

EXAMINATION

QUESTIONS BY MR. KELLER:

Q.    Mr. Cooper, can you state your name for the record.

A.    Kristofer Cooper.

Q.    Is there another name you prefer being called, or is Kristofer fine?

A.    Kristofer's fine.

Q.    And I'm the attorney representing -- one

---

5

of the attorneys representing Ms. Cornett, and we have Mr. Tom Thompson here.  Just to let you know, I'm going to ask you questions, and he's going to get a chance with his questions.  And he represents Park County.

A.    Okay.

Q.    And you just took an oath.  Do you understand what that oath means?

A.    Uh-huh.

Q.    And in your own words, what does that oath mean?

A.    That I'm not going to lie.

Q.    And you understand that if you are found to be lying under oath, that there's possible legal ramifications?

A.    Uh-huh.

MR. THOMPSON:  And, sir, you've got to give an audible response.  An uh-huh or an huh-uh she won't be able to pick up as a yes or no.

THE DEPONENT:  Okay.

BY MR. KELLER:

Q.    That was getting into my next set of discussions here.  So there's some rules here for doing the depositions.  The first one is it's an answer/question type forum.  And I'll ask

6

1  questions, and you just go ahead and give a pause
2  and go ahead and answer, and it will be the same
3  with Mr. Thompson. And do your best just to pause
4  and wait and then answer. Otherwise, what ends up
5  happening is we won't get a good record, and Joan
6  will tell us to slow down.
7      And the other is please give audible
8  answers, yes, no; if you don't know, I don't know.
9  Head nods and uh-huhs, the court reporter can't
10 record.
11     A.    Okay.
12     Q.    And you worked for Park County Road &
13 Bridge previously?
14     A.    Yes, I did.
15     Q.    And when did you start working for Park
16 County Road & Bridge?
17     A.    2005.
18     Q.    What was your -- well, previously to
19 working for Park County Road & Bridge, what did you
20 do?
21     A.    I was an equipment operator and truck
22 driver for Harris Trucking. Prior to that, I
23 worked for Nevada County Department of
24 Transportation in Grass Valley, California.
25     Q.    And as far as equipment operator, what

7

1  kind of equipment did you operate before hiring on
2  with Park County Road & Bridge?
3      A.    All kinds of equipment, loaders, dozers,
4  backhoes, graders. Yeah, just about anything
5  that's used in construction and road maintenance.
6      Q.    Did you already have your CDL when you
7  hired on with Park County Road & Bridge?
8      A.    I had a class B, and I got my class A
9  within six months after hiring on.
10     Q.    And how many years did you operate
11 equipment before coming to Park County Road &
12 Bridge?
13     A.    Since 1990.
14     Q.    And when you hired on with Park County
15 Road & Bridge, do you recall what level, pay level,
16 you were hired on?
17     A.    I started on at an entry level.
18 Operator 1 I think it is.
19     Q.    Do you recall when you made equipment
20 operator 2?
21     A.    I don't.
22     Q.    And what about when you made equipment
23 operator 3?
24     A.    I don't remember the date.
25     Q.    Were you an equipment operator -- you

8

1  were an equipment operator 3 before you left
2  Park --
3      A.    Yes.
4      Q.    And when you left Park County, was that
5  voluntarily?
6      A.    No. I was asked to leave.
7      Q.    And what's your understanding of why you
8  were asked to leave Park County?
9      A.    I still don't know.
10     Q.    Were you ever given a formal reason why
11 in a letter?
12     A.    No.
13     Q.    A verbal reason why?
14     A.    Mr. Edwards and I had a meeting in his
15 office, but I still don't have really any specific
16 reason as to why.
17     Q.    When you worked for Park County Road &
18 Bridge, did you work in the Powell shop?
19     A.    I worked in both shops. I started at
20 Cody and transferred to Powell.
21     Q.    When did you transfer to Powell?
22     A.    2010 maybe, somewhere around there.
23     Q.    And do you recall if you were equipment
24 operator 2 when you transferred to Powell?
25     A.    I believe I was operator 3.

9

1      Q.    And as an equipment operator 3, did you
2  help train other employees?
3      A.    Yeah.
4      Q.    Was there a process for training other
5  employees, that you recall?
6      A.    No process. It was just help each other
7  out and give others opportunities.
8      Q.    Would you observe other employees as they
9  were working and then give them tips?
10     A.    Uh-huh, yes.
11     Q.    And what kinds of equipment did you train
12 other employees on?
13     A.    Chip spreader, dozer, grader. Yeah, I
14 didn't really run excavator a whole lot when I
15 worked there, whatever.
16     Q.    When you're talking truck, would that
17 include the end dump?
18     A.    End dumps, belly dumps, yeah, snowplows.
19     Q.    And did you say the dozer?
20     A.    Yeah.
21     Q.    Now, what about the mower tractor?
22     A.    I didn't really operate that very much.
23 I was usually in a grader in the summertime.
24     Q.    Did you work with Del Ray Jones?
25     A.    Yes.

10

1  Q.   How long did you know Del Ray Jones?

2  A.   As long as I worked at the County.

3  Q.   What was with your relationship like with

4  Del Ray Jones?

5  A.   We had a good one for a long time.  We'd

6  go hunting and fishing and camping on weekends.

7  Q.   And did you apply for the foreman job

8  when Dale Hobby left?

9  A.   Yes.

10  Q.   Were you angry with Del Ray Jones for

11  becoming foreman?

12  A.   No.  I was happy for him.  I brought him

13  doughnuts or something that day.

14  Q.   So any issues -- the issues that you may

15  have had with Del Ray Jones, were they work

16  related?

17  A.   Which issues?

18  Q.   Well, let me back up.  Did you have a

19  fight with Mr. Del Ray Jones?

20  A.   No.

21  Q.   Did you ever tell Del Ray Jones that he

22  had ruined your life for making foreman?

23  A.   No.  I told him that when he chose

24  another person over me for a second in command and

25  the fact that he totally turned away from me the

11

1  day I told him I was going to put in for Dale

2  Hobby's position.

3  Q.   When it comes to -- let's get back to the

4  equipment.  When it comes to operating equipment,

5  what do you consider a competent operator of

6  equipment?

7  A.   Someone that's confident and can get in a

8  piece of equipment and operate it proficiently.

9  Q.   And what do you mean by operate it

10  proficiently?

11  A.   Be able to do whatever task is necessary.

12  Q.   And in regards to most of the equipment

13  that you're required to operate in the Powell shop,

14  did you believe that Del Ray Jones was a competent

15  equipment operator?

16  A.   That's questionable.

17  Q.   And why do you say that's questionable?

18  A.   Because I didn't see him in equipment

19  very often.

20  Q.   When you did see him in equipment, did he

21  operate it proficiently?

22  A.   An excavator, yes.  But he was hard on

23  things, and you wanted to make sure you kept your

24  distance.

25  Q.   What equipment did you actually observe

12

1  him operate?

2  A.   That's really about it.

3  Q.   Did you observe him operating end dump

4  trucks?

5  A.   Oh, yes, trucks.

6  Q.   And what about the grader?

7  A.   I don't think I've ever seen him in a

8  grader.

9  Q.   Dozer?

10  A.   Yeah, I think he pushed up at the pit

11  with the dozer.  I think he was pretty good at

12  that.

13  Q.   Mower?

14  A.   I don't remember ever seeing him run

15  mower.

16  Q.   Roller?

17  A.   Yeah, he ran rollers.

18  Q.   How many years did you actually work with

19  Del Ray Jones?

20  A.   In the same shop?

21  Q.   Yes.

22  A.   From, what, 2010 until whenever I left.

23  Q.   Did he ever damage equipment while you

24  were --

25  A.   Oh, yeah.

13

1  Q.   -- at the Powell shop?

2  A.   Yeah.

3  Q.   What equipment did he damage?

4  A.   That excavator, for one.

5  Q.   Do you recall when that happened?

6  A.   We were putting in a big culvert over in

7  Deaver on Road 1 or something like that.  I forget

8  what road it was.  Yeah, he just got down in one

9  hole and just smashed the side out of it because he

10  was in too deep of a ditch.  He didn't realize he

11  was smashing the side of it.

12  Q.   Was there other equipment that you'd

13  observed him damaging?

14  A.   Things always happen in equipment.

15  That's a tough one.

16  Q.   In regards to training in equipment, did

17  you help train Star Cornett in any equipment?

18  A.   I gave her opportunities in it, yes.

19  Q.   And what equipment did you help train her

20  in?

21  A.   A grader, dozer, I think excavator.

22  Q.   Where did you -- with the excavator,

23  where did you give her an opportunity to work the

24  excavator at?

25  A.   Digging out the pond at the shop, the

14

1  Powell shop.

2      Q.   In regards to the grader, did you take a

3  video of her operating the grader?

4      A.   Uh-huh, yes, I did.

5      Q.   And do you recall when you took that

6  video?

7      A.   I don't know the date. It was on the

8  north end of Powell, I think in Road 3 or Lane 3.

9      Q.   Do you recall about what year it was?

10     A.   I don't. 2012 maybe, something. I don't

11 know.

12          MR. KELLER: Do you mind if I showed the

13 video, Tom?

14          MR. THOMPSON: No.

15 BY MR. KELLER:

16     Q.   We'll try to see it on my little screen

17 here, but I have the video, and we'll try to go

18 through it. I'm going to ask you to describe

19 what's being done in the video for the record.

20 Okay?

21     A.   (Deponent nodded.)

22     Q.   If I can pull it up.

23          MR. THOMPSON: Can you establish

24 foundation as to the date, location and all that?

25 ///

15

1  BY MR. KELLER:

2      Q.   Yeah. So in regards to the video, you

3  said it was at the north end of Powell?

4      A.   Yeah, I'm pretty sure it was up on

5  Lane 3.

6      Q.   And do you recall about what year that

7  was?

8      A.   I don't. A couple years before I left

9  the County. I always gave the truck drivers an

10 opportunity to get in the grader because most of

11 them were stuck in trucks. So I always told them,

12 if you want a chance in this thing, get in, go a

13 couple of rounds. There's nothing here you can do

14 that I can't fix in 10, 15 minutes. So get some

15 time in the seat, get in there and use it. This

16 was an opportunity that Star did.

17     Q.   And do you recall about what time of year

18 it was?

19     A.   It was winter.

20     Q.   Winter. And do you recall at Lane 3, do

21 you recall what you were doing with the grader?

22     A.   I was building the road up, fixing mud

23 holes, filling them in.

24          (Whereupon, video turned on.)

25 ///

16

1  BY MR. KELLER:

2      Q.   So can you see that video?

3      A.   Uh-huh.

4      Q.   All right. Back it up to the start. And

5  as you're looking at the video -- it's not playing

6  yet. I believe we're at time 000, and where are we

7  looking at in the video?

8      A.   A road that's being built up with a motor

9  grader.

10     Q.   What type of motor grader is that?

11     A.   John Deere, probably an 872.

12     Q.   And it's what? I think that's a yellow

13 color?

14     A.   Yes.

15     Q.   And we'll hit play, if I can get it.

16 Technology.

17          So we're at -- we went from 00 to 11

18 seconds, and was Star in this grader at this time?

19     A.   Yes.

20     Q.   And what was she doing during that time?

21     A.   Backing up, getting ready to pull a

22 windrow.

23     Q.   Okay. So we went from 11 to 28. Can you

24 describe what was happening in the video at that

25 time?

17

1      A.   She's getting her blade adjusted to move

2  the windrow.

3      Q.   And by blade adjusted, is it turning?

4      A.   It's turning clockwise.

5      Q.   I'll just pause for a moment. And so we

6  just went from 28 to 54. Can you describe what was

7  happening in the video there?

8      A.   Moving forward adjusting the -- lowering

9  the blade to make contact with the dirt to start

10 moving dirt.

11     Q.   And by the dirt, are you talking -- as

12 you're looking at the picture on what would be the

13 right-hand side of the loader, is there what you'd

14 call a windrow?

15     A.   Yes.

16     Q.   And what kind of material is being

17 graded?

18     A.   That's pit run.

19     Q.   So I believe the time is 50 -- is that

20 54? And so from the last number I had to the end

21 time, what was Star doing?

22     A.   Moving dirt to the edge of the road.

23     Q.   And at the end, was that Star Cornett in

24 the video?

25     A.   Yes.

18

1    Q.    And she's in the cab?

2    A.    Yes.

3    Q.    As far as the operation of the grader,

4    was she doing it correctly?

5    A.    Yes.

6    Q.    And what would she have needed to become

7    more proficient?

8    A.    Just time in the equipment.

9    Q.    And were you able to see other equipment

10    operators that were new to the shop operate the

11    grader?

12    A.    Yes.

13    Q.    And who was that?

14    A.    Just about anybody that came to the shop.

15    Q.    Would that have included Kenny Marchant?

16    A.    Yes.

17    Q.    And starting out, how did Star compare

18    skill-level-wise to Kenny Marchant operating the

19    grader?

20    A.    About the same.

21    Q.    Did you get a chance to observe Tim

22    Morrison operate the grader?

23    A.    Yes.

24    Q.    What's your opinion of Tim Morrison's

25    ability to operate the grader?

19

1    A.    He was very rough.

2    Q.    Can you explain rough?

3    A.    Well, he couldn't grasp the concept of

4    laying out pit run.

5    Q.    So can you for us, can you describe the

6    process of laying out pit run?

7    A.    Laying out pit run is an operation to

8    build the road up. Belly dumps will come down the

9    road. They will drop their load where you specify.

10    At that point, you will start to build the road up

11    leaving pit run in place to establish a height and

12    width of the road that you want.

13    Q.    And what was Tim doing that was wrong?

14    A.    He'd always cut the material right off

15    the road. He couldn't just leave material on the

16    road. And he'd taper off the end every time and

17    have a hard time backing up and getting material

18    actually on the road.

19    Q.    And did you get a chance to observe Star

20    Cornett operate other equipment besides the grader?

21    A.    Uh-huh, motor dozer, excavator, plow

22    trucks, belly dumps, whatever.

23    Q.    Did you observe her operating the mower

24    as well?

25    A.    Yes.

20

1    Q.    And what about in the broom and sweep?

2    A.    Yes.

3    Q.    Do you believe from your observations she

4    had the same skill level as Kenny Marchant?

5    A.    Yes.

6    Q.    What about compared to Tim Morrison?

7    A.    I mean yes.

8    Q.    And what do you mean by I mean yes?

9    A.    Tim Morrison was supposed to be a

10    top-hand operator when he came to work with us, and

11    there was no way he was a top-hand operator.

12    Q.    Besides the grader, did you observe him

13    operate any other equipment?

14    A.    Uh-huh.

15    Q.    What equipment did you observe him

16    operate?

17    A.    Dump trucks, loaders, just the basic

18    standard stuff.

19    Q.    Well, let's say for the dump truck, are

20    we talking about the end dump?

21    A.    Uh-huh.

22    Q.    And on the end dump, what issues was he

23    having with the end dump?

24    A.    Just typical stuff, setting chains too

25    tight, not tripping the gate at the right time,

21

1    just the normal rookie stuff.

2    Q.    So what do you mean by tripping, not

3    tripping the gate right? Can you explain?

4    A.    Well, I always have -- when I'm building

5    a road or applying material to a road, I always

6    park, and I have everybody trip their gate when

7    their cab is next to my front tire. That way the

8    load is next to me. So I just back up, get behind

9    the load and lay the load out. And he'd trip it

10    too soon, malfunction, whatever -- I don't know --

11    trip it on down the road just -- yeah, it's like

12    rookie stuff, not paying attention.

13    Q.    And by tripping the gate, you mean

14    opening the gate?

15    A.    Yes, opening the gate.

16    Q.    As far as the other equipment operator 2s

17    in the shop, did Star have in your opinion the

18    equivalent proficiency?

19    A.    Yeah.

20    Q.    And so as far as operating the end dump

21    truck?

22    A.    Uh-huh.

23    Q.    And the belly dump?

24    A.    Yes, yes.

25    Q.    I was about to say I know it's tough.

**22**

1      And what about with the dozer?
2    **A.**   She was new on the dozer, but able to
3  accomplish the task.
4    **Q.**   Safely?
5    **A.**   Uh-huh, yes.
6    **Q.**   And what about operating the excavator?
7    **A.**   Again, that was very new, but she did a
8  very good job.
9    **Q.**   What about for operating the broom and
10  sweep?
11    **A.**   She's about the only one at the County
12  that does it.
13    **Q.**   And the mower, the tractor?
14    **A.**   Yeah.  She's one of the only people that
15  operates in the Powell district.
16    **Q.**   Roller?
17    **A.**   Yes.
18    **Q.**   And by yes, you mean she had the same
19  proficiency as the other --
20    **A.**   Yes, yes.
21    **Q.**   -- equipment operator 2s?
22    **A.**   Yes.
23    **Q.**   Did you get a chance to observe her
24  running the chipper?
25    **A.**   No.

**23**

1    **Q.**   Water tank -- or water truck?
2    **A.**   Yes.
3    **Q.**   And again, I want to ask the same thing.
4  Was her proficiency the same as the other equipment
5  operator 2s in the shop?
6    **A.**   Yes.
7    **Q.**   Did you get to observe how Del Ray Paco
8  treated Star?
9    **A.**   Yes.
10    **Q.**   Did he treat her differently from the
11  other employees within the Powell shop?
12    **A.**   Yes.
13    **Q.**   How so?
14    **A.**   Very short.
15    **Q.**   What do you mean by short?
16    **A.**   Lack of patience.
17    **Q.**   Was that justified?
18    **A.**   No.
19    **Q.**   Did you ever hear Star request comp time?
20    **A.**   Yes.
21    **Q.**   Can you explain what comp time is?
22    **A.**   Comp time is working overtime for
23  compensated leave.
24    **Q.**   Were others around as well that heard
25  Star request comp time?

**24**

1    **A.**   Not at that time.
2    **Q.**   And did Del Ray Jones grant comp time?
3    **A.**   No, not until I offered to come in and
4  work with her.
5    **Q.**   Well, why did Del Ray Jones say she
6  couldn't come in?
7        MR. THOMPSON:  Objection.  Why did he
8  say?
9  BY MR. KELLER:
10    **Q.**   Yeah, let me rephrase it.  Did he give an
11  explanation why she couldn't come in for comp time?
12    **A.**   He said it was unsafe.
13    **Q.**   Did he give a reason why he said it was
14  unsafe?
15    **A.**   He just said it was unsafe for her to be
16  by herself.
17    **Q.**   When Star is or anybody else is operating
18  the broom and sweep, are they typically by
19  themselves?
20    **A.**   Very much so.
21    **Q.**   What about when they're mowing?
22    **A.**   Very much so.
23    **Q.**   And you offered to come in to work with
24  her?
25    **A.**   Yes.

**25**

1    **Q.**   Did Del Ray grant it at that point?
2    **A.**   I believe he said he had to call and
3  check with Brian.
4    **Q.**   Do others ask for comp time?
5    **A.**   All the time.
6    **Q.**   Who else would ask for comp time?
7    **A.**   I would all the time.
8    **Q.**   Do you know if anybody else did?
9    **A.**   Chris Carter did.  Most of the grader
10  operators did, if not all of them, anybody that
11  wanted some time off.
12    **Q.**   And was it regularly granted?
13    **A.**   Yeah, never questioned.
14    **Q.**   And when others would -- when you would
15  ask for comp time, were you ever told that they had
16  to ask for Brian's permission?
17    **A.**   No.
18    **Q.**   Did you ever hear that from anybody else?
19    **A.**   No.
20    **Q.**   Before operating equipment, who would
21  inspect the equipment?
22    **A.**   The operator.
23    **Q.**   And if the operator noticed that there
24  was something wrong with the equipment, what was
25  the procedure?

26

1     A.    Call a mechanic or fix it yourself.

2     Q.    Now, was that the procedure under Dale

3  Hobby?

4     A.    Yes.

5     Q.    Does Del Ray Jones require the same

6  thing?

7     A.    Yeah.  If something was broke, we called

8  a mechanic.  If it needed fluids, we put in our own

9  fluids.

10     Q.    Was it ever put out by Del Ray Jones that

11  everybody had to notify Del Ray Jones if they

12  wanted any maintenance or repairs done?

13     A.    No.

14     Q.    Did you ever hear Star receive a separate

15  instruction regarding getting maintenance or

16  repairs done?

17         MR. THOMPSON:  Objection as to form.

18  BY MR. KELLER:

19     Q.    Go ahead and answer, or if you don't

20  understand, I can reask.

21     A.    I'm not sure.

22     Q.    Did you ever hear Paco tell Star that she

23  had to notify him before calling a mechanic?

24     A.    Yes.

25     Q.    Was that for all maintenance?

27

1     A.    Yes.

2     Q.    Did you ever have to inspect equipment

3  for Star?

4     A.    No.

5     Q.    Do you know if anybody else had to?

6     A.    I don't know.

7     Q.    Have you ever heard Del Ray Jones say

8  that women don't belong in operating equipment?

9     A.    Yes.

10     Q.    When did he say that?

11     A.    Lots of times.

12     Q.    Was that something that would be said in

13  the shop?

14     A.    Not usually.

15     Q.    Where would these conversations happen?

16     A.    In the pickup on weekends.

17     Q.    Were there other people around when he

18  would say this besides just you?

19     A.    No, it was just me.

20     Q.    When you allowed Star in the grader, did

21  Del Ray Jones get upset?

22     A.    Yes.

23     Q.    What did he tell you?

24     A.    He just questioned why I did that.

25     Q.    Did he question you about allowing other

28

1  truck operators to operate?

2     A.    No.

3     Q.    Say it again.

4     A.    No.

5     Q.    And do you recall how long Star ran the

6  grader the day you took that video?

7     A.    I'm going to guess about an hour.

8     Q.    And do you know if Star had any

9  experience running the grader dozer before coming

10  to the Powell shop?

11     A.    Yes, she did.

12     Q.    And how did you learn that she had that

13  experience?

14     A.    Because she was operating equipment here

15  at the Cody shop.

16     Q.    Were you ever told that you were the dark

17  force in the shop?

18     A.    The day I was let go, I believe.

19     Q.    And who told you that?

20     A.    It was either Mr. Edwards or Mr. Jones.

21     Q.    When you were working for the Powell

22  shop, did you ever hear any rumors about Star

23  Cornett?

24     A.    I don't believe so.

25         MR. KELLER:  I don't have any further

29

1  questions, Tom.

2         MR. THOMPSON:  I've got some questions I

3  need to ask.

4         MR. KELLER:  Tom, just before you start,

5  if you can remember the rule not to step on Tom.

6  Let him finish his questions.

7         THE DEPONENT:  Okay.

8                EXAMINATION

9  QUESTIONS BY MR. THOMPSON:

10     Q.    Do you prefer Kristofer or --

11     A.    Yes.

12     Q.    Kristofer, I introduced myself to you

13  before we went on the record.  My name is Tom

14  Thompson.  I represent Park County in this

15  litigation, and I do have some follow-up questions

16  for you regarding your testimony.

17         You talked about being terminated from

18  Park County; is that correct?

19     A.    Yes.

20     Q.    And you stated that you did not know why

21  you were terminated.  Can you tell me what that

22  looked like?  What were you told?  What happened?

23  What was done?

24         MR. KELLER:  I'm just going to object to

25  the form of the question.

30

1  BY MR. THOMPSON:
2     Q.    Go ahead.
3     A.    I was told in the morning to stay in the
4  shop because Mr. Edwards was going to come talk to
5  me. So I waited in the shop and was told my
6  services were no longer required.
7     Q.    And who told you to stay in the shop?
8     A.    Del Ray Jones.
9     Q.    And did Mr. Edwards say anything else to
10 you other than your services were no longer needed?
11    A.    There was a brief discussion.
12    Q.    And what was that?
13    A.    I don't recall verbatim what was said.
14    Q.    What do you recall generally what was
15 discussed?
16    A.    That they didn't need my services
17 anymore. I was no longer needed.
18    Q.    He didn't say why?
19    A.    No.
20    Q.    You recall being told you were the dark
21 force?
22    A.    Yeah.
23    Q.    Did you ask what's that mean?
24    A.    Part of the conversation was the fact
25 that I don't come in smiling, saying good morning

31

1  every day. That's it.
2     Q.    Was there a reference to you had a bad
3  attitude?
4     A.    I don't remember.
5     Q.    Did you get along with the other
6  employees in the --
7     A.    Yes, very much so.
8     Q.    -- in the shop?
9     A.    Yes.
10    Q.    Tim Morrison? Do you believe Tim
11 Morrison would say he got along with you?
12    A.    I can't speak for him.
13    Q.    Did you ever have any words with Tim
14 Morrison?
15    A.    No.
16    Q.    How about Kenny Marchant?
17    A.    Are you talking harsh words?
18    Q.    Yes, just critical words, hey, you're
19 doing this as a rookie, or you can't operate that
20 equipment?
21    A.    No.
22    Q.    You never told either of them that they
23 weren't proficient in the operation of equipment?
24    A.    I don't believe so.
25    Q.    Were you aware that Starkie Cornett was

32

1  secretively recording people in the shop?
2     A.    I'm not aware of that.
3     Q.    You never heard that before?
4     A.    No.
5     Q.    Hmm. You stated that when asked about
6  your relationship with Del Ray Jones, that you had
7  a good relationship. You went hunting and fishing
8  and camping, correct?
9     A.    Yes.
10    Q.    Was there a time that that changed?
11    A.    The day I told him I was applying for
12 Dale Hobby's position.
13    Q.    And so you were both competing for the
14 same job?
15    A.    Yes.
16    Q.    And he was selected over you?
17    A.    Yes.
18    Q.    And you didn't get selected as the
19 assistant shop foreman, and you told him after
20 that, you ruined my fucking life?
21    A.    Not in so many words, but there was a
22 discussion.
23    Q.    What part of it did I miss?
24    A.    I'd have to -- that conversation was very
25 emotional. Yeah, I know there was more to it than

33

1  just that, yeah.
2     Q.    Why did you tell him that he ruined your
3  life or words to that effect?
4     A.    Because he was no longer treating me like
5  a friend.
6     Q.    And you expected to be treated like a
7  friend and not a co-employee?
8     A.    Yes.
9     Q.    And did that mean preferential treatment?
10    A.    No.
11    Q.    What did that mean to you?
12    A.    That we were friends, that we would still
13 go camping and fishing and hunting and do things.
14    Q.    After you applied for the foreman job,
15 did you ask Del Ray to go hunting or camping and
16 fishing with him?
17    A.    I don't believe so.
18    Q.    And so was it him who stopped the
19 relationship, or did you?
20    A.    He did.
21    Q.    Did families -- did you go with families
22 when you went on those events?
23    A.    Yes, with his wife.
24    Q.    Did you go with your wife?
25    A.    No.

34

1    Q.   Are you married?
2    A.   No.
3    Q.   Were you married at the time?
4    A.   Yes.
5    Q.   So it would be you and Paco and his wife
6  going camping?
7    A.   Yes.
8    Q.   Have you talked to Paco at all since your
9  termination from Park County?
10   A.   No.
11   Q.   Prior to today's testimony, have you
12 talked to Mr. Keller, the gentleman sitting to your
13 right?
14   A.   Just setting the time for this meeting.
15   Q.   Did you have any discussions with
16 Mr. Keller other than setting the time for this
17 meeting?
18   A.   No.
19   Q.   Was there ever a time when an
20 investigator from Mr. Keller's office talked to
21 you?
22   A.   No.
23   Q.   Did you volunteer to Ms. Cornett that you
24 would testify on her behalf?
25   A.   I'm not sure how that came about.

35

1    Q.   Do you understand my question?
2    A.   Well, I have to go back.  Somebody
3  approached me and said, you need to fill out a
4  piece of paper saying what went on.  So I don't
5  know if that was an investigator or not.
6    Q.   That was somebody from Mr. Keller's
7  office?
8    A.   I don't know whether that was
9  Mr. Keller's office or the County.
10   Q.   Okay.  Do you recall who gave that to
11 you?
12   A.   I don't.
13   Q.   Do you recall what you did with that?
14   A.   Turned it in.
15   Q.   Do you recall what they were asking you
16 to -- to identify the incident that happened?
17   A.   Yeah, I believe so, just give an
18 explanation of what took place.
19   Q.   And I'm sorry.  I'm not asking it very
20 well, but I'm trying to figure out what it was they
21 were asking you to report on.  Ms. Cornett or your
22 termination, or what was it?
23   A.   No, it was about Ms. Cornett's, I guess,
24 case going on.
25   Q.   Since your termination from the County,

36

1  have you had communication with Ms. Cornett?
2    A.   A little.
3    Q.   Text communication?
4    A.   I don't believe so.
5    Q.   No texts between you and her since you
6  were terminated?
7    A.   Well, other than her letting me know that
8  her son was playing at the Silver Dollar.
9    Q.   That's it?
10   A.   I believe so, yes.
11   Q.   Any e-mail communication?
12   A.   No.
13   Q.   Instant messaging?
14   A.   No.
15   Q.   Phone conversations?
16   A.   Maybe a couple.
17   Q.   Do you socialize with her?
18   A.   No.
19   Q.   There were rumors that while you were
20 working for Park County, that you and Ms. Cornett
21 were having an extramarital affair.  Ever happen?
22   A.   Nope.
23   Q.   Did your wife ever come to Park County
24 accusing you of that, come to the Park County shop?
25   A.   No.

37

1    Q.   She never showed up at the shop?
2    A.   Not when I was there.
3    Q.   What's your ex-wife's name?
4    A.   Erin Evans.
5    Q.   Does she reside here in Cody?
6    A.   No.
7    Q.   Where does she reside?
8    A.   San Antonio, Texas.
9    Q.   Is that her maiden name, Evans?
10   A.   Yes.
11   Q.   You talked about training Ms. Cornett on
12 grader, dozer and excavator.  My understanding of
13 Road & Bridge operations is that when you have a
14 project that's going on, everybody's assigned to a
15 piece of equipment, and you work on that project.
16 Is that fair?
17   A.   That's fair.
18   Q.   And when this training would occur, would
19 this be because Road & Bridge wasn't using this
20 various equipment?
21   A.   At times.
22   Q.   And the training that you referred to is
23 allowing her to become familiar with the grader,
24 the dozer and the excavator, for example, in the
25 shop yard, correct?

38

1    A.    Or on a road.
2    Q.    And did she ever take the dozer on a
3    road?
4    A.    No.
5    Q.    Did she ever take the excavator on a
6    road?
7    A.    No.
8    Q.    Those were all in the shop yard?
9    A.    Or in the pit.
10    Q.    What was the purpose of you taking a
11    video of her on the grader?
12    A.    To help her build confidence.
13    Q.    And how was that going to help her build
14    confidence?
15    A.    To see that she could actually do the
16    job.
17    Q.    Did you take videos of her doing any
18    other jobs?
19    A.    I don't believe so.
20    Q.    Did you take videos of any other truck
21    drivers that you gave an opportunity to operate a
22    grader?
23    A.    I don't know.
24    Q.    Do you recall doing that?
25    A.    It's possible.

39

1    Q.    But do you have any specific
2    recollection?
3    A.    Yeah, not offhand.
4    Q.    Why wouldn't you do the same thing with
5    another operator who you're trying to build up
6    their confidence, video them?
7    A.    I would.
8    Q.    By you just don't have any specific
9    recollection of doing that?
10    A.    I might have of Rowdy.  I know I have,
11    yeah, pictures of various things from work
12    operations.
13    Q.    Photographs?
14    A.    Yes.
15    Q.    But no other videos that you recall right
16    now?
17    A.    Oh, I probably have videos.  I'm just not
18    sure what they're at this time.
19    Q.    I think you answered this question, but I
20    want to make sure I understand what your testimony
21    is going to be at the trial of this matter.  You
22    can be familiar with a piece of equipment, but it
23    doesn't mean you're proficient on that equipment;
24    is that correct?
25    A.    I'm not sure I understand that question.

40

1    Q.    Let me ask it a different way.  You can
2    take me out into the yard, put me in a motor grader
3    and show me how to operate it, let me operate it
4    for an hour, but you'd agree that that doesn't make
5    me proficient in the operation of that equipment?
6    A.    Correct.
7    Q.    To be proficient in the equipment means
8    that you demonstrate a certain skill level?
9    A.    Yes.
10    Q.    And sometimes that means spending time.
11    More time on the equipment, more proficient you
12    become.  Would you agree?
13    A.    Yes.
14    Q.    And I apologize for skipping around a
15    little bit, but I don't want to go over everything
16    you've already testified to.  Did you have any
17    involvement with wage increases for employees?
18    A.    No.
19    Q.    Did you have any involvement in
20    recommendations for a promotion, for example, from
21    operator 1 to 2 to 2 to 3?
22    A.    No.
23    Q.    You stated that you started as an
24    operator 1?
25    A.    Yes.

41

1    Q.    How many years did you spend as an
2    operator 1 before you went to operator 2?
3    A.    Seven -- five, seven years.  I'm not sure
4    of the date.
5    Q.    Okay.  Between five and seven?
6    A.    Yeah.
7    Q.    When you became an operator 1, did you
8    primarily drive truck?
9    A.    Primarily, yes.
10    Q.    Ron Nieters testified earlier today, as
11    did Chrissy -- or Ms. Wallace, I believe former
12    operator for the County Road & Bridge, and they
13    stated when they started, it was a truck driver
14    position or an operator position.  Was it that way
15    when you started, or was it operator 1?
16    A.    I don't understand the question.
17    Q.    When they started with the Road &
18    Bridge --
19    A.    Uh-huh.
20    Q.    -- there was actually -- you were either
21    a truck driver or you were an operator.  Was there
22    that delineation when you started with the County?
23    A.    I'm not sure how -- an operator 1 is
24    primarily a truck driver, but you also have to
25    operate equipment.

42

1   Q.   Okay. And I'm just asking that when you
2   started -- and maybe the easiest way to ask this is
3   that you started as an operator 1. You weren't
4   designated as a truck driver for your job
5   description, correct?
6       A.   I don't believe so.
7       Q.   It was Cindy Stewart. I had the name
8   wrong. Are you familiar with Ms. Stewart?
9       A.   Yes.
10      Q.   Was she an operator 3?
11      A.   I believe so.
12      Q.   Did she primarily drive truck?
13      A.   Yes.
14      Q.   Even as an operator 3?
15      A.   Yes.
16      Q.   Were you working at the Powell shop when
17  Ms. Cornett transferred from the Cody shop to the
18  Powell shop?
19      A.   Yes.
20      Q.   And she came over as an operator 1?
21      A.   I believe so.
22      Q.   Do you know how many years she had
23  experience as an operator 1?
24      A.   I'm not sure.
25      Q.   Do you know Ron Nieters?

43

1       A.   Yes.
2       Q.   Did you ever work with Ron Nieters?
3       A.   Yes.
4       Q.   Do you trust his judgment in regards to
5   his judgment on being a proficient operator?
6       A.   To some degree.
7       Q.   What degree don't you trust it?
8       A.   It's not so much what you know. It's who
9   you know.
10      Q.   Ron Nieters testified that he did not
11  recommend Ms. Cornett to be an operator 2 while she
12  was working for him because she needed more time in
13  the seat. Do you believe that when she came to the
14  Powell shop, she was proficient enough to be an
15  operator 2?
16      A.   I don't know.
17      Q.   You talked about a comp time event, where
18  Ms. Cornett asked for comp time, and Paco said that
19  she couldn't have comp time because he didn't want
20  her working alone, correct?
21      A.   Yes.
22      Q.   Had her son just been in a significant
23  motor vehicle accident?
24      A.   Yes.
25      Q.   Did you ever hear Paco say the reason he

44

1   didn't want her working alone is he was concerned
2   for her safety?
3       A.   Yes.
4       Q.   Is that a valid concern as a supervisor?
5       A.   Yes.
6       Q.   And once you volunteered to come in, he
7   allowed her that comp time; is that correct?
8       A.   After he got acceptance from Mr. Edwards.
9       Q.   Is comp time a budgetary issue?
10      A.   I'm not sure what you mean.
11      Q.   Allowing people to take comp time, do you
12  know if that is a budgetary issue for the County?
13      A.   I don't know.
14      Q.   And you stated that comp time is
15  regularly granted, at least as of when you worked
16  for the County. What's the basis for that
17  testimony?
18      A.   I was always allowed to accumulate comp
19  time.
20      Q.   Do you know who else was?
21      A.   Every other operator in the County.
22      Q.   So anybody in the County, either in the
23  Powell shop or the Cody shop, that asked for comp
24  time, they were granted comp time?
25      A.   Yes.

45

1       Q.   There are witnesses who have testified in
2   this case that have stated that they never asked
3   for comp time. Do you know who asked for comp
4   time?
5       A.   No. It's a personal choice. It was on
6   our time sheets. You could put comp time or
7   overtime.
8       Q.   If you don't know who asked for comp
9   time, how would you know that everybody in the
10  County was granted it?
11      A.   Discussion in the shop.
12          MR. KELLER: I'm just going to object,
13  Tom. That's a misstatement of previous testimony.
14  BY MR. THOMPSON:
15      Q.   Discussion in the shop, when was that
16  discussion, and who was it with and what was said?
17      A.   Any one of the employees in the Cody or
18  Powell shop that would accumulate 40 hours of comp
19  time.
20      Q.   40 hours of regular time?
21      A.   Comp time.
22      Q.   And who did you know that accumulated 40
23  hours of comp time?
24      A.   Just about everybody in the shop.
25      Q.   So review with me who that is. Who are

46

1  you talking about? Tim Morrison? Kenny Marchant?
2  Rowdy Briggs?
3      A.    Yes.
4      Q.    They all had 40 hours plus of comp time?
5      A.    I don't know. I guess I don't know that
6  they actually kept that. Cody shop, yes, lots of
7  employees kept 40 hours of comp time on their time
8  sheets.
9      Q.    How about the Powell shop?
10     A.    As far as I know, there was quite a few.
11 Chris Carter kept comp time. I know I kept comp
12 time. Del Ray kept comp time. Clarence Anderson
13 kept comp time. Cindy Stewart kept comp time.
14 Yeah, lots of people kept comp time.
15     Q.    Was that from snowplowing primarily?
16     A.    Snowplowing or coming in on the weekends.
17     Q.    And how much of that would you attribute
18 to coming in on the weekends when there was no snow
19 event?
20     A.    It depends on the individual.
21     Q.    We'd have to go look at those records?
22     A.    Yeah, you'd have to go look at the time
23 cards.
24     Q.    I believe everybody that's testified to
25 date has stated that when something was wrong with

47

1  their equipment, while Paco was foreman, they
2  called Paco first to report the problem. Your
3  testimony today is that wasn't the case. There was
4  no understanding that you needed to call Paco
5  first.
6      A.    Correct.
7      Q.    Do you know why anybody -- every other
8  person that's testified testified that there was a
9  chain of command that you used?
10         MR. KELLER: Objection.
11         MR. THOMPSON: What's your objection?
12         MR. KELLER: Oh, foundation.
13 BY MR. THOMPSON:
14     Q.    Have you talked to anybody about your
15 deposition today?
16     A.    No.
17     Q.    Have you talked to any of the employees,
18 current employees, of the Powell shop since you
19 left?
20     A.    No.
21     Q.    You've talked about -- counsel asked you
22 a question, had you ever heard Paco say women
23 shouldn't be operating equipment, and you stated
24 that the times that you've heard that have been in
25 a pickup truck on the weekends with just Paco and

48

1  you present, correct?
2      A.    Yes.
3      Q.    Are you aware of Paco ever saying that in
4  the presence of any employees at the Powell shop?
5      A.    I don't know.
6      Q.    You've never heard that, have you, at the
7  Powell shop, Paco say that?
8      A.    To other employees?
9      Q.    Yes.
10     A.    I don't know what he said to other
11 employees.
12     Q.    I'm asking you if you've ever heard him
13 say that to other employees.
14     A.    No, I've never heard him say that to
15 other employees.
16     Q.    Did you ever have any discussions with
17 Ms. Cornett about trying to get Paco fired from his
18 position?
19     A.    No.
20     Q.    Never had that discussion?
21     A.    No.
22     Q.    Okay. I don't believe I have any further
23 questions.
24         (Whereupon, discussion was held off the
25 record.)

49

1         FURTHER EXAMINATION
2  QUESTIONS BY MR. KELLER:
3      Q.    All right. I just have some follow-up
4  questions. I just get to follow up on questions
5  that Mr. Thompson has asked.
6      A.    Okay.
7      Q.    This will be pretty short.
8         All right. Getting back to the training
9  on equipment, was the training on equipment only at
10 times when it wasn't being used on the job?
11     A.    No.
12     Q.    So there were times when there was a job
13 being done and employees were being trained on the
14 equipment as the work's being done?
15     A.    As in the video.
16     Q.    And that was during a job where people
17 were assigned to equipment?
18     A.    Yes.
19     Q.    And was that normal?
20     A.    Yes. I always told the truck drivers if
21 they wanted experience in the grader, get in there.
22     Q.    Is that also -- did you train Rowdy
23 Briggs?
24     A.    Yes.
25     Q.    And is that how you trained Rowdy Briggs

50

1  as well?

2  **A.**    Yes.

3  **Q.**    Did Del Ray Paco get upset with you when

4  you were training Rowdy Briggs that way?

5  **A.**    No.

6  **Q.**    So I want to talk to you a little bit

7  again about your advancement. You mentioned --

8  correct me if I'm wrong. You stated that you were

9  hired in roughly 2005?

10  **A.**    Yes.

11  **Q.**    And it took about five to seven years to

12  become equipment operator 2?

13  **A.**    I believe so.

14  **Q.**    Did you make equipment operator 3 quickly

15  after that?

16  **A.**    I'm not sure of the time frame.

17  **Q.**    Do you recall stating that you believed

18  you were equipment operator 3 when you came to the

19  Powell shop?

20  **A.**    I believe so.

21  **Q.**    Do you recall when you came to the Powell

22  shop?

23  **A.**    I thought it was 2010, 2014, somewhere in

24  there.

25  **Q.**    Let me ask you. Do you know if there

51

1  were during that time, there were hiring or wage

2  increase freezes?

3  **A.**    I don't believe so. There may have been

4  a short hiring freeze, but I'm not sure.

5  **Q.**    And in regards to proficiency on

6  equipment operating, when Kenny Marchant was hired

7  on, was Star as proficient in, say, the end dump

8  truck as Kenny Marchant was?

9  **A.**    Yeah, she was.

10  **Q.**    And what about the dozer?

11  **A.**    I don't think I've ever seen Kenny run a

12  dozer.

13  **Q.**    What about the water truck?

14  **A.**    Yes.

15  **Q.**    Grader?

16  **A.**    I don't -- I don't know.

17  **Q.**    Belly dump?

18  **A.**    Yes.

19  **Q.**    Roller?

20  **A.**    Yes.

21  **Q.**    Do you recall watching -- did you see or

22  observe Kenny Marchant operate the grader when you

23  were there?

24  **A.**    I'm trying -- if I did, it wasn't very

25  often.

52

1  **Q.**    What about the sweep and broom?

2  **A.**    I don't think I've ever seen Kenny

3  operate that.

4  **Q.**    In regards to the dozer, is that

5  something that's primarily run in the pit?

6  **A.**    Yes.

7  **Q.**    How often is it run out on the road?

8  **A.**    Very rarely.

9  **Q.**    And in regards to the grader, who was in

10  charge of the grader, grading job, primarily when

11  you were with Road & Bridge?

12  **A.**    The grader operator.

13  **Q.**    And was that you?

14  **A.**    Yes.

15  **Q.**    And while you were -- before being

16  terminated, was there ever any discussion regarding

17  layoffs?

18  **A.**    No.

19  **Q.**    All right. I don't have any further

20  questions.

21  MR. THOMPSON: I have no further

22  questions.

23  MR. KELLER: While on the record, you

24  have an option to review your transcripts from this

25  deposition and go through it and sign it, and if

53

1  you believe there's corrections that need to be

2  made, you can make those corrections at the end.

3  Some people go through and they will make

4  corrections with spelling, grammar, whatever.

5  If you make a major correction, just let

6  us know where you say, well, my testimony is wrong

7  and you give a whole explanation why, that opens it

8  up to Mr. Tom Thompson to come back in and redepose

9  you or in court to impeach you. So do you want to

10  sign your deposition, or do you want to waive it.

11  THE DEPONENT: I'll sign it.

12  MR. KELLER: Okay. And you'll have to

13  give Joan an address, or it can be sent to me, and

14  I can get that to you.

15  (Whereupon, the deposition was concluded

16  at 5:14 p.m.)

17

18

19

20

21

22

23

24

25

54

<u>CERTIFICATE OF WITNESS</u>

I, KRISTOFER P. COOPER, being first duly sworn, depose and say:

That I am the witness named in the foregoing deposition consisting of pages 1 through 53; that I have read said deposition and know the contents thereof; that the questions contained therein were propounded to me; and that the answers therein contained are true and correct except for any changes that I may have listed on the Change Sheet attached hereto.

Dated this_____day of_____2024.

_____
KRISTOFER P. COOPER


SUBSCRIBED AND SWORN to before me this

_____day of_____2024.

_____
NAME OF NOTARY PUBLIC

NOTARY PUBLIC FOR _____

RESIDING AT _____

MY COMMISSION EXPIRES _____

---

56

<u>REPORTER'S CERTIFICATE</u>

STATE OF WYOMING    )
                    ) SS.
COUNTY OF JOHNSON    )

I, Joan F. Marshall, a Notary Public in and for the State of Wyoming, residing at Buffalo, County of Johnson, State of Wyoming, and a Court Reporter, do hereby certify:

That on the 23rd day of April 2024, at 3:55 p.m., there appeared before me Kristofer P. Cooper, pursuant to notice and stipulation of counsel, as a witness in the foregoing cause;

That pursuant to stipulation of counsel, said witness was first duly sworn by me to tell the truth, the whole truth, and nothing but the truth as he testified in said cause, and said witness was thereupon examined orally by counsel and made answer thereto, under oath, as hereinabove contained;

That the foregoing testimony was taken by me in stenograph and thereafter reduced to typewriting by me or under my supervision, and the foregoing 53 pages contain a full, true and correct record of all the testimony given by the witness, to the best of my ability;

That the reading and signing of the deposition were expressly requested;

That I am not a relative or employee or attorney or counsel of any of the parties in said cause, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action, nor am I a relative of any person interested in said action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 30th day of April 2024.

_____
JOAN F. MARSHALL, C.S.R.
Notary Public
196 Links Lane
Buffalo, Wyoming 82834

My Commission expires August 24, 2029.

---

55

CHANGE SHEET FOR KRISTOFER P. COOPER

PAGE   LINE   READS   SHOULD READ   REASON
                                    FOR CHANGE

_____
KRISTOFER P. COOPER

## 0

**00** [1] - 16:17
**000** [1] - 16:6

## 1

**1** [12] - 7:18, 13:7, 40:21, 40:24, 41:2, 41:7, 41:15, 41:23, 42:3, 42:20, 42:23, 54:5
**10** [1] - 15:14
**11** [2] - 16:17, 16:23
**111** [1] - 2:4
**12** [1] - 3:7
**120** [1] - 4:4
**15** [1] - 15:14
**18** [1] - 3:7
**196** [1] - 56:23
**1990** [1] - 7:13

## 2

**2** [8] - 7:20, 8:24, 40:21, 41:2, 43:11, 43:15, 50:12
**2005** [2] - 6:17, 50:9
**2010** [3] - 8:22, 12:22, 50:23
**2012** [1] - 14:10
**2014** [1] - 50:23
**2024** [4] - 1:17, 4:3, 56:7, 56:20
**2029** [1] - 56:25
**22-CV-00034** [2] - 1:3, 4:10
**23** [1] - 1:17
**23rd** [2] - 4:2, 56:7
**24** [1] - 56:25
**28** [2] - 16:23, 17:6
**2820** [1] - 4:4
**29** [1] - 3:4
**2s** [3] - 21:16, 22:21, 23:5

## 3

**3** [13] - 7:23, 8:1, 8:25, 9:1, 14:8, 15:5, 15:20, 40:21, 42:10, 42:14, 50:14, 50:18
**30th** [1] - 56:20
**3:55** [2] - 1:17, 56:7

## 4

**4** [1] - 3:3
**40** [5] - 45:18, 45:20, 45:22, 46:4, 46:7
**49** [1] - 3:4

## 5

**50** [1] - 17:19
**53** [2] - 54:6, 56:14
**54** [2] - 17:6, 17:20
**5:14** [1] - 53:16

## 6

**6844** [1] - 2:9

## 7

**7/15/20** [1] - 3:7

## 8

**82009** [1] - 2:10
**82443** [1] - 2:5
**82834** [1] - 56:24
**872** [1] - 16:11

## A

**ability** [2] - 18:25, 56:15
**able** [4] - 5:19, 11:11, 18:9, 22:2
**acceptance** [1] - 44:8
**accident** [1] - 43:23
**accomplish** [1] - 22:3
**accumulate** [2] - 44:18, 45:18
**accumulated** [1] - 45:22
**accusing** [1] - 36:24
**action** [3] - 4:8, 56:18, 56:19
**address** [1] - 53:13
**adduced** [1] - 4:12
**adjusted** [2] - 17:1, 17:3
**adjusting** [1] - 17:8
**advancement** [1] - 50:7
**affair** [1] - 36:21
**agree** [2] - 40:4, 40:12
**ahead** [4] - 6:1, 6:2, 26:19, 30:2

**allowed** [3] - 27:20, 44:7, 44:18
**allowing** [3] - 27:25, 37:23, 44:11
**alone** [5] - 43:20, 44:1
**AND** [3] - 1:7, 4:11, 54:18
**Anderson** [1] - 46:12
**angry** [1] - 10:10
**answer** [4] - 6:2, 6:4, 26:19, 56:11
**answer/question** [1] - 5:25
**answered** [1] - 39:19
**answers** [2] - 6:8, 54:8
**Antonio** [1] - 37:8
**apologize** [1] - 40:14
**appeared** [1] - 56:7
**appearing** [2] - 2:5, 2:10
**applied** [1] - 33:14
**apply** [1] - 10:7
**applying** [2] - 21:5, 32:11
**approached** [1] - 35:3
**April** [3] - 4:3, 56:7, 56:20
**APRIL** [1] - 1:17
**assigned** [2] - 37:14, 49:17
**assistant** [1] - 32:19
**AT** [3] - 1:16, 1:17, 54:23
**attached** [1] - 54:11
**attention** [1] - 21:12
**attitude** [1] - 31:3
**Attorney** [2] - 2:3, 2:8
**attorney** [3] - 4:25, 56:17, 56:18
**attorneys** [1] - 5:1
**attribute** [1] - 46:17
**audible** [2] - 5:18, 6:7
**August** [1] - 56:25
**aware** [3] - 31:25, 32:2, 48:3

## B

**backhoes** [1] - 7:4
**backing** [2] - 16:21, 19:17
**bad** [1] - 31:2
**basic** [1] - 20:17
**basis** [1] - 44:16
**became** [1] - 41:7
**become** [4] - 18:6, 37:23, 40:12, 50:12
**becoming** [1] - 10:11
**BEHALF** [1] - 1:15

**behalf** [4] - 2:5, 2:11, 4:2, 34:24
**behind** [1] - 21:8
**belly** [5] - 9:18, 19:8, 19:22, 21:23, 51:17
**belong** [1] - 27:8
**best** [2] - 6:3, 56:15
**between** [2] - 36:5, 41:5
**big** [1] - 13:6
**bit** [2] - 40:15, 50:6
**blade** [3] - 17:1, 17:3, 17:9
**BOARD** [1] - 1:6
**Box** [1] - 2:4
**Brian** [2] - 2:13, 25:3
**Brian's** [1] - 25:16
**Bridge** [13] - 6:13, 6:16, 6:19, 7:2, 7:7, 7:12, 7:15, 8:18, 37:13, 37:19, 41:12, 41:18, 52:11
**BRIDGE** [1] - 1:7
**brief** [1] - 30:11
**Briggs** [4] - 46:2, 49:23, 49:25, 50:4
**broke** [1] - 26:7
**broom** [4] - 20:1, 22:9, 24:18, 52:1
**brought** [1] - 10:12
**budgetary** [2] - 44:9, 44:12
**Buffalo** [2] - 56:5, 56:24
**build** [5] - 19:8, 19:10, 38:12, 38:13, 39:5
**building** [2] - 15:22, 21:4
**built** [1] - 16:8
**BY** [13] - 1:22, 4:18, 5:21, 14:15, 15:1, 16:1, 24:9, 26:18, 29:9, 30:1, 45:14, 47:13, 49:2

## C

**C.S.R** [2] - 1:23, 56:22
**cab** [2] - 18:1, 21:7
**California** [1] - 6:24
**camping** [5] - 10:6, 32:8, 33:13, 33:15, 34:6
**cards** [1] - 46:23
**Carter** [2] - 25:9, 46:11
**Case** [1] - 1:3
**case** [3] - 35:24, 45:2, 47:3
**CDL** [1] - 7:6

**certain** [1] - 40:8
**CERTIFICATE** [2] - 54:1, 56:1
**certify** [1] - 56:6
**chain** [1] - 47:9
**chains** [1] - 20:24
**chance** [5] - 5:4, 15:12, 18:21, 19:19, 22:23
**Change** [1] - 54:10
**CHANGE** [2] - 55:1, 55:2
**changed** [1] - 32:10
**changes** [1] - 54:10
**charge** [1] - 52:10
**check** [1] - 25:3
**Cheyenne** [1] - 2:10
**chip** [1] - 9:13
**chipper** [1] - 22:24
**choice** [1] - 45:5
**chose** [1] - 10:23
**Chris** [2] - 25:9, 46:11
**Chrissy** [1] - 41:11
**Cindy** [2] - 42:7, 46:13
**Clarence** [1] - 46:12
**class** [1] - 7:8
**clockwise** [1] - 17:4
**co** [1] - 33:7
**co-employee** [1] - 33:7
**Cody** [8] - 4:4, 8:20, 28:15, 37:5, 42:17, 44:23, 45:17, 46:6
**CODY** [1] - 1:16
**color** [1] - 16:13
**coming** [3] - 7:11, 28:9, 46:16, 46:18
**command** [2] - 10:24, 47:9
**Commission** [1] - 56:25
**COMMISSION** [1] - 54:24
**COMMISSIONERS** [1] - 1:6
**communication** [3] - 36:1, 36:3, 36:11
**comp** [34] - 23:19, 23:21, 23:22, 23:25, 24:2, 24:11, 25:4, 25:6, 25:15, 43:17, 43:18, 43:19, 44:7, 44:9, 44:11, 44:14, 44:18, 44:23, 44:24, 45:3, 45:6, 45:8, 45:18, 45:21, 45:23, 46:4, 46:7, 46:11, 46:12, 46:13, 46:14
**compare** [1] - 18:17
**compared** [1] - 20:6

**compensated** [1] - 23:23
**competent** [2] - 11:5, 11:14
**competing** [1] - 32:13
**concept** [1] - 19:3
**concern** [1] - 44:4
**concerned** [1] - 44:1
**concluded** [1] - 53:15
**Conference** [1] - 4:4
**confidence** [3] - 38:12, 38:14, 39:6
**confident** [1] - 11:7
**consider** [1] - 11:5
**consisting** [1] - 54:5
**construction** [1] - 7:5
**contact** [1] - 17:9
**contain** [1] - 56:14
**contained** [3] - 54:7, 54:9, 56:12
**contents** [1] - 54:7
**conversation** [2] - 30:24, 32:24
**conversations** [2] - 27:15, 36:15
**Cooper** [3] - 4:19, 4:21, 56:8
**COOPER** [8] - 1:14, 3:2, 4:1, 4:13, 54:2, 54:15, 55:1, 55:25
**Cornett** [16] - 2:13, 5:1, 13:17, 17:23, 19:20, 28:23, 31:25, 34:23, 35:21, 36:1, 36:20, 37:11, 42:17, 43:11, 43:18, 48:17
**CORNETT** [1] - 1:3
**Cornett's** [1] - 35:23
**correct** [13] - 29:18, 32:8, 37:25, 39:24, 40:6, 42:5, 43:20, 44:7, 47:6, 48:1, 50:8, 54:9, 56:14
**correction** [1] - 53:5
**corrections** [3] - 53:1, 53:2, 53:4
**correctly** [1] - 18:4
**counsel** [6] - 47:21, 56:8, 56:9, 56:11, 56:17, 56:18
**County** [33] - 3:7, 4:3, 5:5, 6:12, 6:16, 6:19, 6:23, 7:2, 7:7, 7:11, 7:14, 8:4, 8:8, 8:17, 10:2, 15:9, 22:11, 29:14, 29:18, 34:9, 35:9, 35:25, 36:20, 36:23, 36:24, 41:12, 41:22, 44:12, 44:16, 44:21, 44:22, 45:10,
56:6
**COUNTY** [4] - 1:6, 1:6, 1:7, 56:3
**couple** [3] - 15:8, 15:13, 36:16
**Court** [4] - 4:6, 4:9, 4:10, 56:6
**court** [2] - 6:9, 53:9
**COURT** [1] - 1:1
**critical** [1] - 31:18
**culvert** [1] - 13:6
**current** [1] - 47:18
**cut** [1] - 19:14

## D

**Dale** [4] - 10:8, 11:1, 26:2, 32:12
**damage** [2] - 12:23, 13:3
**damaging** [1] - 13:13
**dark** [2] - 28:16, 30:20
**date** [5] - 7:24, 14:7, 14:24, 41:4, 46:25
**Dated** [1] - 54:12
**Deaver** [1] - 13:7
**deep** [1] - 13:10
**Deere** [1] - 16:11
**Defendants** [2] - 1:9, 2:11
**degree** [2] - 43:6, 43:7
**Del** [23] - 9:24, 10:1, 10:4, 10:10, 10:15, 10:19, 10:21, 11:14, 12:19, 23:7, 24:2, 24:5, 25:1, 26:5, 26:10, 26:11, 27:7, 27:21, 30:8, 32:6, 33:15, 46:12, 50:3
**delineation** [1] - 41:22
**demonstrate** [1] - 40:8
**Department** [1] - 6:23
**DEPARTMENT** [1] - 1:8
**DEPONENT** [2] - 5:20, 29:7, 53:11
**Deponent** [1] - 14:21
**depose** [1] - 54:3
**deposes** [1] - 4:16
**DEPOSITION** [3] - 1:14, 3:6, 4:1
**deposition** [7] - 47:15, 52:25, 53:10, 53:15, 54:5, 54:6, 56:16
**depositions** [1] - 5:24
**describe** [4] - 14:18, 16:24, 17:6, 19:5
**description** [1] - 42:5
**designated** [1] - 42:4

**different** [1] - 40:1
**differently** [1] - 23:10
**digging** [1] - 13:25
**dirt** [4] - 17:9, 17:10, 17:11, 17:22
**discussed** [1] - 30:15
**discussion** [8] - 30:11, 32:22, 45:11, 45:15, 45:16, 48:20, 48:24, 52:16
**discussions** [3] - 5:23, 34:15, 48:16
**distance** [1] - 11:24
**district** [1] - 22:15
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 4:8, 4:9
**ditch** [1] - 13:10
**DIVISION** [1] - 1:7
**Dollar** [1] - 36:8
**done** [6] - 14:19, 26:12, 26:16, 29:23, 49:13, 49:14
**doughnuts** [1] - 10:13
**down** [4] - 6:6, 13:8, 19:8, 21:11
**dozer** [15] - 9:13, 9:19, 12:9, 12:11, 13:21, 19:21, 22:1, 22:2, 28:9, 37:12, 37:24, 38:2, 51:10, 51:12, 52:4
**dozers** [1] - 7:3
**drive** [2] - 41:8, 42:12
**driver** [5] - 6:22, 41:13, 41:21, 41:24, 42:4
**drivers** [3] - 15:9, 38:21, 49:20
**driving** [1] - 9:15
**drop** [1] - 19:9
**duly** [3] - 4:14, 54:2, 56:9
**dump** [11] - 9:17, 12:3, 20:17, 20:19, 20:20, 20:22, 20:23, 21:20, 21:23, 51:7, 51:17
**dumps** [4] - 9:18, 19:8, 19:22
**during** [3] - 16:20, 49:16, 51:1

## E

**e-mail** [1] - 36:11
**easiest** [1] - 42:2
**edge** [1] - 17:22
**Edwards** [6] - 2:14, 8:14, 28:20, 30:4, 30:9, 44:8

**effect** [1] - 33:3
**either** [4] - 28:20, 31:22, 41:20, 44:22
**emotional** [1] - 32:25
**employee** [2] - 33:7, 56:16, 56:17
**employees** [17] - 9:2, 9:5, 9:8, 9:12, 23:11, 31:6, 40:17, 45:17, 46:7, 47:17, 47:18, 48:4, 48:8, 48:11, 48:13, 48:15, 49:13
**end** [14] - 9:17, 9:18, 12:3, 14:8, 15:3, 17:20, 17:23, 19:16, 20:20, 20:22, 20:23, 21:20, 51:7, 53:2
**ends** [1] - 6:4
**entry** [1] - 7:17
**equipment** [62] - 6:21, 6:25, 7:1, 7:3, 7:11, 7:19, 7:22, 7:25, 8:1, 8:23, 9:1, 9:11, 11:4, 11:6, 11:8, 11:12, 11:15, 11:18, 11:20, 11:25, 12:23, 13:3, 13:12, 13:14, 13:16, 13:17, 13:19, 18:8, 18:9, 19:20, 20:13, 20:15, 21:16, 22:21, 23:4, 25:20, 25:21, 25:24, 27:2, 27:8, 28:14, 31:20, 31:23, 37:15, 37:20, 39:22, 39:23, 40:5, 40:7, 40:11, 41:25, 47:1, 47:23, 49:9, 49:14, 49:17, 50:12, 50:14, 50:18, 51:6
**equivalent** [1] - 21:18
**Erin** [1] - 37:4
**establish** [2] - 14:23, 19:11
**Evans** [2] - 37:4, 37:9
**event** [2] - 43:17, 46:19
**events** [1] - 33:22
**ex** [1] - 37:3
**ex-wife's** [1] - 37:3
**EXAMINATION** [3] - 4:17, 29:8, 49:1
**Examination** [3] - 3:3, 3:4, 3:4
**examined** [1] - 56:11
**example** [2] - 37:24, 40:20
**excavator** [11] - 9:14, 11:22, 13:4, 13:21, 13:22, 13:24, 19:21, 22:6, 37:12, 37:24,

38:5
**except** [1] - 54:9
**EXHIBITS** [1] - 3:6
**expected** [1] - 33:6
**experience** [4] - 28:9, 28:13, 42:23, 49:21
**EXPIRES** [1] - 54:24
**expires** [1] - 56:25
**explain** [3] - 19:2, 21:3, 23:21
**explanation** [1] - 24:11, 35:18, 53:7
**expressly** [1] - 56:16
**extramarital** [1] - 36:21

## F

**fact** [2] - 10:25, 30:24
**fair** [2] - 37:16, 37:17
**familiar** [3] - 37:23, 39:22, 42:8
**families** [1] - 33:21
**far** [5] - 6:25, 18:3, 21:16, 21:20, 46:10
**few** [1] - 46:10
**fight** [1] - 10:19
**figure** [1] - 35:20
**fill** [1] - 35:3
**filling** [1] - 15:23
**financially** [1] - 56:18
**fine** [2] - 4:23, 4:24
**finish** [1] - 29:6
**fired** [1] - 48:17
**Firm** [1] - 2:4
**first** [6] - 4:14, 5:24, 47:2, 47:5, 54:2, 56:9
**fishing** [4] - 10:6, 32:7, 33:13, 33:16
**five** [4] - 41:3, 41:5, 50:11
**fix** [2] - 15:14, 26:1
**fixing** [1] - 15:22
**fluids** [2] - 26:8, 26:9
**follow** [3] - 29:15, 49:3, 49:4
**follow-up** [2] - 29:15, 49:3
**following** [1] - 4:11
**FOR** [4] - 1:1, 54:22, 55:1, 55:2
**force** [2] - 28:17, 30:21
**foregoing** [4] - 54:5, 56:8, 56:12, 56:14
**foreman** [6] - 10:7, 10:11, 10:22, 32:19, 33:14, 47:1

**forget** [1] - 13:7
**form** [2] - 26:17, 29:25
**formal** [1] - 8:10
**former** [1] - 41:11
**forum** [1] - 5:25
**forward** [1] - 17:8
**foundation** [2] - 14:24, 47:12
**frame** [1] - 50:16
**freeze** [1] - 51:4
**freezes** [1] - 51:2
**friend** [2] - 33:5, 33:7
**friends** [1] - 33:12
**front** [1] - 21:7
**fucking** [1] - 32:20
**full** [1] - 56:14
**FURTHER** [1] - 49:1

## G

**gate** [6] - 20:25, 21:3, 21:6, 21:13, 21:14, 21:15
**generally** [1] - 30:14
**gentleman** [1] - 34:12
**given** [2] - 8:10, 56:14
**Government** [1] - 2:9
**graded** [1] - 17:17
**grader** [34] - 9:13, 9:23, 12:6, 12:8, 13:21, 14:2, 14:3, 15:10, 15:21, 16:9, 16:10, 16:18, 18:3, 18:11, 18:19, 18:22, 18:25, 19:20, 20:12, 25:9, 27:20, 28:6, 28:9, 37:12, 37:23, 38:11, 38:22, 40:2, 49:21, 51:15, 51:22, 52:9, 52:10, 52:12
**graders** [1] - 7:4
**grading** [1] - 52:10
**grammar** [1] - 53:4
**grant** [2] - 24:2, 25:1
**granted** [4] - 25:12, 44:15, 44:24, 45:10
**grasp** [1] - 19:3
**Grass** [1] - 6:24
**guess** [3] - 28:7, 35:23, 46:5

## H

**hand** [4] - 17:13, 20:10, 20:11, 56:20
**happy** [1] - 10:12
**hard** [2] - 11:22, 19:17
**Harris** [1] - 6:22

**harsh** [1] - 31:17
**head** [1] - 6:9
**hear** [6] - 23:19, 25:18, 26:14, 26:22, 28:22, 43:25
**heard** [8] - 23:24, 27:7, 32:3, 47:22, 47:24, 48:6, 48:12, 48:14
**height** [1] - 19:11
**held** [1] - 48:24
**help** [6] - 9:2, 9:6, 13:17, 13:19, 38:12, 38:13
**hereby** [1] - 56:6
**hereinabove** [1] - 56:11
**hereto** [1] - 54:11
**hereunto** [1] - 56:19
**herself** [1] - 24:16
**Highway** [1] - 4:4
**hired** [5] - 7:7, 7:14, 7:16, 50:9, 51:6
**hiring** [4] - 7:1, 7:9, 51:1, 51:4
**hit** [1] - 16:15
**hmm** [1] - 32:5
**Hobby** [2] - 10:8, 26:3
**Hobby's** [2] - 11:2, 32:12
**hole** [1] - 13:9
**holes** [1] - 15:23
**hour** [2] - 28:7, 40:4
**hours** [5] - 45:18, 45:20, 45:23, 46:4, 46:7
**huhs** [1] - 6:9
**hunting** [4] - 10:6, 32:7, 33:13, 33:15

## I

**identify** [1] - 35:16
**impeach** [1] - 53:9
**IN** [2] - 1:1, 56:19
**incident** [1] - 35:16
**include** [1] - 9:17
**included** [1] - 18:15
**increase** [1] - 51:2
**increases** [1] - 40:17
**individual** [1] - 46:20
**inspect** [2] - 25:21, 27:2
**instant** [1] - 36:13
**instruction** [1] - 26:15
**interested** [2] - 56:18, 56:19
**introduced** [1] - 29:12
**investigator** [2] -

34:20, 35:5
**involvement** [2] - 40:17, 40:19
**issue** [2] - 44:9, 44:12
**issues** [4] - 10:14, 10:17, 20:22

## J

**JOAN** [2] - 1:23, 56:22
**Joan** [4] - 4:6, 6:5, 53:13, 56:5
**job** [10] - 10:7, 22:8, 32:14, 33:14, 38:16, 42:4, 49:10, 49:12, 49:16, 52:10
**jobs** [1] - 38:18
**John** [1] - 16:11
**JOHNSON** [1] - 56:3
**Johnson** [1] - 56:6
**Jones** [19] - 9:24, 10:1, 10:4, 10:10, 10:15, 10:19, 10:21, 11:14, 12:19, 24:2, 24:5, 26:5, 26:10, 26:11, 27:7, 27:21, 28:20, 30:8, 32:6
**judgment** [2] - 43:4, 43:5
**justified** [1] - 23:17

## K

**KELLER** [18] - 2:3, 4:18, 5:21, 14:12, 14:15, 15:1, 16:1, 24:9, 26:18, 28:25, 29:4, 29:24, 45:12, 47:10, 47:12, 49:2, 52:23, 53:12
**Keller** [5] - 2:4, 3:3, 3:4, 34:12, 34:16
**Keller's** [1] - 34:20, 35:6, 35:9
**Kenny** [10] - 18:15, 18:18, 20:4, 31:16, 46:1, 51:6, 51:8, 51:11, 51:22, 52:2
**kept** [9] - 11:23, 46:6, 46:7, 46:11, 46:12, 46:13, 46:14
**kind** [2] - 7:1, 17:16
**kinds** [2] - 7:3, 9:11
**Kristofer** [5] - 4:21, 4:23, 29:10, 29:12, 56:7
**KRISTOFER** [8] - 1:14, 3:2, 4:1, 4:13, 54:2, 54:15, 55:1,

55:25
**Kristofer 's** [1] - 4:24

## L

**lack** [1] - 23:16
**Lane** [4] - 14:8, 15:5, 15:20, 56:23
**last** [1] - 17:20
**Law** [3] - 2:3, 2:4, 2:8
**lay** [1] - 21:9
**laying** [1] - 19:4, 19:6, 19:7
**layoffs** [1] - 52:17
**learn** [1] - 28:12
**least** [1] - 44:15
**leave** [4] - 8:6, 8:8, 19:15, 23:23
**leaving** [1] - 19:11
**left** [6] - 8:1, 8:4, 10:8, 12:22, 15:8, 47:19
**legal** [1] - 5:14
**letter** [1] - 8:11
**letting** [1] - 36:7
**level** [6] - 7:15, 7:17, 18:18, 20:4, 40:8
**Liability** [1] - 2:9
**lie** [1] - 5:12
**life** [3] - 10:22, 32:20, 33:3
**LINE** [1] - 55:2
**Links** [1] - 56:23
**listed** [1] - 54:10
**litigation** [1] - 29:15
**load** [4] - 19:9, 21:8, 21:9
**loader** [1] - 17:13
**loaders** [2] - 7:3, 20:17
**Local** [1] - 2:9
**location** [1] - 14:24
**look** [2] - 46:21, 46:22
**looked** [1] - 29:22
**looking** [3] - 16:5, 16:7, 17:12
**lowering** [1] - 17:8
**lying** [1] - 5:14

## M

**maiden** [1] - 37:9
**mail** [1] - 36:11
**maintenance** [4] - 7:5, 26:12, 26:15, 26:25
**major** [1] - 53:5
**malfunction** [1] - 21:10
**Marchant** [8] - 18:15,

18:18, 20:4, 31:16, 46:1, 51:6, 51:8, 51:22
**marked** [1] - 3:6
**married** [2] - 34:1, 34:3
**MARSHALL** [3] - 1:23, 2:3, 56:22
**Marshall** [2] - 4:6, 56:5
**material** [5] - 17:16, 19:14, 19:15, 19:17, 21:5
**matter** [1] - 39:21
**mean** [14] - 5:11, 11:9, 20:7, 20:8, 21:2, 21:13, 22:18, 23:15, 30:23, 33:9, 33:11, 39:23, 44:10
**means** [3] - 5:8, 40:7, 40:10
**mechanic** [3] - 26:1, 26:8, 26:23
**meeting** [3] - 8:14, 34:14, 34:17
**mentioned** [1] - 50:7
**messaging** [1] - 36:13
**might** [1] - 39:10
**mind** [1] - 14:12
**minutes** [1] - 15:14
**miss** [1] - 32:23
**misstatement** [1] - 45:13
**moment** [1] - 17:5
**months** [1] - 7:9
**morning** [2] - 30:3, 30:25
**Morrison** [7] - 18:22, 20:6, 20:9, 31:10, 31:11, 31:14, 46:1
**Morrison 's** [1] - 18:24
**most** [3] - 11:12, 15:10, 25:9
**motor** [5] - 16:8, 16:10, 19:21, 40:2, 43:23
**move** [1] - 17:1
**moving** [3] - 17:8, 17:10, 17:22
**mower** [5] - 9:21, 12:13, 12:15, 19:23, 22:13
**mowing** [1] - 24:21
**MR** [31] - 2:3, 2:8, 4:18, 5:17, 5:21, 14:12, 14:14, 14:15, 14:23, 15:1, 16:1, 24:7, 24:9, 26:17, 26:18, 28:25, 29:2, 29:4, 29:9, 29:24,

30:1, 45:12, 45:14, 47:10, 47:11, 47:12, 47:13, 49:2, 52:21, 52:23, 53:12
**mud** [1] - 15:22
**MY** [1] - 54:24

## N

**name** [6] - 4:19, 4:22, 29:13, 37:3, 37:9, 42:7
**NAME** [1] - 54:21
**named** [1] - 54:4
**necessary** [1] - 11:11
**need** [4] - 29:3, 30:16, 35:3, 53:1
**needed** [6] - 18:6, 26:8, 30:10, 30:17, 43:12, 47:4
**Nevada** [1] - 6:23
**never** [8] - 25:13, 31:22, 32:3, 37:1, 45:2, 48:6, 48:14, 48:20
**new** [3] - 18:10, 22:2, 22:7
**next** [3] - 5:22, 21:7, 21:8
**Nieters** [4] - 41:10, 42:25, 43:2, 43:10
**normal** [2] - 21:1, 49:19
**north** [2] - 14:8, 15:3
**NOTARY** [2] - 54:21, 54:22
**Notary** [4] - 1:24, 4:6, 56:5, 56:23
**nothing** [3] - 4:15, 15:13, 56:10
**notice** [1] - 56:8
**noticed** [1] - 25:23
**notify** [2] - 26:11, 26:23
**number** [1] - 17:20

## O

**oath** [5] - 5:7, 5:8, 5:11, 5:14, 56:11
**object** [2] - 29:24, 45:12
**objection** [4] - 24:7, 26:17, 47:10, 47:11
**observations** [1] - 20:3
**observe** [11] - 9:8, 11:25, 12:3, 18:21, 19:19, 19:23, 20:12,

20:15, 22:23, 23:7, 51:22
**observed** [1] - 13:13
**occur** [1] - 37:18
**OF** [11] - 1:1, 1:6, 1:7, 1:14, 1:15, 3:2, 4:1, 54:1, 54:21, 56:2, 56:3
of_____2024 [1] - 54:12
of_____
_____2024 [1] - 54:19
**offered** [2] - 24:3, 24:23
**offhand** [1] - 39:3
**office** [4] - 8:15, 34:20, 35:7, 35:9
**often** [3] - 11:19, 51:25, 52:7
**ON** [1] - 1:15
**once** [1] - 44:6
**one** [9] - 4:25, 5:24, 10:5, 13:4, 13:8, 13:15, 22:11, 22:14, 45:17
**opening** [2] - 21:14, 21:15
**opens** [1] - 53:7
**operate** [22] - 7:1, 7:10, 9:22, 11:8, 11:9, 11:13, 11:21, 12:1, 18:10, 18:22, 18:25, 19:20, 20:13, 20:16, 28:1, 31:19, 38:21, 40:3, 41:25, 51:22, 52:3
**operates** [1] - 22:15
**operating** [14] - 11:4, 12:3, 14:3, 18:18, 19:23, 21:20, 22:6, 22:9, 24:17, 25:20, 27:8, 28:14, 47:23, 51:6
**operation** [4] - 18:3, 19:7, 31:23, 40:5
**operations** [2] - 37:13, 39:12
**operator** [43] - 6:21, 6:25, 7:18, 7:20, 7:23, 7:25, 8:1, 8:24, 8:25, 9:1, 11:5, 11:15, 20:10, 20:11, 21:16, 22:21, 23:5, 25:22, 25:23, 39:5, 40:21, 40:24, 41:2, 41:7, 41:12, 41:14, 41:15, 41:21, 41:23, 42:3, 42:10, 42:14, 42:20, 42:23, 43:5,

43:11, 43:15, 44:21, 50:12, 50:14, 50:18, 52:12
**operators** [3] - 18:10, 25:10, 28:1
**opinion** [2] - 18:24, 21:17
**opportunities** [2] - 9:7, 13:18
**opportunity** [4] - 13:23, 15:10, 15:16, 38:21
**option** [1] - 52:24
**orally** [1] - 56:11
**otherwise** [1] - 6:4
**overtime** [2] - 23:22, 45:7
**own** [2] - 5:10, 26:8

## P

**P.C** [1] - 2:4
**p.m** [2] - 53:16, 56:7
**P.M** [1] - 1:17
**P.O** [1] - 2:4
**Paco** [15] - 23:7, 26:22, 34:5, 34:8, 43:18, 43:25, 47:1, 47:2, 47:4, 47:22, 47:25, 48:3, 48:7, 48:17, 50:3
**PAGE** [2] - 3:2, 55:2
**pages** [2] - 54:5, 56:14
**paper** [1] - 35:4
**park** [1] - 21:6
**Park** [20] - 3:7, 4:3, 5:5, 6:12, 6:15, 6:19, 7:2, 7:7, 7:11, 7:14, 8:2, 8:4, 8:8, 8:17, 29:14, 29:18, 34:9, 36:20, 36:23, 36:24
**PARK** [2] - 1:6, 1:7
**part** [2] - 30:24, 32:23
**parties** [1] - 56:17
**patience** [1] - 23:16
**pause** [3] - 6:1, 6:3, 17:5
**pay** [1] - 7:15
**paying** [1] - 21:12
**pending** [1] - 4:8
**people** [7] - 22:14, 27:17, 32:1, 44:11, 46:14, 49:16, 53:3
**permission** [1] - 25:16
**person** [3] - 10:24, 47:8, 56:19
**personal** [1] - 45:5
**phone** [1] - 36:15
**photographs** [1] -

39:13
**pick** [1] - 5:19
**pickup** [2] - 27:16, 47:25
**picture** [1] - 17:12
**pictures** [1] - 39:11
**piece** [4] - 11:8, 35:4, 37:15, 39:22
**pit** [8] - 12:10, 17:18, 19:4, 19:6, 19:7, 19:11, 38:9, 52:5
**place** [2] - 19:11, 35:18
**Plaintiff** [3] - 1:4, 2:6, 4:2
**PLAINTIFF** [1] - 1:15
**play** [1] - 16:15
**playing** [2] - 16:5, 36:8
**plow** [1] - 19:21
**plus** [1] - 46:4
**point** [2] - 19:10, 25:1
**pond** [1] - 13:25
**Pool** [1] - 2:9
**position** [5] - 11:2, 32:12, 41:14, 48:18
**Position** [1] - 3:7
**possible** [2] - 5:14, 38:25
**Powell** [24] - 8:18, 8:20, 8:21, 8:24, 11:13, 13:1, 14:1, 14:8, 15:3, 22:15, 23:11, 28:10, 28:21, 42:16, 42:18, 43:14, 44:23, 45:18, 46:9, 47:18, 48:4, 48:7, 50:19, 50:21
**prefer** [2] - 4:22, 29:10
**preferential** [1] - 33:9
**presence** [1] - 48:4
**present** [2] - 2:13, 48:1
**pretty** [3] - 12:11, 15:4, 49:7
**previous** [1] - 45:13
**previously** [3] - 3:6, 6:13, 6:18
**primarily** [7] - 41:8, 41:9, 41:24, 42:12, 46:15, 52:5, 52:10
**problem** [1] - 47:2
**procedure** [2] - 25:25, 26:2
**process** [3] - 9:4, 9:6, 19:6
**proficiency** [4] - 21:18, 22:19, 23:4, 51:5
**proficient** [9] - 18:7,

31:23, 39:23, 40:5, 40:7, 40:11, 43:5, 43:14, 51:7
**proficiently** [3] - 11:8, 11:10, 11:21
**project** [2] - 37:14, 37:15
**promotion** [1] - 40:20
**propounded** [1] - 54:8
**PUBLIC** [2] - 1:8, 54:21, 54:22
**Public** [5] - 1:24, 4:3, 4:6, 56:5, 56:23
**pull** [2] - 14:22, 16:21
**purpose** [1] - 38:10
**pursuant** [2] - 56:8, 56:9
**pushed** [1] - 12:10
**put** [5] - 11:1, 26:8, 26:10, 40:2, 45:6
**putting** [1] - 13:6

## Q

**questionable** [2] - 11:16, 11:17
**questioned** [2] - 25:13, 27:24
**QUESTIONS** [3] - 4:18, 29:9, 49:2
**questions** [13] - 5:3, 5:4, 6:1, 29:1, 29:2, 29:6, 29:15, 48:23, 49:4, 52:20, 52:22, 54:7
**quickly** [1] - 50:14
**quite** [1] - 46:10

## R

**ramifications** [1] - 5:15
**ran** [2] - 12:17, 28:5
**rarely** [1] - 52:8
**Ray** [23] - 9:24, 10:1, 10:4, 10:10, 10:15, 10:19, 10:21, 11:14, 12:19, 23:7, 24:2, 24:5, 25:1, 26:5, 26:10, 26:11, 27:7, 27:21, 30:8, 32:6, 33:15, 46:12, 50:3
**read** [1] - 54:6
**READ** [1] - 55:2
**reading** [1] - 56:15
**READS** [1] - 55:2
**ready** [1] - 16:21
**realize** [1] - 13:10

**really** [4] - 8:15, 9:14, 9:22, 12:2
**reask** [1] - 26:20
**REASON** [1] - 55:2
**reason** [5] - 8:10, 8:13, 8:16, 24:13, 43:25
**receive** [1] - 26:14
**recollection** [2] - 39:2, 39:9
**recommend** [1] - 43:11
**recommendations** [1] - 40:20
**record** [8] - 4:20, 6:5, 6:10, 14:19, 29:13, 48:25, 52:23, 56:14
**recording** [1] - 32:1
**records** [1] - 46:21
**redepose** [1] - 53:8
**reduced** [1] - 56:13
**reference** [1] - 31:2
**REFERRED** [1] - 3:6
**referred** [1] - 37:22
**regarding** [3] - 26:15, 29:16, 52:16
**regards** [8] - 11:12, 13:16, 14:2, 15:2, 43:4, 51:5, 52:4, 52:9
**regular** [1] - 45:20
**regularly** [2] - 25:12, 44:15
**related** [1] - 10:16
**relating** [1] - 4:15
**relationship** [4] - 10:3, 32:6, 32:7, 33:19
**relative** [1] - 56:16, 56:17, 56:18
**remember** [4] - 7:24, 12:14, 29:5, 31:4
**repairs** [2] - 26:12, 26:16
**rephrase** [1] - 24:10
**report** [2] - 35:21, 47:2
**REPORTED** [1] - 1:22
**reporter** [1] - 6:9
**Reporter** [2] - 4:6, 56:6
**REPORTER 'S** [1] - 56:1
**Reporting** [1] - 4:5
**represent** [1] - 29:14
**representing** [2] - 4:25, 5:1
**represents** [1] - 5:4
**request** [2] - 23:19, 23:25
**requested** [1] - 56:16
**require** [1] - 26:5

**required** [2] - 11:13, 30:6
**reside** [2] - 37:5, 37:7
**RESIDING** [1] - 54:23
**residing** [1] - 56:5
**response** [1] - 5:18
**review** [2] - 45:25, 52:24
**right-hand** [1] - 17:13
**Road** [16] - 2:10, 6:12, 6:16, 6:19, 7:2, 7:7, 7:11, 7:15, 8:17, 13:7, 14:8, 37:13, 37:19, 41:12, 41:17, 52:11
**ROAD** [1] - 1:7
**road** [19] - 7:5, 13:8, 15:22, 16:8, 17:22, 19:8, 19:9, 19:10, 19:12, 19:15, 19:16, 19:18, 21:5, 21:11, 38:1, 38:3, 38:6, 52:7
**roller** [3] - 12:16, 22:16, 51:19
**rollers** [1] - 12:17
**Ron** [4] - 41:10, 42:25, 43:2, 43:10
**rookie** [2] - 21:1, 21:12, 31:19
**Room** [1] - 4:4
**rough** [2] - 19:1, 19:2
**roughly** [1] - 50:9
**rounds** [1] - 15:13
**Rowdy** [5] - 39:10, 46:2, 49:22, 49:25, 50:4
**ruined** [3] - 10:22, 32:20, 33:2
**rule** [1] - 29:5
**rules** [1] - 5:23
**rumors** [2] - 28:22, 36:19
**run** [10] - 9:14, 12:14, 17:18, 19:4, 19:6, 19:7, 19:11, 51:11, 52:5, 52:7
**running** [2] - 22:24, 28:9

**S**

**safely** [1] - 22:4
**safety** [1] - 44:2
**San** [1] - 37:8
**screen** [1] - 14:16
**seal** [1] - 56:20
**seat** [2] - 15:15, 43:13
**second** [1] - 10:24

**seconds** [1] - 16:18
**secretively** [1] - 32:1
**see** [7] - 11:18, 11:20, 14:16, 16:2, 18:9, 38:15, 51:21
**seeing** [1] - 12:14
**selected** [2] - 32:16, 32:18
**sent** [1] - 53:13
**separate** [1] - 26:14
**Service** [1] - 4:5
**services** [3] - 30:6, 30:10, 30:16
**set** [2] - 5:22, 56:19
**setting** [3] - 20:24, 34:14, 34:16
**seven** [4] - 41:3, 41:5, 50:11
**Sheet** [1] - 54:11
**SHEET** [1] - 55:1
**sheets** [2] - 45:6, 46:8
**shop** [43] - 8:18, 11:13, 12:20, 13:1, 13:25, 14:1, 18:10, 18:14, 21:17, 23:5, 23:11, 27:13, 28:10, 28:15, 28:17, 28:22, 30:4, 30:5, 30:7, 31:8, 32:1, 32:19, 36:24, 37:1, 37:25, 38:8, 42:16, 42:17, 42:18, 43:14, 44:23, 45:11, 45:15, 45:18, 45:24, 46:6, 46:9, 47:18, 48:4, 48:7, 50:19, 50:22
**shops** [1] - 8:19
**short** [4] - 23:14, 23:15, 49:7, 51:4
**SHOULD** [1] - 55:2
**show** [1] - 40:3
**showed** [2] - 14:12, 37:1
**side** [3] - 13:9, 13:11, 17:13
**sign** [3] - 52:25, 53:10, 53:11
**significant** [1] - 43:22
**signing** [1] - 56:15
**Silver** [1] - 36:8
**Sisters** [1] - 4:5
**sitting** [1] - 34:12
**six** [1] - 7:9
**skill** [3] - 18:18, 20:4, 40:8
**skill-level-wise** [1] - 18:18
**skipping** [1] - 40:14
**slow** [1] - 6:6
**smashed** [1] - 13:9

**smashing** [1] - 13:11
**smiling** [1] - 30:25
**snow** [1] - 46:18
**snowplowing** [2] - 46:15, 46:16
**snowplows** [1] - 9:18
**socialize** [1] - 36:17
**someone** [1] - 11:7
**sometimes** [1] - 40:10
**somewhere** [2] - 8:22, 50:23
**son** [2] - 36:8, 43:22
**soon** [1] - 21:10
**sorry** [1] - 35:19
**South** [1] - 4:4
**specific** [3] - 8:15, 39:1, 39:8
**specify** [1] - 19:9
**spelling** [1] - 53:4
**spend** [1] - 41:1
**spending** [1] - 40:10
**spreader** [1] - 9:13
**SS** [1] - 56:3
**standard** [1] - 20:18
**Star** [20] - 13:17, 15:16, 16:18, 17:21, 17:23, 18:17, 19:19, 21:17, 23:8, 23:19, 23:25, 24:17, 26:14, 26:22, 27:3, 27:20, 28:5, 28:8, 28:22, 51:7
**STARKIE** [1] - 1:3
**Starkie** [2] - 2:13, 31:25
**start** [5] - 6:15, 16:4, 17:9, 19:10, 29:4
**started** [9] - 7:17, 8:19, 40:23, 41:13, 41:15, 41:17, 41:22, 42:2, 42:3
**starting** [1] - 18:17
**state** [1] - 4:19
**State** [3] - 4:7, 56:5, 56:6
**STATE** [1] - 56:2
**Statement** [1] - 3:7
**STATES** [1] - 1:1
**States** [1] - 4:8
**stating** [1] - 50:17
**stay** [2] - 30:3, 30:7
**stenograph** [1] - 56:13
**step** [1] - 29:5
**Stewart** [3] - 42:7, 42:8, 46:13
**still** [3] - 8:9, 8:15, 33:12
**stipulation** [2] - 56:8, 56:9

**stopped** [1] - 33:18
**stuck** [1] - 15:11
**stuff** [4] - 20:18, 20:24, 21:1, 21:12
**SUBSCRIBED** [1] - 54:18
**summertime** [1] - 9:23
**supervision** [1] - 56:13
**supervisor** [1] - 44:4
**supposed** [1] - 20:9
**sweep** [4] - 20:1, 22:10, 24:18, 52:1
**sworn** [3] - 4:14, 54:3, 56:9
**SWORN** [1] - 54:18

**T**

**TAKEN** [1] - 1:15
**tank** [1] - 23:1
**taper** [1] - 19:16
**task** [2] - 11:11, 22:3
**technology** [1] - 16:16
**terminated** [4] - 29:17, 29:21, 36:6, 52:16
**termination** [3] - 34:9, 35:22, 35:25
**testified** [8] - 40:16, 41:10, 43:10, 45:1, 46:24, 47:8, 56:10
**testify** [1] - 34:24
**TESTIMONY** [1] - 3:2
**testimony** [10] - 4:11, 29:16, 34:11, 39:20, 44:17, 45:13, 47:3, 53:6, 56:12, 56:14
**Texas** [1] - 37:8
**text** [1] - 36:3
**texts** [1] - 36:5
**THE** [8] - 1:1, 1:1, 1:7, 1:15, 4:1, 5:20, 29:7, 53:11
**themselves** [1] - 24:19
**thereafter** [1] - 56:13
**therein** [2] - 54:8, 54:9
**thereof** [1] - 54:7
**thereto** [1] - 56:11
**THEREUPON** [1] - 4:11
**thereupon** [1] - 56:11
**Thermopolis** [1] - 2:4
**this_____day** [1] - 54:12
**THOMAS** [1] - 2:8
**THOMPSON** [13] - 2:8, 5:17, 14:14, 14:23, 24:7, 26:17, 29:2, 29:9, 30:1, 45:14,

47:11, 47:13, 52:21
**Thompson** [6] - 3:4, 5:2, 6:3, 29:14, 49:5, 53:8
**tight** [1] - 20:25
**Tim** [9] - 18:21, 18:24, 19:13, 20:6, 20:9, 31:10, 31:13, 46:1
**tips** [1] - 9:9
**tire** [1] - 21:7
**today** [3] - 41:10, 47:3, 47:15
**today's** [1] - 34:11
**Tom** [8] - 5:2, 14:13, 29:1, 29:4, 29:5, 29:13, 45:13, 53:8
**took** [5] - 5:7, 14:5, 28:6, 35:18, 50:11
**top** [2] - 20:10, 20:11
**top-hand** [2] - 20:10, 20:11
**totally** [1] - 10:25
**tough** [2] - 13:15, 21:25
**tractor** [2] - 9:21, 22:13
**train** [5] - 9:2, 9:11, 13:17, 13:19, 49:22
**trained** [2] - 49:13, 49:25
**training** [8] - 9:4, 13:16, 37:11, 37:18, 37:22, 49:8, 49:9, 50:4
**transcripts** [1] - 52:24
**transfer** [1] - 8:21
**transferred** [3] - 8:20, 8:24, 42:17
**Transportation** [1] - 6:24
**treat** [1] - 23:10
**treated** [2] - 23:8, 33:6
**treating** [1] - 33:4
**treatment** [1] - 33:9
**trial** [1] - 39:21
**trip** [3] - 21:6, 21:9, 21:11
**tripping** [4] - 20:25, 21:2, 21:3, 21:13
**truck** [19] - 6:21, 9:15, 9:16, 15:9, 20:19, 21:21, 23:1, 28:1, 38:20, 41:8, 41:13, 41:21, 41:24, 42:4, 42:12, 47:25, 49:20, 51:8, 51:13
**Trucking** [1] - 6:22
**trucks** [5] - 12:4, 12:5, 15:11, 19:22, 20:17
**true** [2] - 54:9, 56:14

**trust** [2] - 43:4, 43:7
**truth** [6] - 4:14, 4:15, 56:10
**try** [2] - 14:16, 14:17
**trying** [4] - 35:20, 39:5, 48:17, 51:24
**turned** [3] - 10:25, 15:24, 35:14
**turning** [2] - 17:3, 17:4
**Two** [1] - 4:5
**type** [2] - 5:25, 16:10
**typewriting** [1] - 56:13
**typical** [1] - 20:24
**typically** [1] - 24:18

## U

**uh-huhs** [1] - 6:9
**under** [4] - 5:14, 26:2, 56:11, 56:13
**UNITED** [1] - 1:1
**United** [1] - 4:8
**unsafe** [3] - 24:12, 24:14, 24:15
**up** [20] - 5:19, 6:4, 10:18, 12:10, 14:22, 15:4, 15:22, 16:4, 16:8, 16:21, 19:8, 19:10, 19:17, 21:8, 29:15, 37:1, 39:5, 49:3, 49:4, 53:8
**upset** [2] - 27:21, 50:3

## V

**valid** [1] - 44:4
**Valley** [1] - 6:24
**various** [2] - 37:20, 39:11
**vehicle** [1] - 43:23
**verbal** [1] - 8:13
**verbatim** [1] - 30:13
**video** [17] - 14:3, 14:6, 14:13, 14:17, 14:19, 15:2, 15:24, 16:2, 16:5, 16:7, 16:24, 17:7, 17:24, 28:6, 38:11, 39:6, 49:15
**videos** [4] - 38:17, 38:20, 39:15, 39:17
**voluntarily** [1] - 8:5
**volunteer** [1] - 34:23
**volunteered** [1] - 44:6
**vs** [1] - 1:5

## W

**wage** [2] - 40:17, 51:1

**wait** [1] - 6:4
**waited** [1] - 30:5
**waive** [1] - 53:10
**Wallace** [1] - 41:11
**watching** [1] - 51:21
**water** [3] - 23:1, 51:13
**weekends** [5] - 10:6, 27:16, 46:16, 46:18, 47:25
**WHEREOF** [1] - 56:19
**whole** [4] - 4:15, 9:14, 53:7, 56:10
**width** [1] - 19:12
**wife** [4] - 33:23, 33:24, 34:5, 36:23
**wife's** [1] - 37:3
**windrow** [3] - 16:22, 17:2, 17:14
**winter** [1] - 15:19
**Winter** [1] - 15:20
**wise** [1] - 18:18
**wit** [1] - 4:12
**WITNESS** [2] - 54:1, 56:19
**witness** [5] - 54:4, 56:8, 56:9, 56:10, 56:14
**witnesses** [1] - 45:1
**women** [2] - 27:8, 47:22
**words** [6] - 5:10, 31:13, 31:17, 31:18, 32:21, 33:3
**work's** [1] - 49:14
**WORKS** [1] - 1:8
**Works** [1] - 4:3
**WYOMING** [3] - 1:1, 1:16, 56:2
**Wyoming** [9] - 2:5, 2:9, 2:10, 4:5, 4:7, 4:9, 56:5, 56:6, 56:24

## Y

**yard** [3] - 37:25, 38:8, 40:2
**year** [3] - 14:9, 15:6, 15:17
**years** [7] - 7:10, 12:18, 15:8, 41:1, 41:3, 42:22, 50:11
**yellow** [1] - 16:12
**Yellowtail** [1] - 2:10
**yourself** [1] - 26:1

# Exhibit 5:

## Kenny Marchant Deposition Transcript

2

1  A P P E A R A N C E S

2

3  MR. MARSHALL E. KELLER, Attorney at Law, of the

4  Keller Law Firm, P.C., P.O. Box 111, Thermopolis,

5  Wyoming 82443, appearing for and on behalf of the

6  Plaintiff.

7

8  MR. THOMAS A. THOMPSON, Attorney at Law, of the

9  Wyoming Local Government Liability Pool, 6844

10  Yellowtail Road, Cheyenne, Wyoming 82009, appearing

11  for and on behalf of the Defendants.

12

13  Also present:  Starkie J. Cornett and Brian

14  Edwards.

15

16

17

18

19

20

21

22

23

24

25

3

1  I N D E X

2

TESTIMONY OF KENNY A. MARCHANT:          PAGE

3
Examination by Mr. Keller            4
4  Examination by Mr. Thompson          26
Further Examination by Mr. Keller    30
5

6  DEPOSITION EXHIBITS:                 MARKED

7  (No exhibits marked or identified.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          THE DEPOSITION OF KENNY A. MARCHANT was

2  taken on behalf of the Plaintiff on this, the 23rd

3  day of April 2024, at the Park County Public Works

4  Conference Room, 2820 Highway 120 South, Cody,

5  Wyoming, before Two Sisters Reporting Service, by

6  Joan F. Marshall, Court Reporter and Notary Public

7  within and for the State of Wyoming, to be used in

8  an action pending in the United States District

9  Court for the District of Wyoming, said cause being

10  Cause No. 22-CV-00034 in said Court.

11          AND THEREUPON, the following testimony

12  was adduced, to wit:

13              KENNY A. MARCHANT,

14  having been first duly sworn to tell the truth, the

15  whole truth and nothing but the truth relating to

16  said cause, deposes and says:

17              EXAMINATION

18  QUESTIONS BY MR. KELLER:

19      Q.    Kenny, my name is Marshall Keller, and

20  I'm representing Star in this case.

21          So the main reason I have you here today,

22  we're just here to find out information and get

23  some background.  Today is your deposition.  You

24  were just sworn in.  And do you understand what

25  you're swearing in, you know, why you swear in?

5

1      A.    Yes.

2      Q.    And can you explain what that means to

3  you?

4      A.    So you don't commit perjury, so you're

5  not lying under oath.

6      Q.    And what does that mean to you?  What

7  does perjury mean to you?

8      A.    Not telling the truth, not being

9  truthful.

10      Q.    You understand that if you do, that

11  there's possible penalties with that, fines and all

12  the other stuff that may go with that, right?

13      A.    Yes.

14      Q.    And the other rule is, what we're going

15  to try to do is -- it's kind of like playing catch.

16  I'll ask a question and give you time to answer,

17  and then you go ahead and give your answer, and

18  I'll try to pause.  And that way we don't walk on

19  each other because it makes it really hard for

20  Joan, who will then ask us to slow down.  Okay?

21      A.    Okay.

22      Q.    All right.  So you're currently an

23  employee of Park County Road & Bridge?

24      A.    Yes.

25      Q.    And is that out of the Powell shop?

6

1    A.    Yes.

2    Q.    And how long have you worked for Park

3  County Road & Bridge?

4    A.    Five years as of February of this year,

5  so I'm going on my sixth now.

6    Q.    And when you applied, what position did

7  you apply for?

8    A.    I applied for equipment operator, yeah.

9    Q.    And prior to working for Road & Bridge,

10  who did you work for?

11    A.    I worked for Marchant Reclamation out of

12  high school, which was my dad's company, and I

13  worked for him for 18 years or so.  And then I

14  bought it, and then I sold it back to him.  I got

15  tired of working on the road and traveling, so I

16  sold it back to him.  And I tried to find a job

17  here local where I could sleep in my own bed every

18  night.

19    Q.    And how many years were you the owner?

20    A.    Two.

21    Q.    Two.  And what kind of work -- before you

22  became an owner, what kind of work were you doing

23  for the reclamation company?

24    A.    Highway.  It was highway reclamation,

25  operating tractors and small landscaping jobs, that

7

1  sort of thing.

2    Q.    So when you were saying you were

3  operating a tractor, what tractor were you

4  operating?

5    A.    John Deere.  They were 6000 series John

6  Deere.

7    Q.    About how big is 6000 series John Deere?

8    A.    Medium to large size tractors.

9    Q.    And was that the primary piece of

10  equipment you were operating?

11    A.    Yes.

12    Q.    What sort of attachments were with that?

13    A.    We had a loader bucket, a grapple for

14  grabbing big round bales, large round bales and

15  large square bales and pallet forks for loading

16  trucks and material.

17    Q.    Now, in regards to the landscaping, you

18  mentioned small landscaping jobs.  Can you give a

19  better description as to the size and scope?

20    A.    Large yards, residential yards.

21    Q.    What type of equipment were you using on

22  the residential yards?

23    A.    Skid steers, excavators -- excuse me,

24  mini excavators and hand tools, shovels, rakes.

25    Q.    How often were you doing landscaping

8

1  jobs?

2    A.    I'd say maybe one a year.  Primary work

3  was the reclamation work.

4    Q.    So if you had to estimate, about how many

5  hours a year were you putting on a skid steer?

6    MR. THOMPSON:  Over his lifetime or --

7  BY MR. KELLER:

8    Q.    Yeah, each year.

9    A.    I'm a little confused.  Like each year?

10    Q.    Yes.

11    A.    Two weeks a year.

12    Q.    And with the mini excavator, about how

13  many hours a year were you running a mini ex?

14    A.    The same.

15    Q.    Was that every year that you would have a

16  job where you had to run those pieces of equipment?

17    A.    Most years.

18    Q.    So it wasn't a regular piece of equipment

19  that you were running?

20    MR. THOMPSON:  Objection as to form.

21  BY MR. KELLER:

22    Q.    All right.  Let me back up.  So you

23  mentioned that you didn't run it every year,

24  correct?

25    A.    Correct.

9

1    Q.    So there were years where you were not

2  running the mini excavator or the skid steer?

3    MR. THOMPSON:  Objection as to form,

4  asked and answered.

5  BY MR. KELLER:

6    Q.    Go ahead and answer.

7    A.    Yes.

8    Q.    When you hired on with Road & Bridge, did

9  you have to demonstrate your ability for operating

10  equipment?

11    A.    No.

12    Q.    Did you have your commercial driver's

13  license when you were hired?

14    A.    Yes.

15    Q.    I'm just going to run down and ask you

16  about different pieces of equipment.  Before you

17  hired on with Park County Road & Bridge, did you

18  operate a bulldozer?

19    A.    No.

20    Q.    Did you operate -- I think it's called a

21  sweep or a broom?

22    A.    No.

23    Q.    Dump truck and trailer?

24    A.    Yes.

25    Q.    Snowplow and sander?

10

1   A.   No.
2   Q.   Commercial trucks?
3   A.   Yes.
4   Q.   Lowboy belly dump?
5   A.   Belly dump, no.
6   Q.   Roller?
7   A.   No.
8   Q.   Chip spreader?
9   A.   No.
10  Q.   Oil distributor?
11  A.   No.
12  Q.   Water truck?
13  A.   No.
14  Q.   Road grader?
15  A.   No.
16  Q.   And you mentioned the mini excavator.
17  Any other excavators other than the mini ex?
18  A.   Large excavator.
19  Q.   How many hours did you have in the large
20  excavator?
21  A.   It's hard to say.  I would be kind of
22  guessing.  Hundred maybe.
23  Q.   When did you run the large excavator?
24  A.   What year?
25  Q.   Yes.  Do you recall?

11

1   A.   I don't recall.
2   Q.   How often in your current job with Road &
3   Bridge do you operate an excavator?
4   A.   Not very often.
5   Q.   Could you be a little more descriptive?
6   A.   I'm not sure what you're asking.
7   Q.   Well, when you --
8   A.   On a daily basis or in a month, in a
9   year?  Like what --
10  Q.   Yeah.  In a year, about how often do you
11  run an excavator?
12  A.   Maybe one time.
13  Q.   And when you came to Road & Bridge, were
14  you provided training on any of the equipment I
15  mentioned above?
16  A.   Like the day I was hired did I get any
17  training or --
18  Q.   Just over the time since you've been
19  there.
20  A.   What do you mean by training?
21  Q.   Well, I'll just go through the list again
22  with you if you don't mind, then.
23  MR. THOMPSON:  I think he's asking -- the
24  objection would be vagueness.
25  MR. KELLER:  Oh, vagueness.

12

1   MR. THOMPSON:  He's asking what do you
2   mean by training.
3   BY MR. KELLER:
4   Q.   Right.  Did you get trained to operate
5   other equipment when you came to Road & Bridge?
6   MR. THOMPSON:  He doesn't know what the
7   word "training" means.
8   A.   Yeah.  I'm not sure what you mean by
9   training.  Like somebody would show you this is the
10  equipment, this is what we want you to do, and you
11  go do it.
12  BY MR. KELLER:
13  Q.   So you said you had not operated a
14  bulldozer when you started with Park County; is
15  that correct?
16  A.   Correct.
17  Q.   And so when you started with Park County,
18  did they teach you how to run the bulldozer?
19  A.   Yes.
20  Q.   Did they teach you how to run the broom
21  and sweep?
22  A.   Yes.
23  Q.   Did they teach you how to run the
24  snowplow and sander?
25  A.   Yes.

13

1   Q.   Did they have to teach you how to run the
2   mower?
3   A.   No.
4   Q.   Did they have to teach you how to run the
5   belly dump?
6   A.   Yes.
7   Q.   Did you have to learn how to run the
8   roller?
9   A.   Yes.
10  Q.   Did the Road & Bridge teach you how to
11  run the chip spreader?
12  A.   Yes.
13  Q.   Did Road & Bridge teach you how to run
14  the oil distributor?
15  A.   No.
16  Q.   And did Road & Bridge teach you how to
17  run the water truck?
18  A.   Yes.
19  Q.   Has Road & Bridge spent the time teaching
20  you how to run the road grader?
21  A.   Yes.
22  Q.   Did they have to take time with you to
23  teach you how to run the large excavator?
24  A.   Nobody ever trained me in the excavator,
25  no.

14

1   Q.   Do you recall if you were hired on as an
2   operator 1 or operator 2?
3   A.   Operator 2.
4   Q.   And which shop did you start working at
5   when you hired on?
6   A.   The Cody -- or the Powell shop.  Sorry.
7   Q.   And was Star already working at the
8   Powell shop when you started?
9   A.   Yes.
10  Q.   Was there anybody else that started at
11  the same time you did when you were hired on?
12  A.   Not at the Powell shop.
13  Q.   Do you know if there was anybody that was
14  hired on at the same time in the Cody shop?
15  A.   There was two people that I remember,
16  Greg Torczon and Mark Norton.
17  Q.   And you say Greg who?
18  A.   Torczon.
19  Q.   And what was the other one?
20  A.   Mark Norton.
21  Q.   Norton.
22       Have you had the opportunity since you've
23  been at the Powell shop to work around Starkie
24  Cornett?
25  A.   Yes.

15

1   Q.   And when you were hired on, did you
2   observe her operate equipment?
3   A.   Have I -- did I see her operate
4   equipment?
5   Q.   Yes.
6   A.   Yes.
7   Q.   Do you recall what type of equipment you
8   observed her operating when you were hired on?
9   A.   Belly dump with a tractor, truck, loader,
10  a mower, and I believe that's it.
11  Q.   Do you know if she was also operating a
12  broom and sweep at that point in time?
13  A.   I don't recall seeing her run the
14  sweeper.
15  Q.   Okay.  Dozer?
16  A.   No.
17  Q.   Did you ever see her operate the grader?
18  A.   Yes.
19  Q.   Snowplow and sander?
20  A.   Yes.
21  Q.   The roller?
22  A.   Yes.
23  Q.   Chip spreader?
24  A.   No.
25  Q.   And I forgot.  Did you say the dump

16

1   truck?
2   A.   What was the question on the dump truck?
3   Q.   The dump truck, have you seen her run the
4   dump truck?
5   A.   Oh, yes.
6   Q.   And from your observations, did she
7   appear to be a competent equipment operator?
8       MR. THOMPSON:  Objection to form,
9   foundation.
10  BY MR. KELLER:
11  Q.   Go ahead and answer.
12  A.   Yes.
13  Q.   And when you were hired on, was her skill
14  level the same as yours?
15      MR. THOMPSON:  Objection as to form.
16  A.   That's a hard question to answer.  I
17  can't answer that.
18  BY MR. KELLER:
19  Q.   And since you've been at Road & Bridge,
20  you said you've been getting trained in the grader?
21      MR. THOMPSON:  Objection to form,
22  misstates his testimony.
23  A.   Yes.
24  BY MR. KELLER:
25  Q.   And are you still being trained in the

17

1   grader?
2       MR. THOMPSON:  Same objection.
3   A.   Am I still being trained?
4   BY MR. KELLER:
5   Q.   Yeah.
6   A.   I would say I've been trained, and I'm
7   grading on my own now.
8   Q.   And who trained you?
9   A.   Tim Morrison.
10  Q.   Was there anybody else that took part in
11  training you on how to operate the grader?
12  A.   Chris Carter.
13  Q.   When did you start learning how to run
14  the road grader?
15  A.   I don't remember the exact date or -- two
16  and a half years ago.
17  Q.   Do you know if Starkie Cornett was
18  getting any training on the road grader?
19      MR. THOMPSON:  Objection as to form.
20  A.   Yes, she was.
21  BY MR. KELLER:
22  Q.   Do you have knowledge of when that
23  occurred?
24  A.   Around the same time.
25  Q.   Do you recall who was providing the

18

1 training?

2     **A.**   Rowdy, Rowdy Briggs.

3     **Q.**   Do you know if Starkie Cornett was

4 getting training on any other equipment besides the

5 grader?

6     MR. THOMPSON:  Same objection.

7     **A.**   No.

8 BY MR. KELLER:

9     **Q.**   So you don't have knowledge of whether

10 she was or not?

11     **A.**   No.

12     **Q.**   I want to switch gears a bit.  Do you

13 know what comp time is, compensation time?

14     **A.**   Yes.

15     **Q.**   Can you explain that to me?

16     **A.**   It's when you get hours above your 40

17 hours of the week, and rather than getting paid

18 overtime, you can get comp time and use those as

19 your -- for days you take off.

20     **Q.**   Is that sort of like, another descriptor

21 I guess from my understanding, would be you're

22 building up time, you're banking time as in for

23 like taking a day off vacation time kind of?

24     **A.**   Yes.

25     **Q.**   Are you provided with comp time when you

19

1 ask for it?

2     **A.**   Yes.  You mean when I -- I don't ever ask

3 for comp time, but if I'm asked to work a day, I'm

4 allowed to have the comp time if I want it.

5     **Q.**   So to clarify, you're asked to come in

6 for extra time, and you don't ask for extra time is

7 what you're saying?

8     **A.**   Right.

9     **Q.**   Okay.

10     **A.**   But if -- yes.

11     **Q.**   I think that was a bad question.  So just

12 to clarify, you're asked to come in for overtime?

13     **A.**   Occasionally, yes.

14     **Q.**   And when you come in on overtime, are you

15 operating equipment by yourself?

16     **A.**   No.

17     **Q.**   Is that because you're working on

18 projects or --

19     **A.**   Yes.

20     **Q.**   Have you been around when Star has

21 requested overtime for comp time?

22     **A.**   I don't recall.

23     **Q.**   And you've run the sweep and mower,

24 correct?

25     **A.**   Here?

20

1     **Q.**   Yes.

2     **A.**   The sweep, yes.  The mower, no.

3     **Q.**   When you're running the sweep, is that

4 something that you'd operate by yourself?

5     **A.**   Yes.

6     MR. THOMPSON:  Just for clarification of

7 the record, you mean operating the equipment?

8     MR. KELLER:  Yes.

9 BY MR. KELLER:

10     **Q.**   Would there be other people around you

11 from Road & Bridge when you're operating the --

12 well, let me back up.  Can you give me a

13 description of what you're doing when you're

14 running the sweep?

15     **A.**   I guess I don't understand your question.

16 What --

17     **Q.**   Yeah.  Describe what the sweep is and

18 what you're doing when you're operating a sweep.

19     **A.**   Well, there's one person that sits in the

20 sweeper that runs it, and you may be sweeping an

21 intersection, you might be sweeping for chipping

22 during chip seal.  Is that what you're looking for?

23     **Q.**   Yeah.  What is a sweep?

24     **A.**   It's a broom.

25     **Q.**   So the reason I'm asking is for the

21

1 record, if you can describe it for the record, what

2 the machinery looks like and what it does.

3     **A.**   It's a piece of equipment with a cab on

4 it, and then down below it's got a broom that

5 turns.  You can raise the broom up and down, and

6 it's got a BTO to engage it in to make it turn, to

7 make the broom turn.

8     **Q.**   And that's for cleaning up the street,

9 correct?

10     **A.**   Correct.

11     **Q.**   And there's times when you're operating

12 that piece of equipment, and no one else from

13 Road & Bridge is there?

14     **A.**   Can be, yes.

15     **Q.**   If you were operating a sweep on comp

16 time, would there be any difference between how it

17 would be operated during the regular week?

18     MR. THOMPSON:  Objection as to form.

19     **A.**   No.

20 BY MR. KELLER:

21     **Q.**   Do you know if Del Ray Paco allowed Star

22 to have overtime or comp time?

23     **A.**   No, I don't know.

24     **Q.**   When it comes to equipment maintenance or

25 breakdowns, how do you -- what's the normal

22

1  procedure for getting it taken care of?

2      A.    If you break -- if you break something or

3  if you -- could you repeat that question again,

4  please?

5      Q.    Right.  Do you notice -- for maintenance

6  or a breakdown, how do you normally deal with that

7  maintenance issue?

8      A.    You contact Paco and let him know that

9  it's time for that equipment to be maintenanced,

10  and then you go back to the shop and maintenance

11  it.

12     Q.    Do you ever contact the mechanic

13  directly?

14     A.    Typically Paco.

15     Q.    Back when you were hired on in 2019,

16  2020, was Star Cornett operating the same equipment

17  that you were?

18           MR. THOMPSON:  Objection as to form,

19  foundation.

20     A.    Could you repeat that again?

21  BY MR. KELLER:

22     Q.    So back in 2019 and 2020 when you

23  observed Star Cornett operating equipment --

24     A.    Was she running the same equipment I was?

25     Q.    Yes.

23

1      A.    For the most part, yes.

2      Q.    Have you had a chance to see your

3  personnel file?

4      A.    Could you be more specific on that,

5  personnel file?

6      Q.    Yeah, your personnel file here at Road &

7  Bridge, have you had a chance to see your personnel

8  file?

9      A.    No.

10     Q.    Have you ever had any accidents while

11  operating equipment here at Road & Bridge?

12     A.    Yes.

13     Q.    Were you disciplined for those accidents?

14     A.    Define disciplined.  Like disciplined

15  how?

16           MR. THOMPSON:  Thanks.  You saved me an

17  objection.

18  BY MR. KELLER:

19     Q.    Do you know if you had a formal written

20  discipline against you?

21     A.    I don't know.

22     Q.    So you don't know if that was included in

23  your personnel file?

24     A.    Don't know.

25     Q.    What was the accident?

24

1      A.    I was at the batch plant in an end dump,

2  and I backed up and caught the bumper on a concrete

3  barrier wall and bent the bumper up on a truck.

4      Q.    Do you recall when that happened?

5      A.    I want to say spring of last year, summer

6  of last year.

7      Q.    Have you ever observed Del Ray Paco

8  calling Starkie Cornett sweetie?

9      A.    No.

10     Q.    Have you ever observed Del Ray Paco

11  saying women should not be operating equipment?

12     A.    No.

13           MR. KELLER:  One second, Tom.

14  BY MR. KELLER:

15     Q.    And in regards to Del Ray Paco, does he

16  treat Star Cornett the same way as he does the rest

17  of the crew?

18           MR. THOMPSON:  Objection as to form.

19     A.    As far as I've noticed, yeah.

20  BY MR. KELLER:

21     Q.    And you've noticed no difference?

22           MR. THOMPSON:  Asked and answered.

23     A.    No.

24           MR. KELLER:  Just give me a second, Tom.

25           (Whereupon, a recess was taken at 9:42

25

1  and subsequently reconvened at 9:45.)

2  BY MR. KELLER:

3      Q.    So getting back to the equipment

4  maintenance, who typically checks your equipment?

5      A.    We do.  Like before we go out for the

6  day?

7      Q.    Uh-huh.

8      A.    We do.

9      Q.    And by we, you mean each individual

10  operator?

11     A.    Each individual operator, yes.

12     Q.    And do you do your own checks, then?

13     A.    Yes.

14     Q.    And is Star allowed to check her own

15  equipment?

16           MR. THOMPSON:  Objection as to form.

17     A.    Yes.

18  BY MR. KELLER:

19     Q.    Have you seen anybody told to check her

20  equipment?

21     A.    No.

22     Q.    Have you ever observed Del Ray Paco going

23  out and checking her equipment for her?

24     A.    No.

25     Q.    And prior to today or this morning, what

26

1  did you do for preparing for your depositions?

2      A.    I didn't really do anything to prepare.

3  I just came to work and got in the pickup and came

4  up here.

5      Q.    Did you meet with anybody last week in

6  preparation for your depositions?

7      A.    Yes.

8      Q.    And was that your -- besides the

9  attorney, anybody else?

10     A.    No.

11         MR. KELLER:  I don't have any further

12  questions, Tom.

13              EXAMINATION

14  QUESTIONS BY MR. THOMPSON:

15     Q.    I have a couple of follow-up questions,

16  Kenny.  You talked about working reclamation work,

17  and my understanding is that you worked for your

18  father who had a reclamation business while you

19  were in high school.  Is that correct?

20     A.    I did a little in high school, yes.

21     Q.    And then you also worked for him after

22  high school for approximately 18 years?

23     A.    Correct.

24     Q.    And did that reclamation involve highway

25  reclamation primarily?

27

1      A.    Yes.

2      Q.    And there was also, you mentioned, small

3  landscaping jobs that went along with that?

4      A.    Yes.

5      Q.    You described some of the equipment,

6  including a 6000 series tractor that you operated.

7  Did you operate any trucks while working

8  reclamation work?

9      A.    Yes.

10     Q.    What sort of trucks?

11     A.    We had trucks that we hauled all of our

12  equipment from job to job with.

13     Q.    And what sort of trucks were those?

14     A.    They were large tractor trucks,

15  Freightliner, Freightliners.

16     Q.    Tractor-trailer -- or a tractor-trailer

17  and a tractor combination?

18     A.    Yes.  We had 48-foot flatbed trailers and

19  a 53-foot flatbed trailer for hauling straw, square

20  bales and round bales.

21     Q.    When did you get your CDL?

22     A.    When I was 20, approximately.

23     Q.    Was that required as part of the

24  reclamation work and truck hauling --

25     A.    Yes.

28

1      Q.    -- that you were doing for your father?

2      A.    Yes.

3      Q.    You mentioned operating both a skid steer

4  and a mini excavator, and you estimated

5  approximately two weeks a year most years.  When

6  you got hired on with Road & Bridge, would you have

7  considered yourself proficient in the operation of

8  a skid steer?

9      A.    Yes.

10     Q.    Would you have considered yourself

11  proficient in the operation of a mini excavator?

12     A.    Yes.

13     Q.    Counsel asked you some questions about

14  training, and I think you had a question back that

15  I don't understand what training means, and that

16  was never defined for you.  How would you define

17  what training you received on various equipment for

18  Road & Bridge?

19     A.    Basically, you would get shown the

20  equipment and kind of get a briefing on the

21  controls inside and told what to do, and then you

22  go do it.

23     Q.    So less than 10, 15 minutes tops?

24     A.    I would say yes, 10 minutes.

25     Q.    You weren't taken aside for a week and

29

1  said, this is a piece of equipment, and I'm going

2  to train you how to operated on this rig?  That

3  didn't happen?

4      A.    No.

5      Q.    And as far as your observations about

6  Ms. Cornett, my understanding of how Road & Bridge

7  works is you come in in the morning, you know what

8  your assignment's going to be or you receive it

9  that morning, and you go operate equipment.  You're

10  not observing Ms. Cornett every day, are you?

11     A.    No.

12     Q.    There's times that she's doing things

13  that you're not present in the same location.

14  Would that be fair?

15     A.    Yes.

16     Q.    You mentioned -- there was discussion

17  about comp time, and you informed counsel that you

18  don't ask for comp time, but there are events which

19  result in comp time.  Has that primarily been snow

20  events --

21     A.    Yes.

22     Q.    -- where you get called in because of a

23  storm and the requirement that you need to plow

24  roads?

25     A.    Mainly, yes.

30

1  Q.  Do you know who Brian Edwards is?

2  A.  I do, yes.

3  Q.  He's with us here today.  He's the county

4  engineer?

5  A.  Yes.

6  Q.  Were you personal friends with Brian

7  Edwards before hiring on with the County?

8  A.  No.

9  Q.  Did you have any social relationship --

10  MR. KELLER:  I'm going to just object.

11  It's beyond the scope.

12  BY MR. THOMPSON:

13  Q.  Were you a social friend or social

14  acquaintance with Brian Edwards before hiring on?

15  A.  No.

16  Q.  Did you interview for your position with

17  Park County Road & Bridge?

18  A.  Yes.

19  MR. THOMPSON:  I don't have any further

20  questions.

21  FURTHER EXAMINATION

22  QUESTIONS BY MR. KELLER:

23  Q.  All right.  Getting back to -- I want to

24  talk to you a little bit about the reclamation.

25  This has been brought up.  Can you describe what

31

1  reclamation is, what highway reclamation is, what

2  you did?

3  A.  Well, when they -- when -- highway

4  reclamation is when they go in and build a road or

5  an existing road, when they do work on it, anything

6  they disturb in the highway right-of-way has to be

7  reclaimed, reseeded.  So you go in there.  You'll

8  disk it up, drill-seed it with grain drills like

9  farmers use, and then fertilize it and then blow

10  straw on it for mulch.  And if it's too steep for

11  mulch, you'll hydroseed it or lay erosion blanket

12  on it.

13  Q.  And that's mainly done with the tractor?

14  A.  Multiple tractors, yes, four to five.

15  Q.  And regarding the comp time, do you know

16  of other people that come in on weekends to get

17  comp time?

18  A.  What do you mean by come in?  Just like

19  come in on their own without asking or --

20  Q.  Yeah.  Let me back up.  Do you know

21  people that just ask for overtime to get comp time?

22  A.  I don't.

23  MR. KELLER:  I don't have any further

24  questions.

25  MR. THOMPSON:  We'll read and sign, and

32

1  I'll give you the address after.

2  (Whereupon, the deposition was concluded

3  at 9:55 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

33

1  CERTIFICATE OF WITNESS

2  I, KENNY A. MARCHANT, being first duly

3  sworn, depose and say:

4  That I am the witness named in the

5  foregoing deposition consisting of pages 1 through

6  32; that I have read said deposition and know the

7  contents thereof; that the questions contained

8  therein were propounded to me; and that the answers

9  therein contained are true and correct except for

10  any changes that I may have listed on the Change

11  Sheet attached hereto.

12  Dated this_____day of_____2024.

13

14

15  _____

16  KENNY A. MARCHANT

17

18  SUBSCRIBED AND SWORN to before me this

19  _____day of_____2024.

20

21  _____

22  NAME OF NOTARY PUBLIC

22  NOTARY PUBLIC FOR _____

23  RESIDING AT _____

24  MY COMMISSION EXPIRES _____

25

34

1  CHANGE SHEET FOR KENNY A. MARCHANT

2  PAGE   LINE   READS        SHOULD READ      REASON
                              FOR CHANGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  _____
       KENNY A. MARCHANT

35

1              REPORTER'S CERTIFICATE

2

   STATE OF WYOMING        )
3                          ) SS.
   COUNTY OF JOHNSON       )

4

5          I, Joan F. Marshall, a Notary Public in
   and for the State of Wyoming, residing at Buffalo,
6  County of Johnson, State of Wyoming, and a Court
   Reporter, do hereby certify:
7          That on the 23rd day of April 2024, at
   9:06 a.m., there appeared before me KENNY A.
8  MARCHANT, pursuant to notice and stipulation of
   counsel, as a witness in the foregoing cause;
9          That pursuant to stipulation of counsel,
   said witness was first duly sworn by me to tell the
10 truth, the whole truth, and nothing but the truth
   as he testified in said cause, and said witness was
11 thereupon examined orally by counsel and made
   answer thereto, under oath, as hereinabove
12 contained;
           That the foregoing testimony was taken by
13 me in stenograph and thereafter reduced to
   typewriting by me or under my supervision, and the
14 foregoing 32 pages contain a full, true and correct
   record of all the testimony given by the witness,
15 to the best of my ability;
           That the reading and signing of the
16 deposition were expressly requested;
           That I am not a relative or employee or
17 attorney or counsel of any of the parties in said
   cause, nor am I a relative or employee of such
18 attorney or counsel, nor am I financially
   interested in the action, nor am I a relative of
19 any person interested in said action.
           IN WITNESS WHEREOF, I have hereunto set my
20 hand and seal this 30th day of April 2024.

21

22                  _____
                    JOAN F. MARSHALL, C.S.R.
23                  Notary Public
                    196 Links Lane
24                  Buffalo, Wyoming 82834

25
   My Commission expires August 24, 2029.

## 1

**1** [2] - 14:2, 33:5
**10** [2] - 28:23, 28:24
**111** [1] - 2:4
**120** [1] - 4:4
**15** [1] - 28:23
**18** [2] - 6:13, 26:22
**196** [1] - 35:23

## 2

**2** [2] - 14:2, 14:3
**20** [1] - 27:22
**2019** [2] - 22:15, 22:22
**2020** [2] - 22:16, 22:22
**2024** [4] - 1:17, 4:3, 35:7, 35:20
**2029** [1] - 35:25
**22-CV-00034** [2] - 1:3, 4:10
**23** [1] - 1:17
**23rd** [2] - 4:2, 35:7
**24** [1] - 35:25
**26** [1] - 3:4
**2820** [1] - 4:4

## 3

**30** [1] - 3:4
**30th** [1] - 35:20
**32** [2] - 33:6, 35:14

## 4

**4** [1] - 3:3
**40** [1] - 18:16
**48-foot** [1] - 27:18

## 5

**53-foot** [1] - 27:19

## 6

**6000** [3] - 7:5, 7:7, 27:6
**6844** [1] - 2:9

## 8

**82009** [1] - 2:10
**82443** [1] - 2:5
**82834** [1] - 35:24

## 9

**9:06** [2] - 1:17, 35:7
**9:42** [1] - 24:25
**9:45** [1] - 25:1
**9:55** [1] - 32:3

## A

**A.M** [1] - 1:17
**a.m** [2] - 32:3, 35:7
**ability** [2] - 9:9, 35:15
**accident** [1] - 23:25
**accidents** [2] - 23:10, 23:13
**acquaintance** [1] - 30:14
**action** [3] - 4:8, 35:18, 35:19
**address** [1] - 32:1
**adduced** [1] - 4:12
**ago** [1] - 17:16
**ahead** [3] - 5:17, 9:6, 16:11
**allowed** [3] - 19:4, 21:21, 25:14
**AND** [3] - 1:7, 4:11, 33:18
**answer** [7] - 5:16, 5:17, 9:6, 16:11, 16:16, 16:17, 35:11
**answered** [2] - 9:4, 24:22
**answers** [1] - 33:8
**appear** [1] - 16:7
**appeared** [1] - 35:7
**appearing** [2] - 2:5, 2:10
**applied** [1] - 6:6, 6:8
**apply** [1] - 6:7
**April** [3] - 4:3, 35:7, 35:20
**APRIL** [1] - 1:17
**aside** [1] - 28:25
**assignment 's** [1] - 29:8
**AT** [3] - 1:16, 1:17, 33:23
**attached** [1] - 33:11
**attachme nts** [1] - 7:12
**attorney** [2] - 26:9, 35:17, 35:18
**Attorney** [2] - 2:3, 2:8
**August** [1] - 35:25

## B

**backed** [1] - 24:2
**background** [1] - 4:23
**bad** [1] - 19:11
**bales** [5] - 7:14, 7:15, 27:20
**banking** [1] - 18:22
**barrier** [1] - 24:3
**basis** [1] - 11:8
**batch** [1] - 24:1
**became** [1] - 6:22
**bed** [1] - 6:17
**BEHALF** [1] - 1:15
**behalf** [3] - 2:5, 2:11, 4:2
**belly** [4] - 10:4, 10:5, 13:5, 15:9
**below** [1] - 21:4
**bent** [1] - 24:3
**best** [1] - 35:15
**better** [1] - 7:19
**between** [1] - 21:16
**beyond** [1] - 30:11
**big** [2] - 7:7, 7:14
**bit** [2] - 18:12, 30:24
**blanket** [1] - 31:11
**blow** [1] - 31:9
**BOARD** [1] - 1:6
**bought** [1] - 6:14
**Box** [1] - 2:4
**break** [2] - 22:2
**breakdown** [1] - 22:6
**breakdowns** [1] - 21:25
**Brian** [4] - 2:13, 30:1, 30:6, 30:14
**Bridge** [21] - 5:23, 6:3, 6:9, 9:8, 9:17, 11:3, 11:13, 12:5, 13:10, 13:13, 13:16, 13:19, 16:19, 20:11, 21:13, 23:7, 23:11, 28:6, 28:18, 29:6, 30:17
**BRIDGE** [1] - 1:7
**briefing** [1] - 28:20
**Briggs** [1] - 18:2
**broom** [7] - 9:21, 12:20, 15:12, 20:24, 21:4, 21:5, 21:7
**brought** [1] - 30:25
**BTO** [1] - 21:6
**bucket** [1] - 7:13
**Buffalo** [2] - 35:5, 35:24
**build** [1] - 31:4
**building** [1] - 18:22
**bulldozer** [3] - 9:18, 12:14, 12:18

**bumper** [2] - 24:2, 24:3
**business** [1] - 26:18
**BY** [24] - 1:22, 4:18, 8:7, 8:21, 9:5, 12:3, 12:12, 16:10, 16:18, 16:24, 17:4, 17:21, 18:8, 20:9, 21:20, 22:21, 23:18, 24:14, 24:20, 25:2, 25:18, 26:14, 30:12, 30:22

## C

**C.S.R** [1] - 1:23, 35:22
**cab** [1] - 21:3
**care** [1] - 22:1
**Carter** [1] - 17:12
**Case** [1] - 1:3
**case** [1] - 4:20
**catch** [1] - 5:15
**caught** [1] - 24:2
**CDL** [1] - 27:21
**CERTIFICATE** [2] - 33:1, 35:1
**certify** [1] - 35:6
**chance** [2] - 23:2, 23:7
**Change** [1] - 33:10
**CHANGE** [2] - 34:1, 34:2
**changes** [1] - 33:10
**check** [2] - 25:14, 25:19
**checking** [1] - 25:23
**checks** [2] - 25:4, 25:12
**Cheyenne** [1] - 2:10
**chip** [4] - 10:8, 13:11, 15:23, 20:22
**chipping** [1] - 20:21
**Chris** [1] - 17:12
**clarification** [1] - 20:6
**clarify** [2] - 19:5, 19:12
**cleaning** [1] - 21:8
**Cody** [3] - 4:4, 14:6, 14:14
**CODY** [1] - 1:16
**combination** [1] - 27:17
**commercial** [2] - 9:12, 10:2
**COMMISSION** [1] - 33:24
**Commission** [1] - 35:25
**COMMISSIONERS** [1] - 1:6
**commit** [1] - 5:4
**comp** [14] - 18:13,

**18:18, 18:25, 19:3, 19:4, 19:21, 21:15, 21:22, 29:17, 29:18, 29:19, 31:15, 31:17, 31:21
**company** [2] - 6:12, 6:23
**compensation** [1] - 18:13
**competent** [1] - 16:7
**concluded** [1] - 32:2
**concrete** [1] - 24:2
**Conference** [1] - 4:4
**confused** [1] - 8:9
**considered** [2] - 28:7, 28:10
**consisting** [1] - 33:5
**contact** [2] - 22:8, 22:12
**contain** [1] - 35:14
**contained** [3] - 33:7, 33:9, 35:12
**contents** [1] - 33:7
**controls** [1] - 28:21
**Cornett** [10] - 2:13, 14:24, 17:17, 18:3, 22:16, 22:23, 24:8, 24:16, 29:6, 29:10
**CORNETT** [1] - 1:3
**correct** [11] - 8:24, 8:25, 12:15, 12:16, 19:24, 21:9, 21:10, 26:19, 26:23, 33:9, 35:14
**Counsel** [1] - 28:13
**counsel** [6] - 29:17, 35:8, 35:9, 35:11, 35:17, 35:18
**County** [9] - 4:3, 5:23, 6:3, 9:17, 12:14, 12:17, 30:7, 30:17, 35:6
**COUNTY** [1] - 1:6, 1:6, 1:7, 35:3
**county** [1] - 30:3
**couple** [1] - 26:15
**Court** [4] - 4:6, 4:9, 4:10, 35:6
**COURT** [1] - 1:1
**crew** [1] - 24:17
**current** [1] - 11:2

## D

**dad's** [1] - 6:12
**daily** [1] - 11:8
**date** [1] - 17:15
**Dated** [1] - 33:12
**days** [1] - 18:19

deal [1] - 22:6
Deere [3] - 7:5, 7:6, 7:7
Defendants [2] - 1:9, 2:11
define [2] - 23:14, 28:16
defined [1] - 28:16
Del [5] - 21:21, 24:7, 24:10, 24:15, 25:22
demonstrate [1] - 9:9
DEPARTMENT [1] - 1:8
depose [1] - 33:3
deposes [1] - 4:16
DEPOSITION [3] - 1:14, 3:6, 4:1
deposition [5] - 4:23, 32:2, 33:5, 33:6, 35:16
depositions [2] - 26:1, 26:6
describe [3] - 20:17, 21:1, 30:25
described [1] - 27:5
description [2] - 7:19, 20:13
descriptive [1] - 11:5
descriptor [1] - 18:20
difference [2] - 21:16, 24:21
different [1] - 9:16
directly [1] - 22:13
discipline [1] - 23:20
disciplined [1] - 23:13, 23:14
discussion [1] - 29:16
disk [1] - 31:8
distributor [2] - 10:10, 13:14
DISTRICT [2] - 1:1, 1:1
District [2] - 4:8, 4:9
disturb [1] - 31:6
DIVISION [1] - 1:7
done [1] - 31:13
down [4] - 5:20, 9:15, 21:4, 21:5
dozer [1] - 15:15
drill [1] - 31:8
drill-seed [1] - 31:8
drills [1] - 31:8
driver's [1] - 9:12
duly [3] - 4:14, 33:2, 35:9
dump [10] - 9:23, 10:4, 10:5, 13:5, 15:9, 15:25, 16:2, 16:3, 16:4, 24:1
during [2] - 20:22, 21:17

## E

Edwards [4] - 2:14, 30:1, 30:7, 30:14
employee [3] - 5:23, 35:16, 35:17
end [1] - 24:1
engage [1] - 21:6
engineer [1] - 30:4
equipment [37] - 6:8, 7:10, 7:21, 8:16, 8:18, 9:10, 9:16, 11:14, 12:5, 12:10, 15:2, 15:4, 15:7, 16:7, 18:4, 19:15, 20:7, 21:3, 21:12, 21:24, 22:9, 22:16, 22:23, 22:24, 23:11, 24:11, 25:3, 25:4, 25:15, 25:20, 25:23, 27:5, 27:12, 28:17, 28:20, 29:1, 29:9
erosion [1] - 31:11
estimate [1] - 8:4
estimated [1] - 28:4
events [2] - 29:18, 29:20
ex [2] - 8:13, 10:17
exact [1] - 17:15
EXAMINATION [3] - 4:17, 26:13, 30:21
Examination [3] - 3:3, 3:4, 3:4
examined [1] - 35:11
excavator [12] - 8:12, 9:2, 10:16, 10:18, 10:20, 10:23, 11:3, 11:11, 13:23, 13:24, 28:4, 28:11
excavators [3] - 7:23, 7:24, 10:17
except [1] - 33:9
excuse [1] - 7:23
EXHIBITS [1] - 3:6
exhibits [1] - 3:7
existing [1] - 31:5
EXPIRES [1] - 33:24
expires [1] - 35:25
explain [2] - 5:2, 18:15
expressly [1] - 35:16
extra [2] - 19:6

## F

fair [1] - 29:14
far [2] - 24:19, 29:5
farmers [1] - 31:9
father [2] - 26:18, 28:1

February [1] - 6:4
fertilize [1] - 31:9
file [5] - 23:3, 23:5, 23:6, 23:8, 23:23
financially [1] - 35:18
fines [1] - 5:11
Firm [1] - 2:4
first [3] - 4:14, 33:2, 35:9
five [2] - 6:4, 31:14
flatbed [2] - 27:18, 27:19
follow [1] - 26:15
follow-up [1] - 26:15
following [1] - 4:11
FOR [4] - 1:1, 33:22, 34:1, 34:2
foregoing [4] - 33:5, 35:8, 35:12, 35:14
forgot [1] - 15:25
forks [1] - 7:15
form [10] - 8:20, 9:3, 16:8, 16:15, 16:21, 17:19, 21:18, 22:18, 24:18, 25:16
formal [1] - 23:19
foundation [2] - 16:9, 22:19
four [1] - 31:14
Freightliner [1] - 27:15
Freightliners [1] - 27:15
friend [1] - 30:13
friends [1] - 30:6
full [1] - 35:14
FURTHER [1] - 30:21

## G

gears [1] - 18:12
given [1] - 35:14
Government [1] - 2:9
grabbing [1] - 7:14
grader [9] - 10:14, 13:20, 15:17, 16:20, 17:1, 17:11, 17:14, 17:18, 18:5
grading [1] - 17:7
grain [1] - 31:8
grapple [1] - 7:13
Greg [2] - 14:16, 14:17
guess [2] - 18:21, 20:15
guessing [1] - 10:22

## H

half [1] - 17:16
hand [2] - 7:24, 35:20
hard [3] - 5:19, 10:21, 16:16
hauled [1] - 27:11
hauling [2] - 27:19, 27:24
hereby [1] - 35:6
hereinabove [1] - 35:11
hereto [1] - 33:11
hereunto [1] - 35:19
high [4] - 6:12, 26:19, 26:20, 26:22
Highway [1] - 4:4
highway [6] - 6:24, 26:24, 31:1, 31:3, 31:6
hired [13] - 9:8, 9:13, 9:17, 11:16, 14:1, 14:5, 14:11, 14:14, 15:1, 15:8, 16:13, 22:15, 28:6
hiring [2] - 30:7, 30:14
hours [5] - 8:5, 8:13, 10:19, 18:16, 18:17
hundred [1] - 10:22
hydroseed [1] - 31:11

## I

identified [1] - 3:7
IN [2] - 1:1, 35:19
included [1] - 23:22
including [1] - 27:6
individual [2] - 25:9, 25:11
information [1] - 4:22
informed [1] - 29:17
inside [1] - 28:21
interested [2] - 35:18, 35:19
intersection [1] - 20:21
interview [1] - 30:16
involve [1] - 26:24
issue [1] - 22:7

## J

Joan [3] - 4:6, 5:20, 35:5
JOAN [2] - 1:23, 35:22
job [5] - 6:16, 8:16, 11:2, 27:12

jobs [4] - 6:25, 7:18, 8:1, 27:3
John [3] - 7:5, 7:7
JOHNSON [1] - 35:3
Johnson [1] - 35:6

## K

KELLER [29] - 2:3, 4:18, 8:7, 8:21, 9:5, 11:25, 12:3, 12:12, 16:10, 16:18, 16:24, 17:4, 17:21, 18:8, 20:8, 20:9, 21:20, 22:21, 23:18, 24:13, 24:14, 24:20, 24:24, 25:2, 25:18, 26:11, 30:10, 30:22, 31:23
Keller [4] - 2:4, 3:3, 3:4, 4:19
Kenny [2] - 4:19, 26:16
KENNY [9] - 1:14, 3:2, 4:1, 4:13, 33:2, 33:15, 34:1, 34:25, 35:7
kind [6] - 5:15, 6:21, 6:22, 10:21, 18:23, 28:20
knowledge [2] - 17:22, 18:9

## L

landscaping [5] - 6:25, 7:17, 7:18, 7:25, 27:3
Lane [1] - 35:23
large [9] - 7:8, 7:14, 7:15, 7:20, 10:18, 10:19, 10:23, 13:23, 27:14
last [3] - 24:5, 24:6, 27:14
Law [3] - 2:3, 2:4, 2:8
lay [1] - 31:11
learn [1] - 13:7
learning [1] - 17:13
less [1] - 28:23
level [1] - 16:14
Liability [1] - 2:9
license [1] - 9:13
lifetime [1] - 8:6
LINE [1] - 34:2
Links [1] - 35:23
list [1] - 11:21
listed [1] - 33:10
loader [2] - 7:13, 15:9

**loading** [1] - 7:15
**Local** [1] - 2:9
**local** [1] - 6:17
**location** [1] - 29:13
**looking** [1] - 20:22
**looks** [1] - 21:2
**Lowboy** [1] - 10:4
**lying** [1] - 5:5

## M

**machinery** [1] - 21:2
**main** [1] - 4:21
**maintenance** [5] - 21:24, 22:5, 22:7, 22:10, 25:4
**maintenanced** [1] - 22:9
**MARCHANT** [9] - 1:14, 3:2, 4:1, 4:13, 33:2, 33:15, 34:1, 34:25, 35:8
**Marchant** [1] - 6:11
**Mark** [2] - 14:16, 14:20
**MARKED** [1] - 3:6
**marked** [1] - 3:7
**MARSHALL** [3] - 1:23, 2:3, 35:22
**Marshall** [3] - 4:6, 4:19, 35:5
**material** [1] - 7:16
**mean** [9] - 5:6, 5:7, 11:20, 12:2, 12:8, 19:2, 20:7, 25:9, 31:18
**means** [3] - 5:2, 12:7, 28:15
**mechanic** [1] - 22:12
**medium** [1] - 7:8
**meet** [1] - 26:5
**mentioned** [7] - 7:18, 8:23, 10:16, 11:15, 27:2, 28:3, 29:16
**might** [1] - 20:21
**mind** [1] - 11:22
**mini** [8] - 7:24, 8:12, 8:13, 9:2, 10:16, 10:17, 28:4, 28:11
**minutes** [2] - 28:23, 28:24
**misstates** [1] - 16:22
**month** [1] - 11:8
**morning** [3] - 25:25, 29:7, 29:9
**Morrison** [1] - 17:9
**most** [3] - 8:17, 23:1, 28:5
**mower** [4] - 13:2, 15:10, 19:23, 20:2

**MR** [53] - 2:3, 2:8, 4:18, 8:6, 8:7, 8:20, 8:21, 9:3, 9:5, 11:23, 11:25, 12:1, 12:3, 12:6, 12:12, 16:8, 16:10, 16:15, 16:18, 16:21, 16:24, 17:2, 17:4, 17:19, 17:21, 18:6, 18:8, 20:6, 20:8, 20:9, 21:18, 21:20, 22:18, 22:21, 23:16, 23:18, 24:13, 24:14, 24:18, 24:20, 24:22, 24:24, 25:2, 25:16, 25:18, 26:11, 26:14, 30:10, 30:12, 30:19, 30:22, 31:23, 31:25
**mulch** [2] - 31:10, 31:11
**multiple** [1] - 31:14
**MY** [1] - 33:24

## N

**name** [1] - 4:19
**NAME** [1] - 33:21
**named** [1] - 33:4
**need** [1] - 29:23
**never** [1] - 28:16
**night** [1] - 6:18
**nobody** [1] - 13:24
**normal** [1] - 21:25
**normally** [1] - 22:6
**Norton** [2] - 14:16, 14:20
**norton** [1] - 14:21
**Notary** [2] - 1:24, 4:6, 35:5, 35:23
**NOTARY** [2] - 33:21, 33:22
**nothing** [2] - 4:15, 35:10
**notice** [2] - 22:5, 35:8
**noticed** [2] - 24:19, 24:21

## O

**oath** [2] - 5:5, 35:11
**object** [1] - 30:10
**objection** [14] - 8:20, 9:3, 11:24, 16:8, 16:15, 16:21, 17:2, 17:19, 18:6, 21:18, 22:18, 23:17, 24:18, 25:16
**observations** [2] - 16:6, 29:5

**observe** [1] - 15:2
**observed** [5] - 15:8, 22:23, 24:7, 24:10, 25:22
**observing** [1] - 29:10
**occasionally** [1] - 19:13
**occurred** [1] - 17:23
**OF** [11] - 1:1, 1:6, 1:7, 1:14, 1:15, 3:2, 4:1, 33:1, 33:21, 35:2, 35:3
**of_____2024** [1] - 33:12
**of_____
_____2024** [1] - 33:19
**often** [4] - 7:25, 11:2, 11:4, 11:10
**oil** [2] - 10:10, 13:14
**ON** [1] - 1:15
**one** [6] - 8:2, 11:12, 14:19, 20:19, 21:12, 24:13
**operate** [11] - 9:18, 9:20, 11:3, 12:4, 15:2, 15:3, 15:17, 17:11, 20:4, 27:7, 29:9
**operated** [4] - 12:13, 21:17, 27:6, 29:2
**operating** [18] - 6:25, 7:3, 7:4, 7:10, 9:9, 15:8, 15:11, 19:15, 20:7, 20:11, 20:18, 21:11, 21:15, 22:16, 22:23, 23:11, 24:11, 28:3
**operation** [2] - 28:7, 28:11
**operator** [7] - 6:8, 14:2, 14:3, 16:7, 25:10, 25:11
**opportunity** [1] - 14:22
**orally** [1] - 35:11
**overtime** [6] - 18:18, 19:12, 19:14, 19:21, 21:22, 31:21
**own** [5] - 6:17, 17:7, 25:12, 25:14, 31:19
**owner** [2] - 6:19, 6:22

## P

**P.C** [1] - 2:4
**P.O** [1] - 2:4
**Paco** [7] - 21:21, 22:8, 22:14, 24:7, 24:10,

24:15, 25:22
**PAGE** [2] - 3:2, 34:2
**pages** [2] - 33:5, 35:14
**paid** [1] - 18:17
**pallet** [1] - 7:15
**PARK** [2] - 1:6, 1:7
**Park** [7] - 4:3, 5:23, 6:2, 9:17, 12:14, 12:17, 30:17
**part** [3] - 17:10, 23:1, 27:23
**parties** [1] - 35:17
**pause** [1] - 5:18
**penalties** [1] - 5:11
**pending** [1] - 4:8
**people** [4] - 14:15, 20:10, 31:16, 31:21
**perjury** [2] - 5:4, 5:7
**person** [2] - 20:19, 35:19
**personal** [1] - 30:6
**personnel** [5] - 23:3, 23:5, 23:6, 23:7, 23:23
**pickup** [1] - 26:3
**piece** [5] - 7:9, 8:18, 21:3, 21:12, 29:1
**pieces** [2] - 8:16, 9:16
**Plaintiff** [3] - 1:4, 2:6, 4:2
**PLAINTIFF** [1] - 1:15
**plant** [1] - 24:1
**playing** [1] - 5:15
**plow** [1] - 29:23
**point** [1] - 15:12
**Pool** [1] - 2:9
**position** [2] - 6:6, 30:16
**possible** [1] - 5:11
**Powell** [5] - 5:25, 14:6, 14:8, 14:12, 14:23
**preparation** [1] - 26:6
**prepare** [1] - 26:2
**preparing** [1] - 26:1
**present** [2] - 2:13, 29:13
**primarily** [2] - 26:25, 29:19
**primary** [2] - 7:9, 8:2
**procedure** [1] - 22:1
**proficient** [2] - 28:7, 28:11
**projects** [1] - 19:18
**propounded** [1] - 33:8
**provided** [2] - 11:14, 18:25
**providing** [1] - 17:25
**PUBLIC** [3] - 1:8, 33:21, 33:22

**Public** [5] - 1:24, 4:3, 4:6, 35:5, 35:23
**pursuant** [2] - 35:8, 35:9
**putting** [1] - 8:5

## Q

**QUESTIONS** [3] - 4:18, 26:14, 30:22
**questions** [6] - 26:12, 26:15, 28:13, 30:20, 31:24, 33:7

## R

**raise** [1] - 21:5
**rakes** [1] - 7:24
**rather** [1] - 18:17
**Ray** [5] - 21:21, 24:7, 24:10, 24:15, 25:22
**READ** [1] - 34:2
**read** [2] - 31:25, 33:6
**reading** [1] - 35:15
**READS** [1] - 34:2
**really** [2] - 5:19, 26:2
**REASON** [1] - 34:2
**reason** [2] - 4:21, 20:25
**receive** [1] - 29:8
**received** [1] - 28:17
**recess** [1] - 24:25
**reclaimed** [1] - 31:7
**reclamation** [13] - 6:23, 6:24, 8:3, 26:16, 26:18, 26:24, 26:25, 27:8, 27:24, 30:24, 31:1, 31:4
**Reclamation** [1] - 6:11
**reconvened** [1] - 25:1
**record** [4] - 20:7, 21:1, 35:14
**reduced** [1] - 35:13
**regarding** [1] - 31:15
**regards** [2] - 7:17, 24:15
**regular** [2] - 8:18, 21:17
**relating** [1] - 4:15
**relationship** [1] - 30:9
**relative** [3] - 35:16, 35:17, 35:18
**remember** [2] - 14:15, 17:15
**repeat** [2] - 22:3, 22:20
**REPORTED** [1] - 1:22
**Reporter** [2] - 4:6,

4

35:6

**REPORTER'S** [1] - 35:1

**Reporting** [1] - 4:5

**representing** [1] - 4:20

**requested** [2] - 19:21, 35:16

**required** [1] - 27:23

**requirement** [1] - 29:23

**reseeded** [1] - 31:7

**residential** [2] - 7:20, 7:22

**RESIDING** [1] - 33:23

**residing** [1] - 35:5

**rest** [1] - 24:16

**result** [1] - 29:19

**rig** [1] - 29:2

**right-of-way** [1] - 31:6

**ROAD** [1] - 1:7

**Road** [22] - 2:10, 5:23, 6:3, 6:9, 9:8, 9:17, 11:2, 11:13, 12:5, 13:10, 13:13, 13:16, 13:19, 16:19, 20:11, 21:13, 23:6, 23:11, 28:6, 28:18, 29:6, 30:17

**road** [7] - 6:15, 10:14, 13:20, 17:14, 17:18, 31:4, 31:5

**roads** [1] - 29:24

**roller** [3] - 10:6, 13:8, 15:21

**Room** [1] - 4:4

**round** [3] - 7:14, 27:20

**Rowdy** [2] - 18:2

**rule** [1] - 5:14

**run** [20] - 8:16, 8:23, 9:15, 10:23, 11:11, 12:18, 12:20, 12:23, 13:1, 13:4, 13:7, 13:11, 13:13, 13:17, 13:20, 13:23, 15:13, 16:3, 17:13, 19:23

**running** [6] - 8:13, 8:19, 9:2, 20:3, 20:14, 22:24

**runs** [1] - 20:20

## S

**sander** [3] - 9:25, 12:24, 15:19

**saved** [1] - 23:16

**school** [4] - 6:12, 26:19, 26:20, 26:22

**scope** [2] - 7:19, 30:11

**seal** [2] - 20:22, 35:20

**second** [2] - 24:13, 24:24

**see** [4] - 15:3, 15:17, 23:2, 23:7

**seed** [1] - 31:8

**seeing** [1] - 15:13

**series** [3] - 7:5, 7:7, 27:6

**Service** [1] - 35:19

**set** [1] - 35:19

**Sheet** [1] - 33:11

**SHEET** [1] - 34:1

**shop** [8] - 5:25, 14:4, 14:6, 14:8, 14:12, 14:14, 14:23, 22:10

**SHOULD** [1] - 34:2

**shovels** [1] - 7:24

**show** [1] - 12:9

**shown** [1] - 28:19

**sign** [1] - 31:25

**signing** [1] - 35:15

**Sisters** [1] - 4:5

**sits** [1] - 20:19

**sixth** [1] - 6:5

**size** [2] - 7:8, 7:19

**skid** [5] - 7:23, 8:5, 9:2, 28:3, 28:8

**skill** [1] - 16:13

**sleep** [1] - 6:17

**slow** [1] - 5:20

**small** [3] - 6:25, 7:18, 27:2

**snow** [1] - 29:19

**snowplow** [3] - 9:25, 12:24, 15:19

**social** [3] - 30:9, 30:13

**sold** [2] - 6:14, 6:16

**sorry** [1] - 14:6

**sort** [5] - 7:1, 7:12, 18:20, 27:10, 27:13

**South** [1] - 4:4

**specific** [1] - 23:4

**spent** [1] - 13:19

**spreader** [3] - 10:8, 13:11, 15:23

**spring** [1] - 24:5

**square** [2] - 7:15, 27:19

**SS** [1] - 35:3

**Star** [8] - 4:20, 14:7, 19:20, 21:21, 22:16, 22:23, 24:16, 25:14

**STARKIE** [1] - 1:3

**Starkie** [5] - 2:13, 14:23, 17:17, 18:3, 24:8

**start** [2] - 14:4, 17:13

**started** [4] - 12:14,

12:17, 14:8, 14:10

**STATE** [1] - 35:2

**State** [3] - 4:7, 35:5, 35:6

**STATES** [1] - 1:1

**States** [1] - 4:8

**steep** [1] - 31:10

**steer** [4] - 8:5, 9:2, 28:3, 28:8

**steers** [1] - 7:23

**stenograph** [1] - 35:13

**still** [2] - 16:25, 17:3

**stipulation** [2] - 35:8, 35:9

**storm** [1] - 29:23

**straw** [2] - 27:19, 31:10

**street** [1] - 21:8

**stuff** [1] - 5:12

**SUBSCRIBED** [1] - 33:18

**subsequently** [1] - 25:1

**summer** [1] - 24:5

**supervision** [1] - 35:13

**swear** [1] - 4:25

**swearing** [1] - 4:25

**sweep** [11] - 9:21, 12:21, 15:12, 19:23, 20:2, 20:3, 20:14, 20:17, 20:18, 20:23, 21:15

**sweeper** [2] - 15:14, 20:20

**sweeping** [2] - 20:20, 20:21

**sweetie** [1] - 24:8

**switch** [1] - 18:12

**SWORN** [1] - 33:18

**sworn** [4] - 4:14, 4:24, 33:3, 35:9

## T

**TAKEN** [1] - 1:15

**teach** [9] - 12:18, 12:20, 12:23, 13:1, 13:4, 13:10, 13:13, 13:16, 13:23

**teaching** [1] - 13:19

**testified** [1] - 35:10

**TESTIMONY** [1] - 3:2

**testimony** [4] - 4:11, 16:22, 35:12, 35:14

**THE** [5] - 1:1, 1:1, 1:7, 1:15, 4:1

**thereafter** [1] - 35:13

**therein** [2] - 33:8, 33:9

**thereof** [1] - 33:7

**thereto** [1] - 35:11

**THEREUPON** [1] - 4:11

**thereupon** [1] - 35:11

**Thermopolis** [1] - 2:4

**this_____day** [1] - 33:12

**THOMAS** [1] - 2:8

**THOMPSON** [24] - 2:8, 8:6, 8:20, 9:3, 11:23, 12:1, 12:6, 16:8, 16:15, 16:21, 17:2, 17:19, 18:6, 20:6, 21:18, 22:18, 23:16, 24:18, 24:22, 25:16, 26:14, 30:12, 30:19, 31:25

**Thompson** [1] - 3:4

**Tim** [1] - 17:9

**tired** [1] - 6:15

**today** [4] - 4:21, 4:23, 25:25, 30:3

**Tom** [3] - 24:13, 24:24, 26:12

**took** [1] - 17:10

**tools** [1] - 7:24

**tops** [1] - 28:23

**Torczon** [2] - 14:16, 14:18

**tractor** [9] - 7:3, 15:9, 27:6, 27:14, 27:16, 27:17, 31:13

**tractor-trailer** [2] - 27:16

**tractors** [3] - 6:25, 7:8, 31:14

**trailer** [4] - 9:23, 27:16, 27:19

**trailers** [1] - 27:18

**train** [1] - 29:2

**trained** [7] - 12:4, 13:24, 16:20, 16:25, 17:3, 17:6, 17:8

**training** [13] - 11:14, 11:17, 11:20, 12:2, 12:7, 12:9, 17:11, 17:18, 18:1, 18:4, 28:14, 28:15, 28:17

**traveling** [1] - 6:15

**treat** [1] - 24:16

**tried** [1] - 6:16

**truck** [10] - 9:23, 10:12, 13:17, 15:9, 16:1, 16:2, 16:3, 16:4, 24:3, 27:24

**trucks** [7] - 7:16, 10:2, 27:7, 27:10, 27:11, 27:13, 27:14

**true** [2] - 33:9, 35:14

**truth** [4] - 4:14, 4:15, 5:8, 35:10

**truthful** [1] - 5:9

**try** [2] - 5:15, 5:18

**turn** [2] - 21:6, 21:7

**turns** [1] - 21:5

**two** [6] - 6:20, 6:21, 8:11, 14:15, 17:15, 28:5

**Two** [1] - 4:5

**type** [2] - 7:21, 15:7

**typewriting** [1] - 35:13

**typically** [2] - 22:14, 25:4

## U

**under** [3] - 5:5, 35:11, 35:13

**United** [1] - 4:8

**UNITED** [1] - 1:1

**up** [12] - 8:22, 18:22, 20:12, 21:5, 21:8, 24:2, 24:3, 26:4, 26:15, 30:25, 31:8, 31:20

## V

**vacation** [1] - 18:23

**vagueness** [2] - 11:24, 11:25

**various** [1] - 28:17

**vs** [1] - 1:5

## W

**walk** [1] - 5:18

**wall** [1] - 24:3

**water** [2] - 10:12, 13:17

**week** [4] - 18:17, 21:17, 26:5, 28:25

**weekends** [1] - 31:16

**weeks** [2] - 8:11, 28:25

**WHEREOF** [1] - 35:19

**whole** [2] - 4:15, 35:10

**wit** [1] - 4:12

**WITNESS** [2] - 33:1, 35:19

**witness** [5] - 33:4, 35:8, 35:9, 35:10, 35:14

**women** [1] - 24:11

**word** [1] - 12:7

**WORKS** [1] - 1:8

**Works** [1] - 4:3

**works** [1] - 29:7
**written** [1] - 23:19
**WYOMING** [3] - 1:1,
1:16, 35:2
**Wyoming** [9] - 2:5,
2:9, 2:10, 4:5, 4:7,
4:9, 35:5, 35:6,
35:24

## Y

**yards** [3] - 7:20, 7:22
**year** [15] - 6:4, 8:2,
8:5, 8:8, 8:9, 8:11,
8:13, 8:15, 8:23,
10:24, 11:9, 11:10,
24:5, 24:6, 28:5
**years** [8] - 6:4, 6:13,
6:19, 8:17, 9:1,
17:16, 26:22, 28:5
**Yellowtail** [1] - 2:10
**yourself** [4] - 19:15,
20:4, 28:7, 28:10

Exhibit 6:

Arthur Briggs Deposition Transcript

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3

4    STARKIE CORNETT,                    )
                                         )
5         Plaintiff,                     )
                                         )
6    V.                                  )  22-CV-00034
                                         )
7    PARK COUNTY BOARD OF COUNTY         )
     COMMISSIONERS and PARK COUNTY       )
8    ROAD AND BRIDGE DIVISION OF         )
     THE PUBLIC WORKS DEPARTMENT,        )
9                                        )
          Defendants.                    )
10   _____)

11
     March 14, 2024
12

13   Remote oral deposition of Arthur Briggs
     conducted via Zoom in the State of Wyoming,
14   commencing at 12:56 p.m. on the above date,
     before Barbara Morgenweck, Registered
15   Professional Reporter, Realtime Reporter and
     Notary Public.

16

17              MORGENWECK COURT REPORTING

18                  307.250.0220 ph

19              Barbcourtreporter@gmail.com

20

21

22

23

24

25

```
                                                        Page 2

 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4
      Marshall E. Keller
 5    KELLER LAW FIRM, PC
      116 N 5th St
 6    Thermopolis, WY 82443
      (307)864-2318
 7    Marshall@kellerlawpc.com

 8
      On behalf of Defendant:
 9

10    Thomas A. Thompson
      MaryBeth Oatsvall
11    WYOMING LOCAL GOVERNMENT LIABILITY POOL
      6844 Yellowtail Road
12    Cheyenne, Wyoming 82009
      (307) 638-1911
13    (307) 638-6211 Facsimile
      Tthompson@lglp.net
14

15    Also Present:

16
      Brian Edwards
17

18

19

20

21

22

23

24

25
```

1                    <u>EXAMINATION INDEX</u>

2

3                                        PAGE:

4    Arthur Briggs:

5         Examination by Mr. Keller        4
          Examination by Mr. Thompson      23
6

7

8                    <u>INDEX TO EXHIBITS</u>

9

     EXHIBIT:       DESCRIPTION           PAGE:
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

 1   ARTHUR BRIGGS,

 2          Having first been duly sworn, testified

 3   as follows:

 4                      EXAMINATION.

 5     Q.    Mr. Briggs, can you, for the record,

 6   state your full name?

 7     A.    Arthur Rowdi Briggs.

 8     Q.    What do you prefer being called by?

 9     A.    Rowdi, please.

10     Q.    All right.  So Rowdi, this deposition,

11   this is my one chance to get to talk to you and

12   just ask some questions to get information.

13   With this, there is a couple rules we need to

14   follow.  I got to follow them as best I can, as

15   well.

16          The first one is, this is kind of like

17   playing catch, you know, there will be a

18   question.  I ask that you give a pause, and then

19   give an answer.  And I will try to do the same

20   when you're giving an answer, I will try not to

21   interrupt.  Sometimes it makes it kind of hard,

22   you know, because we're used to just having a

23   normal conversation, but one, we have

24   technology; two, we have a court reporter here

25   who is trying to record what we're saying, so is

1   that something that you agree on doing?

2      A.     Yep.

3      Q.     The other is just -- and this has come

4   up in the other depositions as well, so you just

5   swore under oath and do you understand what that

6   oath means?

7      A.     Yes.

8      Q.     In your own words, what does the oath

9   mean to you?

10     A.     Well, don't lie, tell the truth, answer

11  questions.

12     Q.     This has also been brought up in all the

13  other depositions that being under oath means

14  that if you are found to be lying or being

15  dishonest, there is -- we call it you're causing

16  perjury.  Do you understand what perjury means?

17     A.     Yes.

18     Q.     In your own words, what does that mean?

19     A.     Lying, not telling the truth for what I

20  wrote down, or whatever, so.

21     Q.     And for causing perjury or committing

22  perjury, there is always the chance that there

23  could be a repercussions from that.  Do you

24  understand that?

25     A.     Yes.

Page 6

1    Q.    So I want to dive a bit in your

2   background here.  And when did you start working

3   for Road & Bridge?

4    A.    Would have been the first March, seven

5   years ago, which would have been 2017, 2018.

6    Q.    Before working for the County of Park

7   Road & Bridge, what experience -- what was your

8   work history?

9    A.    Well, excuse me.  Something blinked on

10  me.  What was that?

11   Q.    What was your work history prior to

12  coming to Road & Bridge?

13   A.    Running a back truck in an oil field,

14  dump trucking, hauling equipment, pretty much

15  oil field.

16   Q.    Was that mostly CDL trucking work?

17   A.    Yes.  HAZMAT and tankers, endorsement

18  under CDL.

19   Q.    Besides working the oil fields, did

20  you -- what other experience did you have

21  running equipment?

22   A.    Farming.

23   Q.    By farming, can you -- give a little

24  more detail as to what equipment you were using

25  on the farm?

Page 7

1    A.    Tractors, driving trucks, CDL trucks,

2    operating combines, anything you do on a farm,

3    baling hay, stacking hay, you name it; working

4    cattle.

5    Q.    When you were hired on with Park County

6    Road & Bridge, do you recall what rate you were

7    hired -- pay grade you were hired at?

8    A.    Not right offhand, I don't.  It was 13,

9    the low.  I think 13 and a quarter, I think

10   13.50, somewhere in there.

11   Q.    Were you hired on as an Equipment

12   Operator I?

13   A.    Yep.

14   Q.    Do you recall when you made Equipment

15   Operator II?

16   A.    I would say the second year, 2018.

17   Q.    Did you say -- I am sorry?

18   A.    2018.

19   Q.    2018?

20   A.    In July, I should say.

21   Q.    When you made Equipment Operator II, was

22   that before or after Star Cornett came to work

23   in the Powell shop?

24   A.    It was before.

25   Q.    When you were hired on with Park County

Page 8

1   Road & Bridge, do you recall filling out an

2   application?

3    A.    Yep.

4    Q.    Okay.  And do you recall what

5   equipment -- well, let me rephrase that.

6        Do you recall if you had to list

7   equipment and experience that you had running

8   that equipment on your application?

9    A.    Yes, I did.

10   Q.    Do you -- can you tell me, or do you

11  remember what equipment that you listed on your

12  application?

13   A.    I listed vac trucks and trailers because

14  the John Deere loaders and John Deere backhoes,

15  any kind of equipment on the farm, and various

16  trucks, so other than that, that's about all I

17  can remember.

18   Q.    So I want to ask you questions about --

19  a little bit about your time at Road & Bridge

20  and training.  I am just going to go through a

21  list here of equipment, if you don't mind.  I am

22  just going to ask you if you had to have

23  training on any of this equipment, okay?

24   A.    Okay.

25   Q.    So when you showed up at -- when -- let

Page 9

1    me rephrase that.

2            So did you require training to learn how

3    to use the oil distributor?

4    A.    I did, yes.

5    Q.    Did you require training on the dump

6    truck?

7    A.    No, but I got it -- they rode with you.

8    Q.    Did you require training on the belly

9    dump?

10   A.    Yes.

11   Q.    On the small water truck?

12   A.    Yes.

13   Q.    Did you require training on the water

14   tanker?

15   A.    No, because I had ran one so.

16   Q.    Did you require training on how to run

17   the tool carrier?

18   A.    No.

19   Q.    Did you require training on how to run

20   the loader?

21   A.    No.

22   Q.    Did you need any training on how to run

23   the backhoe?

24   A.    No.

25   Q.    Did you need any training on how to run

Page 10

1   the excavator?

2     A.    Yes.

3     Q.    Did you need training on how to run the

4   dozer?

5     A.    Yes.

6     Q.    Did you need training on how to run the

7   motor grader?

8     A.    Yes.

9     Q.    Did you need training on how to run the

10  roller?

11    A.    Yes.

12    Q.    Did you need any training on how to run

13  the mower?

14    A.    Yes.

15    Q.    Did you need training on how to run the

16  broom?

17    A.    Yes.

18    Q.    Did you need any training on how to run

19  the chipper?

20    A.    No, because I have never ran the chipper

21  so, never even been on it.

22    Q.    I got to ask you this.  We have heard

23  this word "chipper" a few times here in these

24  depositions.  What is a chipper?

25    A.    A chipper is like when you got the

Page 11

1   pavement or old county roads, and they go

2   through and put the little chips down, and you

3   will see the -- I don't know, you have been on

4   the highway, and you've seen where they got the

5   signs that say "fresh oil," or "fresh chips,"

6   slow down 20, 25 miles-an-hour.  You're just

7   going out there, they are spraying the oil down

8   in front of it, they are spreading chips over

9   the top of it.  It just gives it a new seal on

10  top, new surface to run on.

11     Q.    Okay.  Now in regards to the training,

12  when you're talking about training on these

13  various pieces of equipment, did someone

14  actually come out and show you how to operate

15  this equipment?

16     A.    Yes.

17     Q.    Was that in any -- typically in any

18  piece of equipment, what did that -- what did

19  that look like?

20     A.    Well, whichever piece of equipment you

21  can get into with somebody, they rode with me.

22  Other than that, it was you got in, sat down.

23  You went through the process of what every lever

24  does, how to start it, how to check the oil, all

25  that stuff to begin with, you know.

1          And basically, you know, how to move it

2     forward and back and set the blade down,

3     whatever you're doing.  So I mean, it wasn't

4     like they -- and then they stood around, and if

5     you had a question, they'd come to your spot, go

6     ask them.  They just didn't leave you or do

7     anything.  They were there all the time.

8          So until you got comfortable feeling

9     like you could run it, you know, whichever piece

10    of equipment it was.  I mean, trucks, trucks are

11    pretty easy for me to figure out.  The motor

12    grader was tough.  I guess I'm doing all right.

13    They haven't pulled me out of it yet, so.

14    Q.    Is that typically the same process used

15    for the other employees as well?

16    A.    Yes, it is.

17    Q.    So do you recall when Star came to the

18    Powell shop from Cody?

19    A.    Yes.  I don't know the exact time or

20    date or anything, but I remember her coming.

21    Q.    When she came from the Cody shop, did

22    you get an opportunity to observe her operating

23    equipment?

24    A.    Yeah.

25    Q.    How did you end up getting time to

Page 13

1    observe Star operating equipment?

2      A.    Well, you passed by her you know.  You

3    asked questions, I mean.  I don't -- say, you

4    get in the truck and you showed her what she

5    needed to be doing, but she'd already ran most

6    of the trucks by the time she got to Powell.

7           So the mower she hadn't ran, and I

8    didn't get in on that.  She'd ran broom before.

9    I actually taught her how to run a motor grader.

10   So I mean, that's, as far as I know, that's

11   about what you can do.

12     Q.    Do you recall what equipment you've

13   seen -- well, let's say by fiscal year, by July

14   of 2019, do you recall what equipment you had

15   seen Star operate?

16     A.    The dump truck, the belly dumps, the

17   brooms, the mower, then of course the dump truck

18   set up with the snowplows and all of the

19   sanders.  Right offhand, that is all I can think

20   of.  Water truck, both water trucks.

21     Q.    Okay.  Did you see her -- get a chance

22   to see her run the loader?

23     A.    Yes.  Yes, I did.  Excuse me.  The tool

24   carrier ran the loader.

25     Q.    What about the dozer?

Page 14

1    A.    No.

2    Q.    Roller?

3    A.    Yep.  She was in the roller.

4    Q.    I don't -- yeah, you did mention the

5    belly dump.  Water truck?

6    A.    Yep, both of them that we have, she was

7    in.  We got 150-barrel transport truck that

8    she's been in too, so.

9    Q.    And operating the equipment that you

10   listed, did she appear that she was a competent

11   operator?

12   A.    Yes.

13   Q.    Do you believe she was competent enough

14   to be an Equipment II Operator by that time?

15        MR. THOMPSON:  Objection to form, vague,

16   foundation.

17   BY MR. KELLER:

18   Q.    Go ahead and answer, in your opinion.  I

19   will rephrase that so.

20        In your opinion, do you believe she had

21   the skills to be an Equipment Operator II?

22        MR. THOMPSON:  Objection to form,

23   foundation, vague as to time.

24   BY MR. KELLER:

25   Q.    Go ahead, Mr. Edwards, you can answer.

1    I am sorry, not Edwards, but Rowdi.  For some

2    reason, it is showing Edwards underneath Rowdi's

3    name.

4       A.    I would say, yeah.

5       Q.    Now you mentioned that you had been

6    training Star on the grader?

7       A.    Yes.

8       Q.    Do you recall when that happened?

9       A.    A year ago.

10      Q.    That was in 2023?

11      A.    I'd say 2022, excuse me, two years ago.

12      Q.    Was that the same time that Kenny

13   Marchant was getting trained on the grader?

14      A.    Uh-huh.  Yes.

15      Q.    Who -- were you training both Kenny

16   Marchant and Star at the same time?

17      A.    No, I trained Star.

18      Q.    Who was training Kenny Marchant?

19      A.    Tim Morrison.

20      Q.    Did you observe Kenny Marchant as he was

21   going through his training?

22      A.    Nope.

23      Q.    During Star's training on the grader, I

24   mean, was she picking it up as far as skill?

25      A.    Yes.

1    Q.    Did you observe her struggling with the

2    grader?

3    A.    The only time I seen her struggle was

4    when we'd have to pull the borrow pits, and

5    she'd struggle at that, but other than that, no.

6    Q.    Did Delray Paco ever come out to watch

7    her while you were training?

8    A.    Nope.

9    Q.    Do you know if Delray Paco Jones ever

10   told her to operate it differently than the way

11   you had trained her to operate the grader?

12   A.    Nope, I don't.

13   Q.    Did Delray Paco Jones ever ask you your

14   opinion about Star running the grader?

15   A.    Yes.

16   Q.    And what was your advice, or what did

17   you -- what was your opinion?

18   A.    She needed time, but she could do it.

19   Q.    You mentioned a bit that when you

20   started with the grader, you struggled a bit as

21   well?

22   A.    Yes.

23   Q.    Was it time that improved your

24   operating -- operations of the grader?

25   A.    Yes.

Page 17

1    Q.    About how long, how much time was she

2    given in the grader?

3    A.    I think seven days, I think.

4    Q.    I think you answered this, but I am

5    going to ask, was there any other equipment that

6    you remember that you have trained Star on?

7    A.    The big water trailer, I trained Star on

8    it, and nothing else, so.

9    Q.    And I am going to switch subjects here

10   and ask you a little bit about comp time.  What

11   is your understanding of how the comp time

12   process works and what it is?

13   A.    Well, comp time, you can take -- it's

14   your overtime hours, like, if you work 11 hours

15   one day, you can take that one hour of comp

16   time,-- one hour of time and turn it to comp,

17   which gives you an hour-and-a-half, and you can

18   use comp time anytime as long as you have it.

19   Q.    So would the way you would get comp time

20   would be coming in like on a Friday or a

21   Saturday to do extra work?

22   A.    Extra work, yes.

23   Q.    Is that something employees ask for?

24   A.    I guess.  We've never done it over in

25   Powell.  I don't know what they do in Cody, so

Page 18

```
 1   but I mean if there is something to do like

 2   sweeping or mowing, you can ask if Paco will

 3   allow it, yes, you could do it.  I have never

 4   done it so.

 5     Q.    Is there -- well, like sweeping and

 6   mowing, is that -- is there -- is that something

 7   that falls behind during part of the year?

 8           MR. THOMPSON:  Objection to form.

 9           THE WITNESS:  Yeah.

10   BY MR. KELLER:

11     Q.    By falling behind, is that something

12   where there is -- it seems like there's more --

13   the work isn't being kept up on as far as

14   running the mower?

15           MR. THOMPSON:  Same objection.  Go ahead

16   and answer if you can.

17           THE WITNESS:  Yeah, we do.

18   BY MR. KELLER:

19     Q.    Same with running the broom.  Is it --

20   well, let me back up.

21           So as far as, let's say, mowing the

22   ditches; is there like a schedule that's set up

23   for mowing the ditches?

24     A.    No, there's not.

25     Q.    Is that just -- how is it determined
```

Page 19

1    that ditches need to be mowed?

2      A.    We mow the ditches on all the paved

3    roads.  Every year, we mow them back to keep the

4    snowdrifts back.  So if you end up with a wet

5    flow and everything regrows, you end up

6    re-mowing again to the best you can.  So there's

7    really no schedule.  It's just more or less

8    trying to keep the grass back off the edges of

9    the road so we don't get such a big snowdrift

10   going across.

11     Q.    How is it determined how much sweeping

12   needs to be done with the broom?

13     A.    The sweeping, we sweep intersections in

14   the spring of the year for getting the sand off

15   so people don't slide through the intersections.

16   Our chipping areas, we sweep the chipping areas

17   so because you don't want dirt or anything down

18   under the chips.  Other than that, that's pretty

19   much our sweeping that we do so.

20     Q.    Then on both of, let's say, on the

21   mowing, is that you're trying to stay ahead of

22   the grass growing too high?

23     A.    Yes.

24     Q.    With sweeping with the broom, are you

25   trying to get that done as soon as the snow

Page 20

1    melts?

2      A.      Yes.

3      Q.      Do people complain if those aren't done

4    timely?

5      A.      We get some complaints on intersections

6    at times on the sweeping, not so much the

7    mowing, but the sweeping we do get complaints.

8      Q.      Do you know if Star had asked for extra

9    time for comp time?

10     A.      No, I don't.

11     Q.      In your time there at the Powell shop,

12   have you noticed Paco treating Star differently

13   than the other employees?

14            MR. THOMPSON:  Objection to form, vague,

15   foundation.

16   BY MR. KELLER:

17     Q.      Go ahead and answer, Rowdi.

18     A.      Yes, at times.

19     Q.      Okay, so at those times, can you explain

20   what you mean by at those times?

21     A.      Well, like during hot patching, not

22   putting her in a truck to haul hot patch.  She

23   is in the broom.  I am trying to think of any

24   other time that -- I guess not at any other time

25   I can remember.

Page 21

1      Q.      Have you ever heard Delray Jones say

2   that women should not be operating equipment?

3      A.      No, I haven't heard that.

4      Q.      Have you ever heard rumors about Starkie

5   Cornett having an affair with Kris Cooper?

6      A.      No, I haven't heard that either.

7      Q.      About having an affair with Ron Nieters?

8      A.      No, I haven't.

9              MR. KELLER:  I think I am about done

10  there, Tom.  I am going to try and take a quick

11  second here and go over my notes and see if

12  there is anything else.

13             MR. THOMPSON:  Okay.

14  BY MR. KELLER:

15     Q.    I am ready.  I just have one set of

16  questions here left.

17             Rowdi, how does it typically work if an

18  employee needs to bring in a piece of equipment

19  for the mechanic to repair?

20     A.      Well, if it can be moved, you drive it

21  in.  If it can't be moved, then we haul it in.

22     Q.      What if you notice during your

23  inspection something needs to be fixed?

24     A.      Generally, you get ahold of Paco; Paco

25  gets ahold of the mechanic.

Page 22

1    Q.    Do you get ahold of the mechanic

2    yourself?

3    A.    I can, yes.

4    Q.    What about the other employees, are they

5    allowed to call the mechanic themselves?

6    A.    Yes, as far as I know.

7    Q.    Star Cornett, what happens if she calls

8    the mechanic directly?

9    A.    I don't know.  I honestly couldn't tell

10   you.

11   Q.    Have you ever witnessed Delray Paco

12   Jones getting upset with her for calling the

13   mechanic herself?

14   A.    No.

15   Q.    So before today, did you do anything to

16   prepare for these depositions?

17   A.    Nope.

18   Q.    Did Delray Paco or anybody else get with

19   you to discuss the depositions prior to today?

20   A.    Just Tom.  Other than that, no.

21         MR. KELLER:  I have no further

22   questions, Tom.

23         MR. THOMPSON:  Rowdi, I just have a

24   couple of questions.

25   BY MR. THOMPSON:

Page 23

1    Q.    Prior to giving your deposition

2    testimony today, have you ever talked with

3    Mr. Keller?

4    A.    No.

5    Q.    Have you ever talked with anybody from

6    Mr. Keller's office?

7    A.    I can't remember her name, but there was

8    a lady that lives up South Fork that talked to

9    me for about a half hour.  She said she was

10   representing Keller.

11   Q.    Did you tell that lady that you were in

12   a supervisory capacity with Park County?

13   A.    Yep, I did.

14   Q.    Do you know whether or not that occurred

15   after June 2nd of 2020, so sometime within the

16   last three-and-a-half years?

17   A.    No, I am not -- no -- oh, talking to

18   her, yes, yes.

19   Q.    Do you know if that occurred within the

20   last couple of years within back to March 4th of

21   2022?

22   A.    I would say yes on that one.

23       MR. THOMPSON:  I have no further

24   questions.  Thank you.

25       MR. KELLER:  I have no redirect, Tom.

Page 24

1            MR. THOMPSON:  That is it, sir.  You're

2     done.  We will go ahead read and sign.

3            (At 1:35 p.m. the matter was completed)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 25

```
 1

 2              WITNESS' SIGNATURE/CORRECTION PAGE

 3

 4     If there are any typographical errors to your

 5     Deposition, please indicate them below.

 6

 7     PAGE/LINE

 8     _____Change to_____

 9     _____Change to_____

10     _____Change to_____

11     _____Change to_____

12     Any other changes to your Deposition are to be
       listed below with a statement as to the reason
13     for such change.

14     PAGE/LINE          CORRECTION   REASON FOR CHANGE

15     _____

16     _____

17     _____

18     _____

19     _____

20         I, ARTHUR BRIGGS, do hereby certify that I
       have read the foregoing pages of my testimony as
21     transcribed, and that the same is a true and
       correct record of the testimony given by me in
22     this Deposition on March 14, 2024, except for
       the changes made.

23

24     _____        _____
       Date Signed                ARTHUR BRIGGS
25
```

Page 26

3                           CERTIFICATE

5         I, Barbara Morgenweck, Registered
Professional Reporter, and Certified Court
Reporter, do hereby certify that prior to the
6 commencement of the examination the Deponent was
duly sworn by me to testify to the truth, the
7 whole truth and nothing but the truth.
          I DO FURTHER CERTIFY that the foregoing is
8 a verbatim transcript of the testimony as taken
stenographically by me at the time, place and on
9 the date hereinbefore set forth, to the best of
my ability.
10        I DO FURTHER CERTIFY that I am neither a
relative nor employee nor attorney nor counsel
11 of any of the parties to this action, and that I
am neither a relative nor employee of such
12 attorney or counsel, and that I am not
financially interested in the action.
13        Dated this 4th Day of April, 2024.


15        *Barbara Morgenweck*

16        _____

17        Barbara Morgenweck
          COURT REPORTER
18        Registered Professional Reporter
          Certified Court Reporter NM # 526
19        Notary Public

Exhibit 7:

Cindy Stewart Deposition Transcript

1

1          IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF WYOMING
2

3    STARKIE J. CORNETT,        ) Case No.:  22-CV-00034
                                )
4              Plaintiff,       )
                                )
5    vs.                        )
                                )
6    PARK COUNTY BOARD OF       )
     COUNTY COMMISSIONERS and   )
7    its PARK COUNTY ROAD AND   )
     BRIDGE DIVISION OF THE     )
8    PUBLIC WORKS DEPARTMENT,   )
                                )
9              Defendants.      )
     _____)
10

11

12

13

14         DEPOSITION OF CYNTHIA M. STEWART

15        TAKEN ON BEHALF OF THE PLAINTIFF

16             AT CODY, WYOMING

17        APRIL 23, 2024 AT 12:56 P.M.

18

19

20

21

22   REPORTED BY:

23   JOAN F. MARSHALL, C.S.R.
     Notary Public
24

25

              **Two Sisters Reporting Service**
                   **(307) 438-1629**

2

A P P E A R A N C E S

MR. MARSHALL E. KELLER, Attorney at Law, of the
Keller Law Firm, P.C., P.O. Box 111, Thermopolis,
Wyoming 82443, appearing for and on behalf of the
Plaintiff.

MR. THOMAS A. THOMPSON, Attorney at Law, of the
Wyoming Local Government Liability Pool, 6844
Yellowtail Road, Cheyenne, Wyoming 82009, appearing
for and on behalf of the Defendants.

Also present:  Starkie J. Cornett and Brian
Edwards.

3

I N D E X

TESTIMONY OF CYNTHIA M. STEWART:          PAGE

Examination by Mr. Keller              4
Examination by Mr. Thompson           25
Further Examination by Mr. Keller     63

DEPOSITION EXHIBITS:  (Previously marked)   REFERRED

13 - Summary of Wage Adjustments        41

4

        THE DEPOSITION OF CYNTHIA M. STEWART was
taken on behalf of the Plaintiff on this, the 23rd
day of April 2024, at the Park County Public Works
Conference Room, 2820 Highway 120 South, Cody,
Wyoming, before Two Sisters Reporting Service, by
Joan F. Marshall, Court Reporter and Notary Public
within and for the State of Wyoming, to be used in
an action pending in the United States District
Court for the District of Wyoming, said cause being
Cause No. 22-CV-00034 in said Court.
        AND THEREUPON, the following testimony
was adduced, to wit:
        CYNTHIA M. STEWART,
having been first duly sworn to tell the truth, the
whole truth and nothing but the truth relating to
said cause, deposes and says:
        EXAMINATION
QUESTIONS BY MR. KELLER:
    Q.    So, Cindy, can you state your name for
the record.
    A.    Cynthia Stewart.
    Q.    And do you prefer being called Cindy?
    A.    Yeah.
    Q.    And you just took an oath.  And we go
through this with everybody, but do you understand

5

what the oath you took means?
    A.    Uh-huh.
    Q.    Can you explain it in your own words?
        MR. THOMPSON:  You have to give audible
responses to the questions.  So uh-huh or huh-uh
won't show up on the record clear, so if it's a yes
or no --
        THE DEPONENT:  Yes or no.
        MR. THOMPSON:  Yeah.
        THE DEPONENT:  I can understand that.
        MR. THOMPSON:  Otherwise, we will be
arguing about whether you said yes or no.
        THE DEPONENT:  I won't let you argue.
        MR. THOMPSON:  Don't do that to us.
        THE DEPONENT:  I won't do that to you.
BY MR. KELLER:
    Q.    Go ahead.  What does that oath mean to
you?
    A.    To tell the truth.
    Q.    And you understand that if you don't tell
the truth, that there's possible legal
ramifications to that?
    A.    Yes.
    Q.    And just another rule that we have is --
it's kind of like playing catch.  I'll ask you a

6

1 question and I'll do my best to wait for you to
2 respond before I mention anything and then have a
3 pause and then back and forth like that. The
4 reason being is that if we don't, we end up talking
5 over each other, and it makes it hard for the court
6 reporter and for the record.
7     A.    And you're going to have to speak up
8 because I'm hard of hearing, so I'll let you know
9 that now.
10     Q.    Sounds good. I'll do that.
11         You used to work for Park County Road &
12 Bridge?
13     A.    Yes.
14     Q.    And which shop did you work out of?
15     A.    Powell.
16     Q.    Do you recall what year you started
17 working for Road & Bridge?
18     A.    I think it was '94.
19     Q.    And when you started working for Park
20 County Road & Bridge, did you start out as an
21 operator 1?
22     A.    Yeah, truck driver.
23     Q.    And when did you leave Park County Road &
24 Bridge?
25     A.    2018. That's when I retired.

7

1     Q.    At least that's the best of your memory,
2 recollection?
3     A.    Yes.
4     Q.    Okay.
5     A.    It would have been December of '18.
6     Q.    And when you started as an operator 1,
7 did you already have a CDL?
8     A.    Yes.
9     Q.    And by CDL, I mean commercial driver's
10 license.
11     A.    Yes.
12     Q.    And how many years had you operated a
13 truck or a commercial truck before --
14     A.    At that time?
15     Q.    Yep.
16     A.    From -- over ten.
17         MR. THOMPSON: Just for the record,
18 Counsel, that's at the time of hire?
19         THE DEPONENT: Yes.
20 BY MR. KELLER:
21     Q.    And when did you make equipment
22 operator 2 or at least when do you recall making
23 operator 2?
24     A.    Oh, gees, I really don't remember. It
25 was a long ways down the road.

8

1     Q.    Do you recall when you made equipment
2 operator 3?
3     A.    Probably 2006.
4     Q.    Who was your foreman at the time you made
5 operator 3?
6     A.    Larry Nielson.
7     Q.    And were you already working for Park
8 County Road & Bridge when Del Ray Paco Jones was
9 hired?
10     A.    Yes.
11     Q.    Do you recall when he was hired?
12     A.    November something. I don't remember
13 what year it was.
14     Q.    Was it before you made equipment
15 operator 3?
16     A.    Oh, yeah, probably before I made 2.
17     Q.    And when Del Ray Jones was hired on, did
18 you get the opportunity to observe him operate
19 equipment?
20     A.    Yes.
21     Q.    What did you observe him operating?
22     A.    I'm going to have to be nice here. He
23 tried to operate a lot of things. It took him
24 three days to get out of the yard with a truck.
25     Q.    And what do you mean by three days to get

9

1 out of the yard with a truck?
2     A.    He was supposed to be running a truck
3 with a belly dump on it, and they called me three
4 times before I got to the gravel pit. And he
5 couldn't get the air brakes to release, so I had to
6 go back and help him with that. And we did the
7 same thing for two or three days after that. That
8 was him and Larry.
9     Q.    You mean Larry couldn't operate or you
10 and Larry had to help Del Ray Jones?
11     A.    I had to go help them.
12     Q.    You had to help Larry and Del Ray?
13     A.    Yeah.
14     Q.    Do you know if Del Ray Jones had
15 equipment operating experience when he was hired?
16     A.    Some.
17     Q.    And how do you know that?
18     A.    I know a guy he used to work for.
19     Q.    And who did he work for?
20     A.    Whitlock Construction.
21     Q.    And what other equipment did you observe
22 Del Ray Jones operating when he was hired?
23     A.    A loader.
24     Q.    And what did you observe?
25     A.    He wasn't very good at it. We had to

10

1    stop him a lot because he kept contaminating our
2    good gravel, our crushed gravel.
3        Q.    What do you mean by -- you'll have to
4    explain it to us what you mean by contaminating the
5    gravel.
6        A.    He'd get to digging in the bottom of the
7    pit and put big rocks in it.  And if you're trying
8    to spread road base, if you get big rocks in it,
9    then you've contaminated your gravel.
10       Q.    So the gravel is a specified size?
11       A.    Yes.
12       Q.    And by contaminating, you're talking
13   about --
14       A.    Putting big rocks in it and mud and. . .
15       Q.    Okay.
16       A.    And if you haul a load to your operator,
17   they're not very happy with you.
18       Q.    And why is that?
19       A.    Because they have to fight with trying to
20   get the big rocks away from their good gravel.
21       Q.    And did you observe Del Ray Jones
22   damaging equipment?
23       A.    Quite a bit.
24       Q.    Do you recall any specific instances?
25       A.    Well, he dropped a load of cutting edges

11

1    off the -- a lift and took out a tailgate or two.
2    They did that twice.
3        Q.    What's a load of cutting edges?  What do
4    you mean?  Can you --
5        A.    For on a grader, cutting edges for on a
6    grader, and they come in a bundle.
7        Q.    Like on the back of a flatbed or --
8        A.    Pickup.
9        Q.    Pickup?
10       A.    Well, yeah.  They put them in a pickup,
11   and then they transfer them to the shop.  And they
12   lifted them up with the hoist that they had and
13   dropped it and took out a couple of tailgates.
14       Q.    What about when he was operating other --
15   operating any equipment?
16       A.    Turned over a roller.
17       Q.    What do you mean by turned over?
18       A.    Tipped it over.
19       Q.    And you saw that?
20       A.    (Deponent nodded.)
21       Q.    Can you --
22       A.    Yes.
23       Q.    Do you recall when that happened?
24       A.    I don't recall when it happened, but we
25   were chipping on Lane 9.

12

1        Q.    Where is Lane 9?
2        A.    By the cemetery road.  It was out between
3    the cemetery and the landfill in Powell.
4        Q.    Did Del Ray Jones ever damage any of the
5    trucks?
6        A.    Yes.
7        Q.    And when was that?  When did he damage
8    the trucks?
9        A.    I don't remember the dates on it, but he
10   took one of the gears out of a dump truck.  And
11   then Larry come and got him from the gravel pit,
12   and they had, well, somebody take me back up to get
13   the truck.  So I wasn't very happy about that one.
14       Q.    So you'll have to explain that.  So what
15   do you mean by dumped the gears out of the truck?
16       A.    It was -- I don't remember what
17   transmission that one had in it, but instead of
18   putting the clutch in like most people do, he was
19   trying to speed shift and just knocked the edges
20   off the transmission and took a gear out.  And it
21   was that way until they sold it, so they never
22   fixed it.
23       Q.    Did it have to be towed out?
24       A.    No.
25       Q.    You were able to drive it out?

13

1        A.    Yep.
2        Q.    Did Del Ray ever try to blame someone
3    else for the damages?
4        A.    Absolutely.
5        Q.    When did that happen?
6        A.    Every time something happened.
7        Q.    Can you give a specific example?
8        A.    I was gone, and they took the truck I had
9    been driving plowing snow with, and he was driving
10   it and hit something and cracked a frame on the
11   plow.  And Larry tried to blame me for it, but he
12   knew I was gone, so. . .
13       Q.    By gone, what do you mean by gone?
14       A.    I wasn't working that week.
15       Q.    Were you off the entire week?
16       A.    Yes.
17       Q.    And when you left, your truck was in good
18   shape?
19       A.    Yep.
20       Q.    Was that because you -- did you inspect
21   your truck?
22       A.    Yes.
23       Q.    And that was at the end of your shift
24   when you left?
25       A.    Yes.

14

1   Q.   And when you showed back up to work, how
2   did you find out your truck was damaged?
3   A.   I was inspecting it before I left the
4   shop and started -- and picked the plow up, and it
5   was cracked.  It was not going to work.
6   Q.   Do you recall about what year that
7   happened?
8   A.   2009 maybe, 8 or 9.
9   Q.   And you said Larry Nielson was the
10  foreman?
11  A.   Yep.
12  Q.   Do you know if he ever disciplined Del
13  Ray Jones for those actions?
14  A.   I don't think he did.
15  Q.   So in your opinion, was Del Ray Jones an
16  honest employee?
17  A.   No.
18       MR. THOMPSON:  I'm going to object.
19  Asking the witness -- asking the veracity of
20  someone else is improper.
21  BY MR. KELLER:
22  Q.   Do you know if Del Ray Jones was hired on
23  as an equipment operator 1?
24  A.   I don't know.
25  Q.   Was he promoted before you?

15

1   A.   Yes.
2   Q.   Was that for equipment operator 2 or 3?
3   A.   2.
4   Q.   And what happened after he was promoted?
5   A.   I went to Tim French, the commissioner.
6   Q.   What did Mr. French do?
7   A.   He basically forced Larry into giving me
8   the raise.  Larry kept telling me that they said
9   no, so he basically lied to me about it.  And then
10  when I caught him lying, he lied some more, so I
11  just went to Tim and asked him.
12  Q.   By raise, you mean you were advanced to
13  equipment operator 2?
14  A.   And got the -- and the money that went
15  with it.
16  Q.   Before your retirement, were you working
17  with Star Cornett?
18  A.   Yes.
19  Q.   And that was in the Powell shop?
20  A.   Yes.
21  Q.   And did you get a chance to observe her
22  operating equipment?
23  A.   Yes.
24  Q.   What equipment did you observe her
25  operating?

16

1   A.   She run trucks, water trucks.  She
2   chipped with us.  She ran a loader, the sweepers,
3   rollers, and I think they put her on a grader a
4   couple of times and let her work on it, so. . .
5   Q.   Do you know if she was running the mower?
6   A.   Oh, yeah, run the mower, ran the dozer a
7   few times.
8   Q.   And in your opinion, what makes someone a
9   competent equipment operator?
10  A.   Mostly if they're careful and they're
11  willing.
12  Q.   What do you mean by willing?
13  A.   If they don't really want to be there,
14  they're not going to do nothing, so. . .
15  Q.   Did you have the impression that Star
16  Cornett was willing?
17  A.   Yes.
18       MR. THOMPSON:  Objection as to form,
19  speculation, foundation.
20  BY MR. KELLER:
21  Q.   And is that because -- did you know she
22  was asking to get the time on the equipment?
23  A.   Yes.
24       MR. THOMPSON:  Objection as to form,
25  leading.

17

1   BY MR. KELLER:
2   Q.   And how did you find out that she was --
3   did you actually observe her personally asking?
4   A.   Yes.  Dale Hobby was the foreman then.
5   Q.   Do you know if he was giving her the time
6   on the equipment?
7   A.   Yes.
8   Q.   And from your observations, was Star
9   being careful?
10  A.   Yes.
11  Q.   And did you get to observe her operating
12  equipment during the winter?
13  A.   Excuse me?
14  Q.   During the winter.
15  A.   Yes.
16  Q.   What kind of equipment was she operating
17  during the winter?
18  A.   Loader, snowplow.
19  Q.   Is that the same equipment as the men in
20  the shop?
21  A.   Yes.
22  Q.   And you observed her operating equipment
23  in the spring?
24  A.   Yes.
25  Q.   And what equipment would she have been

18

1  operating in the spring?

2      A.    End dumps, belly dumps, loader, the

3  mowers.  In the springtime, sweepers, roller,

4  depending on what they're doing.

5      Q.    And that's the same equipment as the men

6  in the shop were operating?

7      A.    Yes.

8      Q.    And for the summer, is it the same as it

9  would have been in the spring?

10     A.    Yes.

11     Q.    And is that the same equipment that the

12  other equipment operator 2s would have been

13  running?

14     A.    Yes.

15     Q.    Did you observe how -- well, I'm going to

16  go back.

17           Before you retired, did you inform -- let

18  me ask.  How much time did you give Road & Bridge

19  notification of your retirement?

20     A.    Probably about a month.  Dave Williams

21  and I left the same time, so. . .

22     Q.    Who did you notify?

23     A.    I went to the courthouse, to Bobbie in

24  the clerk's office and Dale Hobby, the foreman.

25     Q.    Did Brian Edwards ever talk to you about

19

1  why you were retiring?

2      A.    We had to talk about it, yeah.

3      Q.    When did you have that talk?

4      A.    Couple weeks before I left.

5      Q.    And where did that occur?

6      A.    Lane 9 and probably Road 15, I think.  I

7  don't know where we were.  I was mowing that day.

8      Q.    So I mean did they -- was anybody else

9  with Brian?

10     A.    Ron Nieters.

11     Q.    And they drove out there to where you

12  were working?

13     A.    Uh-huh.

14     Q.    How long were they there for?

15     A.    I don't know, 45 minutes, maybe an hour.

16  I'm not sure.  It was quite a while.

17     Q.    Why did they come out to talk to you?

18     A.    They were in the process I think of

19  finding a new foreman for that shop, for the Powell

20  shop.

21     Q.    And why did they -- I mean what was the

22  concern of talking to you about the foreman?

23     A.    Just asked me my opinion, what I thought,

24  I guess.  I don't know.  And I did tell them that

25  day that I was going to be gone, so it really

20

1  didn't matter to me.

2      Q.    Did they tell you who they were going to

3  make foreman?

4      A.    Do what?

5      Q.    Did they tell you who was going to be

6  foreman?

7      A.    They -- pretty much.  I don't know if

8  they said exactly who it was that day, but I knew

9  who was going to end up with it because the other

10  person didn't want the job, so. . .

11     Q.    And who was that?

12     A.    Chris Carter.

13     Q.    Chris Carter was the one that didn't want

14  the job?

15     A.    He didn't want the job.

16     Q.    And so then you knew it was going to be

17  Del Ray Paco?

18     A.    Yep.

19     Q.    And what did you tell Brian Edwards and

20  Ron Nieters?

21     A.    I have to be nice about this, don't I?

22           MR. THOMPSON:  Just honest.

23  BY MR. KELLER:

24     Q.    Yeah, just be honest.

25     A.    Be honest?

21

1      Q.    Yes.

2      A.    I told them at the time that I told him,

3  Del Ray, that he didn't have the maturity to be the

4  foreman and that it would be a shit show if he was.

5  And that was in the office at Powell's shop.  And

6  then I called Brian and told him that I probably

7  stirred up a hornet's nest, so. . .

8      Q.    Did Brian Edwards ever talk to you about

9  Star Cornett?

10     A.    No.

11     Q.    Did you ever observe how Star was being

12  treated in the Powell shop?

13     A.    Yes.

14     Q.    What did you observe?

15     A.    They didn't treat her very good.

16     Q.    And by not being treated very good, can

17  you be a little more specific?

18     A.    Well, the silent treatment was one thing.

19  Separating her from the rest of the crew was

20  another thing.

21     Q.    And by they, who was "they"?

22     A.    Del Ray.

23     Q.    Was that something that Dale Hobby did?

24     A.    Dale didn't do that, no.  If anything, he

25  forced us to work together to see if we could work

22

1    it out, and it didn't work.

2        Q.    Do you know if Star Cornett had made

3    complaints at that point?

4        A.    She didn't to me.  She just kept doing

5    her job.

6        Q.    Did you -- let me back up.  So in regards

7    to the treatment towards Star, were you treated any

8    differently when Del Ray Jones became foreman?

9        A.    Oh, yeah.  He treated me the same way.

10       Q.    By same way, you mean being separated

11   from the crew?

12       A.    Absolutely.  They don't want you to talk

13   to each other.

14       Q.    And by the time you were getting ready to

15   retire, were you an operator 3?

16       A.    Finally.

17           MR. THOMPSON:  Is that a yes?

18           THE DEPONENT:  Yes.

19   BY MR. KELLER:

20       Q.    Did Brian Edwards ever talk to you about

21   teaching Star how to get along with the other males

22   in the shop?

23       A.    He'd mentioned it, but there's really

24   nothing you can do to teach somebody how to get

25   along with somebody that doesn't want to work with

23

1    you.  So that was kind of a moot subject there.

2        Q.    And what did Mr. Edwards say?

3        A.    He told me they told Star that she was

4    going to have to buck up and get a nasty attitude,

5    I guess, like I said, and if you're not a nasty

6    asshole like I am, you can't do it.

7        Q.    Did you ever hear any rumors going around

8    about Star while you were working at the Powell

9    shop?

10           MR. THOMPSON:  Objection as to form.

11       A.    How many of them do you want to hear?

12   BY MR. KELLER:

13       Q.    Well, let's hear an example of some of

14   the rumors.

15       A.    She was sleeping with Ron Nieters, then

16   she was sleeping with Dale Hobby.  I don't know,

17   probably everybody else.

18       Q.    Who was stating these rumors?

19       A.    Chip, Chip Ash, Del Ray.  Then she was

20   supposed to have been sleeping with Kris Cooper.

21   That was another one that Del Ray started.  Nobody

22   believes him anyway, but they just like to hear the

23   noise.

24       Q.    Did you hear Del Ray say that himself?

25       A.    I heard him say it about Ron, yes.

24

1        Q.    When Star was getting ready -- was

2    working in Cody, did you hear that she was going to

3    transfer to the Powell shop before she got there?

4        A.    I think it ended up -- we asked her why

5    she didn't transfer, and then when she talked to

6    Dale, he said sure.

7        Q.    Did Dale ask for the opinions of the

8    other --

9        A.    Yes.

10       Q.    -- people in the shop?

11       A.    He did.

12       Q.    Was that done by a group session?

13       A.    Uh-huh, yes.

14       Q.    And did everybody agree that Star should

15   come over to the Powell shop?

16       A.    Yes.

17       Q.    Including Del Ray Jones?

18       A.    Yes.

19           MR. KELLER:  Hold on one second, Tom.  I

20   want to go through these real quick.

21           (Whereupon, there was a pause in the

22   proceedings.)

23   BY MR. KELLER:

24       Q.    One quick question.  We talked about you

25   making equipment operator 3 before you retired.

25

1    How long were you an equipment operator 3?

2        A.    Only three or four years when I retired.

3           MR. KELLER:  I don't have any further

4    questions, Tom.

5           MR. THOMPSON:  I'm going to come over to

6    this side.

7           (Whereupon, discussion was held off the

8    record.)

9                    EXAMINATION

10   QUESTIONS BY MR. THOMPSON:

11       Q.    Good afternoon, ma'am.

12       A.    Good afternoon.

13       Q.    I introduced myself off the record.  My

14   name is Tom Thompson.  I'm an attorney representing

15   Park County in this matter.  I've got some

16   questions in follow-up to your testimony this

17   afternoon.

18           It appears to me just from the subject

19   matter that was asked of you -- I mean this was

20   very random subject areas?

21       A.    Uh-huh.

22       Q.    -- that obviously you've had a

23   conversation with Mr. Keller before.

24       A.    Yes.

25       Q.    And how many times have you talked to

26

1  either Mr. Keller or someone from his office about
2  your testimony?
3      A.   Twice, I think.
4      Q.   So you knew coming into this deposition
5  this afternoon those areas of examination that he
6  was going to ask you about?
7      A.   Not really.
8      Q.   Well, you had talked to him --
9      A.   Yeah.
10     Q.   -- about everything you had testified
11 to --
12     A.   Yeah.
13     Q.   -- this afternoon, correct?
14     A.   Uh-huh.
15     Q.   Is that a yes?
16     A.   Yes.
17     Q.   And so he knew the subject areas that he
18 was going to ask you about, and he knew the answers
19 you were going to provide before we ever sat down
20 here today?
21     A.   I don't think so, no.
22     Q.   Did you change any of your -- let me
23 finish the question.
24     A.   I'm going to.
25     Q.   Did you change any of the stories that

27

1  you had told Mr. Keller today when you testified to
2  those questions?
3      A.   No.
4      Q.   Did you testify consistent with the
5  stories that you had told him beforehand?
6      A.   Yes.
7      Q.   And so he knew the answers that you gave
8  today in response to the questions before he even
9  asked the question, correct?
10     A.   Yes.
11     Q.   And how about Ms. Cornett?  Have you
12 talked to her since you left Park County concerning
13 this lawsuit?
14     A.   No.
15     Q.   So from the time that you left Park
16 County, Park County employment --
17     A.   Uh-huh.
18     Q.   -- which was in 2019 --
19     A.   I think '18 or '19.
20     Q.   -- up until today, you have never
21 discussed her lawsuit filed against Park County
22 with her?
23     A.   I knew it was going to happen, but no, we
24 did not discuss it.
25     Q.   Have you texted her?

28

1      A.   No.
2      Q.   Ever e-mailed her?
3      A.   No.
4      Q.   Never called her on the phone?
5      A.   No.
6      Q.   How did you know it was going to happen?
7      A.   Actually, I got a call from Keller Law
8  Firm, and then I just flat didn't answer it.  And
9  something must have been said because Star called
10 me and told me they were going to call, and I said
11 okay.
12     Q.   So you have talked to her on the phone?
13     A.   No -- yeah, for about five seconds
14 because that was the number.
15     Q.   And they were going to call, and it was
16 about a lawsuit against Park County?
17     A.   I guess so, yeah.
18     Q.   Did they have an investigator or somebody
19 who represented themselves as an investigator talk
20 to you?
21     A.   Not that I'm aware of.
22     Q.   Who was it that you recall speaking with?
23     A.   Keller.
24     Q.   Mr. Keller?
25     A.   Yes, and that was it.

29

1      Q.   Did you tell Mr. Keller that you would
2  testify on behalf of Starkie Cornett?
3      A.   Yes.
4      Q.   You are not a fan of Del Ray Paco Jones?
5      A.   No.
6      Q.   Have a personal dislike for Del Ray Paco
7  Jones?
8      A.   As a foreman or work?
9      Q.   In any capacity.
10     A.   In any capacity, yeah, you're right.
11     Q.   And you've had that dislike for quite a
12 few years?
13     A.   Yes.
14     Q.   You had that dislike of Del Ray Paco
15 Jones before he was a foreman?
16     A.   Yes.
17     Q.   You had it for him while he was a
18 foreman?
19     A.   Yes.
20     Q.   And you have that dislike for him today?
21     A.   Yeah.
22     Q.   All right.  What's the basis of -- was
23 there a point in time that you got along with him?
24     A.   No.
25     Q.   You've just always disliked him?

30

1     A.     Yes.

2     Q.     Did you ever try to get him fired?

3     A.     No.

4     Q.     Did you ever go to a commissioner or to a

5   supervisor complaining about him?

6     A.     Yes.

7     Q.     And who was that that you went to and

8   complained about?

9     A.     Larry Nielson.  That was a foreman at the

10   time.  Oh, gees.  Who's the foreman --

11     Q.     I'm not trying to interrupt your

12   testimony, but he can't testify because he's not

13   under oath.

14     A.     Oh, I'm just trying to think.

15     Q.     So Nielson and another foreman before

16   Nielson?

17     A.     No.

18     Q.     After Nielson?

19     A.     No.  I'm trying to think of the

20   engineer's name at the time.

21     Q.     Okay.

22     A.     Gees, Frank Page, and then I gave up and

23   went to Tim French.

24     Q.     All right.  Tell me what you told

25   Nielson.

31

1     A.     I asked him why I wasn't going to get a

2   raise, and they'd already given Del Ray the raise,

3   and he told me that the commissioners just said no.

4   So I went to Frank Page and asked him, and he said

5   that was up to Larry, that he didn't know what was

6   going on.

7     Q.     And Page was a commissioner?

8     A.     He was a foreman -- or the engineer at

9   the time.

10     Q.     Okay.

11     A.     And so I went to Tim French.

12     Q.     Who was a commissioner?

13     A.     Was a commissioner at the time.  He said

14   that they never mentioned my name.  And I asked him

15   if that meant that they were lying, and he said

16   yes, so. . .

17     Q.     Do you know what year that was?

18     A.     No.

19     Q.     Did the County have an equal opportunity

20   employment policy at that time?

21     A.     They were supposed to have.

22     Q.     Did you read the handbook that you were

23   given as an employee?

24     A.     Yeah.

25     Q.     Did you sign an acknowledgment that I've

32

1   received a copy of this handbook?

2     A.     I don't know that I ever did, no.

3     Q.     Did you follow the policy that was in the

4   handbook?

5     A.     Everybody tried to.

6     Q.     Well, not everybody --

7     A.     I tried --

8     Q.     You've got to let me -- she can only take

9   one of us down at a time.

10     A.     That's true.

11     Q.     She can only take down one of us at a

12   time, and if we talk over each other, it's going to

13   cause her problems.  She's the most important

14   person in the room today besides you.

15     A.     That's true.

16     Q.     So I don't want to upset her.

17     A.     No.

18     Q.     All right.  So did you follow the equal

19   opportunity employment policy that was in place at

20   the time that you took your complaints to the

21   supervisor, to the engineer and to the

22   commissioner?

23     A.     Yes.

24     Q.     And why do you say you followed it?

25     A.     Because I was supposed to go to my

33

1   foreman first, then to the engineer that was

2   supposed to be running Road & Bridge, and that

3   didn't work, so I went to the commissioners.

4     Q.     Do you have anything in writing from

5   that?

6     A.     No, I don't think so, no.

7     Q.     What year was that?

8     A.     I don't remember the year.

9     Q.     What do you understand how the pay

10   increases are handled at Road & Bridge?  Do you

11   have any understanding of that?

12     A.     Basically, it's on your equipment skill

13   and years of employment.  I can't remember how they

14   explained it, but. . .

15     Q.     And I'm asking in more general terms.  Do

16   you know how a pay increase is approved?

17     A.     It has to go through the commissioners.

18     Q.     And does it also have to go through the

19   foremen for the different shops, Powell and Cody?

20     A.     The foreman is the one that puts in for

21   them.

22     Q.     They're the ones that recommend?

23     A.     That's the way I understand.

24     Q.     Do you know who they recommend to?

25     A.     Pardon me?

34

1    Q.    Do you know who the foreman recommends
2    to?
3    A.    I think it's to the commissioners.
4    Q.    If I told you that it was to the county
5    engineer and then to the commissioners who have to
6    approve every pay raise, have you ever been part of
7    that process?
8    A.    No.
9    Q.    Were you aware that the county engineer
10   was involved in that process?
11   A.    I thought they were, but I didn't know
12   for you sure because he kept telling me the same
13   thing.
14   Q.    You mentioned that pay increases or wage
15   increases are based on skill level.
16   A.    Uh-huh.
17   Q.    I'm sorry.  You've got to say yes or no.
18   A.    Yes.
19   Q.    Where does that understanding come from?
20   Where does that understanding come from?
21   A.    Basically, it's common sense.  If you can
22   run equipment, you know, then. . .
23   Q.    And so proficiency and --
24   A.    Right.
25   Q.    -- the operation of equipment --

35

1    A.    Yes.
2    Q.    -- may equate to a pay raise?
3    A.    It may, and it may not.
4    Q.    With longevity?
5    A.    With longevity.
6          MR. KELLER:  Give him a chance to finish.
7          THE DEPONENT:  Pardon me?
8          MR. KELLER:  Give him a chance to finish
9    his questions.
10         THE DEPONENT:  Okay.  I'm getting
11   excited.
12   BY MR. THOMPSON:
13   Q.    Are there years -- and maybe you don't
14   know the answer to this question.  If you don't
15   know, you don't know.
16   A.    Okay.
17   Q.    Were there years where nobody got a raise
18   in Park County?
19   A.    Yes.
20   Q.    And why did nobody get a raise?
21   A.    The money wasn't there.
22   Q.    There wasn't enough money in the
23   budget --
24   A.    Right.
25   Q.    -- to pay those people?

36

1    And in regards to the operation of
2    equipment, would you agree with me that putting in
3    hours on a piece of equipment doesn't necessarily
4    equate to being proficient --
5    A.    That's true.
6    Q.    -- in the operation of that equipment?
7    A.    That's true.
8    Q.    My understanding of when you were hired
9    onto the County, there was no operator 1, 2 or 3.
10   A.    Truck drivers.
11   Q.    There was a truck driver or there was an
12   operator, correct?
13   A.    Not necessarily.
14   Q.    Okay.  Was there a job just as a truck
15   driver?
16   A.    No.
17   Q.    When you got hired on, what was your job
18   title?
19   A.    I was truck driver.
20   Q.    Were other people hired on just as a
21   truck driver?
22   A.    Yes.
23   Q.    And were other people hired on as an
24   operator?
25   A.    I don't know that.

37

1    Q.    You -- and I put this in quotes.  You're
2    talking about Del Ray Paco Jones.  What relevance
3    does his skill level back when he was first hired
4    have to do with Ms. Cornett's case?
5    A.    Do you want my opinion or --
6    Q.    I'm just wondering why you were
7    testifying as to that.
8          MR. KELLER:  Objection, speculation.
9    BY MR. THOMPSON:
10   Q.    I'm not asking you to speculate.  I'm
11   asking you to testify as to what you know as far as
12   the relevance of that testimony to an Equal Pay Act
13   case.
14         MR. KELLER:  I'm going to object again as
15   it's a legal question.
16   BY MR. THOMPSON:
17   Q.    Okay.  Go ahead.
18   A.    He just -- he didn't -- he wasn't capable
19   of running equipment as well as Star was.  When she
20   started moving into it, she just picked it up
21   and. . .
22   Q.    Have you seen Del Ray Paco Jones'
23   application for employment?
24   A.    No.
25   Q.    Do you know when he hired on what he told

38

1  the County as far as what experience he had?
2      A.    No.
3      Q.    Have you seen Ms. Cornett's application
4  for employment?
5      A.    No.
6      Q.    Do you know what experience Ms. Cornett
7  had when she was hired on?
8      A.    No.
9      Q.    And when you -- this is your testimony
10  under oath.
11     A.    Uh-huh.
12     Q.    When you say it took him three days to
13  get out of the yard with a truck, are you going to
14  tell a federal jury in this case that he was stuck
15  in the yard for three days trying to get out?
16     A.    I could tell how it happened.
17     Q.    Well, is that your testimony?
18     A.    Yes.
19     Q.    That he could not move a truck from the
20  yard --
21     A.    Yes, right.
22     Q.    -- for three days?
23     A.    Yes, that's correct.
24     Q.    And the County asked for your help to get
25  him out of that yard that he was stuck in for three

39

1  days, correct?
2      A.    Yes.
3      Q.    Were you the most experienced operator
4  for Road & Bridge at that time?
5      A.    No.
6      Q.    Why did they ask you to assist them?
7      A.    Because I was the one in the truck most
8  of the time.
9      Q.    So you were the most experienced truck
10  driver in the County at that time?
11     A.    I don't know that I was.
12     Q.    You had spent the most time in a truck?
13     A.    At that time with them, yeah.
14     Q.    With the County?
15     A.    With the County.
16     Q.    At the time that this happened?
17     A.    Uh-huh.
18     Q.    Is that a yes?
19     A.    Yes.
20     Q.    And when did that happen?
21     A.    Right after they hired Del Ray.
22     Q.    Within a month?
23     A.    Yeah.
24     Q.    And this is a memory that you have
25  from -- that would have been 22 years ago, correct?

40

1      A.    Probably.
2      Q.    2002?
3      A.    Probably somewhere around there, yeah.
4      Q.    Do you know how many years -- if we're
5  comparing Del Ray to Ms. Cornett, do you know how
6  many years it took Del Ray Jones to move from
7  equipment operator 1 to 2?
8      A.    Not very long.
9      Q.    Would you be surprised if it was seven
10  years?
11     A.    Yes, I would.
12     Q.    And if that's what the records at Park
13  County reflect, you wouldn't have any reason to
14  dispute that, would you?
15     A.    No.
16     Q.    Mr. Keller was asking you some questions
17  about whether he was disciplined.  Do you
18  understand discipline to mean both oral reprimand,
19  written reprimand, termination, suspension,
20  demotion, all of those things?
21     A.    Yes.
22     Q.    Have you ever seen his personnel file?
23     A.    No.
24     Q.    So you don't know what's in it?
25     A.    No.

41

1      Q.    So you don't know what happened to him
2  when he damaged equipment?
3      A.    No.
4      Q.    There's an exhibit that's been introduced
5  into the record.  It's called Deposition
6  Exhibit 13, and it is a summary of the wage
7  adjustments that were made in Park County Road &
8  Bridge and includes both previous and current
9  employees.  So, for example, I have your --
10     A.    Okay.
11     Q.    -- wages that you were earning as an
12  equipment operator 3, and it's my understanding you
13  were a grade 17, step 3.
14     A.    I guess so.
15     Q.    And do we need to take a -- let's go off
16  the record.
17         (Whereupon, discussion was held off the
18  record.)
19  BY MR. THOMPSON:
20     Q.    I'm just going to try to give you a basic
21  understanding of this based upon previous
22  testimony.  Those names above the black line are
23  current employees or were current employees as of
24  July 3rd, 2023, the black line that runs across the
25  middle of the page left to right or right to left.

42

1  So all these employees are current.

2      A.    These are current, yes.

3      Q.    And then below that with a strike mark

4  through are names of previous employees.

5      A.    Uh-huh.

6      Q.    Including yourself.

7            I would tell you that the year that

8  Ms. Cornett was hired, fiscal year 2016 -- or

9  excuse me, April 25th, 2016 is what it shows for a

10  hire date.  She was making the same as Arthur

11  Briggs, and then there are also two former

12  employees, John Klein and James Flowers, that were

13  all hired that year at the same wage.

14           There's been testimony from Mr. Briggs in

15  regards to his experience, and he had significantly

16  more experience when he came to Park County than

17  Ms. Cornett had operating heavy equipment.  Do you

18  believe that that's gender discrimination by paying

19  him less -- excuse me, paying him the same wage as

20  Ms. Cornett when he had so much more experience?

21     A.    Who's this?

22     Q.    Rowdy Briggs.

23           MR. KELLER:  Object as to the form of the

24  question.

25     A.    Different kind of equipment.

43

1  BY MR. THOMPSON:

2      Q.    Well, Ms. Cornett had no experience in

3  any kind of equipment.

4      A.    Uh-huh.

5      Q.    Rowdy Briggs had experience, as he's

6  testified under oath in his deposition.  So is it

7  unfair to pay him the same wage when he had so much

8  more experience?

9      A.    I don't know that.

10     Q.    Do you have an opinion as to that?

11     A.    I do.

12     Q.    And what's that opinion?

13     A.    I think this whole step and grade thing

14  is a bunch of BS.

15     Q.    Why is that?

16     A.    Because it doesn't -- it's just like

17  hiring Star.  Whatever wages, that was what they

18  started people at, and then saying two years later

19  after she's got the experience that it doesn't

20  matter if you've got it or not.  You're still going

21  to stay at this wage because we can hire somebody

22  else in, which they have a lot of times, at more

23  money with basically not any more experience than

24  Star or than I or anybody on here.

25     Q.    Well, let's keep it to the question I

44

1  asked.

2      A.    Okay.

3      Q.    Was it discrimination not to pay Rowdy

4  Briggs for the experience that he had?

5            MR. KELLER:  Objection to the form of the

6  question, foundation.

7      A.    That's a little confusing, but I can tell

8  you that it was because they run him down -- I

9  called Rowdy and told him he'd better get in there

10  if he wanted the job, and so he did and they hired

11  him.  But they weren't going to pay him anything if

12  they could keep from it.

13  BY MR. THOMPSON:

14     Q.    So was that based upon a decision, to

15  your knowledge, based upon his gender?

16     A.    Not on his gender, no.

17     Q.    Do you believe the County paid people

18  based -- can I finish the question?

19           MR. KELLER:  Yeah, go ahead.

20  BY MR. THOMPSON:

21     Q.    Do you believe the County paid people

22  differently based on gender?

23     A.    I think they do sometimes, yes.

24     Q.    You and Ms. Cornett?

25     A.    Yes.

45

1      Q.    Do you know the equipment operator that

2  works for the landfill that's the second highest

3  paid employee in the County that's -- or on that

4  side of Public Works that's a female equipment

5  operator?

6      A.    I don't know her.

7      Q.    You don't know her?

8      A.    I don't know.

9            MR. KELLER:  Objection, form, foundation,

10  form of the question.

11  BY MR. THOMPSON:

12     Q.    And so you never filed an Equal Pay Act

13  claim, correct?

14     A.    No.

15     Q.    Never filed a discrimination claim?

16     A.    No.

17     Q.    You left as an equipment operator 3,

18  correct?

19     A.    Yes.

20     Q.    There were other equipment operator 3s

21  that were males that were getting paid the same as

22  you, correct?

23     A.    Yes.

24     Q.    There were equipment operator 3s that

25  were males that were getting paid less than you?

46

1     **A.**   Probably.

2     **Q.**   Is it gender discrimination to pay them

3  less that are doing the same or similar job?

4     **A.**   They didn't work as many years for Park

5  County as I did, so yes, it was discrimination,

6  gender discrimination.

7     **Q.**   To pay the males less?

8     **A.**   No, to pay me less because it took me X

9  amount of years to catch up.

10     **Q.**   Let me show you something here,

11  Ms. Stewart. Let's look at Deposition Exhibit 3,

12  and let's look at your name. As an equipment

13  operator 3, you're being paid 21.42.

14           MR. KELLER: For the record, I want to

15  just make a correction. I think you said 3. I

16  think it's --

17           MR. THOMPSON: 13. Thank you.

18           MR. KELLER: Yeah.

19  BY MR. THOMPSON:

20     **Q.**   Do you see that? Just let me know when

21  you've found that. Do you see that?

22     **A.**   I see this, yeah.

23     **Q.**   And do you see going up the chart Kris

24  Cooper as an equipment operator 3, he's getting

25  paid it 21.42? Do you see that?

47

1     **A.**   Yes.

2     **Q.**   Did Kris Cooper have more experience than

3  you?

4     **A.**   Probably, yes.

5     **Q.**   Do you know why he was only getting paid

6  21.42?

7     **A.**   I could, but you're not going to like the

8  answer.

9     **Q.**   Is it speculation, or is it based upon

10  personal knowledge?

11     **A.**   Based on knowledge of what I saw at the

12  shop.

13     **Q.**   And that's -- go ahead and tell me what

14  you saw at the shop.

15     **A.**   They didn't like him. They wanted him to

16  quit, so they did everything they could think of to

17  push him out.

18     **Q.**   And who's "they"?

19     **A.**   The conversation between Hobby and Jones

20  several times that we all heard. I don't know if

21  Star was there yet then or not, but they didn't

22  like him.

23     **Q.**   And what was that conversation?

24     **A.**   Basically, they thought he should go back

25  to Cody and go to work because they didn't want him

48

1  at the Powell shop.

2     **Q.**   And why didn't they want him at the

3  Powell shop?

4     **A.**   My own opinion is because he was a better

5  operator than Jones, and he didn't want showed up.

6     **Q.**   Do you have any date reference that we

7  can use in regards to these conversations?

8     **A.**   No.

9     **Q.**   Did Kris Cooper put in for the Powell

10  foreman job?

11     **A.**   I don't know if he did or not.

12     **Q.**   And then let's look up at Travis Ball.

13  Did you know Travis Ball?

14     **A.**   Yes.

15     **Q.**   Was he a better equipment operator than

16  you?

17     **A.**   No.

18     **Q.**   He was getting paid as an operator 3; is

19  that correct?

20     **A.**   Yeah.

21     **Q.**   And he was getting paid less than you,

22  correct? He was getting paid 20.27 an hour.

23     **A.**   Travis?

24     **Q.**   Yes.

25     **A.**   That was long before I got to be the 3,

49

1  I'm pretty sure.

2     **Q.**   It's the same year that you left.

3     **A.**   Let's see here. That doesn't look right

4  to me, but, yeah, I guess it's possible, so. . .

5     **Q.**   Do you have an explanation for that, as

6  to why he would have been paid less than you as an

7  equipment operator 3?

8     **A.**   Because he wasn't really -- he wasn't in

9  equipment.

10     **Q.**   So that's another factor that you can use

11  to have a wage differential. You already talked

12  about skill level, years of experience and

13  different operation of different equipment.

14     **A.**   Right.

15     **Q.**   And all those are factors that are gender

16  neutral, correct?

17     **A.**   I would think.

18     **Q.**   Is that your opinion?

19     **A.**   It's my opinion, yeah.

20     **Q.**   All right. And then if you look up for

21  the same last year that you were employed with Park

22  County, there's other equipment operator 3s that

23  are getting paid less than you. Tim Morrison is

24  getting paid less than you. Rowdy Briggs is

25  getting paid less than you. Paul Luthy is getting

50

1  paid less than you, correct?

2  **A.**  Yeah.

3  **Q.**  And they're all males, correct?

4  **A.**  True.

5  **Q.**  And what is the reason that they were

6  getting paid less than you?

7  **A.**  Probably because I'd been there for 10 or

8  15 years more than they had.

9  **Q.**  So the County didn't necessarily pay

10  males more than females.  There were various

11  factors that people got paid a different wage for.

12  MR. KELLER:  Objection, speculation.

13  BY MR. THOMPSON:

14  **Q.**  Correct?

15  **A.**  Yes.

16  **Q.**  Thank you.

17  When did Starkie Cornett actually come

18  over to the Powell shop?

19  **A.**  I'm not sure.

20  **Q.**  The record reflects in this matter that

21  she wouldn't have been there very long before you

22  left.

23  **A.**  Probably a year.

24  **Q.**  And your observations of her operating

25  equipment, my understanding is that she basically

51

1  was operating a truck, a broom, a mower most of

2  that time.

3  **A.**  And roller.

4  **Q.**  And roller.

5  **A.**  And loader.

6  **Q.**  And the loader was in the yard, correct?

7  **A.**  No, it was in the gravel pits or the

8  yard, depending, yeah.

9  **Q.**  And was that her assigned job -- let me

10  finish.  Was that her assigned position, to operate

11  that loader?

12  **A.**  It was everybody's.  I mean if you needed

13  to load a truck, you'd find a loader and load it or

14  sit there for eight hours and wait for somebody.

15  **Q.**  During that first year, is that the

16  extent of what you observed her operating?

17  **A.**  I think so, yes.

18  **Q.**  My understanding is you're good friends

19  with Kris Cooper.  Is that correct?

20  **A.**  I'm friends with Kris.  I wouldn't say

21  good friends.

22  **Q.**  Do you socialize with him?

23  **A.**  Nope.

24  **Q.**  Talk to him by text or phone?

25  **A.**  Nope.

52

1  **Q.**  Have you talked to him about your

2  deposition today?

3  **A.**  No.

4  **Q.**  What's the extent of your friendship?

5  Can you describe it for me?

6  **A.**  I see him in the grocery store and we

7  stand and talk to each other, and other than that,

8  that's it.

9  **Q.**  Did you advocate for Kris Cooper to be

10  foreman of the Powell shop?

11  **A.**  No.

12  **Q.**  And in regards to what I'd call the

13  leading questions concerning whether the Powell

14  shop -- how the Powell shop treated Ms. Cornett,

15  you said they gave her the silent treatment.  What

16  do you mean by that?

17  **A.**  If they were talking about a job in the

18  shop -- they did the same thing with me, so I

19  watched them do it to her, too -- they'd be

20  talking about it and never tell her what they

21  wanted her to do and just get up and leave.

22  **Q.**  Did you report any of that?

23  **A.**  To who?

24  **Q.**  Well, you went to the county engineer and

25  to the county commissioner before when you had a

53

1  grievance, right?

2  **A.**  Yeah.

3  **Q.**  Did you report this to anyone else?

4  **A.**  No.

5  **Q.**  And did you talk to Ms. Cornett about it?

6  **A.**  I don't think so.

7  **Q.**  So someone not talking to another

8  employee is what you would describe as the silent

9  treatment?

10  **A.**  It's basically a -- it's a hostile work

11  environment.

12  **Q.**  By not talking to somebody?

13  **A.**  Absolutely.

14  **Q.**  All right.  But you didn't report it, you

15  didn't do anything about it, and you didn't talk to

16  Ms. Cornett about it?

17  **A.**  She's not stupid.  She knew what was

18  going on.

19  **Q.**  You didn't report it, you didn't do

20  anything about it, and you didn't talk to

21  Ms. Cornett about it?

22  **A.**  Nope.

23  **Q.**  Did you know that Ms. Cornett was

24  secretly recording conversations of coworkers?

25  **A.**  No.

54

1  Q.   Do you think that might have caused
2  people not to want to talk to her?  That's been
3  proven in this -- or that's a fact in this case.
4  A.   I did not know that, so I don't know.
5  Q.   Do you know if she ever secretly recorded
6  you?
7  A.   No.  I don't care if she did.
8  Q.   You don't know?
9  A.   No, I don't know.
10  Q.   Do you think that might cause people to
11  get up and walk away and not want to talk to her if
12  they knew that was going on?
13  A.   I guess if they're that nervous.
14  Q.   You said they don't want you to talk to
15  each other.  My understanding at Road & Bridge is
16  when you come in in the morning, you meet or have
17  coffee or whatever the case may be, and then you
18  get on separate pieces of equipment and go do
19  whatever the job is for the day.  Is that fair?
20  A.   That's true, yeah.
21  Q.   And so when you're on equipment, you
22  really can't talk to each other, can you?
23  A.   No.
24  Q.   And when you say they didn't want you to
25  talk to each other -- that's what you testified to.

55

1  A.   Uh-huh.
2  Q.   Who is "they"?
3  A.   The foremens -- the foremens most of the
4  time.
5  Q.   And so that's true in the Cody shop and
6  in the Powell shop?
7  A.   I think so, yes.
8  Q.   And why didn't they want you to talk to
9  each other?
10  A.   Because they didn't want people to know
11  exactly what they were doing.  So if they can keep
12  you apart and not have you confirm each others
13  stories, then you're -- they can squirm out of it.
14  Q.   So they don't want you talking to each
15  other because they don't want you to know what the
16  other person is doing?
17  A.   Pretty much.
18  Q.   What do you mean by that?  They don't
19  want you to know what job you're doing that day?
20  MR. KELLER:  Objection, speculation.
21  A.   It's just a gossip factor with these
22  guys.  It's the gossip factor.
23  BY MR. THOMPSON:
24  Q.   Can you give me an example of the foremen
25  in either the Powell or the Cody shop keeping

56

1  people from talking to each other because they
2  didn't want the other person to know what their
3  co-employee was doing that day?
4  A.   The Powell and Cody shop used to just be
5  like two different states, two different countries.
6  They did not get along.  They would not hardly work
7  together, and that was pretty much the no-talking
8  zone because they didn't want everybody talking
9  with each other to know what was going on with one
10  foreman and the other foreman.
11  Q.   So was it a competition between shops
12  that they didn't want you talking about?
13  A.   Yeah, they were just -- it was stupid.
14  Q.   Were the foremen in the Powell shop
15  keeping employees from talking to each other so
16  they didn't know -- I'm just trying to understand
17  this.  They didn't want employees to know what
18  their co-employees were doing that day?
19  A.   Pretty much.
20  Q.   So if I'm mowing, they wouldn't let me
21  tell somebody else I was mowing?
22  A.   That's just ridiculous.  It's not -- no.
23  That's not what was meant.
24  Q.   Explain it for me, please.
25  A.   These guys get in little pissing matches

57

1  with each other, and they divide the crew.  That
2  way you get everybody mad at everybody, and
3  nobody's saying anything to anybody.  That's the
4  way they handle it.
5  Q.   And you're going to be called in front of
6  a federal jury.
7  A.   That's fine.
8  Q.   And I'm going to have your deposition
9  transcript, and I'm going to be able to
10  cross-examine you on different areas of your
11  testimony if you're called as a witness.  So I want
12  to know specifics about what your testimony is as
13  to when this happened and who was involved.
14  A.   It was on and on for so long that I don't
15  know what to tell you.
16  Q.   Do you have --
17  A.   I don't have proof of it except what I'm
18  saying, and probably some of these other guys would
19  tell you the same thing except they're afraid of
20  their jobs.  They're afraid to say anything because
21  they're afraid they're going to be gone.
22  Q.   So you don't have any proof?
23  A.   I probably couldn't prove it now because
24  if they say anything, they'll probably get fired,
25  too.

58

1    Q.    Ma'am, understand this is my only chance
2    to talk to you --
3    A.    That's true.
4    Q.    -- before trial.  Do you have any proof
5    that this was going on?
6    MR. KELLER:  Objection, asked and
7    answered.
8    A.    No.
9    BY MR. THOMPSON:
10    Q.    Thank you.
11    You said you heard Del Ray Paco say that
12    Ms. Cornett was sleeping with Ron Nieters, correct?
13    A.    Yes.
14    Q.    When did that happen?
15    A.    When she was still working at the shop.
16    Q.    Which shop?  The Cody shop?
17    A.    The Cody shop.
18    Q.    And where did you hear Del Ray Jones say
19    this?
20    A.    We were in the shop at Powell.
21    Q.    Okay.  And who was present?
22    A.    Probably all of us, the crew.
23    Q.    Do you have a clear recollection of that?
24    A.    Not of who all was there, no.
25    Q.    And what exactly was said?

59

1    A.    That he was sleeping with her -- she was
2    sleeping with him to get where she was going.
3    Q.    And I want to know exactly what you
4    recall Del Ray Jones said.
5    A.    Do you want me to tell you exactly what
6    he said?
7    Q.    Yes.
8    A.    He said she's fucking Ron.
9    Q.    And there were other people present that
10    heard that?
11    A.    Yes.
12    Q.    Did you do anything about that?
13    A.    I just said she's a busy girl.
14    Q.    Did you agree with it?
15    A.    Shit, no, I didn't agree with it.
16    Q.    Did you go to your supervisor and report
17    it?
18    A.    The supervisor was there.
19    Q.    Did you complain to the county engineer?
20    A.    No.
21    Q.    Did you go to any of the commissioners?
22    A.    No.
23    Q.    So that's another example that you
24    didn't -- you thought policy was broken, but you
25    didn't follow the policy --

60

1    MR. KELLER:  Objection, argumentative.
2    MR. THOMPSON:  Let me ask the question,
3    Counsel.
4    BY MR. THOMPSON:
5    Q.    That's another example where there was a
6    policy violation, but you didn't do anything about
7    it, to report it or follow the EO policy in the
8    handbook?
9    A.    I learned a long time ago that that
10    policy in the handbook didn't make any difference
11    because you can go to the commissioners, you can go
12    to the engineers, you can go to your foreman, you
13    can go to another foreman, you can go to the next
14    guy up on the ladder.  It didn't make any
15    difference because nothing's going to get done.
16    Q.    Would you answer my question?
17    A.    I just did.
18    Q.    I don't think you did.
19    A.    I did not complain because it doesn't do
20    any good.
21    Q.    So you would agree with me that's another
22    example --
23    MR. KELLER:  Asked and answered.
24    BY MR. THOMPSON:
25    Q.    -- where you didn't follow the policy?

61

1    A.    No.  I didn't follow it because there's
2    no point in it.
3    Q.    And other than the one -- you say the
4    policy didn't work or people didn't follow the
5    policy.  Other than your complaint about not being
6    paid as much as Del Ray Jones, did you have any
7    other occasions where you tried to follow the
8    policy that you believe it didn't work?
9    A.    Yes.
10    Q.    And what was that?
11    A.    It's pretty much the same thing, the
12    equipment, you know, just -- it was the same thing,
13    not getting stepped up to an operator 2 or
14    whatever.
15    Q.    So you made two complaints about your
16    wages?
17    A.    More than that.
18    Q.    And can you tell me all the complaints
19    that you made, who you made them to and the year
20    that you made those to?
21    A.    I don't remember the year, but it was
22    either Larry Nielson or Frank Page.
23    Q.    And when you made a complaint to Larry
24    Nielson, what did you tell him?
25    A.    I asked him why I wasn't getting raised

62

1  up with everyone else.
2      Q.    And so what year would this have been?
3      A.    I don't remember the years.
4      Q.    And with Frank Page, when did you make
5  the complaint?
6      A.    The same time with Nielson, but I don't
7  remember the year, either.
8      Q.    So this is what you told me about
9  earlier?
10     A.    Yeah -- well, a lot of it, yeah.
11     Q.    Are there any other times that you went
12 to your supervisor, the county engineer or the
13 commissioner concerning what you didn't believe was
14 proper wage increases?
15     A.    I don't remember.  There was so many
16 different times of trying to complain to somebody,
17 and it didn't do any good.  We have no chain of
18 command.
19     Q.    I appreciate the generalities and the
20 critique of your employment with the County, but
21 I'm asking you for specifics.
22     A.    No, I did not complain.
23     Q.    Okay.  Thank you.
24 / / /
25 / / /

63

1                FURTHER EXAMINATION
2  QUESTIONS BY MR. KELLER:
3      Q.    So I want to get back here a little bit
4  on these complaints, if you don't mind, Cindy.
5      A.    Uh-huh.
6      Q.    You sounded a little heated, but when Del
7  Ray had operated your truck and broke the plow, did
8  you complain to Larry Nielson at that time?
9      A.    Yes.
10     Q.    And what happened with that complaint?
11     A.    Nothing.
12     Q.    In regards to treatment in the shop
13 before, had Del Ray Paco ever called you any names?
14     A.    Yes.
15     Q.    What did he call you?
16     A.    Consuela, lots of different names.
17     Q.    Did you ever tell Larry Nielson that you
18 didn't appreciate that?
19     A.    Larry was right there.
20     Q.    And Larry did nothing?
21     A.    Nothing.
22     Q.    Did that give you the impression that
23 nothing was going to happen if you complained?
24     A.    Absolutely.
25     Q.    Was it pretty obvious nothing was going

64

1  to happen?
2      A.    Yes, it was obvious nothing was going to
3  happen.
4      Q.    And the one time you did make a complaint
5  where something did happen, you had to take that
6  all the way up to a public official?
7      A.    Yes.
8      Q.    And in your mind, did that set a standard
9  for you as far as how your complaints were going to
10 be treated?
11     A.    Yes.
12     Q.    And that standard, what was that standard
13 in your mind?
14     A.    That nothing was going to happen.
15     Q.    And again, that was from your previous
16 experience?
17     A.    Yes.
18     Q.    In regards to the -- talking about Larry
19 Nielson, he was the foreman.  Who was the foreman
20 after Larry Nielson?
21     A.    Dale Hobby.
22     Q.    And Dale Hobby, was his management
23 experience different than Larry Nielson?
24     A.    Yes.
25     Q.    How so?

65

1      A.    He was organized.  I don't know.  He
2  just -- if you had something to say to him, you
3  could take him -- go to the office and talk to him
4  and it would be fine.  You know, it was no big
5  screaming match or -- he wouldn't just blow you
6  off.  He'd just talk to you.
7      Q.    And when Dale Hobby was there, did you
8  make complaints to Dale Hobby?
9      A.    I had one time where I had to complain.
10     Q.    And what was that complaint?
11     A.    We had a driver that was scaring the hell
12 out of everybody in the pit, so. . .
13     Q.    And did Dale Hobby do anything about it?
14     A.    Yes.
15     Q.    What did he do?
16     A.    He went up and talked to him.
17     Q.    So would it be safe to say that some
18 foremen would actually take action on your
19 complaints --
20     A.    Yes.
21     Q.    -- and others wouldn't?
22     A.    Yes.
23     Q.    Was Larry Nielson one who would not take
24 action on your complaints?
25     A.    He wouldn't, no.

66

1    **Q.**    And the engineer at the time, would he
2    take action on your complaints?
3    **A.**    With Nielson, no.  Frank Page, no.
4    **Q.**    And again, is that from experience?
5    **A.**    Yes.
6    **Q.**    And just because you don't remember the
7    exact date, does that mean it didn't happen?
8    **A.**    It happened.
9    **Q.**    And you'd be willing to testify to that
10   in front of a federal jury?
11   **A.**    Yes.
12   **Q.**    Was Dale Hobby there when Paco talked
13   about Star sleeping with everybody?
14   **A.**    Yes.
15   **Q.**    Was Travis Ball hired after you were
16   hired?
17   **A.**    Yes.
18   **Q.**    Did he make equipment operator 3 before
19   you did?
20   **A.**    I'm sure he did, yeah.
21   **Q.**    Talking about your observations of
22   people, if you actually like someone as a person,
23   does that change your thoughts on whether or not
24   they're a competent equipment operator or not?
25   **A.**    Say that again.

67

1    **Q.**    Let me rephrase that.  Have you ever seen
2    anybody that you did not like that you still
3    considered a decent equipment operator?
4    **A.**    Yes.
5    **Q.**    And who would that have been?
6    **A.**    Oh, gees, there's a lot of them.  There's
7    been a lot of good operators at the County that I
8    really didn't care for, so. . .
9    **Q.**    Like who?
10   **A.**    At the time, Kris Cooper.  Chip Ash was a
11   good operator, and I didn't care for him.
12   **Q.**    And you didn't like them, but you'd still
13   say they're good equipment operators?
14   **A.**    Great operators, yeah, both of them.
15   **Q.**    So your dislike for Del Ray Jones has
16   nothing to do with whether or not he's a decent
17   equipment operator?
18   **A.**    He's just not a decent equipment
19   operator.
20   **Q.**    And getting back to the skill level, was
21   it your understanding that advancement was based on
22   skill level?
23   **A.**    Yeah.
24   **Q.**    And when you saw Star Cornett operate
25   equipment, do you believe she had the skill level

68

1    to be an equipment operator 2?
2    **A.**    Yeah.  She's got the willingness to --
3    and she tries.  I mean that's more than you can say
4    for quite a few of them.
5    **Q.**    And was there someone else in the Cody
6    shop -- or not Cody shop, but the Powell shop at
7    the time that had made equipment operator 2 where
8    Star Cornett was as skilled as that operator?
9    **A.**    I don't know that.  I don't know.
10   **Q.**    And in regards to the advancement, your
11   understanding, you said the foreman was the one who
12   puts it in, puts people in for advancement?
13   **A.**    That's my understanding.
14   **Q.**    And then anything else beyond what the
15   foreman did would be -- you don't understand or
16   didn't understand?
17   **A.**    No, because they never explained it to
18   us.
19   **Q.**    So that would be speculation on your part
20   as to what happened after the foreman made the
21   recommendation?
22   **A.**    He never did.
23   **Q.**    Okay.  Well, I'm just saying if the
24   foreman was to make a recommendation, you wouldn't
25   know the exact process, would you?

69

1    **A.**    It went to the engineer and into the
2    commissioners meetings, I guess.
3    **Q.**    You're guessing, but that's --
4    **A.**    Yes, that's all I can tell you.  That's
5    what I guess.
6    **Q.**    And you don't know if an advancement had
7    to be signed off by the county commissioners or
8    not, do you?
9    **A.**    I don't know.
10   **Q.**    That would be speculation on your part?
11   **A.**    Yep.
12   **Q.**    And do you know if that's even in the
13   employee handbook, on how that process happens?
14   **A.**    I don't think it was.
15   **Q.**    And in years when people did not get
16   advanced or raises, do you know, did you have
17   firsthand knowledge of whether that was because of
18   budget reasons or not?
19   **A.**    I did not.  That was what we were told.
20   **Q.**    In regards to Travis Ball, do you know
21   what Travis Ball did before he came to Road &
22   Bridge?
23   **A.**    He was a jailer at the Park County.
24   **Q.**    I didn't quite hear that.  Did you say
25   jailer?

70

1    A.    A jailer.

2    Q.    So he wasn't operating equipment before

3    he came over, did he?

4    A.    No.

5    Q.    Do you know how long he was a jailer for?

6    A.    No.

7    Q.    And how do you know he was a jailer?

8    A.    I saw him in his uniform.  I mean he was

9    in the Park County website.

10    Q.    In regards to the treatment in the shop,

11    you mentioned the silent treatment.  Was it

12    something that was obvious?

13    A.    Yes.

14    Q.    Couldn't be missed by anyone?

15    A.    It couldn't have.

16    Q.    And if you were to complain to Brian

17    Edwards about that, do you think anything would

18    have occurred?

19    A.    I doubt it.

20    MR. THOMPSON:  Objection, speculation.

21    A.    No.

22    BY MR. KELLER:

23    Q.    You don't believe that Brian Edwards

24    would have done anything?

25    A.    I don't think so.

71

1    MR. THOMPSON:  Same objections.

2    BY MR. KELLER:

3    Q.    What makes you believe that?

4    MR. THOMPSON:  Same objection.

5    A.    I just -- you know, the things that

6    happen at the shops, and no, I don't believe

7    anything would have happened.

8    BY MR. KELLER:

9    Q.    Would Brian Edwards' statement to you

10    about trying to teach Star how to get a tougher

11    skin, would that have any indication of why you

12    think that your complaint would go nowhere?

13    A.    That's true.

14    MR. KELLER:  I don't have any further

15    questions.

16    MR. THOMPSON:  We're done.

17    THE REPORTER:  Signature?

18    MR. KELLER:  So just to let you know, the

19    way this will work is you're going to get a chance

20    to read your transcript, go through it.  You can

21    make corrections at the end.  Typically there's

22    spelling stuff and all that.  If you want to make a

23    major correction, I just want to let you know or

24    you want to change an answer, that's going to open

25    things up where Mr. Thompson can come back in and

72

1    redepose you as well as use that during trial for

2    cross-examination.

3    THE DEPONENT:  Okay.

4    MR. KELLER:  So if you want to sign it,

5    it will come to my office, and we'll do what we can

6    for you to sign, read and sign it.  And that's up

7    to you if you want to do that, or you can waive it.

8    THE DEPONENT:  I'll waive it.

9    (Whereupon, the deposition was concluded

10    at 2:27 p.m.)

73

1    REPORTER'S CERTIFICATE

2

STATE OF WYOMING        )
3                        ) SS.
COUNTY OF JOHNSON        )

4

5    I, Joan F. Marshall, a Notary Public in
and for the State of Wyoming, residing at Buffalo,
6    County of Johnson, State of Wyoming, and a Court
Reporter, do hereby certify:
7    That on the 23rd day of April 2024, at
12:56 p.m., there appeared before me CYNTHIA M.
8    STEWART, pursuant to notice and stipulation of
counsel, as a witness in the foregoing cause;
9    That pursuant to stipulation of counsel,
said witness was first duly sworn by me to tell the
10    truth, the whole truth, and nothing but the truth
as she testified in said cause, and said witness
11    was thereupon examined orally by counsel and made
answer thereto, under oath, as hereinabove
12    contained;
That the foregoing testimony was taken by
13    me in stenograph and thereafter reduced to
typewriting by me or under my supervision, and the
14    foregoing 72 pages contain a full, true and correct
record of all the testimony given by the witness,
15    to the best of my ability;
That the reading and signing of the
16    deposition were expressly waived;
That I am not a relative or employee or
17    attorney or counsel of any of the parties in said
cause, nor am I a relative or employee of such
18    attorney or counsel, nor am I financially
interested in the action, nor am I a relative of
19    any person interested in said action.
IN WITNESS WHEREOF, I have hereunto set my
20    hand and seal this 30th day of April 2024.

21

22    _____

23    JOAN F. MARSHALL, C.S.R.
Notary Public
24    196 Links Lane
Buffalo, Wyoming 82834

25

My Commission expires August 24, 2029.

**'**

**'18** [2] - 7:5, 27:19
**'19** [1] - 27:19
**'94** [1] - 6:18

## 1

**1** [5] - 6:21, 7:6, 14:23, 36:9, 40:7
**10** [1] - 50:7
**111** [1] - 2:4
**120** [1] - 4:4
**12:56** [2] - 1:17, 73:7
**13** [3] - 3:7, 41:6, 46:17
**15** [2] - 19:6, 50:8
**17** [1] - 41:13
**196** [1] - 73:23

## 2

**2** [11] - 7:22, 7:23, 8:16, 15:2, 15:3, 15:13, 36:9, 40:7, 61:13, 68:1, 68:7
**20.27** [1] - 48:22
**2002** [1] - 40:2
**2006** [1] - 8:3
**2009** [1] - 14:8
**2016** [2] - 42:8, 42:9
**2018** [1] - 6:25
**2019** [1] - 27:18
**2023** [1] - 41:24
**2024** [4] - 1:17, 4:3, 73:7, 73:20
**2029** [1] - 73:25
**21.42** [3] - 46:13, 46:25, 47:6
**22** [1] - 39:25
**22-CV-00034** [2] - 1:3, 4:10
**23** [1] - 1:17
**23rd** [2] - 4:2, 73:7
**24** [1] - 73:25
**25** [1] - 3:4
**25th** [1] - 42:9
**2820** [1] - 4:4
**2:27** [1] - 72:10
**2s** [1] - 18:12

## 3

**3** [19] - 8:2, 8:5, 8:15, 15:2, 22:15, 24:25, 25:1, 36:9, 41:12, 41:13, 45:17, 46:11,

46:13, 46:15, 46:24, 48:18, 48:25, 49:7, 66:18
**30th** [1] - 73:20
**3rd** [1] - 41:24
**3s** [3] - 45:20, 45:24, 49:22

## 4

**4** [1] - 3:3
**41** [1] - 3:7
**45** [1] - 19:15

## 6

**63** [1] - 3:4
**6844** [1] - 2:9

## 7

**72** [1] - 73:14

## 8

**8** [1] - 14:8
**82009** [1] - 2:10
**82443** [1] - 2:5
**82834** [1] - 73:24

## 9

**9** [4] - 11:25, 12:1, 14:8, 19:6

## A

**ability** [1] - 73:15
**able** [2] - 12:25, 57:9
**absolutely** [4] - 13:4, 22:12, 53:13, 63:24
**acknowledgment** [1] - 31:25
**Act** [2] - 37:12, 45:12
**action** [6] - 4:8, 65:18, 65:24, 66:2, 73:18, 73:19
**actions** [1] - 14:13
**adduced** [1] - 4:12
**adjustments** [1] - 41:7
**Adjustments** [1] - 3:7
**advanced** [2] - 15:12, 69:16
**advancement** [4] - 67:21, 68:10, 68:12, 69:6

**advocate** [1] - 52:9
**afraid** [3] - 57:19, 57:20, 57:21
**afternoon** [5] - 25:11, 25:12, 25:17, 26:5, 26:13
**ago** [2] - 39:25, 60:9
**agree** [5] - 24:14, 36:2, 59:14, 59:15, 60:21
**ahead** [4] - 5:17, 37:17, 44:19, 47:13
**air** [1] - 9:5
**amount** [1] - 46:9
**AND** [2] - 1:7, 4:11
**answer** [6] - 28:8, 35:14, 47:8, 60:16, 71:24, 73:11
**answered** [2] - 58:7, 60:23
**answers** [2] - 26:18, 27:7
**anyway** [1] - 23:22
**apart** [1] - 55:12
**appeared** [1] - 73:7
**appearing** [2] - 2:5, 2:10
**application** [2] - 37:23, 38:3
**appreciate** [2] - 62:19, 63:18
**approve** [1] - 34:6
**approved** [1] - 33:16
**April** [4] - 4:3, 42:9, 73:7, 73:20
**APRIL** [1] - 1:17
**areas** [4] - 25:20, 26:5, 26:17, 57:10
**argue** [1] - 5:13
**arguing** [1] - 5:12
**argumentative** [1] - 60:1
**Arthur** [1] - 42:10
**Ash** [2] - 23:19, 67:10
**asshole** [1] - 23:6
**assigned** [2] - 51:9, 51:10
**assist** [1] - 39:6
**AT** [2] - 1:16, 1:17
**attitude** [1] - 23:4
**Attorney** [2] - 2:3, 2:8
**attorney** [3] - 25:14, 73:17, 73:18
**audible** [1] - 5:4
**August** [1] - 73:25
**aware** [2] - 28:21, 34:9

## B

**Ball** [5] - 48:12, 48:13, 66:15, 69:20, 69:21
**base** [1] - 10:8
**based** [9] - 34:15, 41:21, 44:14, 44:15, 44:18, 44:22, 47:9, 47:11, 67:21
**basic** [1] - 41:20
**basis** [1] - 29:22
**became** [2] - 22:8
**beforehand** [1] - 27:5
**BEHALF** [1] - 1:15
**behalf** [4] - 2:5, 2:11, 4:2, 29:2
**believes** [1] - 23:22
**belly** [2] - 9:3, 18:2
**below** [1] - 42:3
**best** [3] - 6:1, 7:1, 73:15
**better** [3] - 44:9, 48:4, 48:15
**between** [3] - 12:2, 47:19, 56:11
**beyond** [1] - 68:14
**big** [5] - 10:7, 10:8, 10:14, 10:20, 65:4
**bit** [2] - 10:23, 63:3
**black** [2] - 41:22, 41:24
**blame** [2] - 13:2, 13:11
**blow** [1] - 65:5
**BOARD** [1] - 1:6
**Bobbie** [1] - 18:23
**bottom** [1] - 10:6
**Box** [1] - 2:4
**brakes** [1] - 9:5
**Brian** [10] - 2:13, 18:25, 19:9, 20:19, 21:6, 21:8, 22:20, 70:16, 70:23, 71:9
**Bridge** [12] - 6:12, 6:17, 6:20, 6:24, 8:8, 18:18, 33:2, 33:10, 39:4, 41:8, 54:15, 69:22
**BRIDGE** [1] - 1:7
**Briggs** [6] - 42:11, 42:14, 42:22, 43:5, 44:4, 49:24
**broke** [1] - 63:7
**broken** [1] - 59:24
**broom** [1] - 51:1
**BS** [1] - 43:14
**buck** [1] - 23:4
**budget** [2] - 35:23, 69:18
**Buffalo** [1] - 73:5,

73:24
**bunch** [1] - 43:14
**bundle** [1] - 11:6
**busy** [1] - 59:13
**BY** [30] - 1:22, 4:18, 5:16, 7:20, 14:21, 16:20, 17:1, 20:23, 22:19, 23:12, 24:23, 25:10, 35:12, 37:9, 37:16, 41:19, 43:1, 44:13, 44:20, 45:11, 46:19, 50:13, 55:23, 58:9, 60:4, 60:24, 63:2, 70:22, 71:2, 71:8

## C

**C.S.R** [2] - 1:23, 73:22
**capable** [1] - 37:18
**capacity** [2] - 29:9, 29:10
**care** [3] - 54:7, 67:8, 67:11
**careful** [2] - 16:10, 17:9
**Carter** [2] - 20:12, 20:13
**case** [5] - 37:4, 37:13, 38:14, 54:3, 54:17
**Case** [1] - 1:3
**catch** [2] - 5:25, 46:9
**caught** [1] - 15:10
**caused** [1] - 54:1
**CDL** [2] - 7:7, 7:9
**cemetery** [2] - 12:2, 12:3
**CERTIFICATE** [1] - 73:1
**certify** [1] - 73:6
**chain** [1] - 62:17
**chance** [5] - 15:21, 35:6, 35:8, 58:1, 71:19
**change** [4] - 26:22, 26:25, 66:23, 71:24
**chart** [1] - 46:23
**Cheyenne** [1] - 2:10
**chip** [1] - 23:19
**Chip** [2] - 23:19, 67:10
**chipped** [1] - 16:2
**chipping** [1] - 11:25
**Chris** [2] - 20:12, 20:13
**Cindy** [3] - 4:19, 4:22, 63:4
**claim** [2] - 45:13, 45:15
**clear** [2] - 5:6, 58:23

**clerk's** [1] - 18:24
**clutch** [1] - 12:18
**co** [2] - 56:3, 56:18
**co-employee** [1] - 56:3
**co-employees** [1] - 56:18
**CODY** [1] - 1:16
**Cody** [11] - 4:4, 24:2, 33:19, 47:25, 55:5, 55:25, 56:4, 58:16, 58:17, 68:5, 68:6
**coffee** [1] - 54:17
**coming** [1] - 26:4
**command** [1] - 62:18
**commercial** [2] - 7:9, 7:13
**Commission** [1] - 73:25
**commissioner** [8] - 15:5, 30:4, 31:7, 31:12, 31:13, 32:22, 52:25, 62:13
**commissioners** [9] - 31:3, 33:3, 33:17, 34:3, 34:5, 59:21, 60:11, 69:2, 69:7
**COMMISSIONERS** [1] - 1:6
**common** [1] - 34:21
**comparing** [1] - 40:5
**competent** [2] - 16:9, 66:24
**competition** [1] - 56:11
**complain** [7] - 59:19, 60:19, 62:16, 62:22, 63:8, 65:9, 70:16
**complained** [2] - 30:8, 63:23
**complaining** [1] - 30:5
**complaint** [7] - 61:5, 61:23, 62:5, 63:10, 64:4, 65:10, 71:12
**complaints** [10] - 22:3, 32:20, 61:15, 61:18, 63:4, 64:9, 65:8, 65:19, 65:24, 66:2
**concern** [1] - 19:22
**concerning** [3] - 27:12, 52:13, 62:13
**concluded** [1] - 72:9
**Conference** [1] - 4:4
**confirm** [1] - 55:12
**confusing** [1] - 44:7
**considered** [1] - 67:3
**consistent** [1] - 27:4
**Construction** [1] - 9:20
**Consuela** [1] - 63:16

**contain** [1] - 73:14
**contained** [1] - 73:12
**contaminated** [1] - 10:9
**contaminating** [3] - 10:1, 10:4, 10:12
**conversation** [3] - 25:23, 47:19, 47:23
**conversations** [2] - 48:7, 53:24
**Cooper** [7] - 23:20, 46:24, 47:2, 48:9, 51:19, 52:9, 67:10
**copy** [1] - 32:1
**Cornett** [23] - 2:13, 15:17, 16:16, 21:9, 22:2, 27:11, 29:2, 38:6, 40:5, 42:8, 42:17, 42:20, 43:2, 44:24, 50:17, 52:14, 53:5, 53:16, 53:21, 53:23, 58:12, 67:24, 68:8
**CORNETT** [1] - 1:3
**Cornett's** [2] - 37:4, 38:3
**correct** [19] - 26:13, 27:9, 36:12, 38:23, 39:1, 39:25, 45:13, 45:18, 45:22, 48:19, 48:22, 49:16, 50:1, 50:3, 50:14, 51:6, 51:19, 58:12, 73:14
**correction** [2] - 46:15, 71:23
**corrections** [1] - 71:21
**Counsel** [2] - 7:18, 60:3
**counsel** [5] - 73:8, 73:9, 73:11, 73:17, 73:18
**countries** [1] - 56:5
**county** [7] - 34:4, 34:9, 52:24, 52:25, 59:19, 62:12, 69:7
**COUNTY** [4] - 1:6, 1:6, 1:7, 73:3
**County** [33] - 4:3, 6:11, 6:20, 6:23, 8:8, 25:15, 27:12, 27:16, 27:21, 28:16, 31:19, 35:18, 36:9, 38:1, 38:24, 39:10, 39:14, 39:15, 40:13, 41:7, 42:16, 44:17, 44:21, 45:3, 46:5, 49:22, 50:9, 62:20, 67:7, 69:23, 70:9, 73:6
**couple** [3] - 11:13, 16:4, 19:4

**court** [1] - 6:5
**Court** [4] - 4:6, 4:9, 4:10, 73:6
**COURT** [1] - 1:1
**courthouse** [1] - 18:23
**coworkers** [1] - 53:24
**cracked** [2] - 13:10, 14:5
**crew** [4] - 21:19, 22:11, 57:1, 58:22
**critique** [1] - 62:20
**cross** [2] - 57:10, 72:2
**cross-examination** [1] - 72:2
**cross-examine** [1] - 57:10
**crushed** [1] - 10:2
**current** [5] - 41:8, 41:23, 42:1, 42:2
**cutting** [3] - 10:25, 11:3, 11:5
**Cynthia** [1] - 4:21
**CYNTHIA** [5] - 1:14, 3:2, 4:1, 4:13, 73:7

# D

**Dale** [13] - 17:4, 18:24, 21:23, 21:24, 23:16, 24:6, 24:7, 64:21, 64:22, 65:7, 65:8, 65:13, 66:12
**damage** [2] - 12:4, 12:7
**damaged** [2] - 14:2, 41:2
**damages** [1] - 13:3
**damaging** [1] - 10:22
**date** [3] - 42:10, 48:6, 66:7
**dates** [1] - 12:9
**Dave** [1] - 18:20
**days** [7] - 8:24, 8:25, 9:7, 38:12, 38:15, 38:22, 39:1
**December** [1] - 7:5
**decent** [3] - 67:3, 67:16, 67:18
**decision** [1] - 44:14
**Defendants** [2] - 1:9, 2:11
**Del** [36] - 8:8, 8:17, 9:10, 9:12, 9:14, 9:22, 10:21, 12:4, 13:2, 14:12, 14:15, 14:22, 20:17, 21:3, 21:22, 22:8, 23:19, 23:21, 23:24, 24:17,

29:4, 29:6, 29:14, 31:2, 37:2, 37:22, 39:21, 40:5, 40:6, 58:11, 58:18, 59:4, 61:6, 63:6, 63:13, 67:15
**demotion** [1] - 40:20
**DEPARTMENT** [1] - 1:8
**Deponent** [1] - 11:20
**DEPONENT** [10] - 5:8, 5:10, 5:13, 5:15, 7:19, 22:18, 35:7, 35:10, 72:3, 72:8
**deposes** [1] - 4:16
**Deposition** [2] - 41:5, 46:11
**DEPOSITION** [3] - 1:14, 3:6, 4:1
**deposition** [6] - 26:4, 43:6, 52:2, 57:8, 72:9, 73:16
**describe** [2] - 52:5, 53:8
**difference** [2] - 60:10, 60:15
**different** [11] - 33:19, 42:25, 49:13, 50:11, 56:5, 57:10, 62:16, 63:16, 64:23
**differential** [1] - 49:11
**differently** [2] - 22:8, 44:22
**digging** [1] - 10:6
**discipline** [1] - 40:18
**disciplined** [2] - 14:12, 40:17
**discrimination** [6] - 42:18, 44:3, 45:15, 46:2, 46:5, 46:6
**discuss** [1] - 27:24
**discussed** [1] - 27:21
**discussion** [2] - 25:7, 41:17
**dislike** [5] - 29:6, 29:11, 29:14, 29:20, 67:15
**disliked** [1] - 29:25
**dispute** [1] - 40:14
**District** [2] - 4:8, 4:9
**DISTRICT** [2] - 1:1, 1:1
**divide** [1] - 57:1
**DIVISION** [1] - 1:7
**done** [4] - 24:12, 60:15, 70:24, 71:16
**doubt** [1] - 70:19
**down** [5] - 7:25, 26:19, 32:9, 32:11, 44:8
**dozer** [1] - 16:6
**drive** [1] - 12:25

**driver** [7] - 6:22, 36:11, 36:15, 36:19, 36:21, 39:10, 65:11
**driver's** [1] - 7:9
**drivers** [1] - 36:10
**driving** [2] - 13:9
**dropped** [2] - 10:25, 11:13
**drove** [1] - 19:11
**duly** [2] - 4:14, 73:9
**dump** [2] - 9:3, 12:10
**dumped** [1] - 12:15
**dumps** [1] - 18:2
**during** [5] - 17:12, 17:14, 17:17, 51:15, 72:1

# E

**e-mailed** [1] - 28:2
**earning** [1] - 41:11
**edges** [4] - 10:25, 11:3, 11:5, 12:19
**Edwards** [8] - 2:14, 18:25, 20:19, 21:8, 22:20, 23:2, 70:17, 70:23
**Edwards'** [1] - 71:9
**eight** [1] - 51:14
**either** [4] - 26:1, 55:25, 61:22, 62:7
**employed** [1] - 49:21
**employee** [8] - 14:16, 31:23, 45:3, 53:8, 56:3, 69:13, 73:16, 73:17
**employees** [9] - 41:9, 41:23, 42:1, 42:4, 42:12, 56:15, 56:17, 56:18
**employment** [7] - 27:16, 31:20, 32:19, 33:13, 37:23, 38:4, 62:20
**end** [5] - 6:4, 13:23, 18:2, 20:9, 71:21
**ended** [1] - 24:4
**engineer** [10] - 31:8, 32:21, 33:1, 34:5, 34:9, 52:24, 59:19, 62:12, 66:1, 69:1
**engineer's** [1] - 30:20
**engineers** [1] - 60:12
**entire** [1] - 13:15
**environment** [1] - 53:11
**EO** [1] - 60:7
**equal** [2] - 31:19, 32:18

**Equal** [2] - 37:12, 45:12
**equate** [2] - 35:2, 36:4
**equipment** [65] - 7:21, 8:1, 8:14, 8:19, 9:15, 9:21, 10:22, 11:15, 14:23, 15:2, 15:13, 15:22, 15:24, 16:9, 16:22, 17:6, 17:12, 17:16, 17:19, 17:22, 17:25, 18:5, 18:11, 18:12, 24:25, 25:1, 33:12, 34:22, 34:25, 36:2, 36:3, 36:6, 37:19, 40:7, 41:2, 41:12, 42:17, 42:25, 43:3, 45:1, 45:4, 45:17, 45:20, 45:24, 46:12, 46:24, 48:15, 49:7, 49:9, 49:13, 49:22, 50:25, 54:18, 54:21, 61:12, 66:18, 66:24, 67:3, 67:13, 67:17, 67:18, 67:25, 68:1, 68:7, 70:2
**exact** [2] - 66:7, 68:25
**exactly** [5] - 20:8, 55:11, 58:25, 59:3, 59:5
**EXAMINATION** [3] - 4:17, 25:9, 63:1
**Examination** [2] - 3:3, 3:4
**examination** [3] - 3:4, 26:5, 72:2
**examine** [1] - 57:10
**examined** [1] - 73:11
**example** [7] - 13:7, 23:13, 41:9, 55:24, 59:23, 60:5, 60:22
**except** [2] - 57:17, 57:19
**excited** [1] - 35:11
**excuse** [3] - 17:13, 42:9, 42:19
**exhibit** [1] - 41:4
**Exhibit** [2] - 41:6, 46:11
**EXHIBITS** [1] - 3:6
**experience** [17] - 9:15, 38:1, 38:6, 42:15, 42:16, 42:20, 43:2, 43:5, 43:8, 43:19, 43:23, 44:4, 47:2, 49:12, 64:16, 64:23, 66:4
**experienced** [2] - 39:3, 39:9
**expires** [1] - 73:25
**explain** [4] - 5:3, 10:4,

12:14, 56:24
**explained** [2] - 33:14, 68:17
**explanation** [1] - 49:5
**expressly** [1] - 73:16
**extent** [2] - 51:16, 52:4

---

### F

**fact** [1] - 54:3
**factor** [3] - 49:10, 55:21, 55:22
**factors** [2] - 49:15, 50:11
**fair** [1] - 54:19
**fan** [1] - 29:4
**far** [3] - 37:11, 38:1, 64:9
**federal** [3] - 38:14, 57:6, 66:10
**female** [1] - 45:4
**females** [1] - 50:10
**few** [3] - 16:7, 29:12, 68:4
**fight** [1] - 10:19
**file** [1] - 40:22
**filed** [3] - 27:21, 45:12, 45:15
**finally** [1] - 22:16
**financially** [1] - 73:18
**fine** [2] - 57:7, 65:4
**finish** [5] - 26:23, 35:6, 35:8, 44:18, 51:10
**fired** [2] - 30:2, 57:24
**Firm** [2] - 2:4, 28:8
**first** [5] - 4:14, 33:1, 37:3, 51:15, 73:9
**firsthand** [1] - 69:17
**fiscal** [1] - 42:8
**five** [1] - 28:13
**fixed** [1] - 12:22
**flat** [1] - 28:8
**flatbed** [1] - 11:7
**Flowers** [1] - 42:12
**follow** [5] - 25:16, 32:3, 32:18, 59:25, 60:7, 60:25, 61:1, 61:4, 61:7
**follow-up** [1] - 25:16
**followed** [1] - 32:24
**following** [1] - 4:11
**FOR** [1] - 1:1
**forced** [2] - 15:7, 21:25
**foregoing** [3] - 73:8, 73:12, 73:14
**foreman** [32] - 8:4,

14:10, 17:4, 18:24, 19:19, 19:22, 20:3, 20:6, 21:4, 22:8, 29:8, 29:15, 29:18, 30:9, 30:10, 30:15, 31:8, 33:1, 33:20, 34:1, 48:10, 52:10, 56:10, 60:12, 60:13, 64:19, 68:11, 68:15, 68:20, 68:24
**foremen** [4] - 33:19, 55:24, 56:14, 65:18
**foremens** [2] - 55:3
**form** [7] - 16:18, 16:24, 23:10, 42:23, 44:5, 45:9, 45:10
**former** [1] - 42:11
**forth** [1] - 6:3
**foundation** [3] - 16:19, 44:6, 45:9
**four** [1] - 25:2
**frame** [1] - 13:10
**Frank** [5] - 30:22, 31:4, 61:22, 62:4, 66:3
**French** [4] - 15:5, 15:6, 30:23, 31:11
**friends** [3] - 51:18, 51:20, 51:21
**friendship** [1] - 52:4
**front** [2] - 57:5, 66:10
**fucking** [1] - 59:8
**full** [1] - 73:14
**FURTHER** [1] - 63:1

---

### G

**gear** [1] - 12:20
**gears** [2] - 12:10, 12:15
**gees** [4] - 7:24, 30:10, 30:22, 67:6
**gender** [7] - 42:18, 44:15, 44:16, 44:22, 46:2, 46:6, 49:15
**general** [1] - 33:15
**generalities** [1] - 62:19
**girl** [1] - 59:13
**given** [3] - 31:2, 31:23, 73:14
**gossip** [2] - 55:21, 55:22
**Government** [1] - 2:9
**grade** [2] - 41:13, 43:13
**grader** [3] - 11:5, 11:6, 16:3
**gravel** [9] - 9:4, 10:2,

10:5, 10:9, 10:10, 10:20, 12:11, 51:7
**great** [1] - 67:14
**grievance** [1] - 53:1
**grocery** [1] - 52:6
**group** [1] - 24:12
**guess** [8] - 19:24, 23:5, 28:17, 41:14, 49:4, 54:13, 69:2, 69:5
**guessing** [1] - 69:3
**guy** [2] - 9:18, 60:14
**guys** [3] - 55:22, 56:25, 57:18

---

### H

**hand** [1] - 73:20
**handbook** [6] - 31:22, 32:1, 32:4, 60:8, 60:10, 69:13
**handle** [1] - 57:4
**handled** [1] - 33:10
**happy** [2] - 10:17, 12:13
**hard** [2] - 6:5, 6:8
**hardly** [1] - 56:6
**haul** [1] - 10:16
**hear** [8] - 23:7, 23:11, 23:13, 23:22, 23:24, 24:2, 58:18, 69:24
**heard** [4] - 23:25, 47:20, 58:11, 59:10
**hearing** [1] - 6:8
**heated** [1] - 63:6
**heavy** [1] - 42:17
**held** [2] - 25:7, 41:17
**hell** [1] - 65:11
**help** [5] - 9:6, 9:10, 9:11, 9:12, 38:24
**hereby** [1] - 73:6
**hereinabove** [1] - 73:11
**hereunto** [1] - 73:19
**highest** [1] - 45:2
**Highway** [1] - 4:4
**himself** [1] - 23:24
**hire** [3] - 7:18, 42:10, 43:21
**hired** [19] - 8:9, 8:11, 8:17, 9:15, 9:22, 14:22, 36:8, 36:17, 36:20, 36:23, 37:3, 37:25, 38:7, 39:21, 42:8, 42:13, 44:10, 66:15, 66:16
**hiring** [1] - 43:17
**hit** [1] - 13:10
**Hobby** [11] - 17:4,

10:5, 10:9, 10:10, 10:20, 12:11, 51:7
**great** [1] - 67:14
**grievance** [1] - 53:1
**grocery** [1] - 52:6
**group** [1] - 24:12
**guess** [8] - 19:24, 23:5, 28:17, 41:14, 49:4, 54:13, 69:2, 69:5
**guessing** [1] - 69:3
**guy** [2] - 9:18, 60:14
**guys** [3] - 55:22, 56:25, 57:18

18:24, 21:23, 23:16, 47:19, 64:21, 64:22, 65:7, 65:8, 65:13, 66:12
**hoist** [1] - 11:12
**hold** [1] - 24:19
**honest** [4] - 14:16, 20:22, 20:24, 20:25
**hornet's** [1] - 21:7
**hostile** [1] - 53:10
**hour** [2] - 19:15, 48:22
**hours** [2] - 36:3, 51:14

---

### I

**important** [1] - 32:13
**impression** [2] - 16:15, 63:22
**improper** [1] - 14:20
**IN** [2] - 1:1, 73:19
**includes** [1] - 41:8
**including** [2] - 24:17, 42:6
**increase** [1] - 33:16
**increases** [4] - 33:10, 34:14, 34:15, 62:14
**indication** [1] - 71:11
**inform** [1] - 18:17
**inspect** [1] - 13:20
**inspecting** [1] - 14:3
**instances** [1] - 10:24
**instead** [1] - 12:17
**interested** [2] - 73:18, 73:19
**interrupt** [1] - 30:11
**introduced** [2] - 25:13, 41:4
**investigator** [2] - 28:18, 28:19
**involved** [2] - 34:10, 57:13

---

### J

**jailer** [5] - 69:23, 69:25, 70:1, 70:5, 70:7
**James** [1] - 42:12
**Joan** [2] - 4:6, 73:5
**JOAN** [2] - 1:23, 73:22
**job** [13] - 20:10, 20:14, 20:15, 22:5, 36:14, 36:17, 44:10, 46:3, 48:10, 51:9, 52:17, 54:19, 55:19
**jobs** [1] - 57:20
**John** [1] - 42:12
**JOHNSON** [1] - 73:3

**Johnson** [1] - 73:6
**Jones** [23] - 8:8, 8:17, 9:10, 9:14, 9:22, 10:21, 12:4, 14:13, 14:15, 14:22, 28:18, 24:17, 29:4, 29:7, 29:15, 37:2, 40:6, 47:19, 48:5, 58:18, 59:4, 61:6, 67:15
**Jones'** [1] - 37:22
**July** [1] - 41:24
**jury** [3] - 38:14, 57:6, 66:10

## K

**keep** [3] - 43:25, 44:12, 55:11
**keeping** [2] - 55:25, 56:15
**KELLER** [35] - 2:3, 4:18, 5:16, 7:20, 14:21, 16:20, 17:1, 20:23, 22:19, 23:12, 24:19, 24:23, 25:3, 35:6, 35:8, 37:8, 37:14, 42:23, 44:5, 44:19, 45:9, 46:14, 46:18, 50:12, 55:20, 58:6, 60:1, 60:23, 63:2, 70:22, 71:2, 71:8, 71:14, 71:18, 72:4
**Keller** [11] - 2:4, 3:3, 3:4, 25:23, 26:1, 27:1, 28:7, 28:23, 28:24, 29:1, 40:16
**kept** [4] - 10:1, 15:8, 22:4, 34:12
**kind** [5] - 5:25, 17:16, 23:1, 42:25, 43:3
**Klein** [1] - 42:12
**knocked** [1] - 62:19
**knowledge** [4] - 44:15, 47:10, 47:11, 69:17
**Kris** [8] - 23:20, 46:23, 47:2, 48:9, 51:19, 51:20, 52:9, 67:10

## L

**ladder** [1] - 60:14
**landfill** [2] - 12:3, 45:2
**Lane** [4] - 11:25, 12:1, 19:6, 73:23
**Larry** [22] - 8:6, 9:8, 9:9, 9:10, 9:12, 12:11, 13:11, 14:9,

15:7, 15:8, 30:9, 31:5, 61:22, 61:23, 63:8, 63:17, 63:19, 63:20, 64:18, 64:20, 64:23, 65:23
**last** [1] - 49:21
**Law** [4] - 2:3, 2:4, 2:8, 2:7
**lawsuit** [3] - 27:13, 27:21, 28:16
**leading** [2] - 16:25, 52:13
**learned** [1] - 60:9
**least** [2] - 7:1, 7:22
**leave** [2] - 6:23, 52:21
**left** [12] - 13:17, 13:24, 14:3, 18:21, 19:4, 27:12, 27:15, 41:25, 45:17, 49:2, 50:22
**legal** [2] - 5:21, 37:15
**less** [12] - 42:19, 45:25, 46:3, 46:7, 46:8, 48:21, 49:6, 49:23, 49:24, 49:25, 50:1, 50:6
**level** [6] - 34:15, 37:3, 49:12, 67:20, 67:22, 67:25
**Liability** [1] - 2:9
**license** [1] - 7:10
**lied** [2] - 15:9, 15:10
**lift** [1] - 11:1
**lifted** [1] - 11:12
**line** [2] - 41:22, 41:24
**Links** [1] - 73:23
**load** [5] - 10:16, 10:25, 11:3, 51:13
**loader** [8] - 9:23, 16:2, 17:18, 18:2, 51:5, 51:6, 51:11, 51:13
**Local** [1] - 2:9
**longevity** [2] - 35:4, 35:5
**look** [5] - 46:11, 46:12, 48:12, 49:3, 49:20
**Luthy** [1] - 49:25
**lying** [2] - 15:10, 31:15

## M

**ma'am** [2] - 25:11, 58:1
**mad** [1] - 57:2
**mailed** [1] - 28:2
**major** [1] - 71:23
**males** [6] - 22:21, 45:21, 45:25, 46:7, 50:3, 50:10
**management** [1] -

64:22
**mark** [1] - 42:3
**marked** [1] - 3:6
**MARSHALL** [3] - 1:23, 2:3, 73:22
**Marshall** [2] - 4:6, 73:5
**match** [1] - 65:5
**matches** [1] - 56:25
**matter** [5] - 20:1, 25:15, 25:19, 43:20, 50:20
**maturity** [1] - 21:3
**mean** [23] - 5:17, 7:9, 8:25, 9:9, 10:3, 10:4, 11:4, 11:17, 12:15, 13:13, 15:12, 16:12, 19:8, 19:21, 22:10, 25:19, 40:18, 51:12, 52:16, 55:18, 66:7, 68:3, 70:8
**means** [1] - 5:1
**meant** [2] - 31:15, 56:23
**meet** [1] - 54:16
**meetings** [1] - 69:2
**memory** [2] - 7:1, 39:24
**men** [2] - 17:19, 18:5
**mention** [1] - 6:2
**mentioned** [4] - 22:23, 31:14, 34:14, 70:11
**middle** [1] - 41:25
**might** [2] - 54:1, 54:10
**mind** [3] - 63:4, 64:8, 64:13
**minutes** [1] - 19:15
**missed** [1] - 70:14
**money** [4] - 15:14, 35:21, 35:22, 43:23
**month** [1] - 18:20, 39:22
**moot** [1] - 23:1
**morning** [1] - 54:16
**Morrison** [1] - 49:23
**most** [8] - 12:18, 32:13, 39:3, 39:7, 39:9, 39:12, 51:1, 55:3
**mostly** [1] - 16:10
**move** [2] - 38:19, 40:6
**moving** [1] - 37:20
**mower** [3] - 16:5, 16:6, 51:1
**mowers** [1] - 18:3
**mowing** [3] - 19:7, 56:20, 56:21
**MR** [69] - 2:3, 2:8, 4:18, 5:4, 5:9, 5:11, 5:14, 5:16, 7:17,

7:20, 14:18, 14:21, 16:18, 16:20, 16:24, 17:1, 20:22, 20:23, 22:17, 22:19, 23:10, 23:12, 24:19, 24:23, 25:3, 25:5, 25:10, 35:6, 35:8, 35:12, 37:8, 37:9, 37:14, 37:16, 41:19, 42:23, 43:1, 44:5, 44:13, 44:19, 44:20, 45:9, 45:11, 46:14, 46:17, 46:18, 46:19, 50:12, 50:13, 55:20, 55:23, 58:6, 58:9, 60:1, 60:2, 60:4, 60:23, 60:24, 63:2, 70:20, 70:22, 71:1, 71:2, 71:4, 71:8, 71:14, 71:16, 71:18, 72:4
**mud** [1] - 10:14
**must** [1] - 28:9

## N

**name** [5] - 4:19, 25:14, 30:20, 31:14, 46:12
**names** [4] - 41:22, 42:4, 63:13, 63:16
**nasty** [2] - 23:4, 23:5
**necessarily** [3] - 36:3, 36:13, 50:9
**need** [1] - 41:15
**needed** [1] - 51:12
**nervous** [1] - 54:13
**nest** [1] - 21:7
**neutral** [1] - 49:16
**never** [9] - 12:21, 27:20, 28:4, 31:14, 45:12, 45:15, 52:20, 68:17, 68:22
**new** [1] - 19:19
**next** [1] - 60:13
**nice** [2] - 8:22, 20:21
**Nielson** [17] - 8:6, 14:9, 30:9, 30:15, 30:16, 30:18, 30:25, 61:22, 61:24, 62:6, 63:8, 63:17, 64:19, 64:20, 64:23, 65:23, 66:3
**Nieters** [4] - 19:10, 20:20, 23:15, 58:12
**no-talking** [1] - 56:7
**nobody** [3] - 23:21, 35:17, 35:20
**nobody 's** [1] - 57:3
**noise** [1] - 23:23
**Notary** [4] - 1:24, 4:6,

73:5, 73:23
**nothing** [12] - 4:15, 16:14, 22:24, 63:11, 63:20, 63:21, 63:23, 63:25, 64:2, 64:14, 67:16, 73:10
**nothing 's** [1] - 60:15
**notice** [1] - 73:8
**notification** [1] - 18:19
**notify** [1] - 18:22
**November** [1] - 8:12
**nowhere** [1] - 71:12
**number** [1] - 28:14

## O

**oath** [7] - 4:24, 5:1, 5:17, 30:13, 38:10, 43:6, 73:11
**object** [3] - 14:18, 37:14, 42:23
**objection** [12] - 16:18, 16:24, 23:10, 37:8, 44:5, 45:9, 50:12, 55:20, 58:6, 60:1, 70:20, 71:4
**objections** [1] - 71:1
**observations** [3] - 17:8, 50:24, 66:21
**observe** [12] - 8:18, 8:21, 9:21, 9:24, 10:21, 15:21, 15:24, 17:3, 17:11, 18:15, 21:11, 21:14
**observed** [2] - 17:22, 51:16
**obvious** [3] - 63:25, 64:2, 70:12
**obviously** [1] - 25:22
**occasions** [1] - 61:7
**occur** [1] - 19:5
**occurred** [1] - 70:18
**OF** [9] - 1:1, 1:6, 1:7, 1:14, 1:15, 3:2, 4:1, 73:2, 73:3
**office** [5] - 18:24, 21:5, 26:1, 65:3, 72:5
**official** [1] - 64:6
**ON** [1] - 1:15
**one** [12] - 12:10, 12:13, 12:17, 20:13, 21:18, 23:21, 24:19, 24:24, 32:9, 32:11, 33:20, 39:7, 56:9, 61:3, 64:4, 65:9, 65:23, 68:11
**ones** [1] - 33:22
**open** [1] - 71:24

operate [5] - 8:18, 8:23, 9:9, 51:10, 67:24
operated [2] - 7:12, 63:7
operating [17] - 8:21, 9:15, 9:22, 11:14, 11:15, 15:22, 15:25, 17:11, 17:16, 17:22, 18:1, 18:6, 42:17, 50:24, 51:1, 51:16, 70:2
operation [4] - 34:25, 36:1, 36:6, 49:13
operator [44] - 6:21, 7:6, 7:22, 7:23, 8:2, 8:5, 8:15, 10:16, 14:23, 15:2, 15:13, 16:9, 18:12, 22:15, 24:25, 25:1, 36:9, 36:12, 36:24, 39:3, 40:7, 41:12, 45:1, 45:5, 45:17, 45:20, 45:24, 46:13, 46:24, 48:5, 48:15, 48:18, 49:7, 49:22, 61:13, 66:18, 66:24, 67:3, 67:11, 67:17, 67:19, 68:1, 68:7, 68:8
operators [3] - 67:7, 67:13, 67:14
opinion [9] - 14:15, 16:8, 19:23, 37:5, 43:10, 43:12, 48:4, 49:18, 49:19
opinions [1] - 24:7
opportunity [3] - 8:18, 31:19, 32:19
oral [1] - 40:18
orally [1] - 73:11
organized [1] - 65:1
otherwise [1] - 5:11
own [2] - 5:3, 48:4

**P**

P.C [1] - 2:4
p.m [2] - 72:10, 73:7
P.M [1] - 1:17
P.O [1] - 2:4
Paco [10] - 8:8, 20:17, 29:4, 29:6, 29:14, 37:2, 37:22, 58:11, 63:13, 66:12
PAGE [1] - 3:2
Page [6] - 30:22, 31:4, 31:7, 61:22, 62:4, 66:3
page [1] - 41:25

pages [1] - 73:14
paid [19] - 44:17, 44:21, 45:3, 45:21, 45:25, 46:13, 46:25, 47:5, 48:18, 48:21, 48:22, 49:6, 49:23, 49:24, 49:25, 50:1, 50:6, 50:11, 61:6
pardon [2] - 33:25, 35:7
Park [19] - 4:3, 6:11, 6:19, 6:23, 8:7, 25:15, 27:12, 27:15, 27:16, 27:21, 28:16, 35:18, 40:12, 41:7, 42:16, 46:4, 49:21, 69:23, 70:9
PARK [2] - 1:6, 1:7
part [3] - 34:6, 68:19, 69:10
parties [1] - 73:17
Paul [1] - 49:25
pause [2] - 6:3, 24:21
pay [3] - 33:9, 33:16, 34:6, 34:14, 35:2, 35:25, 43:7, 44:3, 44:11, 46:2, 46:7, 46:8, 50:9
Pay [2] - 37:12, 45:12
paying [2] - 42:18, 42:19
pending [1] - 4:8
people [18] - 12:18, 24:10, 35:25, 36:20, 36:23, 43:18, 44:17, 44:21, 50:11, 54:2, 54:10, 55:10, 56:1, 59:9, 61:4, 66:22, 68:12, 69:15
person [6] - 20:10, 32:14, 55:16, 56:2, 66:22, 73:19
personal [2] - 29:6, 47:10
personally [1] - 17:3
personnel [1] - 40:22
phone [3] - 28:4, 28:12, 51:24
picked [1] - 14:4, 37:20
pickup [3] - 11:8, 11:9, 11:10
piece [1] - 36:3
pieces [1] - 54:18
pissing [1] - 56:25
pit [4] - 9:4, 10:7, 12:11, 65:12
pits [1] - 51:7
place [1] - 32:19
Plaintiff [3] - 1:4, 2:6,

4:2
PLAINTIFF [1] - 1:15
playing [1] - 5:25
plow [3] - 13:11, 14:4, 63:7
plowing [1] - 13:9
point [3] - 22:3, 29:23, 61:2
policy [12] - 31:20, 32:3, 32:19, 59:24, 59:25, 60:6, 60:7, 60:10, 60:25, 61:4, 61:5, 61:8
Pool [1] - 2:9
position [1] - 51:10
possible [2] - 5:21, 49:4
Powell [22] - 6:15, 12:3, 15:19, 19:19, 21:12, 23:8, 24:3, 24:15, 33:19, 48:1, 48:3, 48:9, 50:18, 52:10, 52:13, 52:14, 55:6, 55:25, 56:4, 56:14, 58:20, 68:6
Powell's [1] - 21:5
prefer [1] - 4:22
present [3] - 2:13, 58:21, 59:9
pretty [7] - 20:7, 49:1, 55:17, 56:7, 56:19, 61:11, 63:25
previous [4] - 41:8, 41:21, 42:4, 64:15
previously [1] - 3:6
problems [1] - 32:13
proceedings [1] - 24:22
process [5] - 19:18, 34:7, 34:10, 68:25, 69:13
proficiency [1] - 34:23
proficient [1] - 36:4
promoted [2] - 14:25, 15:4
proof [3] - 57:17, 57:22, 58:4
proper [1] - 62:14
prove [1] - 57:23
proven [1] - 54:3
provide [1] - 26:19
public [1] - 64:6
PUBLIC [1] - 1:8
Public [6] - 1:24, 4:3, 4:6, 45:4, 73:5, 73:23
pursuant [1] - 73:8, 73:9
push [1] - 47:17
put [5] - 10:7, 11:10,

16:3, 37:1, 48:9
puts [3] - 33:20, 68:12
putting [3] - 10:14, 12:18, 36:2

**Q**

QUESTIONS [3] - 4:18, 25:10, 63:2
questions [9] - 5:5, 25:4, 25:16, 27:2, 27:8, 35:9, 40:16, 52:13, 71:15
quick [2] - 24:20, 24:24
quit [1] - 47:16
quite [5] - 10:23, 19:16, 29:11, 68:4, 69:24
quotes [1] - 37:1

**R**

raise [8] - 15:8, 15:12, 31:2, 34:6, 35:2, 35:17, 35:20
raised [1] - 61:25
raises [1] - 69:16
ramifications [1] - 5:22
ran [2] - 16:2, 16:6
random [1] - 15:20
Ray [36] - 8:8, 8:17, 9:10, 9:12, 9:14, 9:22, 10:21, 12:4, 13:2, 14:13, 14:15, 14:22, 20:17, 21:3, 21:22, 22:8, 23:19, 23:21, 23:24, 24:17, 29:4, 29:6, 29:14, 31:2, 37:2, 37:22, 39:21, 40:5, 40:6, 58:11, 58:18, 59:4, 61:6, 63:7, 63:13, 67:15
read [3] - 31:22, 71:20, 72:6
reading [1] - 73:15
ready [2] - 22:14, 24:1
real [1] - 4:20
really [8] - 7:24, 16:13, 19:25, 22:23, 26:7, 49:8, 54:22, 67:8
reason [3] - 6:4, 40:13, 50:5
reasons [1] - 69:18
received [1] - 32:1
recollection [2] - 7:2, 58:23

recommend [2] - 33:22, 33:24
recommendation [2] - 68:21, 68:24
recommends [1] - 34:1
record [12] - 4:20, 5:6, 6:6, 7:17, 25:8, 25:13, 41:5, 41:16, 41:18, 46:14, 50:20, 73:14
recorded [1] - 54:5
recording [1] - 53:24
records [1] - 40:12
redepose [1] - 72:1
reduced [1] - 73:13
reference [1] - 48:6
REFERRED [1] - 3:6
reflect [1] - 40:13
reflects [1] - 50:20
regards [10] - 22:6, 36:1, 42:15, 48:7, 52:12, 63:12, 64:18, 68:10, 69:20, 70:10
relating [1] - 4:15
relative [1] - 73:16, 73:17, 73:18
release [1] - 9:5
relevance [1] - 37:2, 37:12
remember [11] - 7:24, 8:12, 12:9, 12:16, 33:8, 33:13, 61:21, 62:3, 62:7, 62:15, 66:6
rephrase [1] - 67:1
report [5] - 52:22, 53:3, 53:14, 53:19, 59:16, 60:7
REPORTED [1] - 1:22
Reporter [2] - 4:6, 73:6
REPORTER [1] - 71:17
reporter [1] - 6:6
REPORTER 'S [1] - 73:1
Reporting [1] - 4:5
represented [1] - 28:19
representing [1] - 25:14
reprimand [2] - 40:18, 40:19
residing [1] - 73:5
respond [1] - 6:2
response [1] - 27:8
responses [1] - 5:5
rest [1] - 21:19
retire [1] - 22:15

**retired** [4] - 6:25, 18:17, 24:25, 25:2
**retirement** [2] - 15:16, 18:19
**retiring** [1] - 19:1
**ridiculous** [1] - 56:22
**ROAD** [1] - 1:7
**Road** [14] - 2:10, 6:11, 6:17, 6:20, 6:23, 8:8, 18:18, 19:6, 33:2, 33:10, 39:4, 41:7, 54:15, 69:21
**road** [3] - 7:25, 10:8, 12:2
**rocks** [4] - 10:7, 10:8, 10:14, 10:20
**roller** [4] - 11:16, 18:3, 51:3, 51:4
**rollers** [1] - 16:3
**Ron** [6] - 19:10, 20:20, 23:15, 23:25, 58:12, 59:8
**Room** [1] - 4:4
**room** [1] - 32:14
**Rowdy** [5] - 42:22, 43:5, 44:3, 44:9, 49:24
**rule** [1] - 5:24
**rumors** [3] - 23:7, 23:14, 23:18
**run** [4] - 16:1, 16:6, 34:22, 44:8
**running** [5] - 9:2, 16:5, 18:13, 33:2, 37:19
**runs** [1] - 41:24

**S**

**safe** [1] - 65:17
**sat** [1] - 26:19
**saw** [5] - 11:19, 47:11, 47:14, 67:24, 70:8
**scaring** [1] - 65:11
**screaming** [1] - 65:5
**seal** [1] - 73:20
**second** [2] - 24:19, 45:2
**seconds** [1] - 28:13
**secretly** [2] - 53:24, 54:5
**see** [8] - 21:25, 46:20, 46:21, 46:22, 46:23, 46:25, 49:3, 52:6
**sense** [1] - 34:21
**separate** [1] - 54:18
**separated** [1] - 22:10
**separating** [1] - 21:19
**Service** [1] - 4:5
**session** [1] - 24:12

**set** [2] - 64:8, 73:19
**seven** [1] - 40:9
**several** [1] - 47:20
**shape** [1] - 13:18
**shift** [2] - 12:19, 13:23
**shit** [2] - 21:4, 59:15
**shop** [39] - 6:14, 11:11, 14:4, 15:19, 17:20, 18:6, 19:19, 19:20, 21:5, 21:12, 22:22, 23:9, 24:3, 24:10, 24:15, 47:12, 47:14, 48:1, 48:3, 50:18, 52:10, 52:14, 52:18, 55:5, 55:6, 55:25, 56:4, 56:14, 58:15, 58:16, 58:17, 58:20, 63:12, 68:6, 70:10
**shops** [3] - 33:19, 56:11, 71:6
**show** [3] - 5:6, 21:4, 46:10
**showed** [2] - 14:1, 48:5
**shows** [1] - 42:9
**side** [2] - 25:6, 45:4
**sign** [4] - 31:25, 72:4, 72:6
**signature** [1] - 71:17
**signed** [1] - 69:7
**significantly** [1] - 42:15
**signing** [1] - 73:15
**silent** [4] - 21:18, 52:15, 53:8, 70:11
**similar** [1] - 46:3
**Sisters** [1] - 4:5
**sit** [1] - 51:14
**size** [1] - 10:10
**skill** [7] - 33:12, 34:15, 37:3, 49:12, 67:20, 67:22, 67:25
**skilled** [1] - 68:8
**skin** [1] - 71:11
**sleeping** [7] - 23:15, 23:16, 23:20, 58:12, 59:1, 59:2, 66:13
**snow** [1] - 13:9
**snowplow** [1] - 17:18
**socialize** [1] - 51:22
**sold** [1] - 12:21
**someone** [7] - 13:2, 14:20, 16:8, 26:1, 53:7, 66:22, 68:5
**sometimes** [1] - 44:23
**somewhere** [1] - 40:3
**sorry** [1] - 34:17
**sounded** [1] - 63:6
**sounds** [1] - 6:10

**South** [1] - 4:4
**speaking** [1] - 28:22
**specific** [3] - 10:24, 13:7, 21:17
**specifics** [2] - 57:12, 62:21
**specified** [1] - 10:10
**speculate** [1] - 37:10
**speculation** [8] - 16:19, 37:8, 47:9, 50:12, 55:20, 68:19, 69:10, 70:20
**speed** [1] - 12:19
**spelling** [1] - 71:22
**spent** [1] - 39:12
**spread** [1] - 10:8
**spring** [3] - 17:23, 18:1, 18:9
**springtime** [1] - 18:3
**squirm** [1] - 55:13
**SS** [1] - 73:3
**stand** [1] - 52:7
**standard** [3] - 64:8, 64:12
**Star** [21] - 15:17, 16:15, 17:8, 21:9, 21:11, 22:2, 22:7, 22:21, 23:3, 23:8, 24:1, 24:14, 28:9, 37:19, 43:17, 43:24, 47:21, 66:13, 67:24, 68:8, 71:10
**Starkie** [3] - 2:13, 29:2, 50:17
**STARKIE** [1] - 1:3
**start** [1] - 6:20
**started** [7] - 6:16, 6:19, 7:6, 14:4, 23:21, 37:20, 43:18
**State** [3] - 4:7, 73:5, 73:6
**state** [1] - 4:19
**STATE** [1] - 73:2
**statement** [1] - 71:9
**states** [1] - 56:5
**STATES** [1] - 1:1
**States** [1] - 4:8
**stating** [1] - 23:18
**stay** [1] - 43:21
**stenograph** [1] - 73:13
**step** [2] - 41:13, 43:13
**stepped** [1] - 61:13
**STEWART** [5] - 1:14, 3:2, 4:1, 4:13, 73:8
**Stewart** [2] - 4:21, 46:11
**still** [4] - 43:20, 58:15, 67:2, 67:12
**stipulation** [2] - 73:8,

73:9
**stirred** [1] - 21:7
**stop** [1] - 10:1
**store** [1] - 52:6
**stories** [3] - 26:25, 27:5, 55:13
**strike** [1] - 42:3
**stuck** [2] - 38:14, 38:25
**stuff** [1] - 71:22
**stupid** [2] - 53:17, 56:13
**subject** [4] - 23:1, 25:18, 25:20, 26:17
**Summary** [1] - 3:7
**summary** [1] - 41:6
**summer** [1] - 18:8
**supervision** [1] - 73:13
**supervisor** [5] - 30:5, 32:21, 59:16, 59:18, 62:12
**supposed** [5] - 9:2, 23:20, 31:21, 32:25, 33:2
**surprised** [1] - 40:9
**suspension** [1] - 40:19
**sweepers** [2] - 16:2, 18:3
**sworn** [2] - 4:14, 73:9

**T**

**tailgate** [1] - 11:1
**tailgates** [1] - 11:13
**TAKEN** [1] - 1:15
**teach** [2] - 22:24, 71:10
**teaching** [1] - 22:21
**ten** [1] - 7:16
**termination** [1] - 40:19
**terms** [1] - 33:15
**testified** [5] - 26:10, 27:1, 43:6, 54:25, 73:10
**testify** [5] - 27:4, 29:2, 30:12, 37:11, 66:9
**testifying** [1] - 37:7
**TESTIMONY** [1] - 3:2
**testimony** [13] - 4:11, 25:16, 26:2, 30:12, 37:12, 38:9, 38:17, 41:22, 42:14, 57:11, 57:12, 73:12, 73:14
**text** [1] - 51:24
**texted** [1] - 27:25
**THE** [16] - 1:1, 1:1,

1:7, 1:15, 4:1, 5:8, 5:10, 5:13, 5:15, 7:19, 22:18, 35:7, 35:10, 71:17, 72:3, 72:8
**themselves** [1] - 28:19
**thereafter** [1] - 73:13
**thereto** [1] - 73:11
**THEREUPON** [1] - 4:11
**thereupon** [1] - 73:11
**Thermopolis** [1] - 2:4
**THOMAS** [1] - 2:8
**THOMPSON** [34] - 2:8, 5:4, 5:9, 5:11, 5:14, 7:17, 14:18, 16:18, 16:24, 20:22, 22:17, 23:10, 25:5, 25:10, 35:12, 37:9, 37:16, 41:19, 43:1, 44:13, 44:20, 45:11, 46:17, 46:19, 50:13, 55:23, 58:9, 60:2, 60:4, 60:24, 70:20, 71:1, 71:4, 71:16
**Thompson** [3] - 3:4, 25:14, 71:25
**thoughts** [1] - 66:23
**three** [9] - 8:24, 8:25, 9:3, 9:7, 25:2, 38:12, 38:15, 38:22, 38:25
**Tim** [5] - 15:5, 15:11, 30:23, 31:11, 49:23
**tipped** [1] - 11:18
**title** [1] - 36:18
**today** [7] - 26:20, 27:1, 27:8, 27:20, 29:20, 32:14, 52:2
**together** [2] - 21:25, 56:7
**Tom** [3] - 24:19, 25:4, 25:14
**took** [12] - 4:24, 5:1, 8:23, 11:1, 11:13, 12:10, 12:20, 13:8, 32:20, 38:12, 40:6, 46:8
**tougher** [1] - 71:10
**towards** [1] - 22:7
**towed** [1] - 12:23
**transcript** [2] - 57:9, 71:20
**transfer** [3] - 11:11, 24:3, 24:5
**transmission** [2] - 12:17, 12:20
**Travis** [6] - 48:12, 48:13, 48:23, 66:15, 69:20, 69:21
**treat** [1] - 21:15

**treated** [6] - 21:12, 21:16, 22:7, 22:9, 52:14, 64:10
**treatment** [7] - 21:18, 22:7, 52:15, 53:9, 63:12, 70:10, 70:11
**trial** [2] - 58:4, 72:1
**tried** [5] - 8:23, 13:11, 32:5, 32:7, 61:7
**tries** [1] - 68:3
**truck** [26] - 6:22, 7:13, 8:24, 9:1, 9:2, 12:10, 12:13, 12:15, 13:8, 13:17, 13:21, 14:2, 36:10, 36:11, 36:14, 36:19, 36:21, 38:13, 38:19, 39:7, 39:9, 39:12, 51:1, 51:13, 63:7
**trucks** [4] - 12:5, 12:8, 16:1
**true** [10] - 32:10, 32:15, 36:5, 36:7, 50:4, 54:20, 55:5, 58:3, 71:13, 73:14
**truth** [8] - 4:14, 4:15, 5:19, 5:21, 73:10
**try** [3] - 13:2, 30:2, 41:20
**trying** [10] - 10:7, 10:19, 12:19, 30:11, 30:14, 30:19, 38:15, 56:16, 62:16, 71:10
**turned** [2] - 11:16, 11:17
**twice** [2] - 11:2, 26:3
**Two** [1] - 4:5
**two** [7] - 9:7, 11:1, 42:11, 43:18, 56:5, 61:15
**typewriting** [1] - 73:13
**typically** [1] - 71:21

## U

**under** [5] - 30:13, 38:10, 43:6, 73:11, 73:13
**unfair** [1] - 43:7
**uniform** [1] - 70:8
**UNITED** [1] - 1:1
**United** [1] - 4:8
**up** [31] - 5:6, 6:4, 6:7, 11:12, 12:12, 14:1, 14:4, 20:9, 21:7, 22:6, 23:4, 24:4, 25:16, 27:20, 30:22, 31:5, 37:20, 46:9, 46:23, 48:5, 48:12,

49:20, 52:21, 54:11, 60:14, 61:13, 62:1, 64:6, 65:16, 71:25, 72:6
**upset** [1] - 32:16

## V

**various** [1] - 50:10
**veracity** [1] - 14:19
**violation** [1] - 60:6
**vs** [1] - 1:5

## W

**wage** [9] - 34:14, 41:6, 42:13, 42:19, 43:7, 43:21, 49:11, 50:11, 62:14
**Wage** [1] - 3:7
**wages** [3] - 41:11, 43:17, 61:16
**wait** [2] - 6:1, 51:14
**waive** [2] - 72:7, 72:8
**waived** [1] - 73:16
**walk** [1] - 54:11
**watched** [1] - 52:19
**water** [1] - 16:1
**ways** [1] - 7:25
**website** [1] - 70:9
**week** [2] - 13:14, 13:15
**weeks** [1] - 19:4
**WHEREOF** [1] - 73:19
**Whitlock** [1] - 9:20
**whole** [3] - 4:15, 43:13, 73:10
**Williams** [1] - 18:20
**willing** [4] - 16:11, 16:12, 16:16, 66:9
**willingness** [1] - 68:2
**winter** [3] - 17:12, 17:14, 17:17
**wit** [1] - 4:12
**witness** [6] - 14:19, 57:11, 73:8, 73:9, 73:10, 73:14
**WITNESS** [1] - 73:19
**wondering** [1] - 37:6
**words** [1] - 5:3
**Works** [2] - 4:3, 45:4
**WORKS** [1] - 1:8
**works** [1] - 45:2
**writing** [1] - 33:4
**written** [1] - 40:19
**WYOMING** [3] - 1:1, 1:16, 73:2
**Wyoming** [9] - 2:5,

2:9, 2:10, 4:5, 4:7, 4:9, 73:5, 73:6, 73:24

## Y

**yard** [8] - 8:24, 9:1, 38:13, 38:15, 38:20, 38:25, 51:6, 51:8
**year** [17] - 6:16, 8:13, 14:6, 31:17, 33:7, 33:8, 42:7, 42:8, 42:13, 49:2, 49:21, 50:23, 51:15, 61:19, 61:21, 62:2, 62:7
**years** [17] - 7:12, 25:2, 29:12, 33:13, 35:13, 35:17, 39:25, 40:4, 40:6, 40:10, 43:18, 46:4, 46:9, 49:12, 50:8, 62:3, 69:15
**Yellowtail** [1] - 2:10
**yourself** [1] - 42:6

## Z

**zone** [1] - 56:8

Exhibit 8:

Starkie Cornett Deposition Transcript

Page 1

1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3

4    STARKIE CORNETT,                    )
                                         )
5          Plaintiff,                    )
                                         )
6    V.                                  )  22-CV-00034
                                         )
7    PARK COUNTY BOARD OF COUNTY         )
     COMMISSIONERS and PARK COUNTY       )
8    ROAD AND BRIDGE DIVISION OF         )
     THE PUBLIC WORKS DEPARTMENT,        )
9                                        )
           Defendants.                   )
10   _____)

11
     March 12, 2024
12

13   Remote oral deposition of Starkie Cornett
     conducted via Zoom in the State of Wyoming,
14   commencing at 9:00 a.m. on the above date,
     before Barbara Morgenweck, Registered
15   Professional Reporter, Realtime Reporter and
     Notary Public.

16

17            MORGENWECK COURT REPORTING

18               307.250.0220 ph

19            Barbcourtreporter@gmail.com

20

21

22

23

24

25

```
                                                              Page 2
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4
      Marshall E. Keller
 5    KELLER LAW FIRM, PC
      116 N 5th St
 6    Thermopolis, WY 82443
      (307) 864-2318
 7    Marshall@kellerlawpc.com

 8
      On behalf of Defendant:
 9

10    Thomas A. Thompson
      MaryBeth Oatsvall
11    WYOMING LOCAL GOVERNMENT LIABILITY POOL
      6844 Yellowtail Road
12    Cheyenne, Wyoming 82009
      (307) 638-1911
13    (307) 638-6211 Facsimile
      Tthompson@lglp.net
14

15    Also Present:

16
      Brian Edwards
17

18

19

20

21

22

23

24

25
```

Page 3

1                    EXAMINATION INDEX

2

3                                           PAGE:

4    STARKIE CORNETT:

5        Examination by Mr. Thompson      4
         Examination by Mr. Keller       201
6        Examination by Mr. Thompson     279

7

8                    INDEX TO EXHIBITS

9

     EXHIBIT:      DESCRIPTION              PAGE:
10

     1 bates 893 & 894 employment application  19
11   2 bates 931 orientation                   71
     3 bates 1278                              76
12   4 bates 1422                              82
     5 bates 930 policy manual acknowledgement 84
13   6 bates 923 - 929                         87
     7 bates 911 - 923 personnel form          90
14   9 bates 1228 - 1233 Operator I job       126
     10 FMLA 2018                             146
15   11 March 3, 2020, letter response        192
     12 July 15, 2020, Matthew Nitta letter   196
16   13 summary wage adjustments 01908        230
     14 maintenance log bates 00096           253
17   15 bates 2017, 2018                      260
     16 dump truck off road bates 4001        262
18   17 photo truck damage bates 4002, 4003   262
     18 photo bumper bates 4008               262

19

20

21

22

23

24

25

Page 4

1  STARKIE CORNETT,

2  Having first been duly sworn, testified as

3  follows:

4                          EXAMINATION

5  BY MR. THOMPSON:

6    Q.    Good morning, Ma'am.  Would you please

7  state your full name for the record.

8    A.    Starkie J. Cornett.

9    Q.    Ms. Cornett, my name is Tom Thompson.  I

10  represent the Defendant Park County in this

11  matter.  For purposes of this deposition today,

12  I am going to be asking you a series of

13  questions.  Would you prefer that I refer to you

14  as Ms. Cornett, as Starkie or some other name?

15    A.    I go by Star usually.

16    Q.    You're okay with me calling you Star

17  throughout today's deposition?

18    A.    Yes, sir.

19    Q.    Feel free to call me Tom.

20    A.    Thank you.

21    Q.    Star, you just raised your right hand

22  and you swore or affirmed that you would tell

23  the truth in this deposition.  Do you understand

24  that your testimony today is being given under

25  oath?

Page 5

1    A.    Yes, sir.

2    Q.    And what does that mean to you?

3    A.    Means I am going to tell you the truth

4    or else.

5    Q.    Do you know what that "or else" is?

6    A.    I am sure there will be legal

7    ramifications.

8    Q.    You understand that your testimony is

9    subject to the penalties of perjury?

10   A.    Yes, sir.

11   Q.    You understand that perjury is a felony

12   in the State of Wyoming?

13   A.    Yes, sir.

14   Q.    Do you understand that your testimony

15   given today can be used at the trial of this

16   case in October of this year?

17   A.    Yes, sir.

18   Q.    Are you under the influence of any

19   substance as we sit here this morning?

20   A.    No, sir.

21   Q.    You have not taken any prescription

22   medications before today's--

23   A.    Coffee and vitamin B.

24   Q.    I am going to discuss with you some

25   rules for this deposition.  These are just

Page 6

1  guidelines for the purpose of having a clean

2  transcript.

3          As your attorney has probably informed

4  you, at the conclusion of this deposition, our

5  court reporter, who is taking down everything

6  that is being said, will transcribe your

7  testimony and put it in booklet format where we

8  have questions, answers, questions, maybe an

9  objection interspersed in that examination.

10          The idea at the conclusion of this

11  deposition is to have a clean transcript meaning

12  that we want to be allowed to completely ask a

13  question before you begin answering that

14  question and vice versa, I want you to

15  completely answer the question before I start

16  asking another question.

17          I tell you this because it is very

18  important that we not talk over each other, and

19  I understand there is somewhat of a delay in

20  this transmission based upon the fact that we're

21  doing this by remote means.

22          So please, let me completely ask my

23  question before you begin to answer it.  And

24  you're going to anticipate some of my questions

25  when I am halfway through them, but give me a

1   chance to completely ask it before you begin to

2   answer, and I will do the same, okay?

3     A.    Yes, sir.

4     Q.    Are you suffering from any medical

5   condition this morning that may affect your

6   ability to recall certain events?

7     A.    No, sir.

8     Q.    Let me discuss with you having a clean

9   transcript, there's some other guidelines for

10  purposes of having a clean transcript at the

11  conclusion of this deposition.  One of those is

12  I want you to answer the question only if you

13  understand the question, okay?

14    A.    Okay.

15    Q.    And so if you don't understand my

16  question, I am going to ask you to agree right

17  now that you will ask me to repeat the question

18  or ask it a different way.  Do you agree to

19  that?

20    A.    I agree.

21    Q.    Do you agree that I can assume that if

22  you have answered a question that you have, in

23  fact, understood the question that I have asked?

24  Can we agree to that?

25    A.    Yes.

Page 8

1    Q.    You have to give an audible answer, so a

2    head shake one way or the other is not going to

3    show up on a deposition transcript as a yes or a

4    no, so you have to give an audible response to

5    my questions.  Do you agree to that?

6    A.    Yes, sir.

7    Q.    Uh-huh and huh-uh is not clear to me,

8    and Mr. Keller and I do not want to end up

9    before the Court arguing over whether or not you

10   agreed to something or you disagreed to a

11   question being posed, so if it is a yes or no

12   question, if you could please respond yes or no

13   versus uh-huh or huh-uh, okay?

14   A.    Yes, sir.

15   Q.    This deposition is going to take several

16   hours, I would guess, so if at any time during

17   the deposition you need a break, please let me

18   know, and as long as we're not in the middle of

19   a question, in other words, I have asked a

20   question and you haven't answered, we can go

21   ahead and get through that area of examination

22   and take a break for you to get up, stretch your

23   legs, use the restroom, do whatever you need to

24   do, okay?

25   A.    Okay.

Page 9

1    Q.    Star, have you gone by any other names

2    other than Starkie Cornett?

3    A.    Yes, Starkie Velvick.

4    Q.    Could you spell that for the court

5    reporter, your last name?

6    A.    V-as in Victor, E-L-V-as in Victor,

7    I-C-K.

8    Q.    Was that a married name?

9    A.    Yes, sir.

10    Q.    I assume that you and Mr. Velvick are

11    divorced?

12    A.    Yes, sir.

13    Q.    And what is Mr. Velvick's first name?

14    A.    John.

15    Q.    Where --

16    A.    I didn't hear the question.

17    Q.    Where does Mr. Velvick live or reside?

18    A.    He lived in Cheyenne.  He passed away in

19    December.

20    Q.    How long were you and Mr. Velvick

21    married?

22    A.    About 17 years.

23    Q.    Can you give me the date of marriage?

24    A.    It was -- no, I actually can't.

25    Q.    Can you give me the year that you were

Page 10

1    married, first married to Mr. Velvick?

2        A.    1994 or, wait -- yes, 1994.

3        Q.    So you divorced in approximately 2021?

4        A.    No, I could be wrong on my dates.  We

5    divorced in 2010.

6        Q.    Any children born as issue of that

7    marriage?

8        A.    Yes, one.

9        Q.    What is that individual's name?

10       A.    John.

11       Q.    John Velvick?

12       A.    Yes.

13       Q.    Where does John live?

14       A.    Cheyenne.

15       Q.    How old is John?

16       A.    He is now 28.

17       Q.    Have any other children born of the

18   issue of that marriage?

19       A.    No, sir.

20       Q.    Are there any other marriages that you

21   have entered into other than the marriage with

22   Mr. Velvick?

23       A.    Yes.

24       Q.    Is that with Mr. Hoyt?

25       A.    Yes.

Page 11

```
 1     Q.     When were you married to Mr. Hoyt?

 2     A.     In the late '80s.

 3     Q.     What was Mr. Hoyt's first name?

 4     A.     William.

 5     Q.     Where does Mr. Hoyt reside?

 6     A.     I don't know.

 7     Q.     When did that marriage end?

 8     A.     In 1990.

 9     Q.     Where did Mr. Hoyt last reside -- what

10   was his last known address?

11     A.     It was in Lander, Wyoming.

12     Q.     Do you know what Mr. Hoyt does for a

13   living?

14     A.     He was a pipe liner.  He ran a side

15   booth.

16     Q.     Gas?

17     A.     Yes.

18     Q.     Any children born as issue of that

19   marriage?

20     A.     Yes, one.

21     Q.     What is his or her name?

22     A.     Brandi.  Her last name is Velvick.

23     Q.     Where does Brandi reside?

24     A.     Cody.

25     Q.     How old is Brandi?
```

Page 12

```
 1    A.    31.
 2    Q.    Which Brandi -- does Brandi work for a
 3  living?
 4    A.    Yes.
 5    Q.    What does Brandi do?
 6    A.    She sells insurance.
 7    Q.    What kind of insurance does she sell?
 8    A.    Life insurance.
 9    Q.    Is it with a specific company?
10    A.    Yes, the Farm Bureau.
11    Q.    Have you gone by any other names other
12  than Velvick or Hoyt?
13    A.    Yes, Gideon.
14    Q.    Was this a married name?
15    A.    Yes.
16    Q.    What was Mr. Gideon's first name?
17    A.    Jeff.
18    Q.    What years were you and Mr. Gideon
19  married?
20    A.    We were married for six months in, I
21  believe, 1987, '86, somewhere in there.
22    Q.    I believe you indicated to me that you
23  were married to Mr. Hoyt in the late '80s to
24  1990?
25    A.    Oh, it might have been -- I don't know,
```

Page 13

1    I don't know what year I was married to Jeff.

2    Q.    Were you married to Jeff Gideon before

3    you married Mr. Hoyt?

4    A.    Yes.

5    Q.    Any children as a result of that

6    marriage?

7    A.    No, sir.

8    Q.    Do you know where Mr. Gideon resides

9    now?

10    A.    No, sir.

11    Q.    Do you know what his last known address

12    was?

13    A.    Somewhere in Cody.

14    Q.    What did Mr. Gideon do for a living?

15    A.    He worked on the oil rigs.

16    Q.    Ma'am, what is your current physical

17    address?

18    A.    431 Road 10 in Powell, Wyoming.

19    Q.    Is that a house?

20    A.    Yes.

21    Q.    Single family house?

22    A.    Yes.

23    Q.    Do you live there with anyone?

24    A.    Yes.

25    Q.    Who resides with you at that address?

Page 14

1    A.    Steven Ramsey.

2    Q.    How would you describe the relationship

3    between you and Mr. Ramsey?

4         MR. KELLER:  Tom, I am just going to

5    object; relevancy.  Go ahead.

6         THE WITNESS:  Companion.

7    BY MR. THOMPSON:

8    Q.    How long have you and Mr. Ramsey been

9    companions?

10   A.    About 14 years.

11   Q.    So you and Mr. Ramsey have been

12   companions prior to your employment with Park

13   County?

14   A.    Yes.

15   Q.    You and Mr. Ramsey have been companions

16   throughout the time that you have been employed

17   with Park County, correct?

18   A.    Yes, sir.

19   Q.    Has he lived with you during that entire

20   time?

21   A.    Yes, sir.  Well, for probably 11 years.

22   Q.    The last 11 years?

23   A.    Yes.

24   Q.    Continuously?

25   A.    Yes.

1    Q.    Anyone else living at that address other

2    than you and Mr. Ramsey?

3    A.    No, sir.

4    Q.    Ma'am, some of these questions are not

5    meant to embarrass you or to unnecessarily

6    invade your privacy, but you have filed a

7    lawsuit against my clients.  And this is my only

8    opportunity to speak with you in this manner.

9    Do you understand that?

10   A.    Yes, sir.

11   Q.    All right.  What is your current age?

12   A.    55.

13   Q.    You and Mr. Ramsey are not married,

14   correct?

15   A.    Correct.

16   Q.    Let me ask you a little bit about your

17   background just so I can get to know you a

18   little bit better.  Where did you grow up?

19   A.    Cody, Wyoming.

20   Q.    Born in Cody?

21   A.    I was born in Powell.

22   Q.    Did you go to school in Cody?

23   A.    Yes.

24   Q.    Through high school?

25   A.    Yes, sir.

Page 16

1    Q.    Did you graduate high school?

2    A.    No.

3    Q.    Did you end up getting a GED?

4    A.    Yes, sir.

5    Q.    Congratulations on that.

6    A.    Thank you.

7    Q.    What year did you leave high school?

8    A.    '86.

9    Q.    What grade would that have been that you

10   last completed?

11   A.    Ten.

12   Q.    Why did you leave high school?

13   A.    Because I was pregnant.

14   Q.    When did you get your GED?

15   A.    1986.

16   Q.    What did you do once you left high

17   school as far as employment?

18   A.    I served in a restaurant for a few years

19   and then I basically did restaurant work.

20   Q.    Is that an accurate statement from the

21   time that you left high school in the beginning

22   of the 11th grade, I assume, all the way up to

23   the point that you were employed with Park

24   County, Wyoming?

25   A.    No, sir.

Page 17

1    Q.    Tell me, other than restaurant work,

2    what other occupations did you have during that

3    time period after leaving high school?

4    A.    I was a bartender.  I owned a hardwood

5    flooring company for 16 years.  I ran a bar for

6    eight years.

7    Q.    You -- when you applied for the position

8    with Park County, specifically the Operator I

9    position, you filled out an application; do you

10   recall that?

11   A.    I recall filling out an application for

12   the flagger position.  After that, I didn't fill

13   out another application.

14   Q.    When you filled out the application for

15   the flagger position, did you provide Park

16   County with your employment history or

17   experiences?

18   A.    Part of it.

19   Q.    All right.

20   A.    Just four jobs.

21   Q.    And that would have been R&K Superbowl

22   where you worked as a bartender, correct?

23   A.    Yes.

24   Q.    Pinnacle Bank of Wyoming where you

25   worked approximately a year as a bank teller,

Page 18

1   correct?

2     A.     Correct.

3     Q.     Olive Glenn Golf Course where you worked

4   as a bartender and server, correct?

5     A.     Yes, sir.

6     Q.     The Irma, which I understand is a hotel

7   in Cody where you worked as a server and

8   bartender?

9     A.     Correct.

10     Q.     And that would have been 2009 through

11   the date of your employment application, which

12   was April 3rd of 2016; is that accurate?

13     A.     That's part of it, yes.

14     Q.     Do you recall putting any other jobs on

15   that employment application?

16     A.     I did not.

17     Q.     Did you provide them a complete history

18   of your employment during those years listed on

19   your employment application?

20     A.     No, sir.

21     Q.     Why not?

22     A.     Because it was an application for

23   flagger.  I already had a job.  Ron Nieters had

24   come in and said they were having a really

25   difficult time finding flaggers to fill the

Page 19

 1  position, and I said, Well, what hours does it

 2  take?  I'll do it.  And so I wasn't planning on

 3  this being -- it was supposed to be a temporary

 4  job.

 5   Q.    Did you understand my last question

 6  Ma'am?

 7   A.    Maybe not.

 8   Q.    Did you list all jobs that you were

 9  employed working in some occupation from the

10  time period of 2009 through April of 2016 on

11  your application?

12   A.    No, sir.

13   Q.    What jobs did you not list?

14   A.    I do wood flooring on the side still, so

15  that's what I didn't list.

16   Q.    Any other jobs that you didn't list?

17   A.    No.

18        MR. THOMPSON:  MaryBeth, if you would go

19  ahead and share what we're going to mark as

20  Deposition Exhibit 1?

21        (Exhibit 1 was marked for

22  identification.)

23  BY MR. THOMPSON:

24   Q.    Which would be Park County 893 and 894.

25  Can you see that on the screen, Ma'am?

Page 20

1    A.    Yes, sir.  I have it in front of me

2    also.

3    Q.    Is that your handwriting on Deposition

4    Exhibit 1?

5    A.    Yes, sir.

6    Q.    Go ahead, take a minute to look through

7    it and just let me know when you have reviewed

8    it?

9    A.    Okay, I have.

10   Q.    Does that appear to be your employment

11   application for Park County, Wyoming?

12   A.    Yes, sir.

13   Q.    Is the date on that correct that you

14   signed that as of April 3rd of 2016?

15   A.    Yes, sir.

16   Q.    And at the time that you signed this

17   application for employment with Park County, you

18   were working as a bartender in R&K Superbowl; is

19   that accurate?

20   A.    Yes, sir.

21   Q.    Is that phone number listed on page 1,

22   is that the phone number that you had at the

23   time you made this application for employment?

24   A.    That was my work phone number and my

25   cell phone number, yes.

Page 21

1    Q.    Is that email address the email that you

2    had back when you made this application for

3    employment?

4    A.    Yes, sir.

5    Q.    You still have that email address?

6    A.    Yes, sir.

7    Q.    Do you use that email address?

8    A.    Mostly for junk mail and the other

9    one -- I have another one with gmail now.

10   Q.    What is that email address that has the

11   gmail account?

12   A.    Skijstr@gmail.com.

13   Q.    Have you used that email address to

14   communicate with anyone other than your attorney

15   concerning this subject matter of this

16   litigation?

17   A.    My daughter, I believe.

18   Q.    And what email communication have you

19   had with your daughter concerning this subject

20   matter of this litigation?

21   A.    I asked her to look over my letter for

22   Brian Edwards and for the EEOC.

23   Q.    The letter for Brian Edwards, was that

24   the letter that you wrote to him in response to

25   his letter asking you for more specification

Page 22

1  concerning the complaint that you brought to

2  him?

3    A.    I don't know.

4        MR. KELLER:  I want to object to the

5  form of the question.  I don't know if she

6  understood the question, Tom.

7        MR. THOMPSON:  Okay.

8  BY MR. THOMPSON:

9    Q.    Ma'am, you indicated to me that you have

10  used two email addresses, correct?

11    A.    Correct.

12    Q.    An AOL email address and a gmail email

13  address, correct?

14    A.    Correct.

15    Q.    My question to you is:  Did you

16  communicate with anyone other than your

17  attorney, so the whole world other than your

18  attorney concerning the subject matter of this

19  litigation, and I believe you have answered that

20  you communicated with your daughter, and you

21  communicated with her regarding your letter to

22  Brian Edwards and your EEOC correspondence,

23  correct?

24    A.    Yes, but I am unsure, it may have just

25  been the EEOC.

Page 23

1    Q.    Did you communicate with anyone else

2    other than your daughter concerning the subject

3    matter of this litigation?

4    A.    No, sir, I do not believe so.

5    Q.    Have you gone back and looked to see

6    whether or not there is any email communication

7    in either of those email accounts concerning the

8    subject matter of this litigation?

9    A.    No.  I guess you could add Jack

10   Hatfield, the Park County assistant district

11   attorney.

12   Q.    What communication did you have with

13   Mr. Hatfield using either one of those email

14   addresses?

15   A.    Mr. Hatfield wanted my documentation

16   that I had for his investigation, and that's

17   about it.

18   Q.    Do you recall what that documentation

19   was they provided to Mr. Hatfield?

20   A.    Yes.

21   Q.    What was it?

22   A.    It was the same documentation I gave to

23   Brian Edwards including my calendars, my

24   journalling, my -- that's about it.  My -- just

25   my calendars and my journalling.

Page 24

1    Q.    All right, Ma'am.  I am going to have

2    you direct your attention back to Deposition

3    Exhibit 1.

4    A.    Okay.

5    Q.    My understanding is that when you made

6    application with Park County, this application

7    was to go to work as a flagger for the Road &

8    Bridge Department?

9    A.    Yes, sir.

10    Q.    And where it says, "Please list any

11    special skills, experience or attributes you

12    bring to the position for which you are

13    applying," that section is blank, correct?

14    A.    Yes.

15    Q.    And at the time that you filled out this

16    application, you had a Wyoming driver's license

17    Class C with, it appears, a motorcycle

18    endorsement?

19    A.    Correct.

20    Q.    Is it fair to say that at the time that

21    you made application for employment with Park

22    County Road & Bridge on April 3rd of 2016, you

23    had never operated any heavy equipment?

24    A.    No, sir.

25    Q.    That's not fair?

Page 25

1    A.    No.

2    Q.    What heavy equipment did you operate

3    prior to April 3rd of 2016?

4    A.    A Skid Steer and a farm tractor.

5    Q.    Okay.  When did you operate a Skid Steer

6    prior to April 3, 2016?

7    A.    It wasn't as a job, it was for personal

8    use on my property in Oklahoma, and it was back

9    in, I believe, '94 and '95, thereabouts.

10    Q.    What was the personal use on your

11    property where you were required to operate a

12    Skid Steer?

13    A.    Dug out a foundation for an addition on

14    a house and dug out a pond.

15    Q.    Did you own that property that you're

16    referring to with anyone?

17    A.    Yes, my husband at the time, John

18    Velvick.

19    Q.    Where was the property located?

20    A.    In Tulsa, Oklahoma.

21    Q.    In city proper for Tulsa?

22    A.    Yes.

23    Q.    Do you recall the address?

24    A.    4109 East 23rd Street.

25    Q.    Were you on the deed for that property?

Page 26

1    A.    Not on that one, no.  I also used it on

2    our other property at 20510 West 81st Street

3    South in Sapulpa, Oklahoma.  That was for the

4    pond.

5    Q.    What year was that?

6    A.    That was in 2002.

7    Q.    Were you on the deed for that property?

8    A.    Yes.

9    Q.    Was your husband using the Skid Steer

10   during that same period of time?

11   A.    At the property in Tulsa, yes, but not

12   at the property in Sapulpa.

13   Q.    Why not at the second property?

14   A.    Because he had fallen down and injured

15   his knee and was in a straight leg brace.

16   Q.    For how long was he in a straight leg

17   brace?

18   A.    About two months.

19   Q.    Did you rent that equipment?

20   A.    Yes.

21   Q.    Do you recall, in regards to the

22   property in Tulsa, where did you rent that from?

23   A.    I have no idea.  I would like to say A-1

24   Rental, but I'm unsure.

25   Q.    How long did you -- did you rent the

Page 27

1    equipment for two years?

2    A.    No, we rented the equipment twice.

3    Q.    For how many days each time?

4    A.    For the first one, it was through 4

5    days, and for the second one, it was about a

6    week.

7    Q.    How about the second property; how long

8    did you rent the Skid Steer?

9    A.    One week.

10    Q.    So the total time would have been

11    approximately 18 days?

12    A.    Correct.

13    Q.    Any other experience on the Skid Steer?

14    A.    No, sir.

15    Q.    In regards to the farm tractor that you

16    indicate you operated, when was that?

17    A.    Around 2002, and then, again, I have

18    been using one since 2013.

19    Q.    As to the farm tractor that you operated

20    in 2002, where was that?

21    A.    In Sapulpa, Oklahoma.

22    Q.    What was the make and model, if you

23    recall, of that farm tractor?

24    A.    I don't know.  It was an old one.  It

25    was borrowed from a neighbor.

Page 28

1    Q.    Did it have any implements attached to

2    it?

3    A.    It had a loader bucket and it had a

4    brush hog.

5    Q.    Then you also operated a farm tractor in

6    2013 to the present?

7    A.    Yes.

8    Q.    Where is that farm tractor located?

9    A.    It's at 431 Road 10 at my address.

10   Q.    What kind of tractor is it?  Do you

11   recall the make and model?

12   A.    It is a Kubota, a 3800 series.

13   Q.    What implements are attached to that

14   Kubota?

15   A.    It has got a tiller, a blade, a brush

16   hog, forklift, or forks and a bucket.

17   Q.    Other than the farm tractor and the Skid

18   Steer, when you made application to Park County

19   Road & Bridge on April 3rd of 2016, had you

20   driven any other heavy equipment?

21   A.    No, sir.

22   Q.    Did you have -- you did not have a CDL,

23   correct?

24   A.    Correct.

25   Q.    Did not have a class A license?

Page 29

```
1     A.     Correct.

2     Q.     Were not qualified to operate, for

3  example, a belly dump, that you now operate in

4  your capacity as an Operator II, when you went

5  to work for Park County?

6     A.     Correct.

7     Q.     Okay.  Ma'am, when you went to Tulsa,

8  did you work in any other capacity other than as

9  a bartender or a server in Tulsa during the time

10 that you lived there?

11    A.     Yes, I worked.  I owned a wood flooring

12 company and I worked as a manager for Hancock

13 Fabrics.

14    Q.     What did you do as a manager for Hancock

15 Fabrics?

16    A.     I helped to load and unload trucks.  I

17 ran the upholstery department.  It was my job to

18 set up the upholstery department and set up for

19 sales and take money and measure fabrics and

20 that was about it.

21    Q.     How did you load and unload trucks?

22    A.     Most of it was by hand.  Some of it was

23 with a -- there was a lift gate on the back of

24 the trucks, so it was just dollies and manual

25 forklifts.
```

1     Q.     In regards to your flooring business, is

2     this wood floors?

3     A.     Yes, sir.

4     Q.     Does that business go by a specific

5     name?

6     A.     It was called Wood Creations by John

7     Velvick.

8     Q.     You indicated you still do wood

9     flooring?

10    A.     Yes, sir.

11    Q.     And what is the name of the company now?

12    A.     Five Star Flooring.

13    Q.     Is that company either limited liability

14    company or a corporation?

15    A.     No, sir.

16    Q.     Have you ever operated your flooring

17    company as a corporation or limited liability

18    company?

19    A.     Yes, sir.

20    Q.     Ask when was that?

21    A.     That was when it was under Wood

22    Creations by John Velvick.

23    Q.     Was that an Oklahoma limited liability

24    company or corporation?

25    A.     Yes, it was a corporation.

Page 31

1    Q.    Did you have any ownership interest in

2  the corporation?

3    A.    Yes, I had 50 percent.

4    Q.    Is that a corporation still active in

5  good standing in Oklahoma?

6    A.    No, sir.

7    Q.    Do you recall what year that company was

8  dissolved?

9    A.    Late 2009.

10    Q.    Have you -- and I apologize if some of

11  these questions are repeated, but I am just

12  trying to be as thorough as possible.  Have you

13  ever operated your flooring company as a limited

14  liability company or corporation in the State of

15  Wyoming?

16    A.    No, sir.

17    Q.    Are there any other owners of your

18  flooring company other than yourself?

19    A.    No, sir.

20    Q.    Are there any paid employees of your

21  flooring company?

22    A.    No, sir.

23    Q.    When you do a floor for a particular

24  client, is it you that does all the work to

25  install that flooring?

Page 32

1    A.    Yes, sir.

2    Q.    Do you ever hire anybody to assist you

3    with that?

4    A.    Sometimes my sons will come down and

5    help, and sometimes Mr. Ramsey will help.

6    Q.    Other than Cody and the two locations in

7    Oklahoma that you have told me about.

8          MR. THOMPSON:  We can go ahead take down

9    Deposition Exhibit 1.

10   MR. THOMPSON:

11   Q.    Are there any other places that you have

12   resided since obtaining your GED?

13   A.    Yes.  I have lived in Reno.  I have

14   lived in Detroit.  I have lived in Cheyenne.  I

15   have lived in Lander.  I have lived in Casper.

16   And Tulsa.

17   Q.    In regards to those locations, other

18   than Tulsa, can you give me a brief summary of

19   when you lived there and how you were employed,

20   if at all?

21   A.    When I lived in Reno, I lived there in

22   '84.  And part of '85, wait, no.  It had to be

23   '87 and '88, I guess.  And I ran a deli.  I

24   managed a deli.  I lived there only for a year.

25          When I lived in Detroit, I was -- I only

Page 33

1    lived there for about six months.  I had a

2    friend who was in a huge car accident and his

3    mother had me come and take care of him because

4    she had to work, so I was a paid caregiver.

5              In Casper, I worked for a bar as a

6    server and a dancer.  In Cheyenne, I worked as a

7    server, a bartender and a dancer, and I don't

8    know, in Tulsa, I was mostly a server, and I

9    managed the Hancock Fabric's upholstery

10   department, and I ran the floor business.  I did

11   the books and did the floors.  And that's about

12   it, right?

13   Q.    When you indicate you worked as a

14   dancer, what are you referring to?

15   A.    Exotic dancer.

16   Q.    What was the place of employment that

17   you worked in Casper?

18   A.    North 40th.

19   Q.    Is this what is commonly as referred to

20   as a strip club?

21   A.    Yes.

22   Q.    How about when you worked in Cheyenne,

23   same thing, did you work at a strip club in

24   Cheyenne?

25   A.    Yes, sir.

```
 1          MR. KELLER:  I am just going to -- for
 2   the record, just object for relevancy.
 3          MR. THOMPSON:  Yeah.
 4   BY MR. THOMPSON:
 5    Q.    What was the name of the strip club you
 6   worked at in Cheyenne?
 7    A.    Clown's Den Nightclub.  I was the
 8   janitor, the bartender, the DJ, the cocktail
 9   waitress and a bouncer a couple of times also.
10   So that was my mother-in-law's bar.
11    Q.    Ma'am, who have you discussed this
12   lawsuit with other than your attorney?  I am
13   going to ask you some questions today concerning
14   conversations that you may have had.  I do not
15   want to ask you about any conversations with
16   your attorney.  Those are protected by the
17   attorney/client privilege, okay?  These
18   questions are directed at other than
19   conversations with your attorney.
20    A.    My mom and dad, my children, Steven
21   Ramsey.  I have asked some of them if they would
22   be willing to give depositions, some people if
23   they would be willing to give depositions or
24   statements.  And that includes Ron Nieters,
25   Christopher Cooper, Cindy Stewart, Arthur
```

Page 35

1    Briggs, Diana Markham, Kim Cover, and Kelly

2    Triplett and James Flowers.

3      Q.     Of those individuals that you have asked

4    to give depositions, has the conversation been

5    anything other than, would you be willing to

6    give your deposition in this case?

7      A.     It has been, I have a case in the EEOC

8    about the Park County and their treatment of me.

9    Would you please have a deposition, or do a

10   deposition or a statement, and would you please

11   bring your documentation?

12     Q.     Have you been provided any documentation

13   from any of those individuals that you have just

14   named?

15     A.     No, it was their job to bring the

16   documentation.

17     Q.     They have not volunteered any of that

18   documentation to you?

19     A.     I told them to give it to my lawyer.  I

20   did get video and a couple of pictures from

21   Chris Cooper, Arthur Briggs, and I think that's

22   all.

23     Q.     Chris Cooper is no longer employed with

24   Park County?

25     A.     Correct.

Page 36

1    Q.    He was terminated?

2    A.    Yes.

3    Q.    Arthur Briggs is the assistant foreman

4    at the Powell shop?

5    A.    Correct.

6    Q.    Chris Cooper went by the nickname

7    "Coop"?

8    A.    Yes, sir.

9    Q.    Arthur Briggs goes by the nickname

10   "Rowdi"?

11   A.    Yes, sir.

12   Q.    What videos were you provided?

13   A.    I was provided with a video of me

14   running a grader, and I was provided with a

15   couple of pictures of other employees who had to

16   be pulled out of ditches and whatnot and damage

17   to equipment.

18   Q.    You have actually taken photographs of

19   co-employees during your course and scope of

20   employment with Park County, correct?

21   A.    Yes.

22   Q.    You have also surreptitiously recorded

23   other employees without their knowledge?

24   A.    Yes.

25   Q.    Have you provided all of the audio

Page 37

1    recordings you have made to your attorney?

2    A.    Yes.

3    Q.    My understanding is that there are a

4    number of those audio recordings that you no

5    longer have.

6    A.    Correct.

7    Q.    You lost them, your explanation for that

8    is that you lost them when you purchased a new

9    phone?

10   A.    Yes.

11   Q.    Had you transferred those audio

12   recordings to any sort of storage device prior

13   to purchasing a new phone?

14   A.    No, I wish.

15   Q.    Had you sent those audio recordings to

16   anyone prior to purchasing the new phone?

17   A.    No.

18   Q.    Have there been any videos that you made

19   that you no longer have?

20   A.    No.

21   Q.    Are there any photographs that you took

22   that you no longer have?

23   A.    Probably, but I was also taking them for

24   Brian Edwards.  He would ask me to take some

25   pictures of different jobs that we were on, and

Page 38

1    I also took pictures while we were in line, and

2    so there is a bunch of those I no longer have.

3      Q.    And in regards to the purchase of the

4    new phone, which is when you state you lost

5    these audio recordings, when did you purchase a

6    new phone?

7      A.    My phone went down, I believe, in late

8    February, early March of 2020.

9      Q.    Is that when you testified that you lost

10   those audio recordings?

11     A.    Yes.

12     Q.    Where did you buy your new phone from?

13     A.    Walmart.

14     Q.    Walmart, where?

15     A.    Cody.

16     Q.    Is there only one Walmart in Cody?

17     A.    Yes.

18     Q.    What kind of phone did you have prior to

19   purchasing a new phone in late February, early

20   March of 2020?

21     A.    I believe it was an Android.

22     Q.    What kind of -- do you know what kind of

23   Android?

24     A.    I have no idea.

25     Q.    What kind of phone do you own now?

Page 39

1    A.    It's an Apple SE, I think.

2    Q.    Do you recall whether or not you had any

3    conversations with the sales representatives

4    that sold you that phone at Walmart in February

5    or March of 2020 concerning transferring that

6    data?

7    A.    No.

8    Q.    You don't recall?

9    A.    I just brought my phone up to the

10   register and paid for it.

11   Q.    Did you keep that phone?

12   A.    No.

13   Q.    You didn't keep the old phone?

14   A.    It would not work.

15   Q.    Understand that it may not have worked,

16   but did you keep it?

17   A.    No.

18   Q.    What did you do with it?

19   A.    I couldn't tell you.  It probably ended

20   up in the trash.  I don't know.

21   Q.    Are you certain that you disposed of it?

22   A.    Fairly certain, yes.

23   Q.    Have you looked for it?

24   A.    No.

25   Q.    Can you do that, and let your attorney

Page 40

1    know if you can locate it?

2    A.    Yes.

3    Q.    In regards --

4         MR. KELLER:  We're coming up on an hour.

5    Do you mind if we take a quick break?

6         MR. THOMPSON:  Yeah, that works fine.

7         (A recess was taken from 9:51 a.m. until

8    9:57 a.m.)

9    BY MR. THOMPSON:

10   Q.    Ms. Cornett, do you understand you're

11   still under oath?

12   A.    Yes, sir.

13   Q.    Let me ask you about your earlier

14   testimony in regards to notes and calendars and

15   recordings.  My understanding would have been

16   that the recordings obviously were made prior to

17   February or early March of 2020, because that is

18   when you lost them, correct?

19   A.    Yes.

20   Q.    Are those --

21   A.    In March is, I believe, up through

22   March.

23   Q.    The recordings were prior to March of

24   2020?

25   A.    Yes.

Page 41

1    Q.    When were they made, do you recall?

2    A.    They were usually for the pre-shift

3    meeting.  Every morning we have a pre-shift

4    meeting where the foreman, or whoever is in

5    charge for the day, tells us what to do and

6    basically where we're going for the day.  And so

7    I would start the recording before I walked in

8    to work.

9    Q.    That was always done using your phone?

10    A.    Yes, sir.

11    Q.    How many times did you make recordings

12    of the morning meeting?

13    A.    I don't know.  Probably ten or more

14    times, not more than 15.

15    Q.    What was the determinative factor as to

16    whether you turned on your phone prior to going

17    into the morning meeting?

18    A.    It was for my protection because Paco,

19    Delray Jones, had come up to me several times

20    and said incredibly rude things and threatened

21    me with my job and other things, and at that

22    point, he was telling other people in the shop

23    to tell me what I was going to do for the day,

24    even though we were sitting at the same table.

25    Q.    I want to stop you because it is not

Page 42

1  responsive to my question.  My question is:  Why

2  did you choose to turn on your phone on certain

3  days and leave your phone off on other days

4  prior to going into morning meeting?

5      A.    I did it for probably 10 to 15 days

6  straight, and then I was told not to.

7      Q.    Who told you not to?

8      A.    Paco.

9      Q.    How did Paco know that you were

10 recording from the very first time you record

11 it?

12     A.    I don't know.

13     Q.    Did Paco tell you that he knew you were

14 recording from the very first time you made a

15 recording?

16     A.    No.

17     Q.    Did Paco find out you were recording on

18 or about the 15th time you recorded?

19     A.    I couldn't tell you when he found out.

20     Q.    Do you know how he found out?

21     A.    I believe it was Tim sitting next to me

22 told him.

23     Q.    Tim being Tim Morrison?

24     A.    Yes, sir.

25     Q.    Did you admit to Paco that you had been

Page 43

1    recording?

2      A.    Yes.

3      Q.    Did he ask for the recordings?

4      A.    No.

5      Q.    Do you recall when that would have been

6    that you started making those 15 consecutive

7    recordings?

8      A.    Probably the end of February.

9      Q.    Of 2020?

10     A.    Yes.

11     Q.    Prior to filing the complaint, going to

12   Brian Edwards and filing a complaint, did you

13   ever provide Brian with any notes or calendaring

14   --

15     A.    No.

16     Q.    -- prior to that time?

17           Were you making notes and calendaring

18   prior to going to Brian and filing the

19   complaint?

20     A.    Yes, sir.

21     Q.    What did you do with those notes?

22     A.    I kept them.

23     Q.    Do you have all the notes that you made?

24     A.    Yes.

25     Q.    Do you have all of the calendar entries

Page 44

1   that you made?

2      A.    Most of them.

3      Q.    Which ones do you not have?

4      A.    The ones that my cat threw up on and I

5   had to get rid of.

6      Q.    What days or months are those that you

7   had to get rid of?

8      A.    My 2017 calendar and part of one of my

9   journals.

10     Q.    Which year would the journal be for?

11     A.    All of my journals are basically just

12  kind of like a notebook or a bound journal book.

13  They just -- they can range from one to four

14  years, so there is -- I want to say that one was

15  2017 through 2019.

16     Q.    So the cat threw up on all calendaring

17  for 2017 and notes for 2017 through 2019?

18     A.    My journal for 2017, part of 2017

19  through 2019, and then my whole calendar for

20  2017.

21     Q.    Your testimony under oath is that the

22  cat threw up on those and destroyed those?

23     A.    Yes.

24     Q.    How big of a cat is it?

25     A.    Well, she was a pretty big cat.  She

 1   died shortly after that.  She was in renal

 2   failure.

 3    Q.    Have you provided all of the calendars

 4   and all of the diaries that have not been

 5   destroyed?  Have you provided those all to your

 6   attorney?

 7    A.    No.

 8    Q.    Why not?

 9    A.    Because some of it is my personal

10   journal for my personal life.

11        MR. THOMPSON:  Counsel, I believe there

12   is discovery request in for that documentation,

13   so maybe we can talk later this week in regards

14   to that.

15        MR. KELLER:  Yep.  Sounds good.

16   BY MR. THOMPSON:

17    Q.    Did you ever -- prior to filing this

18   complaint with Brian Edwards, did you ever

19   provide Brian Edwards with any photographs where

20   you believe an operator had caused the problem,

21   in other words, an operator had taken a grader

22   off the road or a belly dump off the road?

23    A.    Not to my knowledge, no.

24    Q.    The photographs that you might have

25   provided to Brian Edwards prior to filing the

Page 46

1  complaint were just photographs of a job being

2  done by Park County Road & Bridge, correct?

3     A.     Correct.

4     Q.     So prior to filing the complaint with

5  Brian Edwards, you had never provided him any

6  recordings, any calendars, any diaries or any

7  photos of what you perceived to be operator

8  error?

9     A.     No, sir.

10    Q.     Is that correct?

11    A.     Yes, sir.

12    Q.     You had also mentioned, Ma'am, that your

13 sons will help you come down -- will come down

14 and help you do flooring.  For some reason, I

15 only took down one son in Cheyenne.  Do you have

16 another son that I didn't ask you about?

17    A.     Yes, sir, and another daughter.

18    Q.     What is the other son's name that we

19 haven't talked about?

20    A.     Jesse Cornett.

21    Q.     Where does Jesse live?

22    A.     Right now he is in Florida until April.

23    Q.     What happens in April?

24    A.     In April he moves back up to Colorado in

25 the Fort Collins-Loveland area.

Page 47

1 Q. How old is Jesse?

2 A. Jesse is 35.

3 Q. So I assume Jesse doesn't fly from

4 Florida to help you with wood flooring at the

5 present time?

6 A. Sometimes.  It depends on what he is

7 doing at work.

8 Q. How many times has he flown from Florida

9 to Park County to assist you with a flooring

10 project?

11 A. He usually drives.

12 Q. How many times has he driven from

13 Florida to Cody, Wyoming to assist you with a

14 flooring project?

15 A. Once in the past five years.

16 MR. KELLER:  I am going to just object

17 to that line of questioning too on relevancy.

18 BY MR. THOMPSON:

19 Q. Ma'am, what is your daughter's name that

20 we haven't talked about?

21 A. Kristen Grant.

22 Q. Where does Kristen live?

23 A. Deaver, Wyoming.

24 Q. Either I didn't understand you, or I

25 have never heard of it.  Can you spell that for

Page 48

1   me?

2       A.      D-E-A-V-E-R.

3       Q.      How old is Kristen?

4       A.      37.

5       Q.      What does Kristen do in Deaver, Wyoming?

6       A.      She is a captain of the volunteer fire

7   department.  She runs a 600-acre ranch.

8       Q.      What does Jesse do in Florida?

9       A.      He is a captain of a guide boat

10  fishing -- he is a fishing guide on a -- and a

11  captain on a boat.

12      Q.      You gave me a list of individuals that

13  you have talked to about this lawsuit starting

14  with your mother and father, who I believe that

15  is Margo and Thomas Cornett, correct?

16      A.      That is correct.

17      Q.      There was a period of time that you

18  lived with your mother and father while working

19  for Park County Road & Bridge; is that correct?

20      A.      That is incorrect.

21      Q.      Where do Margo and Thomas live?

22      A.      Cody, Wyoming.

23      Q.      What are the conversations that you have

24  had with your mother and father?

25      A.      Conversations about how my job is going,

Page 49

1  how my training is going, how my court case is

2  going, how I feel on any given day, my

3  frustrations, my worries, just what you

4  generally talk to your parents about.

5    Q.    It is my understanding -- I'm sorry.

6  You weren't finished and I stepped on your

7  answer.

8    A.    Just whatever you talk to your parents

9  for -- about, when you need advice on different

10  things.

11    Q.    It is my understanding that your mother

12  has encouraged you or did encourage you to make

13  recordings at work; is that correct?

14    A.    My mom did, and so did a couple of the

15  other people that I work around.  They told me,

16  Document everything.

17    Q.    Chris Cooper?

18    A.    No.

19    Q.    Did Mr. Cooper encourage you to file a

20  lawsuit against Park County?

21    A.    No, he did not.

22    Q.    You never had any discussions with

23  Mr. Cooper prior to his termination about filing

24  a lawsuit against either Park County or Paco?

25    A.    No.

Page 50

1    Q.    Ma'am, what have you done in preparation

2    for your deposition today?

3    A.    I have gone through my calendars and my

4    notes.  I have gone through the -- oh, the stuff

5    for the interrogatories.  I have looked over the

6    letters from Bryan, from Bryan Skoric; from me

7    to them.  Any emails that I have gotten, and I

8    have spoken with my attorney.

9    Q.    Have you ever given a deposition before?

10   A.    No.

11   Q.    Have you ever testified under oath in a

12   court proceeding of any kind?

13   A.    Yes, sir.

14   Q.    When did you testify under oath?

15   A.    A long, long time ago, probably when I

16   was about 16 or 17.

17   Q.    What context were you testifying under

18   oath?

19   A.    It was -- I had been ticketed for citing

20   a riot, for driving down Main Street and yelling

21   out the window, and that is when.

22   Q.    Where did that occur?

23   A.    In Cody.

24   Q.    Any other occasions where you testified

25   under oath?

1    A.    Not that I can remember.

2    Q.    Since April of 2016, have you used any

3    social media accounts?

4    A.    I used to be on Facebook, and I believe

5    in 2019, I went off Facebook.

6    Q.    Did you ever post anything on Facebook

7    concerning your employment with Park County Road

8    and Bridge?

9    A.    No, only pictures of jobs we were on or

10   informative little things like, Hey, everybody,

11   beware, we're going to be chip sealing on road

12   whatever, but that's it.

13   Q.    Why did you get off Facebook in 2019?

14   A.    Biden was running for president and a

15   bunch of people were getting very angry at

16   people and the wolf culture started in, and I

17   was over it.

18   Q.    So for reasons unrelated to your

19   employment with Park County, you got off of

20   Facebook?

21   A.    Yes, sir.

22   Q.    Have you ever had any other social media

23   accounts other than Facebook?

24   A.    No.  Snapchat, but.

25   Q.    Can't profess to know how Snapchat

Page 52

```
 1   works, but?
 2      A.    I don't either.
 3      Q.    Do you still have a Snapchat account?
 4      A.    Yes.
 5      Q.    Do you use Snapchat?
 6      A.    I check messages from my son.  He sends
 7   fishing videos.
 8      Q.    Have you communicated with anyone on
 9   Snapchat concerning the subject matter of this
10   litigation?
11      A.    No.
12      Q.    Any other social media that you use or
13   have used since April of 2016?
14      A.    No, sir.
15      Q.    Have you communicated with anyone, and I
16   think we touched on this, but I just want to be
17   able to check this off.  Have you communicated
18   with anyone by email about this lawsuit other
19   than your attorney?
20      A.    Only Jack Hatfield and my daughter
21   Brandi.
22      Q.    How about messaging?  In other words,
23   the ability to text someone?  Have you
24   communicated with anyone concerning this lawsuit
25   or your employment with Park County other than
```

Page 53

1   your attorney?

2      A.    Yes.  Ron Nieters, Rowdi Briggs, Chris

3   Cooper, maybe.

4      Q.    When is the last time you communicated

5   with Ron Nieters concerning this lawsuit?

6      A.    Well, I had called him a couple of weeks

7   ago on something unrelated, and he told me he

8   had a deposition to do on the 14th.  Other than

9   that, it would have been about three months

10  before since I had talked to him, but generally,

11  we don't talk about the lawsuit so.

12     Q.    Do you still have all the text messages

13  for any communication you have had with Ron

14  Nieters?

15     A.    No.

16     Q.    What did you do with the text messages?

17     A.    Most of them were on my old phone.

18  There were some on this phone, but I just -- I

19  try not to clog up my phone.  It's an older

20  phone now, and it just -- I don't.

21     Q.    Your complaint in this matter was filed

22  on February 16th of 2022.  Have there been text

23  messages with Ron Nieters since then?

24     A.    No.

25     Q.    You have not had any text messaging with

Page 54

1    Ron Nieters since February of 2022?

2        A.    Not that I'm aware of.

3        Q.    How about text messages with Rowdi

4    Briggs during that time period?

5        A.    Yes.  We text each other occasionally.

6        Q.    Do you have those text messages?

7        A.    Yes, I believe I do.

8        Q.    Have you provided those to your

9    attorney?

10       A.    No, sir.

11       Q.    I'd ask you not to delete any messages

12   or emails or other electronically stored

13   information that you may have on any device

14   concerning the subject matter of this litigation

15   or your employment with Park County.

16       A.    Okay.

17       Q.    What about text messages with Chris

18   Cooper?

19       A.    I have some of those.

20       Q.    Same thing.  Please don't delete those

21   or do anything that damages the integrity of

22   those messages.

23       A.    Okay.

24       Q.    Have you text messaged anyone else other

25   than those individuals concerning this lawsuit?

Page 55

1    A.    No.

2    Q.    Ma'am, I talked to you a little bit

3  about your GED and your employment history.  I

4  assume that you never -- prior to your

5  employment with Park County, you never attended

6  a trade school; is that fair?

7    A.    That is fair.

8    Q.    Prior to your employment with Park

9  County, you've never underwent any formal

10  training on how to operate heavy equipment?

11    A.    Correct.

12    Q.    Even after you were hired by Park County

13  to be an Operator I with Road & Bridge, you did

14  not have your CDL, correct?

15    A.    Correct.

16    Q.    Did Park County assist you in obtaining

17  that CDL?

18    A.    Yes.

19    Q.    Could you explain to the jury what a CDL

20  is?

21    A.    CDL is a commercial driver's license to

22  operate vehicles that are 26,000 pounds or more.

23  It can be interstate or intrastate.  You can be

24  hauling anything from sand to groceries,

25  basically.  It's a big deal.  It's a commercial

Page 56

1    driver's license.  I don't know what you want.

2       Q.    I just want your explanation of what one

3    is.  Is that your answer?

4       A.    Yes.

5       Q.    When did you obtain your CDL?

6       A.    I obtained my permit, I believe, in

7    September or October, and then I got my actual

8    CDL in November of -- was it -- it was either

9    2016 or 2017.

10      Q.    And that was --

11      A.    Sorry.

12      Q.    Go ahead?

13      A.    That was when they hired me on

14   full-time.  The contingency was they would wait

15   and see if I could pass my driving test before

16   they hired me on full-time.  Then they hired me

17   on full-time.  I believe my CDL driving test was

18   on November 7th, and then I think November -- I

19   want to say, 11th, they put me on as a full-time

20   operator.

21      Q.    Is that interstate or intrastate?

22      A.    Well, for them it is interstate, I

23   believe, but I do drive for other companies, so

24   I do have the intrastate license.

25      Q.    My understanding is that interstate

Page 57

1   would be within --

2      A.    Okay, intra.

3      Q.    -- the state of Wyoming, and intrastate

4   would be outside of the state of Wyoming.  Do

5   you recall what your driver's license is?

6      A.    Mine is interstate.

7      Q.    So you can drive in other states?

8      A.    Yes.

9      Q.    You indicated you drive for another

10  company.  Are you employed -- currently, are you

11  employed with another company?

12     A.    Yes, sir.

13     Q.    What company is that?

14     A.    MTC Logistics.

15     Q.    How are you employed with MTC Logistics?

16     A.    I run the mail from Powell, Ralston and

17  Cody to Casper and back again.

18     Q.    How often do you run the mail between

19  those locations and Casper?

20     A.    Once or twice a month.

21     Q.    Is that on weekends?

22     A.    Yes.

23     Q.    When you run the mail back and forth to

24  Casper, how many hours does that take you?

25     A.    11 to 14.

Page 58

1    Q.    When you run the mail on weekends for 11
2    to 14 hours, do you notify your supervisor at
3    Park County Road & Bridge?
4    A.    No.
5    Q.    Let me finish the question.
6    A.    Sorry.
7    Q.    Do you notify your supervisor of Park
8    County Road & Bridge that you will not be able
9    to respond to an on-call request for assistance?
10   A.    No.
11   Q.    Why not?
12   A.    People will usually tell us if we are
13   going to be on call for the weekend.  My
14   agreement with my job at MTC Logistics is if I
15   am on call, if there is a weather event coming
16   up, then I will have -- there will be a
17   replacement driver put in place to go run the
18   mail.
19   Q.    Who is your supervisor at MTC Logistics?
20   A.    Matt Croft.
21   Q.    What is Matt's title?
22   A.    Owner-operator.
23   Q.    Where does Matt reside?
24   A.    Utah.
25   Q.    Do you have Matt's contact information?

Page 59

```
 1    A.    I do.

 2    Q.    Including his phone number?

 3    A.    I do.

 4    Q.    Do you have that memorized?

 5    A.    No, I can get it though.

 6    Q.    Okay.

 7    A.    I just got his -- his phone number is

 8    (801)641-4109.

 9    Q.    Is this agreement that you spoke of that

10    when you are on call with Park County Road &

11    Bridge that he will get an alternate driver; is

12    that a document that -- that that agreement was

13    reduced to writing?

14    A.    Not that I'm aware of.  I have been

15    running for him for at least three, maybe four

16    years.

17    Q.    It is just a verbal understanding with

18    Matt?

19    A.    Yes.

20    Q.    Any other employment other than MTC

21    Logistics?

22    A.    Up until 2019, I believe, 2019, maybe

23    early 2020, I would make runs for special ops

24    out of Cody, Wyoming.

25    Q.    What is special ops?
```

Page 60

```
 1    A.    They run fire trailers, they run trucks
 2  all over the United States, the FEMA trucks or
 3  trailers and the fireman's quarters, fireman's
 4  lounges and kitchens for the big fires across
 5  the United States, so you pull doubles.  It
 6  could be to California, it could be to New York,
 7  it could be to Toledo, it could be to Houston,
 8  it could be to anywhere.
 9    Q.    Would you do that on the weekends?
10    A.    No.
11    Q.    When would you work for special ops?
12    A.    I would -- I would ask my foreman.  The
13  last time I ran was when I was in Cody.  I asked
14  my foreman for four days off, and that's -- I
15  went Monday, Tuesday, Wednesday and Thursday.
16    Q.    When you say "in Cody," you're referring
17  to the Cody shop of the Park County Road &
18  Bridge?
19    A.    Yes.
20    Q.    Have you ever been terminated from any
21  employment?
22    A.    No, not that I'm aware of.
23    Q.    Have you ever applied for unemployment?
24    A.    I think I did, but I can't remember.
25    Q.    In the State of Wyoming?
```

Page 61

1    A.    I don't remember.

2    Q.    Prior to coming to work for Park County

3    as an Operator I, what was the highest paying

4    job you ever held?

5    A.    I am going to say my wood flooring

6    business.

7    Q.    Okay.

8    A.    Then after that R&K Superbowl.

9    Q.    R&K Superbowl was where you were working

10   at the time you made application in April of

11   2016?

12   A.    Yes.

13   Q.    What was your hourly rate of pay at

14   M&K -- or excuse me, R&K Superbowl?

15   A.    I believe I was making $12 an hour plus

16   tips.

17   Q.    Was that a full-time job?

18   A.    Yes.

19   Q.    What was the -- your initial rate of pay

20   when you started with Park County as a flagger?

21   A.    $13.71.  Oh, $12 an hour for a flagger.

22   Q.    Why did you leave the job with R&K to

23   take a job with Park County as a flagger when

24   you weren't getting any increase in pay?

25   A.    I didn't leave my job with R&K

Page 62

1    Superbowl.  I did both jobs.

2       Q.    So R&K became a part-time job?

3       A.    No.

4       Q.    So you were doing --

5       A.    R&K was --

6       Q.    Let me finish.  You were working

7    80 hours a week at two different jobs full-time?

8       A.    It wasn't necessarily 80 hours a week,

9    no.

10      Q.    Were you working 40 hours a week at R&K?

11      A.    Off and on.

12      Q.    So this is while you're employed as a

13   flagger for Park County?

14      A.    Yes.

15      Q.    Are you working 40 hours or more as a

16   flagger for Park County?

17      A.    Yes.

18      Q.    So you -- at times, you were working

19   80 hours a week for both R&K and Park County?

20      A.    If I worked -- had to work late as a

21   flagger, I would call R&K and tell them I

22   couldn't make it in, or I wouldn't be in until

23   late.  I usually worked from five in the evening

24   until around midnight -- well, anywhere from ten

25   to midnight on the evening shift at the

Page 63

1   bowling -- at the R&K Superbowl.  So I would say

2   I was probably getting 25 hours to 35 hours at

3   the Superbowl.

4      Q.    Why did you decide to apply to be a

5   flagger with Park County?

6      A.    Because Ron Nieters said they were

7   having problems getting flaggers, and I had

8   flagged before, and I said, I'll do it.  I had

9   all of my days off except for my weekends, and

10  it was supposed to be four days a week so.

11     Q.    You didn't -- I don't recall you telling

12  me about flagging before employment with Park

13  County.

14     A.    I did that when I was 17 and 18 years

15  old on the road between Riverton and Lander, and

16  that was, I guess, probably for about four

17  months.

18     Q.    When you flagged before, when you were

19  17 or 18 years old, who did you work for?

20     A.    I don't know.  It was someone out of

21  Lovell.  I don't remember the name of the

22  company.

23     Q.    So it was a private company, not a

24  public entity?

25     A.    Correct.

Page 64

1    Q.    Did you receive any certificate for

2    being a flagger?

3    A.    I believe so.  We had to test, so.

4    Q.    So you decided to make application after

5    discussing it with Ron Nieters?

6    A.    Yes.

7    Q.    And at the time that you and Ron Nieters

8    had that conversation, where were you at; what

9    sort of setting were you in?

10   A.    I was bartending, and he and his ex-wife

11   came in and were talking about how he needed

12   flaggers.

13   Q.    Did you know Ron Nieters prior to that

14   conversation?

15   A.    A little bit.  I knew his ex-wife more.

16   Q.    What was Ron Nieter's position with Park

17   County Road & Bridge when you had that

18   conversation with him?

19   A.    He was a foreman of the Cody shop.

20   Q.    Other than Ron Nieters, had you -- did

21   you, prior to making your application with Park

22   County in April of 2016, did you know any of the

23   other Park County Road & Bridge employees?

24   A.    Yes.

25   Q.    Who?

Page 65

1    A.    Tommy Thompson, I knew of Tom Hiltz, and
2    I think that's it.
3    Q.    How did you know Tommy Thompson?
4    A.    Because we went to the same high school
5    and he was somebody everybody knew, just like
6    Ron Nieters was someone everyone knew.  Tom
7    Hiltz, they were all jocks, so everybody knew
8    them.
9    Q.    So you knew them from high school, or
10   you knew them just from being in the community
11   or both?
12   A.    I knew them both.
13   Q.    You were hired on as a flagger with Park
14   County, correct?
15   A.    Yes.
16   Q.    So as a flagger, were you required to
17   operate any equipment?
18   A.    Yes.
19   Q.    What equipment were you required to
20   operate?
21   A.    Ron had me and the other flagger, we ran
22   the brooms, the sweepers that sweeped the sand
23   off the road.  I ran the mower, and other than
24   that, it was pickup trucks, big old trailers,
25   air compressors to clean off bridges, and other

Page 66

1  than that, I would just say pickup trucks.

2    Q.    How long did you work for Park County as

3  a flagger?

4    A.    Two summers.

5    Q.    And when did you apply for the

6  Operator I position?

7    A.    At the end of the second summer.

8    Q.    You said that you did not make any

9  written application for the Operator I position?

10   A.    I don't recall that, no.

11   Q.    Do you recall how you found out about

12  the Operator I job?

13   A.    There was a gentleman who was retiring.

14  His name was Art.  I don't know his last name,

15  but he was retiring, and I said, How do I get

16  his job?  And Ron told me, You have to have a

17  CDL.  So that afternoon, we weren't doing

18  anything.  I asked if I could leave early, and I

19  went down and I did my test.  I got my CDL

20  permit.

21   Q.    So is it your testimony that you

22  obtained your CDL permit before you were

23  employed with Park County as an operator?

24   A.    Yes.

25   Q.    And did you make written application for

Page 67

1    Operator I?

2        A.    Not that I recall.

3        Q.    Did you interview for the job?

4        A.    Not that I recall.

5        Q.    Do you know whether or not the job was

6    advertised?

7        A.    Yes, it was.

8        Q.    And where was it advertised?

9        A.    In the Cody paper, the *Cody Enterprise*.

10       Q.    Do you know if there were any other

11   applicants for that job?

12       A.    No, I do not.

13       Q.    Who hired you?

14       A.    I guess it has to go through the

15   commissioners, and Ron had gone to Brian Edwards

16   and talked to him.  And then they talked to the

17   commissioners, and from what I was told is he

18   went to bat and told them we can train her

19   however we want without any bad habits.  And so

20   they said, Well, if she can pass all of the

21   tests, then we'll hire her on.

22       Q.    Were they having that discussion due to

23   your lack of experience operating heavy

24   equipment?

25       A.    I wouldn't know that.

Page 68

1    Q.    Did you ever hear about that?

2    A.    No.

3    Q.    When you say "they went to bat for you,"

4    what does that -- what are you referring to?

5    A.    Ron went out there and put his name on

6    it and said, She can do this.

7    Q.    She can be trained?

8    A.    Yes.

9    Q.    Do you know if Park County had ever

10    hired an Operator I who had no experience

11    operating heavy equipment?

12    A.    Several.

13    Q.    Who's that?

14    A.    Travis Ball.  Phil Heeg.

15    Q.    Spell Phil's last name?

16    A.    H-E-A-G [sic], Phil Heeg.

17          I think there is a couple others, but I

18    don't recall their names.  I'm sorry.

19    Q.    When was Travis Ball hired on to Road &

20    Bridge?

21    A.    I don't know.

22    Q.    After you?

23    A.    Before me.

24    Q.    Was he still working when you started

25    your job as an Operator I?

Page 69

1    A.    Yes.

2    Q.    Which shop did he operate out of?

3    A.    Cody.

4    Q.    How do you know what his employment

5    history was prior to coming to work for Park

6    County?

7    A.    He was showing me how to water roads and

8    told me he had to get his CDL.  The county

9    actually helped him get his CDL as well.  We

10   talked while he also trained me in certain

11   things.

12   Q.    Having operated heavy equipment doesn't

13   require a CDL, does it?

14   A.    No.

15   Q.    So how do you know whether or not he

16   operated heavy equipment prior to coming to work

17   for Park County?

18   A.    He had worked for the sheriff's

19   department as a dispatcher, and I don't know.

20   Q.    Do you know whether or not he operated

21   heavy equipment prior to coming to work for Park

22   County?

23   A.    No, I don't.

24   Q.    Do you know whether or not Phil Heeg

25   operated heavy equipment prior to coming to work

Page 70

1    for Park County?

2    A.    No, I don't.

3    Q.    Do you have anyone other than Travis

4    Ball or Phil Heeg that you know of that came to

5    work for Park County as an Operator I without

6    any experience operating heavy equipment?

7    A.    Kenny Marchant told me he had only run a

8    farm tractor somewhat like my Kubota and a Skid

9    Steer a little bit before he came to work, but

10   that's all I know.

11   Q.    Do you know that Kenny Marchant had his

12   own construction company?

13   A.    Where he ran a tractor and a truck.

14   Q.    His testimony will be provided in this

15   case, and you wouldn't dispute if he comes in

16   and testifies that he has experience operating

17   heavy equipment.  You wouldn't have any reason

18   to dispute that, would you?

19   A.    He told me he had run a tractor about

20   like my farm -- my Kubota farm tractor and a

21   Skid Steer, and he told me that, and I had to

22   show him -- he said he had never run a loader

23   before, and I had to show him how to switch it

24   from manual to automatic, and how to put the

25   ride control on and do a couple of things,

Page 71

1   because he was loading very dangerously and

2   having a difficult time.

3      Q.    Well, we'll talk to Kenny Marchant in

4   the next go round in depositions.

5      A.    Perfect.

6           MR. THOMPSON:  MaryBeth, if you would

7   put up deposition Exhibit 2 bates 931?

8           (Exhibit 2 was marked for

9   identification.)

10  BY MR. THOMPSON:

11     Q.    Ma'am, I have just shared screen with

12  you what has been marked as deposition

13  Exhibit 2.  Go ahead, it's a two-page document.

14  Just look that over.  I have a couple questions

15  in regards to this.

16          Have you reviewed it?

17     A.    Yes, I have.

18     Q.    Does this look familiar to you?

19     A.    No, but...

20     Q.    Is that your signature at the bottom of

21  page 1?

22     A.    It is.

23     Q.    Your signature is dated 11/7 of 2016?

24     A.    Yes.

25     Q.    This document is titled "Full-Time New

Page 72

1    Employee Orientation," correct?

2     A.     Yes.

3     Q.     For Park County, Wyoming; is that

4    correct?

5     A.     That is correct.

6     Q.     This indicates that you began full-time

7    employment as an Operator I with Park County on

8    November 7th of 2016, correct?

9     A.     Correct.

10     Q.     Your rate of pay was 13.71 an hour,

11    right?

12     A.     Yes, sir.

13     Q.     As far as an hourly wage, this was the

14    highest wage you had ever received up to that

15    point in time, correct?

16     A.     No, incorrect.

17     Q.     Can you tell me what job you worked at

18    that had a higher rate of pay per hour than this

19    job?

20     A.     Wood Creations by John Velvick.

21     Q.     Were you paid hourly when you worked for

22    John Velvick?

23     A.     Yes.

24     Q.     Do you have any documentation indicating

25    that employment?

Page 73

1    A.    I might have my tax returns from then,

2    one of them.

3    Q.    Do you have a W-2 statement from John

4    Velvick?

5    A.    I may have.

6    Q.    What was the rate of pay that you

7    received from John Velvick?

8    A.    I was making $14 an hour.

9    Q.    Why did you stop working as a wood

10   finisher if you were making higher wage?

11   A.    I was going through a divorce and I

12   moved from Oklahoma to Cody.

13   Q.    Well, I understand that, but you have

14   your own wood finishing business now, correct?

15   A.    Correct.

16   Q.    If you can make a higher wage doing

17   that, why not work in that capacity versus an

18   operator for the Road & Bridge?

19        MR. KELLER:  I'm just going to object on

20   relevancy.

21   BY MR. THOMPSON:

22   Q.    Go ahead.

23   A.    Because I am 55 years old.  The tools

24   aren't getting any lighter, and insurance and

25   having your own small business has gotten pretty

Page 74

1  expensive.

2      Q.    Other than Wood Creations -- you were

3  part owner in that business, correct?

4      A.    Correct.

5      Q.    Other than Wood Creations, had you been

6  employed in any other capacity at a higher rate

7  of pay other than 13.71 an hour?

8      A.    Yes.  When I was working for -- too busy

9  and I ran a bar, I was making $18 an hour

10  approximately, but I don't know how I can show

11  you that because that was back in '87, and I'm

12  sure I don't have my taxes from that.  I also

13  worked as a security guard, which I didn't put

14  that down either.  Sorry.  I worked as a

15  security guard for an oil company, and I worked

16  nights.  That was $18 an hour.

17      Q.    How long did you work for the oil

18  company as a security guard?

19      A.    I worked there for about six months.

20      Q.    Where was that?

21      A.    That was on the Colorado-Wyoming border.

22  They were putting in a pump station.

23      Q.    What was the name of the oil company you

24  worked for?

25      A.    I don't recall.

Page 75

1    Q.    What year did you work for an oil

2  company as a security guard making $18 an hour?

3    A.    That was about 1987 or '88, somewhere in

4  there.

5    Q.    You've provided us with your social

6  security earnings history, correct?

7    A.    Yes.

8    Q.    That document is an accurate reflection

9  of the wages that you have earned over the

10  years?

11    A.    I think so.

12    Q.    Did you look at it?

13    A.    Not really, no.

14    Q.    Can we get a page 2 of this document?

15    A.    Okay.

16    Q.    Part of the new employee orientation as

17  set forth on Exhibit 2, page 2, is an FMLA

18  Employee Rights and Responsibilities, and it

19  shows -- includes the word "provided."  Do you

20  recall receiving your FMLA Employee Rights and

21  Responsibilities when you signed this document

22  back in November 7th of 2016?

23    A.    No.

24    Q.    Do you know why you signed it and

25  checked -- that block was checked?

Page 76

1    A.    Because every new or employee

2    orientation you go and you sit in a room with

3    Bobbie Hinze, and she has a whole bunch of

4    paperwork, and she hands you each piece of

5    paperwork and just says, You can go over this

6    later.  This just says this, this just says

7    that.  Just sign here, sign here, and you spend

8    about an hour signing all of these things, and

9    then you take this whole packet of things home.

10   So I can remember some of it.  I don't remember

11   some of it also.

12   Q.    But you don't dispute you were provided

13   the documentation?

14   A.    Yes.

15   Q.    You don't dispute or do you dispute?

16   A.    I do not dispute.

17   Q.    Let's go to the next exhibit, Exhibit 3,

18   bates 1278.

19          (Exhibit 3 was marked for

20   identification.)

21          THE WITNESS:  Okay.

22   BY MR. THOMPSON:

23   Q.    Ma'am, do you recognize what's been

24   marked as deposition Exhibit 3?

25   A.    Yes.

Page 77

1    Q.    What is it?

2    A.    It's the policy manual for Park County.

3    Q.    Were you provided a policy manual when

4    you began your employment with Park County?

5    A.    Yes.

6    Q.    If we go to the very end of that

7    exhibit, there is an Employee Acknowledgement

8    Form.  Do you see that?

9    A.    Yep.

10    Q.    Park County 937 is the bates number.  Is

11    that your signature on this document?

12    A.    It is.

13    Q.    Do you see the middle paragraph stating,

14    "I understand"?

15    A.    Yes.

16    Q.    Could you read that out loud?

17    A.    "I understand it is my responsibility to

18    become familiar with the contents of the

19    personnel and policy manual."

20    Q.    And you also understand that your

21    employment when you signed on with Park County

22    was at-will?

23    A.    Yes, sir.

24    Q.    What does "AT-WILL" mean to you?

25    A.    It means I can quit if I want to at any

Page 78

1    given time, or they can fire me at any given

2    time with no reason given.

3        Q.    Did you, in fact, become familiar with

4    the contents of the personnel and policy manual?

5        A.    Some of it.  Most of it, yes.

6        Q.    Why wouldn't you become familiar with

7    the entire manual?

8        A.    Because it is -- you can read over it,

9    you can go through it, you're not going to

10    remember it all.  I have gone through it all.

11        Q.    Maybe you misunderstood my question.

12    Did you become familiar with the manual?

13        A.    Yes.

14        Q.    If you'd look to the second page of this

15    exhibit, there is a chapter from the manual

16    beginning on page 16, Park County 1295 is the

17    bates number, and it states, there is a

18    paragraph at the top titled "Equal Employment

19    Opportunities."  Do you see that?

20        A.    Yes, sir.

21        Q.    Did you become familiar with the Equal

22    Employment Opportunities section of the manual?

23        A.    Yes.

24        Q.    Did you ever have any questions about

25    what that meant?

Page 79

1    A.    No.

2    Q.    Did you ever -- strike that.

3          Did the first paragraph under Equal

4    Employment Opportunities, it states, second

5    sentence, "Park County does not discriminate

6    against applicants or employees for any status

7    protected by state or federal law."

8          You would certainly agree with me that

9    Park County did not discriminate against you on

10   the basis of your gender, female, in the

11   application process, correct?

12   A.    Not in the application process, no.

13   Q.    They hired you without any experience on

14   heavy equipment, correct?

15   A.    Correct.

16   Q.    You understood that Park County had an

17   equal employment opportunity statement in their

18   personnel manual which applied to all employees

19   of Park County, correct?

20         MR. KELLER:  Tom, I'm just going to

21   object on the form of the question.  I think it

22   was kind of long.

23         MR. THOMPSON:  Sure.  We will go through

24   it piece by piece.

25   BY MR. THOMPSON:

1    Q.    Ma'am, did Park County have an equal

2    employment opportunity statement in their

3    personnel manual?

4    A.    Yes.

5    Q.    You understood that when you first

6    became an employee with Park County by virtue of

7    signing the acknowledgement?

8    A.    Yes.

9    Q.    This included a statement that they

10   complied with Title 7 of the Civil Rights Act?

11   A.    Yes.

12   Q.    And the Equal Pay Act, correct?

13   A.    Yes, sir.

14   Q.    Then it was unlawful to harass anyone

15   under any of these federal laws for making a

16   complaint, correct?

17   A.    Correct.

18   Q.    Let me have you turn to the next page,

19   Park County 1296 is the bates number.  Do you

20   see at the top of that page that it talks about

21   how complaints of harassment or discrimination

22   are to be handled?

23   A.    Yes.

24   Q.    Did you ever bring a complaint of

25   harassment or discrimination to the attention of

Page 81

1    the Park County attorney?

2    A.    No, sir.

3    Q.    Why not?

4    A.    Because Brian Edwards told me he was HR

5    and I was to speak to him if it was employee or

6    work-related.

7    Q.    I understand employee or work-related,

8    but did you ever ask Brian Edwards as to whether

9    or not you should go to the county attorney if

10   you had an equal employment opportunity

11   complaint?

12   A.    No.  He was my boss.  I asked him who

13   was HR and who do I go to.

14   Q.    When did you do that?

15   A.    I did that on February 14th of 2020, I

16   believe.

17   Q.    Prior to February 14th of 2020 --

18   A.    Oh, wait.  The first time I asked him

19   who HR was, was August 2017.

20   Q.    Would you agree with me that there's a

21   significant difference between asking somebody

22   who HR is versus where a complaint based upon

23   discrimination should be filed?

24   A.    He was my boss.

25         MR. KELLER:  I'm just going to object to

Page 82

1    form of the question.

2              (The last question was read back by the

3    court reporter.)

4    BY MR. THOMPSON:

5        Q.    Go ahead, Ma'am.

6        A.    Yes, I would agree with that.

7        Q.    Let's go to the next exhibit, Park

8    County 1422.  I believe this is four.

9              (Exhibit 4 was marked for

10    identification.)

11    BY MR. THOMPSON:

12        Q.    Ma'am, deposition Exhibit 4 is in front

13    of you now.  Have you seen this document before?

14        A.    I am sure I have, yes.

15        Q.    What is it?

16        A.    Park County Policy Manual.

17        Q.    With an effective date of July 1, 2017?

18        A.    Yes.

19        Q.    If you turn to the last page of that

20    document?

21        A.    Okay.

22        Q.    Could you read the first paragraph out

23    loud?

24        A.    "I understand and agree that it is my

25    responsibility to read and comply with the

Page 83

1  policies in the handbook and become familiar

2  with this information, as doing so will acquaint

3  me with the County's personnel practices, rules,

4  employee benefits and basic organizational

5  philosophy."

6     Q.    Is that your signature at the bottom of

7  that acknowledgement?

8     A.    It is.

9     Q.    What is the date of that

10  acknowledgement?

11    A.    7/11/17.

12    Q.    Did you, in fact, acquaint yourself with

13  the policies that were contained in the

14  handbook?

15    A.    Yes.

16    Q.    There were other handbooks including one

17  that was provided to you in 2023, correct?

18    A.    Yes, and addendums as well.

19    Q.    And you, when you -- with those

20  addendums are -- new policies were provided to

21  you, you signed an employee acknowledgement

22  form?

23    A.    Most of the time, we just get the

24  signature page, and if we want a copy of the

25  policy manual, we can have it.  But this year I

1  went in and asked for the 2023, or whatever the

2  last time we signed.  I went in and asked Bobbie

3  Hinze for my copy and an extra copy, but

4  basically, we are given this signature sheet and

5  the books are sitting there if you want to take

6  them.

7    Q.    Have you ever been denied a request to

8  see a personnel manual or personnel handbook?

9    A.    No, sir.

10    Q.    Let's go to the next exhibit, or county

11  930?

12          (Exhibit 5 was marked for

13  identification.)

14  BY MR. THOMPSON:

15    Q.    Is that your signature on this exhibit?

16    A.    Yes.

17    Q.    I believe we are at Exhibit 5 or 6?

18    A.    We are on five.

19    Q.    We will go ahead mark this five.  Again,

20  this required you to become familiar with the

21  contents of the policy manual, correct?

22    A.    Correct.

23    Q.    You did that?

24    A.    I did that.

25    Q.    Why do you believe it's important to

Page 85

1  know what's in the policy and procedure manual?

2    A.    Well, because it tells you what is

3  expected of you at work and what is expected of

4  your bosses and their bosses at work.  It tells

5  you what to expect with your payroll, your sick

6  time, and how to decipher all of the stuff

7  between sick, vacation and comp time, days off,

8  and it gives you stuff about harassment and

9  sexual harassment and that's about it.  Tells

10 you how to conduct yourself as an employee.

11   Q.    It is a mutual understanding between the

12 employer and the employee as to these policies;

13 would you agree?

14        MR. KELLER:  Object to form of the

15 question.

16        THE WITNESS:  Yes.

17 BY MR. THOMPSON:

18   Q.    When you applied for the Operator I

19 position, do you know if -- and I think you said

20 you don't know if there was any other

21 applicants; is that correct?

22   A.    That is correct.

23   Q.    You don't know if any female or male

24 applicants applied for that position, correct?

25   A.    Correct.

1          MR. KELLER:  Tom, is it all right if we

2     take another 5 or 10-minute break?

3          MR. THOMPSON:  Sure.  I have got quite a

4     bit left, probably ten typed pages.  What do you

5     want to -- I can make arrangements now for

6     lunch.  Do you want to break at noon and come

7     back at one?

8          MR. KELLER:  Yeah, that sounds good.  We

9     will only take about five minutes here real

10    quick, get up and stretch a little bit.

11          (A recess was taken from 11:12 a.m.

12    until 11:20 a.m.)

13    BY MR. THOMPSON:

14    Q.    Ma'am, you understand you are still

15    under oath?

16    A.    Yes, sir.

17    Q.    Park County had represented that he only

18    had record of you working one spring or summer,

19    or spring and summer, as a flagger.  Is it your

20    testimony that you worked two different years as

21    a flagger?

22    A.    Yes, sir.

23    Q.    When you worked in 2016, who was your

24    supervisor?

25    A.    Ron Nieters.

Page 87

1    Q.    Which months in 2016 did you work for

2    Park County?

3    A.    I believe April through September.

4    Q.    Let me have you go to, I believe,

5    Defendant's Exhibit 6, which is bates 929.

6         (Exhibit 6 was marked for

7    identification.)

8    BY MR. THOMPSON:

9    Q.    I am going to ask you to review all of

10   the pages of this deposition exhibit and just

11   let me know when you have looked through those.

12   You have a hard copy in front of you?

13   A.    Yes, I do.  Okay.

14   Q.    Are you familiar with what has been

15   marked as deposition Exhibit 6?

16   A.    Yes.

17   Q.    What is deposition Exhibit 6?

18   A.    This is the action form that they put

19   into my employee file that says the dates that I

20   was hired for, and then there is the hidden

21   paychecks that Colleen sends out.

22   Q.    What do you mean, the "hidden

23   paychecks"?  That refers to the monetary value

24   of benefits you're receiving?

25   A.    The way I see it, it's the cost of

Page 88

1  business to employ someone, and a lot of these

2  numbers on these hidden paychecks for my wages

3  do not match up to my W-2 statements.

4    Q.    Explain that to me.

5    A.    So every year --

6    Q.    Let's start -- let me see if I can help

7  direct you to -- let's look at 929.  It shows an

8  actual hourly wage of 21.59 an hour.

9    A.    That is my actual hourly wage.

10    Q.    It shows wages for that period of

11  July 1, 2017, through June 30, of 2018 at

12  30,276.80.  Do you see that?

13    A.    I see that.

14    Q.    Is that the wages that you were paid

15  during that time period?

16    A.    I don't know because I don't have my W-2

17  in front of me.

18    Q.    Do you have -- you would agree that the

19  hourly wages, what you were receiving, correct?

20    A.    No.

21    Q.    You don't believe you were receiving

22  21.59 an hour?

23    A.    No, sir.

24    Q.    That is the hourly wage with benefits

25  included?

1    A.    A lot of those benefits are part of my

2    hidden paycheck, which includes the social

3    security match that the company has to do, the

4    Medicare match, and the worker's compensation

5    that are not part of a benefits package.  That's

6    the only benefits we get are health insurance,

7    life insurance up to a $140,000, but generally

8    10,000 in this case, and Wyoming retirement.

9    Q.    You would agree with me that on each one

10   of these documents in deposition Exhibit 6,

11   there's a separate line item entry for wages

12   that you are receiving, correct?

13   A.    Correct.

14   Q.    And that is a different number.  It

15   is -- that number is less than the total value

16   of the compensation package.

17   A.    Correct.

18   Q.    The total value of the compensation

19   package includes your wages plus your benefits?

20   A.    Yes.

21   Q.    This also indicates what your position

22   is with Park County Road & Bridge, correct?  And

23   it is in the top box?

24   A.    Yes.

25   Q.    And if you would turn to the document

Page 90

1   for the time period July 1st of 2021 through

2   June 30th of 2022?

3      A.    Okay.

4      Q.    It indicates you're Equipment Operator

5   II; is that correct?

6      A.    Yes.

7      Q.    When were you moved from an Equipment

8   Operator I to an Equipment Operator II?

9      A.    I don't know.

10     Q.    You don't know?

11     A.    No, sir, I don't.

12     Q.    Let's go to the next deposition exhibit.

13     A.    Exhibit 7?

14     Q.    Yes.  And it's approximately the fifth

15  page in that deposition exhibit.

16            (Exhibit 7 was marked for

17  identification.)

18  BY MR. THOMPSON:

19     Q.    I believe one more up, sorry.  I had you

20  going the wrong way.

21            Off the record.

22            (There was a brief discussion off the

23  record.)

24  BY MR. THOMPSON:

25     Q.    Go to bates number 918.

Page 91

1    A.    Okay.

2    Q.    Go to 919.  Do you see the document that

3    is part of this deposition exhibit titled --

4    there is multiple documents titled "Park County

5    Personnel Form"?

6    A.    Yes.

7    Q.    What is your understanding of what this

8    document is?

9    A.    This is where I am put in for a raise,

10   and it's either approved or not.

11   Q.    Okay.  And does it also reference the

12   position that you hold with Park County?

13   A.    Yes, at the top.

14   Q.    Does it include information on pay rate

15   and grade and step?

16   A.    Yes.

17   Q.    And does this form -- is this form, to

18   the best of your knowledge, filled out whenever

19   there is a change on your pay rate, grade or

20   step?

21   A.    I believe so.  I don't know.

22   Q.    You don't have any idea when you were

23   moved to an Equipment Operator II?

24   A.    No, sir.  I do not.

25   Q.    Why not?

Page 92

1    A.    I believe it was in 2022, but I am not

2    sure when.

3    Q.    Do you see on this document that

4    references Equipment Operator II where your new

5    pay rate was 17.40 an hour?

6         MR. KELLER:  Which document are you

7    looking at, Tom?

8         MR. THOMPSON:  Should be the first

9    Equipment Operator II reference.

10        THE WITNESS:  15.32 an hour, isn't it?

11        MR. THOMPSON:  Let's go off the record

12   for a minute.

13        (There was a brief discussion off the

14   record.)

15   BY MR. THOMPSON:

16   Q.    Ma'am, do you see what is being

17   displayed on the screen as Park County 914?

18   A.    Yes, sir.

19   Q.    We will make that part of deposition

20   Exhibit 6.  This shows your position as an

21   Equipment Operator II, and the actual date is a

22   little bit obscured, but it's 2021; would you

23   agree?

24   A.    I don't see the date.

25   Q.    It's below changes for existing

Page 93

1    employees, right above the reason.

2        A.     I guess it says 2021.

3        Q.     In 2021, your hourly rate of pay went

4    from 16.04 an hour to 17.40 an hour as an

5    Equipment Operator II; is that correct?

6        A.     I don't know.  I guess so.

7        Q.     Do you have any reason to dispute this

8    document as contained in your personnel file?

9        A.     Well, I can't really see the date, and

10   right at the bottom, if you will notice, it says

11   this change will not go into effect until signed

12   by both parties.  It hasn't been signed and it

13   doesn't have a clear date.  I'd have to look on

14   my paycheck.

15       Q.     Well, the year is clear, isn't it?

16       A.     Yes.

17       Q.     And is it your testimony that if one of

18   these forms was filled out and both parties

19   didn't sign, that you didn't get the increase in

20   wages set forth in these forms?

21       A.     I don't know what their policy is on

22   this.  I have no idea, in fact.

23       Q.     Did you receive grade changes or COLA

24   increases that you didn't get those COLA

25   increases or grade changes?

Page 94

1    A.    I did get COLA increases and grade

2    changes.  I don't know when.  I am not fully

3    familiar with this form.  I can only go with

4    what it says on the form and on my paycheck.

5    Q.    Well, let me have you look through

6    deposition Exhibit 6.

7    A.    Okay.

8    Q.    With the different personnel forms and

9    just look through all of them.  Tell me whether

10   you believe there are ones in here that you

11   didn't receive.

12   A.    I think you're talking about Exhibit 7.

13        MR. KELLER:  Hold on.  I am going to

14   object to the question, Tom, just due to the

15   form of the question.  She's confused.

16        MR. THOMPSON:  Yeah.  Let me -- part of

17   that is probably my fault.

18   BY MR. THOMPSON:

19   Q.    Ma'am, let's look at Park County

20   personnel forms that have been provided.  It

21   begins on, I believe, bates number 9222.

22   A.    922?

23   Q.    That's not correct, 920?

24   A.    922, 921, all the way down to 917.

25   Q.    Yeah.

Page 95

1          Are any of those increases in your rate

2     of pay, do you believe?

3     A.    What date was on that other one?

4     Q.    The year was 2021.

5     A.    Okay.

6     Q.    Do you believe there are any of those

7     that you have not received that are documented

8     by these personnel action forms as contained in

9     your personnel file?

10    A.    Okay.  Can I just ask a question really

11    quick?

12    Q.    Yeah, as a point of clarification?

13    A.    Yes.  So on Exhibit 7, page 917 or

14    Document 917, that was also 2021, correct?

15    Q.    What it indicates as far as effective

16    date.

17    A.    4-11-2021, right.  Okay, so the other

18    one is also effective in 2021?

19    Q.    That's what it indicated.

20    A.    They don't generally bump you up twice

21    in one year, so that is my question on this, is

22    if somebody put in the wrong date or something,

23    because, I guess, it makes no sense to me.  They

24    usually only bump you up one time.

25    Q.    Ma'am, let me try to come at it this

1   way:  The documentation that I have shows your

2   initial rate of pay, which we already discussed,

3   and that was your rate of pay back when you were

4   hired in 2016, correct, at 13.71 an hour?

5        A.     Yes, as operator, yes.

6        Q.     Are you currently making 21.51 an hour?

7        A.     I believe so, yes.

8        Q.     You have gone from a Grade 11, Step 1 to

9   a Grade 15, Step 8?

10       A.     I am unsure about that.

11       Q.     Would we have to refer to the

12  documentation in your personnel file?

13       A.     Yes.

14       Q.     Have you reviewed your personnel file?

15       A.     I only -- I have gone over some of it.

16  Some of it, I don't understand, so.  And some of

17  it that was sent as my personnel file does not

18  belong in my personnel file.

19       Q.     What's that?

20       A.     There's some pictures and some other

21  papers.

22       Q.     What are the pictures of?

23       A.     One is of a filter, excuse me.  And just

24  the filter is all I can think of right at this

25  point, and then another is just some paperwork

1    that I believe was in my personnel file.

2       Q.     What is the picture of the filter, is it

3    a filter for a piece of equipment?

4       A.     Yes.

5       Q.     Did you have issues with a filter on a

6    piece of equipment?

7       A.     No, I did not.

8       Q.     Do you know what piece of equipment that

9    filter photograph is for?

10      A.     Yes.

11      Q.     What piece of equipment?

12      A.     PT 38.

13      Q.     What is that?

14      A.     It's a dump truck, and it has the PTO

15   pump has gone out on it three different times

16   with three separate drivers not including me.

17      Q.     What is the paperwork you're referring

18   to?

19      A.     I don't know.  It is just miscellaneous

20   random papers that don't mean anything.  Some

21   are, I don't know if they're parts numbers or

22   just company logos.

23      Q.     Ma'am, would you agree with me, there's

24   approximately 50 people within the Road & Bridge

25   and 50 employees within Road & Bridge and

Page 98

1    Landfill?

2        A.    I don't know how many are in Landfill.

3    We are Park County Road & Bridge.

4        Q.    Do you know how many are within Park

5    County Road & Bridge?

6        A.    Well, in the Cody district, there are 12

7    people.  In the Powell district, there are eight

8    people.  And then I don't -- there's probably

9    five people in the public works office, but Road

10   & Bridge, there's 12 people in the Cody shop,

11   maybe 13, and in the Powell shop, there is seven

12   or eight.

13       Q.    Are there any other female operators?

14       A.    There used to be, but not anymore.

15       Q.    So the answer is no?

16       A.    Right.

17       Q.    Do you know if there's any female

18   operators on the landfill side?

19       A.    Not a clue, no.

20       Q.    You don't know?

21       A.    I don't know.

22       Q.    Do you know who Brenda Mar (ph) is?

23       A.    No, I don't.

24       Q.    Did you ever talk to any elected

25   officials with Park County concerning your

Page 99

1    complaints as set forth in your charges of

2    discrimination?

3    A.    No.

4    Q.    Would you a -- I think we have reviewed

5    the fact that you read the personnel manuals and

6    you signed or acknowledged that you -- it was

7    your responsibility to become familiar with

8    those manuals.  Do you recall that testimony?

9    A.    I do.

10   Q.    Do you recall that in the personnel

11   manuals, there is reference to the compensation

12   plan for Park County?

13   A.    Yes, I do.

14   Q.    You would agree with me that as an

15   operator with Park County Road & Bridge, that

16   longevity or the years of service does not

17   equate to being promoted to different operator

18   levels?

19        MR. KELLER:  I'm going to object to form

20   of the question.

21        THE WITNESS:  Would you repeat the

22   question, please.

23   BY MR. THOMPSON:

24   Q.    Sure.

25        (The last question was read back by the

Page 100

1    court reporter.)

2         THE WITNESS:  No, I disagree.

3    BY MR. THOMPSON:

4    Q.    So is it your testimony that the longer

5    you work for Park County, all you would have to

6    do is work for Park County for a number of years

7    and you automatically get promoted to the next

8    level?

9    A.    No.

10   Q.    So how many years do I have to work for

11   Park County to get promoted to Operator II?

12   A.    Generally, three to four years, but you

13   have to be given the opportunity.

14   Q.    Isn't the year requirement minimum noted

15   as minimum number of years experience in the

16   operation and maintenance of equipment?

17   A.    I don't understand.

18   Q.    Where do you get the three to four years

19   of longevity before being promoted to the next

20   level?

21   A.    On the Park County Operator II job

22   description.

23   Q.    That states four years of experience in

24   operation in maintenance of medium and heavy

25   sized equipment as one of the criteria for the

1  minimum qualifications, correct?

2    A.    I think so.  I don't have that in front

3  of me, so.

4    Q.    Lucky for you, I have got it, so we'll

5  bring it up.  Looking at the next deposition

6  exhibit number, I believe it is seven.  This has

7  Park County equipment --

8    A.    Number 8.

9    Q.    Eight?  This has Equipment Operator II;

10  do you see that?

11    A.    Yes.

12    Q.    The number of years experience, those

13  are minimum qualifications; would you agree?

14    A.    I would agree.

15    Q.    So there is no guarantee that after four

16  years of experience in the operation and

17  maintenance of medium and heavy sized equipment

18  that you get promoted from Operator I to

19  Operator II, correct?

20    A.    I am going to assume, yes.

21    Q.    Well, is that what the document

22  indicates for minimum qualifications?

23    A.    It says, "Four (4) years of experience

24  in operation and maintenance of medium and heavy

25  sized equipment, or an equivalent combination of

1   education and experience."  That tells me it is

2   opportunity also, time and equipment.

3      Q.    Do you have any education outside of

4   your employment with Park County Road and Bridge

5   on heavy equipment or medium sized equipment?

6      A.    No, just servicing my trucks and

7   tractors.

8      Q.    You mean your tractor?

9      A.    Yeah, my tractor.

10     Q.    We go to the next page, 1231.  The

11  Operator II also has a section on Required

12  Knowledge, Skills and Abilities.  Do you see

13  that?

14     A.    Yes.

15     Q.    Would you agree with me that different

16  operators had different skills in the operation

17  of heavy equipment?

18     A.    Yes.

19     Q.    And different skills equate to being

20  placed as an Operator I, II or III, correct?

21     A.    Yes.

22     Q.    If an individual has greater skills than

23  another individual, then that would be one of

24  the criteria that would result in the individual

25  with greater skills being paid more?

Page 103

1    A.    Yes.

2    Q.    That is regardless of gender.

3    A.    Yes.

4    Q.    Somebody that's male shouldn't be paid

5    more than a female who has greater skills

6    operating heavy equipment; would you agree?

7         MR. KELLER:  She seems confused, Tom.

8    Can you rephrase the question?

9         MR. THOMPSON:  Can you just read it

10   back?

11        (The last question was read back by the

12   court reporter.)

13   BY MR. THOMPSON:

14   Q.    The second part of that question is that

15   a female operator with greater skills than a

16   male operator, that female operator ought to be

17   paid more; would you agree?

18   A.    Yes.

19   Q.    And same thing with a male.  A male

20   operator with greater skills should be paid more

21   than a female operator.

22   A.    Correct.

23   Q.    Just because an operator is female does

24   not mean that they have to be paid the same as

25   someone who has greater skills than them,

Page 104

1    correct?

2    A.    Correct.

3    Q.    There is a difference between operating

4    a piece of equipment versus being skilled in the

5    operation of that equipment; would you agree?

6    A.    Yes.

7    Q.    Let's go ahead and stop there for lunch.

8         (A recess was taken from 11:56 a.m.

9    until 1:08 p.m.)

10   BY MR. THOMPSON:

11   Q.    Ms. Cornett, you understand you are

12   still under oath?

13   A.    Yes, sir.

14   Q.    Before we left for lunch, I talked to

15   you about the idea that a more skilled operator

16   would justify a higher wage.  Do you recall that

17   conversation?

18   A.    Yes.

19   Q.    In your complaint that you have filed,

20   the individuals that you have used as

21   comparators.  In other words, those male

22   employees that you believe are getting paid

23   higher than you are Tim Morrison, who is

24   referred to in the complaint in paragraph 28 as

25   TM; is that correct?

Page 105

1    A.    Yes.

2    Q.    And KM, who is referred to in the

3    complaint in paragraph 29 as Kenny Marchant,

4    correct?

5    A.    Correct.

6    Q.    Are those the two comparators that you

7    believe are getting paid more than you based

8    upon the fact that they're male?

9    A.    No.  Can you rephrase the question,

10   please.

11   Q.    Are those the two comparators that you

12   believe are getting paid more than you, and

13   they're getting paid more because they're male?

14   A.    It's not because they're male.  It's

15   because they were put in that position because

16   of who they know and, no.

17   Q.    Do you believe that there are -- well,

18   let's do this:  In regards to Tim Morrison --

19   and your camera is blurry for whatever reason, I

20   am not sure why -- but in regards to Tim

21   Morrison, do you know what his skill level is?

22   A.    No.

23   Q.    Do you believe that he has had more

24   experience in operating heavy equipment than

25   you?

1    A.    At this time, yes, he does now.  Before,
2    I don't believe so.
3    Q.    Would it surprise you that when he was
4    hired for Park County, he had between 20 and
5    30 years experience on heavy equipment?
6    A.    Yes.
7    Q.    Would that justify a higher pay for Tim
8    Morrison if that in fact is true?
9    A.    Not necessarily but.
10   Q.    Why would it not?
11   A.    I guess it would depend on the skill he
12   shows at the job, but yes, it depends on the
13   skill he shows at the job he is doing.
14   Q.    When Tim Morrison was hired, how many
15   years did you have working for Park County Road
16   & Bridge?
17   A.    Probably four or five.
18   Q.    If through the hiring process, Tim
19   Morrison indicated that he had that many years
20   of experience, you have no facts to tell me
21   about which would contradict his years of
22   experience as an operator?
23   A.    I don't understand what you mean.
24   Q.    Well, you can't sit here and tell me
25   factually -- you can't dispute what Tim Morrison

Page 107

1    testifies to in regards to the years of

2    experience that he has, can you?

3    A.    No.

4    Q.    And in regards to Kenny Marchant, do you

5    know how many years experience he indicated that

6    he had when he applied for a position with Park

7    County Road & Bridge?

8    A.    No.

9    Q.    If he had 15 plus years experience

10   operating heavy equipment, would that justify

11   him being paid more than someone who has four

12   years operating equipment?

13   A.    It depends.

14   Q.    What does it depend on?

15   A.    On the job he is doing in any particular

16   piece of equipment, his skills level.

17   Q.    If you accept what he told Park County

18   when he was hired, and they understand --

19   understood that he had 15 years experience, you

20   would agree with me that that would have been

21   justification for hiring him in as an Equipment

22   Operator II?

23        MR. KELLER:  I'm going to object to form

24   of the question.

25   BY MR. THOMPSON:

Page 108

1    Q.    Why do you disagree with me?  I mean,

2    you're an Equipment Operator IV, or excuse me,

3    Equipment Operator II, and you have how many

4    years experience?  Six?

5    A.    Eight.

6         MR. KELLER:  Objection, form of the

7    question.

8    BY MR. THOMPSON:

9    Q.    Go ahead.

10   A.    I have eight years experience.

11   Q.    Well, tell me why someone applying with

12   15 years of experience, why it's not justified

13   to put them into an Operator II position?

14   A.    Because it would -- it depends on the

15   skills they show in each piece of equipment.

16   When I was hired, I was told we cannot hire you

17   above the lowest paid.

18   Q.    So you think -- is it your testimony

19   that someone -- an applicant with 15 years of

20   experience has to start off as an Operator I?

21   A.    I think their skills need to be proven.

22   Q.    Well, you had no skills.

23   A.    Indeed, and I had to prove my skills.

24   Q.    And so is it your testimony that you

25   believe it is improper for someone with 15 years

Page 109

1    of experience to get hired into a Operator II

2    position?

3            MR. KELLER:  Objection, asked and

4    answered.

5            MR. THOMPSON:  I don't think it has been

6    answered.

7            MR. KELLER:  Well, I do.

8            THE WITNESS:  Ask me again, please.

9    BY MR. THOMPSON:

10    Q.    Is it improper for somebody with

11    15 years of experience in the operation of heavy

12    equipment to be hired into an Operator II

13    position?  That is all the facts I am giving

14    you.

15    A.    I think it depends on the equipment they

16    have experience with.

17    Q.    That is your -- that's going to be your

18    answer to a jury in October of this year?

19    A.    I don't know, sir.

20    Q.    Well, it's my one chance to talk to you,

21    so if that's your answer, I will live with it.

22    But if you're going to change your answer, I

23    need to know.

24            MR. KELLER:  Argumentative.

25            THE WITNESS:  I don't know.

1    BY MR. THOMPSON:

2      Q.    Are you -- again, you're under oath.  I

3    have asked you a question.  You indicated to me,

4    at least you haven't asked me to ask it a

5    different way, so you understand the question as

6    per our agreement this morning, and you have

7    answered that question, correct?

8      A.    As I said, I believe if someone is hired

9    as an Operator II or Operator III level, they

10   have to have experience with most of the

11   equipment on the Operator II and Operator III

12   job description.

13     Q.    Have you ever seen the county give a

14   test to individuals hired in as Operator II or

15   Operator III?

16     A.    No.

17     Q.    If an individual represented to the

18   county in the hiring process that they had

19   15 years experience, would there be something

20   wrong with the county assuming that what they

21   told them is true?

22     A.    No.  I don't believe so.

23     Q.    You weren't tested on each piece of

24   equipment when you were promoted to Operator II,

25   were you?

Page 111

1    A.    I was trained in different types of

2  equipment, and my foreman put me in for Operator

3  II.  The foreman of the Cody shop was the first

4  one that I am aware of, so the foreman decides.

5    Q.    You weren't tested when you were placed

6  into the position of Operator II, were you?

7    A.    I was tested in my ability to run the

8  equipment my foreman asked me to run.

9    Q.    So you underwent a formal testing

10  procedure?

11    A.    I was trained in the pieces of

12  equipment.  My boss decided.

13    Q.    Your foreman watched you perform and

14  made a decision as to your skill level, correct?

15    A.    Correct.

16    Q.    Is that the job that Paco has in regards

17  to operators in the Powell shop?

18    A.    Yes.

19    Q.    So it is his judgment as to whether

20  somebody can be an Operator II or an Operator

21  III?

22    A.    Yes.

23    Q.    I talked to you about your pay as an

24  employee of Park County Road & Bridge.  Would

25  you agree with me that there were approximately

Page 112

1    three to four years where no pay raises were

2    given to any employees?

3    A.    Yes.

4    Q.    So of your eight years of employment,

5    there were approximately three to four years of

6    those eight years where nobody received a raise.

7    A.    I don't know for sure.

8    Q.    Well, you just testified that you would

9    agree that nobody received a raise in three or

10   four years.

11   A.    Okay.

12   Q.    That would have been while you were

13   employed, correct?

14   A.    Yes.

15   Q.    So there would have been three or

16   four years of your employment where not only

17   you, but nobody else in Park County received a

18   raise.

19   A.    All I know -- all I can say is about me.

20   I know that, yes.

21   Q.    Well, I am asking you what your personal

22   knowledge is in regards to other employees in

23   Park County.  Do you have any knowledge?

24   A.    I have some knowledge, but not intimate

25   knowledge, no.

Page 113

1     Q.     So is that statement wrong that there is

2    three or four years since you had been employed

3    where nobody received a raise?

4     A.     It could be wrong.  All I can tell is

5    what I have made or not made.

6     Q.     So we'd have to rely upon the

7    documentation from Park County.

8     A.     Yes.

9     Q.     And Brian Edwards' testimony, correct?

10    A.     Yes, and the newspaper listing.

11    Q.     And if that information shows no raises

12    in that three to four years, you're not going to

13    show up at trial and testify differently.

14    A.     No.

15    Q.     Have you received all cost of living

16    adjustments that have been given by Park County

17    since your initial date of employment?

18    A.     Yes.

19    Q.     Would you agree with me that when

20    certain COLA adjustments are paid, or increases

21    are paid, it can actually change steps for an

22    individual's pay grade?

23    A.     I don't know.

24    Q.     We'd have to rely upon our county and

25    Brian Edwards, correct?

Page 114

1    A.    Correct.

2    Q.    Do you have an understanding as to

3    whether or not anyone in Park County received a

4    merit increase in 2020?

5    A.    I am not sure.  I don't know.

6    Q.    Are you aware of any male operators that

7    are getting paid less than you?

8    A.    Yes.

9    Q.    Who are those?

10   A.    Greg Torczon is the only one that I am

11   aware of at this time.

12   Q.    Are you aware of any operators in the

13   Cody shop that are getting paid less than you?

14   A.    That's the one I mentioned, Greg

15   Torczon.

16   Q.    Any others?

17   A.    I don't know.

18   Q.    Are you aware of any operators, Operator

19   IIIs that are getting paid the same amount as

20   you?

21   A.    No.

22   Q.    Can that happen?  Can an Operator III

23   actually receive equal or lower pay than an

24   Operator II?

25   A.    I don't know.

1    Q.    Are there any other comparators that --

2    those are the only two that are listed in your

3    complaint, Tim Morrison and Kenny Marchant.  Are

4    there any other comparators that you are going

5    to present to the court that are getting paid

6    differently because they're male?

7          MR. KELLER:  Objection, speculation.

8    BY MR. THOMPSON:

9    Q.    Personal knowledge, whatever you know.

10   A.    Not at this time.

11   Q.    Did you look at what male and female

12   employees of Park County are getting paid in any

13   other department other than Road & Bridge?

14   A.    No.

15   Q.    Paragraph 16 of your complaint alleges

16   that the Public Works Department in Cody,

17   Wyoming trained you to drive, and it lists

18   various pieces of equipment.  Is there any

19   record within Park County that I can refer to

20   that indicates the number of hours that you have

21   had on each piece of equipment?

22   A.    That would be in the office.  You would

23   have to get that from probably Brian Edwards.

24   He can get it from Trapper Marsh.  I think that

25   our computer programs should mark how many hours

Page 116

1  you spend in equipment.

2    Q.    So if you go to work tomorrow and you

3  spend two hours in a dump truck and three hours

4  on a road grader, how do you note that for

5  purposes of recordkeeping?

6    A.    We have tablets now.  We used to do it

7  by paper, but we have tablets where we put down

8  the date, who we are, where we were, what

9  location we were at, what the job code is, how

10  many hours we were at that job, what we were

11  doing, whether we were hauling material, pushing

12  out equipment, loading material, hauling

13  equipment, snowplowing, et cetera, et cetera,

14  and then we have the equipment used and how many

15  hours in each piece of equipment, and then we

16  also have if we were hauling material or

17  whatever we have another box for the inventory

18  used.  That is our newer system.

19    Q.    I am going to have you just verify for

20  me, I believe it is deposition Exhibit 8, the

21  job descriptions for Equipment Operator I, II,

22  and III.  Those were kind of the job

23  descriptions that you've -- the job descriptions

24  for Equipment Operator I, II, and III since you

25  have been employed with Park County.

1    A.    Operator I, yes, all of the above.

2  Everything but the chip spreader on Operator II.

3    Q.    What do you mean, "everything but the

4  chip spreader"?

5    A.    I have run every piece of equipment on

6  Operator II except for the chip spreader.

7    Q.    I am just asking you, Ma'am, whether or

8  not these are the job descriptions for Equipment

9  Operator I, II, and III?

10    A.    Yes.

11    Q.    They have been the job descriptions

12  since your initial date of hire, correct?

13    A.    I believe so.

14    Q.    Do you see at the top where it says

15  "effective date"?

16    A.    Yes.

17    Q.    Have you -- are you aware of any other

18  job descriptions that you have reviewed for

19  Equipment Operator I, II, or III?

20    A.    This is the first time I have gotten to

21  see these descriptions.  I have asked my

22  foreman, my current foreman for the description

23  of Operator II, and I haven't received that.

24  This is the first I have seen all three of these

25  besides the one they have put in the newspaper.

1    Q.    When you say you "have been asking for

2    these," when is the first time you asked for

3    these?

4    A.    First time I asked for this was June of

5    2018, when I transferred over to the Powell shop

6    and Dale Hobby said he was retiring.

7    Q.    Okay.  And who did you ask?

8    A.    Delray Jones.

9    Q.    Was that the only time in 2018 that you

10   have asked him for these?

11   A.    No, he said he would keep looking for

12   it.  Then I spoke with Ron Nieters in the Cody

13   shop, and he wasn't sure that he could get that

14   for me, and then I -- finally, Ron Nieters gave

15   me the Operator II description in 2020.

16   Q.    So Paco did not deny you access to the

17   job description.  He just said he would see if

18   he could find it.

19   A.    Paco brought me a piece of paper that

20   was cut out of a long piece of paper.  It had

21   two sentences on it.  That's all he ever brought

22   me.

23   Q.    So again, the question is, Paco didn't

24   deny you these job descriptions.  He just said

25   he would see if he could find them.

Page 119

1    A.    He said he would get back with me, yes.

2    Q.    Thank you.  You made a comment earlier

3    that this is not about males being paid more

4    than females, this is about the good old boy

5    network; do you recall that?

6    A.    Yes.

7    Q.    So your complaint isn't that males are

8    being paid more than females, your complaint is

9    that people are being put in positions

10   regardless of male or female because of the good

11   old boy network.

12   A.    Can you repeat that please, that was

13   super long.

14   Q.    I don't think it was, but I will do

15   whatever I can do to make sure you understand.

16         (Question read by the court reporter.)

17         THE WITNESS:  No.

18   BY MR. THOMPSON:

19   Q.    Isn't that what you testified to

20   earlier?

21   A.    No.

22   Q.    Okay.  What did you mean when you said,

23   "This is not about being male or female.  This

24   is about the good ole boy network"?

25   A.    We were discussing them hiring Operators

1    II or III just by them saying, I have 15 years.

2    I have 20 years.  And what I mean is they didn't

3    check the skills.  The skills have to be

4    checked.  I don't know how to state it.  My

5    skills have to be checked before I get put in

6    for a raise.  I don't know if they did a job

7    check with their previous employers to find out

8    if, yeah, they really did, or if they saw the

9    quality of work these people did with whatever

10   equipment.  Some of these guys have been hired

11   because they're friends of guys in the office.

12   That's what I mean.

13     Q.    Is that part of your lawsuit?

14     A.    I don't know.  Can I take a break?

15     Q.    There is a question pending.  Have you

16   answered that question?

17         MR. KELLER:  I believe she did.  She

18   said, I don't know.

19   BY MR. THOMPSON:

20     Q.    Is that your answer, Ma'am?

21     A.    Yes, I don't know.

22         MR. THOMPSON:  We can go ahead and take

23   five minutes.

24         (A recess was taken from 1:38 p.m. until

25   1:47 p.m.)

Page 121

1    BY MR. THOMPSON:

2        Q.    Ma'am, you understand you are still

3    under oath?

4        A.    Yes, sir.

5        Q.    All right.  Before we took a break, you

6    had provided some testimony about individuals

7    being hired in under the good ole boy system.

8    What do you mean by that?

9        A.    Good ole boy system doesn't include

10   females, but what we're here for is I am not

11   getting the opportunity so I can move ahead.

12   Paco will not allow that, just like he wouldn't

13   allow it with Cindy.  I deserve the same pay for

14   the same work.

15       Q.    What I asked you -- what the question

16   was, and I appreciate the commentary, but the

17   question is, what is the good ole boy network?

18       A.    It is something that doesn't include the

19   good ole girls.

20       Q.    What do you mean by "being hired in

21   under the good ole boy network"?

22       A.    Friends of people in the office.

23       Q.    Who do you believe has been hired in

24   under the good ole boy network?

25       A.    There are several people.

Page 122

1    Q.    Give me names.

2    A.    Tim and Kenny.

3    Q.    So is it your testimony -- I am sorry,

4    are you done, Tim and Kenny?

5    A.    There may be more.  I just don't know

6    right now.

7    Q.    Is it your testimony that Tim Morrison

8    knew somebody in Park County -- Park County Road

9    & Bridge that he was hired in without going

10   through any formal hiring process?

11   A.    No.  He knew somebody in Park County.  I

12   don't know what his hiring process was.

13   Q.    Who did he know?

14   A.    Trapper Marsh and Ben McDonald.

15   Q.    Did Trapper Marsh and Ben McDonald have

16   anything to do with hiring?

17   A.    I don't know.

18   Q.    Well, what is the basis for your

19   statement under oath that he was hired in

20   because he knew those two individuals?

21   A.    I don't know at this time.

22   Q.    Kenny Marchant, who did he know that got

23   him a job at Park County without having to go

24   through an application process?

25   A.    Neither of them did not have to go

Page 123

1   through the application process.  Both of them

2   were friends with or their families were friends

3   with people in the office.

4      Q.    You talked about Tim Morrison, and let

5   me understand what you're saying.  Your

6   testimony is neither of them had to fill out an

7   application?

8      A.    No.  They did have to fill out

9   applications.  They were hired at a higher rate

10  because of their friendships in the office.

11     Q.    They were hired at a higher rate because

12  of their friendships in the office versus their

13  skill level.

14     A.    I believe, yes.

15     Q.    What is the factual basis for that

16  testimony that you've provided under oath?

17     A.    I have seen them operate equipment.

18     Q.    Okay.  Who in the office got them hired?

19  You talked about Tim Morrison.  Who in the

20  office was a friend of Kenny Marchant that --

21  let me finish -- that got him hired by Park

22  County Road & Bridge?

23     A.    Brian Edwards.

24     Q.    And you know this how?

25     A.    Because Brian Edwards told me that he

Page 124

1   was great friends with Kenny's family.  They
2   were family friends.
3      Q.     Anything else?
4      A.     No.
5      Q.     A lot of people in Park County know each
6   other, correct?
7      A.     Correct.
8      Q.     You, in fact, if one was to look at your
9   application, or your initial hiring, one would
10  think you came in under the good ole boy
11  network, correct?
12     A.     No.
13     Q.     Well, Ron Nieters was a friend of yours.
14  He frequented the bar that you worked at,
15  correct?
16     A.     No, he was an acquaintance of mine.
17     Q.     Who frequented the bar that you worked
18  at?
19     A.     No, sir.  That was the first time I had
20  seen him in six years that I had worked there.
21     Q.     So he was a high school friend?
22     A.     I knew of him in high school because he
23  was a jock.
24     Q.     You didn't have to fill out an
25  application, correct?

Page 125

1    A.    I did.

2    Q.    You didn't have to be interviewed by

3  Park County?

4    A.    Not for a flagger job.

5    Q.    You don't know if there was anybody else

6  that was notified of that opportunity to apply

7  for an Operator I, correct?

8    A.    Correct.

9    Q.    You don't know if Ron Nieters just

10  simply said, Give me an application and I will

11  get you hired?

12    A.    I went in to the office and filled out

13  an application.

14    Q.    Okay.  That is the formality of your

15  hiring, correct?

16    A.    Correct.

17    Q.    So you'd agree with me that Tim Morrison

18  and Kenny Marchant actually went through a more

19  rigorous hiring process when they applied for

20  their position with Park County.

21    A.    I don't know.

22    Q.    You don't know either way.

23    A.    I don't know.

24    Q.    You don't know either way, correct?

25    A.    I don't know.

1    Q.    You don't know what they did or didn't

2    do in regards to the hiring process.

3    A.    Correct.

4    Q.    You don't know what they were qualified

5    on, what they indicated in their application for

6    employment with Park County, correct?

7    A.    Correct.

8    Q.    Let's look at the next document,

9    deposition exhibit, I believe we are on 9, which

10   is the charge of discrimination.

11            (Exhibit 9 was marked for

12   identification.)

13   A.    Okay.

14   Q.    If you look under the discrimination

15   statement, there is a number of paragraphs

16   there.  No. 2 states, "I was subject to

17   gender-based harassment and intimidation."

18            Can you tell me all facts which support

19   that statement?

20   A.    When I worked at the Cody shop, my

21   coworker, James Flowers, at the time came up to

22   me and told me that -- I had asked him what time

23   we were supposed to come in to plow, and he told

24   me I wasn't going to be called in to plow

25   because Gator said, I won't call her in ever.

1   She shouldn't be in equipment and because she is

2   a female, or something to that effect.  And I

3   walked in.  I have been called a female.  I have

4   been called a bitch and a cunt, and the token

5   female.  I have been called the office bitch.  I

6   have been told I shouldn't be in equipment

7   because I am a woman.  I have been told -- ask

8   Cindy what it is to be a woman working a man's

9   job.

10      Q.    I want to know specifics because in your

11  documentation that you submitted to the county

12  when you referenced that you have been called a

13  bitch and a cunt, you stated that you had not

14  been called that to your face; is that correct?

15      A.    I walked in and they didn't know I was

16  standing in the break room, and there were four

17  guys sitting at the table.  I was called the

18  token bitch, the token cunt -- or the token

19  bitch and I am just a cunt, so it wasn't to my

20  face, it was to other people, and then they

21  turned around and realized -- well, one of them

22  turned around and realized I was there.

23      Q.    Did you -- have you represented

24  differently to anyone at Park County that you

25  did not hear that being said, but you were told

Page 128

1   that had been said?

2    A.    I -- no, I have been told that.  I --

3   that has been said to me, or said about me from

4   different people, and I have walked in -- I

5   walked in on that one instance.

6    Q.    Did you ever tell Brian Edwards about

7   that?

8    A.    I don't recall.  I believe I did in my

9   first discussion with him.

10    Q.    Do you have any other specific dates as

11   to the what other -- being called the other

12   names, and who said it, and where they said it,

13   the specifics of each?

14    A.    I don't know.  It could be in my

15   documents.  I don't remember.

16    Q.    So if it is not in the documents that

17   you have, and you have not provided all those to

18   your attorney, correct?

19    A.    I have provided most all of it, yeah,

20   but not like some of my journals.

21    Q.    If it is not in the documents you have,

22   then you have no specific recollection as to who

23   said what, or when it was said, or what was

24   said?

25    A.    I may have that in my journals.  I don't

1    know.

2    Q.    My question is, Ma'am, if it is not in

3    your journals, what is your testimony as to who

4    said it, when they said it, and what was said?

5    A.    They would be part of my -- the people

6    who said -- who told me would be part of my

7    witness list.  The people who witnessed it or

8    were around them or were told, I guess.

9    Q.    Let's break this down.  Let's start with

10   your personal knowledge of anyone using that

11   language in front of you.  Did that ever occur?

12   A.    Yes.

13   Q.    When did it occur?

14   A.    Shortly after I became full-time.

15   Q.    When you were working at the Cody shop?

16   A.    Yes, sir.

17   Q.    What year was it?

18   A.    2016.

19   Q.    You didn't start until November of 2016,

20   correct?

21   A.    Right.

22   Q.    Full-time?  So it was after November 7th

23   of 2016?

24   A.    Yes, it was December.

25   Q.    Who said it?

Page 130

1    A.    James Flowers told me that Gator said.

2    Q.    We're getting off track again.  I am

3  asking you about --

4    A.    When I heard it?

5    Q.    -- statements that were made in front of

6  you.

7    A.    I don't know the exact dates.  I would

8  have to look in my calendars and at my

9  paperwork.

10    Q.    Well, what was said to you?  And who

11  said it?  You would remember that, wouldn't you?

12    A.    Gator.  Tom Hiltz told me I didn't

13  belong in equipment, and he would jerk me out of

14  it.  He called when I walked into the office and

15  they were sitting at the break table, he was --

16  said I was the token bitch and/or the token

17  female and just something about bitch.  I don't

18  know, and he turned around and I just -- I

19  walked out.  Weasel or Jim Cover was there,

20  Johnny Zierke, Tom Hiltz and I believe Lewis Ash

21  were there sitting at the break table when he

22  told me he was going to jerk me out of my truck.

23  That was just him and I.  That's all I can

24  remember right now.

25    Q.    In regards to him saying you didn't

Page 131

1    belong in equipment, could that have been a

2    statement of your inability to operate that

3    equipment?

4        A.    No, sir.

5        Q.    How do you know?

6        A.    Because I was doing the same job as

7    everyone else.

8        Q.    In 2016, you were brand new without any

9    experience, correct?

10       A.    I had been driving since September or

11   August of that year because I had gone and

12   gotten my CDL permit.  I had been driving with

13   the county in the end dumps -- in the belly

14   dumps loading trucks, doing different things

15   before I got my CDL.

16       Q.    Is it fair to say you don't know what he

17   meant?

18       A.    No, it is not fair to say that.

19       Q.    How do you -- how are you able to read

20   in his mind as to why he would yank you out of

21   the equipment?

22       A.    Because of his treatment of me up to

23   that point.

24       Q.    If this treatment occurred as you

25   alleged, why didn't you file or follow the

Page 132

1   county's EEO policy and make a complaint to

2   someone?

3      A.    Because Brian Edwards -- I went to him

4   first, as it was my -- one of my heads or one of

5   my supervisors, so I went to his supervisor and

6   I talked to Brian Edwards, and he never said,

7   oh, I think this is something Bryan -- you need

8   to take to Bryan Skoric.  I thought my boss,

9   Brian Edwards, could fix it or look into it.

10     Q.    When did you go to Brian Edwards and

11  complain about this language that Gator had

12  used?

13     A.    I went on several different occasions in

14  2017 and 2018 and 2019 and 2020.  Two of

15  those -- at least two of those times were about

16  Gator, maybe three of those times.

17     Q.    And this is documented in your diary or

18  calendar?

19     A.    Yes.

20     Q.    And have you provided that to your

21  attorney?

22     A.    Yes.

23     Q.    If I were looking for that entry in the

24  diary or calendar, where would I look?

25     A.    August of -- I don't know.  I don't

1    know, you would have to look through.  I don't

2    have the dates right in front of each time I

3    went through that.

4        Q.    What is the entry on the diary or

5    calendar?

6        A.    I don't have it right in front of me.

7        Q.    Would you like to take a moment to look

8    at them?

9        A.    Yes.

10       Q.    At least the ones that you provided to

11   us?

12       A.    Sure.

13       Q.    Do you have those there with you?

14             MR. THOMPSON:  Counsel, can we go off

15   the record for a minute?

16             MR. KELLER:  Yes.

17             (There was a brief discussion off the

18   record.)

19   BY MR. THOMPSON:

20       Q.    Ma'am, before we went off the record, I

21   asked you to review calendars that may include

22   or note you going to Brian Edwards as you

23   testified to earlier concerning comments made by

24   Gator, and in front of you should be now Park

25   County 1874 to Park County 1901.  I'd ask you to

Page 134

1    take a minute to review those diary entries and

2    calendar entries, and refer me to where you went

3    to Brian.

4       A.    February 14th was one of them.

5    MR. THOMPSON:

6       Q.    2018?

7       A.    2020.

8       Q.    Do you know what the bates number on

9    that is?  Is that 1890?

10      A.    Yes, April 26, 2019, that's bates number

11   1892.

12      Q.    Is that the entry for April 26th?

13      A.    Yes.

14            January 17, 2018.

15      Q.    What is the bates number?

16      A.    1897. That's all I can see in these.

17      Q.    In the entry of January 20th, Park

18   County 1899, that's an entry for Sunday,

19   correct?

20      A.    No.  You can see the arrow.  No.  See

21   the arrow next to it?  It points to the 17th,

22   and it says "Brian knows," and "Ron is back."

23   If I didn't have enough room, I would draw an

24   arrow usually on these.  So Saturday and Sunday

25   were just taken up by generally whatever day.

1    Since we don't work usually Fridays, Saturdays

2    and Sundays, my stuff would end up on Friday

3    Saturday or Sunday with an arrow going to the

4    date.

5        Q.    Did you make any of these entries after

6    the fact; in other words, did you go back when

7    this lawsuit started and make any entries into

8    either these calendars or diaries?

9        A.    No.

10       Q.    Do you have the originals of all of

11   these documents?

12       A.    I do.  I think, yeah.

13       Q.    Are there any calendars or diaries -- as

14   you look through this exhibit, are there any

15   calendars or diaries that have not been

16   produced?

17       A.    There is my small 2022 little pocket

18   calendar, but -- and this -- I don't think the

19   2016 is in here, but -- and the 2023 is not in

20   there.

21       Q.    Well, even the calendars that you have

22   provided, not all of the pages on the calendar

23   are copied; would you agree?

24       A.    I would agree.

25       Q.    That's not because those pages are

Page 136

1    removed.  It's simply because you have the

2    originals, but the other pages were not copied

3    and produced?

4    A.    Correct.

5    Q.    Did you ever talk to the shop foreman in

6    Cody in regards to the language that you believe

7    was being used?

8    A.    Yes.

9    Q.    Who was that shop foreman when you

10   started?

11   A.    Ron Nieters.

12   Q.    What did you talk to Mr. Nieters about?

13   A.    About Gator, how he was talking, any of

14   the other derogatory comments from others, what

15   I had been told by Gator or by other people,

16   basically what was going on.

17   Q.    Did you put any of that in writing when

18   you talked to Ron Nieters?

19   A.    Just occasionally.

20   Q.    Is there anything on your calendars that

21   indicate when you talked to Ron Nieters?

22   A.    Yes.

23   Q.    Where would I look at that and see that?

24   A.    I don't know which pages for sure.  I

25   would have to go through and tell you that.

Page 137

1    Q.    Well, I could look for it, but your

2    testimony is you documented your conversations

3    with Ron Nieters complaining of the language

4    being used.

5    A.    Telling him, yeah, the language being

6    used and him asking me direct questions.

7    Q.    How many times would you say that there

8    was inappropriate language used in the

9    workplace; less than six?

10    A.    Probably 6 to 10.

11    Q.    And it is your testimony that you have

12    complained to the shop foreman or to Brian

13    Edwards about each one of those instances?

14    A.    Not about each one.

15    Q.    How many did you complain about?

16    A.    Just a few that were the worst.

17    Q.    Less than three?

18    A.    No, probably about five.

19    Q.    Have you ever used inappropriate

20    language in the workplace?

21    A.    Yes.

22    Q.    What language have you used --

23    inappropriate language in the workplace?

24    A.    Fuck and shit.

25    Q.    Fuck off?

Page 138

1    A.    Yes.

2    Q.    You told Tim Morrison to fuck off here

3   recently, didn't you?

4    A.    No, I didn't.

5    Q.    Not in February of this year?

6    A.    Not that I'm aware of.

7    Q.    Was there an incident where he talked to

8   you about pulling out in front of him on his way

9   to work?

10    A.    Yes.

11    Q.    Did that occur in February of this year?

12    A.    I don't think it was this year.

13    Q.    Did you tell him to fuck off?

14    A.    Yes.

15    Q.    In regards to "the harassment complained

16   of affected a term, condition or privilege of

17   employment and was so pervasive as to alter the

18   working conditions of employment."  That, again,

19   is limited to what you have already told me

20   about, correct?

21    A.    I don't understand.

22    Q.    The harassment that you're referring to

23   in paragraph 3 of the charge of discrimination

24   is limited to those comments that you talked to

25   me about, correct?  The inappropriate language

Page 139

1    that you either heard about or witnessed?

2    A.    Not just that, but yes.

3    Q.    What else?

4    A.    The comments of -- well, "at least she

5    got ten hours in today."  "Usually she just

6    comes and snuggles with Ron."  And, "Oh, aren't

7    you going to do anything today?"  Or, "Are you

8    just going to stay here and remain the office

9    bitch"?  Things like that.  I just -- the

10    harassment was basically about me, not -- I

11    don't know, not working with them and they were

12    making it harder for me.  A lot of them said,

13    No, I don't want to train her.  I don't want to

14    train her.  And then some of them said, yeah,

15    I'll train her, and then -- I don't know, but

16    they -- there were a lot of things said that.

17    Q.    Well, that's what I am here to find out.

18    Two comments about staying there and snuggling

19    with Ron.  Who made that comment?

20    A.    There was a whole batch of guys there.

21    I believe it was Chip Ash and Tom Hiltz was

22    there, Travis Ball was there, John Klein, Paul

23    Luthy.  I don't know.  That is also in my

24    calendar somewhere.

25    Q.    Chip Ash made the comment?

Page 140

1    A.    Yes.

2    Q.    Who made the comment about being the

3  office bitch?

4    A.    Oh, everybody.  I had been called that

5  several times by several different people.

6    Q.    Was that to your face?

7    A.    Yes.  Billy Sandoval, Jim Cover, John

8  Klein, sometimes it was in jest, other times it

9  was -- there was several people.  That was the

10  running joke.

11    Q.    All of those individuals worked at the

12  Cody shop, correct?

13    A.    Yes, sir.

14    Q.    Have there been any derogatory comments

15  made to your face at the Powell shop?

16    A.    I have to look through my notes again.

17    Q.    Without looking at your notes, can you

18  recall any derogatory comments made while

19  working at the Powell shop?

20    A.    No.  I can't right now, no.

21    Q.    Why did you leave the Cody shop?

22    A.    Because Ron was taking a lot of

23  vacations.  When he went on vacation, instead of

24  putting me in the truck and the trucks or the

25  equipment, Gator would say, you're no longer

1  needed.  He would make sure that I wasn't doing

2  what -- he was second in command in the Cody

3  shop.  Tom Hiltz was.  And Ron would come back

4  and say, did Gator put you in the truck?  You

5  were supposed to water the chips in the morning,

6  go out in the truck in the afternoon.  You were

7  supposed to do this today.  Did he do that?  And

8  I'd say, no, he had me water chips and he'd tell

9  me you're no longer needed.  Go sit in the

10  office.  That happened during our chip seal

11  season for quite some time.  I felt like I

12  wanted to be working because I loved my job and

13  what I do, and I wasn't being allowed to work,

14  whether it is because the boss was gone a lot or

15  put the second in charge, in charge, or

16  whatever, I don't know.  So I transferred over

17  there for that reason and my -- I had started

18  remodelling a house for my dad over in Powell so

19  I -- it was just a better way to do things.

20     Q.    Were you living in Powell at the time

21  that you transferred to Powell?

22     A.    Yes.

23     Q.    Did you have personality conflicts with

24  any of the coworkers at the Cody shop?

25     A.    Just Gator mostly.

Page 142

1    Q.    Nobody else?

2    A.    Not really.

3    Q.    Did you complain of anyone else to Ron

4    Nieters?

5    A.    Probably John Klein, but that's really

6    it, I think.

7    Q.    Paragraph 5 of your charge of

8    discrimination states that "I was qualified

9    applicant -- I was a qualified applicant for a

10    promotion."  What are you referring to?

11    A.    That was for the Operator II position

12    that opened up in Powell.

13    Q.    When did that position open up in

14    Powell, the position you're referring to?

15    A.    Right before I transferred, which would

16    have been, I want to say, June of 2018.

17    Q.    So you had less than two years

18    experience when you transferred, correct?

19    A.    Yes, I had about two years experience.

20    Q.    Well, you were hired in November of

21    2016, right?

22    A.    Yes, and while I was a flagger --

23    Q.    Ma'am, let my -- your attorney will get

24    to ask questions.

25    A.    Perfect.

Page 143

1    Q.    I am trying to nail down when you were

2    transferred and how much experience you had.  If

3    you started in November of 2016, and the job

4    came up in June of 2018, by my calculations, you

5    had less than two years experience.

6    A.    Okay.

7    Q.    Correct?

8    A.    Correct.

9    Q.    Just over a year-and-a-half?

10   A.    Yes.

11   Q.    So you didn't meet the minimum

12   qualifications for Operator II, did you?

13   A.    Yes, I did.  No, I did not.

14   Q.    Are there any other jobs that you have

15   applied for -- well, let me ask you this.  Did

16   you apply for that Operator II position?

17   A.    I had asked Delray, I had told him,

18   okay.  First Dale Hobby, yes, I applied for that

19   position with Dale Hobby.  Then I asked Delray

20   also, what it would take to move up to Operator

21   II.

22   Q.    Foreman at Powell at the time you

23   transferred over?

24   A.    Yes, sir.

25   Q.    When you say you applied for that

Page 144

1   position, did you make a written application for

2   that position?

3     A.    No, I went and spoke with Dale Hobby.

4     Q.    Are there any other positions that you

5   applied for that you believe that you did not

6   get promoted to in existing vacancy?

7     A.    No.

8     Q.    Who was hired for that position?

9     A.    I believe no one was hired for that

10  position.  I believe they had to put me on as

11  just a driver, and he kept me on anyway.

12    Q.    So nobody?

13    A.    Nobody was hired until Tim.

14    Q.    When was Tim hired?

15    A.    I don't know.

16    Q.    So the position that you claim that you

17  did not get promoted to, nobody, in fact, was

18  hired for that position.  It remained vacant.

19    A.    Correct.

20    Q.    Paragraph 7, where it says, "The

21  employer continued to seek further applicants,

22  or the position was filled with someone outside

23  my protected work group," that was the hiring of

24  Tim Morrison.

25    A.    I believe it might have been.  I'm not

Page 145

1  sure.  Labor department gentleman filled this

2  out, sir, I just marked certain boxes.  He

3  filled it out.

4      Q.    Do you see under the bottom of page 2,

5  the charge of discrimination signatures there?

6      A.    Yep.

7      Q.    It states, "I want this charge filed

8  with both the EEOC and the State or local

9  Agency."  Do you see that?

10     A.    Yes.

11     Q.    Above your signature between that and

12  your signature, it says, "I declare under

13  penalty of perjury that the above is true and

14  correct."

15     A.    Yes.

16     Q.    And so I am fine --

17     A.    I took -- it is hard for me to go back

18  to this date and remember what this is about.

19  He put it in there.  I agreed over the phone.

20     Q.    So these allegations are not your

21  allegations?

22     A.    They are.  He just reworded things, so I

23  don't know -- pardon me.  I don't know who got

24  the job for number seven.  It was more than

25  likely Tim.

Page 146

1    Q.    Let's go to next exhibit number.

2          MS. OATSVALL:  Tom, did you want me to

3    screen share?

4          MR. THOMPSON:  Yes, please, on the next

5    one.  Really after this 9 or 10.

6          (Exhibit 10 was marked for

7    identification.)

8    BY MR. THOMPSON:

9    Q.    Do you see what is being displayed on

10   the screen now, Ma'am, as exhibit Deposition

11   Exhibit 10?

12   A.    Yes, sir.

13   Q.    Do you recognize this document?

14   A.    Yes.

15   Q.    How do you recognize it?

16   A.    It is -- I went on the FMLA plan when I

17   had to have a surgery.

18   Q.    Okay.  Is this letter what was provided

19   to you by the Park County clerk when you went on

20   the FMLA plan?

21   A.    Yes, sir.

22   Q.    Did you understand that this letter was

23   providing you notification of your right,

24   et cetera, FMLA?

25   A.    Yes.

Page 147

```
 1    Q.    Did the county grant you FMLA?

 2    A.    They did.

 3    Q.    Do you have any complaints in regards to

 4    the FMLA that was granted to you by the county?

 5    A.    No.

 6    Q.    Did you take FMLA more than one time?

 7    A.    Yes, I did.

 8    Q.    Did you use sick time for your FMLA

 9    leave -- excuse me, as part of your FMLA leave?

10    A.    No.  I used my sick and my vacation time

11    before I was allowed to use my FMLA time.

12    Q.    Appreciate that.  Did some other

13    employees of Park County Road & Bridge donate

14    sick time to you?

15    A.    Yes, sir, they did.

16    Q.    Ma'am, I am going to ask you now

17    about --

18          MR. THOMPSON:  We can drop that

19    Exhibit 10, and MaryBeth, if you could pick up

20    and share Park County 4 through 7.

21          (Exhibit 10 was marked for

22    identification.)

23    BY MR. THOMPSON:

24    Q.    Ma'am, have there been incidents that

25    you have been involved with while employed by
```

Page 148

1    Park County that has resulted in the damage of

2    equipment?

3      A.    Yes.

4      Q.    How many incidents?

5      A.    Maybe four.

6      Q.    I count five, but we can talk about them

7    individually.

8      A.    Perfect.

9      Q.    This would be -- I am not going to mark

10   it as an exhibit, but it is Park County 4

11   through 7.

12          Was there an incident that occurred on

13   June 23, 2020, resulting in damage to a tire on

14   a John Deere motor tractor?

15     A.    Yes, sir.

16     Q.    Displayed on the screen is Park County

17   004.  Have you had a chance to review that?

18     A.    I have.

19     Q.    Do you disagree with any of that?

20     A.    Yes.

21     Q.    What do you disagree with?

22     A.    It wasn't 214 feet.  I ran over a T

23   post.  He didn't -- he came up and I was taking

24   pictures for my documentation, and -- but I

25   don't know when he said, How far did you drive

Page 149

1  it?  And I said, Not that far.  And he said, It

2  looks pretty far to me.

3     Q.    Did you measure the distance?

4     A.    No, I did not.

5     Q.    When you say, "he," who are you

6  referring to?

7     A.    Delray.  The one who wrote the letter.

8     Q.    Do you know if Delray measured the

9  distance?

10    A.    He measured the distance, I guess, he

11 thought it was.

12    Q.    Do you have any testimony that would

13 dispute the cost of that rim?

14    A.    No, sir.  I think that is the cost of

15 the tire, isn't it?

16    Q.    There is both tire and rim there, I

17 believe.  They are C and B John Deere?

18    A.    I see.

19    Q.    Did you have a radio on in the cab of

20 the John Deere tractor?

21    A.    Yes, I did.

22    Q.    When I say "radio," I am talking about

23 AM or FM radio.

24    A.    Oh, no, sir.  There is one in there, but

25 I was not listening to the radio.

Page 150

1    Q.    Let's go to Park County 008 through 11

2    on the screen displayed is Park County 008,

3    color photo of a plow blade.  Do you see that?

4    A.    Yes, sir.

5    Q.    Are you familiar with this photograph?

6    A.    Yes, sir.

7    Q.    How are you familiar with it?

8    A.    It came up when my lawyer was showing me

9    the pictures, but I know what plow that is.

10   Q.    What plow is that?

11   A.    That was on DT 26.

12   Q.    Was that a plow that you operated?

13   A.    Yes, sir.

14   Q.    Did this damage occur when you were

15   operating the plow?

16   A.    Yes, sir.

17   Q.    When did this occur; do you recall the

18   month and year?

19   A.    I do not.

20   Q.    How did the equipment get damaged?

21   A.    I hit a manhole cover.

22   Q.    What did you do after you hit the

23   manhole cover?

24   A.    I brought the truck into the shop.

25   Q.    Did you call Paco and tell him what

Page 151

1  happened?

2      A.    No, I didn't.  I just brought it into

3  the shop.

4      Q.    You mentioned in letters that you

5  submitted to the Park County engineer you've

6  referenced a chain of command.  Do you recognize

7  that there is a chain of command within Park

8  County?

9      A.    Yes, there is.

10     Q.    Do you recognize that there is a chain

11 of command within Park County Road & Bridge?

12     A.    Yes, there is.

13     Q.    Is there a chain of command within Park

14 County Powell shop for Road & Bridge?

15     A.    Yes.

16     Q.    Is Paco your supervisor?

17     A.    Yes.

18     Q.    Do you believe it's appropriate to

19 notify Paco of any accidents that occur while

20 operating Park County equipment?

21     A.    Yes, I do.

22     Q.    Why didn't you call him and notify him

23 of this?

24     A.    Because he would have said, Bring it

25 back in and let me see.  I couldn't plow anymore

1  with that.  I was more of a danger blocking the

2  road so I went in and showed it to him.

3    Q.    As an employee of Park County, you

4  communicate with other employees both via cell

5  phone and via radio, correct?

6    A.    Yes, occasionally, yes.

7    Q.    But you will not take any calls from

8  Paco on your cell phone.

9    A.    Not any longer, I will not.

10    Q.    Is that permissible?

11    A.    Except for when we are on call, yes, it

12  is.

13    Q.    Will you take calls for other Park

14  County employees?

15    A.    No, sir.  Usually we don't talk on the

16  phone during the day.

17    Q.    So your testimony is since this lawsuit

18  has been filed that you have not talked to other

19  Park County employees via cell phone?

20    A.    On the job, not unless they have called

21  me and said, Are you at the shop?  Can you grab

22  me this?  Are you wherever?

23    Q.    What is your cell phone number?

24    A.    307-250-5392.

25    Q.    Who is your carrier?

Page 153

```
 1    A.    Straight Talk Verizon.

 2    Q.    Let's display Park County 12.

 3          Do you recognize these photos?

 4    A.    Yes, I do.

 5    Q.    What are these photos of?

 6    A.    That is a battery cover for my batteries

 7   on my T18, the Peterbilt.

 8    Q.    Is that what a normal battery cover

 9   looks like?

10    A.    No, sir.

11    Q.    Is this battery cover damaged?

12    A.    Yes, it is.

13    Q.    Who damaged this battery cover?

14    A.    I ran over that battery cover.

15    Q.    How did you run over it?

16    A.    The alternator was dying in my truck --

17   in the truck.  The truck was poked out into the

18   road.  I ran to the driver's side of the truck.

19   I ran around from the passenger side, jumped in

20   the truck to move it out of the road in case it

21   was going to be dead for days.  I had the

22   battery cover leaned up against the bottom of

23   the battery box, and I just backed up over it.

24    Q.    So you took the battery cover off the

25   battery?
```

Page 154

1    A.    Yes.

2    Q.    And you ran over the battery cover?

3    A.    Yes, sir.

4    Q.    Do you know the previous exhibit that

5    was up in regards to the blade on the snowplow;

6    do you know how much it cost to replace that

7    blade?

8    A.    No, I don't.

9    Q.    In regards to the battery cover, do you

10    know what the costs were to get a new battery

11    cover?

12    A.    We didn't.  We beat it out, and it's on

13    my truck now, but no, I don't.

14    Q.    Let's go to Park County 13 through 17.

15    Do you recognize photographs of this tire?

16    A.    Yes.  All of it, yes.

17    Q.    There was four tires involved in this

18    incident?

19    A.    Yes.

20    Q.    And all four of those tires were damaged

21    to the point that they needed to be replaced?

22    A.    Yes, sir.

23    Q.    Do you know what the cost was to replace

24    those tires?

25    A.    No, sir.

Page 155

1    Q.    Those tires were on a truck that you

2    were driving, correct?

3    A.    Correct.

4    Q.    And you claimed that the brakes locked

5    up on the truck.

6    A.    The back axle locked up on the truck.

7    Q.    Were you aware of an inspection after

8    the incident by a mechanic?

9    A.    Yes.  I told the mechanic to look at it.

10   Q.    Did the -- are you aware of the fact

11   that the mechanic didn't find any problems after

12   the incident?

13   A.    Yes, I am.

14   Q.    Then you were also -- so that is four

15   incidents.  You also were involved in an

16   accident with a car?

17   A.    Yeah.

18   Q.    So that would be five, correct?

19   A.    Yes.

20   Q.    What happened in regards to the accident

21   with the car?

22   A.    I had no brakes.  My brakes were froze

23   up.  My -- about 4 to 5 feet of my plow slid out

24   into the intersection.  I couldn't get stopped,

25   and a gentleman was traveling from the other

Page 156

1    road, and he couldn't get stopped.  And so he

2    lined up with my driver's side tire and ran into

3    me.

4        Q.    Was there a stop sign in the direction

5    you were traveling before the intersection?

6        A.    Yes, sir.

7        Q.    Did the other driver have the

8    right-of-way at that intersection?

9        A.    Yes, sir.

10       Q.    Is what is displayed before you the

11   incident report that you filled out for that

12   incident on January 28, 2023?

13       A.    I believe so, yes.

14           MR. KELLER:  Tom, can you scroll through

15   the whole thing.  I just want to see --

16           THE WITNESS:  Yeah, I can only see part

17   of it.  Yes.

18           MR. THOMPSON:  Can you go all the way

19   down to the bottom on that, MaryBeth?

20   BY MR. THOMPSON:

21       Q.    So it is produced by you guys.  3003, I

22   believe it was.  Do you take responsibility for

23   any of the incidents that we've discussed?

24       A.    Yes.

25       Q.    Which ones do you not take

1    responsibility for, if any?

2     A.     The tire on the tractor.  That can

3    happen to anyone with all the debris in the

4    right-of-way.  This accident, I was driving

5    another truck originally, and my truck that I

6    had been driving, the windshield wiper motor

7    went out on it.  And so Paco told me to switch

8    out with another driver.  When that other driver

9    came in, he said, Good Luck, the brakes are all

10    froze on that truck.  You won't have brakes.

11    And Paco said, Just go out and finish your

12    section, your area. So I drove the truck.  It

13    was still my responsibility.  I shouldn't have

14    been driving the truck.  I should have said, No,

15    I will wait until I have a truck with brakes.

16    Backing over the battery cover was just -- I

17    needed to have the truck out of the road.  That

18    was my responsibility.  The tires?  I don't know

19    what happened with the tires.  For the back axle

20    only to lock up, there has to be more -- there

21    has to be a problem with either air canisters or

22    the valve.  Otherwise, both axles on that

23    trailer should have locked up.  Otherwise, that

24    truck shouldn't have been on the road because

25    the brakes aren't working properly.

Page 158

1    Q.    Is that it?

2    A.    Yes.  As far as the plow, the plow edge,

3    that also can happen to anyone.  That's -- I

4    remember that morning that that plow edge was

5    getting down to whatever real thin, and I told

6    Paco, I think I need to change my edges, and he

7    said, I think you got another day or two in it,

8    drive it anyway.

9    Q.    So you also had another incident fairly

10   recently in regards to the mower deck on the

11   mower, correct?

12   A.    No.

13   Q.    Okay.  Did you damage the mower deck on

14   the mower?

15   A.    No, I did not.

16   Q.    Who damaged it?

17   A.    It is not damaged.  If you pull up the

18   pictures, I can explain it.

19        MR. THOMPSON:  I believe those are in

20   our supplemental discovery, MaryBeth.

21   BY MR. THOMPSON:

22   Q.    On the screen, the Park County 1901,

23   1902, or excuse me, 1902, 1903, photographs,

24   would you agree with me those are the mower

25   deck?

Page 159

1    A.    That is the mower deck.

2    Q.    In the foreground of the mower deck,

3    there is a portion that appears to be metal,

4    worn off, and bent up in the air.  Would you

5    agree?

6    A.    Yes.

7    Q.    Explain away.

8    A.    That piece of metal that is sticking up

9    is a skid plate.  That is a wear item.  We put

10   those on the bottom of the deck.  If you look in

11   close, you can see the bolts on where it is

12   bolted onto that L bracket at the bottom of the

13   mower deck.  I don't know if you know what I am

14   talking about.  See the bolt?

15   Q.    I do see it.

16   A.    Okay.  That is usually a three-quarter

17   inch piece of metal.  They use old cutting edges

18   off of their graders.  Instead of buying from

19   the company, we use the old cutting edges.  They

20   are three-quarters inch thick.  They add bolts

21   to them.  They bolt them onto the bottom, and

22   then they add shoes with a hard face.  They weld

23   on shoes.  You see the shoe at the left-hand

24   side of the picture?

25   Q.    I do.

1    A.    Usually both of those pieces, when

2    they're brand new, those are three-quarters inch

3    thick.    Those are wear items, they wear out.

4    The reason they put those on there is to protect

5    that deck.    What that piece of metal is that has

6    bent up is just part of that skid plate.

7    Q.    This is worn off, correct?

8    A.    No, it is not all the way warn off.    The

9    edge of it is lifted.

10    Q.    A good part of it from where it should

11    connect to the deck to where it starts to go up

12    in the air, that part is worn on this, correct?

13    A.    The skid plate is worn.    There is no

14    damage to the mower deck.    If the skid plate was

15    gone and it was damaged, that bolt would be

16    sheared off, and that would be the metal that is

17    bent up from the mower deck.

18    Q.    So is it your testimony that you are to

19    run the mower to the point where the skid plate

20    is worn away, and that that is the proper

21    operation of the mower?

22    A.    No.

23    Q.    If the skid plate is worn away, is that

24    something that you should alert your supervisor

25    about?

Page 161

1    A.    This very same day, my supervisor had

2    our shop mechanic weld shoes on that skid plate.

3    See how the shoe is about three-quarters inch

4    thick?

5    Q.    Before or after the incident?

6    A.    Before and after.

7    Q.    Did you tell your supervisor about the

8    damage to the skid plate?

9    A.    I brought it in and said, Look, I

10   screwed this one up.  It is almost gone because

11   the shoes were missing.  The shoes he had put on

12   earlier had just fallen off because I don't know

13   if the weld failed or what, but.

14   Q.    Question was, did you notify your

15   supervisor?

16   A.    Yes, he was there, yes.

17   Q.    And you said, I screwed up?

18   A.    Yes.

19   Q.    Referring to --

20   A.    I almost screwed this up.  That is what

21   I said.

22   Q.    All right.  Can we pull up Park County

23   1831?  Are these text messages that you pulled

24   off of your phone?

25   A.    Yes, sir.

Page 162

1    Q.    Are there any text messages relating to

2    the subject matter of this litigation that have

3    not been provided to your attorney?

4    A.    I don't know.

5    Q.    Why did you provide -- did you just

6    provide select text messages to your attorney?

7    A.    Only ones from Brian.  Any that were

8    communications between Park County office and

9    me, I believe.

10    Q.    So you have other text messages from

11    other co-employees?

12    A.    Some, yes.

13    Q.    Have you provided those to your

14    attorney?

15    A.    No, sir.

16    Q.    Why not?

17    A.    Because they were not really important

18    texts.  These were the things telling me what I

19    needed to do and when I needed to do them.

20    Q.    Not important as determined by whom?

21    A.    Me.

22    Q.    Can you provide those texts that you had

23    determined not to be important from any other

24    employee from Park County to your attorney?

25    A.    Sure.

Page 163

1     Q.     If you would go down to Park County

2     1842.  What does this photograph depict?

3     A.     That is Chris Carter showing Tim how to

4     lay out a road.  Tim and Chris Carter and the

5     grader.

6     Q.     Why did you -- did you take this

7     photograph?

8     A.     No, sir, I did not.

9     Q.     Do you know who took this photograph?

10    A.     Chris Cooper.

11    Q.     Okay.  Was Mr. Cooper a friend of yours

12    in the Cody shop, in the Powell shop?

13    A.     He was an acquaintance, coworker, yeah.

14    Q.     Did you socialize with Mr. Cooper?

15    A.     At the job.

16    Q.     You never socialized with him in the

17    Powell community?

18    A.     I think we went to have tea after he got

19    fired.

20    Q.     Did you ever go out with Mr. Cooper and

21    have drinks?

22    A.     We met Cindy Stewart after she retired

23    for a drink one night.

24    Q.     Did you have drinks with Mr. Cooper on

25    any other occasions?

Page 164

1    A.    No, unless a retirement party maybe.

2    Q.    Were you and Mr. Cooper ever

3    romantically involved?

4    A.    No.  He was married.

5    Q.    Mr. Cooper got divorced, correct?

6    A.    Yes, he did.

7    Q.    Why did Mr. Cooper -- do you know why

8    did he take this photo and provide it to you?

9    A.    I have no idea.  He also provided --

10   Q.    He also provided what?

11   A.    He also provided this and a couple

12   others to my attorney.

13   Q.    We have already established Mr. Cooper

14   was fired from his job at Park County Road &

15   Bridge, correct?

16   A.    Yes.

17   Q.    Mr. Cooper was going for the same job

18   that Paco applied for, shop foreman, correct?

19   A.    Correct.

20   Q.    And Paco got that job over Mr. Cooper?

21   A.    Correct.

22   Q.    Did Mr. Cooper ever encourage you to

23   record conversations of other employees at Park

24   County?

25   A.    No.

Page 165

1    Q.    Do you have any email communication with

2    Mr. Cooper?

3    A.    No.

4    Q.    Do you have any text messages between

5    you and Mr. Cooper?

6    A.    Maybe, yes.

7    Q.    And you'll provide those to your

8    attorney?

9    A.    If they are during when he still worked

10   for Park County, yes.

11   Q.    Well, I'd like you to provide all of the

12   text messages to your attorney and then

13   Mr. Keller and I can sort out whether or not

14   they should be produced.

15   A.    Okay.

16   Q.    Did Mr. Cooper ever encourage you to

17   file a lawsuit against Park County?

18   A.    No, he did not.

19   Q.    Did he ever encourage you to file a

20   charge of discrimination against Paco Jones?

21   A.    No.

22   Q.    Did you ever talk about filing a lawsuit

23   with Mr. Cooper?

24   A.    Yes.

25   Q.    What was that discussion?

Page 166

1    A.    That I was filing and could he be a --
2    give a statement.
3    Q.    So that conversation occurred before the
4    lawsuit was filed?
5    A.    Yes.  Well, after I had spoken to my
6    lawyer.
7    Q.    Again, I don't want to know about any
8    conversations you have had with your lawyer.
9    Have you gone behind other employees of Park
10    County, specifically Tim Morrison or Kenny
11    Marchant, and checked the work that they
12    performed?
13    A.    No.
14    Q.    You never have?
15    A.    Not unless we were plowing snow and we
16    went into somebody else's area and found
17    something was done or not done, but we all cover
18    each other's -- we all go through each other's
19    routes when we get done.
20    Q.    I'm not talking about helping each other
21    out.  I am talking about going and checking on
22    someone else's work as far as the quality of
23    that work?
24    A.    No.
25    Q.    You have no supervisory authority over

Page 167

1    Kenny Marchant or Tim Morrison, correct?

2    A.    Correct.

3    Q.    In regards to any photographs that you

4    have taken of co-employees, what is the purpose

5    of taking photographs of other employees on the

6    job?

7    A.    As I said before, any pictures I have of

8    other employees were just on a job site, if

9    we're doing our job and they happen to be in --

10   get in the shot, or if I had been asked by Brian

11   to get pictures of what we were doing, or

12   something that I thought was just cool, and I

13   took a picture.

14   Q.    So your testimony is you have not taken

15   any pictures for purposes of supporting your

16   claims in this lawsuit?

17   A.    No, just stuff on the job.

18   Q.    Have you asked anybody else to take

19   pictures?

20   A.    No, I have not.

21   Q.    Have you recorded anyone without their

22   knowledge since this lawsuit was filed?

23   A.    Yes, I think.

24   Q.    Has that recording been produced?

25   A.    Yes, it has.

```
 1    Q.    Who was it who are you recording?

 2    A.    Rowdi and I.

 3          MR. THOMPSON:  Counsel, I don't know if

 4    I have that.  I take that back.

 5    BY MR. THOMPSON:

 6    Q.    That's prior to the interviews that were

 7    conducted in this matter?  You had that

 8    conversation with Rowdi?

 9    A.    Oh, you're talking to me now?

10    Q.    Yes?

11    A.    Yes.

12    Q.    Have you recorded anyone else?

13    A.    No.  Jack Hatfield.

14    Q.    Other than Jack Hatfield?

15    A.    No.

16    Q.    Why did you stop making recordings?

17    A.    Because I was told to stop.

18    Q.    Bear with me as I work through this.

19    A.    Can we take a break while you're working

20    through that?

21    Q.    Yeah, take five minutes.

22          MR. KELLER:  Just on a logistic note, I

23    know we're past 3:00.  Wondering about time-wise

24    and time for cross-examination, so.

25          MR. THOMPSON:  I got about another five
```

Page 169

1    hours.

2          (A recess was taken from 3:17 p.m. until

3    3:23 p.m.)

4    BY MR. THOMPSON:

5    Q.    We are back on the record.  Do you

6    understand you are still under oath?

7    A.    Yes, sir.

8    Q.    Can we display 1874, which is back to

9    your diary and calendars?  Can you see that this

10   is an entry from January 2nd of 2018?

11   A.    Yes.

12   Q.    It is referencing Gator falling all over

13   himself to take care of Paul Luthy.  Is that

14   correct?

15   A.    Yes.

16   Q.    Then it goes on to say, "Amazing that he

17   received this orientation when no one else has."

18   Do you see that?

19   A.    Yes.

20   Q.    So I assume that that's no one else on

21   the crew, male or female, received that type of

22   orientation?

23   A.    Correct.

24   Q.    This wasn't just an act that you were

25   complaining of that was done against you as a

Page 170

1    female.  You're complaining that Gator didn't

2    provide this orientation to anyone?

3       A.    Correct.

4       Q.    Then 1875, this entry is from January 4,

5    2018, correct?

6       A.    Yes.

7       Q.    What is the complaint about not being

8    given Billy's truck to drive?

9       A.    So as new people come into the shop --

10   at this time, two gentlemen were retiring.

11   Maybe three were retiring.  I was told, Star,

12   you're getting Billy's truck because Billy was

13   retiring.  Okay.  That means you have something

14   to do.  When I first started, there were no

15   extra end dumps or belly dumps for someone to

16   move into unless somebody showed up sick.  So

17   basically, I was told you'll be given Billy's

18   truck to drive, and then Paul was given Billy's

19   truck.  Paul was told, Well, you'll be driving

20   Billy's truck.

21      Q.    Did you have another belly dump truck to

22   drive?

23      A.    No.  Whatever was available if somebody

24   wasn't there.

25      Q.    So were you driving a truck at the time

Page 171

1    on January 4th of 2018?

2    A.    Yes.  I mean, if other people were sick

3    or weren't there, I was driving truck or I was

4    servicing with Johnny or I was loading, but I

5    wasn't driving as much as the other people who

6    were all assigned trucks.  I had no assigned

7    truck.

8    Q.    What is crossed out on this entry?

9    A.    I have no idea.

10   Q.    Why did you cross it out?

11   A.    I apparently didn't like what I wrote

12   down.  I don't know.

13   Q.    When did you cross it out?

14   A.    On the day that I wrote it.

15   Q.    You know that for a fact?

16   A.    Generally, I don't go back very much

17   afterwards.  The only time I have gone back is

18   throughout this case when I have been told to

19   basically go through my stuff and check it, and

20   so I keep myself familiar with it.

21   Q.    Go to 1876.  You see this entry?

22   A.    Yes.

23   Q.    Are you complaining about Gator getting

24   unimportant job to do?

25   A.    Which --

Page 172

1    Q.    Gator giving you an unimportant job to

2    do?

3    A.    Yes.

4    Q.    What are the unimportant jobs?

5    A.    Go to the store, get supplies like paper

6    plates and silverware, like drive around and

7    check roads, or I am sure that time it was go

8    check a road.  Go do whatever.  I don't know.

9    Busy work, basically.  It's not out plowing.

10   Its not loading sand, it's not -- I have got

11   nothing for you to do, so wait here and help

12   Johnny, if you have to help Johnny, go to the

13   store if we need supplies, go do this, go check

14   a road.

15   Q.    Is checking the roads checking the roads

16   for safety?

17   A.    Checking the roads for snow, if there is

18   any driftings, if there is -- if it needs sand,

19   I guess, if it's.

20   Q.    As insuring safe roads for the public?

21   A.    I suppose so, yes.

22   Q.    Is that unimportant?

23   A.    No.

24   Q.    How many times were you told to go to

25   the store and get plates and silverware?

Page 173

1    A.    Few times.

2    Q.    How many times during the entire time

3  that you have been employed with Park County?

4    A.    Several times.  In Powell, Paco told me

5  that is my job, to go to the store and get water

6  and supplies.

7    Q.    That is the entirety of your job?

8    A.    No.  He said that is your job now that

9  Cindy is gone.  You got to make sure we have

10  water and supplies.

11    Q.    We will talk to Paco tomorrow, so.

12    A.    Perfect.

13    Q.    On January 15th on this entry, what is

14  your complaint?

15    A.    There is no complaint, just an entry of

16  my feelings for the day.

17    Q.    Were you anticipating litigation when

18  you were making these journal entries?

19    A.    Nope.

20    Q.    Were you anticipating litigation when

21  you were calendaring?

22    A.    No.

23    Q.    When did you make a decision to file a

24  charge of discrimination with EEOC?

25    A.    When I had talked to Brian on several

Page 174

1    occasions and as of, I guess, some time in March

2    of 2020, still nothing had been done.  Maybe it

3    was May of 2020, nothing had been done, and I

4    had been told that he could no longer talk to

5    me, and therefore I had no one to go to.

6        Q.    In February of 2020, Brian was

7    communicating with you in regards to your

8    complaint, correct?

9        A.    He was asking me for more information,

10   yes.

11       Q.    So something was being done, wasn't it?

12       A.    I guess, yes.

13       Q.    So you filed the charge of

14   discrimination in the middle of the

15   investigation by Park County attorney's office?

16       A.    I contacted Wyoming Workforce Services,

17   or the labor department, I believe in June

18   because Brian had sent me a text saying, Sorry,

19   they have just been really, really busy and they

20   haven't gotten to you.  And I just said, This is

21   going nowhere.

22       Q.    You filed your charge of discrimination

23   during the investigation of the Park County

24   attorney's office, correct?

25       A.    I had sent the paperwork in through the

1    mail, I believe.  I don't know, I sent the

2    paperwork in in June.  The investigation had not

3    started.  I received a -- on -- text at 5:02 the

4    night before Jack Hatfield started his, or was

5    going to do the interviews.  I had no idea that

6    they were even doing anything.

7        Q.    I appreciate the fact that you are

8    trying to be helpful and provide this additional

9    commentary, but it is really a simple question

10   that I am trying to get to.  Your charge of

11   discrimination is dated June 2nd of 2020,

12   correct?

13       A.    Correct.

14       Q.    And on February 19th of 2020, Brian

15   Edwards sends you a letter asking for additional

16   information as a result of the complaint that

17   you made with them, correct?

18       A.    Correct.

19       Q.    On May 21, 2020, prior to filing your

20   charge of discrimination, you were interviewed

21   by Jack Hatfield?

22       A.    Correct.

23       Q.    In June of 2020, Jack Hatfield is not --

24   had not -- the county attorney's office had not

25   completed their investigation, correct?  They

Page 176

1    had not provided you a letter saying, We have

2    completed our investigation and here are our

3    findings?

4      A.    Correct.

5      Q.    So you filed your charge of

6    discrimination after making your complaint but

7    before the investigation was complete?

8      A.    Correct.

9      Q.    Let me go to 1878.  This is an entry

10   from January 22nd and 23rd of 2018.  Do you see

11   that?

12     A.    Yes.

13     Q.    You're complaining about no light

14   conversation and odd glances from people staying

15   away from you?

16     A.    Yes.

17     Q.    Is this after you had made recordings of

18   the employees?

19     A.    No.

20     Q.    Why did you -- I mean, did you try to

21   approach anybody and talk to them?

22     A.    Yes.  We all have had conversations

23   every morning at the pre-shift and then

24   generally walking out to our trucks.

25     Q.    So what do you attribute this perception

1   you had that people were glancing at you oddly?

2      A.    I don't know.  I don't recall.

3      Q.    Is that discriminatory conduct?

4      A.    No.

5      Q.    Go to 1879.  It indicates that -- there

6   is no date on this.  It says, "We got back from

7   the shop.  We in the whole break room cleared

8   out except Ron and Gator.  I am the plague now,

9   but at least I have jobs to do.  Okie okay day."

10     A.    Yeah, and the date will be on the page

11  before that.

12     Q.    Who did you go to the store to get

13  supplies with?

14     A.    I don't know.  I'll have to check the

15  page before.

16     Q.    It would have been a male employee,

17  correct?

18     A.    Probably.

19     Q.    There weren't any female employees.

20     A.    Correct.

21     Q.    Yourself.  Why are you stating in this

22  entry that you're the plague now?

23     A.    I don't know.  I would have to read the

24  rest of it.  From before.

25     Q.    Is that the entry before?

Page 178

1    A.    I don't know.  I would have to look at

2    my book.

3    Q.    Last entry is, "park the truck until,"

4    and then the next page --

5    A.    Tomorrow.

6    Q.    -- "tomorrow, because tire shop won't

7    have them until then."

8    A.    It was probably with Ron or with Mike

9    Thompson.

10    Q.    Well, it says that Ron and Gator were

11    the two that didn't clear out.

12    A.    Right.  So it could have been Ron or

13    Mike Thompson.

14    Q.    But you don't know what this entry is

15    about?

16    A.    No.

17    Q.    Let's have you turn to 1890. Like,

18    specifically go to the entry of February 12th.

19    This is 2020, correct?

20    A.    Yes.

21    Q.    You're talking about Paco having the

22    whole crew on the Heart Mountain side?

23    A.    Yes.

24    Q.    Is it your job to direct the crew where

25    to go?

Page 179

1    A.    No.

2    Q.    Is that part of your job description to

3    make those decisions as to which areas should be

4    plowed first?

5    A.    No.

6    Q.    Was that Paco's job?

7    A.    Yes.

8    Q.    Let's go to 1893.  Paco -- this is an

9    entry from December 9th -- I am not sure what

10   year.

11   A.    Me either.  Maybe 2020.

12   Q.    The entry from the 11th, there was a

13   problem with one of the equipment -- pieces of

14   equipment you were operating?

15   A.    Uh-huh.  Yes.

16   Q.    Yes.  You have been doing good up until

17   now on that.

18   A.    Sorry.

19   Q.    Paco was upset with you?

20   A.    Yes.

21   Q.    Should he treat you differently as a

22   supervisor than male employees?

23   A.    No.

24   Q.    Does Paco get upset with male employees

25   in the shop when they break a piece of

Page 180

1   equipment?

2      A.     I don't know, not usually, no.

3      Q.     You haven't seen any male employees

4   break any equipment?

5      A.     Yes, I have.

6      Q.     Is Paco upset because of that?

7      A.     Not generally, no.

8      Q.     Is he happy about it?

9      A.     He just says, let's.

10     Q.     You shrugged your shoulders?

11     A.     Sorry, I am starting to do it.

12     Q.     I am just trying to put on the record

13  what you did.  And you shrugged your shoulders,

14  correct?

15     A.     Yes.

16     Q.     That is your testimony under oath as to

17  how Paco reacts when a male employee breaks a

18  piece of equipment?

19     A.     No, he usually asks them what happened

20  and they get it done, get something taken care

21  of, I guess.

22     Q.     Let's go to 1893, or excuse me, 1894.

23  Why were you documenting -- I assume Tim, in

24  this, refers to Tim Morrison?

25     A.     Yes.

Page 181

1    Q.    Why were you documenting matters about

2    Tim?

3    A.    I was documenting matters about

4    everyone.

5    Q.    Okay.  Why were you documenting matters

6    about everyone?

7    A.    This is just about my day.

8    Q.    Well, it doesn't say anything about your

9    day.  It talks about Tim.

10    A.    It throughout, it talks about what truck

11    I was in, where we were at.

12    Q.    I am not talking about the other

13    entries, Ma'am, I am talking about 1894 that is

14    displayed on the screen for you to read.

15    A.    Okay, because it says, DT26, Road 12.

16    That's my day, I'm cleaning up Road 12, 13 blah,

17    blah, blah.  Road 12, T18, watching Tim.

18    Q.    Thank you for that commentary.  I am

19    talking about Wednesday the first of January and

20    Thursday the second of January.  There is

21    nothing in those entries that talks about your

22    day, correct?

23    A.    Yes, there is.

24    Q.    Well, R 12.

25    A.    The R 12 and the truck I was in.

Page 182

1    Q.    Other than that, there is nothing in

2    those entries that talks about your day, but it

3    does talk about Tim Morrison.

4    A.    Yes.

5    Q.    Why did you feel it is important not to

6    document your day but to discuss what Tim

7    Morrison was doing?

8    A.    My day is already on there.

9    Q.    Okay.  That is your answer?

10    A.    If we're sitting on the side of a road,

11    I am going to write why we are sitting on the

12    side of a road.  And I write what road we are

13    on, what truck I am in.

14    Q.    Is that what is entered on January 1st

15    and 2nd on this entry 1894, what sitting on the

16    side of the road?

17    A.    It says where I'm at, what truck I'm in

18    and what I'm doing --

19    Q.    Let me --

20    A.    -- to Tim still struggling.

21    Q.    Go ahead and read the rest of it.

22    A.    I am watching Tim still struggling.

23    Q.    It doesn't say you're watching, it says

24    Tim struggling.

25    A.    Okay.  Tim still struggling.  Close coop

Page 183

1    over.  This is what I am watching.  This is what

2    I am seeing.  That is part of my day.

3      Q.    Ma'am, since you're unwilling to read it

4    into the record, I will read it.

5      A.    Okay, I can't see it all the way so.

6      Q.    "Tim still struggling, pulls coop over

7    every round to ask for advice and help.  Entire

8    crew talking about it.  Tim is apologizing for

9    not being able to get this.  He is very

10   stressed."

11         That discusses nothing about your day,

12   agreed?

13     A.    No, I don't agree.

14     Q.    Okay.  All right.  Well, we can talk to

15   the jury about that one.

16         Ma'am, I want to talk to you about the

17   recording that you made of Rowdi Briggs, and

18   there is other individuals participating in that

19   conversation, correct?

20     A.    Yes.

21     Q.    Did you think that recording people was

22   a violation of their privacy without telling

23   them they were being recorded?

24     A.    No.

25     Q.    You didn't?

Page 184

1    A.    No.

2    Q.    So recording someone without their

3    knowledge is not a violation of their privacy.

4    A.    If I am in a conversation with someone,

5    even if it is with five people, in the State of

6    Wyoming it is my understanding that it is okay

7    for me, for only one person in that conversation

8    to know that a recording is going on.

9    Q.    So here is an example of you

10   misunderstanding my question.  I didn't ask you

11   whether it was legal.  I asked you whether it

12   was an invasion of their privacy?

13   A.    No, it is not.

14   Q.    That's your belief.

15   A.    Yes.

16   Q.    You made statements on that recording

17   about Paco and about your complaint of not being

18   able to work on Fridays, knowing that you were

19   being recorded -- you were recording yourself,

20   didn't you?

21   A.    No, I have conversations where basically

22   I will know that.

23   Q.    You didn't know you were recording

24   yourself?

25   A.    I knew I was recording myself.

Page 185

1    Q.    Those were self-serving statements that

2    are issues in this lawsuit, correct?

3    A.    No.

4          MR. KELLER:  Objection, form of the

5    question.

6    BY MR. THOMPSON:

7    Q.    When you made these recordings, did you

8    anticipate filing the charge of discrimination?

9    A.    No.

10   Q.    What is the date of the recording?

11   A.    I don't recall.  I believe it was the

12   day before we spoke with Mr. Hatfield or the day

13   of.

14   Q.    So that was in May of 2020?

15   A.    Yes.

16   Q.    You filed the charge of discrimination

17   in June of 2020.

18   A.    Yes.

19   Q.    And it is your testimony that when you

20   made this recording in May of 2020, you had not

21   contacted the EEOC or workforce services?

22   A.    Correct.

23   Q.    You didn't anticipate filing a lawsuit?

24   A.    No.

25   Q.    Just going through my notes, so bear

Page 186

1    with me.  You told Jack Hatfield that you were

2    threatened with your job on four separate

3    occasions by Delray Paco; is that correct?

4        A.    I am asking on four separate occasions?

5        Q.    Yes.

6        A.    I recall three, but I don't recall the

7    days.

8        Q.    One was in the context of if you ran out

9    of FMLA leave, correct?

10       A.    No.  It was -- I was running out of FMLA

11   and I needed to be there 40 hours a week.  My

12   job was on the line.

13       Q.    That would have been consistent with the

14   letter that you received from the county clerk

15   as to your rights under the FMLA.

16       A.    No.  I mean, yes, yes.

17       Q.    The other, quote, unquote, threat was

18   when Delray, when you alleged that Delray said,

19   if there are budget cuts, you would be the first

20   to go?

21       A.    Correct.

22       Q.    Has there -- do you know if there has

23   ever been a budget cut in the county since you

24   have been employed with them?

25       A.    I have no idea.  There was a newspaper

1    article that stated that that week in the paper,

2    and it was brought up twice to me that I was low

3    man on the totem pole.

4        Q.    There was never a budget cut, correct?

5        A.    I don't know.  I don't think so.

6        Q.    What's the other occasion that you

7    believe you were threatened with your job?

8        A.    There were two occasions on the budget

9    cut, and the one where he told me my job was on

10   the line if I wasn't there 40 hours a week, even

11   though I was still on FMLA.

12       Q.    And you were running out of FMLA leave.

13       A.    No, when I was still on FMLA.

14       Q.    Shortly after you transferred over to

15   the Powell shop, it is my understanding that you

16   received a $1.25 an hour raise and a COLA raise;

17   is that correct?

18       A.    I don't have that documentation in front

19   of me, but I am sure if that is what you show,

20   yes.

21       Q.    You believe Rowdi Briggs has less

22   qualifications than you do as an operator?

23       A.    No, sir.

24       Q.    Did you tell Jack Hatfield that?

25       A.    No, I told Jack Hatfield that I had

Page 188

1    seniority, I had been there a year longer.

2      Q.    You didn't tell him that there were

3    other males who had less qualifications,

4    specifically Rowdi Briggs?

5      A.    I don't recall.  I would have to listen

6    to the recording again.

7      Q.    Does he have less qualifications than

8    you do as an operator?

9      A.    Certainly not.

10     Q.    Bear with me.  I don't want to ask

11   questions I have already covered.  Have you ever

12   been involved in any prior lawsuits?

13     A.    Not that I'm aware of, huh-uh.

14     Q.    You'd recall if you sued anyone,

15   correct?

16     A.    Yeah, I haven't sued anybody.

17     Q.    You'd recall if you were a party to a

18   lawsuit, being sued?

19     A.    I believe so, yeah.

20     Q.    Have you made any claims other than the

21   filing of the lawsuit, any claims of any nature?

22     A.    No.

23     Q.    Have you ever claimed that you were

24   discriminated against based upon your gender?

25     A.    No.

Page 189

1    Q.    Have you ever filed a complaint for

2    discrimination?

3    A.    No.

4    Q.    You would agree with me that Chris

5    Cooper and Paco did not get along?

6    A.    No.

7    Q.    You would agree with that?

8    A.    No, I would not.

9    Q.    You think they got along?

10    A.    They were best friends.  Yes, sir.

11    Q.    Up until the time that Paco got the job

12    over Cooper, correct?

13    A.    No.  Somewhere around there, yeah.

14    Q.    At the time that Paco got the job, Chris

15    Cooper was extremely upset about that?

16    A.    No.

17    Q.    Were you aware that Chris Cooper told

18    Paco, you ruined my fucking life?

19    A.    No.

20    Q.    We're through this.  Ma'am, are all

21    the -- is the only cause of action that you're

22    bringing in this matter in the complaint under

23    the equal pay act; do you know?

24    A.    I don't know.

25    Q.    I asked you as part of the discovery

Page 190

1    conducted in this matter to provide all

2    principal facts that you rely upon to support

3    the allegation in paragraph 36 of your

4    complaint.  Paragraph 36 of your complaint

5    states that Plaintiff Cornett had more seniority

6    time operating specialized equipment and

7    knowledge of the county road system than her

8    male counterparts hired at higher wages, higher

9    pay rates, than her during her employment at

10   Powell, Wyoming Division of Public Works, and

11   you refer to Kenny Marchant and Tim Morrison,

12   and we have already established those are the

13   only two comparators that you're referring to,

14   correct?

15     A.    Correct.

16     Q.    In preparation for your deposition

17   today, did you review your discovery responses

18   to the interrogatories?

19     A.    Yes, sir.

20     Q.    Is everything that you responded to

21   originally in those interrogatories true and

22   accurate?

23     A.    Yes, if a bit wordy.

24     Q.    You got to blame that on the attorneys,

25   right?

Page 191

1    A.    Yes.  Sure.

2         MR. THOMPSON:  MaryBeth, can you go to

3    the letter from Ms. Cornett dated March 30th of

4    2020?  I think it is the next exhibit or an

5    exhibit after that.  It's 2006 marked by

6    plaintiff.

7    BY MR. THOMPSON:

8    Q.    Before we get to 2006, my records

9    concerning your employment with Parks -- the

10   records that I reviewed concerning your

11   employment with Park County shows that you have

12   had a pay rate increase of 57 percent since you

13   were initially employed; do you have any reason

14   to dispute that?

15   A.    No, if that is what you have, I will go

16   with that.

17   Q.    You have been provided approximately an

18   increase that equals an increase of

19   approximately 7.1 percent per year.  Do you have

20   any reason to deny that?

21   A.    That's what it equals out to per year,

22   but I am stating that it didn't happen like that

23   every year.

24   Q.    Do you see what's marked 2006 in front

25   of you?

Page 192

```
 1    A.    I do.
 2    Q.    Is this the document that you sent to
 3  Brian Edwards?
 4    A.    Yes, it is.
 5    Q.    Is this the document that your daughter
 6  helped you with?
 7    A.    Yes.
 8    Q.    What is the date of this?
 9    A.    March the third.
10    Q.    We will mark this whatever the next
11  exhibit number is.
12          (Exhibit 11 was marked for
13  identification.)
14    Q.    Go to the next page, 2007.  At the
15  bottom of this, after your discussion concerning
16  Paco, you state, "Mr. Jones was very
17  disrespectful in my opinion.  As I had dealt
18  with his disrespectful attitude and tone over
19  the course of the past several months and
20  especially the prior two-and-a-half weeks, I
21  decided then that I was no longer going to be
22  disrespected in private via phone or any random
23  other occurrence.  I decided from then on,
24  Delray could use the county radio to contact me
25  and furthermore I would always make sure someone
```

Page 193

1  else was with me or nearby when he spoke to me?"

2          Do you see that?

3   A.    Yes.

4   Q.    Do you get to make those decisions as to

5  how a supervisor communicates with you?

6   A.    I do.  My phone is my personal phone and

7  I pay for it.

8   Q.    But other people take calls on their

9  personal phone?

10  A.    Yes.  He'll request that you call him.

11  Q.    Look at 2008.

12  A.    Okay.

13  Q.    You're out -- middle of the page --

14  you're out plowing PMA four, the cell phone

15  rings.  Delray was calling.  You ignored the

16  call, correct?

17  A.    Yes, correct.

18  Q.    You didn't call him back on the radio?

19  A.    No, I didn't because he came on the

20  radio immediately after that.

21  Q.    Go to 2009.  Towards the bottom of the

22  page, you make a statement, "I realize that

23  differences in opinion, disagreement and

24  conflict are not uncommon in the workplace."

25  A.    Correct.

Page 194

1    Q.    Is that your belief?

2    A.    Yes.

3    Q.    Other than the calendar entries that you

4    have referred to, do you have any other

5    documentation that you provided to Brian Edwards

6    concerning the complaints that you made to him

7    other than this complaint?

8    A.    No, sir.

9    Q.    At the bottom of page 2009, when you're

10    referring being stepped over for promotions in

11    Cody shop, I think you have already testified to

12    this, but that was the Operator II position that

13    wasn't filled when you came over to the Cody

14    shop and eventually was filled by Tim Morrison?

15    A.    No, Tim -- that was over in the Powell

16    shop.

17    Q.    Powell shop, I'm sorry.

18    A.    Yes.  Ron Nieters had told me I had been

19    put in.  He had gotten me Operator II at the

20    Cody shop, okay.  Then, when I found out I was

21    only Operator I when I got to Powell shop, I

22    called him and said, What happened?  And he

23    said, Well, Brian decided that it was better

24    just to give you a raise.  We're trying to raise

25    the -- he is trying to raise the pay scale,

Page 195

1   whatever that means.  And said, Sorry.

2      Q.    You testified earlier that when you came

3   over to the Powell shop, you were hoping to fill

4   an Operator II job.

5      A.    That is correct.

6      Q.    Told me that was the only promotion that

7   was complained about in your charge of

8   discrimination, correct?

9      A.    Yes, but it is the same one.  Ron had

10  told me I was Operator II.  He had gotten me

11  Operator II, and so when I went to the Powell

12  shop, I applied for that Operator II position,

13  or I talked to Dale about it, and requested it,

14  and then I found out I was still only Operator

15  I, so I didn't get moved up -- I don't know how

16  to explain it -- Ron put me in for Operator II.

17  He said, I got you Operator II.  I went and

18  spoke with Dale Hobby and said, I would like to

19  take Jason -- I would like to get Jason Flower's

20  job -- or Jason Field's job.  I would like to

21  apply for his position.  He was an Operator II

22  who left.  Dale said, Okay, are you Operator II?

23  And I said, I believe so.  And he said, Well,

24  let me go and check that out.

25      Q.    Do you have any documentation that shows

Page 196

1    that you were an Operator II before being

2    transferred over to the Powell shop?

3    A.    No, but we don't get that documentation.

4    Q.    Well, you have looked in your personnel

5    file, correct?

6    A.    Now I have, yes.

7    Q.    Is there any documentation in your

8    personnel file that shows you were an Operator

9    II before moving over to the Powell shop?

10   A.    No.

11   Q.    Let's turn to the next exhibit, letter

12   from Park County prosecuting attorney.  Do you

13   recognize this document?

14   A.    Yes.

15         (Exhibit 12 was marked for

16   identification.)

17   Q.    Did you receive this document from Bryan

18   Skoric, Park County prosecuting attorney?

19   A.    No, I received that letter from Glen

20   Parker at the EEOC.

21   Q.    I apologize.  It is directed to Matthew

22   Nitta, correct?

23   A.    Yes.

24   Q.    And you received this from the EEOC?

25   A.    Yes.

1    Q.    If you turn to the second page, first

2    full paragraph.  Says:  "Unbeknownst to

3    Ms. Cornett, at the time she made her internal

4    complaint, Public Works had previously submitted

5    a request to the Park County Board of

6    Commissioners to increase her rate of pay on the

7    performance of her duties in 2019."  Were you

8    aware of that?

9    A.    No.

10    Q.    Then it goes on to say, "However,

11    requested pay increases were uniformly

12    disapproved for all county employees by the

13    commissioners based upon budgetary constraints."

14    Were you aware of that?

15    A.    No.

16    Q.    It is my understanding, as a result of

17    taking FMLA for your own personal medical

18    issues, upon returning from medical leave, FMLA

19    leave, you were assigned to light duty work in

20    the Public Work's offices; is that correct?

21    A.    Yes, sir.

22    Q.    And at that time, you had not accrued

23    sufficient vacation and sick time, so you

24    requested donated sick time from your fellow

25    Park County employees?

Page 198

1    A.    Yes, that was done for me, yes.

2    Q.    Are you aware that Brian Edwards had a

3    petition that commissioners to waive

4    restrictions on donated sick time so that you

5    could be paid while you were out?

6    A.    Yes, sir.

7    Q.    This happened not once, but twice.  The

8    second time occurring when you were out as a

9    result of caring for your son, who was involved

10   in an accident on April 1, 2019.

11   A.    Yes, sir.

12   Q.    Did Brian Edwards, once this complaint

13   was filed, did he offer to transfer you back to

14   the Cody shop?

15   A.    He said I could work over there if it

16   was too uncomfortable over in the Powell side.

17   Q.    What was your response?

18   A.    I did not respond.  That would add an

19   extra hour drive onto my trip.  I just wanted to

20   do my job.

21   Q.    Did you respond to Brian that you would

22   never work with Chip Ash or Gator again?

23   A.    No, I did not.

24   Q.    When you're requesting time off for

25   reasons other than sickness, are you required to

Page 199

1    contact your supervisor before taking time off?

2    A.    Yes.

3    Q.    Have you done that in regards to

4    communications with Paco?

5    A.    Most of the time, if it is something

6    like in December, I had to go down to see my son

7    because he found his father dead, and my son has

8    a traumatic brain injury, then I called Brian to

9    let him know.  I called him.

10    Q.    Why didn't you call Paco?

11    A.    Because I wanted to know how bereavement

12    worked, and if that fell under bereavement.

13    Paco doesn't know those answers and I figured I

14    was killing two birds with one stone, and it was

15    a very long moment so.

16    Q.    Have you ever referred to Paco by any

17    derogatory names?

18    A.    Paco.

19    Q.    How about Puco?

20    A.    Billy -- there are a couple of people

21    who actually call him that.

22    Q.    Have you called him that?

23    A.    I have once or twice, not to his -- like

24    in passing in a conversation.

25    Q.    Just behind his back?

Page 200

1    A.    Just, yeah, because everybody says it,

2  and it comes out sometimes.

3    Q.    Do you ever make a statement on the

4  radio, watch out for two ugly smart guys in a

5  white truck, referring to McDonald and Edwards?

6    A.    No, I didn't; Snuff Triplett did.

7    Q.    Cindy Stewart was employed by Park

8  County Road & Bridge, correct?

9    A.    Correct.

10    Q.    She was an Operator III at the time of

11  her retirement?

12    A.    Correct.

13    Q.    That is as high as you can go in Park

14  County Road & Bridge is Operator III?

15    A.    Or foreman or above that, I guess, but

16  yes, in the Road & Bridge probably there and to

17  foreman.

18    Q.    Rowdi Briggs, I think we've already

19  discussed him.  He is the assistant foreman for

20  the Powell shop?

21    A.    Yes.

22    Q.    Do you believe he is qualified to be in

23  that position?

24    A.    Yeah.

25    Q.    I'm sorry.  Your answer, Ma'am?

Page 201

1    A.    Yes.

2    Q.    Let's take about a three-minute break.

3    I am going to look through my notes and I may be

4    done.  And we will go back on the record and I

5    will turn it over to your attorney.

6    A.    Okay.

7          (A recess was taken from 4:21 p.m. until

8    4:29 p.m.)

9          MR. THOMPSON:  Ma'am, that concludes my

10   questioning for you.  Thank you for your

11   cooperation and your attention to the questions

12   asked of you today.  I will go ahead and turn it

13   over to your attorney at this time.

14         THE WITNESS:  Thank you.

15   BY MR. KELLER:

16   Q.    Okay, let's see here.

17         MR. THOMPSON:  Marshall, do you want to

18   just break at this point and pick it up in the

19   morning?

20         MR. KELLER:  I can go here for probably

21   about an hour real quick, and then we can call

22   it quits.  Well, I guess we could.  It's almost

23   five, isn't it?

24         (A recess was taken from 4:30 p.m. until

25   9:00 a.m. on March 13, 2024)

Page 202

1          MR. THOMPSON:  We are in day two of

2     Plaintiff Starkie Cornett's deposition.  This is

3     Tom Thompson representing Defendant Park County.

4     I have completed my examination of Ms. Cornett

5     and have been informed that there is

6     approximately six hours minus breaks that were

7     taken of deposition testimony yesterday pursuant

8     to Federal Rule 30(d)(1).  I would object to any

9     examination by plaintiff's counsel beyond seven

10    hours is exceeding the permissible duration of

11    any one deposition, and we will leave it at

12    that.  Thank you.

13

14    STARKIE CORNETT,

15    Having first been duly sworn, testified as

16    follows:

17                    EXAMINATION

18    BY MR. KELLER:

19     Q.    Star, we will just kind of give you an

20    outline of what my portion on the depositions

21    are is basically I get to come back in, and I am

22    going to ask you questions regarding same

23    subjects and matters that Mr. Thompson has

24    asked, if that's okay.  So just to recap a

25    little bit yesterday, you had started with the

Page 203

1    Road & Bridge in Cody in -- as a temporary in
2    2016?
3      A.    Yes.
4      Q.    And that would -- and you started
5    sometime in the spring in April or about that
6    time?
7      A.    Yes, as a flagger.
8      Q.    Then you were brought on in November of
9    2017 as an Equipment Operator I.
10     A.    Yes.
11     Q.    Then you were an Operator I until --
12    well, let me rephrase that question.  You made
13    Operator II in 2021?
14     A.    Yes.
15     Q.    Okay.  I am going to go back to
16    Exhibit 6, and I believe we had a bates number
17    925, Park County 925.  So I think there was a
18    little confusion when we're going over this
19    yesterday.  And do you recall this being called
20    the "hidden paycheck"?
21     A.    Yes.
22     Q.    Is there somewhere on Park County bates
23    number 925 where it says "hidden paycheck"?
24     A.    At the bottom.
25     Q.    Okay.

Page 204

1    A.    In the small writing.

2    Q.    And if you go up into the top, there is

3    a box up in the right-hand corner, can you read

4    what it states in the right-hand corner?

5    A.    "Your Total Compensation July 1, 2021

6    through June 30, 2022 Updated as of 3/4/2022."

7    Q.    Okay.  Below that, is there one that

8    says "Position"?

9    A.    Operator to Equipment Operator II.

10   Q.    Okay.

11         Thank you.  So that just reinforces that

12   you had made Operator II sometime in 2021?

13   A.    Yes.

14   Q.    By looking at that document, does that

15   give you the exact date that you made Operator

16   II?

17   A.    No, it does not.

18   Q.    Go to Exhibit 7 --

19         MR. KELLER:  I am sorry, Tom, I am kind

20   of a Luddite on holding this stuff up, so you

21   will have to bear with me.  I will try to read

22   them off. Let me know if you don't have them.

23         MR. THOMPSON:  Thank you.

24   BY MR. KELLER:

25   Q.    I am looking at Exhibit 7, and what I

Page 205

1   believe is Park County 00914.  And as you look

2   at that, this form, is this the Park County

3   Personnel Form?

4    A.    I guess so.  This is not something that

5   we get as employees.

6    Q.    Okay.  I am going to rephrase.  Is that

7   what it states?

8    A.    Yes.

9    Q.    Then does that also state your position

10   in there?

11    A.    It does.

12    Q.    What is that position?

13    A.    Equipment Operator II.

14    Q.    And as we're looking down in the middle,

15   there is a section that says, "Changes for

16   Existing Employee."  Do you see that?

17    A.    Yes.

18    Q.    And just for the record, what does it

19   state in there as far as -- as you read across?

20    A.    Says, "$17.40 New Pay Rate.  15-Grade,

21   1-Step, 16.04 Current Pay Rate, Effective Date

22   -- Current Pay Rate 12-Grade, 5-Step, 7/4/2021

23   Effective Date."

24    Q.    Okay.  You're not disputing that is when

25   you would have made Operator II?

Page 206

1    A.    I was told that I had it in 2018.

2    Q.    I understand that, but --

3    A.    I am not disputing, no.

4    Q.    That is when you -- you are not

5    disputing that is when you started getting paid

6    for it?

7    A.    Correct.

8    Q.    Clear that up.  I am going to go back

9    here on a little bit on some of your experience.

10   Now you talked about owning property in

11   Oklahoma?

12   A.    Yes.

13   Q.    Okay.  And the property that you owned

14   in Oklahoma, about how long did you own that?

15   A.    From 2002 until 2010.

16   Q.    You stated you were running a tractor on

17   those -- on the property?

18   A.    Yes.

19   Q.    Okay.  How large was the property?

20   A.    20 acres.  Probably 15 of it was wooded.

21   Q.    And this tractor, what implements did

22   you use on this tractor?

23   A.    We used just a bucket brush hog and a

24   blade.

25   Q.    Okay.  So with the bucket, was that used

Page 207

1    to move material?

2        A.      Occasionally, yes.

3        Q.      Possibly to dig?

4        A.      Not so much digging.  It was more of a

5    loader bucket.

6        Q.      The brush hog, can you explain what a

7    brush hog is?

8        A.      It is a mower deck about six-foot by

9    five-foot and it's on a three point hitch and it

10   mows tall grass.  It is exactly what we have on

11   the mower for the county.

12       Q.      Okay.  And the bucket -- operating that

13   bucket, is it similar to running your front-end

14   loader at the job site?

15              MR. THOMPSON:  Object to form, leading.

16              MR. KELLER:  Let me rephrase that

17   question.

18   BY MR. KELLER:

19       Q.      Is that -- the running the bucket on

20   your tractor, is that substantially the same as

21   anything you're running on the job site now?

22              MR. THOMPSON:  Same objection.

23              THE WITNESS:  Yes, it's a little more

24   rudimentary.

25   BY MR. KELLER:

Page 208

1    Q.    Is it similar to that you operate on the

2    job site?

3    A.    It is the same as the loader or the tool

4    carriers that we had, or the mower.  It just

5    doesn't have all the fancier buttons, and it

6    has -- it had two gears, basically, so forward

7    and reverse.  I guess it had four-wheel drive

8    too.

9    Q.    Okay.  When you were talking about the

10   blade, what was the blade?

11   A.    It was just like a moldboard like we

12   have on the graders, the motor graders, but it

13   was straight and in place.  It only moved side

14   to side, so it didn't really -- you had to put

15   it in place down on the bar.  So it attached

16   also to a three-point hitch, and so you had to

17   switch its direction down on that three-point

18   hitch.  It wasn't an automatic thing.

19   Q.    Okay.  And but clarify that you were

20   using that to blade your road?

21   A.    Yes, and other areas to make them flat.

22   Q.    Similar to your grader?

23         MR. THOMPSON:  Objection to form?

24         THE WITNESS:  Yes and no.  Yes, because

25   it kind of does the same thing, but no, because

Page 209

1  it was more for clearing off -- well, for

2  clearing off debris from a flat area.  It is not

3  as strong as a grader, but somewhat the same,

4  yes.

5  BY MR. KELLER:

6    Q.    Again, just to reiterate, you were

7  operating this -- oh, let me back up.  You

8  mentioned you had a flooring business?

9    A.    Yes.

10    Q.    All right.  That flooring business, were

11  you able to use the -- did you use the tractor

12  at all in your flooring business?

13    A.    If we had a big load of wood that we had

14  to unload from a semi truck, we would use the

15  forks -- the forklift or the forks on that

16  tractor to unload pallets of hardwood or pallets

17  of plywood.

18    Q.    Okay.  You were operating this tractor

19  from 2002 to 2010?

20    A.    Yes, off and on.

21    Q.    Okay.  So that would be eight years of

22  use using that tractor?

23    A.    Yes.

24    Q.    Then in 2016, as a flagger, you'd

25  mentioned that Mr. Nieter [sic] was your

Page 210

1  foreman?

2  A.    Yes.

3  Q.    Did he offer training for you?

4  A.    Yes.

5  Q.    What kind of training?

6  A.    He -- when the weather was bad and we

7  weren't doing chipping or laying down asphalt,

8  he would say, Okay, well, what do you guys want

9  to do?  So I said, I want to learn how to run

10 every piece of equipment on here.  So he put me

11 in a loader and had me practicing pushing up the

12 pile.  He put me in the excavator and had me

13 digging holes.  He put me in the mower, he put

14 me in the broom.  He put me in the Skid Steer.

15 We just got to mess around with that stuff.

16 Q.    Okay.  And, you know, I am going to back

17 up say, so Mr. Nieter, how many years -- do you

18 know how long he was with the Road & Bridge for

19 Park County?

20 A.    I think 36 or 38.

21 Q.    Was he -- did he seem knowledgeable?

22 A.    Yes.

23 Q.    Do you know if he was well respected

24 within the Road & Bridge community?

25      MR. THOMPSON:  Objection to form,

Page 211

1   speculation.

2          THE WITNESS:  I believe he was.

3   BY MR. KELLER:

4     Q.    Have you seen a news article about

5   Mr. Nieter?

6     A.    Yes.

7     Q.    Was that a positive article?

8     A.    It was a very positive article.

9     Q.    Did it talk about his reputation within

10  Park County Road & Bridge?

11    A.    Yes.

12    Q.    So I want to go to Exhibit 8.  And we're

13  going to look at Park County bates 01228.

14         MR. THOMPSON:  What is the deposition,

15  or excuse me, the exhibit?

16         MR. KELLER:  Exhibit 8.

17         MR. THOMPSON:  Job descriptions?

18         MR. KELLER:  Yeah.

19  BY MR. KELLER:

20    Q.    So getting back to -- I am going to ask

21  you to go ahead and review this document again,

22  Star.  And by this, I mean, bates stamp 1228.

23    A.    Yes.

24    Q.    Okay.  And so when -- did Mr. Nieters,

25  did he train you on use of the dump truck?

1    A.    He trained me on that and so did James

2    Flowers and Jeff Gerhardt.

3    Q.    The loader?

4    A.    The loader, Ron taught me, Ron Nieters.

5    Q.    The roller?

6    A.    The roller was Ron Nieters and Billy

7    Sanvold.

8    Q.    The mower?

9    A.    The mower was Ron Nieters.

10    Q.    What about construction and maintenance

11    of the mower?

12    A.    That was gone over -- we are expected

13    generally to service our equipment, so we have

14    to know those things, and that is how we get to

15    know them.  Is that what you meant?

16    Q.    Uh-huh.  Let's see here.  And so, and

17    you -- when did you start operating that

18    equipment?

19    A.    As soon as I got my CDL permit, I was

20    running the trucks, but before that I had run

21    the mower and the brooms and the loader.

22    Q.    Did that job include monitoring flood

23    and control channels?

24    A.    It did.

25    Q.    Clearing culverts?

Page 213

1    A.    Yes.

2    Q.    What about repairing pot holes?

3    A.    Yes.

4    Q.    Highways and shoulders of roads?

5    A.    That really -- it was just mostly road

6    surface and things.

7    Q.    Laying road cover and gravel?

8    A.    Yes.

9    Q.    So I mean, as you look at this job

10   description, can you point out something -- and

11   we're looking at job description for Equipment

12   Operator I, can you point out something that you

13   were not doing as an Operator I?

14   A.    I can't say that there is anything.

15   Q.    Now besides the equipment that was

16   listed in the description for Operator I, I am

17   going to look at the job description for

18   Equipment Operator II, same exhibit number as

19   Park County 01230.  While you were at the Cody

20   shop, I want to ask you what equipment you were

21   trained on while you were there out at here, so

22   were you trained on the dozer?

23   A.    Yes.

24   Q.    Who did that?

25   A.    Ron Nieters.

Page 214

1    Q.    The backhoe?

2    A.    A little bit with Jeff Gerhardt.

3    Q.    We already talked about the trucks.  You

4    have been trained on the trucks, correct?

5    A.    Correct.

6    Q.    And the loader?

7    A.    Yes.

8    Q.    Were you trained on lowboy belly dump?

9    A.    Yes.

10    Q.    Who did that?

11    A.    On the lowboy, Ron Nieters put me in

12    that.  That was one of my training things for

13    my -- before I did my CDL testing.

14    Q.    We talked about the roller.  What about

15    the water truck?

16    A.    Yes.

17    Q.    Who trained you on that?

18    A.    Travis Ball.

19    Q.    What about the chip spreader?

20    A.    There is only four people in the county

21    shop that know how to run the chip spreader.

22    Not everybody gets to do that.

23    Q.    Okay.  So not all the Operator IIs get

24    to do that?

25    A.    Nope.

Page 215

1    Q.    What about the Operator IIIs?

2    A.    Nope.

3    Q.    Have you at least had a little bit of

4    familiarization with it?

5    A.    Just how to hook up to it with my truck

6    and clean it out.

7    Q.    And you were operating trucks?

8    A.    Yes.

9    Q.    What about dump trucks?

10    A.    Yes.

11    Q.    Trailers?

12    A.    Yes.

13    Q.    Snowplows?

14    A.    Yes.

15    Q.    Sanders?

16    A.    Yes.

17    Q.    Plowing, cleaning streets and highways?

18    A.    Yes.

19    Q.    As you look at this, I want you to look

20    at this description and, again, let me know if

21    there is anything in that description that you

22    are not doing as an Operator II.  And I am going

23    to be fairly specific on the years between 2017

24    and 2020.

25    A.    This all looks like stuff I had been

Page 216

1    doing.

2    Q.    Were you doing that in the Cody shop?

3    A.    In the Cody, yeah.

4    Q.    Okay.  Then when you transferred to the

5    Powell shop, it was Dale Hobby that was your

6    foreman then?

7    A.    Yes.

8    Q.    Dale Hobby had you doing the same --

9    about everything that was listed in that

10   Equipment Operator II description?

11   A.    No, he had started me out in the broom,

12   and then in the mower, and then in the water

13   truck, the dump truck, the belly dump, the

14   roller, helping to move equipment, but then he

15   retired.

16   Q.    Right.  And under Dale Hobby, you were

17   doing those same tasks?

18   A.    Yes, he was checking me in what my

19   knowledge was.

20   Q.    Okay.  Now under Dale Hobby, was he also

21   allowing you to continue training on new

22   equipment?

23        MR. THOMPSON:  Objection to form,

24   leading?

25        MR. KELLER:  Go ahead and answer.

Page 217

1  Before I do that, I am going to -- I am on

2  cross, I am allowed to go ahead.

3       THE WITNESS:  He was checking my

4  knowledge in each piece of equipment because he

5  had been told by Ron Nieters what I had been

6  running.

7  BY MR. KELLER:

8   Q.    How many years of experience, or to your

9  knowledge, do you know how many years Dale Hobby

10  had of experience?

11   A.    I don't know.

12   Q.    Do you know how long he had been with

13  the Road & Bridge?

14   A.    I think he had been foreman for three

15  years.  Or I don't know how.  I don't know.

16   Q.    Don't know?

17   A.    That he was foreman.

18   Q.    Okay.  But you -- you were running

19  multiple different pieces of equipment under

20  Dale Hobby?

21   A.    Yes.

22   Q.    Then when Delray Paco became foreman,

23  how many pieces of equipment were you allowed to

24  run then?

25   A.    It started out, I was just running the

1   broom, the trucks.  I didn't start running the

2   mower as much until Cindy had gone.  Cindy

3   Stewart.  I was allowed to load trucks and push

4   up the pile.

5       Q.    Back up.  By load up and push up the

6   pile, describe what you're talking about.

7       A.    That's with the tool carrier or a

8   loader.  Pushing up the pile is where when the

9   trucks bring in loads, there are piles of

10  gravel, pit run, sand, and once those trucks

11  pull away, you push the material up into big

12  piles so that as the trucks come back through,

13  there is clearer places for them to lay the new

14  gravel and bring more in so that you can keep

15  the yard stocked by loading.  It is loading

16  trucks, loading end dumps or dump trucks.  And

17  the same thing.

18      Q.    Okay.  So under Ron Nieters and Dale

19  Hobby, you were doing the same job as all the

20  other people that would be considered equipment

21  Operator II level?

22      A.    Yes.

23      Q.    And then under Delray Paco, you were

24  limited to what equipment again?

25      A.    The loader.  The loader, the tool

Page 219

```
 1  carrier, the mower, the broom and the trucks.

 2     Q.    You were no longer allowed to run the

 3  belly dumps?

 4     A.    I was running the belly dumps also.  It

 5  was -- I was no longer put in the dozer.  I

 6  wasn't put in the excavator or the backhoe.  I

 7  wasn't even considered for them.

 8     Q.    Were you offered any more training

 9  opportunities under Delray Paco?

10     A.    Will you say that again?

11     Q.    Did Delray Paco offer you training

12  opportunities on new equipment?

13     A.    No.

14     Q.    What about improving your skills on the

15  equipment that you had been running on?

16     A.    No, he didn't believe I had experience

17  in the grader.  I don't know about if he knew

18  about the dozer or anything else, but he laughed

19  at me when I told him I had grader experience

20  over in Cody.

21     Q.    So you explained to him that you had

22  experience running the grader?

23     A.    Yes.

24     Q.    He laughed at you?

25     A.    Yes.
```

Page 220

1    Q.    Did he -- what about any of the other

2    equipment when you brought it up?

3    A.    I had asked him if I could push material

4    with the dozer at the pit, that we at Big Horn

5    pit, and he said, No, I've got people who know

6    how to do that.  People usually grab equipment

7    and in the yard and they'll go and mess with it.

8    The excavator, the dozer, different pieces of

9    equipment to familiarize and to do something

10    when we get into the shop around 4 or 4:15, and

11    I was not -- he told me no.  And in fact, I got

12    in the excavator one day because that is what

13    everybody had been doing is getting in the

14    excavator, getting in something.  We have a pond

15    on the property that we clean out, and he said,

16    What are you doing?  And Kenny came over got

17    that in --

18    Q.    So I am going to back up here a little

19    bit.  As it was brought up yesterday, do you

20    know of any testing on equipment that was, as

21    far as your skill level, was done?

22    A.    No.  No.

23    Q.    Did you -- when we went through your

24    employee files, did you -- was there any

25    documentation of equipment that you were

Page 221

1    operating?

2     A.    I don't -- well, the only documentation

3    there was, was of different damages on

4    equipment.

5     Q.    Okay.  And so if everybody's -- this is

6    a hypothetical.  If everybody's employee file

7    was the same without training certifications and

8    hours on equipment, would it be safe to believe

9    that the way that they find out about your

10   experience is asking?

11          MR. THOMPSON:  Objection, form.

12          THE WITNESS:  Yes.

13   BY MR. KELLER:

14    Q.    To clarify, do you believe that the only

15   way that Paco would have found out about your

16   experience is by asking you or one of your

17   previous foremen?

18          MR. THOMPSON:  Objection to form.

19          THE WITNESS:  Yes.

20   BY MR. KELLER:

21    Q.    I am going to go to what we had listed

22   as Exhibit 1.

23          MR. KELLER:  But obviously, it is not

24   Exhibit 1 now that we had sent to you, Tom, and

25   it will be bates Park County 01908.

Page 222

1          MR. THOMPSON:  Thank you.

2   BY MR. KELLER:

3    Q.    Okay.  So Star, before these

4   depositions, had you seen this document here --

5   by bates we're talking about the numbers down in

6   the right-hand corner.  Have you seen this

7   document, bates 09108?

8    A.    No.

9    Q.    I am just going to posit to you that

10  this came from Park County.

11         MR. THOMPSON:  Counsel, sorry to stop

12  you.  I thought the bates number was 019.  It is

13  1908?

14         MR. KELLER:  Yeah, 1908.

15         THE WITNESS:  So I guess it is 13 now.

16         MR. KELLER:  Let me know when you're

17  there, Tom.

18         MR. THOMPSON:  Okay.

19  BY MR. KELLER:

20   Q.    And so we're just going to first get

21  into the description of this document, okay.  So

22  up in the left-hand corner, what -- can you read

23  that for the record?

24   A.    "Summary of Road & Bridge Department

25  Wage Adjustments."

Page 223

1    Q.    As you look across, does this look like

2    a spreadsheet?

3    A.    Yes.

4    Q.    And in the top row of the spreadsheet,

5    can you read off what's in the top row?

6    A.    "Name, District Position, Hire Date, End

7    of Employment, Years of Service, Grade/Step,

8    FY 2024, FY2023, FY2022, FY2021, FY2020,

9    FY 2019, FY2018, FY2017, FY2016, and FY2015."

10    Q.    So by FY2024, all the way down to

11    FY2015, do you believe that those are years?

12    A.    Basically, years.

13    Q.    Under the names, do you recognize the

14    names in the column under -- in that column?

15    A.    Yes.

16    Q.    How do you know those names?

17    A.    These are the people that I work with or

18    have worked with, most of them.

19    Q.    Okay.  The ones that you have worked

20    with down at the bottom, are they -- they are

21    crossed out, correct?

22    A.    Correct.

23    Q.    The ones up top above those are the ones

24    that are current employees?

25    A.    Yes.

Page 224

1    Q.    Do you see your name in?

2    A.    Yes.

3    Q.    Okay.  So as you're looking at your

4    name, can you go to fiscal year 2020, and tell

5    me what your wage was in fiscal 2020?

6    A.    $15.32.

7    Q.    Were you the lowest paid employee at

8    Road & Bridge that year?

9    A.    I think so.  Yes.  Out of the employees

10   that are still there.

11   Q.    We will get there.  So looking at fiscal

12   year 2019, does it appear that there are other

13   new hires that year?

14   A.    No.  2019?

15   Q.    Yes?

16   A.    Yes, there are three.

17   Q.    Who were they?

18   A.    Norton, Mark; Marchant, Kenny, and

19   Torczon, Greg.

20   Q.    Okay.  Were they -- their pay rates in

21   fiscal year '19, were they -- how do they

22   compare to your pay rate?

23   A.    They're higher.

24   Q.    Are they all males?

25   A.    Yes.

Page 225

1    Q.    Okay.  We're going to go all the way to

2    fiscal year of 2021, or, yeah, 2021.  Was there

3    a new hire in 2021, and if so, who was it?

4    A.    Yes, there was, and it was Mike Lohr.

5    Q.    Then in 2021, what was his pay rate?

6    A.    $14.40.

7    Q.    What was it fiscal year 2022?

8    A.    22.21.

9    Q.    Was that higher than your pay rate?

10    A.    Yes.

11    Q.    And do you know if he had undergone any

12    equipment testing to -- let me back that up.  Do

13    you know what he was bumped up to?

14    A.    No.

15         MR. THOMPSON:  Counsel, just as a point

16    of clarification, Mike Lohr is a mechanic.

17         MR. KELLER:  I think it also says

18    Operator III.  That is what I was going to get

19    to there.

20         MR. THOMPSON:  Okay.

21    BY MR. KELLER:

22    Q.    As you go across, can you see where it

23    has the designations?

24    A.    Yes.  Says he is a Mechanic/Operator

25    III.

Page 226

1    Q.    Thank you.   Then -- so then, as we get

2    to fiscal year of 2022, please go through that

3    and tell me how many employee -- fiscal year of

4    2022 earn a wage less than you?

5    A.    None.

6    Q.    Go through the entire list, please.

7    A.    I see.   Jeremy Decker, looks like I am

8    reading that right, and Joe -- nope, just Jeremy

9    Decker makes 15.60, and I make 17.90 at that

10   time in 2022.

11   Q.    Just to clarify, so all the way from

12   your time from 2016 up until fiscal year of

13   2022, you were the lowest paid person in Road &

14   Bridge?

15   A.    Correct.

16   Q.    Now we're going to go down to the people

17   that had -- have left on the bottom of this and

18   by -- and you recognize the names?

19   A.    Jason Fields, Chris Solberg, James

20   Flowers.   I don't remember Chris Solberg, but

21   the ones in blue, is that all you wanted?

22   Q.    Yep.

23   A.    Yep.   Jason Fields, Chris Solberg and

24   James Flowers.

25         MR. THOMPSON:   Counsel, just for my

1    clarification, where is she reading from?  Is it

2    the.

3              THE WITNESS:  The marked out.

4              MR. THOMPSON:  The stricken cross

5    through names, the second bottom half of this

6    exhibit.

7              MR. KELLER:  Yes, yes.

8              MR. THOMPSON:  Doesn't it start with Ted

9    Dykes?

10             MR. KELLER:  It does.  I was going to

11   have her go back up.  I just asked her which

12   ones she recognized.

13             MR. THOMPSON:  Oh, okay.

14             THE WITNESS:  Ted Dykes, Cory Holloway,

15   Phillip Heeg, John Klein, Elio Merino, Chris

16   Carter, Travis Ball, Mark Smith.

17   BY MR. KELLER:

18     Q.    Okay.  So as we're looking in fiscal

19   year of 2018, can you -- does it appear to you

20   that -- who quit and if so, who -- or left?

21     A.    On the bottom row or all through?

22     Q.    Can you -- so let me clarify that.  So

23   as you're looking at this spreadsheet, do you

24   see lines where there is no numbers in those

25   lines?

Page 228

1    A.    Yes.

2    Q.    Then as you go from left to right, do

3    you hit numbers that are crossed out for the --

4    they look like monetary amounts?

5    A.    Yes.

6    Q.    And does that indicate to you the year

7    that they possibly -- or what does that indicate

8    to you?

9    A.    That indicates to me that they left Park

10   County Road & Bridge.

11   Q.    And, again, that says to your

12   understanding by looking at this exhibit?

13   A.    Yes.

14   Q.    You didn't produce this?

15   A.    No, I did not.

16   Q.    So as -- but you do recall knowing Bill

17   Sanvold?

18   A.    Yes.

19   Q.    Jason Fields?

20   A.    Yes.

21   Q.    Okay.  When you're looking at the rows

22   with Bill Sanvold's name and Jason Field's name,

23   what year does the last year where there is an

24   entry for what appears to be a pay rate?

25   A.    For Bill Sanvold it was 2018, and same

Page 229

1    thing for Jason Fields.

2       Q.    For those -- does that sound about --

3    does that match your memory as to when they left

4    in 2018?

5       A.    I believe so, yes.

6       Q.    Okay.  Do you know if there was budget

7    cuts that year?

8       A.    I don't remember.

9       Q.    Okay.  Do you believe that those were

10   budgeted positions?

11      A.    Yes, I do.

12      Q.    Then in fiscal year 2019, are there

13   other people that left in 2019?

14           MR. THOMPSON:  Objection, form,

15   foundation.

16   BY MR. KELLER:

17      Q.    Go back as you're looking at

18   Exhibit 1908, and you look in the column for

19   FY2019; do you see where people would have left?

20           MR. THOMPSON:  Same objection?

21           THE WITNESS:  James Flowers left that

22   year.

23   BY MR. KELLER:

24      Q.    How can you tell he left that year?

25      A.    Because there is no more monetary

Page 230

1   reporting for him for after 2019.

2      Q.    Does that match with your memory?

3      A.    Yes, it does.

4      Q.    Did Cindy Stewart leave in 2019?

5      A.    Yes, she did.

6      Q.    Okay.  Dave Williams?

7      A.    Yes, he did.

8      Q.    What about Dale Hobby?

9      A.    Yes, he did.

10     Q.    When Dale Hobby left, he was a foreman,

11  correct?

12     A.    Correct.

13     Q.    But then Delray Paco moved up into that

14  position?

15     A.    Yes.

16     Q.    And to your knowledge, were those

17  budgeted positions?

18     A.    Yes, they were.

19     Q.    I'm going to just mark that.  I believe

20  we were on -- maybe the court reporter can

21  correct me.  Mark that as Exhibit 13.

22          (Exhibit 13 was marked for

23  identification.)

24  BY MR. KELLER:

25     Q.    So questions had come up about your

1    knowledge of what other people had done prior

2    and how you would know.  Have you seen any

3    resumes of other employees?

4      A.    No.  Well, yes, I have.

5      Q.    Which employee?

6      A.    Well, I have seen it for several.  I

7    have seen Orrin Denny's, I have seen Mike

8    Lohr's.  When they have people apply for a job,

9    then generally Paco brings us any candidates

10   that are out there, and he passes around their

11   application and their resume, and he says, Just

12   go through these, tell me what you think, if you

13   know any of these guys, if they're worth hiring,

14   if they're not, whatever; so we all look through

15   the resumes and give him the ones that we like

16   and.

17     Q.    Okay.  That opens up a whole new line of

18   questioning.  I am going back -- so do you know

19   if that was the practice for when you were

20   brought over from the Cody shop to the Powell

21   shop?

22     A.    No.

23     Q.    Did anybody tell you that people had

24   reviewed your?

25     A.    No.

Page 232

1    Q.    Do you know if it had been brought up

2    whether or not people could object to you coming

3    over to the Powell shop?

4    A.    Can you say that again?

5    Q.    Do you know if people had the ability to

6    object to you going to the Powell shop?

7         MR. THOMPSON:  Objection to form.

8         THE WITNESS:  Yes.

9    BY MR. KELLER:

10   Q.    How do you know?

11   A.    Because Dale Hobby told me.

12   Q.    Dale Hobby, again, was the foreman at

13   the time?

14   A.    Yes.

15   Q.    So what was your understanding of

16   that -- how that worked from your conversation

17   with Dale?

18   A.    Well, my conversation with Dale was on

19   the phone, and he told me that Paco was the only

20   one in the whole entire Powell crew who

21   completely objected to me transferring over.

22   Q.    So I am going to rephrase that again.

23   So what is your understanding as to who

24   objected?

25   A.    My understanding is Delray Jones

Page 233

1    objected.

2    Q.    Was it your understanding he was the

3    only one that objected?

4    A.    Yes.

5    Q.    Okay.  So other than -- when the time

6    when people -- when you had been given those

7    resumes at your job site, have you had any

8    applications -- have you had a chance to review

9    any of them for these depositions?

10    A.    No, I have not.

11    Q.    If they were provided to you, would you

12    have?

13    A.    Yes.

14    Q.    So did you get a chance to look at Mike

15    Lohr's application and resume?

16    A.    Yes.

17    Q.    And do you recall what his prior

18    experience had been when you had looked at it?

19    A.    Not completely.  I don't remember.  I

20    know what he has talked about since then that

21    his jobs were.

22    Q.    So then that comes back, so besides what

23    you had seen, what's the only other way you

24    would be able to know what people's prior

25    experience was is through talking with them?

Page 234

1    A.    Yes.

2    Q.    Do you talk to other employees about

3  what they have done in the past?

4    A.    I do.  Or they talk out loud about what

5  they have done in the past.

6    Q.    Okay.  Mike Lohr, what was -- where did

7  he -- prior to coming to Park County Road &

8  Bridge, where had he been employed?

9    A.    What he talks about a lot is the, I

10  think it's the Game and Fish, or something that

11  he used to work for where they trap and release

12  animals and tag them and stuff like that.  He

13  also works -- he has kind of a farm business.

14  He does horse shoeing.  A lot of hunting.

15    Q.    And you had also had the opportunity to

16  have other employees like Tim Morrison talk to

17  you about what they had done prior to coming on

18  to Road & Bridge?

19    A.    Yes.

20    Q.    Okay.  What about Arthur Briggs?

21    A.    Yes.

22    Q.    What was your understanding of what

23  Arthur Briggs did before coming on?

24    A.    Arthur Briggs used to own a farm.  He

25  did a lot of farming.  He also owned a -- his

1  wife owned, I should say, an auto salvage place.

2  He has driven a truck, driven all over the

3  place.  Every year he takes about three weeks

4  off in the summer, or late summer, early fall,

5  to run beets and corn and stuff for other

6  farmers now.

7     Q.    Sort of like similar to that you taking

8  the side hustle job to?

9     A.    Yes.

10    Q.    To drive trucks?

11    A.    Yes.

12    Q.    What about Kenny Marchant?  Did you talk

13  to Kenny Marchant about what he had done

14  previously?

15    A.    Yes.  Kenny's dad ran a hydro seed

16  company for 20 years.  I had asked Kenny if he

17  had ever run a loader because he was having

18  issues in the pit, and I had to show him a few

19  things on the loader.  He told me, no, I have

20  only run basically a farm tractor, kind of like

21  your Kubota probably, and driven trucks.

22    Q.    So again, your understanding of that

23  conversation speaking with Kenny Marchant was he

24  had operated a small medium sized tractors?

25    A.    Yes.

Page 236

```
 1    Q.    And driven trucks?

 2    A.    Yes.

 3    Q.    So now when some of these other

 4    employees --

 5          MR. KELLER:  Actually, I want to take a

 6    break there, Tom, if that is okay.

 7          MR. THOMPSON:  Sure.

 8          (A recess was taken from 10:04 a.m.

 9    until 10:14 a.m.)

10          MR. KELLER:  We're back from break.

11    BY MR. KELLER:

12    Q.    Just to remind you, Star, you're under

13    oath?

14    A.    Okay.

15    Q.    So I want to talk a little bit about

16    what you have observed as far as when other

17    trainees have been hired on in regards to

18    training.  So you mentioned that under Delray

19    Paco, you were not being trained on any new

20    equipment?

21    A.    Correct.

22    Q.    Who was?

23    A.    Kenny, Tim, Mike, Orrin, that's -- well

24    Cory, who used to work there.  That's about it.

25    Q.    So let's do this by -- you said first
```

Page 237

1    names.  Let's use last names too.  So you

2    mentioned Kenny.  Is that Kenny Marchant?

3    A.    Kenny Marchant, Tim Morrison, Orrin

4    Denney, Mike Lohr, Cory -- I have to look at

5    that paper to tell you his last name.

6    Q.    Okay.  So when Tim Morrison was hired,

7    there was training required for him?

8    A.    Yes.

9    Q.    Who trained him?

10   A.    Snuff did some on the grader.

11   Q.    So back up there.  Who is Snuff?

12   A.    Kelly Triplett did some in the grader

13   along with Chris Carter.  I believe he was put

14   in the dozer a couple of times out in the pit.

15   That's basically where Paco takes them out and

16   says, Hey, here, jump in.  Familiarize yourself

17   with the controls.  This is what I want you to

18   do.  Go from this spot to this spot.  He was

19   running the roller on lane five and he was

20   having difficulties.  I helped him -- show him

21   how to roll in the roller.  Let's see, Chris

22   Cooper did some training with him in the grader.

23   Q.    I am going to back you up a little bit

24   there.  So I take it you mentioned Delray took

25   them down to the pit to train them on the dozer?

Page 238

1    A.    I believe so.  I was not there.

2    Q.    What makes you believe so?

3    A.    Because Paco has taken Kenny Marchant

4    and he took Cory down to the pit, to the Big

5    Horn pit, and put them in the dozer and told

6    them, Here, I am going to let you run this for a

7    day and get used to it.

8    Q.    How do you know that happened?

9    A.    Because we were loading out of that pit,

10   and when we all pulled into the pit, Paco was

11   telling Kenny to get in there.  And Kenny had

12   said, Well, this will either go good or it

13   won't, or something to that effect.

14   Q.    So those are things you witnessed

15   yourself?

16   A.    Yes.

17   Q.    Were you afforded the same opportunity?

18   A.    No.

19   Q.    You mentioned Tim Morrison's training.

20   That included the grader.  You said you

21   previously had been trained on the grader,

22   correct?

23   A.    Correct.

24   Q.    Okay.  Did Tim Morrison ask you at all

25   for advice on how to run the grader?

1    A.    At one point, Chris Cooper put me in the

2    grader.  We were on lane three, and he was

3    letting me lay out.  He was letting Rowdi lay

4    out the pit run that the trucks were dumping and

5    he let Tim lay out.  When we got done with the

6    day, Tim said, I don't know how you can just do

7    that in three passes.  I don't.  I have a hard

8    time with that.

9    Q.    Okay.  So I am going to have you explain

10   the process for laying out gravel or what you're

11   talking about.  So when you're talking about

12   layout, can you describe what happens?

13   A.    So the grader pad is usually sitting to

14   the side of the road.  They will tell you

15   whether they want you to -- the truck drivers to

16   lay out their load either in one lane in the

17   center or where they want the load of gravel pit

18   run, whatever they're putting down.  They will

19   say, I want it right here.  They will -- the

20   grader hand will also tell you to dump it once

21   your window, your passenger window, or your

22   driver's window gets to their front tire on that

23   grader.  So that's where the truck's dumped,

24   okay?  They dump the load.  The grader hand then

25   backs up and then you spread out the materials.

1  So the way I was taught, you go down the center

2  and you push it out, then you go to the right

3  side, and then you go to the left side, and you

4  push it out.  And you have to maintain the edges

5  of the road for the whole distance.

6    Q.    I want to back up there just to get the

7  description in a little bit clearer.  So when

8  you're saying that you go down, you're talking

9  about -- so this pile of gravel is in front of

10  the blade on the grader?

11    A.    Yes.

12    Q.    And you're driving forward spreading it

13  out in front of the blade?

14    A.    Yes, you're pushing it out across the

15  road and down the road.

16    Q.    By "pass," you're talking about how many

17  times you have to do that to smooth out the

18  road?

19    A.    Yes.

20    Q.    It took you --

21    A.    Three passes.

22    Q.    How many did it take Tim?

23    A.    Five or six or more, and sometimes he

24  would have to go to the end, turn around and

25  push material back because he overworked the

Page 241

1    burden or the load.

2     Q.    And did you ever have to show Arthur

3    Briggs how to do anything?

4     A.    No, I did not.

5     Q.    Kenny Marchant?

6     A.    Yes.

7     Q.    What did you have to teach Kenny

8    Marchant?

9     A.    We were in the pit.  It was one of his

10   first days.  He was running the loader.  He

11   picked up a bucket of pit run.  He was to load

12   the trucks.  We each take turns loading the

13   trucks as we go.  He was loading trucks, and he

14   kept going with the bucket raised up in the air

15   and the pit floor was not flat as most of them

16   aren't, and I walked up to Rowdi and said,

17   Aren't you going to tell him to bring that

18   bucket back down?  He said, No, he has got to

19   figure it out on his own.  He is an Operator II.

20   So I stopped Kenny and told him, Hey, Kenny, you

21   got to bring that bucket down when you're

22   loading people because it is dangerous to travel

23   with the bucket in the air because that weight

24   will knock over anything.  It can hurt you, it

25   can hurt the trucks, it can hurt the equipment.

1    And then I showed him how to push.  I noticed he

2    was using the manual switch on the side to go

3    forward and backwards, and I said, Do you know

4    how to use the automatic switch?  And he said,

5    No.  So I showed him which buttons to push to

6    make it so that all of his controls were in his

7    joy stick controller.  He told me that the

8    tractor -- the loader was kind of bouncy.  I

9    showed him the stickers on the side window in

10   the loader that tell every single operation of

11   that loader are the buttons in that loader, and

12   so he could push ride control.

13       Q.    Did you have to explain or teach anybody

14   anything about maintenance?

15       A.    We were switching out the blades on the

16   side deck on the mower, and Tim said, So what do

17   we have to do, block this up, or how do we get

18   to that?  Do we have to use roller?  I said, No,

19   there is a hole in the side.  Somebody gets on

20   this side and on the bottom side where the

21   blades are.  You hold that, somebody else gets

22   on there with the drill.  So I had to tell him

23   how to take those blades off and replace them.

24       Q.    So you showed Tim how to do maintenance

25   on the mower?

Page 243

1    A.    Yes.

2    Q.    So when we -- going back to the grader

3    and passes, when you're operating a truck now,

4    are there times where you're in line waiting?

5    A.    Yes.

6    Q.    And besides watching the grader

7    operator, are you supposed to be doing anything

8    else?

9    A.    No, you're just waiting for your turn.

10   Q.    So when you're watching that, you're not

11   necessarily -- you are doing your job, correct?

12   A.    Correct.

13   Q.    And in watching Tim Morrison's

14   performance now, does he still struggle with

15   that job?

16   A.    He is getting better now, however, he

17   has his struggles.

18   Q.    And you talk with other operators from

19   Cody and Powell?

20   A.    Yes.

21   Q.    And what is Tim Morrison's reputation as

22   an operator of equipment?

23   A.    Joe and Kip over in the Cody shop have

24   told us that if they are told to come and run

25   loads to Powell to one of our grader hands, they

Page 244

1    will ask which grader hand, and if it is Tim,

2    they will flip a coin.

3      Q.    So I am going to ask the question again.

4    So what is Tim Morrison's reputation as far as

5    being an equipment operator?

6      A.    He is not a hand.  He should be put back

7    in a truck.

8      Q.    I want to start talking a little bit

9    about some of these safety and accident reports

10   that we looked at a bit yesterday.  And do you

11   recall looking at the report for the tire on the

12   tractor?

13     A.    Yes.

14     Q.    Do you recall when that was filed?

15     A.    That was sometime in 2020, I believe,

16   September.

17     Q.    Was that after you had filed your

18   complaint?

19     A.    Yes.

20     Q.    Were there -- from the files that were

21   sent that you have been able to review, were

22   there any files previous or any complaints in

23   your file prior to the tractor incident?

24     A.    Not that I have seen, no.

25     Q.    So in regards to running the tractor or

Page 245

1    mowing the ditches, what was the procedure under

2    Dale Hobby?

3      A.    Dale would have us go and check our

4    right-of-ways.  We would go out generally two

5    people to a truck, and our job was to go and

6    check our right-of-ways.

7      Q.    Why would there be two people to the

8    truck?

9      A.    Kind of because that's the only amount

10   of trucks there was, but if there was stuff in

11   the right-of-way, we could help each other to

12   get it cleaned up or move it to the edge of the

13   road so we could pick it up later with an end

14   dump or whatever was needed.

15     Q.    Okay.  And why would you inspect the

16   ditches prior to mowing?

17     A.    Because there's a lot of junk in there.

18   There could be bicycles, T-posts, delineator

19   posts, concrete slabs, big rocks, chunks of

20   wood.  Fence line, fence posts, fence of all

21   different kinds.  There can be garbage, bags of

22   garbage, different things.

23     Q.    As your -- let me rephrase that.  The

24   ditches, I mean, what is the condition that as

25   far as the grass and visual ability to see

Page 246

1    obstacles?

2           MR. THOMPSON:  Objection to form.

3           MR. KELLER:  Yeah, bad question.

4    BY MR. KELLER:

5    Q.    Can you explain why you would walk the

6    ditch first instead of just driving the tractor

7    down the ditch?

8    A.    Because spring time is our super busy

9    time, and usually by the time we start mowing,

10   the kochia weeds, the alfalfa, the stuff can be

11   anywhere from three to five-foot tall, and you

12   can't -- you can't see everything.  You can't

13   see anything most of the time.

14   Q.    So then what's the -- what was Delray

15   Paco -- what is the procedure under Delray?

16   A.    He just says, I want you to go start

17   mowing, usually in whatever area we are going to

18   chip seal or whatever area we're going to do our

19   hot patch, our asphalt patching.

20   Q.    So he doesn't send people out to inspect

21   prior to mowing?

22   A.    No.

23   Q.    Is that a safety concern?

24   A.    Yeah.

25   Q.    Have you brought that up as a safety

1    concern?

2    A.    I have.

3    Q.    When?

4    A.    Last year as I was mowing.  I was mowing

5    in the town of Ralston, and a gentleman had

6    taken rebar spikes and pounded them at different

7    levels in the right-of-way right where I was

8    mowing.  They were anywhere from six inches to

9    18 inches tall.  Luckily, I didn't hit any of

10   those.  I brought that to Paco's attention, and

11   he said, No, that is dangerous.  And he said,

12   Well, I am going to have to check with the

13   office.  If it is in the right-of-way, it just

14   shouldn't be there.  I noticed last week they

15   finally got -- they're not there anymore.  Kelly

16   Triplett lives right nearby.  He brought it to

17   the attention of Paco as well.

18   Q.    Do you know if it has been brought up

19   that you -- that people should be inspecting the

20   ditches prior to mowing?

21   A.    No.

22   Q.    You don't know if that has been brought

23   up?  But Paco was there when Dale Hobby had the

24   ditches inspected prior to mowing?

25   A.    Yes.

Page 248

1    Q.    I want to talk a bit about this truck,
2    TR29.

3    A.    My trailer, or a trailer.

4    Q.    Do you know -- has anybody else driven a
5    TR29?

6    A.    Usually that is Kenny's belly dump.

7    Q.    Besides Kenny, who else has driven?  Is
8    there anybody else that has driven?

9    A.    We have all -- we all take turns
10   depending on if something is being serviced or
11   whatever, so I would say Kelly Triplett, myself,
12   Rowdi Briggs, Kenny Marchant, Orrin Denney, even
13   Mike Lohr.  We have all driven.

14   Q.    Anybody else have trouble with the
15   trailer rear axle locking up?

16   A.    On Monday, Rowdi did.

17   Q.    Are you talking this last Monday?

18   A.    Yes.

19   Q.    What happened?

20   A.    He said he pulled into the pit.  He
21   pulled his park brake, and then when he was
22   going down the hill, he realized that his back
23   axles were locked up.  I don't know if it was
24   both axles or one, but he rode those all the way
25   to the gate, or close to the gate, and got them

Page 249

1    to work and continued.  I don't know about

2    before that.

3       Q.    I have here -- would have been what I

4    sent over in Exhibit 5, but the page or bates,

5    Park CO 00096.

6            MR. KELLER:  Let me know when you're

7    there, Tom.

8            MR. THOMPSON:  Go ahead.

9    BY MR. KELLER:

10      Q.    Star, do you remember looking at this

11   document when we were going over discovery?

12      A.    Yes.

13      Q.    Have you seen this document prior to us

14   going over the document?

15      A.    No, I have not.

16      Q.    So I am just -- and you believe this

17   came from Park County?

18      A.    Yes.

19      Q.    Now I am just going to have you describe

20   it as we go through.  Does it look like a

21   spreadsheet to you?

22      A.    It does.

23      Q.    As you're going from left to right, what

24   is in the columns?

25      A.    There is the trailer number.  I don't

Page 250

```
 1   know what the second number is.  I guess work
 2   that has been done.  Cost on -- I am not sure
 3   what the costs are on.  The date, and then
 4   another description.
 5       Q.    So do you see a two as you're looking
 6   over in the left hand column, there is a section
 7   that says "Group."  Can you see that?
 8       A.    Yes.
 9       Q.    Over on the left-hand side?
10       A.    Yes.
11       Q.    Okay.  And what does that group state on
12   the left-hand side, kind of about two-thirds of
13   the way up?
14       A.    Group TR29.
15       Q.    What does TR29 mean to you?
16       A.    TR29 is the trailer No. 29.
17       Q.    So let's -- the top row, or TR29, what
18   is the first entry as far as -- it looks like
19   the third column?
20       A.    Yes.  "These were the tires that needed
21   replaced after Star drug them off."
22       Q.    As you go across, you get to the date
23   column?
24       A.    Yes.
25       Q.    What is the date?
```

Page 251

```
 1    A.    10/20/23.
 2    Q.    What's the final column state?
 3    A.    "These were the tires needed replaced
 4    after Star drug them off."
 5    Q.    Okay.  Now the next row below that, can
 6    you read the next row?
 7    A.    "Replace brakes and drums.  Installed
 8    new S-cam bushings on rear axle.  Left rear
 9    brake can was leaking, replaced with new."
10    Q.    Okay.  That's in the third column?
11    A.    Yes.
12    Q.    As you go across to the date column,
13    what is the date?
14    A.    9/27/23.
15    Q.    What is in the final column?
16    A.    "Replace brakes and drums.  Installed
17    new S-cam bushings on rear axle.  Left rear
18    brake can was leaking, replaced with new."
19    Q.    Okay.
20          Do you know who made these entries?
21    A.    I don't know.  One of the mechanics, I
22    believe, is in charge of this, or both of the
23    mechanics.  I don't know.  Sorry.
24    Q.    Fair enough.  So when you read that,
25    what does the -- what does that mean to you?
```

Page 252

1              MR. THOMPSON:  Objection to form,

2    foundation, speculation.

3    BY MR. KELLER:

4      Q.      Let me rephrase that.  So you just read

5    the descriptions, correct?

6      A.      Correct.

7      Q.      And you have read the dates.

8      A.      Correct.

9      Q.      And you have read what someone had

10   entered as far as repairs to what you believe is

11   TR29?

12     A.      Yes.

13     Q.      Okay.  And so as you looked at the

14   dates, you have read the descriptions.  What

15   does that mean to you?

16             MR. THOMPSON:  Same objection.

17             THE WITNESS:  Tells me that the brakes

18   and bushings on the rear axle were replaced and

19   fixed, and that is the same axle that drug on

20   that trailer.

21   BY MR. KELLER:

22     Q.      That was within a month of when your

23   accident was?

24     A.      Yes.

25     Q.      Do you know if there is any quality

Page 253

1    control done on repairs in the shop?

2    A.    No.

3    Q.    No, there isn't, or you don't know if

4    there is?

5    A.    No, I don't know if there is.  I don't

6    think so.  "Let's just drive it, it's fixed."

7    Q.    I am going to enter this as Exhibit 14.

8    We'll mark it 14, not enter.

9         (Exhibit 14 was marked for

10   identification.)

11   BY MR. KELLER:

12   Q.    Have you talked to another mechanic

13   about possibilities of what might cause the rear

14   axle to lock up on that truck?

15   A.    Yes, because it was only the rear axle,

16   not both axles.  It didn't make sense.  He said,

17   Well, it could be the valve, but it could be the

18   cams, and/or one cam, or any of the cams.  And

19   he said, Generally, the valve is either off or

20   on, meaning the brake is either off or on, but

21   if only one axle is locked during that time,

22   then there is a problem.  Both axles should lock

23   up if the brake valve is on.

24   Q.    Okay.  In the pictures that you saw

25   regarding the tire damage, was it one axle?

Page 254

1    A.    It was only one axle, and he said there

2    could be rocks in the slack adjusters, which

3    there were not at the time that it happened, and

4    he said, but other than that, he said, that

5    happens quite often and it sounds like it's

6    probably the cams.

7    Q.    Okay.  So I am going to talk to you a

8    little bit about tires.  That word -- where were

9    you when the trailer rear axle locked up on you?

10   A.    I was on a dirt road hauling to upper

11   Sunshine Lake in Meeteetse.

12   Q.    There were other employees working out

13   there?

14   A.    Yes.

15   Q.    Which shop?

16   A.    Both shops.

17   Q.    Okay.  Were there other employees that

18   had tire damage that week?

19   A.    Yes.

20   Q.    How many that you know of?

21   A.    Quite a few.  Two for sure.  Possibly

22   three, but two that I know of for sure.

23   Q.    What can cause the tire damage?

24   A.    Pretty much anything.  You can get a

25   rock stuck between your duals and your tires,

Page 255

1   and that can cause issues.  Just running through

2   the pit, different sharp rocks.  Could be where

3   you're turning around.  If you're having to make

4   really tight turns, sometimes that can damage

5   tires.  It can run them off, but you can run

6   over a nail, you could run over anything on

7   these roads.

8   Q.    So it is not uncommon for tire damage?

9   A.    No, it is a normal daily thing.

10  Q.    The cell phone usage, as far as -- do

11  you know if there is a policy regarding cell

12  phone usage while you're operating equipment or

13  trucks?

14  A.    I haven't seen a policy in the policy

15  manual, but I know that we were given an

16  addendum a few years ago about not using our

17  cell phones, and if we were caught using our

18  cell phones and texting and stuff while in the

19  trucks, we were in deep trouble.  Also, as a CDL

20  holder, we are not allowed to be talking on the

21  phone unless it is a hands free situation.

22  Q.    So as a CDL, if you're driving on the

23  road, are you stating that there is potential

24  fines and penalties for using a cell phone while

25  you're operating a truck?

Page 256

1          MR. THOMPSON:  Objection to form.  I

2     have let it go.  This is leading.  It is your

3     own witness.  It's not normal cross-examination.

4          MR. KELLER:  Okay.

5     BY MR. KELLER:

6     Q.    Do you know, Star, what are the

7     penalties for using a cell phone in a CDL truck?

8     A.    You can get a fine, get ticketed and get

9     fined.  It goes against the driving record, and

10    also, it's just a form of distracted driving.

11    It can cause accidents and other things.

12    Q.    Regarding the lower deck, did you

13    pre-inspect the lower deck before taking it out?

14    A.    Yes.

15    Q.    Did that include looking at the skid

16    plate?

17    A.    Yes.

18    Q.    Can you describe the welds for the --

19    well, let me back up.  That includes looking at

20    the shoes on the skid plate?

21    A.    Yes.

22    Q.    Can you describe the welds that were

23    done on the shoes for the skid plate before you

24    took it out?

25    A.    Some of the shoes were welded on with a

1   solid line of weld.  Some were with a broken

2   line of weld.

3      Q.    Is that something -- is that what you

4   would call a tack weld?

5      A.    Yes.

6      Q.    Do you know who did those welds?

7      A.    Mike Lohr.

8      Q.    Do you know if Mike Lohr is a certified

9   welder?

10     A.    I don't.

11     Q.    Do you know if there was any quality

12  control checks on his work?

13     A.    I don't.

14     Q.    Do you know if Delray Paco would have --

15  if he would have inspected it prior to taking

16  the equipment?

17     A.    I don't.

18     Q.    So I want to talk to you a bit about

19  Chris Cooper.  That came up yesterday as well.

20  You know Chris Cooper from work?

21     A.    Yes.

22     Q.    Did you know Chris Cooper from work?

23     A.    Yes.  I said I know him from work and

24  that's the only place I know him from.

25     Q.    Do you find it pretty offensive that

Page 258

1    someone mentioned to you that you may have had

2    an affair with Mr. Cooper?

3    A.    Yes.

4    Q.    Do you know where that rumor would have

5    come from?

6    A.    No.  It is typical.

7    Q.    What do you mean, typical?

8    A.    Was the same thing they said about Ron.

9    Q.    Okay.  And who is "they"?

10   A.    The guys that work at the county shop on

11   the Cody and the Powell side.  Certain guys, I

12   guess, not all of them.

13   Q.    Did you ever hear that -- how do you

14   hear about these rumors?

15   A.    They are spoken up, like the snuggling

16   comment that was made with -- about Ron and I in

17   the other shop, in the Cody shop.  I didn't hear

18   anything in the Powell shop.  That was kind of

19   out of the blue, that is offensive.

20   Q.    Do they make the same comments about men

21   dating men there?

22   A.    No.

23   Q.    Okay.  Back to Chris Cooper here.  The

24   video and pictures, he sent those to you?

25   A.    Yes.  When I requested them from you --

Page 259

1  or you requested them from me.

2   Q.    We don't need to talk about

3  client-attorney privilege.  So were you out

4  dealing anybody?

5   A.    No.

6         MR. KELLER:  Since we brought up the

7  photographs here, I believe these -- so I am

8  looking at -- what I sent over is Exhibit 7,

9  Tom, and bates numbers 2017 and 2018.  Let me

10  know when you have them.

11         MR. THOMPSON:  I have got them.

12         MR. KELLER:  Okay, thanks.

13  BY MR. KELLER:

14   Q.    Star, I am looking at Exhibit 2017.

15  What am I looking at?

16   A.    That is a grader going off the edge of

17  the side of a canal.

18   Q.    Okay.  Is there a date at the top?

19   A.    September 9, 2019.

20   Q.    Have you seen this photograph before?

21   A.    Yes.

22   Q.    And how did you -- or what was the

23  circumstances for you seeing this photograph?

24   A.    I requested it from -- I requested any

25  photos and videos -- well, I requested a video

Page 260

1    from Chris Cooper, and he sent me these.

2        Q.    These were taken by -- and you are

3    certain that they were taken by Chris Cooper?

4        A.    Yes.

5        Q.    And what -- were you informed who was

6    inside of the grader at the time?

7        A.    Yes.  He told me this was Tim Morrison

8    stuck in the ditch, and Cooper had to come and

9    pull him out with his grader.

10       Q.    And as I am looking at 2018, what am I

11   looking at?

12       A.    You are looking at front angle of this

13   stuck grader.

14       Q.    That's on the same day, this

15   September 9, 2019?

16       A.    It is.

17       Q.    Do you know if there was an accident

18   report that ended up in Tim Morrison's file?

19       A.    I have no idea.

20       Q.    Then what exhibit number are we on?

21            MS. OATSVALL:  15.

22            MR. KELLER:  I am going to mark these as

23   Exhibit 15, Tom.

24            (Exhibit 15 was marked for

25   identification.)

Page 261

1   BY MR. KELLER:

2      Q.    I am looking at the same exhibit

3   number -- it would be -- that I sent over, bates

4   numbers 4001 and 400 -- just 4001.  Can you

5   describe what bates number 4001 is?

6      A.    That is a dump truck that slid off the

7   road into a ditch and almost rolled.

8      Q.    Okay.  Where did this photograph come

9   from?

10     A.    Rowdi Briggs sent it to me.

11     Q.    And who is -- do you know who the driver

12  was?

13     A.    That was Tim Morrison.

14     Q.    Do you know if that ended that -- let me

15  back up.  When did this occur?

16     A.    About a month, month and a half ago.

17     Q.    Where at?

18     A.    It is on a road between Cody and Clark

19  called 7RP.  It's in the Cody district.  We're

20  building it up right now.

21     Q.    Do you know if this made it into Tim

22  Morrison's file?

23     A.    I have no idea.

24          MR. KELLER:  I am going to enter this as

25  Exhibit 16 -- or mark it as Exhibit 16, Tom.

Page 262

1          MR. THOMPSON:  Okay.

2          (Exhibits 16, 17, and 18 were marked for

3    identification.)

4    BY MR. KELLER:

5    Q.    I have here bates number 4002 and 4003.

6    Can you -- Star, can you explain what bates 4002

7    and 4003?

8    A.    This is our water tanker, TR28.  This is

9    in the county shop.  There is damage to these --

10   the bumper on this.  You can see the metal is

11   ripped and mangled.

12   Q.    Why is it -- how did you get this

13   photograph?

14   A.    I took this photograph.

15   Q.    Okay.

16         This is while you were in the shop?

17   A.    Yes, it is was parked next to the truck

18   I was driving.

19   Q.    Do you know who had or what caused the

20   damage?

21   A.    Yes.  Tim Morrison was clearing the

22   parking lot at the shop, and he backed into it

23   with his grader.

24   Q.    Okay.

25         Do you know if there was an accident

Page 263

1  report filed on this incident?

2    A.    No, I don't.

3    Q.    When did this incident happen?

4    A.    About -- not this winter, but the winter

5  before, I believe.

6    Q.    So you're talking about the winter of

7  2022 or 2023?

8    A.    It would have been right -- probably --

9  well, 2022, 2023, sometime in that time.

10   Q.    You have any idea if this made -- if

11 there was a -- any report of this that made it

12 into Tim Morrison's file?

13   A.    I don't know.

14   Q.    Do you know if there were any retraining

15 actions or disciplinary actions made for Tim

16 Morrison regarding these accidents?

17   A.    No, I don't.

18   Q.    So when you first went to the Powell

19 shop, did you get to know Cindy Stewart?

20   A.    I had worked with her for a couple years

21 by then, yes.

22   Q.    You had observed her operate equipment?

23   A.    Yes.

24   Q.    Was she a competent operator?

25   A.    I mostly got to watch her run a roller,

Page 264

1    a sweep, a mower, and the trucks, but yes, she

2    was competent.

3      Q.    And did you get a chance to talk to her

4    about why she was retiring?

5      A.    She had told Kelly Triplett and

6    myself -- I believe it was Kelly Triplett, but

7    she had told me that since they had put Paco in

8    charge -- she would have stayed another five

9    years, but since they put Paco in charge, she

10   wasn't staying.

11     Q.    So I am going to re-ask the question

12   again.  Did you talk to her about why she was

13   retiring?

14     A.    Yes.

15     Q.    Per that conversation, what was your

16   understanding of why she was retiring?

17     A.    Because Paco got put in charge, and she

18   wouldn't be treated the way he treats her.

19     Q.    Did she describe to you how Paco treated

20   her?  By "her," I mean Cindy Stewart.

21     A.    She said like a red-headed stepchild.

22     Q.    Did she give you any advice about Paco?

23     A.    She told me -- yes.

24     Q.    Okay.  What was your understanding of

25   that advice?

Page 265

1    A.    She -- it was, I better document

2    everything or I would be next.

3    Q.    What did you take it to mean by "being

4    next"?

5    A.    To be talked down to and treated like

6    crap.

7    Q.    So you believe that Delray Paco had a --

8    Delray Jones had a history of treating females

9    in the department disparagingly?

10         MR. THOMPSON:  Objection to form.

11         THE WITNESS:  Yes, that's yes.

12   BY MR. KELLER:

13   Q.    I am just going to break that down

14   because of the objection.  We went through that

15   you had spoken with Cindy Stewart, correct?

16   A.    Correct.

17   Q.    And we -- you had spoken with her about

18   how Paco had treated her in the past, correct?

19   A.    Correct.

20   Q.    And due to those conversations with

21   Cindy Stewart, are you led to believe that

22   Delray Paco has a history of treating women in

23   the department disparagingly?

24   A.    Yes.

25         MR. THOMPSON:  Objection to form.

Page 266

1    BY MR. KELLER:

2    Q.    Talking about Delray Jones, does he --

3    well, you heard questions yesterday about there

4    being another female to dump.

5    A.    Yes.

6    Q.    Does Delray Jones supervise the dump?

7    A.    No.

8    Q.    Did Gator supervise the dump?

9    A.    No.

10   Q.    Do they have their own foreman?

11   A.    Yes.

12   Q.    Now when you were working underneath

13   Dale Hobby, was shopping and doing other

14   gophering type tasks, was that a shared

15   responsibility?

16   A.    Yes.

17   Q.    And can you describe, for the record,

18   like, how that was shared?

19   A.    Generally, whoever was available would

20   go to the store to get water or whatever

21   supplies we needed from the store, so whoever,

22   whether it was Cindy, Chris Carter, Coop --

23   Kristopher Cooper, Delray -- even Dale would go

24   to get the water and the stuff for the shop.  He

25   would just say, Can you go grab water, to

Page 267

 1  whoever was there and available.

 2      Q.    And since you had been, or since Delray

 3  Paco has been in the shop, is it now still a

 4  shared responsibility?

 5      A.    It has started to become that way, but

 6  he told me right after Cindy left that it was my

 7  job to keep the water stocked and the supplies

 8  up.  He said, Don't even ask, just do it.  Make

 9  sure it is done, and said it was my job.

10      Q.    Okay.  What about -- when you were

11  working under Ron Nieters, was it a shared

12  responsibility to do the shopping and gophering?

13          MR. THOMPSON:  Objection, form,

14  foundation.

15  BY MR. KELLER:

16      Q.    When you worked under Ron Nieters, was

17  it a shared responsibility to do the shopping?

18          MR. THOMPSON:  Same objection.

19          THE WITNESS:  Whenever there were

20  supplies to be gotten, I guess it was, yes,

21  whoever was available if the need arose.  But

22  they don't get as much supplies in the Cody

23  shop.

24  BY MR. KELLER:

25      Q.    Okay.

Page 268

1          It came up about driving around doing

2   inspections for roads as well, so under -- when

3   you were working under Ron Nieters, how was that

4   handled?

5      A.    Well, generally, when there was a snow

6   event, Gator would go out and check roads and

7   call in everybody for whatever maintenance area

8   needed to be taken care of.  There were

9   different odd people out when I had started, I

10  was doing training to be in the snowplow to

11  learn the plow areas, I guess, and learn how to

12  run those plows, but if Ron was gone, then Gator

13  would rather have me in a truck.  But we all

14  go -- if there was somebody done with their

15  area, or if there was somebody extra, they would

16  go and check roads.

17     Q.    Okay.  So if someone was available, they

18  would be the ones when they were finished with

19  their tasks, they would be the ones to inspect

20  the roads under Ron Nieters.  Is that what

21  you're saying?

22     A.    Yes.

23     Q.    And so once Gator, when he was in

24  charge, was that still the same?

25     A.    Not really.  I would have to go and

Page 269

1  check the roads, and because I was the odd man

2  out without a truck.  So instead of training, I

3  was driving in a pickup.

4    Q.    Okay.

5          So you were missing out on training in

6  the truck?

7    A.    Uh-huh.

8          MR. THOMPSON:  Objection to form.

9  BY MR. KELLER:

10    Q.    You currently work with the Cody shop on

11  a regular basis?

12    A.    Yes.

13    Q.    And do you have interactions with Gator

14  since you moved over to the Cody shop?

15    A.    Yes. Or Powell shop, you mean?

16    Q.    Yes. Describe your relationship with

17  Gator now.

18    A.    Gator is friendly.  He waves at me.  If

19  we talk, then he is pretty cordial and nice.

20    Q.    When did that behavior begin to change?

21    A.    A couple of years ago, I was watering

22  chips for him at one of our pits for chip seal

23  season, and that is when he started coming and

24  asking me questions and talking to me.

25    Q.    That was after your complaints?

Page 270

1    A.    Yes.

2    Q.    Before Delray Paco became -- Delray

3    Jones, did -- became a foreman, did you interact

4    with Delray much?

5    A.    Yes, we were friends.  I used to go to

6    his house.  We drank beer together.

7    Q.    That changed once he became a foreman?

8    A.    Yes.

9    Q.    How often does Delray Jones come out to

10   inspect jobs?

11         MR. THOMPSON:  Objection to form,

12   foundation.

13   BY MR. KELLER:

14   Q.    I'll back up.  So do you believe it's

15   the foreman's job to inspect work that's done?

16   A.    Yes.

17   Q.    Does that include for safety?

18   A.    Yes.

19   Q.    And quality control?

20   A.    Yes.

21   Q.    How often does Delray Jones -- let me

22   rephrase that.  On the jobs that you are on, do

23   you see Delray Jones come out to check the jobs?

24   A.    Sometimes.  We are mostly working on the

25   Cody side now, so we don't see him that often.

Page 271

1    Q.    What about when you are working on the
2    Powell side?
3    A.    Most of the time, yes; some of the time,
4    no.
5    Q.    Does that include inspecting prior to
6    work for safety reasons?
7    A.    I believe he does go out there.  He --
8    on the big jobs, like, if we're putting in a
9    culvert, if we're putting in -- I don't know, if
10   we have digging or excavating to do, I believe
11   he goes out and checks the jobs before we get
12   there.  I don't know though.  I don't know what
13   he does during the day.
14   Q.    And for comparison, you do work on the
15   Cody side occasionally?
16   A.    Quite a bit, yes.
17   Q.    Who is the foreman on the Cody side now?
18   A.    Lewis Ash.
19   Q.    When you're working on the Cody side,
20   how often do you see Lewis Ash out on the job
21   site doing inspections?
22   A.    All day long.  He is out there working,
23   inspecting, working, checking, all of it.
24   Q.    And how often did Dale Hobby inspect the
25   jobs that you were working on?

Page 272

1    A.    Every time, he was usually out there

2    working with us.  He usually got there before us

3    and was sweeping areas, checking areas, clearing

4    up areas, and he was out there all day long.

5    Q.    You were beginning to record inspections

6    of the vehicles you worked on, correct?

7    A.    Yes.

8    Q.    You were documenting and you were --

9    what did you do with -- you created a form?

10   A.    I did.

11   Q.    Where did you get the idea for creating

12   the form from?

13   A.    Because that's the type of form that I

14   have used with my other driving jobs.  You have

15   to do a pre-trip and a post-trip inspection at

16   my other jobs.

17   Q.    You had taken, as part of your job with

18   Park [sic] & Bridge, and some of the training

19   you also had to do MSHA?

20   A.    Yes.

21   Q.    By MSHA, it is a 40-hour safety class?

22   A.    Yes.

23   Q.    Do they -- in that class, did they talk

24   at all about doing inspections?

25   A.    Yes.

Page 273

1    Q.    And documenting inspections?

2    A.    Yes.

3    Q.    Okay.  Did Delray tell you to quit

4    documenting inspections?

5    A.    He told me that my forms were useless

6    and they weren't needed, and he didn't know why

7    I was doing that.

8    Q.    Did he ever provide any type of

9    inspection forms?

10   A.    No.

11   Q.    So there was a little bit of talk

12   yesterday about a nickname, and so Delray Jones,

13   his nickname is Paco?

14   A.    Yes.

15   Q.    How does one get their nicknames?

16   A.    Just -- I don't know.  Everybody in the

17   shop basically has a nickname.  I guess they

18   either grew up with it or they were given it for

19   something they did.

20   Q.    And you had -- the question came up

21   yesterday if you had called Delray Jones Puco --

22   Puco?

23   A.    Uh-huh.

24   Q.    Where did that start?

25   A.    That started by one of our

Page 274

1    subcontractors that comes out and lays asphalt.

2    He has a name for everyone including Ponytail,

3    Tarzan, Oileo.  He has a name for all of us, and

4    that was his name for Paco, and that stuck.  It

5    just stuck because a lot of people at the Cody

6    and the Powell shop have used it.

7    Q.    So you're not the one who started it?

8    A.    No.

9    Q.    To your knowledge, are you the only one

10   that has said it?

11   A.    No.

12   Q.    Now has Delray Jones, has he called you

13   something else?

14   A.    Sweetie.

15   Q.    Does he call you Sweetie on a regular

16   basis?

17   A.    No.  I think it is only by accident, and

18   then the guys give me a hard time and say, Oh.

19   Q.    You ever hear him call any other males a

20   similar equivalent to Sweetie?

21   A.    No.

22       MR. KELLER:  Tom, I am going to take a

23   quick break here and go over my notes and see if

24   I have missed anything.

25       MR. THOMPSON:  Okay.  I have got some

Page 275

1    redirect.

2            MR. KELLER:  I figured you probably

3    would.  Thanks.

4            (A recess was taken from 11:21 a.m.

5    until 11:25 a.m.)

6    BY MR. KELLER:

7      Q.    Just a reminder, Star, that you're under

8    oath.  So getting back to your experience and

9    education, you had mentioned that you didn't

10   finish high school?

11     A.    No, I did not.

12     Q.    You got a GED?

13     A.    Correct.

14     Q.    That was back in '86?

15     A.    '86.

16     Q.    And have you taken college courses since

17   that time?

18     A.    Yes.

19     Q.    Which college courses did you take?

20     A.    Mostly English, philosophy, biology and

21   anatomy, anatomy lab, and writing.  I also took

22   some nursing.

23     Q.    How long ago did you take those courses?

24     A.    The writing and stuff was in, I believe,

25   somewhere in the '90s, '91.  The nursing was

Page 276

1    around '97.

2       Q.    Did you complete a degree program?

3       A.    I did a CNA course that I completed and

4    worked as a CNA for awhile.

5       Q.    As far as the college courses, did you

6    receive another degree?

7       A.    No, I did not.

8       Q.    Did you complete all of the -- you

9    listed off English.  Did you complete your

10   English classes?

11      A.    Yes.

12      Q.    How many classes?

13      A.    It was one semester's worth.  It was

14   only just the general.

15      Q.    And what about your writing class?

16      A.    Same thing.

17      Q.    One semester?

18      A.    Yep.  One semester, same thing with all

19   of them.

20      Q.    Were all these classes taken in the same

21   semester?

22      A.    Most of them, yes, except for the CNA.

23      Q.    In regards to the handbook policy that

24   you were -- that Road & Bridge had, you said

25   you'd familiarized yourself with it?

Page 277

1    A.    Yes.

2    Q.    Did you understand all of it?

3    A.    No.

4    Q.    Is that why you'd call Brian Edwards?

5          MR. THOMPSON:  Objection to form.

6  BY MR. KELLER:

7    Q.    Did you call Brian Edwards to ask

8  questions about the policy?

9    A.    No.

10    Q.    Did you call Brian Edwards to ask him

11  how to handle a complaint?

12          MR. THOMPSON:  Same objection.

13  BY MR. KELLER:

14    Q.    As you had read through the -- went over

15  it with Mr. Tom Thompson yesterday, that was

16  also in the handbook?

17    A.    Will you repeat that?

18    Q.    How to handle complaints for the EEOC?

19    A.    Yes, that is in there, mostly under the

20  sexual harassment and harassment, I guess.  And

21  the discrimination, I guess, but it says -- it

22  leads right into sex harassment.

23    Q.    When you had called Brian Edwards to

24  gain an understanding of that, did he explain

25  where to look for the policy?

1         MR. THOMPSON:  Objection to form.

2    BY MR. KELLER:

3    Q.    Let me rephrase that.  Did Brian Edwards

4    tell you to call the county attorney?

5    A.    No.  He told me he was HR.

6    Q.    Did you have any reason to doubt Brian

7    Edwards?

8    A.    No.

9    Q.    By stating that Brian -- when Brian

10   Edwards told you he was HR, what did that mean

11   to you?

12   A.    That meant that I was to direct my

13   complaints or questions or issues to him.

14   Q.    By "him," you mean Brian Edwards?

15   A.    Yes.

16   Q.    At any point, did he direct you to

17   reread your handbook?

18   A.    No.

19   Q.    At any point, did he direct you to call

20   the county attorney?

21   A.    No.

22        MR. KELLER:  I don't have any further

23   questions, Tom.

24        MR. THOMPSON:  Okay.

25        All right, Ma'am, I have got a few

Page 279

1    questions for you.

2    BY MR. THOMPSON:

3    Q.    Let's start off with your testimony a

4    little earlier there.  From 2002 through 2010,

5    you were operating a tractor on your property in

6    Oklahoma.  Do you recall that?

7    A.    Yep.

8    Q.    Do you recall that you told your

9    attorney that that property consisted of

10   approximately 20 acres of which five acres was

11   not wooded, correct?

12   A.    Correct.

13   Q.    On your job application, you indicate,

14   which is Deposition Exhibit 1, you indicate that

15   from 2009 through 2011, you were working as a

16   server/bartender at the Irma Hotel.  So were you

17   working at the Irma Hotel or were you in

18   Oklahoma working this property?

19   A.    I left Oklahoma in September of 2009,

20   late September.

21   Q.    So your earlier testimony that you were

22   there from 2002 through 2010 is incorrect?

23   A.    No, we owned the property until 2010, so

24   yeah, I left in 2009, so yes, it is 2002

25   through 2009.

 1    Q.    So your earlier testimony is incorrect,

 2   correct?

 3    A.    Correct.

 4          MR. KELLER:  I am going to object as to

 5   the form of the question.  That is not what was

 6   asked during my questioning, I believe.

 7          MR. THOMPSON:  Counsel, I think we have

 8   been doing good, but let's agree to keep the

 9   objections to non-speaking objections.

10   BY MR. THOMPSON:

11    Q.    Ma'am, you didn't list any experience in

12   operating a tractor on your job application, did

13   you?

14    A.    No.

15    Q.    You didn't notify Park County Road &

16   Bridge, you didn't notify Ron Nieters.  You

17   didn't list it on your application, correct?

18          MR. KELLER:  Objection to form.

19   BY MR. THOMPSON:

20    Q.    Is that correct?

21    A.    I did not list it on my application, no.

22    Q.    You didn't tell Ron Nieters?

23    A.    I don't recall any conversations to

24   that, no.

25    Q.    There is a -- wouldn't you agree with me

1   there is a significant difference from operating

2   a Kubota 3800 series to operating a Cat 950?

3     A.    There is a huge difference, yeah.

4     Q.    The Kubota 3800, you see people that

5   have a small plot of land using a brush mower.

6   It's approximately 2700 pounds, correct?

7     A.    I don't know.  With the mower on it,

8   it's probably more than that, but yes.

9     Q.    In a Cat, 950 is approximately 30,000

10  pounds, correct?

11    A.    Yes.

12    Q.    In a mower, a 772 grader is

13  approximately 25,000 pounds, the one that Park

14  County has, correct?

15    A.    Correct.

16    Q.    When you talked about Ron Nieters let

17  you mess around with stuff, that was -- I put

18  that in quotes.  "Got to mess around with that

19  stuff."  Does that mean that you were on a road

20  grader for 40 hours a week when you were at Park

21  County Cody shop?

22    A.    No, he trained me in it for a couple of

23  days, ten hours here, five hours there, four

24  hours here.

25    Q.    Do you have any documentation as to how

Page 282

1    much training you had in the various pieces of

2    equipment?

3        A.    As I said yesterday, that would be in

4    the books under -- that Brian Edwards has in the

5    office.  It would be under those records.

6        Q.    Why didn't you journal that in your

7    diary?  You were keeping records of all other

8    kinds of work.

9        A.    I did journal that.

10       Q.    Let me finish the question, Ma'am.

11       A.    Okay.

12       Q.    You were keeping all kinds of other work

13    entries.

14       A.    I did journal that.

15       Q.    Okay.  Is it in the journals you have

16    provided, or is that in the journals that you

17    have held back?

18       A.    It is in -- it will say the equipment,

19    like, it will say MG 42, or what BD 06, or it

20    will be under what we write down for the job

21    code for equipment.

22       Q.    Okay.  So if it is not in your journals,

23    it didn't happen, correct?

24       A.    Incorrect.  There were sometimes I was

25    just putting it in. Ron Nieters can tell you

Page 283

1    that.

2      Q.    Well, let's talk about Ron Nieters

3    because within a year of being transferred to

4    the Powell shop, or a year and a half, you were

5    promoted by Delray Jones to Operator II,

6    correct?

7      A.    Correct.

8      Q.    Ron Nieters never promoted you to

9    Operator II?

10     A.    He had put me in for Operator II.

11     Q.    You never were promoted to Operator II

12    while you were at the Cody shop.

13     A.    Correct.

14     Q.    Let's go to Exhibit 8, which are the job

15    descriptions.

16     A.    Eight?

17     Q.    Yeah.  Let me know when you're there.

18     A.    I am there.

19     Q.    You talked about the equipment that is

20    required of this job description, but what was

21    not talked about is the working levels that are

22    required for each of these jobs.  And you'd

23    agree with me that there is different skill

24    levels required for Operator I, Operator II and

25    Operator III, correct?

Page 284

1    A.    I would.

2    Q.    And for example, Operator I working

3    skilled -- well, the general purpose states,

4    "perform working level skilled tasks," correct?

5    Page 1?

6    A.    Yes.

7    Q.    And page 2, under Park County 1229, it

8    states, "Apprentice level skill in the operation

9    of medium and heavy equipment," correct?

10    A.    Correct.

11    Q.    So you would agree it is more than just

12    becoming familiar with the equipment.  You have

13    to demonstrate a skill level that would allow

14    you to serve as an Operator II or an Operator

15    III?

16    A.    I would agree.

17    Q.    Thank you.  You talked about immediately

18    when you came to work for the Cody shop that you

19    began operating equipment, and you talked about

20    the different equipment you started to operate.

21    You came to work for the Cody shop in November

22    -- mid-November of 2016?

23    A.    Correct.

24    Q.    Is it your testimony that you were

25    operating a mower then and a sweeper and other

Page 285

1   equipment that would typically be operated in

2   the summertime?

3      A.    No, I started for the county as a

4   flagger.

5      Q.    And so it is your testimony that you

6   were laying road cover and gravel when you were

7   operating as a flagger?

8      A.    No, sir.

9      Q.    In fact, you didn't -- you wouldn't have

10  been, because the weather would have been

11  prohibitive from laying road cover and gravel

12  until the year after you were hired, correct?

13  You didn't do that in the winter months.

14     A.    Correct.

15     Q.    If a -- I will give you a hypothetical

16  because I think your attorney was asking you

17  some of these hypotheticals, but if an employee

18  trains on a piece of equipment, say, a grader,

19  motor grader for a week, does that make them

20  proficient in the operation of a motor grader?

21     A.    No.

22     Q.    Does that give them journey level skills

23  on the operation of a motor grader?

24     A.    No.

25     Q.    Let's go to Park County 01908.

```
 1              MR. KELLER:  Is there an exhibit number
 2    to that, Tom?
 3              MR. THOMPSON:  I didn't write it down.
 4    This is the matrix.
 5              MR. KELLER:  Okay.  I believe that is
 6    13.
 7    BY MR. THOMPSON:
 8    Q.    Do you have that in front of you, Ma'am?
 9    A.    I do.
10    Q.    You were discussing with your attorney
11    when he was asking questions about your pay
12    comparative to other male employees in the
13    county.  Do you recall that testimony?
14    A.    Yes.
15    Q.    And the first entry for you is in 2017,
16    correct?
17    A.    Correct.
18    Q.    You were being paid 13.71 an hour.
19    A.    Correct.
20    Q.    And it shows that Arthur Briggs was also
21    hired in 2017, correct?
22    A.    Correct.
23    Q.    He was being paid 13.71 an hour.
24    A.    Correct.
25    Q.    John Klein was hired in 2017, correct?
```

Page 287

1    A.    I am not showing that.  Where is Klein?

2    Q.    It is on the bottom half -- left.

3    A.    John Klein, yes.

4    Q.    And James Flowers was hired in 2017, and

5  he was paid 13.71 an hour, correct?

6    A.    Correct.

7    Q.    John Klein was, in fact, hired as an

8  Operator II, and he received the same initial

9  pay that you received as an Operator I with

10 absolutely no experience, correct?

11   A.    That's, I guess that -- yeah, that's

12 what it says, Operator II.

13   Q.    So were the male employees that were

14 hired, I mean, was it discriminatory for John

15 Klein to be paid the same that you were being

16 paid as an Operator II?

17   A.    I don't know.

18   Q.    You would agree with me that John Klein

19 and Arthur Briggs and James Flowers are all

20 males.

21   A.    I would agree with you on that.

22   Q.    Let's go to Cindy Stewart.  When she

23 left in 2019, she was an Operator III, correct?

24   A.    Yes.

25   Q.    Other than being a foreman, that is the

Page 288

1    highest level operator that you can be, correct?

2      A.    Correct.

3      Q.    And she was making more than Chris

4    Carter was when she left, wasn't she?

5      A.    Yes.

6      Q.    And Chris Carter was being paid as an

7    Operator III, correct?

8      A.    No, it looks like they were making the

9    same amount.

10     Q.    Let's go to Travis Ball.  He is right

11   below Chris Carter.  He is an Operator III,

12   correct?

13     A.    Correct.

14     Q.    Cindy Stewart is making more than Travis

15   Ball is as an Operator III, correct?

16     A.    Correct.

17     Q.    Is that discriminatory towards Travis

18   Ball?  He is an Operator III and a female is

19   getting paid more than he is?

20     A.    He had 11.3 years; she had 24.6.

21     Q.    So does that mean that these pay

22   differences can be justified by years of

23   experience or proficiency on different pieces of

24   equipment?

25     A.    I don't know, yes.

Page 289

1    Q.    Well, what is your understanding of the

2    difference in the pay that people receive?  Why

3    does an Operator III receive one wage and

4    another Operator III receive a different wage?

5    A.    It's experience and that's -- it's

6    experience and time at your company, I suppose.

7    Q.    You would agree with me that that is not

8    discriminatory to pay somebody a higher wage

9    based upon experience?

10    A.    And time at the job, yeah.

11    Q.    How about just experience?

12    A.    Yes.

13    Q.    Are you -- do you believe that you

14    should now be an Operator III?

15    A.    No, I do not.

16    Q.    You talked about when Delray Paco, or

17    excuse me, Delray Jones, Paco Jones, was hired

18    on as the foreman.  Do you recall that

19    testimony?

20    A.    Yes.

21    Q.    It is fair to say you do not like Delray

22    Jones?

23    A.    No, that is not fair to say.  I don't

24    like him as a foreman.

25    Q.    You don't respect him in the workplace,

Page 290

1    correct?

2      A.      Yes, I do.

3      Q.      Well, you don't answer his calls,

4    correct?

5      A.      I answer his calls when I am required to

6    answer his calls.

7      Q.      On the radio?

8      A.      On the radio and on my phone, if it's --

9    I am on call.

10      Q.      So up to the time that you made a

11    decision that you weren't going to take his

12    calls on your cell phone prior to that time,

13    that was routine practice in Road & Bridge,

14    wasn't it?

15      A.      For the Powell side, yes.

16      Q.      Then you decided that you were going to

17    make that change that you were no longer going

18    to communicate by cell phone, and that was a

19    unilateral decision that you made, correct?

20      A.      No.

21      Q.      Who made it?

22      A.      We were given an addendum or a letter

23    stating we were not supposed to be -- we had a

24    radio for a reason, and we were not supposed to

25    be texting and calling on our phones.

Page 291

1    Q.    Is that for personal calls?

2    A.    I don't know.  It is just said calls.

3    Q.    You were in Kris Cooper's court as far

4    as getting the foreman job, correct?

5    A.    No, I went to Brian Edwards and told him

6    Paco should get the job.

7    Q.    Does Chris Cooper know that?

8    A.    Yes.

9    Q.    When did you do that?  When did you talk

10   to Brian Edwards about that?

11   A.    Before Paco got the job, when they were

12   all going in for interviews.

13   Q.    Seems to me that way Road & Bridge works

14   is it's Paco's discretion as to who is on what

15   equipment and who does what job; is that fair?

16   A.    Yes.

17   Q.    You disagree with a lot of the decisions

18   he has made as a foreman as far as who is on

19   what equipment and who is doing what job?

20   A.    No.

21   Q.    Despite what you just testified to under

22   oath?

23   A.    Yes.

24   Q.    So you agree with all the decisions he

25   has made as a foreman?

Page 292

1    A.    No.

2    Q.    So you do disagree with decisions that

3 he has made as far as who is on what equipment

4 and who does what job.

5    A.    No, I don't agree with all of his

6 decisions.  I agree with some of his decisions.

7    Q.    Do you think you should be the shop

8 foreman?

9    A.    No.

10    Q.    Let's go back to 1 or 01908.  If you

11 look at that, in fiscal year 2020, I believe

12 your attorney was asking you questions about

13 either fiscal year '19 or 2020.  Let's just stay

14 with 2020.  I think the question was directed at

15 current employees, but if you look at male

16 employees that are no longer with Park County,

17 there are a number of operators that were being

18 paid less than you in 2020, correct?

19    A.    Correct.

20    Q.    So how do you explain that?

21    A.    Phil Heeg had to be trained and get his

22 CDL just like I did.  He came with no experience

23 on that first year.  That --

24    Q.    So that justified him not being trained

25 and no experience justified a lower wage.

1    A.    He had just been trained.  That was the

2    new -- I guess, pay grade.  I don't know what

3    that justifies.  That just -- that is the new

4    pay grade for new employees at that time.

5    Q.    And my question to you is, could you

6    explain that, or why is that?  Is the fact that

7    Mr. Heeg, Phillip Heeg, had no experience, did

8    that justify being paid a lower wage?

9    A.    Yes, just like I was.

10   Q.    And then how about?

11   A.    Mr. Merino?

12   Q.    Mr. Merino.  He is an Operator II and he

13   is making less than you.

14   A.    And I don't know what happened there

15   with that.  I have no idea why he was so low.  I

16   don't know why.

17   Q.    Could be his lack of experience?

18   A.    No, he had worked for several years.

19   Q.    So he should have been paid higher than

20   you at that time?

21   A.    I have no idea.  I assumed he was.

22   Q.    I think we have covered this, but in

23   2019, Cindy Stewart is being paid more than

24   significant number of employees with Road &

25   Bridge.  Cindy Stewart, a female, correct?

Page 294

1    A.    Correct.

2    Q.    As a matter of fact, she is getting paid

3 more than anybody listed in the top half of this

4 document, other than Gator Tom Hiltz and Jeff

5 Gerard, correct?

6    A.    Yes.

7    Q.    Can you justify that based upon her

8 years of service, longevity and her training on

9 various pieces of equipment, correct?

10    A.    I don't justify it.  It is what it is.

11 I can't assume why she was being paid more.

12    Q.    She was a proficient operator; is that

13 correct?

14    A.    Yes.

15    Q.    You talked about Tim Morrison's

16 reputation as an operator, and in response to a

17 question asked of you by your attorney, and you

18 referred to Joe and Kip at the Cody shop.  Who

19 are you referring to?

20    A.    Joe and Kip.  I don't know their last

21 names.

22    Q.    Are their names on this document?  Kip

23 Matteson?

24    A.    Yes.

25    Q.    And Joe Becktold?

Page 295

1    A.    Becktold.

2    Q.    Are those two individuals that told you

3 what you testified to?

4    A.    Yes.

5    Q.    When did they tell you that?

6    A.    Several months ago, last year.

7    Q.    So November of 2023?

8    A.    I don't know.  I don't have that

9 information in front of me.  I can't give you an

10 exact date.

11    Q.    You didn't write that down in your diary

12 or on your calendar?

13    A.    I don't have that in front of me.

14    Q.    Did you write it down on your diary or

15 calendar?

16    A.    I don't know.

17    Q.    Listening to the response to your

18 questions in regards to damage to equipment, it

19 sounds to me like you are blaming Paco for the

20 damage to the John Deere tire because he didn't

21 direct somebody to inspect the ditch.  Is that

22 accurate?

23    A.    No.

24    Q.    Is that your responsibility?

25    A.    No.

Page 296

1    Q.    Whose responsibility is that -- the

2    tire?

3    A.    Everyone's responsibility.

4    Q.    But not yours.

5    A.    On the tire?  That is -- it's my

6    responsibility.  It happened while I was driving

7    it.

8    Q.    The belly dump tires, are you blaming

9    that on Kenny Marchant?

10   A.    No.

11   Q.    Is that your responsibility?

12   A.    Yes.

13   Q.    On the mower deck, is that the person

14   who welded it responsibility?

15   A.    No.

16   Q.    Is that your responsibility?

17   A.    It's not ruined, so no.

18   Q.    I am talking about the damage to the

19   mower deck.

20   A.    There was no damage to the mower deck.

21   There was damage to the wear item.

22   Q.    We will discuss that -- present those

23   photos at a later date, the ones you saw

24   yesterday.  In regards to the repairs made by

25   the mechanic, just so I understand it, you're

Page 297

1    not a mechanic, correct?

2    A.    I am not.

3    Q.    You never worked as a mechanic?

4    A.    No.

5    Q.    You didn't do the repairs on the vehicle

6    that you were referencing?

7    A.    No.

8    Q.    You talked about that you found it

9    offensive that somebody would have a rumor about

10   you and Chris Cooper.

11         Do you recall that testimony?

12   A.    Yes.

13   Q.    But if you and Chris Cooper were

14   conspiring to get Delray Paco Jones fired, that

15   would be something that would be relevant to

16   these proceedings, wouldn't it?

17   A.    No.

18   Q.    No?

19   A.    I don't know how.

20   Q.    Well, if you were motivated to get him

21   fired, that could be motive for this lawsuit,

22   couldn't it?

23   A.    It could be.

24   Q.    Okay.  So that is a fair question to

25   delve into the relationship that you had with

Page 298

1    Chris Cooper, who is the individual that

2    competed for Delray Jones' current position.

3    A.    No, he is my friend.  To jump to that

4    conclusion is wrong.

5    Q.    Do you find it offensive, and I think

6    you answered this yesterday, but surreptitiously

7    recording somebody isn't offensive, correct?

8    A.    No.

9    Q.    Taking photos of coworkers isn't

10   offensive, correct?

11   A.    Not in a public place, no.

12   Q.    And taking videos of coworkers isn't

13   offensive, correct?

14   A.    I did not take videos.

15   Q.    I didn't ask.  I just said, taking

16   videos of someone is not offensive to you.

17   Taking videos of coworkers?

18   A.    In a public place, no.

19   Q.    Even if the coworker doesn't know you're

20   doing it.

21   A.    Yes.

22   Q.    You talked about working with the Cody

23   shop on a regular basis.  It was my

24   understanding that the two shops did not work

25   together unless there was a summer project.  Is

Page 299

1    there a reason that you are working in the Cody

2    shop or with the Cody shop on a regular basis?

3       A.    I don't know.

4       Q.    But that is your testimony, correct?

5       A.    That is my testimony, yes.

6       Q.    How often has that been over the last

7    two months?

8       A.    We've worked with the Cody shop probably

9    90 percent of the time.

10      Q.    Doing what?

11      A.    Building a road.

12      Q.    Where is that road located?

13      A.    It's 7RP.  It is between Cody and Clark.

14      Q.    Last item, you mentioned a checklist

15   that you use on your other jobs, and I think you

16   said it twice, you plural.  Are there -- do you

17   have another job other than the mail hauling job

18   that we talked about yesterday?

19      A.    Not at this time, no.

20      Q.    Have you had other jobs while employed

21   for Park County?

22      A.    Yes, I used to run for special ops out

23   of Cody.

24      Q.    You testified as to that yesterday.

25      A.    Yes.

 1          MR. THOMPSON:  All right.  That's all I

 2   have.  You have the right to read and sign, or

 3   you may waive.

 4          MR. KELLER:  I don't think I have

 5   explained this to her, Tom.  So if you want to

 6   or if you want me to explain it, I am fine

 7   either way.

 8          MR. THOMPSON:  I just think the court

 9   reporter needs to know where to send the

10   deposition transcript to if it is a read and

11   sign.

12          MR. KELLER:  What he is asking you is do

13   you want to read your deposition before you --

14   you have the right to object to answers in the

15   end and clarify it.  Correct me if I am wrong,

16   Tom, but that opens up the ability for Tom to

17   come back and ask questions about what you have

18   written so.

19          THE WITNESS:  Okay.

20          MR. KELLER:  You can do that and then

21   sign it and send it in, or you can just get it

22   and sign it, or you can right now say, No, I

23   just waive signing it.  That is what he is

24   asking, Star.

25          THE WITNESS:  I don't know.

Page 301

1          MR. KELLER:  Would you like to read your

2     deposition before signing it?

3          THE WITNESS:  I would.

4          MR. KELLER:  Okay.

5          (At 12:04 p.m. the matter was completed)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 302

2          WITNESS' SIGNATURE/CORRECTION PAGE

4    If there are any typographical errors to your

5    Deposition, please indicate them below.

7    PAGE/LINE

8    _____Change to_____

9    _____Change to_____

10   _____Change to_____

11   _____Change to_____

12   Any other changes to your Deposition are to be
     listed below with a statement as to the reason
13   for such change.

14   PAGE/LINE           CORRECTION    REASON FOR CHANGE

15   _____

16   _____

17   _____

18   _____

19   _____

20        I, STARKIE CORNETT, do hereby certify that
     I have read the foregoing pages of my testimony
21   as transcribed, and that the same is a true and
     correct record of the testimony given by me in
22   this Deposition on March 13, 2024, except for
     the changes made.

23

24   _____          _____
     Date Signed                 STARKIE CORNETT
25

Page 303

```
 1

 2

 3                      CERTIFICATE

 4
          I, Barbara Morgenweck, Registered
 5   Professional Reporter, and Certified Court
     Reporter, do hereby certify that prior to the
 6   commencement of the examination the Deponent was
     duly sworn by me to testify to the truth, the
 7   whole truth and nothing but the truth.
          I DO FURTHER CERTIFY that the foregoing is
 8   a verbatim transcript of the testimony as taken
     stenographically by me at the time, place and on
 9   the date hereinbefore set forth, to the best of
     my ability.
10        I DO FURTHER CERTIFY that I am neither a
     relative nor employee nor attorney nor counsel
11   of any of the parties to this action, and that I
     am neither a relative nor employee of such
12   attorney or counsel, and that I am not
     financially interested in the action.
13        Dated this 2nd Day of April, 2024.

14

15
          Barbara Morgenweck
16

17        _____

     Barbara Morgenweck
18   COURT REPORTER
     Registered Professional Reporter
19   Certified Court Reporter NM # 526
     Notary Public
20

21

22

23

24

25
```

Exhibit 9:

Ron Nieters Deposition Transcript

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF WYOMING
 2

 3     STARKIE J. CORNETT,        ) Case No.:  22-CV-00034
                                  )
 4                  Plaintiff,    )
                                  )
 5     vs.                        )
                                  )
 6     PARK COUNTY BOARD OF       )
       COUNTY COMMISSIONERS and   )
 7     its PARK COUNTY ROAD AND   )
       BRIDGE DIVISION OF THE     )
 8     PUBLIC WORKS DEPARTMENT,   )
                                  )
 9                  Defendants.   )
       _____)
10

11

12

13

14             DEPOSITION OF RONALD C. NIETERS

15           TAKEN ON BEHALF OF THE PLAINTIFF

16                 AT CODY, WYOMING

17            APRIL 23, 2024 AT 2:40 P.M.

18

19

20

21

22     REPORTED BY:

23     JOAN F. MARSHALL, C.S.R.
       Notary Public
24

25
```

**Two Sisters Reporting Service**
**(307) 438-1629**

2

A P P E A R A N C E S

MR. MARSHALL E. KELLER, Attorney at Law, of the
Keller Law Firm, P.C., P.O. Box 111, Thermopolis,
Wyoming 82443, appearing for and on behalf of the
Plaintiff.

MR. THOMAS A. THOMPSON, Attorney at Law, of the
Wyoming Local Government Liability Pool, 6844
Yellowtail Road, Cheyenne, Wyoming 82009, appearing
for and on behalf of the Defendants.

Also present: Starkie J. Cornett and Brian
Edwards.

---

3

I N D E X

TESTIMONY OF RONALD C. NIETERS:          PAGE

Examination by Mr. Keller          4

DEPOSITION EXHIBITS: (Previously marked)   IDENT'D

12 - 7/15/20 Park County Position Statement 18

---

4

THE DEPOSITION OF RONALD C. NIETERS was
taken on behalf of the Plaintiff on this, the 23rd
day of April 2024, at the Park County Public Works
Conference Room, 2820 Highway 120 South, Cody,
Wyoming, before Two Sisters Reporting Service, by
Joan F. Marshall, Court Reporter and Notary Public
within and for the State of Wyoming, to be used in
an action pending in the United States District
Court for the District of Wyoming, said cause being
Cause No. 22-CV-00034 in said Court.

AND THEREUPON, the following testimony
was adduced, to wit:

RONALD C. NIETERS,
having been first duly sworn to tell the truth, the
whole truth and nothing but the truth relating to
said cause, deposes and says:

EXAMINATION

QUESTIONS BY MR. KELLER:

Q. Mr. Nieters, for the record, can you
state your full name.

A. Ronald Charles Nieters.

Q. And do you like being called Ron or --

A. That's fine.

Q. And, Ron, when did you -- well, I want to
back up. We'll lay down a few rules here first. I

---

5

almost forgot.

So when we're talking, one thing that we
try not to do is step on each other when we're
talking or talk over each other. So I'll do my
best to leave a pause, you know, before I ask
another question, and when I ask a question, just
pause. That way it helps the court reporter get a
complete record. Okay?

And when I ask questions, you're going to
have to be verbal about it because the court
reporter can't log in head nods and uhms and --
okay?

A. Yes.

MR. THOMPSON: You listened.

BY MR. KELLER:

Q. Thank you.

And the first question that we've asked
everybody is you just took an oath, and what is
your understanding of that oath?

A. That I should tell you what I know.

Q. And you understand that if you're not
honest, there's a possibility for legal
repercussions later on, correct?

A. Yes.

Q. Now, I'm just going to ask you a bit

6

1 about your background. You worked for the Park
2 County Road & Bridge?
3    A.    I did.
4    Q.    How long did you work for Park County
5 Road & Bridge?
6    A.    38 years.
7    Q.    And did you retire from Park County
8 Road & Bridge?
9    A.    I did.
10    Q.    When did you retire?
11    A.    Four years ago, I think. Is it three?
12 Three years ago.
13    Q.    About three years ago?
14    A.    Yeah.
15    Q.    2020, '21, somewhere in there?
16    A.    Actually, '21, I think. I just saw that
17 sign this morning.
18    Q.    And what was your position at the time of
19 retirement?
20    A.    Foreman.
21    Q.    And which shop out of were you foreman
22 at?
23    A.    Cody.
24    Q.    How long had you been in the position of
25 foreman before retirement?

7

1    A.    Frank Page left in '90 -- '92 or 3, and
2 then I took over foreman, Road & Bridge foreman.
3 But prior to that, I was -- actually, I was a
4 Road & Bridge superintendent, and then after, I was
5 Road & Bridge working foreman. And then when Frank
6 quit, they put me as Road & Bridge superintendent,
7 so I worked for the commissioners.
8    Q.    Okay. So can you explain the job
9 position as superintendent?
10    A.    Maintaining the county roads.
11    Q.    Were you overseeing the Powell and Cody
12 shop at the time or --
13    A.    No, just Cody. After Frank Page left,
14 they made me boss over here, and the guy in Powell
15 was over there.
16    Q.    And was that just a -- as foreman, is
17 that the same as being a superintendent?
18    A.    I guess.
19    Q.    And as the foreman, what's your -- well,
20 what were your responsibilities?
21    A.    For the road systems, take care of the
22 road systems.
23    Q.    By take care, do you mean -- your
24 responsibility as the foreman, what was the job
25 description?

8

1    A.    Actually, maintenance of all county
2 roads, snowplow, grading, building roads.
3    Q.    And were you in charge of employees?
4    A.    Yes.
5    Q.    About how many employees did you oversee
6 at that point?
7    A.    Oh, I think I had 12.
8    Q.    And were you also in charge of training
9 those employees?
10    A.    Yes, and the other hands also trained
11 employees.
12    Q.    And if another hand was training
13 employees, is that something you would assign
14 someone to do or --
15    A.    Yeah.
16    Q.    And did you also -- were you in charge of
17 evaluating skill levels of your employees?
18    A.    Yes.
19    Q.    Can you explain the process for
20 evaluating skill levels?
21    A.    I would go out and watch them. Like when
22 Star started, I would ride with her.
23    Q.    And when it came to training, can you
24 explain the -- at least when you were foreman, the
25 process for training an employee on a new piece of

9

1 equipment.
2    A.    I would assign them to a lead operator,
3 and they would go out with them. And I would take
4 the recommendations of them, the lead operator, on
5 how they were doing.
6    Q.    So if they were training someone, would
7 it be -- could you walk -- actually, just walk me
8 through the steps of how the training was supposed
9 to happen.
10    A.    Well, when they were training on a
11 grader, they would take another grader with them,
12 and they would grade together. And the lead
13 operator would talk to them, tell them what they're
14 doing right, tell them what they're doing wrong,
15 and then he would sometimes stop his grader and
16 just watch them. That's how we did it.
17    Q.    So it's not like you would just take
18 someone out and walk them around a piece of
19 equipment and show them the controls and let them
20 go to town or do the work?
21    A.    That, and we'd be up here in the back
22 just in our yard so they didn't screw anything up.
23    Q.    So you're saying that when you would walk
24 around and show them the equipment, you'd take them
25 out to the yard and watch them operate for a while

10

1  and make sure they had the basics?

2      A.    Had an idea of it, yes.

3      Q.    And then after that, did you just let

4  them go out on their own, or did they have to still

5  have someone observe them for a bit?

6      A.    They were with somebody.

7          MR. THOMPSON:  Counsel, I'm sorry.  Is

8  this my exhibit?

9          MR. KELLER:  It's the same one that you

10  handed -- 13.

11          (Whereupon, discussion was held off the

12  record.)

13  BY MR. KELLER:

14      Q.    All right.  And so when you're saying

15  someone was out there watching, it would be an

16  experienced equipment operator with them?

17      A.    Yes.

18      Q.    And then they would observe and give

19  instruction?

20      A.    Yes.

21      Q.    And as the foreman, who did you report

22  to?

23      A.    The county commissioners and the

24  engineer.  I would let the engineer know what we

25  were doing and where we were working.

11

1      Q.    So was Brian Edwards your boss, or was he

2  the same level as you?

3      A.    I would say that he was -- added

4  education, so I don't know if we would say we were

5  on the same page -- or same level, but I was there

6  a long time.

7      Q.    And were you the one that made

8  recommendations for advancements?

9      A.    Yes.

10      Q.    And you understand the pay grade scheme

11  that -- or at least at the time when you were

12  working?

13      A.    I do -- did.

14      Q.    And what were the different equipment

15  operator levels?

16      A.    Operator 1, 2 and 3.

17      Q.    And when Star was hired, do you know who

18  recommended hiring Star?

19      A.    I did.

20      Q.    And do you know what her starting

21  position was?

22      A.    What her -- operator -- or she was a

23  truck driver.  You were an operator 1.

24      Q.    Is that when she very first started --

25      A.    Yes.

12

1      Q.    -- with Road & Bridge?

2          Do you recall if she was hired full time

3  or temporary?

4      A.    She worked for us that summer flagging,

5  and then she got her training while she was part

6  time.  And when she was put on full time, she was

7  trained for that position.

8      Q.    Okay.

9      A.    She was qualified for that position.

10      Q.    And when she was working part time, what

11  equipment was she trained on?

12      A.    Well, in the summer she would sweep for

13  me, and then after the chips were all swept, we

14  started training her on a truck, an end dump and

15  then a belly dump.  And to run a truck and a belly

16  dump, you have to also learn how to run a loader

17  because you have to load your own truck.

18      Q.    And do you know if she had her CDL when

19  she started?

20      A.    She did not.

21      Q.    Okay.  Is that -- go ahead.

22      A.    We got it for her.

23      Q.    Okay.

24      A.    At that time, we could do that.  Now, I

25  don't think you can.  I think you have to go to

13

1  school for it now.

2      Q.    And when you were training Star, was that

3  the same process that you previously described as

4  other equipment operators?

5      A.    Yeah.

6      Q.    And you mentioned that you had trained

7  her on the belly dump?

8      A.    Yes.

9      Q.    And the dump truck and trailer?

10      A.    Yes.  You got that backwards.

11      Q.    Or trailer and -- yeah, go ahead and

12  explain it for us.

13      A.    We trained her on an end dump first and

14  then a belly dump.  That's a truck and trailer.

15      Q.    And I've heard the word "end dump" a

16  couple times.  Can you describe what an end dump

17  is?

18      A.    It's a -- I don't even know the GVW on

19  it.  It's just a dump truck.  It's a cab and a

20  truck and a box, and in that box goes a sander and

21  a plow for snow.

22      Q.    And you mentioned that you trained her on

23  the broom and sweep.

24      A.    Yes.

25      Q.    And was she trained in your shop as well

14

1  for the tractor and mower?

2  **A.**  Yes.

3  **Q.**  What about the --

4  **A.**  Well, I don't know if she's ever mowed

5  for me.  I don't -- we had Brock that did that, but

6  she might have been.  I can't remember, to be

7  honest with you.

8  **Q.**  And what about the water truck?

9  **A.**  Yes.

10  **Q.**  And the dozer?

11  **A.**  Yes.

12  **Q.**  Roller?

13  **A.**  Yes.

14  **Q.**  Chip spreader?

15  **A.**  I don't think she was ever on that.

16  **Q.**  Excavator?

17  **A.**  She dug a hole up here in the -- up in

18  the yard.

19  **Q.**  So as far as her training in your shop,

20  she was able to get in it in the yard here under

21  supervision --

22  **A.**  Yeah, she was.

23  **Q.**  -- is what you're saying?

24  **A.**  Yeah.

25  **Q.**  But she didn't get out on the job site

15

1  and operate?

2  **A.**  No.

3  **Q.**  What about the road grader?

4  **A.**  That was in the yard -- oh, and I took

5  her out on a road.  I don't remember what the road

6  number is.  It was out in --

7      MS. CORNETT:  Red Lake.

8  **A.**  -- Red Lake.

9      MR. THOMPSON:  You can't --

10  **A.**  Red Lake, and she got to operate it out

11  there a little bit, and I was in with her.

12  BY MR. KELLER:

13  **Q.**  Now, in regards to making recommendations

14  for advancement, what did you base the

15  recommendations on?

16      MR. THOMPSON:  Talking generally anyone?

17  BY MR. KELLER:

18  **Q.**  Yes, generally.

19  **A.**  Time.

20  **Q.**  And did you include a skill level in that

21  at all?

22  **A.**  Yeah.

23  **Q.**  Would you make recommendations based on

24  time only?

25  **A.**  Well, time, and they've got to be able to

16

1  run it.  They've got to be able to know what

2  they're doing.  They've got to be able to be let

3  out alone.

4  **Q.**  And during the time that Star Cornett was

5  in the Cody shop, did she have the skill levels on

6  the equipment that you mentioned to operate on her

7  own?

8  **A.**  No.

9  **Q.**  What equipment did she not have the skill

10  levels to operate on her own?

11  **A.**  Grader, excavator, dozer.

12  **Q.**  What about the belly dump?

13  **A.**  She was fine there.

14  **Q.**  The end dump?

15  **A.**  Fine.

16  **Q.**  And the water truck?

17  **A.**  Fine.

18  **Q.**  The broom and sweep?

19  **A.**  Fine.

20  **Q.**  And you mentioned you weren't sure about

21  the tractor and mower or you can't remember.

22  **A.**  Yeah, I don't remember if she mowed for

23  me or not because I always had a guy do that that

24  came, that was a summer hand.

25  **Q.**  And did you evaluate Star for

17

1  advancement?

2  **A.**  Yeah.

3  **Q.**  And did you make a recommendation for her

4  to advance?

5  **A.**  No.

6  **Q.**  And you never made a -- I'm going to ask

7  it another way.  Did you ever make a recommendation

8  for her to advance to equipment operator 2?

9  **A.**  No.

10  **Q.**  Why not?

11  **A.**  She needed time in the seat.

12      MR. KELLER:  Hold on one second, Tom.

13  Can we go off the record for a second.

14      (Whereupon, discussion was held off the

15  record.)

16  BY MR. KELLER:

17  **Q.**  Did you ever make a recommendation for a

18  pay advancement for Starkie Cornett?

19  **A.**  Yeah, I think I did.

20  **Q.**  And who did you make that recommendation

21  for the pay advancement to?

22  **A.**  Brian.

23  **Q.**  And do you recall what happened with that

24  recommendation?

25  **A.**  I think it was shot down by the county

18

1  commissioners.

2  **Q.** Do you recall when that was made?

3  **A.** I don't.

4  **Q.** Did you ever talk to a county attorney,

5  Mr. Hatfield?

6  **A.** I don't think so.

7  **Q.** What I have here is -- this has been in

8  our previous depositions. It's Exhibit 12.

9  MR. THOMPSON: Okay.

10  BY MR. KELLER:

11  **Q.** I want to just have you -- I want to have

12  you read this. The Bates number on Exhibit 12 is

13  3021, and it's the second to the last paragraph. I

14  want you to go ahead and --

15  **A.** This one?

16  **Q.** This one, the second to the bottom here.

17  Go ahead and read that to yourself real quick.

18  **A.** This one?

19  **Q.** Yes.

20  **A.** I'd have to read it again.

21  Okay. So I mean if I'm reading that

22  correctly, I mean the summation is that someone had

23  recommended Ms. Cornett a promotion to operator 2.

24  **A.** Okay.

25  **Q.** Is that your understanding of that

19

1  paragraph?

2  **A.** I guess, yes.

3  **Q.** And you're saying that wasn't you that

4  made the recommendation to equipment operator 2?

5  **A.** I don't even know who that is.

6  **Q.** All right. And by that, you don't know

7  who Mr. Hatfield is?

8  **A.** Huh-uh, no.

9  **Q.** When you made that recommendation, do you

10  recall if there was a wage freeze at that time?

11  MR. THOMPSON: Made what recommendation,

12  Counsel?

13  BY MR. KELLER:

14  **Q.** Let me make that clear. When you made

15  the recommendation for a pay increase, do you know

16  if there was a budget freeze at the time?

17  **A.** There very well could have been. We

18  didn't get raises for years.

19  **Q.** But you're not sure if there was or not?

20  **A.** No.

21  **Q.** When you made the recommendation -- I

22  think you may have answered this, but who was the

23  recommendation made directly to?

24  **A.** Brian.

25  **Q.** Brian. And you're stating Brian turned

20

1  that down?

2  **A.** No.

3  MR. THOMPSON: Objection as to form,

4  misstates his testimony.

5  BY MR. KELLER:

6  **Q.** I'm asking. So do you know if Brian

7  turned it down?

8  **A.** No.

9  **Q.** No, you don't know?

10  **A.** I don't know. I believe that the county

11  commissioners shut us down.

12  **Q.** And what makes you believe the county

13  commissioners shut it down?

14  **A.** Because they weren't giving anybody

15  raises at that time.

16  **Q.** Were there employees in the past that had

17  been hired that didn't meet expectations, did not?

18  **A.** I don't recall any.

19  **Q.** And let me -- I think that's probably a

20  poor question. When someone gets hired, they list

21  their experience on their application; is that

22  correct?

23  **A.** Yes.

24  **Q.** And do you recall anybody that had put

25  down experience on their application that wasn't --

21

1  that claimed to be an operator that needed

2  training?

3  **A.** No.

4  **Q.** And have you hired experienced employees

5  in the past that came with bad habits for operating

6  equipment?

7  **A.** I can't recall.

8  **Q.** And in your mind, what makes a good

9  equipment operator?

10  **A.** Experience and be able to run a crew when

11  they're out on the job.

12  **Q.** What about just operating the equipment?

13  You said run a crew.

14  **A.** That's an operator 3 actually.

15  **Q.** Yeah.

16  **A.** Would you --

17  **Q.** Yeah. Like if I was to say -- let's

18  pick -- well, let's say a dozer, if you were to --

19  or any single piece of equipment. What makes

20  someone a good operator of that piece of equipment?

21  **A.** Okay. When I go out there after they're

22  done and I can drive that road and I can tell if I

23  like it or not.

24  **Q.** And you're talking about whether or not

25  the end product is a good product?

22

1      A.    Yes.

2      Q.    And the equipment that you were able to

3   train Star on, do you believe you trained her to be

4   a good operator?

5      A.    Yes, in the truck and the stuff that she

6   was doing daily.

7      Q.    But to get to that point, you have to

8   have time in that piece of equipment?

9      A.    Yes.

10     Q.    And if someone was not getting time in

11  equipment, would that harm their career

12  advancement?

13     MR. THOMPSON:  Objection as to the form.

14     THE DEPONENT:  Pardon?

15     MR. THOMPSON:  I objected as to form.  Go

16  ahead and answer if you can.

17     A.    I'm not real sure.  Would you repeat that

18  one more time.

19  BY MR. KELLER:

20     Q.    Yes.  So if someone wasn't getting time

21  in various pieces of equipment, would that harm

22  their ability to advance to like say equipment

23  operator 2 or 3?

24     MR. THOMPSON:  Same objection.

25     A.    Not really because they -- if they stay

23

1   and they hang on and they hang with it, they will

2   eventually get some time.

3   BY MR. KELLER:

4      Q.    And do you recall what the skill level

5   was required to make operator 2?

6      A.    You had to drive truck, belly dump,

7   loader, run a grader, excavator.  You had to be

8   able to run pretty much all the equipment.

9      Q.    And that was to make it to only an

10  operator 2, not operator 3?

11     A.    That was operator 2.  Operator 3, you

12  needed to be able to run a crew and you had to be

13  able to run everything, be proficient in everything

14  that we have in the yard.

15     Q.    So for operator 3, you had to actually

16  not only know how to run it, but be able to do a

17  good job with it, what you mean by proficient?

18     A.    Yeah, and run the crew.

19     Q.    And for operator 2, did you have to be

20  proficient in all that equipment?

21     A.    Not so much.  You had to be able to run

22  it and run it well, I mean to where you weren't

23  endangering the public.

24     Q.    And do you recall when Star transferred

25  to Powell?

24

1      A.    The date?

2      Q.    Just roughly, yes.

3      A.    No.

4      Q.    But you do recall that she did transfer?

5      A.    Yes.

6      Q.    And whose choice was it for her to

7   transfer?

8      A.    She did.

9      Q.    Do you know why she requested a transfer?

10     A.    No.

11     Q.    Did she ever complain to you about

12  treatment from other employees in the Cody shop?

13     A.    Not to me.

14     Q.    Did Brian Edwards ever inform you that he

15  was taking complaints from Star Cornett to the

16  county attorney?

17     A.    I don't recall him telling me that.

18     Q.    And did you know Cindy Stewart?

19     A.    I did.

20     Q.    Did she ever work in the Cody shop with

21  you?

22     A.    Yeah.

23     Q.    How long ago was that?

24     A.    When she was actually working in Cody?

25     Q.    Yes.

25

1      A.    Oh, I -- long time ago.

2      Q.    So was she in the Powell shop when Star

3   came to work for you?

4      A.    Yes.

5      Q.    And did Cindy Stewart, did she retire

6   before you did?

7      A.    Yeah.

8      Q.    Did you get a chance to speak with her

9   about why she was retiring?

10     A.    No.

11     Q.    Did you ever meet with Cindy Stewart and

12  Brian Edwards?

13     A.    I don't recall.  Oh, strike that.  Brian

14  and I went over and talked to her.  About what, I

15  don't remember.  But yes, we -- I did go talk to

16  her with Brian Edwards.

17     Q.    You just don't recall the conversation?

18     A.    Huh-uh.

19     Q.    Do you recall where that conversation

20  happened?

21     A.    Out on a road somewhere in Powell in a

22  pickup.

23     MR. KELLER:  Do you mind if we take a

24  second with my client?

25     MR. THOMPSON:  Absolutely.

26

1       MR. KELLER:  I think I'm pretty much done

2  with my questions.

3       (Whereupon, discussion was held off the

4  record.)

5       MR. KELLER:  I don't have any further

6  questions, Tom.

7       MR. THOMPSON:  I don't have any

8  questions.  So we'll read and sign, and actually,

9  even though he's not an employee, we can still send

10  it -- we'll send it to Brian.  And he'll notify you

11  when it gets here, if that's all right with you.

12       THE DEPONENT:  Uh-huh.  He'll notify me

13  for what?

14       MR. THOMPSON:  To read your deposition.

15       (Whereupon, the deposition was concluded

16  at 3:22 p.m.)

17

18

19

20

21

22

23

24

25

---

27

1            CERTIFICATE OF WITNESS

2       I, RONALD C. NIETERS, being first duly

3  sworn, depose and say:

4       That I am the witness named in the

5  foregoing deposition consisting of pages 1 through

6  26; that I have read said deposition and know the

7  contents thereof; that the questions contained

8  therein were propounded to me; and that the answers

9  therein contained are true and correct except for

10  any changes that I may have listed on the Change

11  Sheet attached hereto.

12       Dated this_____day of_____2024.

13

14

15       _____

        RONALD C. NIETERS

16

17

18       SUBSCRIBED AND SWORN to before me this

19  _____day of_____2024.

20

21       _____

        NAME OF NOTARY PUBLIC

22       NOTARY PUBLIC FOR _____

23       RESIDING AT _____

24       MY COMMISSION EXPIRES _____

25

---

28

1  CHANGE SHEET FOR RONALD C. NIETERS

2  PAGE  LINE  READS     SHOULD READ    REASON
                   FOR CHANGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25       RONALD C. NIETERS

---

29

1       REPORTER'S CERTIFICATE

2

  STATE OF WYOMING    )

3              ) SS.

  COUNTY OF JOHNSON   )

4

5       I, Joan F. Marshall, a Notary Public in

6  and for the State of Wyoming, residing at Buffalo,
  County of Johnson, State of Wyoming, and a Court

7  Reporter, do hereby certify:

       That on the 23rd day of April 2024, at

8  2:40 p.m., there appeared before me RONALD C.
  NIETERS, pursuant to notice and stipulation of

9  counsel, as a witness in the foregoing cause;

       That pursuant to stipulation of counsel,

10  said witness was first duly sworn by me to tell the
  truth, the whole truth, and nothing but the truth

11  as he testified in said cause, and said witness was
  thereupon examined orally by counsel and made

12  answer thereto, under oath, as hereinabove
  contained;

13       That the foregoing testimony was taken by
  me in stenograph and thereafter reduced to

14  typewriting by me or under my supervision, and the
  foregoing 26 pages contain a full, true and correct

15  record of all the testimony given by the witness,
  to the best of my ability;

16       That the reading and signing of the
  deposition were expressly requested;

17       That I am not a relative or employee or
  attorney or counsel of any of the parties in said

18  cause, nor am I a relative or employee of such
  attorney or counsel, nor am I financially

19  interested in the action, nor am I a relative of
  any person interested in said action.

20       IN WITNESS WHEREOF, I have hereunto set my
  hand and seal this 30th day of April 2024.

21

22       _____

        JOAN F. MARSHALL, C.S.R.

23       Notary Public
        196 Links Lane

24       Buffalo, Wyoming 82834

25

  My Commission expires August 24, 2029.

**'**

**'21** [2] - 6:15, 6:16
**'90** [1] - 7:1
**'92** [1] - 7:1

**1**

**1** [3] - 11:16, 11:23, 27:5
**111** [1] - 2:4
**12** [4] - 3:6, 8:7, 18:8, 18:12
**120** [1] - 4:4
**13** [1] - 10:10
**18** [1] - 3:6
**196** [1] - 29:23

**2**

**2** [9] - 11:16, 17:8, 18:23, 19:4, 22:23, 23:5, 23:10, 23:11, 23:19
**2020** [1] - 6:15
**2024** [4] - 1:17, 4:3, 29:7, 29:20
**2029** [1] - 29:25
**22-CV-00034** [2] - 1:3, 4:10
**23** [1] - 1:17
**23rd** [2] - 4:2, 29:7
**24** [1] - 29:25
**26** [2] - 27:6, 29:14
**2820** [1] - 4:4
**2:40** [2] - 1:17, 29:7

**3**

**3** [7] - 7:1, 11:16, 21:14, 22:23, 23:10, 23:11, 23:15
**3021** [1] - 18:13
**30th** [1] - 29:20
**38** [1] - 6:6
**3:22** [1] - 26:16

**4**

**4** [1] - 3:3

**6**

**6844** [1] - 2:9

**7**

**7/15/20** [1] - 3:6

**8**

**82009** [1] - 2:10
**82443** [1] - 2:5
**82834** [1] - 29:24

**A**

**ability** [2] - 22:22, 29:15
**able** [11] - 14:20, 15:25, 16:1, 16:2, 21:10, 22:2, 23:8, 23:12, 23:13, 23:16, 23:21
**absolutely** [1] - 25:25
**action** [3] - 4:8, 29:18, 29:19
**added** [1] - 11:3
**adduced** [1] - 4:12
**advance** [3] - 17:4, 17:8, 22:22
**advancement** [5] - 15:14, 17:1, 17:18, 17:21, 22:12
**advancements** [1] - 11:8
**ago** [5] - 6:11, 6:12, 6:13, 24:23, 25:1
**ahead** [5] - 12:21, 13:11, 18:14, 18:17, 22:16
**almost** [1] - 5:1
**alone** [1] - 16:3
**AND** [3] - 1:7, 4:11, 27:18
**answer** [2] - 22:16, 29:11
**answered** [1] - 19:22
**answers** [1] - 27:8
**appeared** [1] - 29:7
**appearing** [2] - 2:5, 2:10
**application** [2] - 20:21, 20:25
**April** [3] - 4:3, 29:7, 29:20
**APRIL** [1] - 1:17
**assign** [2] - 8:13, 9:2
**AT** [3] - 1:16, 1:17, 27:23
**attached** [1] - 27:11
**attorney** [4] - 18:4, 24:16, 29:17, 29:18

**Attorney** [2] - 2:3, 2:8
**August** [1] - 29:25

**B**

**background** [1] - 6:1
**backwards** [1] - 13:10
**bad** [1] - 21:5
**base** [1] - 15:14
**based** [1] - 15:23
**basics** [1] - 10:1
**Bates** [1] - 18:12
**BEHALF** [1] - 1:15
**behalf** [3] - 2:5, 2:11, 4:2
**belly** [6] - 12:15, 13:7, 13:14, 16:12, 23:6
**best** [2] - 5:5, 29:15
**bit** [3] - 5:25, 10:5, 15:11
**BOARD** [1] - 1:6
**boss** [2] - 7:14, 11:1
**bottom** [1] - 18:16
**Box** [1] - 2:4
**box** [1] - 13:20
**Brian** [12] - 2:13, 11:1, 17:22, 19:24, 19:25, 20:6, 24:14, 25:12, 25:13, 25:16, 26:10
**Bridge** [8] - 6:2, 6:5, 6:8, 7:2, 7:4, 7:5, 7:6, 12:1
**BRIDGE** [1] - 1:7
**Brock** [1] - 14:5
**broom** [2] - 13:23, 16:18
**budget** [1] - 19:16
**Buffalo** [2] - 29:5, 29:24
**building** [1] - 8:2
**BY** [12] - 1:22, 4:18, 5:15, 10:13, 15:12, 15:17, 16:16, 18:10, 19:13, 20:5, 22:19, 23:3

**C**

**C.S.R** [2] - 1:23, 29:22
**cab** [1] - 13:19
**care** [2] - 7:21, 7:23
**career** [1] - 22:11
**Case** [1] - 1:3
**CDL** [1] - 12:18
**CERTIFICATE** [2] - 27:1, 29:1
**certify** [1] - 29:6
**chance** [1] - 25:8

**Change** [1] - 27:10
**CHANGE** [2] - 28:1, 28:2
**changes** [1] - 27:10
**charge** [3] - 8:3, 8:8, 8:16
**Charles** [1] - 4:21
**Cheyenne** [1] - 2:10
**chip** [1] - 14:14
**chips** [1] - 12:13
**choice** [1] - 24:6
**Cindy** [3] - 24:18, 25:5, 25:11
**claimed** [1] - 21:1
**clear** [1] - 19:14
**client** [1] - 25:24
**Cody** [8] - 4:4, 6:23, 7:11, 7:13, 16:5, 24:12, 24:20, 24:24
**CODY** [1] - 1:16
**Commission** [1] - 29:25
**COMMISSION** [1] - 27:24
**COMMISSIONERS** [1] - 1:6
**commissioners** [5] - 7:7, 10:23, 18:1, 20:11, 20:13
**complain** [1] - 24:11
**complaints** [1] - 24:15
**complete** [1] - 5:8
**concluded** [1] - 26:15
**Conference** [1] - 4:4
**consisting** [1] - 27:5
**contain** [1] - 29:14
**contained** [3] - 27:7, 27:9, 29:12
**contents** [1] - 27:7
**controls** [1] - 9:19
**conversation** [2] - 25:17, 25:19
**CORNETT** [2] - 1:3, 15:7
**Cornett** [5] - 2:13, 16:4, 17:18, 18:23, 24:15
**correct** [4] - 5:23, 20:22, 27:9, 29:14
**correctly** [1] - 18:22
**counsel** [6] - 10:7, 29:8, 29:9, 29:11, 29:17, 29:18
**Counsel** [1] - 19:12
**county** [8] - 7:10, 8:1, 10:23, 17:25, 18:4, 20:10, 20:12, 24:16
**County** [6] - 3:6, 4:3, 6:2, 6:4, 6:7, 29:6
**COUNTY** [4] - 1:6, 1:6,

1:7, 29:3
**couple** [1] - 13:16
**COURT** [1] - 1:1
**court** [2] - 5:7, 5:10
**Court** [4] - 4:6, 4:9, 4:10, 29:6
**crew** [4] - 21:10, 21:13, 23:12, 23:18

**D**

**daily** [1] - 22:6
**date** [1] - 24:1
**Dated** [1] - 27:12
**Defendants** [2] - 1:9, 2:11
**DEPARTMENT** [1] - 1:8
**DEPONENT** [2] - 22:14, 26:12
**depose** [1] - 27:3
**deposes** [1] - 4:16
**DEPOSITION** [3] - 1:14, 3:5, 4:1
**deposition** [5] - 26:14, 26:15, 27:5, 27:6, 29:16
**depositions** [1] - 18:8
**describe** [1] - 13:16
**described** [1] - 13:3
**description** [1] - 7:25
**different** [1] - 11:14
**directly** [1] - 19:23
**discussion** [3] - 10:11, 17:14, 26:3
**District** [2] - 4:8, 4:9
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:7
**done** [2] - 21:22, 26:1
**down** [7] - 4:25, 17:25, 20:1, 20:7, 20:11, 20:13, 20:25
**dozer** [3] - 14:10, 16:11, 21:18
**drive** [2] - 21:22, 23:6
**driver** [1] - 11:23
**dug** [1] - 14:17
**duly** [3] - 4:14, 27:2, 29:9
**dump** [13] - 12:14, 12:15, 12:16, 13:7, 13:9, 13:13, 13:14, 13:15, 13:16, 13:19, 16:12, 16:14, 23:6
**during** [1] - 16:4

## E

**education** [1] - 11:4
**Edwards** [5] - 2:14, 11:1, 24:14, 25:12, 25:16
**employee** [4] - 8:25, 26:9, 29:16, 29:17
**employees** [9] - 8:3, 8:5, 8:9, 8:11, 8:13, 8:17, 20:16, 21:4, 24:12
**end** [6] - 12:14, 13:13, 13:15, 13:16, 16:14, 21:25
**endangering** [1] - 23:23
**engineer** [2] - 10:24
**equipment** [23] - 9:1, 9:19, 9:24, 10:16, 11:14, 12:11, 13:4, 16:6, 16:9, 17:8, 19:4, 21:6, 21:9, 21:12, 21:19, 21:20, 22:2, 22:8, 22:11, 22:21, 22:22, 23:8, 23:20
**evaluate** [1] - 16:25
**evaluating** [2] - 8:17, 8:20
**eventually** [1] - 23:2
**Examination** [1] - 3:3
**EXAMINATION** [1] - 4:17
**examined** [1] - 29:11
**excavator** [3] - 14:16, 16:11, 23:7
**except** [1] - 27:9
**Exhibit** [2] - 18:8, 18:12
**exhibit** [1] - 10:8
**EXHIBITS** [1] - 3:5
**expectations** [1] - 20:17
**experience** [3] - 20:21, 20:25, 21:10
**experienced** [2] - 10:16, 21:4
**EXPIRES** [1] - 27:24
**expires** [1] - 29:25
**explain** [4] - 7:8, 8:19, 8:24, 13:12
**expressly** [1] - 29:16

## F

**far** [1] - 14:19
**few** [1] - 4:25

**financially** [1] - 29:18
**fine** [5] - 4:23, 16:13, 16:15, 16:17, 16:19
**Firm** [1] - 2:4
**first** [7] - 4:14, 4:25, 5:17, 11:24, 13:13, 27:2, 29:9
**flagging** [1] - 12:4
**following** [1] - 4:11
**FOR** [1] - 1:1, 27:22, 28:1, 28:2
**foregoing** [4] - 27:5, 29:8, 29:12, 29:14
**foreman** [11] - 6:20, 6:21, 6:25, 7:2, 7:5, 7:16, 7:19, 7:24, 8:24, 10:21
**forgot** [1] - 5:1
**form** [3] - 20:3, 22:13, 22:15
**four** [1] - 6:11
**Frank** [3] - 7:1, 7:5, 7:13
**freeze** [2] - 19:10, 19:16
**full** [4] - 4:20, 12:2, 12:6, 29:14

## G

**generally** [2] - 15:16, 15:18
**given** [1] - 29:14
**Government** [1] - 2:9
**grade** [2] - 9:12, 11:10
**grader** [6] - 9:11, 9:15, 15:3, 16:11, 23:7
**grading** [1] - 8:2
**guess** [2] - 7:18, 19:2
**guy** [2] - 7:14, 16:23
**GVW** [1] - 13:18

## H

**habits** [1] - 21:5
**hand** [3] - 8:12, 16:24, 29:20
**handed** [1] - 10:10
**hands** [1] - 8:10
**hang** [2] - 23:1
**harm** [2] - 22:11, 22:21
**Hatfield** [2] - 18:5, 19:7
**head** [1] - 5:11
**heard** [1] - 13:15
**held** [3] - 10:11, 17:14, 26:3

**helps** [1] - 5:7
**hereby** [1] - 29:6
**hereinabove** [1] - 29:11
**hereto** [1] - 27:11
**hereunto** [1] - 29:19
**Highway** [1] - 4:4
**hired** [5] - 11:17, 12:2, 20:17, 20:20, 21:4
**hiring** [1] - 11:18
**hold** [1] - 17:12
**hole** [1] - 14:17
**honest** [2] - 5:22, 14:7

## I

**idea** [1] - 10:2
**IDENT'D** [1] - 3:5
**IN** [2] - 1:1, 29:19
**include** [1] - 15:20
**increase** [1] - 19:15
**inform** [1] - 24:14
**instruction** [1] - 10:19
**interested** [2] - 29:18, 29:19

## J

**JOAN** [2] - 1:23, 29:22
**Joan** [2] - 4:6, 29:5
**job** [5] - 7:8, 7:24, 14:25, 21:11, 23:17
**JOHNSON** [1] - 29:3
**Johnson** [1] - 29:6

## K

**KELLER** [17] - 2:3, 4:18, 5:15, 10:9, 10:13, 15:12, 15:17, 17:12, 17:16, 18:10, 19:13, 20:5, 22:19, 23:3, 25:23, 26:1, 26:5
**Keller** [2] - 2:4, 3:3

## L

**Lake** [3] - 15:7, 15:8, 15:10
**Lane** [1] - 29:23
**last** [1] - 18:13
**Law** [3] - 2:3, 2:4, 2:8
**lay** [1] - 4:25
**lead** [3] - 9:2, 9:4, 9:12
**learn** [1] - 12:16
**least** [2] - 8:24, 11:11

**leave** [1] - 5:5
**left** [2] - 7:1, 7:13
**legal** [1] - 5:22
**level** [4] - 11:2, 11:5, 15:20, 23:4
**levels** [5] - 8:17, 8:20, 11:15, 16:5, 16:10
**Liability** [1] - 2:9
**LINE** [1] - 28:2
**Links** [1] - 29:23
**list** [1] - 20:20
**listed** [1] - 27:10
**listened** [1] - 5:14
**load** [1] - 12:17
**loader** [2] - 12:16, 23:7
**Local** [1] - 2:9
**log** [1] - 5:11

## M

**maintaining** [1] - 7:10
**maintenance** [1] - 8:1
**marked** [1] - 3:5
**MARSHALL** [3] - 1:23, 2:3, 29:22
**Marshall** [2] - 4:6, 29:5
**mean** [5] - 7:23, 18:21, 18:22, 23:17, 23:22
**meet** [2] - 20:17, 25:11
**mentioned** [4] - 13:6, 13:22, 16:6, 16:20
**might** [1] - 14:6
**mind** [2] - 21:8, 25:23
**misstates** [1] - 20:4
**morning** [1] - 6:17
**mowed** [2] - 14:4, 16:22
**mower** [1] - 14:1, 16:21
**MR** [31] - 2:3, 2:8, 4:18, 5:14, 5:15, 10:7, 10:9, 10:13, 15:9, 15:12, 15:16, 15:17, 17:12, 17:16, 18:9, 18:10, 19:11, 19:13, 20:3, 20:5, 22:13, 22:15, 22:19, 22:24, 23:3, 25:23, 25:25, 26:1, 26:5, 26:7, 26:14
**MS** [1] - 15:7
**MY** [1] - 27:24

## N

**name** [1] - 4:20

**NAME** [1] - 27:21
**named** [1] - 27:4
**needed** [3] - 17:11, 21:1, 23:12
**never** [1] - 17:6
**new** [1] - 8:25
**NIETERS** [9] - 1:14, 3:2, 4:1, 4:13, 27:2, 27:15, 28:1, 28:25, 29:8
**Nieters** [2] - 4:19, 4:21
**NOTARY** [2] - 27:21, 27:22
**Notary** [4] - 1:24, 4:6, 29:5, 29:23
**nothing** [2] - 4:15, 29:10
**notice** [1] - 29:8
**notify** [2] - 26:10, 26:12
**number** [2] - 15:6, 18:12

## O

**oath** [3] - 5:18, 5:19, 29:11
**objected** [1] - 22:15
**objection** [3] - 20:3, 22:13, 22:24
**observe** [2] - 10:5, 10:18
**OF** [11] - 1:1, 1:6, 1:7, 1:14, 1:15, 3:2, 4:1, 27:1, 27:21, 29:2, 29:3
**of_____2024** [1] - 27:12
**of_____ _____2024** [1] - 27:19
**ON** [1] - 1:15
**one** [8] - 5:2, 10:9, 11:7, 17:12, 18:15, 18:16, 18:18, 22:18
**operate** [5] - 9:25, 15:1, 15:10, 16:6, 16:10
**operating** [2] - 21:5, 21:12
**operator** [24] - 9:2, 9:4, 9:13, 10:16, 11:15, 11:16, 11:22, 11:23, 17:8, 18:23, 19:4, 21:1, 21:9, 21:14, 21:20, 22:4, 22:23, 23:5, 23:10, 23:11, 23:15, 23:19
**operators** [1] - 13:4

**orally** [1] - 29:11
**oversee** [1] - 8:5
**overseeing** [1] - 7:11
**own** [4] - 10:4, 12:17, 16:7, 16:10

## P

**P.C** [1] - 2:4
**p.m** [2] - 26:16, 29:7
**P.M** [1] - 1:17
**P.O** [1] - 2:4
**PAGE** [2] - 3:2, 28:2
**Page** [2] - 7:1, 7:13
**page** [1] - 11:5
**pages** [2] - 27:5, 29:14
**paragraph** [2] - 18:13, 19:1
**pardon** [1] - 22:14
**PARK** [2] - 1:6, 1:7
**Park** [5] - 3:6, 4:3, 6:1, 6:4, 6:7
**part** [2] - 12:5, 12:10
**parties** [1] - 29:17
**past** [2] - 20:16, 21:5
**pause** [2] - 5:5, 5:7
**pay** [4] - 11:10, 17:18, 17:21, 19:15
**pending** [1] - 4:8
**person** [1] - 29:19
**pick** [1] - 21:18
**pickup** [1] - 25:22
**piece** [5] - 8:25, 9:18, 21:19, 21:20, 22:8
**pieces** [1] - 22:21
**Plaintiff** [3] - 1:4, 2:6, 4:2
**PLAINTIFF** [1] - 1:15
**plow** [1] - 13:21
**point** [2] - 8:6, 22:7
**Pool** [1] - 2:9
**poor** [1] - 20:20
**position** [6] - 6:18, 6:24, 7:9, 11:21, 12:7, 12:9
**Position** [1] - 3:6
**possibility** [1] - 5:22
**Powell** [5] - 7:11, 7:14, 23:25, 25:2, 25:21
**present** [1] - 2:13
**pretty** [2] - 23:8, 26:1
**previous** [1] - 18:8
**previously** [2] - 3:5, 13:3
**process** [3] - 8:19, 8:25, 13:3
**product** [2] - 21:25
**proficient** [3] - 23:13, 23:17, 23:20

**promotion** [1] - 18:23
**propounded** [1] - 27:8
**PUBLIC** [3] - 1:8, 27:21, 27:22
**public** [1] - 23:23
**Public** [5] - 1:24, 4:3, 4:6, 29:5, 29:23
**pursuant** [2] - 29:8, 29:9
**put** [3] - 7:6, 12:6, 20:24

## Q

**qualified** [1] - 12:9
**QUESTIONS** [1] - 4:18
**questions** [5] - 5:9, 26:2, 26:6, 26:8, 27:7
**quick** [1] - 18:17
**quit** [1] - 7:6

## R

**raises** [2] - 19:18, 20:15
**READ** [1] - 28:2
**read** [6] - 18:12, 18:17, 18:20, 26:8, 26:14, 27:6
**reading** [2] - 18:21, 29:15
**READS** [1] - 28:2
**real** [2] - 18:17, 22:17
**really** [1] - 22:25
**REASON** [1] - 28:2
**recommendation** [11] - 17:3, 17:7, 17:17, 17:20, 17:24, 19:4, 19:9, 19:11, 19:15, 19:21, 19:23
**recommendations** [5] - 9:4, 11:8, 15:13, 15:15, 15:23
**recommended** [2] - 11:18, 18:23
**record** [7] - 4:19, 5:8, 10:12, 17:13, 17:15, 26:4, 29:14
**Red** [3] - 15:7, 15:8, 15:10
**reduced** [1] - 29:13
**regards** [1] - 15:13
**relating** [1] - 4:15
**relative** [3] - 29:16, 29:17, 29:18
**remember** [5] - 14:6, 15:5, 16:21, 16:22,

25:15
**repeat** [1] - 22:17
**repercussions** [1] - 5:23
**report** [1] - 10:21
**REPORTED** [1] - 1:22
**Reporter** [2] - 4:6, 29:6
**reporter** [2] - 5:7, 5:11
**REPORTER 'S** [1] - 29:1
**Reporting** [1] - 4:5
**requested** [2] - 24:9, 29:16
**required** [1] - 23:5
**residing** [1] - 29:5
**RESIDING** [1] - 27:23
**responsibilities** [1] - 7:20
**responsibility** [1] - 7:24
**retire** [3] - 6:7, 6:10, 25:5
**retirement** [2] - 6:19, 6:25
**retiring** [1] - 25:9
**ride** [1] - 8:22
**ROAD** [1] - 1:7
**road** [7] - 7:21, 7:22, 15:3, 15:5, 21:22, 25:21
**Road** [9] - 2:10, 6:2, 6:5, 6:8, 7:2, 7:4, 7:5, 7:6, 12:1
**roads** [3] - 7:10, 8:2
**roller** [1] - 14:12
**Ron** [2] - 4:22, 4:24
**RONALD** [9] - 1:14, 3:2, 4:1, 4:13, 27:2, 27:15, 28:1, 28:25, 29:7
**Ronald** [1] - 4:21
**Room** [1] - 4:4
**roughly** [1] - 24:2
**rules** [1] - 4:25
**run** [13] - 12:15, 12:16, 16:1, 21:10, 21:13, 23:7, 23:8, 23:12, 23:13, 23:16, 23:18, 23:21, 23:22

## S

**sander** [1] - 13:20
**saw** [1] - 6:16
**scheme** [1] - 11:10
**school** [1] - 13:1
**screw** [1] - 9:22
**seal** [1] - 29:20

**seat** [1] - 17:11
**second** [5] - 17:12, 17:13, 18:13, 18:16, 25:24
**send** [2] - 26:9, 26:10
**Service** [1] - 4:5
**set** [1] - 29:19
**Sheet** [1] - 27:11
**SHEET** [1] - 28:1
**shop** [8] - 6:21, 7:12, 13:25, 14:19, 16:5, 24:12, 24:20, 25:2
**shot** [1] - 17:25
**SHOULD** [1] - 28:2
**show** [2] - 9:19, 9:24
**shut** [2] - 20:11, 20:13
**sign** [2] - 6:17, 26:8
**signing** [1] - 29:15
**single** [1] - 21:19
**Sisters** [1] - 4:5
**site** [1] - 14:25
**skill** [6] - 8:17, 8:20, 15:20, 16:5, 16:9, 23:4
**snow** [1] - 13:21
**snowplow** [1] - 8:2
**someone** [10] - 8:14, 9:6, 9:18, 10:5, 10:15, 18:22, 20:20, 21:20, 22:10, 22:20
**sometimes** [1] - 9:15
**somewhere** [2] - 6:15, 25:21
**sorry** [1] - 10:7
**South** [1] - 4:4
**spreader** [1] - 14:14
**SS** [1] - 29:3
**Star** [10] - 8:22, 11:17, 11:18, 13:2, 16:4, 16:25, 22:3, 23:24, 24:15, 25:2
**Starkie** [2] - 2:13, 17:18
**STARKIE** [1] - 1:3
**started** [4] - 8:22, 11:24, 12:14, 12:19
**starting** [1] - 11:20
**State** [3] - 4:7, 29:5, 29:6
**state** [1] - 4:20
**STATE** [1] - 29:2
**Statement** [1] - 3:6
**STATES** [1] - 1:1
**States** [1] - 4:8
**stating** [1] - 19:25
**stay** [1] - 22:25
**stenograph** [1] - 29:13
**step** [1] - 5:3

**steps** [1] - 9:8
**Stewart** [3] - 24:18, 25:5, 25:11
**still** [2] - 10:4, 26:9
**stipulation** [2] - 29:8, 29:9
**stop** [1] - 9:15
**strike** [1] - 25:13
**stuff** [1] - 22:5
**SUBSCRIBED** [1] - 27:18
**summation** [1] - 18:22
**summer** [3] - 12:4, 12:12, 16:24
**superintendent** [4] - 7:4, 7:6, 7:9, 7:17
**supervision** [2] - 14:21, 29:13
**supposed** [1] - 9:8
**sweep** [3] - 12:12, 13:23, 16:18
**swept** [1] - 12:13
**sworn** [3] - 4:14, 27:3, 29:9
**SWORN** [1] - 27:18
**systems** [2] - 7:21, 7:22

## T

**TAKEN** [1] - 1:15
**temporary** [1] - 12:3
**testified** [1] - 29:10
**TESTIMONY** [1] - 3:2
**testimony** [4] - 4:11, 20:4, 29:12, 29:14
**THE** [7] - 1:1, 1:1, 1:7, 1:15, 4:1, 22:14, 26:12
**thereafter** [1] - 29:13
**therein** [2] - 27:8, 27:9
**thereof** [1] - 27:7
**thereto** [1] - 29:11
**THEREUPON** [1] - 4:11
**thereupon** [1] - 29:11
**Thermopolis** [1] - 2:4
**they've** [3] - 15:25, 16:1, 16:2
**this_____day** [1] - 27:12
**THOMAS** [1] - 2:8
**THOMPSON** [14] - 2:8, 5:14, 10:7, 15:9, 15:16, 18:9, 19:11, 20:3, 22:13, 22:15, 22:24, 25:25, 26:7, 26:14
**three** [3] - 6:11, 6:12,

6:13
**together** [1] - 9:12
**Tom** [2] - 17:12, 26:6
**took** [3] - 5:18, 7:2, 15:4
**town** [1] - 9:20
**tractor** [2] - 14:1, 16:21
**trailer** [3] - 13:9, 13:11, 13:14
**train** [1] - 22:3
**trained** [8] - 8:10, 12:7, 12:11, 13:6, 13:13, 13:22, 13:25, 22:3
**training** [12] - 8:8, 8:12, 8:23, 8:25, 9:6, 9:8, 9:10, 12:5, 12:14, 13:2, 14:19, 21:2
**transfer** [3] - 24:4, 24:7, 24:9
**transferred** [1] - 23:24
**treatment** [1] - 24:12
**truck** [12] - 11:23, 12:14, 12:15, 12:17, 13:9, 13:14, 13:19, 13:20, 14:8, 16:16, 22:5, 23:6
**true** [2] - 27:9, 29:14
**truth** [6] - 4:14, 4:15, 29:10
**try** [1] - 5:3
**turned** [2] - 19:25, 20:7
**Two** [1] - 4:5
**typewriting** [1] - 29:13

## U

**uhms** [1] - 5:11
**under** [3] - 14:20, 29:11, 29:13
**UNITED** [1] - 1:1
**United** [1] - 4:8
**up** [5] - 4:25, 9:21, 9:22, 14:17

## V

**various** [1] - 22:21
**verbal** [1] - 5:10
**vs** [1] - 1:5

## W

**wage** [1] - 19:10
**walk** [4] - 9:7, 9:18,

9:23
**watch** [3] - 8:21, 9:16, 9:25
**watching** [1] - 10:15
**water** [2] - 14:8, 16:16
**WHEREOF** [1] - 29:19
**whole** [2] - 4:15, 29:10
**wit** [1] - 4:12
**WITNESS** [2] - 27:1, 29:19
**witness** [5] - 27:4, 29:8, 29:9, 29:10, 29:14
**word** [1] - 13:15
**Works** [1] - 4:3
**WORKS** [1] - 1:8
**WYOMING** [3] - 1:1, 1:16, 29:2
**Wyoming** [9] - 2:5, 2:9, 2:10, 4:5, 4:7, 4:9, 29:5, 29:6, 29:24

## Y

**yard** [6] - 9:22, 9:25, 14:18, 14:20, 15:4, 23:14
**years** [5] - 6:6, 6:11, 6:12, 6:13, 19:18
**Yellowtail** [1] - 2:10
**yourself** [1] - 18:17

Exhibit 10:

Kelly Triplett Deposition Transcript

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF WYOMING
 2

 3      STARKIE J. CORNETT,        ) Case No.:  22-CV-00034
                                   )
 4                    Plaintiff,   )
                                   )
 5      vs.                        )
                                   )
 6      PARK COUNTY BOARD OF       )
        COUNTY COMMISSIONERS and   )
 7      its PARK COUNTY ROAD AND   )
        BRIDGE DIVISION OF THE     )
 8      PUBLIC WORKS DEPARTMENT,   )
                                   )
 9                    Defendants.  )
        _____)
10

11

12

13

14            DEPOSITION OF KELLY J. TRIPLETT

15          TAKEN ON BEHALF OF THE PLAINTIFF

16                 AT CODY, WYOMING

17           APRIL 23, 2024 AT 10:05 A.M.

18

19

20

21

22      REPORTED BY:

23      JOAN F. MARSHALL, C.S.R.
        Notary Public
24

25
```

**Two Sisters Reporting Service**
**(307) 438-1629**

2

<u>A P P E A R A N C E S</u>

MR. MARSHALL E. KELLER, Attorney at Law, of the Keller Law Firm, P.C., P.O. Box 111, Thermopolis, Wyoming 82443, appearing for and on behalf of the Plaintiff.

MR. THOMAS A. THOMPSON, Attorney at Law, of the Wyoming Local Government Liability Pool, 6844 Yellowtail Road, Cheyenne, Wyoming 82009, appearing for and on behalf of the Defendants.

Also present:  Starkie J. Cornett and Brian Edwards.

3

<u>I N D E X</u>

TESTIMONY OF KELLY J. TRIPLETT:            PAGE

Examination by Mr. Keller            4

DEPOSITION EXHIBITS:  (Previously marked)  REFERRED

13 - Summary of Wage Adjustments            8

4

THE DEPOSITION OF KELLY J. TRIPLETT was taken on behalf of the Plaintiff on this, the 23rd day of April 2024, at the Park County Public Works Conference Room, 2820 Highway 120 South, Cody, Wyoming, before Two Sisters Reporting Service, by Joan F. Marshall, Court Reporter and Notary Public within and for the State of Wyoming, to be used in an action pending in the United States District Court for the District of Wyoming, said cause being Cause No. 22-CV-00034 in said Court.

AND THEREUPON, the following testimony was adduced, to wit:

KELLY J. TRIPLETT, having been first duly sworn to tell the truth, the whole truth and nothing but the truth relating to said cause, deposes and says:

<u>EXAMINATION</u>

QUESTIONS BY MR. KELLER:

Q.    Mr. Kelly Triplett, my name is Marshall Keller.  What do you prefer being called?

A.    Kelly or Snuf is fine.

Q.    And you were just sworn in and gave your oath.  What does that oath mean to you?

A.    Better not lie.

Q.    And you understand that if you do, then

5

there's potential ramifications legal-wise that go along with that?

A.    Yes.

Q.    And prior to today, did you do any preparation for the depositions?

A.    I talked with Tom here.

Q.    Other than meeting with the attorney, did you speak with anybody else?

A.    No.

Q.    And you're a current employee of Park County Road & Bridge?

A.    Yes.

Q.    Which shop do you work out of?

A.    The Powell shop.

Q.    Have you always worked in the Powell shop?

A.    Yes.

Q.    When did you start?

A.    April of '11, 2011.

Q.    And before working for Park County Road & Bridge, where did you work?

A.    I worked for the Big Horn Co-op.

Q.    What did you do for Big Horn Co-op?

A.    I drove their bulk truck, fuel delivery truck.

6

1  Q.  And besides driving truck, did you
2  operate any other equipment before coming to Road &
3  Bridge?
4     A.  Several pieces, yes.
5     Q.  What pieces of equipment did you run
6  before coming to Road & Bridge?
7     A.  I've operated scrapers, skid steers, from
8  the little skid steers to the big skid tears,
9  tractors, loaders, backhoes, excavators, a little
10 bit of grader work, several trucks.
11    Q.  Who did you run that equipment for?
12    A.  I started out with Rodriguez Farms when I
13 was 13, and then I worked for G.K. Construction,
14 and then just various equipment through the John
15 Deere dealership there in Powell.
16    Q.  Were you hired on -- let me back up.  Do
17 you recall what pay rate you were hired on as?
18    A.  I want to say 13 or 14 something an hour,
19 something like that.
20    Q.  Do you know if that was an equipment
21 operator 1 or 2?
22    A.  It would have been 1.
23    Q.  And when you were hired on, did you
24 already know how to run a bulldozer?
25    A.  I was acquainted with them just from

7

1  working with G.K.  I was a mechanic for them, so I
2  operated some of their equipment.
3     Q.  And what about did you need any training
4  on the sweep?
5     A.  No.  It's a pretty straightforward piece
6  of machinery.
7     Q.  When you hired on with Road & Bridge, was
8  there any equipment you needed training on when you
9  were hired?
10    A.  I had a little bit of training with Chris
11 Carter on the blade.
12    Q.  And by blade, do you mean the road
13 grader?
14    A.  Yes.
15    Q.  And what's your current position with
16 Road & Bridge?
17    A.  As far as what?  Operator 1, 2, 3?
18    Q.  Yes.
19    A.  I think my paycheck says operator 2.  We
20 have a callout sheet with our radio numbers on
21 there.  It says operator 3 on there, so I don't
22 really know.
23    Q.  So you're saying your callout sheet says
24 operator 3, but you think you're getting paid as
25 operator 2?

8

1     A.  Yes, or vice versa.
2        MR. THOMPSON:  Counsel, just for the
3  record, the Exhibit 13 shows him as an operator 2.
4        MR. KELLER:  Okay.  Thank you.
5  BY MR. KELLER:
6     Q.  So all together, how many years of
7  equipment operating experience do you have?
8     A.  I have to do the math.  I started running
9  equipment when I was 13, and I'm 59 now.  I'll be
10 59 in May.
11    Q.  And you were working at the Powell shop
12 when Starkie Cornett transferred over?
13    A.  Yes.
14    Q.  Do you have the opportunity to observe
15 her operate equipment?
16    A.  Yes.
17    Q.  What kind of equipment did you observe
18 her operate?
19    A.  I've seen her run the snowplow, end dump,
20 belly dump, the loader, the broom and the mower,
21 and she's run the grader a little bit.  And I think
22 that's about it.  That's all I can recall.
23    Q.  Have you seen her run the dozer?
24    A.  I've not seen her run the dozer, no.
25    Q.  What about the roller?

9

1     A.  Yes, yes.
2     Q.  Chip spreader?
3     A.  Not -- no.
4     Q.  Water truck?
5     A.  Yes.
6     Q.  What would you consider a competent
7  equipment operator?
8        MR. THOMPSON:  Objection as to form.  Go
9  ahead and answer if you can.
10    A.  What --
11 BY MR. KELLER:
12    Q.  What would you consider to be a competent
13 equipment operator?
14       MR. THOMPSON:  Same objection.
15       THE DEPONENT:  Go ahead and answer?
16       MR. THOMPSON:  Yes.
17    A.  Somebody that can do a competent job, I
18 guess, get the job completed and not tear anything
19 up.
20 BY MR. KELLER:
21    Q.  And from the list of equipment that we've
22 mentioned that you had observed Star operating, do
23 you believe she's a competent equipment operator?
24    A.  On those pieces that we just talked
25 about, yes.

10

1    **Q.**    And when Star came to the Powell shop,
2    was she doing the same jobs as the other operators
3    within the Powell shop?
4    **A.**    I don't recall.  That's been a long time
5    ago.
6    **Q.**    Do you believe she had the skill to do
7    the same work as the other equipment operators in
8    the shop?
9         MR. THOMPSON:  Objection as to form,
10    foundation.
11    **A.**    Now, whatever she run she's good at.
12    Then, I don't remember.  I don't know.
13    BY MR. KELLER:
14    **Q.**    I'm trying to think on how to reword
15    that.  So we've gone through the equipment.  So
16    what's a typical job for Road & Bridge?
17    **A.**    What do we do on a daily basis?
18    **Q.**    Yes.
19    **A.**    Oh, it just depends on that particular
20    day.  We can be doing anything from plowing snow to
21    hauling gravel.  There's all kinds of things we do
22    in a given day.
23    **Q.**    So let's talk about snow.  So during the
24    winter, what are most of the jobs that you do
25    during the winter?

11

1    **A.**    Snow removal, yeah.
2    **Q.**    And is that something that Star does?
3    **A.**    Yes.
4         MR. THOMPSON:  It takes up 11 months out
5    of the year.
6         THE DEPONENT:  No, no.  Well, it depends
7    I suppose on any given year, yeah.
8    BY MR. KELLER:
9    **Q.**    And the laying sand?
10    **A.**    Putting sand down when we plow, yeah.
11    **Q.**    And then once we finally do get to
12    construction season and the snow melts, what are
13    the typical jobs that Road & Bridge does?
14    **A.**    Well, over the wintertime, there's some
15    things that get neglected, so we go in and do those
16    things in the spring.  Like we build up roads with
17    pit run, haul pit run to the grader operators, and
18    then sometimes, not always, we'll put crushed
19    material over the top, put culverts in, trim trees.
20    Sometimes we do maintenance that gets neglected
21    through the winter in the shop.
22    **Q.**    So in regards to building up the roads,
23    what pieces of equipment are used for building up
24    the roads?
25    **A.**    Well, there's a loader at the pit to load

12

1    the material.  There's a grader on site, a roller,
2    a water truck sometimes.  And a belly dump's just
3    hauled to the grader operator or an end dump,
4    depending on what we need.  And we dump the
5    material, and the guy spreads it out and keep
6    going.
7    **Q.**    And are those jobs you've observed Star
8    Cornett doing?
9    **A.**    Yeah, yes.
10    **Q.**    As well as the other operators?
11    **A.**    Yes.
12    **Q.**    And what about mowing?
13    **A.**    What do you want to know?
14         MR. THOMPSON:  What's the question?
15    BY MR. KELLER:
16    **Q.**    I guess the same thing.  That's a typical
17    job done during the summer?
18    **A.**    Yeah.  It can be, yeah.  It keeps the
19    roads from drifting, yes.
20    **Q.**    And running the broom and sweep, is that
21    a summer job as well?
22    **A.**    A lot in the spring to scoop the sand off
23    the intersections and things, and there's some in
24    the summer after we chip seal.
25    **Q.**    And those are also jobs that Starkie

13

1    Cornett does?
2    **A.**    Yes.
3    **Q.**    I want to switch gears here a bit.  Do
4    you understand what compensation time is?
5    **A.**    Comp time, yeah.
6    **Q.**    Can you explain what compensation time
7    is?
8    **A.**    It's kind of a tradeoff for overtime.
9    You get extra time instead of extra pay for days
10    off.
11    **Q.**    And who explained to you what
12    compensation time was?
13    **A.**    Nobody.  I just kind of knew, I guess, or
14    at least I thought I did.  Maybe I don't.
15    **Q.**    Have you observed Starkie Cornett
16    requesting compensation time?
17    **A.**    I don't know.  I don't know what people
18    ask for.
19    **Q.**    Is that something that you've asked for?
20    **A.**    I've never asked for comp time.
21    **Q.**    Do you know if Del Ray Paco ever allows
22    Starkie Cornett to have compensation time?
23         MR. THOMPSON:  Objection as to form and
24    foundation.  Go ahead and answer.
25    **A.**    Ask the question again, please.

14

BY MR. KELLER:

Q.   Do you know if Del Ray Paco denies Starkie Cornett?

A.   Not firsthand, I don't know.

Q.   Do you do your own inspection for maintenance for equipment?

A.   Yes.

Q.   And is that standard procedure for everybody in the shop?

A.   Yes.

Q.   Have you observed Starkie Cornett being instructed to have someone else inspect her equipment for her?

MR. THOMPSON:  Objection as to form.

A.   No.

BY MR. KELLER:

Q.   And if you find something wrong with your equipment, what's the typical procedure for having it fixed?

A.   If it's something straightforward, we'll do it ourselves.

Q.   Have you ever observed Starkie Cornett being told that she can't fix something herself?

A.   I've not seen it.

Q.   What if it's something that you can't fix

15

yourself?

A.   Then we tell Paco, and he'll tell Mike or Jason.

Q.   Do you call the mechanic yourself?

A.   Not Jason.  We have in the past.

Q.   So in the past, you would call the mechanic directly?

A.   With the previous supervisors, the previous foremans, we did.

Q.   When did it change?

MR. THOMPSON:  Objection as to form, misstates his testimony.

A.   Change is a harsh word.  But when Paco took over, he just wants to be left in the loop.

BY MR. KELLER:

Q.   And your nickname is Snuf, correct?

A.   Yes.

Q.   How did you get your nickname?

A.   What does that matter?

Q.   I just -- humor me.  So where does the name come from?

A.   I used to look like the character in the funny papers named Snuffy Smith when I was a little boy.

Q.   And have you ever heard Paco call Star

16

sweetie?

A.   No.

Q.   Have you heard rumors about Star sleeping with Kristofer Cooper?

A.   No.

Q.   And coming in here today, do you have any fear for retribution from any of your supervisors?

A.   No.

MR. KELLER:  I'm going to take a few minutes, if you don't mind, Tom.

(Whereupon, there was a pause in the proceedings.)

BY MR. KELLER:

Q.   Going back to the compensation time, do you know of anybody else that asked for compensation -- overtime to get compensation time?

A.   Yes.

Q.   Who does that?

A.   Oh, currently Tim Morrison asks for overtime or comp time and maybe others.  I don't know.

Q.   And do you know if they're granted that?

A.   What?

Q.   Do you know if they're granted that request?

17

A.   I assume so.  They need help with the landfill over here, so everybody is kind of given an opportunity.

Q.   I didn't hear that last part.

A.   There's a project at the landfill, and we were all offered that comp time.  And Tim has taken him up on it, so good for him.

Q.   Do you know if that compensation time was offered to Starkie Cornett as well?

A.   I think it was offered to everybody because it was brought up at the break table.  It seemed like it was brought up one afternoon that the landfill had been granted the okay to work some OT and comp time if you want it.

Q.   Have you ever seen Del Ray Paco treat Star differently than the rest of the crew?

A.   I've never seen it with my own eyes, no.

Q.   Have you ever heard Del Ray Paco state that women shouldn't be working on construction or in equipment?

A.   No.

MR. KELLER:  I don't have any further questions, Tom.

MR. THOMPSON:  I don't have any.  We'll read and sign.

18

1          (Whereupon, the deposition was concluded
2     at 10:31 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

19

1                CERTIFICATE OF WITNESS
2          I, KELLY J. TRIPLETT, being first duly
3     sworn, depose and say:
4          That I am the witness named in the
5     foregoing deposition consisting of pages 1 through
6     17; that I have read said deposition and know the
7     contents thereof; that the questions contained
8     therein were propounded to me; and that the answers
9     therein contained are true and correct except for
10    any changes that I may have listed on the Change
11    Sheet attached hereto.
12         Dated this_____day of_____2024.
13
14
15         _____
16                KELLY J. TRIPLETT
17
18         SUBSCRIBED AND SWORN to before me this
19    _____day of_____2024.
20
21         _____
22              NAME OF NOTARY PUBLIC
23              NOTARY PUBLIC FOR _____
24              RESIDING AT _____
25              MY COMMISSION EXPIRES _____

20

1     CHANGE SHEET FOR KELLY J. TRIPLETT
2     PAGE   LINE   READS        SHOULD READ        REASON
3                                                  FOR CHANGE
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25          KELLY J. TRIPLETT

21

1                REPORTER'S CERTIFICATE
2
      STATE OF WYOMING      )
3                           ) SS.
      COUNTY OF JOHNSON     )
4
5          I, Joan F. Marshall, a Notary Public in
6     and for the State of Wyoming, residing at Buffalo,
      County of Johnson, State of Wyoming, and a Court
      Reporter, do hereby certify:
7          That on the 23rd day of April 2024, at
      10:05 a.m., there appeared before me KELLY J.
8     TRIPLETT, pursuant to notice and stipulation of
      counsel, as a witness in the foregoing cause;
9          That pursuant to stipulation of counsel,
      said witness was first duly sworn by me to tell the
10    truth, the whole truth, and nothing but the truth
      as he testified in said cause, and said witness was
11    thereupon examined orally by counsel and made
      answer thereto, under oath, as hereinabove
12    contained;
           That the foregoing testimony was taken by
13    me in stenograph and thereafter reduced to
      typewriting by me or under my supervision, and the
14    foregoing 17 pages contain a full, true and correct
      record of all the testimony given by the witness,
15    to the best of my ability;
           That the reading and signing of the
16    deposition were expressly requested;
           That I am not a relative or employee or
17    attorney or counsel of any of the parties in said
      cause, nor am I a relative or employee of such
18    attorney or counsel, nor am I financially
      interested in the action, nor am I a relative of
19    any person interested in said action.
           IN WITNESS WHEREOF, I have hereunto set my
20    hand and seal this 30th day of April 2024.
21
22         _____
           JOAN F. MARSHALL, C.S.R.
23         Notary Public
           196 Links Lane
24         Buffalo, Wyoming 82834
25
      My Commission expires August 24, 2029.

**fear** [1] - 16:7
**few** [1] - 16:9
**finally** [1] - 11:11
**financially** [1] - 21:18
**fine** [1] - 4:21
**Firm** [1] - 2:4
**first** [3] - 4:14, 19:2, 21:9
**firsthand** [1] - 14:4
**fix** [2] - 14:23, 14:25
**fixed** [1] - 14:19
**following** [1] - 4:11
**FOR** [4] - 1:1, 19:22, 20:1, 20:2
**foregoing** [4] - 19:5, 21:8, 21:12, 21:14
**foremans** [1] - 15:9
**form** [5] - 9:8, 10:9, 13:23, 14:14, 15:11
**foundation** [2] - 10:10, 13:24
**fuel** [1] - 5:24
**full** [1] - 21:14
**funny** [1] - 15:23

**G**

**G.K** [2] - 6:13, 7:1
**gears** [1] - 13:3
**given** [4] - 10:22, 11:7, 17:2, 21:14
**Government** [1] - 2:9
**grader** [6] - 6:10, 7:13, 8:21, 11:17, 12:1, 12:3
**granted** [3] - 16:22, 16:24, 17:13
**gravel** [1] - 10:21
**guess** [3] - 9:18, 12:16, 13:13
**guy** [1] - 12:5

**H**

**hand** [1] - 21:20
**harsh** [1] - 15:13
**haul** [1] - 11:17
**hauled** [1] - 12:3
**hauling** [1] - 10:21
**hear** [1] - 17:4
**heard** [3] - 15:25, 16:3, 17:18
**help** [1] - 17:1
**hereby** [1] - 21:6
**hereinabove** [1] - 21:11
**hereto** [1] - 19:11
**hereunto** [1] - 21:19

**herself** [1] - 14:23
**Highway** [1] - 4:4
**hired** [5] - 6:16, 6:17, 6:23, 7:7, 7:9
**Horn** [2] - 5:22, 5:23
**hour** [1] - 6:18
**humor** [1] - 15:20

**I**

**IN** [2] - 1:1, 21:19
**inspect** [1] - 14:12
**inspection** [1] - 14:5
**instead** [1] - 13:9
**instructed** [1] - 14:12
**interested** [2] - 21:18, 21:19
**intersections** [1] - 12:23

**J**

**Jason** [2] - 15:3, 15:5
**Joan** [2] - 4:6, 21:5
**JOAN** [1] - 1:23, 21:22
**job** [5] - 9:17, 9:18, 10:16, 12:17, 12:21
**jobs** [5] - 10:2, 10:24, 11:13, 12:7, 12:25
**John** [1] - 6:14
**JOHNSON** [1] - 21:3
**Johnson** [1] - 21:6

**K**

**keep** [1] - 12:5
**keeps** [1] - 12:18
**KELLER** [15] - 2:3, 4:18, 8:4, 8:5, 9:11, 9:20, 10:13, 11:8, 12:15, 14:1, 14:16, 15:15, 16:9, 16:13, 17:22
**Keller** [3] - 2:4, 3:3, 4:20
**Kelly** [2] - 4:19, 4:21
**KELLY** [9] - 1:14, 3:2, 4:1, 4:13, 19:2, 19:15, 20:1, 20:25, 21:7
**kind** [4] - 8:17, 13:8, 13:13, 17:2
**kinds** [1] - 10:21
**Kristofer** [1] - 16:4

**L**

**landfill** [3] - 17:2, 17:5, 17:13
**Lane** [1] - 21:23
**last** [1] - 17:4
**Law** [3] - 2:3, 2:4, 2:8
**laying** [1] - 11:9
**least** [1] - 13:14
**left** [1] - 15:14
**legal** [1] - 5:1
**legal-wise** [1] - 5:1
**Liability** [1] - 2:9
**lie** [1] - 4:24
**LINE** [1] - 20:2
**Links** [1] - 21:23
**list** [1] - 9:21
**listed** [1] - 19:10
**load** [1] - 11:25
**loader** [2] - 8:20, 11:25
**loaders** [1] - 6:9
**Local** [1] - 2:9
**look** [1] - 15:22
**loop** [1] - 15:14

**M**

**machinery** [1] - 7:6
**maintenance** [2] - 11:20, 14:6
**marked** [1] - 3:5
**MARSHALL** [3] - 1:23, 2:3, 21:22
**Marshall** [3] - 4:6, 4:19, 21:5
**material** [3] - 11:19, 12:1, 12:5
**math** [1] - 8:8
**matter** [1] - 15:19
**mean** [2] - 4:23, 7:12
**mechanic** [3] - 7:1, 15:4, 15:7
**meeting** [1] - 5:7
**melts** [1] - 11:12
**mentioned** [1] - 9:22
**Mike** [1] - 15:2
**mind** [1] - 16:10
**minutes** [1] - 16:10
**misstates** [1] - 15:12
**months** [1] - 11:4
**Morrison** [1] - 16:19
**most** [1] - 10:24
**mower** [1] - 8:20
**mowing** [1] - 12:12
**MR** [27] - 2:3, 2:24, 4:18, 8:2, 8:4, 8:5, 9:8, 9:11, 9:14, 9:16,

9:20, 10:9, 10:13, 11:4, 11:8, 12:14, 12:15, 13:23, 14:1, 14:14, 14:16, 15:11, 15:15, 16:9, 16:13, 17:22, 17:24
**MY** [1] - 19:24

**N**

**name** [2] - 4:19, 15:21
**NAME** [1] - 19:21
**named** [2] - 15:23, 19:4
**need** [3] - 7:3, 12:4, 17:1
**needed** [1] - 7:8
**neglected** [2] - 11:15, 11:20
**never** [2] - 13:20, 17:17
**nickname** [2] - 15:16, 15:18
**nobody** [1] - 13:13
**NOTARY** [2] - 19:21, 19:22
**Notary** [4] - 1:24, 4:6, 21:5, 21:23
**nothing** [2] - 4:15, 21:10
**notice** [1] - 21:8
**numbers** [1] - 7:20

**O**

**oath** [3] - 4:23, 21:11
**objection** [6] - 9:8, 9:14, 10:9, 13:23, 14:14, 15:11
**observe** [2] - 8:14, 8:17
**observed** [5] - 9:22, 12:7, 13:15, 14:11, 14:22
**OF** [11] - 1:1, 1:6, 1:7, 1:14, 1:15, 3:2, 4:1, 19:1, 19:21, 21:2, 21:3
**of_____2024** [1] - 19:12
**of_____ _____2024** [1] - 19:19
**offered** [3] - 17:6, 17:9, 17:10
**ON** [1] - 1:15
**once** [1] - 11:11
**one** [1] - 17:12
**op** [2] - 5:22, 5:23

**operate** [3] - 6:2, 8:15, 8:18
**operated** [2] - 6:7, 7:2
**operating** [2] - 8:7, 9:22
**operator** [11] - 6:21, 7:17, 7:19, 7:21, 7:24, 7:25, 8:3, 9:7, 9:13, 9:23, 12:3
**operators** [4] - 10:2, 10:7, 11:17, 12:10
**opportunity** [2] - 8:14, 17:3
**orally** [1] - 21:11
**OT** [1] - 17:14
**ourselves** [1] - 14:21
**overtime** [3] - 13:8, 16:16, 16:20
**own** [2] - 14:5, 17:17

**P**

**P.C** [1] - 2:4
**P.O** [1] - 2:4
**Paco** [7] - 13:21, 14:2, 15:2, 15:13, 15:25, 17:15, 17:18
**PAGE** [1] - 3:2, 20:2
**pages** [2] - 19:5, 21:14
**paid** [1] - 7:24
**papers** [1] - 15:23
**PARK** [2] - 1:6, 1:7
**Park** [4] - 4:3, 5:10, 5:20
**part** [1] - 17:4
**particular** [1] - 10:19
**parties** [1] - 21:17
**past** [2] - 15:5, 15:6
**pause** [1] - 16:11
**pay** [2] - 6:17, 13:9
**paycheck** [1] - 7:19
**pending** [1] - 4:8
**people** [1] - 13:17
**person** [1] - 21:19
**piece** [1] - 7:5
**pieces** [4] - 6:4, 6:5, 9:24, 11:23
**pit** [3] - 11:17, 11:25
**Plaintiff** [3] - 1:4, 2:6, 4:2
**PLAINTIFF** [1] - 1:15
**plow** [1] - 11:10
**plowing** [1] - 10:20
**Pool** [1] - 2:9
**position** [1] - 7:15
**potential** [1] - 5:1
**Powell** [6] - 5:14, 5:15, 6:15, 8:11, 10:1, 10:3

**prefer** [1] - 4:20
**preparation** [1] - 5:5
**present** [1] - 2:13
**pretty** [1] - 7:5
**previous** [2] - 15:8, 15:9
**previously** [1] - 3:5
**procedure** [2] - 14:8, 14:18
**proceedings** [1] - 16:12
**project** [1] - 17:5
**propounded** [1] - 19:8
**PUBLIC** [3] - 1:8, 19:21, 19:22
**Public** [5] - 1:24, 4:3, 4:6, 21:5, 21:23
**pursuant** [2] - 21:8, 21:9
**put** [2] - 11:18, 11:19
**putting** [1] - 11:10

**Q**

**questions** [2] - 17:23, 19:7
**QUESTIONS** [1] - 4:18

**R**

**radio** [1] - 7:20
**ramifications** [1] - 5:1
**rate** [1] - 6:17
**Ray** [4] - 13:21, 14:2, 17:15, 17:18
**read** [2] - 17:25, 19:6
**READ** [1] - 20:2
**reading** [1] - 21:15
**READS** [1] - 20:2
**really** [1] - 7:22
**REASON** [1] - 20:2
**record** [2] - 8:3, 21:14
**reduced** [1] - 21:13
**REFERRED** [1] - 3:5
**regards** [1] - 11:22
**relating** [1] - 4:15
**relative** [3] - 21:16, 21:17, 21:18
**remember** [1] - 10:12
**removal** [1] - 11:1
**REPORTED** [1] - 1:22
**Reporter** [2] - 4:6, 21:6
**REPORTER 'S** [1] - 21:1
**Reporting** [1] - 4:5
**request** [1] - 16:25
**requested** [1] - 21:16

**requesting** [1] - 13:16
**RESIDING** [1] - 19:23
**residing** [1] - 21:5
**rest** [1] - 17:16
**retribution** [1] - 16:7
**reword** [1] - 10:14
**road** [1] - 7:12
**ROAD** [1] - 1:7
**Road** [9] - 2:10, 5:11, 5:20, 6:2, 6:6, 7:7, 7:16, 10:16, 11:13
**roads** [4] - 11:16, 11:22, 11:24, 12:19
**Rodriguez** [1] - 6:12
**roller** [2] - 8:25, 12:1
**Room** [1] - 4:4
**rumors** [1] - 16:3
**run** [10] - 6:5, 6:11, 6:24, 8:19, 8:21, 8:23, 8:24, 10:11, 11:17
**running** [2] - 8:8, 12:20

**S**

**sand** [3] - 11:9, 11:10, 12:22
**scoop** [1] - 12:22
**scrapers** [1] - 6:7
**seal** [2] - 12:24, 21:20
**season** [1] - 11:12
**Service** [1] - 4:5
**set** [1] - 21:19
**several** [2] - 6:4, 6:10
**Sheet** [1] - 19:11
**sheet** [2] - 7:20, 7:23
**SHEET** [1] - 20:1
**shop** [9] - 5:13, 5:14, 5:16, 8:11, 10:1, 10:3, 10:8, 11:21, 14:9
**SHOULD** [1] - 20:2
**shows** [1] - 8:3
**sign** [1] - 17:25
**signing** [1] - 21:15
**Sisters** [1] - 4:5
**site** [1] - 12:1
**skid** [3] - 6:7, 6:8
**skill** [1] - 10:6
**sleeping** [1] - 16:3
**Smith** [1] - 15:23
**snow** [4] - 10:20, 10:23, 11:1, 11:12
**snowplow** [1] - 8:19
**Snuf** [2] - 4:21, 15:16
**Snuffy** [1] - 15:23
**someone** [1] - 14:12
**sometimes** [1] -

11:18, 11:20, 12:2
**South** [1] - 4:4
**spreader** [1] - 9:2
**spreads** [1] - 12:5
**spring** [2] - 11:16, 12:22
**SS** [1] - 21:3
**standard** [1] - 14:8
**Star** [7] - 9:22, 10:1, 11:2, 12:7, 15:25, 16:3, 17:16
**Starkie** [9] - 2:13, 8:12, 12:25, 13:15, 13:22, 14:3, 14:11, 14:22, 17:9
**STARKIE** [1] - 1:3
**start** [1] - 5:18
**started** [2] - 6:12, 8:8
**state** [1] - 17:18
**State** [3] - 4:7, 21:5, 21:6
**STATE** [1] - 21:2
**STATES** [1] - 1:1
**States** [1] - 4:8
**steers** [2] - 6:7, 6:8
**stenograph** [1] - 21:13
**stipulation** [2] - 21:8, 21:9
**straightforward** [2] - 7:5, 14:20
**SUBSCRIBED** [1] - 19:18
**Summary** [1] - 3:6
**summer** [3] - 12:17, 12:21, 12:24
**supervision** [1] - 21:13
**supervisors** [2] - 15:8, 16:7
**suppose** [1] - 11:7
**sweep** [2] - 7:4, 12:20
**sweetie** [1] - 16:1
**switch** [1] - 13:3
**sworn** [4] - 4:14, 4:22, 19:3, 21:9
**SWORN** [1] - 19:18

**T**

**table** [1] - 17:11
**TAKEN** [1] - 1:15
**tear** [1] - 9:18
**tears** [1] - 6:8
**testified** [1] - 21:10
**TESTIMONY** [1] - 3:2
**testimony** [4] - 4:11, 15:12, 21:12, 21:14
**THE** [7] - 1:1, 1:1, 1:7,

1:15, 4:1, 9:15, 11:6
**thereafter** [1] - 21:13
**therein** [2] - 19:8, 19:9
**thereof** [1] - 19:7
**thereto** [1] - 21:11
**THEREUPON** [1] - 4:11
**thereupon** [1] - 21:11
**Thermopolis** [1] - 2:4
**this_____day** [1] - 19:12
**THOMAS** [1] - 2:8
**THOMPSON** [12] - 2:8, 8:2, 9:8, 9:14, 9:16, 10:9, 11:4, 12:14, 13:23, 14:14, 15:11, 17:24
**Tim** [2] - 16:19, 17:6
**today** [2] - 5:4, 16:6
**together** [1] - 8:6
**Tom** [3] - 5:6, 16:10, 17:23
**took** [1] - 15:14
**top** [1] - 11:19
**tractors** [1] - 6:9
**tradeoff** [1] - 13:8
**training** [3] - 7:3, 7:8, 7:10
**transferred** [1] - 8:12
**treat** [1] - 17:15
**trees** [1] - 11:19
**trim** [1] - 11:19
**Triplett** [1] - 4:19
**TRIPLETT** [9] - 1:14, 3:2, 4:1, 4:13, 19:2, 19:15, 20:1, 20:25, 21:8
**truck** [5] - 5:24, 5:25, 6:1, 9:4, 12:2
**trucks** [1] - 6:10
**true** [2] - 19:9, 21:14
**truth** [6] - 4:14, 4:15, 21:10
**trying** [1] - 10:14
**Two** [1] - 4:5
**typewriting** [1] - 21:13
**typical** [4] - 10:16, 11:13, 12:16, 14:18

**U**

**under** [2] - 21:11, 21:13
**United** [1] - 4:8
**UNITED** [1] - 1:1
**up** [9] - 6:16, 9:19, 11:4, 11:16, 11:22, 11:23, 17:7, 17:11, 17:12

**V**

**various** [1] - 6:14
**versa** [1] - 8:1
**vice** [1] - 8:1
**vs** [1] - 1:5

**W**

**Wage** [1] - 3:6
**wants** [1] - 15:14
**water** [2] - 9:4, 12:2
**WHEREOF** [1] - 21:19
**whole** [2] - 4:15, 21:10
**winter** [3] - 10:24, 10:25, 11:21
**wintertime** [1] - 11:14
**wise** [1] - 5:1
**wit** [1] - 4:12
**WITNESS** [2] - 19:1, 21:19
**witness** [5] - 19:4, 21:8, 21:9, 21:10, 21:14
**women** [1] - 17:19
**word** [1] - 15:13
**WORKS** [1] - 1:8
**Works** [1] - 4:3
**WYOMING** [3] - 1:1, 1:16, 21:2
**Wyoming** [9] - 2:5, 2:9, 2:10, 4:5, 4:7, 4:9, 21:5, 21:6, 21:24

**Y**

**year** [2] - 11:5, 11:7
**years** [1] - 8:6
**Yellowtail** [1] - 2:10
**yourself** [2] - 15:1, 15:4

EXHIBIT 10A

TIM MORRISON DEPOSITION TRANSCRIPT

Page 1

1               IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF WYOMING

3

4    STARKIE CORNETT,                  )
                                       )
5         Plaintiff,                   )
                                       )
6    V.                                )  22-CV-00034
                                       )
7    PARK COUNTY BOARD OF COUNTY       )
     COMMISSIONERS and PARK COUNTY     )
8    ROAD AND BRIDGE DIVISION OF       )
     THE PUBLIC WORKS DEPARTMENT,      )
9                                      )
          Defendants.                  )
10   _____)

11
     March 14, 2024
12

13   Remote oral deposition of Tim Morrison conducted
     via Zoom in the State of Wyoming, commencing at
14   1:55 p.m. on the above date, before Barbara
     Morgenweck, Registered Professional Reporter,
15   Realtime Reporter and Notary Public.

16
                 MORGENWECK COURT REPORTING
17
                     307.250.0220 ph
18
              Barbcourtreporter@gmail.com
19

20

21

22

23

24

25

```
                                                          Page 2
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4
      Marshall E. Keller
 5    KELLER LAW FIRM, PC
      116 N 5th St
 6    Thermopolis, WY 82443
      (307)864-2318
 7    Marshall@kellerlawpc.com

 8
      On behalf of Defendant:
 9

10    Thomas A. Thompson
      MaryBeth Oatsvall
11    WYOMING LOCAL GOVERNMENT LIABILITY POOL
      6844 Yellowtail Road
12    Cheyenne, Wyoming 82009
      (307) 638-1911
13    (307) 638-6211 Facsimile
      Tthompson@lglp.net
14

15    Also Present:

16
      Brian Edwards
17

18

19

20

21

22

23

24

25
```

1                   EXAMINATION INDEX

2

3                                              PAGE:

4    Tim Morrison:

5         Examination by Mr. Keller           4

6

7

8                   INDEX TO EXHIBITS

9

     EXHIBIT:      DESCRIPTION              PAGE:
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1  TIMOTHY MORRISON,

2        Having first been duly sworn, testified

3  as follows:

4                   EXAMINATION.

5    Q.    Mr. Morrison, my name is Marshall

6  Keller.  Is there a -- for the record, can you

7  state your full name?

8    A.    Timothy Morrison.

9    Q.    I'm sorry.  Go ahead.

10   A.    Timothy Charles Wayne Morrison.

11   Q.    And Mr. Morrison, is there a name that

12  you prefer being called by?

13   A.    Tim is great.  I appreciate that.

14   Q.    I am going to go over a couple of

15  things.  One of them is a rule with the court

16  reporter, which I just broke.  So when we're

17  talking, it's kind of like playing catch.  I got

18  to wait for you to throw the ball, then I catch

19  it and you go back and forth, all right.  So by

20  that, what I mean is, when I speak, I will just

21  try to wait until I stop and give it a pause

22  before you give an answer, and I will try to do

23  the same, and then that way, we don't step over

24  each other.  And with technology it's kind of

25  tough sometimes because there is a lag.  It

Page 5

1  looks like someone is done talking and then it

2  picks back up.  Is that something you can agree

3  to do?

4     A.    You bet, I can do that.

5     Q.    Okay.  I will try to do my best as well.

6  The other is, and I am sure Tom will attest to

7  this at some point, but my questions can be

8  confusing sometimes, or if they sound perfectly

9  good to me, but they may not to you.  You may

10  not know what I'm talking about.  If that is the

11  case, just please let me know.  There is nothing

12  wrong with telling me that I have no idea what I

13  am asking and just I will try to re-ask the

14  question in a way that makes sense, okay?

15     A.    Okay.  Sounds good.

16     Q.    This has been brought up in all the

17  depositions as far as I can remember this week,

18  but you just took an oath.  Do you understand

19  what that oath meant?

20     A.    Yes, I do.

21     Q.    What does it mean to you?

22     A.    Means I am not going to lie to you, I am

23  going to tell you the truth.

24     Q.    By lying, that means that there is

25  possibility of what is considered committing

Page 6

1   perjury.  Do you understand what perjury is?

2     A.    I believe so, yes.

3     Q.    In your own words, what does it mean to

4   you -- perjury mean?

5     A.    Means not being truthful, being

6   dishonest.

7     Q.    You understand that for perjury that

8   there is potential legal consequences for

9   committing perjury?

10    A.    Yes.

11    Q.    All right.  So Tim, prior to working for

12  Park County Road & Bridge, what was your work

13  history?

14    A.    You want me to just start from Park

15  County and work backwards, or start from my work

16  history and work towards Park County?

17    Q.    Well, you can go ahead and work

18  backwards.

19    A.    Okay.  So before I got hired by Park

20  County Road & Bridge, I worked for the City of

21  Cody up here in Cody, for three years before

22  that.  I was firefighter for Loveland Fire

23  Rescue Authority down in Loveland, Colorado for

24  nine years.  Before that, I worked for the City

25  of Loveland in the streets department operating

Page 7

1    heavy equipment.

2            Before, I want to say five years, five

3    or six years, and before that, I worked for --

4    the company had changed names several times, but

5    it is basically the same asphalt company.  I

6    worked for Lafarge Northern and it was before

7    that, it was Western Mobile, but it was the same

8    company.  They just changed names.  They were

9    bought by -- different companies bought them

10   out, so I worked there for five or six years.

11           And before that, I worked for another

12   asphalt company, and then I was in the Navy for

13   four years also.  That takes it basically back

14   to the beginning of, you know, once I graduated

15   high school.

16   Q.     When you were working for -- before Road

17   & Bridge, for Cody, what equipment did you run

18   for Cody?

19   A.     I operated their road graders, dump

20   trucks, rollers, loaders, their paint trucks,

21   fairly certain I might be missing something, but

22   the equipment that they had was everything I

23   operated.  I operated their loaders, their

24   graders, their dump trucks.  I plowed snow, I

25   maintained all the alleys -- gravel alleys in

Page 8

1   Cody, skid steer.  I worked skid steer, backhoe.

2   I'm trying to remember all the equipment I

3   operated.  I think that about rounds it out for

4   you.

5      Q.    As far as operating the grader for Cody,

6   what type of work were you using the grader for?

7      A.    Maintaining a couple of -- we had a

8   couple of different gravel roads.  They weren't

9   terribly long, but we had gravel roads we

10  maintained.  I took care of all the alleys.  All

11  the alleys in Cody are gravel except for maybe

12  two or three, so I graded all the alleys and

13  made sure they were in good condition.

14     Q.    What about for snow removal?

15     A.    I ran a road grader plowing Main Street,

16  basically, when we got heavy snows.  They had me

17  on Sheridan Avenue plowing the snow from curb to

18  curb to the center of the road and any other

19  streets I was directed to go to.

20     Q.    Is there a difference between

21  maintaining the alley ways versus the county

22  roads as far as how the -- well, just in the

23  maintenance?

24     A.    There is a little bit of difference,

25  yes.  Most of the alleys don't have borrow pits

Page 9

1   where you grab the material out of the ditch and

2   put it back into the road.  The alleys were

3   basically flat, so I would grade the material

4   from one side.  I would carry it back and forth

5   until I got it back into the road the way I

6   wanted it to turn out.

7       Q.    And when you're with the Loveland Fire

8   Department, was there any equipment you ran with

9   the fire department?

10      A.    I operated every fire truck they owned,

11  and I also plowed snow for the City of Loveland

12  on my off days when I wasn't a fireman, and that

13  was either with a grader or a snowplow and plow

14  truck.

15      Q.    And then you -- for Lafarge, well, yeah

16  you said there were two asphalt companies?

17      A.    Yep.  There was Lafarge.  I went to work

18  for Lafarge after I got out of the military.

19  Before that it was called Sterling Companies.

20  That was right out of high school.  I went to

21  work for Sterling Companies doing asphalt work,

22  and then I went in the military.  And when I got

23  out of the military to supplement going to

24  college, I went and got hired back with the

25  company and it changed names.

Page 10

1    Q.    Were you running equipment when you were

2    working for Lafarge?

3    A.    Yes, I was.

4    Q.    What equipment were you operating with

5    Lafarge?

6    A.    Backhoe, landscape tractor, I think up

7    here in Wyoming people call them skip loaders.

8    It's a tractor with a drag box on the back.

9    They are operated asphalt pavers, rollers.  I

10   also, when we were working, I traveled on a

11   highway paving crew.  When I did that, I

12   would -- they would take -- bring a motor grader

13   out to the job because we used to shoulder the

14   roads after we paved them, and I would operate

15   the grader in the pit maintaining the pit roads

16   and keeping -- just doing any odd jobs I could

17   find with the grader to do around the gravel pit

18   and the hot plant.

19   Q.    Did you operate a dozer at all?

20   A.    I did not.

21   Q.    Did you operate an excavator at all?

22   A.    No.

23   Q.    Had you operated a belly dump at all?

24         MR. THOMPSON:  Counsel, just for

25   clarification, are you talking about when he

1    worked for Lafarge or any time in his life?

2        MR. KELLER:  I will clarify that.

3    Thanks, Tom.

4    BY MR. KELLER:

5    Q.    So prior to working for Road & Bridge,

6    did you operate a dozer?

7    A.    I did for the City of Cody for about a

8    half an hour.

9    Q.    Prior to working for Road & Bridge, had

10   you operated an excavator?

11   A.    Yes.

12   Q.    Where did you operate the excavator at?

13   A.    The City of Cody.

14   Q.    Prior to working for Road & Bridge, had

15   you operated a belly dump?

16   A.    Yes, I did.

17   Q.    Where did you operate that at?

18   A.    City of Cody and also Lafarge.

19   Q.    Prior to working for Road & Bridge, had

20   you operated an oil distributor?

21   A.    No.  I had been around them when I

22   worked in the asphalt industry, and I knew my

23   way around one fairly well, but I never operated

24   one, no.

25   Q.    Prior to working for Road & Bridge, had

Page 12

1    you operated the water tanker?

2    A.    Yes.

3    Q.    Who did you operate the water tanker

4    for?

5    A.    City of Cody and the City of Loveland

6    also.

7    Q.    Prior -- before Road & Bridge, had you

8    operated the mower?

9    A.    The mower?

10    Q.    Yeah?

11    A.    I have operated mowers for the City of

12    Loveland.

13    Q.    When you were hired on, did anybody

14    from -- or before you were hired on with Road &

15    Bridge, did anyone from Park County come out to

16    observe you operating equipment?

17    A.    No.

18    Q.    Do you know if -- when you left --

19    before you came over to Road & Bridge if your

20    super -- let me back up.

21         Who is your supervisor for the City of

22    Cody?

23    A.    Rob Kramer.

24    Q.    Do you know if Rob Kramer had given you

25    a recommendation for working at Road & Bridge?

Page 13

1    A.    No, Rob Kramer was upset that I was

2    leaving the City of Cody.

3    Q.    I will try to rephrase that.  Do you

4    know if Road & Bridge after you were -- if Road

5    & Bridge had verified your experience with the

6    City Park or the City of Cody?

7         MR. THOMPSON:  Objection to form,

8    foundation, speculation.  Answer if you can.

9    BY MR. KELLER:

10   Q.    I am just asking your knowledge.  Do you

11   know if they had verified your experience with

12   the City of Cody?

13   A.    I don't know.

14   Q.    And, Tim, I'm just going to tell you,

15   that's another rule I forgot to mention, if you

16   don't know something, you're perfectly fine

17   saying you don't know, okay?

18   A.    Okay.

19   Q.    I am not trying to catch you on

20   anything, I am just trying to gather

21   information, so that's fine.

22         So I am going to bring up Exhibit 16 and

23   Bate stamp 4001.  Is MaryBeth there to help out?

24         MR. KELLER:  Okay.  Thank you, Mary.

25         MR. THOMPSON:  I told you you're getting

Page 14

```
 1    a bill when this is over with.

 2            MR. KELLER:  I know.  I know.  That's

 3    what happens when I am working on this stuff.

 4    BY MR. KELLER:

 5    Q.    Tim, have you seen this picture before?

 6    A.    Yes.

 7    Q.    Can you tell me, do you know who took

 8    the picture?

 9    A.    I do not.

10    Q.    And what is in the picture?

11    A.    That would be a dump truck in the ditch.

12    Q.    Was that a dump truck you were driving?

13    A.    Yes, it was.

14    Q.    Where did this happen at?

15    A.    It's called 7RP in the Clark area.

16    Q.    When this happened, was -- I see a

17    grader in the background.  Is that -- am I

18    correct in saying that that's a grader back

19    behind the truck?

20    A.    Yes.

21    Q.    In your own words, can you tell me what

22    happened in this picture?

23    A.    The grader operator was laying out the

24    material in one lane, and I attempted to go

25    around him in the other lane of -- on the road,
```

Page 15

1    and the bank shoulder was soft, and the rear end

2    of the truck slid out from underneath me.

3        Q.    Okay.  Was there damage to the truck?

4        A.    Not caused by me.

5        Q.    I am just asking.  I mean, when this --

6    after this happened, was there damage?

7        A.    Yes.

8        Q.    What was the damage?

9        A.    The hoist that lifts the bed was broken

10   and one of the springs was broken.

11              MR. KELLER:  That's all the questions I

12   have about that, Tim.  I appreciate that.

13   Thanks.

14              You can go ahead and take that down.

15   Just one second, Tom.  I think that about wraps

16   it up on this.

17              MR. THOMPSON:  Okay.

18              (A recess was taken from 2:14 p.m. until

19   2:15 p.m.)

20              MR. KELLER:  Tom, that is all the

21   questions I have for Tim.

22              MR. THOMPSON:  I have no questions.  We

23   will go ahead and read and sign.

24              Barbara, you can send that to Brian as

25   with the other deposition transcripts.

Page 16

1                 (At 2:15 p.m. the matter was completed)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 17

1

2            WITNESS' SIGNATURE/CORRECTION PAGE

3

4   If there are any typographical errors to your

5   Deposition, please indicate them below.

6

7   PAGE/LINE

8   _____Change to_____

9   _____Change to_____

10  _____Change to_____

11  _____Change to_____

12  Any other changes to your Deposition are to be
    listed below with a statement as to the reason
13  for such change.

14  PAGE/LINE           CORRECTION   REASON FOR CHANGE

15  _____

16  _____

17  _____

18  _____

19  _____

20       I, TIM MORRISON, do hereby certify that I
    have read the foregoing pages of my testimony as
21  transcribed, and that the same is a true and
    correct record of the testimony given by me in
22  this Deposition on March 14, 2024, except for
    the changes made.

23

24  _____        _____
    Date Signed                TIM MORRISON
25

Page 18

1

2

3                              CERTIFICATE

4

5          I, Barbara Morgenweck, Registered
    Professional Reporter, and Certified Court

6   Reporter, do hereby certify that prior to the
    commencement of the examination the Deponent was
    duly sworn by me to testify to the truth, the

7   whole truth and nothing but the truth.
           I DO FURTHER CERTIFY that the foregoing is

8   a verbatim transcript of the testimony as taken
    stenographically by me at the time, place and on

9   the date hereinbefore set forth, to the best of
    my ability.

10         I DO FURTHER CERTIFY that I am neither a
    relative nor employee nor attorney nor counsel

11  of any of the parties to this action, and that I
    am neither a relative nor employee of such

12  attorney or counsel, and that I am not
    financially interested in the action.

13         Dated this 4th Day of April, 2024.

14

15

            *Barbara Morgenweck*

16

17         _____

    Barbara Morgenweck
18  COURT REPORTER
    Registered Professional Reporter
19  Certified Court Reporter NM # 526
    Notary Public
20

21

22

23

24

25